EXHIBIT 3

New Creative Mix Inc.
1515 Broadway
New York, NY 10036

March 7, 2011

Twelvesixty, LLC
P.O. Box 4420
Malibu, CA 90264
Attn: Robert Marderosian

Re: "Twelvesixty, LLC f/s/o Aron Marderosian and Robert Marderosian together p/k/a
"Heavy Young Heathens" Composer Agreement/Amendment # 1"

Dear Robert:

Reference is made to the agreement dated as of May 19, 2010 between New Remote Productions Inc. ("Company") on the one hand, and Twelvesixty, LLC ("Lender") for the services of Aron Marderosian, individually, ("AMardo") and Robert Marderosian, individually, ("RMardo") together the artists professionally known as "Heavy Young Heathens" (AMardo and RMardo are collectively referred to herein as "Composer"), on the other hand, with respect to the composer services of Composer ("Existing Agreement"). The Existing Agreement together with this amendment dated as of March 7, 2011 ("Amendment # 1") shall jointly be referred to as the "Agreement." Capitalized terms used herein without definition shall have the respective definition(s) ascribed thereto in the Existing Agreement.

Company and Composer hereby agree to modify the Existing Agreement as follows:

1.  This shall confirm that effective as of the date hereof, Company hereby transfers and assigns to New Creative Mix Inc. and New Creative Mix Inc. hereby accepts the transfer and assignment of, all of Company's right, title, interest and obligations in and to the Existing Agreement.

2.  Lender and Composer agree to execute Company's "Hype Music Library" master composer agreement (the "Hype Master Agreement"), attached hereto as Exhibit "A", in connection with the Compositions, Masters and/or any and all additional Materials delivered by Composer to Company under the Existing Agreement as directed by Company. In the event of any conflicts between the Existing Agreement and the Hype Master Agreement the terms of the Hype Master Agreement shall prevail, however, at all other times the terms and conditions of the Existing Agreement shall remain in full force and effect.

Except as otherwise expressly indicated above, all terms and conditions of the Agreement remain in full force and effect. Please sign below to indicate agreement with, and acceptance of, the terms of this Amendment #1. The parties may execute this Amendment #1 by signatures obtained through facsimile and/or e-mail PDF and signatures may be relied upon by the other party as valid as if they were signed in the presence of the other party. This Amendment #1 shall constitute a full and binding amendment between the parties.

[Signature page to follow]

506675

EXHIBIT 3.1

ACCEPTED AND AGREED:

TWELVESIXTY, LLC

By: _____ Henry Tony Hathaws
                        (Title)

Date: _3/29/11_

NEW CREATIVE MIX INC.

By: _____ SVP Music
                        (Title)

Date: _____

506675

EXHIBIT 3.2

EXHIBIT "A"
## HYPE MASTER AGREEMENT

Dated                    March 7, 2011

NEW CREATIVE MIX INC.

[♦]

---

BLANKET COMPOSER
AGREEMENT

---

506675

EXHIBIT 3.3

## Contents

| Clause | Page |
|---|---|
| 1 | Definitions ......................................................................................................... 1 |
| 2 | Rights .................................................................................................................. 3 |
| 3 | Warranties and Representations ...................................................................... 5 |
| 4 | Compensation ................................................................................................... 6 |
| 5 | Accounting ......................................................................................................... 7 |
| 6 | Legal Advice ...................................................................................................... 9 |
| 7 | Miscellaneous .................................................................................................... 9 |
| | Schedule A ...................................................................................................... 11 |

EXHIBIT 3.4

This **Agreement** is made on ......................................... March 7, 2011 **(Effective Date)**

### Between

(1)   New Creative Mix Inc., whose principal place of business is at 1515 Broadway, New York, New York 10036 **(Company)**; and

(2)   Twelvesixty, LLC ("**Lender**") for the services of Aron Marderosian, individually, ("AMardo") and Robert Marderosian, individually, ("RMardo") together the artists professionally known as "Heavy Young Heathens" ("**Composer**"), on the other hand.

### Whereas

(A)   Company owns, operates and manages programming services and produces original programming for exhibition on such services and licenses Works (as defined in paragraph 2.1 below) for use by third parties.

(B)   The Composer is a composer, arranger, performer and producer of the Works (as defined in Clause 2.1 below).

### It is agreed

1      Definitions

1.1   **Composition(s)** shall have the meaning set forth in Clause 2.1.

1.2   **Blanket Licences** means all so-called "blanket licences" issued by or on behalf of Extreme to third parties entitling them to access and use a library of production/library music composed by various composers, where such composers include the Composer;

1.3   **Extreme** means The Extreme Music Library Limited whose principal place of business is at 30 Golden Square, London W1 9LD;

1.4   **Gross Receipts** means all monies (exclusive of value added tax) that are actually received by Extreme or Company, or credited to Extreme or Company against a prior advance, and that:

       (a)    represent the Relevant Share of Hype Music Blanket Licensing Income; or

       (b)    are, to the extent that such monies do not represent the Relevant Share of Hype Music Blanket Licensing Income, directly and identifiably attributable to the exploitation of the HM Works,

       it being acknowledged, without prejudice to the generality of the foregoing and without limitation, that Gross Receipts shall exclude: (A) any sub-publisher fees and commissions charged by affiliated or third-party sub-publishers; (B) any costs and expenses incurred by Company or Extreme in the exercise of the rights granted herein; (C) any foreign withholding taxes (where applicable) and (D) the so-called "writer's share" and

500622

EXHIBIT 3.5

"publisher's share" of public performance royalties (if any) as set forth in Clause 7.4 below;

1.5 **Hype Music Library** means the premium production music library currently named the "Hype Music Library", which library may be accessed by third party licensees in return for a license fee;

1.6 **Hype Music Blanket Licensed Compositions** means in respect of any Blanket Licences, the Hype Music Library compositions made available to third party licensees under such Blanket Licences;

1.7 **Hype Music Blanket Licensing Income** means Hype Music Library income from Blanket Licences;

1.8 **Masters** shall have the meaning set forth in Clause 2.1.

1.9 **MTVN** means MTV Networks, a division of Viacom International Inc., whose principal place of business is at 1515 Broadway, New York, New York 10036;

1.10 **Recording Costs** means all costs incurred in connection with the recording (including re-recording required by Company for creative or other reasons until final delivery to and acceptance by Company of the Works) and delivery of the Works (dub ready), including, without limitation, the costs of all studios, tape, instrument rentals, engineers, musicians and all other parties rendering services in connection with the musical material, cartage and related expenses, travel, accommodations and per diems; and

1.11 **Relevant Share** means, in respect of Hype Music Blanket Licensing Income, the share of Hype Music Blanket Licensing Income apportioned in respect of the Composer's compositions on the basis specified in Clause 7.3 below.

1.12 **Works** shall have the meaning set forth in Clause 2.1.

2      Services

2.1 Lender shall cause Composer to render services for Company as a composer and audio producer. These services shall include, without limitation, (a) writing, composing, arranging, orchestrating, conducting and delivering to Company suitable original musical material, whether consisting of lyrics and/or sound effects (**Compositions**) and performing, recording, producing, mixing, dubbing and delivering to Producer suitable original audio recordings of the Compositions (the **Masters** and together with the Compositions, the **Works**); (b) any and all services customarily provided by first class audio producers and composers; and (c) any and all other services Company requests. Company may employ or engage other persons or entities as composers, lyricists, arrangers, orchestrators, copyists, adapters or conductors and such other persons may, at Company's direction, modify, edit, adapt, re-record or make any other changes to the Works as requested by Company. All services provided hereunder shall be pursuant to the direction and control of Company and are subject to Company's approval in its sole discretion. For the avoidance of doubt, Company shall have the right to assign any or all

EXHIBIT 3.6

of Lender's and/or Composer's services and/or the results and proceeds thereof pursuant to Clause 8.2 below.   Notwithstanding anything to the contrary contained in this Agreement, Company shall be under no obligation to use the results and proceeds of Composer hereunder.

2.2     A list of Works is set forth in the Short Form License Agreement attached hereto as Schedule A and incorporated herein by this reference.  Any works set forth in a Short Form License Agreement to this Agreement signed by Company and the Lender and the Composer following the date of this Agreement shall be deemed to be Works hereunder.

2.3     In respect of each Work, the terms of this Agreement shall apply from the date upon which the parties sign the Short Form License Agreement in which such Work is listed.

2.4     Lender shall cause Composer to deliver the Works in compliance with the Technical Delivery Specifications set forth on Exhibit "A".  In addition, Lender shall cause Composer to provide Company with a completed Exhibit "B".

## 3     Term/Exclusivity

3.1     The term of this Agreement shall commence upon the Effective Date set forth above and continue until the termination of this Agreement by either party hereto, which termination shall be effective upon delivery of written notice to the other party; provided that if Composer is rendering on, or providing materials for Company with respect to any Works at the time of such termination, the provisions of this Agreement shall apply to Composer's services and obligations with respect to such Works, and, if requested by Company, Lender shall be required to cause Composer to complete all services and obligations related thereto (the "Term").  Company shall have the right to terminate this Agreement at any time, with or without cause, subject to Company's obligation to pay Lender any accrued but unpaid compensation for services already actually completed by Composer.

3.2     For a period of two (2) years commencing upon the Effective Date, Lender shall provide Composer to render services exclusively to Company with respect to composing and/or recording production/library music library.  Notwithstanding the foregoing, Composer shall not be precluded from entering into direct deals with third party television production companies to compose and/or record original music solely for use by such third party television production companies.

## 4     Rights

4.1     The Services rendered by Composer pursuant to this Agreement and the results and proceeds thereof, including, without limitation, the Works, and whether or not actually used by Company (all such material, services, and the results and proceeds thereof are referred to collectively as the **Material**), have been and/or will be solely created by Composer as a "work made for hire" specially ordered or commissioned by Company for use as part of an audio/visual work within the meaning of the U.S. Copyright Law, with Company being deemed the sole author, and, at all stages of completion, the sole and exclusive owner of the Material, and of all rights of every kind or nature, whether now

506675

EXHIBIT 3.7

known or hereafter devised (including, without limitation, all copyrights, trademarks, patents and all extensions and renewals of same) in and to the Material in perpetuity throughout the universe.    To the extent not deemed works "made-for-hire," then immediately upon creation but no later than Composer's completion of services in connection with the Material, Artist will be deemed to have automatically and irrevocably assigned solely and exclusively to Company, and Company will own, in perpetuity and throughout the universe, all right, title and interest of every kind and nature in all media, whether now known or hereafter recognized, in all languages, in all versions (including without limitation digitized versions), in and to the Material.    In connection with Company's exploitation of the rights granted to Company herein, Company shall have the right, subject only to Clause 7.2 below, to collect any and all income arising throughout the world in respect of exploitation of the Material.

4.2    Without in any way limiting the generality of the foregoing, Company shall have the right to make all known or hereafter existing uses of the Material in perpetuity throughout the universe, including without limitation as Production/Library Music in productions, television programs and/or motion pictures or otherwise, in all media and all forms and all formats, including, without limitation, videocassette, videodisc, sound recording, publishing, music publishing, merchandising, character, sequel, remake, theme park, legitimate stage, electronic, interactive, digital, computer-assisted media and other new technologies, whether now known or hereafter devised, including, but not limited to, laser disc, cartridge, CD-ROM and other similar or dissimilar disc systems, interactive television/cable, all means of video and/or audio streaming, still or download, whether delivered to portable devices, personal computers, set top boxes, televisions or other forms of hardware via broadcast, syndication, basic cable, pay television, pay-over-the-air, closed circuit, hotel/motel, TVRO, SMATV, MDS, MMDS, DBS, video-on-demand, pay-per-view, datacasting, Internet protocol, wireless protocol, terrestrial radio, satellite radio, and any other devices and/or methods of delivery, in any and all media now existing or hereafter devised, and all allied, ancillary and subsidiary rights in and to each of the foregoing, and the right to make all changes in the Material as Company deems necessary or desirable, including, but not limited to, the right to revise, change, modify, translate, reformat, reprocess, dramatize, fictionalize, add material to and/or remove material from the Material as Company shall, in its sole discretion, deem appropriate.

4.3    Composer shall not (i) utilize any material as the basis of the Works (including samples) or any arrangements hereunder which are believed to be in the public domain without first notifying Company of the identity of such material so that Company may verify the public domain status thereof; or (ii) use any material whatsoever not composed entirely by Composer, such as samples (whether or not in the public domain) without first obtaining Company's prior written consent in each instance.

4.4    The Lender and Composer jointly and severally hereby absolutely, irrevocably and unconditionally waives all so-called "droit moral", "moral rights" or similar rights or principals of law in any country of the world which Lender and Composer may now or later have in the Material and Lender and Composer agree not to institute or permit any action or lawsuit on the grounds that the Material or any other work based upon the Material constitutes an infringement of Lender's and/or Composer's droit moral or is in

506675

EXHIBIT 3.8

any way a defamation or mutilation of the Material or any part thereof, or contains unauthorized variations, alterations, modifications, changes, or translations of the Material. Lender and Composer expressly acknowledge that other works may or will embody all or part of the Material. Accordingly, if under any applicable law the above waiver or assignment by Lender and Composer of "droit moral" or "moral rights" is not effective, then Lender and Composer agree to exercise such rights in a manner which recognizes the contribution of, and will not have a material adverse effect upon, such other parties.

4.5 The Lender and Composer hereby grant to Company the right in connection with the exploitation of the Works to exploit and permit and permit third parties to exploit Composer's name, professional name, and any likeness, photograph, signature and biographical material. The Lender shall cause Composer to supply, upon Company's request, suitable materials for publicity, advertising, trade and promotional purposes inclusive of all rights in the same.

4.6 The Lender shall cause Composer to at the reasonable request and expense of Company do all further acts, deeds and things and execute all such further documents, deeds and instruments from time to time necessary to vest in Company the rights granted under this Agreement and, subject to the other terms of this Agreement, for the protection and enforcement of the same.

4.7 The Lender shall cause Composer to deliver to Company as soon as reasonably practicable following signature of this Agreement the Works in such format as Company shall reasonably direct.

4.8 Company shall register in its name the Works with all appropriate mechanical and performing rights collecting societies who are responsible for the collection and distribution of royalties relating to exploitation of mechanical and performing rights.

4.9 Effective as of the date of this Agreement, and unless Company otherwise consents in writing, Composer shall not record, re-record, produce, arrange, or perform (as conductor or otherwise) for anyone other than for Company, any of the Compositions at any time. The foregoing shall be applicable regardless of the so-called "compulsory license" provisions of any applicable copyright law.

4.10 Lender and Composer acknowledge that Company is not a party to any collective bargaining agreements that might be applicable to the type of services provided hereunder, and Lender and Composer understand and agree that neither this Agreement nor Composer's services hereunder shall be subject to any collective bargaining agreements, including, without limitation the American Federation of Musicians ("AFM") or the American Federation of Television and Radio Artists ("AFTRA").

## 5    Hype Music Option

5.1 Company shall have the exclusive, irrevocable option ("Hype Music Option") exercisable without notice, at any time, to exploit any or all of the Works as part of the Hype Music Library (each such Work, an "HM Work") and in connection therewith, shall have the right

EXHIBIT 3.9

to transfer all rights and obligations hereunder with respect to each HM Work to the owners of the Hype Music Library (currently MTVN and Extreme) or their designees ("HM Transferees").

## 6   Warranties and Representations

6.1   The Lender and Composer jointly and severally hereby warrant and represent that:

(a)   The Lender and Composer have full right and power to enter into this Agreement and to grant, transfer and assign the rights granted to Company under this Agreement and neither Lender nor Composer have entered into and will not enter into any commitment or agreement that will or might in any way conflict with Lender's and Composer's obligations under this Agreement;

(b)   The Composer is the sole author and producer of the Works and is the sole owner of the entire right, title, and interest in and to the Works including, without limitation, copyright, performers' property rights, rights of action and all other rights of whatsoever nature as may exist in any part of the world in and to the Works;

(c)   Neither the Lender nor the Composer have previously assigned, transferred, charged, mortgaged, licensed or otherwise granted to a third party any right, title or interest in or to the Works;

(d)   Neither Lender nor Composer has signed , agreed to sign, nor will neither Lender nor Composer sign during the Term hereof, an exclusive recording agreement and/or songwriter/publishing agreement or any other agreement that may affect Company's rights hereunder;

(e)   Composer shall not collaborate with any third-party lyricists and/or composers and/or recording artists/musicians under exclusive contracts with third parties, and shall not make use of any musical compositions not written or composed specifically and originally in connection with this Agreement, without Company's prior written consent;

(f)   The Material is wholly original to the Composer and does not contain anything that infringes the rights of any third party;

(g)   The Works contain nothing that is obscene, blasphemous or libellous;

(h)   The Works contain no uncleared samples or interpolations;

(i)   The Lender has caused Composer to obtain to the full extent permitted by law from any performer whose performance is embodied in the Works an irrevocable assignment of any and all right, title or interest in and to the Works (including, without limitation, performers' property rights), a grant of all relevant consents and an irrevocable waiver of all so-called "moral rights" or similar rights;

SD6675

EXHIBIT 3.10

(j)     No consents are required from, and no payments are required to, any third party in connection with the rights granted and assigned under this Agreement; and

(k)     Lender has paid all Recording Costs.

6.2     The Lender and Composer shall indemnify Company and keep Company, its parent, subsidiary and affiliated entities, and the shareholders, officers, directors, employees and agents of each of the foregoing, and any person(s) or entity(ies), in whole or in part, owning, financing, distributing and/or otherwise exploiting the Material fully indemnified on demand from and against all losses and all actions, claims, proceedings, costs and damages (including any damages or compensation paid by Company on legal advice to compromise or settle any claim) and all legal costs or other expenses arising out of any breach of any of the warranties and representations contained in this Agreement or out of any claim by a third party based on any facts which if substantiated would constitute such a breach. The Lender and Composer hereby authorise Company or any HM Transferees (without prior notice) to apply any sums due to the Lender and Composer under this Agreement or otherwise towards satisfaction of the Lender's and Composer's liability under this indemnity.

## 7     Compensation

7.1     Provided that Company has received a copy of this Agreement signed by Lender and Composer, Lender and Composer have complied with all applicable requirements, including, but not limited to, signing and delivering to Company any and all required tax and immigration forms (as applicable) and neither Lender nor Composer are in breach or default of this Agreement, Lender shall receive a one-time all-inclusive payment in the amount set forth on the applicable Short Form License Agreement in full consideration of the services performed, materials furnished and rights acknowledged or granted under this Agreement, including without limitation, all Recording Costs (as defined in Clause 1.5 above), subject to Lender's and Composer's full performance of the terms of this Agreement. Unless stated otherwise in the applicable Short Form License Agreement, the foregoing compensation shall be payable 50% upon complete execution of this Agreement and 50% following Lender's and Composer's completion of all services and materials required hereunder. Composer's compensation is subject to all withholdings and deductions that employers are required to make by law. Lender and Composer shall comply with all eligibility verifications required by law.

7.2     Notwithstanding anything to the contrary contained herein, in the event Company exercises the Hype Music Option, and provided Composer has complied with all applicable requirements and is not in breach or default of this Agreement, and solely for the period during which the HM Works are exploited as part of the Hype Music Library, Company or the HM Transferees shall pay or cause to be paid to the Composer in respect of all exploitation of the HM Works, a royalty equal to 50% of the Gross Receipts, except that neither Company nor the HM Transferees shall have any obligation to pay a royalty on the reasonable reproduction, distribution, performance, communication to the public and other exploitation of the HM Works in any form or in any medium (including, without limitation, by the distribution of printed editions, compact discs, tapes or digital

506675

EXHIBIT 3.11

files or by the making available of the HM Works on websites) for the purposes of promoting the HM Works and/or the Hype Music Library. For the avoidance of doubt, Gross Receipts shall include revenue from the sale of permanent digital downloads of the Masters.

7.3 In the event Company exercises the Hype Music Option, Company agrees that it shall procure that the HM Transferees shall apportion Hype Music Blanket Licensing Income as between Hype Music Blanket Licensed Compositions on a fair, reasonable and practicable basis, such basis to be determined in Company and the HM Transferees' sole discretion. Without prejudice to the generality of the foregoing, Company and the HM Transferees reserve the right to apportion Hype Music Blanket Licensing Income:

    (a)    on any actual usage basis determined by Company or the HM Transferees; or

    (b)    on any projected usage basis determined by Company or the HM Transferees; or

    (c)    on a basis which is a composite of the methods described above.

7.4 Lender and Composer acknowledge and agree that, except as otherwise specified in this Clause 7, neither Lender nor Composer shall be entitled to any other compensation whatsoever in connection with Composer's services hereunder and/or the exploitation of the Material, including, without limitation, any songwriter royalties, mechanical royalties, phonorecord royalties, synchronization fees, master use license fees, print royalties or any other revenue opportunities, including, without limitation, exploitation of the Works as part or production music libraries (other than the Hype Music Library). Lender and Composer acknowledge that this agreement constitutes a full buy-out of any and all rights to the Works. Notwithstanding the foregoing, Lender and Composer and Company hereby acknowledge and agree that Composer may receive and retain Composer's respective portion of the so-called "writer's share" of public performance income which may be payable directly from a performing rights society such as ASCAP, BMI and SESAC, and Company will retain one hundred percent (100%) of the so-called "publisher's share" of public performance income and one hundred percent (100%) of all other publishing income. If Composer co-writes a Composition, either from inception or subsequently (e.g., an additional composer and/or lyricist is hired to compose additional music for the Composition and/or rewrite all or part of the lyrics at a later date or an additional writer is otherwise granted or receives a writer's credit on the Composition concerned) then Lender and Composer acknowledge and agree that Composer's share of the performance royalties shall be reduced proportionately in accordance with Composer's contribution to the work as agreed among Composer and the co-writer(s), but in the absence of such agreement, or if the Compositions are subsequently altered or modified, the assessment of such reduction shall be made solely by Company. Lender and Composer hereby acknowledge that Company is acquiring hereunder, at no additional cost to Company, a U.S. theatrical performance "buy-out" with respect to the theatrical performance in the United States of the Compositions that are subject to this Agreement. If requested by Company, Lender shall cause Composer to obtain from and deliver to Company an appropriate release, at no cost to Company, consenting to the theatrical performance in the United States of the Compositions. Notwithstanding

EXHIBIT 3.12

anything to the contrary, however, where it is, or may from time to time be, unlawful for the performing rights society, or any of its affiliated bodies, to collect performance fees, or where the society, or any of its affiliated bodies, does not, from time to time, for any reason whatsoever, actually maintain a regular system of collecting performance fees, Company may authorize the performance of the Compositions in and as a part of productions, television programs and/or motion pictures in which they are included and the advertising, promotion and publicity thereof, or otherwise, without payments of any performance fees whatsoever to Lender, Composer, the society, or to anyone else.

7.5 If more than one person is named in this Agreement as the Composer, Company shall allocate and pay the flat fee set forth in Clause 7.1 and royalties set forth in Clause 7.2 (if any) to each such named person in equal proportions unless otherwise directed in writing signed by all of such named persons.

7.6 Company shall pay VAT on all payments due to the Lender under this Agreement upon receipt of a proper VAT invoice.

## 8 Royalty Payments and Accountings

8.1 Company shall send (or procure that the HM Transferees shall send) statements to Lender on or before the date ninety (90) days after the end of each of Company's then-current semiannual accounting periods (currently ending on June 30 and December 31), together with payment of Composer's share of Gross Receipts, if any, earned by Composer hereunder during the semiannual period for which the statement is rendered (based on monies received during the accounting period for which the statement is rendered), less all charges against Composer's share of Gross Receipts under this Agreement which are paid or incurred prior to the end of the applicable accounting period (unless paid or incurred later than the end of that accounting period at Lender's request or for reasons within Lender's control). No payments shall be made where the total sum due is under £100, and such amounts shall be carried forward to the next following accounting statement.

8.2 Lender and Composer shall be deemed to have consented to all accountings rendered or required to be rendered by Company hereunder and each accounting shall be conclusive, final and binding, shall constitute an account stated, and shall not be subject to any objection for any reason whatsoever, unless Lender provides written notice to Company stating the specific basis for that objection within two (2) years after the date rendered. Neither Lender nor Composer may maintain any action, suit or proceeding of any nature against Company (or individually against either MTVN or Extreme) in respect of any accounting rendered or required to be rendered by Company hereunder (or in respect of the accounting period to which it relates or was to relate) unless Lender commences that action, suit or proceeding in a court of competent jurisdiction within two (2) years after the date rendered. If Lender shall commence an action, suit or proceeding against Company (or individually against either MTVN or Extreme) concerning royalty accountings rendered or required to be rendered by Company hereunder, the scope of that action, suit or proceeding shall be limited to a determination of the amount of Composer's share of Gross Receipts, if any, payable for the accounting periods in

506675

EXHIBIT 3.13

question, and Lender's and Composer's sole remedy shall be the recovery thereof. For purposes of this clause 8.2 and 8.3 below, each accounting required to be rendered hereunder shall be deemed to have been rendered as and when required unless Lender provides written notice to Company to the contrary not later than sixty (60) days after the date that accounting was required to have been rendered hereunder.

8.3     Company shall maintain books and records concerning the licensing of individual Works and the corresponding third party income generated hereunder. Except as otherwise permitted by applicable law, Lender shall have the right to designate an independent and certified public accountant on Lender's and Composer's behalf, at Lender's own expense, to examine those books and records solely for the purpose of verifying the accuracy of accounting statements rendered by Company hereunder, only during Company's normal business hours and only upon reasonable written notice. Neither Lender nor Composer shall have the right, however, to engage a particular accountant (or Lender's own firm) to conduct an examination of our books and records on Lender's and Composer's behalf if that accountant (or his or her firm) is then-currently engaged in an examination or audit of Company's books and records (or in the resolution of any outstanding claims derived therefrom) on behalf of a third person. Company's books and records relating to a particular accounting statement may be examined only within two (2) years after the date rendered. Company shall have no obligation to permit neither Lender nor Composer to examine Company's books and/or records relating to any particular statement more than once. Prior to rendering a report to Lender with respect to the examination of Company's books and records as aforesaid, the accountant engaged by Composer shall first review his or her tentative written findings with a designated representative of Company's finance department in order to remedy any factual errors and clarify any issues that may have resulted from misunderstanding. Lender and Composer hereby acknowledge that Company's books and records contain confidential trade information. Neither Lender nor Composer nor Lender's accountant or other representatives shall communicate at any time to any other party (other than to Lender's attorney) or use on behalf of any other party any information obtained as a result of any examination of Company's books and records. Further, prior to the commencement of any examination of Company's books and records in accordance with the provisions of this Clause, Lender shall cause the accountant engaged by Lender to sign a letter in a form approved by Company which acknowledges his or her agreement (and the agreement of his or her firm) to be bound by the foregoing. The rights hereinabove granted to Lender and Composer shall constitute Lender's and Composer's sole and exclusive rights to examine Company's books and records. Notwithstanding the third sentence of this Clause 8.3, if Company notifies Lender that the representative designated by Lender to conduct an examination of Company's books and records under this Clause 8.3, is engaged in an examination on behalf of another party ("Other Examination"), Lender may nevertheless have Lender's examination conducted by Lender's designee, and the running of time within which such examination may be made shall be suspended until Lender's designee has completed the Other Examination, subject to the following conditions:

(a)     Lender shall notify Company of Lender's election to that effect within fifteen (15) days after the date of Company's said notice to Lender;

EXHIBIT 3.14

(b)    Lender's designee shall proceed in a reasonably continuous and expeditious manner to complete the Other Examination and render the final report thereon to the client and Company; and

(c)    Lender's examination, shall not be commenced by Lenders designee before the delivery to Company of the final report on the Other Examination, shall be commenced within thirty (30) days thereafter, and shall be conducted in a reasonably continuous and expeditious manner.

(The preceding provisions set forth in the last sentence of this Clause 8.3 and sections (a), (b) and (c) of this Clause 8.3 shall not apply if Company elects to waive the provisions of the third sentence of Clause 8.3 which require that Lender's representative shall not be engaged in any Other Examination.)

8.4    Company shall have the right to deduct from any monies payable hereunder any amounts which are required to be deducted from those monies under any statute, regulation, treaty or other law, or under any union or guild agreement, and Lender shall cause Composer to promptly execute and deliver to Company any documents required in connection therewith. If Company fails for any reason to make any required deduction, then, without limiting any of Company's other rights or remedies, Lender shall pay Company, upon demand, the amount of those monies which were paid to Lender but which were required to have been deducted, or, at Company's election, Company may deduct that amount from any monies payable hereunder and, at Company's election, under any other agreement between Lender and Composer and Company or Company's affiliates.

9    Legal Advice

THE LENDER AND COMPOSER ACKNOWLEDGE AND CONFIRM THAT THE LENDER AND COMPOSER HAVE BEEN ADVISED BY COMPANY PRIOR TO SIGNATURE OF THIS AGREEMENT TO RETAIN INDEPENDENT COUNSEL, SELECTED BY LENDER AND COMPOSER, TO REPRESENT THE LENDER AND COMPOSER IN CONNECTION WITH THE LENDER'S AND THE COMPOSER'S EXECUTION OF THIS AGREEMENT, AND THE LENDER AND COMPOSER WARRANT THAT THE LENDER AND COMPOSER HAVE TAKEN SUCH LEGAL ADVICE.

10    Miscellaneous

10.1    In performing its obligations under this Agreement, each of the parties hereto shall be deemed an independent contractor, and nothing in this Agreement shall in any way constitute either party, or any of such party's officer or directors, an agent or employee of the other party and this Agreement shall not be deemed to constitute a partnership, joint venture or contract of employment between the parties..

10.2    Company may freely assign or license this Agreement, and any or all of the rights granted by Lender and Composer to Company hereunder, to any other person or entity

506675

EXHIBIT 3.15

without restriction. Neither Lender nor Composer may assign this Agreement, and any attempt to do so shall be void ab initio.

10.3 This Agreement contains the entire understanding between the parties and supersedes all prior understandings of the parties hereto relating to the subject matter herein and/or the right for the Composer to receive royalties of any kind from Company. This Agreement cannot be changed or terminated orally.

10.4 No waiver by either of the parties hereto of any failure by the other party to keep or perform any covenant or condition of this Agreement shall be deemed a waiver of any preceding or succeeding breach by such party. Except as expressly provided to the contrary: (a) the remedies provided herein of each party hereto shall be deemed cumulative; (b) the exercise of one shall not preclude the exercise of any other; and (c) each party hereto is entitled to any rights and remedies which may be available to it at law or in equity.

10.5 The rights and remedies contained in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

10.6 If more than one person is named in this Agreement as the Composer, then, unless expressly provided otherwise, all warranties, representations, undertakings, covenants, agreements and obligations given, made or entered into in this Agreement by the Composer are made, given or entered into jointly and severally by each such named person. Company may take action against any one or more of such named persons and/or may release or compromise in whole or in part the liability of, or grant any time or other indulgence to, any one or more of such named persons under this Agreement without affecting the liability of the other(s).

10.7 No provision of this Agreement is enforceable by any person who is not a party to this Agreement.

10.8 All disputes arising under this Agreement shall be governed by the laws of the State of New York, and each of the parties submits to the exclusive jurisdiction of the federal and state courts of the State of New York.

[Signature page to follow]

506675

EXHIBIT 3.16

Signed by the parties or their duly authorized representatives on the date of this Agreement.

Signed by
duly authorized for and on behalf of
**New Creative Mix Inc.**

Signed by
**Twelvesixty, LLC**

I ACKNOWLEDGE THAT I HAVE READ THIS AGREEMENT AND AGREE TO BE BOUND BY
ITS TERMS AS IF I HAD ENTERED INTO IT DIRECTLY WITH COMPANY, AND I
ACKNOWLEDGE THAT WITHOUT THIS ACKNOWLEDGEMENT, COMPANY WOULD NOT
BE WILLING TO ENTER INTO THIS AGREEMENT WITH LENDER:

Robert Marderosian
Social Security #: 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

Aron Marderosian
Social Security #: 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

506675

EXHIBIT 3.17

## Schedule A
## SHORT FORM LICENSE AGREEMENT

### COMPOSER SERVICES

By and between New Creative Mix Inc. ("Company"), 1515 Broadway, New York, NY 10036, and Twelvesixty, LLC ("Lender") for the services of Aron Marderosian, individually, ("AMardo") and Robert Marderosian, individually, ("RMardo") together the artists professionally known as "Heavy Young Heathens". Company and Composer hereby agree to the terms set forth below with respect to the Project described below and agree that the terms of the Blanket Composer Agreement dated as of March 7, 2011 signed by Composer with Company shall be incorporated herein by reference:

1.   CONTRACTING PARTY NAME: Twelvesixty, LLC

2.   PROJECT NAME/DESCRIPTION: "Hype Music Library."

3.   SERVICES TO BE PROVIDED: Composition of original Works.

4.   MATERIALS TO BE DELIVERED:
       (a) Number of Works: Twenty (20) vocal Works, Fifteen (15) instrumental Works
       (b) Timing/Duration of each Work. Approximately 2:30-3:30 in length each
       (c) Genre: Misc
       (d) Tempo: Misc
       (e) BPM/cadence/ other creative info: All Works to be delivered with stems and stings, lyrics, if applicable.

5.   MATERIALS DELIVERY SCHEDULE: All Works to be delivered within three (3) months of the Effective Date.

6.   BUDGET AND CASH FLOW SCHEDULE: Lender shall receive a flat fee of Twenty Thousand Dollars ($20,000) which shall be payable to Lender fifty percent (50%) upon commencement and the final fifty percent (50%) payment upon Company's acceptance of a completed Exhibit "B."

7.   DATE SERVICES TO COMMENCE: Upon the Effective Date.
Services will be provided until all services requested by Company on the Project have been fully completed to Company's satisfaction with no guarantee of any minimum term of employment.

8.   COMPANY CONTACT: Ernesto Elias--

[*Signature page to follow*]

506675

EXHIBIT 3.18

**Signed** by the parties or their duly authorized representatives on ....................................
2011.

Signed by                                          )
duly authorized for and on behalf of               )
**New Creative Mix Inc.**                           )
                                                   )

Signed by                                          )
**Twelvesixty, LLC**                                )

I have read the above agreement and agree to its terms:

Signature of Composer Above

Print Composer's Name: ROBERT MARKROSIANS
Composer's SS#:    561 - 67 - 5698

Signature of Composer Above

Print Composer's Name: Iven MIHURENGIAN
Composer's SS#:    561 - 87 - 4730

-----End of Schedule A-----

506675

EXHIBIT 3.19

Exhibit "A"

## Technical Delivery Specifications

- All Tracks to be between 2.30-3.30 in length unless otherwise agreed

- Format: 48k 24bit

- Mix splits/stems to accommodate requests for 5.1 or alternate mixes

- Pro-tools / Logic or relevant files and sessions inc audio tracks where possible

- If there is a vocal supply full, voice only and instrumental mixes

- All lyrics with translations if appropriate.

- Composer credits together with performance society membership association and membership numbers

- Composer full names and addresses and contact numbers

- For multiple composers provide share splits (Also included in Exhibit "A")

- Materials are to be delivered to:

  Ernesto Elias
  Music Coordinator
  ph: 310-752-8403
  email: Ernesto.Elias@mtvnmix.com
  MTV Networks
  2600 Colorado Avenue
  Santa Monica, CA 90404

-----End of Exhibit A-----

506675

EXHIBIT 3.20

Exhibit "B"

| | Title | Composer | Performing Rights Organization | Percent Ownership | ISRC |
|---|---|---|---|---|---|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4 | | | | | |
| 5. | | | | | |
| 6 | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | | | | | |
| 11. | | | | | |
| 12. | | | | | |
| 13. | | | | | |
| 14. | | | | | |
| 15. | | | | | |
| 16. | | | | | |
| 17. | | | | | |
| 18. | | | | | |
| 19 | | | | | |
| 20. | | | | | |
| 21. | | | | | |
| 22 | | | | | |
| 23. | | | | | |
| 24 | | | | | |
| 25 | | | | | |
| 26. | | | | | |
| 27. | | | | | |
| 28. | | | | | |
| 29. | | | | | |
| 30. | | | | | |
| 31. | | | | | |
| 32. | | | | | |
| 33. | | | | | |
| 34 | | | | | |
| 35. | | | | | |
| 36. | | | | | |
| 37. | | | | | |
| 38. | | | | | |
| 39 | | | | | |
| 40. | | | | | |
| 41 | | | | | |
| 42. | | | | | |
| 43. | | | | | |
| 44. | | | | | |
| 45. | | | | | |
| 46 | | | | | |
| 47 | | | | | |
| 48. | | | | | |
| 49. | | | | | |
| 50. | | | | | |

-----End of Exhibit B-----

506675

EXHIBIT 3.21

506675

EXHIBIT 3.22