# EXHIBIT A

**To The July 28, 2017
Declaration of Donald S. Zakarin**

**Plaintiffs' First Amended Complaint and
accompanying Exhibits 1-3, dated March 28,
2017**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TWELVE SIXTY LLC, ARON MARDEROSIAN and ROBERT MARDEROSIAN,<br><br>Plaintiffs,<br><br>v.<br><br>EXTREME MUSIC LIBRARY LIMITED, a division of Sony/ATV Music Publishing; EXTREME MUSIC LIMITED; MTV NETWORKS, a division of Viacom International Inc.; NEW CREATIVE MIX INC.; HYPE PRODUCTION MUSIC,<br><br>Defendants. | Civil Case No. :  1:17-CV-01479-PAC<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND <u>DEMAND FOR JURY TRIAL</u>**<br><br><br>*District Judge:  Hon. Paul A. Crotty*<br>*Magistrate:  Hon. Gabriel W. Gorenstein* |

COMES NOW Plaintiffs TWELVE SIXTY LLC ("TWELVE SIXTY"), ARON MARDEROSIAN ("ARON"); ROBERT MARDEROSIAN ("ROBERT") (ARON and ROBERT collectively referred to as the "MARDEROSIANS"), (TWELVE SIXTY, ARON, and ROBERT collectively referred to as "PLAINTIFFS") and submit the following Complaint For Damages and Demand for Jury Trial against EXTREME MUSIC LIBRARY LIMITED, a division of Sony/ATV Music Publishing; EXTREME MUSIC LIMITED (EXTREME MUSIC LIBRARY LIMITED and EXTREME MUSIC LIMITED collectively referred to as "EXTREME"); MTV NETWORKS, a division of Viacom International Inc.; NEW CREATIVE MIX INC.; and HYPE PRODUCTION MUSIC (collectively, all of the named defendants are referred to herein as "DEFENDANTS").

1

## INTRODUCTION

1.      The MARDEROSIANS are well-known and established song writers, musicians and producers of musical recordings, professionally known as "Heavy Young Heathens."  The MARDEROSIANS have written and recorded hundreds of musical compositions included in and used to promote numerous theatrical motion pictures, television series and video games, including by way of example, musical compositions featured in such recent motion films as *Rules Don't Apply*, *Masterminds* and *Supermensch*, as well as prominent trailers for *The Magnificent Seven*, *Deadpool*, *The Amazing Spider-Man* and *The Expendables 2*. Their music has additionally been placed in numerous television programs such as *The Simpsons*, *CSI*, *Jersey Shore*, *Punk'd* and ESPN's *30 for 30*, and commercials for Starbucks, Chrysler, Dodge, Ford, Bacardi, Adidas and Red Bull.

2.      Based on their reputation for creating high quality cutting edge commercial musical recordings, the MARDEROSIANS established a successful relationship with MTVN to supply musical recordings for use in television programming on MTVN and its related platforms.  After realizing the value that PLAINTIFFS' musical compositions afforded to MTVN and its affiliated entities, MTVN colluded with each of the defendant affiliated entities on a scheme to obtain ownership and use PLAINTIFFS' musical recordings without having to pay PLAINTIFFS any license fees.

3.      In or around May 2010, MTVN informed the MARDEROSIANS that if they wanted to continue conducting business with MTVN and supply MTVN musical recordings to be used in MTVN programming and on other Viacom affiliated platforms and networks, MTVN

2

required that the PLAINTIFFS enter into a written composer agreement with an MTVN affiliated entity, New Remote Productions Inc. ("NRP").

4.     MTVN individually and on behalf of its affiliated entity NRP, represented to PLAINTIFFS that (i) the proposed composer agreement would be hugely beneficial to PLAINTIFFS by providing PLAINTIFFS with the opportunity to place and commercially exploit a significant number of PLAINTIFFS' musical recordings on MTVN branded platforms and related Viacom platforms and networks, which use and broadcast would generate significant fees and recognition of the MARDEROSIANS as professional production and soundtrack composers; and (ii) PLAINTIFFS would retain and receive 100% of the writer's share of public performance income generated from the broadcast and use of PLAINTIFFS' musical recordings by MTVN.

5.     Reluctantly, PLAINTIFFS agreed to enter into the composer agreement with MTVN's affiliated entity, NRP.     Pursuant to that agreement, PLAINTIFFS delivered approximately fifty (50) original musical recordings to MTVN for use in and to promote MTVN and its affiliated entities' television programming.     The musical recordings supplied by PLAINTIFFS to MTVN were hugely popular and widely used and exploited by MTVN as part of and to promote its programming.

6.     Based on the continued success and popularity of PLAINTIFFS' musical recordings featured in and to promote programming of MTVN and its affiliates, in early 2011, MTVN informed PLAINTIFFS that MTVN wanted to expand upon the 2010 composer agreement and have PLAINTIFFS become "partners" with MTVN and its affiliated entities to commercially use and exploit PLAINTIFFS' musical recordings through a new joint venture called "HYPE PRODUCTION MUSIC" that MTVN intended to establish with EXTREME, which on

3

information and belief, are wholly owned subsidiaries of Sony/ATV Music Publishing. MTVN
further represented that as partners, PLAINTIFFS would receive a royalty equal to 50% of the
gross receipts generated from all exploitations of PLAINTIFFS' musical recordings together with
100% of the writer's share of public performance fees generated from the use of PLAINTIFFS'
musical recordings. In reliance on the representations of MTVN, PLAINTIFFS entered into an
amendment dated March 7, 2011 to the 2010 composer agreement with a separate MTVN affiliated
entity, NEW CREATIVE MIX, INC. (the "2011 Composer Agreement").

7.      After entering the 2011 Composer Agreement, it became apparent to PLAINTIFFS
that they had been defrauded by MTVN and its affiliated entities. DEFENDANTS aggressively
used and exploited PLAINTIFFS' musical recordings for their own economic benefit without any
accounting or payment to PLAINTIFFS. Among other uses, PLAINTIFFS' musical recordings
were used by MTVN and its affiliated entities in numerous television programs without payment
of any license fee; EXTREME and/or HYPE licensed the right to use PLAINTIFFS' musical
recordings to third-party television networks without any payment of license fees to PLAINTIFFS;
Defendants EXTREME and/or HYPE licensed the rights to use PLAINTIFFS' musical recordings
for major commercial advertising campaigns without payment of any license fees to PLAINTIFFS;
and EXTREME and/or HYPE licensed PLAINTIFFS' musical recordings to promote and market
motion pictures and television programming by numerous third parties without any payment of
any license fees to PLAINTIFFS.

8.      The fair market value of the commercial uses made by DEFENDANTS individually
and through licenses granted to affiliated entities and third parties of PLAINTIFFS' musical
recordings is substantial. Notwithstanding the significant commercial value of PLAINTIFFS'

musical recordings controlled and exploited by DEFENDANTS for their own benefit, DEFENDANTS have paid PLAINTIFFS nothing more than a paltry small fraction of what PLAINTIFFS are owed.

9.      This case seeks legal recourse as a result of the DEFENDANTS' pernicious, fraudulent, improper, and illegal conduct regarding the exploitation of PLAINTIFFS' musical compositions and productions as well as their malicious efforts to harm PLAINTIFFS and their business known as TWELVE SIXTY.  Specifically, the DEFENDANTS have wrongfully and maliciously engaged in a course of conduct designed to maximize their own profits at the significant expense and to the significant detriment of the PLAINTIFFS.  The DEFENDANTS have deprived the PLAINTIFFS of millions of dollars by exploiting PLAINTIFFS' music in a manner that is completely inconsistent with the terms of any agreement and done in such a deceitful manner as to cover up the full nature and extent of the exploitations.  The egregious and reprehensible conduct complained of herein includes, but is not limited to:

a.      The fraudulent inducement of  PLAINTIFFS to enter into contract to obtain copyright ownership of PLAINTIFFS' music with the intent to fraudulently exploit PLAINTIFFS' compositions and productions in such a manner as to avoid responsibility for royalties and license fees PLAINTIFFS are rightfully owed and entitled to;

b.      The fraudulent exploitation of  PLAINTIFFS' compositions and productions in such a manner as to deprive PLAINTIFFS of their fifty percent (50%) of the gross receipts of all licensing fees due and owing to PLAINTIFFS as a result of the exploitation of their compositions and productions as required by the contract;

c.      The failure to promptly and properly register PLAINTIFFS' music with performing rights society, BMI and which has resulted and continues to result in the loss of royalty payments to PLAINTIFFS;

d.      The fraudulent exploitation of PLAINTIFFS' compositions and productions in such a manner as to avoid filing of cue sheets in an effort to conceal uses

5

of PLAINTIFFS' compositions and productions and thus depriving PLAINTIFFS of royalties and license fees;

e.   The failure to accurately report uses of PLAINTIFFS' compositions and productions as required by the Agreements for the purpose of fraudulently concealing the uses of PLAINTIFFS' music and thus depriving PLAINTIFFS of royalties and license fees;

f.   The wrongful and illegal use of  PLAINTIFFS' compositions and productions without a necessary license or any authority from PLAINTIFFS;

g.   The fraudulent exploitation of PLAINTIFFS' music in a manner that creates profit streams for the DEFENDANTS only.  For example, one or more of the DEFENDANTS have offered PLAINTIFFS' music for gratis or at a very low rate to third party users such as television networks, advertising companies, etc. such that DEFENDANTS could secure other or additional opportunities, contracts, and profit streams that only benefit the DEFENDANTS and again deprive the PLAINTIFFS of their share of royalties and licensing fees.

10.   The DEFENDANTS have accomplished their fraudulent scheme not only by fraudulently inducing the PLAINTIFFS to deliver music to the DEFENDANTS, but by materially breaching their Agreements with PLAINTIFFS and by making numerous significant and material misrepresentations which were made with the sole purpose of deceiving PLAINTIFFS and depriving them of money that was rightfully owed.   It is abundantly clear that the DEFENDANTS plotted and schemed from the very beginning, targeting PLAINTIFFS because of their talent, the quality of their work, and the fact that the PLAINTIFFS' business was successful in generating income.

11.   By and through this lawsuit, PLAINTIFFS seek: (a) payment of all profits, income, and compensation received by DEFENDANTS, in any form, including income that should have been charged and received as a result of the exploitation of PLAINTIFFS' compositions and productions; (b) a full and complete accounting of all exploitations, uses, royalties, income,

6

consulting fees, and profits, in any form, generated as a result of the exploitation of PLAINTIFFS' compositions and productions including an accounting of royalties and licensing fees that should have been charged and paid by third party users as a result of the exploitation and uses of PLAINTIFFS' compositions and productions as required by the contract; (c) disgorgement of all income and profits generated from any exploitation of PLAINTIFFS' music; (d) recession of all contracts with DEFENDANTS including licenses, thereby returning to PLAINTIFFS all rights and ownership to the compositions and productions that will be the subject of this litigation; and (e) punitive damages, costs, and interest.

## PARTIES

12.     Plaintiff TWELVE SIXTY is a California limited liability company duly organized and existing under the laws of the State of California, having a place of business in the County of Los Angeles.

13.     Plaintiff ARON MARDEROSIAN is an individual who resides and works in the County of Los Angeles in the State of California.

14.     Plaintiff ROBERT MARDEROSIAN is an individual who resides and works in the County of Los Angeles in the State of California.

15.     PLAINTIFFS are informed and believe and based thereon allege that EXTREME MUSIC LIBRARY LIMITED, a division of Sony/ATV Music Publishing ("EXTREME MUSIC LIBRARY"), is a limited liability company organized and existing under the laws of the United Kingdom, having its principal place of business at 30 Golden Square, London W1 9LD.  On information and belief, EXTREME MUSIC LIBRARY regularly conducts business throughout the United States, including in the State of New York.

7

16.     PLAINTIFFS are informed and believe and based thereon allege that EXTREME

MUSIC LIMITED ("EXTREME MUSIC") is a limited liability company organized and existing

under the laws of the United Kingdom, having its principal place of business at 5th Floor, Kent

House, 14-17 Market Place, in London, England. On information and belief, EXTREME MUSIC

regularly conducts business throughout the United States, including in the State of New York.

17.     PLAINTIFFS are informed and believe and based thereon allege that MTV

NETWORKS ("MTVN"), a division of Viacom International Inc. is a corporation organized and

existing under the laws of the State of Delaware, having its principal place of business located at

1515 Broadway, New York, NY 10036.

18.     PLAINTIFFS are informed and believe and based thereon allege that NEW

CREATIVE MIX INC. ("NEW CREATIVE") is a wholly owned subsidiary of Viacom Inc. and is

a corporation organized and existing under the laws of the State of Delaware, having its principal

place of business at 1515 Broadway, New York, NY 10036.

19.     PLAINTIFFS are informed and believe and based thereon allege that HYPE

PRODUCTION MUSIC ("HYPE") is a partnership formed by MTVN, a division of Viacom Inc.

and EXTREME MUSIC, the production arm of Sony ATV.  On information and belief, this

partnership is based in New York, New York.

20.     On information and belief, NEW CREATIVE is an alter ego of MTVN and MTVN

controls and operates NEW CREATIVE, such that NEW CREATIVE has ceased to exist as a

separate entity. Specifically, on information and belief, MTVN executives and employees serve

and operate on behalf of Defendant NEW CREATIVE.  MTVN executives sign contracts on

behalf of NEW CREATIVE.  The principal place of business for both MTVN and NEW

8

CREATIVE are in the same location and specifically 1515 Broadway in New York, New York.

Both entities are wholly owned subsidiaries of Viacom, Inc. and on information and belief,

officers, managers, and/or directors of NEW CREATIVE are also officers, managers, and/or

directors of MTVN.   NEW CREATIVE and MTVN are agents of one another and/or alter egos

of one another.

<div align="center">

**JURISDICTION AND VENUE**

</div>

21.    This Court has subject matter jurisdiction over this matter pursuant to 29 U.S.C. §

1332 because there is complete diversity between the parties and the amount in controversy

exceeds $75,000 excessive of interest and costs.

22.    This Court has personal jurisdiction over Defendants because: (a) NEW

CREATIVE has contractually submitted to personal jurisdiction in the federal courts in the State

of New York; (b) upon information and belief, EXTREME MUSIC LIBRARY and EXTREME

MUSIC (hereinafter collectively "EXTREME") were assignees to a contractual agreement which

contained a forum selection clause that was deemed to apply to these defendants and the Central

District of California determined that this judicial district was appropriate and ordered this case

transferred; (c) upon information and belief, the principal places of business of MTVN and NEW

CREATIVE are located at 1515 Broadway, New York, NY 10036; and (d) all defendants maintain

offices and/or regularly do or solicit business in New York so as to establish a basis for jurisdiction

in New York.

23.    Venue is proper in this district by virtue of 28 U.S.C. § 1391(c) because each of the

Defendants is subject to personal jurisdiction within this district and the Honorable Judge Klausner

<div align="center">

9

</div>

of the Central District of California determined this matter should be transferred to this judicial district.

## DEMAND FOR JURY TRIAL

24.     PLAINTIFFS hereby demand a jury trial.

## FACTUAL BACKGROUND

25.     Plaintiffs ARON and ROBERT are brothers who have been in the music business most of their lives.  They spent decades writing, recording, and performing their music.  They have released hundreds of songs and have toured the world performing songs they wrote and composed.

26.     Over the last decade, the MARDEROSIANS have built a very successful business, TWELVE SIXTY, and have earned their living by composing and producing songs and music which are licensed for use in blockbuster films, hit television series, television commercials, video games, viral internet promotional campaigns, and highly successful product advertising.  The MARDEROSIANS have built their business from the ground up focusing on the importance of music and high quality productions in order to create their own brand and sound, which has proved to be very successful for them. They have developed a reputation for being able to create and produce music that has successfully promoted major television shows, sold significant products, and promoted important films and movies.

27.     In the years immediately prior to PLAINTIFFS entering into the agreements which are the subject of this action, MTVN repeatedly sought the PLAINTIFFS' services.  PLAINTIFFS were asked to custom compose much of the music that was being used on MTVN original programming.  PLAINTIFFS' music was used as theme music and in support of key story lines

10

in weekly television programming broadcast on MTVN. PLAINTIFFS had a long history of custom composing music for Viacom programming. This work included custom composing music for entire programming, custom composing theme songs, and multiple promotions for Viacom's networks. PLAINTIFFS were very successful and earned substantial sums of money for their work. PLAINTIFFS entered into individual licensing agreements with MTVN or one of Viacom's other subsidiaries, divisions, or affiliates for each new work that was selected for MTVN programming. PLAINTIFFS would receive fees not only from the sync licenses, but would also collect substantial writer and publisher royalties as a result of the placement of PLAINTIFFS' music.

28. By 2010, PLAINTIFFS' work for MTVN was extensive in terms of providing music for many of the MTVN programs, including program theme songs. As a result of PLAINTIFFS' substantial work with MTVN, PLAINTIFFS were introduced to several MTVN employees and executives, including Jose Cuello ("Cuello"), who headed the "Music Supervision" function for the Viacom subsidiary networks, and Ernesto Elias ("Elias"). Among other things, Cuello and Elias represented to PLAINTIFFS that: (a) "neither MTVN nor any other Viacom network would use any of PLAINTIFFS' music unless they entered into a composer agreement assigning all copyrights to their music to MTVN and agree to be part of an 'MTVN music library'", which would be controlled by Cuello; (b) if PLAINTIFFS entered into a composer agreement with an MTVN entity, PLAINTIFFS' "music would be exploited on a much larger worldwide basis and substantially increase their income"; (c) PLAINTIFFS "had to assign copyright ownership to their music and be part of the "MTVN music library" or their relationship with MTVN and any other Viacom network "would come to an immediate end"; (d) PLAINTIFFS would still retain their

11

writer's share of royalties "which would substantially increase" as a result of the increase in exposure; and (e) PLAINTIFFS were informed that they had "no other choice" but to enter into this agreement "because neither MTVN or Viacom would ever use their music again" unless they entered into this contract.

## A.    **2010 COMPOSER AGREEMENT**

29.    Based on the aforesaid specific representations by MTVN's employees, agents, and/or representatives, including that PLAINTIFFS would be richly (and fairly) compensated for the works they contributed and the royalties generated therefrom, PLAINTIFFS entered into a Blanket Composer Agreement dated as of May 19, 2010 (the "2010 Composer Agreement") with MTVN's affiliated entity NRP. A copy of the 2010 Composer Agreement is attached hereto as Exhibit 1.

30.    Pursuant to the 2010 Composer Agreement, PLAINTIFFS were to provide their services including, but not limited, to "writing, composing, arranging, orchestrating, conducting and delivering" to NRP original musical material and original audio recordings." In exchange for those services PLAINTIFFS were to receive the "writer's share" of royalties that would be generated upon NRP's registration of PLAINTIFFS' works with Broadcast Music Inc. ("BMI"). This meant that the PLAINTIFFS were supposed to receive payment each and every time their music was publicly performed including being placed in a commercial, television show, movie, movie trailer, internet promotion, or otherwise used and broadcast to the public at large.

31.    PLAINTIFFS agreed to enter into the 2010 Composer Agreement based on the representations of MTVN's employees Cuello and Elias that PLAINTIFFS' music would be extensively exploited through the MTV music library and that PLAINTIFFS' writer's share of the

12

public performance income generated by the exploitation of PLAINTIFFS' works would result in significant royalties to PLAINTIFFS and would thereby make up the difference between what would be the ordinary sync fees for delivering music such as that previous delivered by PLAINTIFFS and that which would be earned pursuant to this contract.

32.     A standard practice within the music industry requires that songs be registered with a performing rights organization, such as BMI, so that when those songs are exploited and the uses reported to BMI through the filing of cue sheets and other means, all those having an interest in those songs, would receive their share of the royalties paid by the users such as television networks, film companies, advertisers, etc.     In this case, it was NRP's responsibility to register PLAINTIFFS' music with BMI, and Elias on behalf of MTVN and its affiliated entity NRP, confirmed that NRP would undertake this responsibility and "promptly register all works [PLAINTIFFS] delivered."

33.     In order for PLAINTIFFS to receive their writer's share of the royalties from BMI, two steps needed to be properly performed and completed.   The failure to do either one of these things results in the PLAINTIFFS not receiving their "writer's share" of royalties that are owed to them.   First, NRP was required to register the songs with BMI. Second, the production company that exploits the music is required to submit accurate cue sheets confirming the use, the name of the song used, the timing of the song used, the composer affiliation, and the publisher affiliation. PLAINTIFFS would only be able to receive their writer's share from BMI if both of these two steps were completed and completed correctly.

34.     The songs delivered by PLAINTIFFS to NRP were an immediate success and were used for countless MTVN trailers, promotions, and television series, including the MTVN original

13

program "Skins" and MTVN series "Death Valley" to name just a couple.   However, despite the

fact that the PLAINTIFFS' works were being significantly exploited and used in heavy rotation by

MTVN and other affiliated Viacom subsidiaries, divisions, and affiliates, PLAINTIFFS were not

receiving any of the writer's share of royalties they were owed under the 2010 Composer

Agreement because neither NRP nor MTVN or any of their affiliates, had registered PLAINTIFFS'

work with BMI as they were obligated to do.   PLAINTIFFS complained to Cuello and Elias as

representatives of NRP and MTVN that PLAINTIFFS were not receiving their writer's share of

royalties, however, neither NRP nor MTVN took any steps to register the work or otherwise correct

these deficiencies, thereby depriving PLAINTIFFS of significant royalties they were entitled to

under the terms of the 2010 Composer Agreement.   Instead, Cuello and Elias, on behalf of NRP

and MTVN, fraudulently/falsely represented to PLAINTIFFS that the required paperwork had

been sent to BMI and it was *BMI*, that was responsible for the delay.   This was a blatantly false

statement and was known to be false when made.

　　　　35.　　By not registering the musical compositions that PLAINTIFFS created pursuant

to the 2010 Composer Agreement, MTVN and its affiliated Viacom entities could commercially

use and exploit these compositions and avoid having to pay PLAINTIFFS anything.

**B.**　　**2011 COMPOSER AGREEMENT**

　　　　36.　　In January 2011, PLAINTIFFS met with Cuello and Elias for lunch.   At the

meeting, PLAINTIFFS again complained about their lack of revenue from royalties.   Cuello

represented that all of the works had been sent to BMI for registration and misrepresented to

PLAINTIFFS that BMI was responsible for any delay.   This statement was knowingly false and

14

was made for the purposes of deceiving PLAINTIFFS, who relied upon this misrepresentation to their ongoing detriment.

37.    At the same meeting, Cuello praised PLAINTIFFS, saying they were "the poster boys" for MTV's music library and due to the success of MTVN and its affiliates in using PLAINTIFFS' music, Viacom, including Defendant MTVN, wanted PLAINTIFFS to become their "partners." Cuello and Elias proposed that PLAINTIFFS enter into a new agreement with MTVN affiliate NEW CREATIVE MIX, INC., which would incorporate the original fifty (50) works delivered under the 2010 Composer Agreement plus additional compositions, all of which would be added to a new music library that MTVN was creating called "The Hype Music Library." Cuello and Elias advised PLAINTIFFS they would be entering into a partnership, which would greatly increase revenues to PLAINTIFFS because PLAINTIFFS' work would be available for license to third parties for commercial use, promoted by the full weight of Viacom and its divisions, subsidiaries, and affiliates and their industry connections and marketing.    A significant component of the proposed new agreement proposed by MTVN was that PLAINTIFFS would be entitled to "a royalty equal to fifty percent of the gross receipts" generated by all exploitations of PLAINTIFFS' music within the Viacom organization and to any third party licensee.

38.    Cuello and Elias also advised PLAINTIFFS that NEW CREATIVE and MTVN would work hand in hand with another music industry executive, Russell Emmanuel ("Emmanuel"), a principal of Defendants EXTREME which also marketed their own music library. According to Cuello and Elias, NEW CREATIVE and MTVN would work as a joint venture with Defendants EXTREME, to market the "Hype Music Library" works outside of the MTV family of networks, thereby generating additional revenue for PLAINTIFFS who would be entitled to not

15

only their "writer's share of royalties" but also fifty percent of the revenue from the licensing of the PLAINTIFFS' music.

39.     Notably, on March 1, 2011, days before the PLAINTIFFS entered into the contract with NEW CREATIVE, a press release was issued that provided that MTV and Sony ATV's Extreme Music intended to launch "Hype Production Music," which was a "newly created, first of its kind hybrid music production and licensing partnership fueled by the best new and emerging independent talent." The press release stated that "artists will benefit from their songs inclusion in the "Hype Music Library" and that "All revenues from the licensing and digital distribution of songs included in the "Hype Music Library" will be split with fifty (50%) percent going to the artist". A copy of this press release was given to PLAINTIFFS and released to the world. Based on the conduct of NEW CREATIVE, EXTREME, MTVN, and HYPE, as described herein, this statement was completely false, misleading, and deceptive. A copy of the press release is attached hereto as Exhibit 2.

40.     Based on the aforesaid representations of Cuello and Elias on behalf of MTVN and NEW CREATIVE, PLANTIFFS entered into an amendment to the 2010 Composer Agreement dated as of March 7, 2011 with NEW CREATIVE (the"2011 Composer Agreement"). This Contract was signed by Cuello on behalf of NEW CREATIVE. A copy of the 2011 Composer Agreement is attached hereto as Exhibit 3.

41.     On information and belief, NEW CREATIVE is an alter ego of MTVN and MTVN controls and operates NEW CREATIVE, such that NEW CREATIVE has ceased to exist as a separate entity. Specifically, on information and belief, MTVN executives and employees serve and operate on behalf of Defendant NEW CREATIVE. MTVN executives sign contracts on

16

behalf of NEW CREATIVE. The principal place of business for both MTVN and NEW CREATIVE are in the same location and specifically 1515 Broadway in New York, New York. Both entities are wholly owned subsidiaries of Viacom, Inc. and on information and belief, officers, managers, and/or directors of NEW CREATIVE are also officers, managers, and/or directors of MTVN. NEW CREATIVE and MTVN are agents of one another and/or alter egos of one another.

42.    The 2011 Composer Agreement provides, *inter alia*, that: (a) the "Hype Music Library" which the PLAINTIFFS' works would be part of, would be "accessed by third party licensees in return for a license fee"; (b) PLAINTIFFS would "receive a fair share of revenue generated by" their music; (c) the PLAINTIFFS' works would be registered by NEW CREATIVE with BMI so that PLAINTIFFS would receive their "writer's share" of "royalties"; (d) NEW CREATIVE had the right to exploit the PLAINTIFFS' works by exercising the "Hype Music Option" and to transfer the rights to any particular work to the owners of the "Hype Music Library" (MTVN and EXTREME or their "designees"); (e) NEW CREATIVE would be "responsible for ensuring that Composers (MARDEROSIANS), received a fair share of revenue generated by the music, whether or not the right to exploit the music were transferred outside of New Creative"; and (f) NEW CREATIVE was obligated to maintain books and records concerning each every individual license of PLAINTIFFS' work and provide semiannual statements reflecting an accounting of all monies received from the exploitation of PLAINTIFFS' work.

43.    From the inception of the 2011 Composer Agreement, the DEFENDANTS have failed to adhere to terms of the contract in a manner consistent with the spirit and purpose of the contract and have conducted themselves in a manner that has deprived PLAINTIFFS of ownership

and proceeds from the exploitation of their music and deprived them of the ability to detect and

discover the nature and extent of exploitation and income generated from that exploitation.

44.     PLAINTIFFS have recently discovered that as a direct violation by

DEFENDANTS of the terms and obligations of the 2011 Composer Agreement, thousands of

exploitations of their music were never reported to them and for which they never received a

penny.  Had DEFENDANTS complied with the terms and obligations of the 2011 Composer

Agreement, these usages *should* have generated millions of dollars for the PLAINTIFFS in

licensing fees and writer's share royalties.  Instead, PLAINTIFFS have received comparatively

little and far less than PLAINTIFFS could have earned through the license of a *single* work for a

limited advertising campaign on the open market.  Moreover, the PLAINTIFFS have barely

received any of the writer's share royalties that are owed.

45.     On the other hand, DEFENDANTS have earned millions from PLAINTIFFS' work

and have concealed the full extent of the exploitation so as to keep collecting money for themselves

to the significant detriment of the PLAINTIFFS. Specifically, DEFENDANTS have accomplished

this by:

    a.    Fraudulently induced PLAINTIFFS to enter into a contract to obtain copyright ownership and with the intent to fraudulently exploit PLAINTIFFS' compositions and productions in a manner to avoid responsibility for royalties and license fees entitled to PLAINTIFFS as required by the contract;

    b.    Fraudulently exploited PLAINTIFFS' compositions and productions in a manner to deprive PLAINTIFFS of their fifty percent (50%) of the gross receipts of all licensing fees due and owing to PLAINTIFFS as a result of the exploitation of their compositions and productions as required by the contract;

    c.    Failing to promptly and properly register PLAINTIFFS' music with  performing rights society, BMI, which has resulted and continues to result in the loss of royalty payments to PLAINTIFFS;

18

d.     Exploiting PLAINTIFFS' compositions and productions in a fraudulent manner to avoid filing of cue sheets in an effort to conceal uses of PLAINTIFFS' compositions and productions and thus depriving PLAINTIFFS of royalties and license fees;

e.     Failing to report uses of PLAINTIFFS' compositions and productions as required by the Agreements for the purpose of fraudulently concealing the uses of PLAINTIFFS' music and thus depriving PLAINTIFFS of royalties and license fees;

f.     Using PLAINTIFFS' compositions and productions without a necessary license or any authority from PLAINTIFFS;

g.     Exploiting PLAINTIFFS' music in a manner that targets, interferes with, and disrupts PLAINTIFFS' business efforts in order to deprive PLAINTIFFS of the opportunity of doing business in a fair and competitive business environment for the purpose of maliciously causing harm to PLAINTIFFS' business efforts and depriving PLAINTIFFS of substantial income; and

h.     Using and exploiting PLAINTIFFS' music in a manner that creates profit streams for the DEFENDANTS only.  For example, one or more of the DEFENDANTS have offered PLAINTIFFS' music for gratis or at a very low rate to 3rd party users such as television networks, advertising companies, etc. such that DEFENDANTS could secure other or additional lucrative opportunities, contracts, and profit streams that only benefit the DEFENDANTS and again deprive the PLAINTIFFS of their share of royalties and licensing fees.

## C.   FRAUDULENT INDUCEMENT TO ENTER INTO CONTRACT

46.    In an effort to induce and/or lure PLAINTIFFS into agreeing to be part of the "Hype Music Library" and to forego individual licenses for their music and enter into the 2011 Composer Agreement, Cuello and Elias fraudulently represented to PLAINTIFFS that if PLAINTIFFS agreed to contribute their musical compositions to the "Hype Music Library" being established by MTVN and Extreme, the revenue from this "new model" would be substantial for PLAINTIFFS as it would significantly increase the exploitation and commercial placement of PLAINTIFFS' music both by Viacom, its divisions and affiliates, and by third parties. This was a fraudulent representation designed to induce PLAINTIFFS into agreeing to the contract as it is abundantly

clear that from the outset, DEFENDANTS targeted PLAINTIFFS to obtain the rights to their music and had no intention of fairly compensating them for their contributions.

47.    In an effort to induce and/or lure PLAINTIFFS into agreeing to be part of DEFENDANTS' "new model" and to forego individual licenses for their music and enter into the 2011 Composer Agreement, Cuello and Elias, on behalf of MTVN and its affiliate NEW CREATIVE, and on behalf of the joint venture between MTVN and Extreme to create the "Hype Music Library", knowingly and fraudulently represented to PLAINTIFFS that they would receive fifty percent (50%) of all licensing fees and would be "fairly compensated" for the exploitation of their music.  This was clearly a fraudulent representation designed to induce PLAINTIFFS into agreeing to the 2011 Composer Agreement and to relinquish their copyrights.

48.    In an effort to induce and/or lure PLAINTIFFS into agreeing to be part of DEFENDANTS' "new model"and contribute PLAINTIFFS musical compositions to Defendants MTVN and EXTREMES' new joint venture HYPE PRODUCTION MUSIC ("HYPE"), DEFENDANTS' representatives, agents and/or employees, Cuello and Elias, represented that the writer's share of royalties PLAINTIFFS would receive would be substantial because the exploitation and placement of PLAINTIFFS' musical compositions would be significantly increased under the HYPE new model. This was a fraudulent representation as it is clear from the outset that the DEFENDANTS' conspired together to delay registration of PLAINTIFFS' works to the benefit of Viacom and its divisions, subsidiaries and affiliates, including MTVN, and to third party licensees who became clients of EXTREME and HYPE, and who did not have to pay

20

royalties where DEFENDANTS either failed to register PLAINTIFFS' works or failed to file cue sheets.

49. In a further effort to induce and/or lure PLAINTIFFS into agreeing to be part of DEFENDANTS' "new model" Hype Music Library, DEFENDANTS' agents, representatives, and/or employees, Cuello and Elias, represented that PLAINTIFFS and DEFENDANTS would be "partners" and would share the revenue from PLAINTIFFS' music equally. PLAINTIFFS were told they would receive fifty percent (50%) of all license fees generated by the exploitation of PLAINTIFFS' musical compositions contributed to the Hype Music Library. This was a fraudulent representation. DEFENDANTS have earned millions of dollars from PLAINTIFFS' musical works and PLAINTIFFS have received pennies. DEFENDANTS either failed to charge a license fee, which violates the terms of the 2011 Composer Agreement or have concealed receipt of such license fees. Even in situations where DEFENDANTS have charged a licensing fee for use of PLAINTIFFS' music, DEFENDANTS have not paid PLAINTIFFS their share as dictated by the terms of the Contract.

50. In a further effort to induce and/or lure PLAINTIFFS into agreeing to be part of DEFENDANTS' "new model" Hype Music Library, DEFENDANTS' agents, representatives, and/or employees, Cuello and Elias, represented that PLAINTIFFS would receive accurate and regular statements which reflected the exploitation of PLAINTIFFS' works. This was fraudulent representation. DEFENDANTS have never received an accurate statement which reflected the full nature and extent of the exploitation of PLAINTIFFS' works. Instead, PLAINTIFFS recently

21

have had to use outside resources to discover the full nature and extent of the exploitation of their music.

**D.   DEFENDANTS' WIDELY EXPLOITED PLAINTIFFS' MUSICAL COMPOSITIONS WITHOUT PAYING PLAINTIFFS THEIR SHARE OF LICENSE FEES**

51.     The 2011 Composer Agreement made it absolutely clear that there would be **no free licenses** of PLAINTIFFS' music.   Specifically, the 2011 Composer Agreement provided that the "Hype Music Library" was defined as "the library which may be accessed by third party licensees **in return for a license fee.**"   In other words, there would be no gratis licenses under this contract.

52.     Despite the aforesaid unequivocal term of the 2011 Composer Agreement, together with the contractual terms and obligations that PLAINTIFFS would receive a royalty equal to fifty percent (50%) for **all exploitations** of PLAINTIFFS' musical compositions, and that PLAINTIFFS would be compensated on a "fair, reasonable, and practicable basis", DEFENDANTS proceeded to extensively exploit PLAINTIFFS' work without providing any compensation to PLAINTIFFS whatsoever.   Among other commercial exploitations made by DEFENDANTS of PLAINTIFFS' musical compositions, are the following:

   a.   PLAINTIFFS' music was used in the Amazing Spiderman 2 Trailer for which they received **zero compensation**.

   b.   PLAINTIFFS' music was used in a Chrysler Men Who Built America commercial for which they received **zero compensation**.

   c.   PLAINTIFFS' music was used in a TBS Angie Tribeca promo and reoccurring multi-platform campaign which they received **zero compensation**.

   d.   PLAINTIFFS' music was used by the History Channel in support of Museum Men for which they received **zero compensation**.

e.  PLAINTIFFS' music was used multiple times on a recurring weekly basis in Showtime Inside the NFL for which they received **zero compensation**.

f.  PLAINTIFFS' music was used multiple times on a recurring weekly basis in NASCAR Race Wrap Up segments for which they received **zero compensation**.

g.  PLAINTIFFS' music was used in support of the Fox Show Lucifer for which they received **zero compensation**.

h.  PLAINTIFFS' music was used in the Hardcore Henry trailer for which they received **zero compensation**.

i.  PLAINTIFFS' music was used in the A & E show Nightwatch for which they received **zero compensation**.

j.  PLAINTIFFS' music was used in support of a Dodge Ram Truck Month Campaign for which they received **zero compensation**.

k.  PLAINTIFFS' music was used in support of the Showtime series Ray Donovan and Masters of Sex for which they received **zero compensation**.

l.  PLAINTIFFS' music was used in support of the program The Grinder for which they received **zero compensation**.

m.  PLAINTIFFS' music was used in support of the show NHL After Dark for which they received **zero compensation**.

n.  PLAINTIFFS' music was used in support of the Fox show Gotham for which they received **zero   compensation**.

o.  PLAINTIFFS' music was used in support of the movie Supermensch: The Legend of Shep Gordon for which they received **zero compensation**.

p.  PLAINTIFFS' music was used in the movie trailer for the film Deadpool for which they received **zero compensation**.

q.  PLAINTIFFS' music was used in support of Red Bull advertising campaigns for which they received **zero compensation**.

r.  PLAINTIFFS' music was used in support of Go Pro/NHL Digital advertising campaigns for which they received **zero compensation**.

23

s.      PLAINTIFFS' music was used in support of Disney Channel programming for which they received **zero compensation**.

t.      PLAINTIFFS' music was used in support of the NBC show First Look for which they received **zero compensation**.

u.      PLAINTIFFS' music was used on a recurring weekly basis in support of the YES Network programming for which they received **zero compensation**.

v.      PLAINTIFFS' music is being used in a Starbucks campaign for which they received **zero compensation.**

53.    The above represents only a handful of examples wherein Defendants, individually and/or jointly, have licensed and/or exploited PLAINTIFFS music but have failed to pay PLAINTIFFS the amounts due and owing under the 2011 Composer Agreement.   The foregoing constitutes direct, material and on-going breach of the 2011 Composer Agreement.   On their own, PLAINTIFFS earned $100,000 or more per song license for placements like those detailed above. As a result of DEFENDANTS' conduct, PLAINTIFFS have either earned nothing or pennies.   To add insult to injury, the few dollars that have been received, were paid to PLAINTIFFS by Defendants EXTREME in British pounds, subjecting the PLAINTIFFS to further losses in having to exchange such currency for dollars.

54.    In addition to the egregious conduct alleged above, the DEFENDANTS engaged in a scheme to actively conceal the placement of PLAINTIFFS' music so PLAINTIFFS would not discover:   (a)   the DEFENDANTS' fraudulent scheme; (b) the full extent of PLAINTIFFS' music that was exploited by DEFENDANTS; and (c) that the supposed statements that were provided were grossly inaccurate.   DEFENDANTS were not reporting to PLAINTIFFS the licensing and use of their music because DEFENDANTS were earning millions of dollars and did not want to pay PLAINTIFFS anything and did not want the PLAINTIFFS to discover what DEFENDANTS

24

were doing.   Instead, the PLAINTIFFS had to discover for themselves that their music was being

exploited and the full extent of such exploitation.   DEFENDANTS never advised PLAINTIFFS

of the vast majority of the exploitations.   DEFENDANTS rarely sent statements or accounting

and when PLAINTIFFS questioned DEFENDANTS about the exploitation of the PLAINTIFFS'

music without any compensation, PLAINTIFFS were either ignored, given the run around, or met

with a resounding chorus of excuses.   Ultimately, PLAINTIFFS discovered that Defendants

EXTREME frequently offered PLAINTIFFS music to their clientele in exchange for a yearly

"consulting fee" Defendants EXTREME received.   Under these types of "arrangements,"

Defendants EXTREME received millions of dollars for the exploitation of PLAINTIFFS' music

but claimed that they did not have to pay PLAINTIFFS anything because there was "no license

fee" charged.

     55.     In addition, Defendants EXTREME issued statements which materially omitted the

vast majority of exploitations of PLAINTIFFS' music. This conduct prevented the PLAINTIFFS

from knowing the full extent of the exploitation of PLAINTIFFS' music. This is significant

because the 2011 Composer Agreement specifically provides that PLAINTIFFS have a certain

amount of time to challenge the statements and accounting provided.   However, DEFENDANTS'

deceptive and fraudulent conduct prevented PLAINTIFFS from discovering the full nature and

extent of the exploitation and deprived PLAINTIFFS of the knowledge and opportunity to object

to or challenge the fraudulent accounting statements.

     56.     PLAINTIFFS have recently undertaken an extensive investigation into the full

extent of the exploitation of their music and have discovered there have been thousands of

instances wherein their music has been exploited for which they have received no compensation whatsoever but for which DEFENDANTS have profited handsomely.

**E.     FAILURE TO PROMPTLY AND PROPERLY REGISTER PLAINTIFFS' MUSIC DEPRIVING PLAINTIFFS OF ROYALTY INCOME**

57.     The 2011 Composer Agreement clearly provides that PLAINTIFFS are entitled to their writer's share of public performance income from the use of PLAINTIFFS' music. Furthermore, DEFENDANTS were responsible for promptly registering PLAINTIFFS' music with performing rights society, BMI, to ensure that PLAINTIFFS would receive their writer's share of all public performance income.   At various points in time, DEFENDANTS have pointed at one another as being responsible for such registration, none of whom actually effectively and efficiently completed such task, thereby depriving PLAINTIFFS of substantial income.

58.     None of the DEFENDANTS promptly and completely registered the PLAINTIFFS' music as they were obligated to do under the 2011 Composer Agreement.   Instead, these DEFENDANTS purposefully delayed in registering PLAINTIFFS' music such that those production companies and agencies (DEFENDANTS' affiliates, divisions, and clients) who would be responsible for paying public performance royalties when PLAINTIFFS' music was used in their media, would not have to pay such royalties.   In addition, to the extent that DEFENDANTS licensed PLAINTIFFS' music to third parties, such third parties would not have to pay such royalties making it more desirable for these third parties to do additional business with DEFENDANTS.   It was a "win win" for DEFENDANTS and left PLAINTIFFS with no way to collect the writer's share of royalties that were owed under the 2011 Composer Agreement.

59.     In order to conceal DEFENDANTS material breach of the 2011 Composer Agreement by the failure to register PLAINTIFFS' musical compositions with all applicable

performing rights societies, the following misrepresentations were made by and on behalf of

DEFENDANTS joint and individually:

a.   In January 2011, PLAINTIFFS inquired about the registrations. They were told by DEFENDANTS' agent, representative, and/or employee, Cuello, that the works had been sent to BMI for registration and BMI was responsible for the delay.   BMI subsequently confirmed that no DEFENDANT had taken any steps to register the PLAINTIFFS' music. Cuello's statement was knowingly false and was made with the specific intent that PLAINTIFFS would rely on such statements.

b.   On August 19, 2011, PLAINTIFFS inquired again regarding the registrations. DEFENDANTS' agent, representative, and/or employee, Elias, claimed that Defendants EXTREME would be registering the music. This was clearly a misrepresentation and an effort to shift the burden from Defendant NEW CREATIVE, who was a signatory to the contract, to Defendants EXTREME.

c.   On August 23, 2011, PLAINTIFFS inquired again regarding the registration of PLAINTIFFS' songs. DEFENDANTS' agent, representative, and/or employee, Elias, advised that Defendants EXTREME would be registering the songs in the next two weeks but supposedly had a problem with the website.  This was clearly a misrepresentation and was just an excuse to justify the significant delay in the registration of songs that should have been registered months before.

d.   On August 26, 2011, PLAINTIFFS asked Kelsey Dewald an executive for Defendants EXTREME, if the PLAINTIFFS' songs had been registered. Ms. Dewald responded on September 1, 2011, by saying there was a "mix-up with song titles" that delayed the registration.  This statement was knowingly false when made and was made with the specific intention that PLAINTIFFS' would rely on such statement.  Again, DEFENDANTS were purposefully delaying the registration of PLAINTIFFS' work to PLAINTIFFS' significant detriment and to DEFENDANTS' significant benefit.

e.   On November 9, 2011, PLAINTIFFS inquired again about the registration for the music that was delivered under the 2011 Composer Agreement, Cuello responded by stating that the songs should be registered "any day now".  This statement was knowingly false when made and was made with the specific intention that PLAINTIFFS would rely on such statement.

27

f.    On December 21, 2011, following the PLAINTIFFS' discovery that one of the songs they had delivered under the 2011 Composer Agreement had been used in an advertisement for "Land Rover," PLAINTIFFS confirmed again that the registrations had not been completed.   On January 5, 2012, PLAINTIFFS again inquired with DEFENDANTS' representative, agent, and/or employee, Elias, and with Defendants EXTREMES' representative, agent, and/or employee, Emmanuel, inquiring why **all but one song** remained unregistered.   At this point, PLAINTIFFS had lost **more than a year** of royalties. DEFENDANTS did not even respond to this email.

g.    In an email dated January 4, 2012, Kelsey Dewald, on behalf of Defendants EXTREME falsely represented that Defendants "submit[ed] the registrations to BMI months ago for all" Plaintiffs' tracks. "The instrumentals AND the Scavengers EP."

h.    On January 12, 2012, PLAINTIFFS discovered that a musical composition submitted to DEFENDANTS under the 2011 Composer Agreement had been featured on the ABC television show "Revenge."   PLAINTIFFS checked with BMI, who reported that "no submitted or pending" registrations existed for the work they had delivered to DEFENDANTS under the Contracts.   PLAINTIFFS again emailed DEFENDANTS' employee, agent, and/or representatives, Elias, and Emmanuel, about the fact that the registrations had not been submitted.  Again, PLAINTIFFS' inquiry was ignored.

i.    Days later, on January 14, 2012, PLAINTIFFS followed up with Defendants EXTREME regarding a Land Rover commercial which featured their unregistered music.  Defendants EXTREME responded by claiming that the registrations had supposedly been submitted months ago.   This was a knowingly false statement which was blatantly contradicted not only by BMI but also by the DEFENDANTS' own statements.   DEFENDANTS were clearly conspiring together to further delay the registrations.

j.    On February 24, 2012, DEFENDANTS' agent, representative, and/or employee, Elias, wrote advising the PLAINTIFFS one of their songs had been registered.   PLAINTIFFS inquired with BMI who confirmed the song was not registered.   Elias's statement was knowingly false and was made with the intent that PLAINTIFFS would rely on such statements.

60.    It was not until February 27, 2012 that DEFENDANTS began registering *some* of

PLAINTIFFS' works with performing rights societies so that PLAINTIFFS could finally begin

receiving a small fraction of their writer's share of public performance income.  The registrations were sporadic and haphazard through 2013, costing PLAINTIFFS substantial sums in lost royalties.

61.     However, even after the DEFENDANTS finally registered PLAINTIFFS' songs with the performing rights societies, DEFENDANTS then concocted a scheme to change the names of the PLAINTIFFS' songs such that they would go undetected and could be used by MTVN and its affiliated entities and by EXTREMES' clientele without paying any public performance income to PLAINTIFFS.  Cue sheets would either not be submitted as discussed below or would be submitted under the different song titles and PLAINTIFFS would then be again deprived of their writer's share of royalties.  Furthermore, this scheme made it impossible, for PLAINTIFFS to determine if, in fact, DEFENDANTS were using their work without their receiving the compensation they were rightfully owed.  DEFENDANTS' efforts were designed to conceal the exploitation of PLAINTIFFS' music and save themselves and their clients' money.

**F.     FAILURE TO FILE OR REQUIRE CUE SHEETS**

62.     In addition to the aforesaid acts and omissions of DEFENDANTS, DEFENDANTS engaged in a malicious course of conduct to deprive PLAINTIFFS of the royalties they were rightfully owed by failing to file or to require the filing of cue sheets or by filing cue sheets or directing them to be filed with different song titles, which had not been registered as PLAINTIFFS' songs.

63.     First, as indicated above, DEFENDANTS purposefully and willfully delayed in registering the PLAINTIFFS' music with applicable performing rights societies.  This deprived the PLAINTIFFS of income they were rightfully owed under the contracts because until a song is

properly registered, there is no obligation to pay the writer's share of royalties, no matter how many times the PLAINTIFFS' music is exploited.

64. Second, when these DEFENDANTS finally got around to registering PLAINTIFFS' music, DEFENDANTS changed the titles of numerous songs, thereby depriving PLAINTIFFS of public performance income because the new songs had not been registered with performing rights societies as being affiliated with PLAINTIFFS.

65. Third, DEFENDANTS entered into "sweetheart" deals for the use of PLAINTIFFS' music by Viacom, its divisions, subsidiaries, and affiliates, and to third party licensees for little or no consideration advising that the songs were "pre-cleared and royalty free" and as such, no cue sheets had to be filed. The DEFENDANTS were able to profit from this because EXTREME, MTVN, and HYPE were receiving annual "consultation" fees for delivering music like that of the PLAINTIFFS. The PLAINTIFFS, on the other hand, were not receiving any licensing fee or any royalty.

66. In addition to the "sweetheart" deals discussed above, DEFENDANTS were giving away PLAINTIFFS music for free to gain "good will" to secure further deals for themselves and their partners. DEFENDANTS would again misrepresent that PLAINTIFFS' music was "pre-cleared and royalty free" thereby misrepresenting to these clients and/or potential clients that cue sheets did not have to be filed. This resulted in economic benefit to EXTREME, MTVN, and HYPE but resulted in the PLAINTIFFS receiving nothing from the exploitation of their works.

67. Like the registration scheme, the DEFENDANTS' cue sheet scheme again deprived PLAINTIFFS of income they were unquestionably owed as a result of the exploitation of PLAINTIFFS' music under the terms of the Contract.

30

## G.    FAILURE TO PROPERLY REPORT AS REQUIRED BY CONTRACT

68.     The 2011 Composer Agreement provides that NEW CREATIVE was to provide biannual accounting statements to PLAINTIFFS reflecting the exploitation of PLAINTIFFS' music and a complete accounting of the profits.

69.     NEW CREATIVE never provided any statements to PLAINTIFFS.

70.     Defendants EXTREME, which are not signatories to the 2011 Composer Agreement, provided sporadic statements, which unknown to PLAINTIFFS until recently, were completely misleading, inadequate, and incomplete.   Among other deficiencies, the statements provided by and on behalf of DEFENDANTS did not reflect each license given for PLAINTIFFS' music, they did not include the money made from the exploitation of PLAINTIFFS' music, and they were vague and ambiguous at best.   Those accounting statements rendered by EXTREME individually and on behalf of the other DEFENDANTS, made it appear that PLAINTIFFS were receiving 100% of the income they were entitled to receive pursuant to the terms of the 2011 Composer Agreement when, in fact, DEFENDANTS were intentionally not reporting and concealing from PLAINTIFFS the fact that substantial additional income was due and owing to PLAINTIFFS.   PLAINTIFFS reasonably relied on the accuracy of the accounting statement rendered by defendant EXTREME, individually and on behalf of the other DEFENDANTS, and PLAINTIFFS did not discover until recently the fraudulent reporting of income from the exploitation of PLAINTIFFS' musical compositions, and the concealment of income otherwise due and owing to PLAINTIFFS under the 2011 Composer Agreement.

71.     As a result of PLAINTIFFS' recent investigation, they have discovered that there are thousands of uses of PLAINTIFFS' music which were not reported on any of the statements

provided by EXTREME, individually and on behalf of the other DEFENDANTS, or on the

PLAINTIFFS' BMI statements which further confirms not only that the DEFENDANTS were not

accurately reporting the uses, but also confirms that the PLAINTIFFS were not being properly

paid for such uses.   The DEFENDANTS' concealment of the full exploitation of PLAINTIFFS'

music is still being uncovered as a result of DEFENDANTS' intentional failure to properly

disclose all uses on the few statements that were rendered to PLAINTIFFS and the intentional

concealment of the amounts actually and legitimately owed to PLAINTIFFS.

72.    By not issuing statements and/or by issuing fraudulent, misleading, and incomplete

statements, NEW CREATIVE and EXTREME, individually and on behalf of the other

DEFENDANTS were purposefully concealing the full extent of exploitation of PLAINTIFFS'

music and the amount of income otherwise due and owing to PLAINTIFFS.   These purposeful

omissions prevented PLAINTIFFS from learning the full extent of exploitation of PLAINTIFFS'

work and prevented them from immediately objecting to such statements. When the

DEFENDANTS' fraudulent scheme became apparent, PLAINTIFFS immediately undertook an

investigation, the results of which are still being discovered.

## H.    FRAUDULENT EXPLOITATION OF PLAINTIFFS' MUSIC DEPRIVING THEM OF LICENSING FEES AND WRITER'S SHARE OF ROYALTIES

73.    It is now apparent that DEFENDANTS conspired together to target PLAINTIFFS'

music and PLAINTIFFS' business so that they could exploit PLAINTIFFS' music and maximize

their own profits to the detriment of PLAINTIFFS.   DEFENDANTS were able to pay next to

nothing to obtain PLAINTIFFS' valuable catalog of music under the auspices that the

PLAINTIFFS would share equally in the profits that were generated from the exploitation of their

music.   However, while DEFENDANTS were representing one thing to PLAINTIFFS, they were

plotting and scheming to do something entirely different.   Specifically, DEFENDANTS, through
EXTREME, MTVN, and HYPE, made substantial profits by including PLAINTIFFS' music in a
catalog for which EXTREME were paid yearly consulting fees by third-party licensees.   In
exchange for the consulting fee, EXTREME provided their clientele, such as, the History Channel
or A&E, complete access to what is referred to as   the "Extreme Blanket Library" which they
represented was " pre-cleared and royalty free" music.   As a result,   EXTREME were receiving
millions of dollars exploiting PLAINTIFFS' music under this arrangement and PLAINTIFFS were
receiving no compensation whatsoever.

      74.    PLAINTIFFS are informed and believe and thereon allege that EXTREME, have
standing agreements with television networks like the History Channel, A&E, Fox, the NFL
Network and others, whereby in exchange for the payment of a blanket license fee to EXTREME,
licensees are not required to pay artists like PLAINTIFFS any writer's share nor are they required
to fill out any cue sheets for this music.   This essentially allows DEFENDANTS to make
significant profits exploiting PLAINTIFFS' work while PLAINTIFFS' receive nothing. Nothing
contained in any contract permits this type of exploitation of PLAINTIFFS' music.

      75.    It is abundantly clear that DEFENDANTS' exploitation of PLAINTIFFS' music
was what the DEFENDANTS had envisioned all along.   While DEFENDANTS represented that
they wanted a "partnership" with the PLAINTIFFS and would split the profits equally, in reality
it was a calculated plan to enable EXTREME, through HYPE, to grossly exploit PLAINTIFFS'
music so that the DEFENDANTS could receive substantial profits and PLAINTIFFS would make
none.

I.  **DEFENDANTS' CONDUCT HAS WRONGFULLY INTERFERED WITH PLAINTIFFS' BUSINESS**

76.     The means and manner in which the DEFENDANTS have been exploiting PLAINTIFFS' music, as detailed hereinabove, has directly interfered with PLAINTIFFS' existing business relationships and potential business opportunities.

77.     Specifically, PLAINTIFFS have been engaged in composing and producing music for various projects on behalf of a motion picture production company when EXTREME and/or HYPE approached the same client and offered the PLAINTIFFS' music as part of the "Extreme Music Library" scam detailed above.   The existing and potential clients are presented with either paying the PLAINTIFFS' for their work or getting it from EXTREME without having to compensate the artists at all.   By way of example, PLAINTIFFS were hired to do the "Amazing Spiderman" trailer for which they received a substantial sum of money.   They were approached to do the trailer for the *Amazing Spiderman 2* but EXTREME and/or HYPE interfered in the potential license by offering PLAINTIFFS' music for no license fee and no royalty payment and as such, PLAINTIFFS' earned nothing despite the fact that it was their work used for the trailer. This is not a limited incident but has occurred on several occasions damaging PLAINTIFFS' business, profits, and reputation.

78.     Likewise, the market value of PLAINTIFFS' work has been impacted by the fact that EXTREME are running this scam.   Prior to PLAINTIFFS' involvement with DEFENDANTS, PLAINTIFFS were earning $100,000 or more for a project like a blockbuster movie trailer.   EXTREME and MTVN have offered PLAINTIFFS music for free as part of sweetheart deals to affiliated entities and as favors to clients or as part of the "Extreme Music

Library" scam detailed above and as such, potential clients of PLAINTIFFS discover that they do not have to pay $100,000 or more to license PLAINTIFFS' music when they could just get PLAINTIFFS' music for free from EXTREME and/or HYPE.

### FIRST CLAIM
### BREACH OF CONTRACT
### (Against Defendant NEW CREATIVE and MTVN
### as an Alter Ego of Defendant NEW CREATIVE)

79.     PLAINTIFFS incorporate Paragraphs 1 through 78 as though fully set forth herein.

80.     As alleged hereinabove, PLAINTIFFS and NEW CREATIVE entered into an amendment dated March 7, 2011 to the 2010 Composer Agreement, as amended, the 2011 Composer Agreement.   The 2011 Composer Agreement has attached to it and includes as Exhibit A, the Hype Master Agreement.   All references herein to the "2011 Composer Agreement" include and incorporate the HYPE Master Agreement attached as Exhibit A to the March 7, 2011 amendment to the 2010 Composer Agreement.   The 2011 Composer Agreement recites and provides that NRP transferred and assigned to NEW CREATIVE, and NEW CREATIVE accepted transfer and assignment of all NRP's right, title, interest and obligations in and to the 2010 Composer Agreement.   Accordingly, as of March 7, 2011, NEW CREATIVE MIX accepted and assumed all duties and obligations of NRP under the 2010 Composer Agreement.

81.     Section 4.8 of the 2011 Composer Agreement provided that NEW CREATIVE would register the works with all appropriate mechanical and performing rights collection societies who are responsible for the collection and distribution of royalties relating to exploitation of mechanical and performing rights.

35

82.     Section 7.4 of the 2011 Composer Agreement provides that PLAINTIFFS would receive and retain their writer's share of public performance income which may be payable directly from a performing rights society such as ASCAP, BMI, and SESAC.

83.     In material breach of the 2011 Composer Agreement, and despite the fact that it was NEW CREATIVE's sole responsibility to register the works so that PLAINTIFFS would receive their writer's share of royalties pursuant to the terms of the 2011 Composer Agreement, NEW CREATIVE NCM failed and/or substantially delayed to register the songs thereby depriving PLAINTIFFS of the money they were rightfully owed and entitled to under the terms of the contract with NEW CREATIVE.

84.     As a direct and proximate result of NEW CREATIVE'S dilatory conduct, PLAINTIFFS did not receive the benefit of the bargain and were deprived of significant rights, benefits, and monies owed and to which the PLAINTIFFS were clearly entitled.

85.     Pursuant to Sections 7.2 and 7.3 of the 2011 Composer Agreement, NEW CREATIVE was obligated to pay a royalty equal to fifty percent (50%) of the gross receipts generated from the work PLAINTIFFS delivered, and that PLAINTIFFS would be compensated on a "fair, reasonable, and practicable basis."

86.     As alleged hereinabove, in direct breach of the 2011 Composer Agreement, NEW CREATIVE has not fairly or fully compensated PLAINTIFFS for the use and exploitation of their music and PLAINTIFFS did not receive a royalty equal to fifty percent (50%) of the gross receipts generated from the work PLAINTIFFS delivered.

87.     Pursuant to Section 8.3 of the 2011 Composer Agreement, NEW CREATIVE was obligated to maintain accurate books and records concerning the licensing of PLAINTIFFS' works and corresponding third party income generated under the 2011 Composer Agreement.

88.     In direct breach of the 2011 Composer Agreement, Defendant NEW CREATIVE has not issued any statements as required under the 2011 Composer Agreement.   Instead, EXTREME issued sporadic statements, which were not accurate, were not complete, and which were misleading and fraudulent. EXTREME obviously and purposefully did not maintain accurate books and records concerning the licensing of PLAINTIFFS' works and as a result, PLAINTIFFS have not received complete and accurate statements (and often did not receive any statement) and have not received all of the monies owed to them under the 2011 Composer Agreement. Furthermore, because EXTREME purposefully concealed the full extent of their exploitation of PLAINTIFFS' work, PLAINTIFFS are only now just discovering the full extent of usage and damages they have suffered.

89.     NEW CREATIVE owed PLAINTIFFS a duty of good faith and fair dealing.

90.     In direct breach of its duty of good faith and fair dealing, NEW CREATIVE acted in a manner that was manipulative and in a manner that maximized its own profits and benefits to the significant detriment of PLAINTIFFS. NEW CREATIVE aided, abetted, and allowed EXTREME to exploit PLAINTIFFS' music in a manner that was unfair, inequitable, and directly contrary to the terms of the 2011 Composer Agreement. NEW CREATIVE's conduct deprived PLAINTIFFS of the benefit of the bargain.

91.     As a result of the numerous material breaches of the 2011 Composer Agreement by NEW CREATIVE, as alleged hereinabove, PLAINTIFFS have suffered and continue to suffer significant and substantial damages in an amount to be proven at trial.

92.     On information and belief, NEW CREATIVE is an alter ego of MTVN and MTVN completely controls and operates NEW CREATIVE, such that NEW CREATIVE has ceased to exist as a separate entity. Specifically, on information and belief, MTVN executives and employees serve and operate as the executives and employees of NEW CREATIVE. MTVN executives sign contracts on behalf of NEW CREATIVE and in this case, MTVN executive Jose Cuello not only negotiated the 2011 Composer Agreement on behalf of NEW CREATIVE, but also signed it on behalf of NEW CREATIVE. The principal place of business for both MTVN and NEW CREATIVE are in the same location and specifically 1515 Broadway in New York, New York, which is also the address of their common parent, Viacom, Inc. Both entities are wholly owned subsidiaries of Viacom, Inc. and on information and belief, officers, managers, and/or directors of NEW CREATIVE are also officers, managers, and/or directors of MTVN. NEW CREATIVE and MTVN are agents of one another and/or alter egos of one another. To the extent any judgment against NEW CREATIVE cannot be collected because NEW CREATIVE is under-capitalized, then PLAINTIFFS seek to recover such judgment from Defendant MTVN.

## SECOND CLAIM
### BREACH OF CONTRACT
### (Against Defendants EXTREME, MTVN, and HYPE)

93.     PLAINTIFFS incorporate Paragraphs 1 through 92 as though fully set forth herein.

94.     On information and belief, EXTREME, MTVN, and HYPE were assigned the rights and obligations under the 2011 Composer Agreement with NEW CREATIVE with respect to PLAINTIFFS' works.

95.     As assignees of the rights and obligations under the 2011 Composer Agreement with respect to PLAINTIFFS' works, EXTREME, MTVN, and HYPE were obligated to perform and fulfill all obligations with respect to PLAINTIFFS' works including, but not limited to:

a.     The obligation to register PLAINTIFFS' works with BMI such that PLAINTIFFS could receive their writer's share;

b.     The obligation to license PLAINTIFFS' works for a profit and not for free;

c.     The obligation to ensure that PLAINTIFFS were fully and fairly compensated for the exploitation of their works;

d.     The obligation to pay PLAINTIFFS 50% of the gross receipts generated as a result of the exploitation of PLAINTIFFS' works; and

e.     The obligation to render semi-annual accounting statements to PLAINTIFFS which fully and accurately set forth all exploitation of and payment for PLAINTIFFS' works from any source.

96.     Despite the fact that PLAINTIFFS fulfilled all of their obligations under the 2011 Composer Agreement, EXTREME, MTVN, and HYPE did not.   In fact, EXTREME, MTVN, and HYPE failed to fulfill any of their obligations as an assignee and repeatedly breached the 2011

39

Composer Agreement by failing to timely register the works, by failing to properly register the works, by failing to license PLAINTIFFS' music for profit, by failing to require cue sheets for each exploitation and for each and every use, by failing to ensure PLAINTIFFS were fairly compensated for the extensive exploitation of their work, by failing to share all gross receipts generated by exploitation of PLAINTIFFS works "50/50", and by failing to deliver the required accounting statements and information under the 2011 Composer Agreement.

97.     EXTREME, MTVN, and HYPE owed PLAINTIFFS a duty of good faith and fair dealing.

98.     In direct breach of its duty of good faith and fair dealing, EXTREME, MTVN, and HYPE acted in a manner that was manipulative and in a manner that maximized their own profits and economic benefits to the significant detriment of PLAINTIFFS. EXTREME, MTVN, and HYPE exploited PLAINTIFFS' music in a manner that was detrimental to PLAINTIFFS and which deprived the PLAINTIFFS of the benefits that were supposed to be conveyed pursuant to the 2011 Composer Agreement.

99.     EXTREME, MTVN, and HYPE's conduct as described throughout this Complaint and herein constitutes a material breach of the 2011 Composer Agreement and of its duty of good faith and fair dealing thereby entitling PLAINTIFFS to monetary damages.

100.     As a direct and proximate cause of EXTREME, MTVN, and HYPE's numerous breaches of the 2011 Composer Agreement, PLAINTIFFS have suffered and continue to suffer substantial damages that PLAINTIFFS were clearly entitled to.   These damages are in an amount to be proven at trial.

## THIRD CLAIM
## BREACH OF IMPLIED IN FACT CONTRACT
### (Against Defendants EXTREME, MTVN, and HYPE)

101.    PLAINTIFFS incorporate Paragraphs 1 through 100 as though fully set forth herein.

102.    EXTREME and MTVN were in a partnership referred to in the 2011 Composer Agreement as the HYPE MUSIC LIBRARY. On information and belief, the rights and obligations in the 2011 Composer Agreement were assigned to these Defendants.   However, pursuant to Fed. R. Civ. P 8(d)(2), if no assignment exists, then PLAINTIFFS allege that there was an Implied In Fact Contract with these Defendants which was repeatedly breached by them.

103.    EXTREME, MTVN, and HYPE have conducted themselves in a manner as though there was some sort of contractual relationship with PLAINTIFFS.   Specifically, as is set forth throughout this Complaint:

a.      EXTREME, MTVN, and HYPE have been facilitating and licensing rights to third-parties to use PLAINTIFFS' music in movies, television, advertising campaigns, and on the internet;

b.      EXTREME, MTVN, and HYPE have been facilitating the exploitation of PLAINTIFFS' music in MTVN and Viacom productions including television programs and movies.

c.      Employees and executives from MTVN and/or HYPE, and specifically Cuello and Elias, remained involved in transactions regarding PLAINTIFFS' music.

d.      After repeated requests to both MTVN and EXTREME,   Defendants EXTREME finally registered PLAINTIFFS' songs with BMI; and

41

e.      The sporadic statements regarding the exploitation of PLAINTIFFS' works and the nominal payments received by PLAINTIFFS came from Defendants EXTREME.

104.    EXTREME, MTVN, and HYPE have acted as though they were signatories to the 2011 Composer Agreement in the sense that they exploited the works delivered by PLAINTIFFS. However, EXTREME, MTVN, and HYPE did not properly, adequately, or fairly compensate PLAINTIFFS pursuant to such agreement, did not promptly register PLAINTIFFS' works, and did not provide complete and correct statements to PLAINTIFFS reflecting the exploitation of PLAINTIFFS' works.

105.    As a result of the conduct of EXTREME, MTVN, and HYPE, there was, at a minimum, an Implied In Fact Contract, which EXTREME, MTVN, and HYPE repeatedly and materially breached by failing to timely register the works, by failing to properly register the works, by failing to license PLAINTIFFS' music for profit, by failing to require cue sheets for each exploitation and for each and every use, by failing to ensure PLAINTIFFS were fairly compensated for the extensive exploitation of their work, by failing to share all gross receipts generated by exploitation of PLAINTIFFS' works "50/50", and by failing to deliver the required statements and information under the Agreement.

106.    As a direct and proximate cause of EXTREME, MTVN, and HYPE's numerous breaches, PLAINTIFFS have suffered and continue to suffer substantial damages.   These damages are in an amount to be proven at trial.

107.    PLAINTIFFS have repeatedly requested that EXTREME produce a copy of any assignment such as to avoid having to make this claim in the alternative.   However, EXTREME

42

have refused to produce any existing assignment which calls into question whether such documentation exists.

## FOURTH CLAIM
### FRAUD
### (Against Defendants MTVN, EXTREME, and HYPE)

108.     PLAINTIFFS incorporate Paragraphs 1 through 107 as though fully set forth herein.

109.     As alleged hereinabove, MTVN and EXTREME formed HYPE, a partnership under which they fraudulently gained access to PLAINTIFFS' music.

110.     As hereinabove and with additional specificity below, the DEFENDANTS, and each of them, conspired to devise and execute a plan to deprive PLAINTIFFS of their ownership and share of income generated from the exploitation of PLAINTIFFS' musical creations and productions and in a manner that prevented PLAINTIFFS from detecting and discovering the full nature and extent of the exploitation of PLAINTIFFS' music thereby preventing them from objecting and seeking through legal recourse the income they were entitled to pursuant to the Contract they had entered into on March 7, 2011.

111.     In April 2010, PLAINTIFFS were approached by MTVN employees and managing executives, Cuello and Elias, regarding a "new project" they wanted to discuss with PLAINTIFFS. As of April 2010, PLAINTIFFS had a well-established and profitable relationship with MTVN, and had supplied MTVN with dozens of original music compositions used by MTVN in and to market its television programming.   During the course of the discussion, Jose Cuello, specifically stated that "even though MTVN has had a very successful and profitable relationship with you, we are no longer going to use your music unless you agree to enter into a new contract with us."   As

43

the discussion continued, both Cuello and Elias explained that PLAINTIFFS' music would be part of a "MTV Music Library" that would allow Viacom networks to use PLAINTIFFS' music, which would increase PLAINTIFFS' royalties. Specifically, Cuello stated that "we will take full ownership of your copyrights and, in exchange, substantially increase the use of [PLAINTIFFS] songs and substantially increase [PLAINTIFFS'] BMI income." Both Cuello and Elias stated that "each of the songs would be identified" in the contract and that they "would take responsibility for registering all of the songs with BMI", which was PLAINTIFFS' designated performing rights organization. Shortly after executing the 2010 Composer Agreement, PLAINTIFFS began complaining to Cuello and Elias about the fact that the songs were not being registered with BMI. Cuello and Elias stated to PLAINTIFFS that they would register the songs knowing that they had no intent to do so and knowing that these false statements to PLAINTIFFS were intended to mislead and cause PLAINTIFFS to rely on these representations to PLAINTIFFS' financial detriment.

112.    In January 2011, PLAINTIFFS met Cuello and Elias for lunch. PLAINTIFFS inquired again with Cuello and Elias about the fact that the 2010 Composer Agreement did not identify the songs that were the subject of the contract, even though PLAINTIFFS had identified the songs when they were completed and submitted to Cuello and Elias and again, complained that Cuello and Elias were not registering PLAINTIFFS' songs with BMI as required by the 2010 Composer Agreement. Cuello and Elias specifically stated and represented, falsely, that they were "in the process of completing the song registrations with BMI" and apologized for the delay. These statements were knowingly false and made with the specific intent to cause PLAINTIFFS to rely upon them and to cause PLAINTIFFS financial harm.

44

113.    At the same meeting in January 2011, Cuello told PLAINTIFFS that they were the "poster boys" for MTV's music library and due to MTVN's success in using PLAINTIFFS' music, MTVN wanted PLAINTIFFS to become their "partners".    Cuello and Elias proposed entering into a new agreement which would incorporate the original fifty (50) works delivered under the 2010 Composer Agreement plus new compositions, all of which would be added to a new music library called "The Hype Music Library", which according to Cuello, was jointly owned and operated by MTVN and a company referred to as "Extreme Music" and its owner, Russell Emmanuel.    Cuello stated that by contributing PLAINTIFFS' musical compositions to the "Hype Music Library", PLAINTIFFS' music would be "exploited worldwide and without limitation" to just Viacom networks.    In addition, Cuello stated "you guys are going to make a shitload of money from Extreme's exploitation of your music."    These statements were knowingly false, and specifically stated for the purpose of inducing PLAINTIFFS to enter into a new contract.    PLAINTIFFS relied on these representations to their detriment and damage.

114.    On March 1, 2011, "MTV, a division of Viacom, Inc. and Extreme Music, the Production Music Arm of Sony/ATV" issued an "all media release" identifying their partnership in "Hype Production Music."    Within this "all media release," which is attached hereto as Exhibit 2, Jose Cuello, "SVP, Creative Music Integration for MTV," and "Russell Emmanuel CEO, Extreme Music" discuss their partnership whose mission is to discover new "emerging artists and songs".    Russell Emmanuel specifically stated that the Hype Music "model" would be "an artist-friendly incubator leveraging its ability to license tracks directly in high profile shows..."    The press release stated that "artists will benefit from their songs inclusion in the "Hype Music Library" and that "All revenues from the licensing and digital distribution of songs included in the "Hype

Music Library" will be split with 50 percent going to the artist."   These statements were knowingly false and misleading and intended for the purpose of causing PLAINTIFFS to rely upon them and to enter into the contract which is the subject of this litigation, dated March 7, 2011. This contract is attached hereto as Exhibit 3.

115.   As a result of PLAINTIFFS' pre contract relationship with MTVN, PLAINTIFFS accepted MTVN's representations to the effect that PLAINTIFFS' music would be exploited on a much larger basis and that the income from the increased exploitations would benefit everyone, including PLAINTIFFS.   It is now apparent that the whole concept of the "Hype Music Library" as referenced in the Contract was nothing but sham and, in fact, PLAINTIFFS' music is being exploited in a manner that is in total disregard of the spirit, terms, and context of the Contract. The conduct of EXTREME in exploiting the subject music has no connection whatsoever to the spirit, context, or specific terms of the March 7, 2011 contract.   Instead, the music is being exploited as if PLAINTIFFS have no interest whatsoever in the subject works.

116.   Based on the representations made by Cuello and Elias, as discussed above, and by Cuello and Emmanuel, as discussed in the subject press release, PLAINTIFFS entered into a new contract on March 7, 2011, wherein PLAINTIFFS would write and produce additional songs and transfer copyright ownership of those songs in exchange for the representation that the music would be exploited in a manner that would result in increased writer's share royalties and licensing use fees.

117.   On August 19, 2011, PLAINTIFFS inquired with MTVN's employee, Ernesto Elias, about the lack of BMI registrations, Elias indicated that he would "look into this" but also suggested that they contact EXTREME, who is "now responsible for registering the songs."   Elias

46

specifically instructed PLAINTIFFS to contact EXTREME representatives Russell Emmanuel and Kelsey Dewald.   Even though Elias indicated that he would "look into this", he never would respond, causing PLAINTIFFS to repeatedly follow up on the fact that their music was not being registered with BMI and they were losing royalty income as a result.   When PLAINTIFFS' contacted Russell Emmanuel and Kelsey Dewald at EXTREME, PLAINTIFFS were told by both Mr. Emmanuel and Ms. Dewald that the "songs were being registered" and that PLAINTIFFS "were gonna make a lot of money."   At one point, on January 4, 2012, Kelsey Dewald falsely represented that EXTREME had "submitted the registrations to BMI months ago for all your guys tracks," which was blatantly and knowingly false and stated for the purpose of causing PLAINTIFFS to rely on her representations that the songs were being registered when, in fact, they were not and continued to cause PLAINTIFFS substantial damage.   In reality, many of the songs were not registered with BMI.

118.   In February 24, 2012, MTVN employee Ernesto Elias contacted PLAINTIFFS and advised that *one* of their songs had been registered.   PLAINTIFFS inquired with BMI who confirmed the song was *not* registered.   In reality, it was not until February 27, 2012 that DEFENDANTS began registering *some* of PLAINTIFFS' works; however, this registration was haphazard and incomplete and remained that way through 2013.

119.   In January 2012, PLAINTIFFS discovered, on their own, that their music was being used in a Land Rover commercial and on the ABC television program "Revenge" from which they had not received any accounting or information about licensing fees that should have been charged for these significant uses. On January 5, 2012, PLAINTIFFS communicated with MTVN executive, Jose Cuello, and EXTREME executive, Russell Emmanuel about the Land Rover

commercial and on January 12, 2012 about the "Revenge" placement.   On January 5, 2012, Cuello responded, concerning the Land Rover commercial, "we will get you answers ASAP."   In response to the "Revenge" placement, on January 12, 2012, Cuello responded "adding Ernesto and Kelsey," meaning he would inquire with them as to this placement.   Even though Russell Emmanuel was on all e-mail communications, he did not respond.   Though no response was ever received from EXTREME, who negotiated these placements, on February 24, 2012 MTVN executive, Ernesto Elias, responded by stating "Yes, cue sheets have been submitted for this. They are just waiting to be approved in the system. You guys (and Hype) are good to go."   This statement was knowingly false because PLAINTIFFS have received no income as a result of the Land Rover placement and no licensing fee from EXTREME as a result of the "Revenge" placement.   These are just two examples of the numerous and substantial licenses of PLAINTIFFS' musical compositions resulting in no income to PLAINTIFFS.   See also Paragraph 52 which reflects additional examples but which is still just a handful of the thousands of exploitations from which PLAINTIFFS have received no royalties or licensing fees.

120.   The DEFENDANTS have purposefully, intentionally, and fraudulently prevented PLAINTIFFS from discovering the full extent of the exploitation of their music and avoided detection by: (1) changing the names of the PLAINTIFFS' songs; (2) not registering the songs with BMI; (3) preventing and/or not requiring the filing of "cue sheets"; (4) submitting vague and false accounting reports regarding licensing fees; and (5) by telling PLAINTIFFS that they will "look into" and "get them answers" , but then never responding further.   Not only has this course of ongoing conduct prevented PLAINTIFFS from discovering the extent of the exploitations but it has also prevented PLAINTIFFS from objecting to the false, fraudulent and incomplete

accountings submitted by the EXTREME.   MTVN, EXTREME, and HYPE conspired, and aided and abetted each other, to create this fraudulent scheme designed to harm PLAINTIFFS and only benefit DEFENDANTS.

121.    Specifically, in April 2013, PLAINTIFFS requested a meeting with EXTREME'S CEO, Russell Emmanuel, to discuss reasons as to why they were not being compensated for exploitations that they had discovered and which   had not been reported on any of the EXTREME accounting reports.   In addition, PLAINTIFFS specifically asked Mr. Emmanuel if he was giving away their music for free because they had been told by music supervisors that EXTREME was providing them with PLAINTIFFS' music that was "pre-cleared royalty free".   On April 24, 2013, during the course of a phone conference with Mr. Emmanuel, PLAINTIFFS specifically asked him if he was giving away their music for free and why they were not receiving any royalty or licensing income for various uses that they had discovered on their own, which included but were not limited to Land Rover and Chrysler commercials, the use of their music in the theatrical movie trailer for *Spiderman 2*, and other uses in network television programming.

122.    In response to these questions raised by PLAINTIFFS, and specifically for the purpose of misleading the PLAINTIFFS into believing that the terms of the 2011 Composer Agreement were being performed as stated and to thwart discovery of the exploitations that were being made in a manner completely inconsistent with the terms of that agreement, EXTREME CEO, Russell Emmanuel, by telling PLAINTIFFS:

> "No. None of this is happening, but if it is, it's because of some loophole mate and I'll check into it and get back to you."

This was a false statement, known to be false by EXTREME and their CEO, Russell Emmanuel, who made it for the purpose of misleading PLAINTIFFS and causing them to continue

to rely on these representations and the false and fraudulent accounting statements issued by EXTREME to their financial detriment. First of all, Mr. Emmanuel never did respond to PLAINTIFFS or respond to any of their questions. Secondly, in truth, the EXTREME simply continued to exploit the PLAINTIFFS' music in a manner that not only deprived PLAINTIFFS of their share of the income as required by the 2011 Composer Agreement but also in a manner that prevented PLAINTIFFS from discovering the full nature and extent of the exploitations.

123. On April 18, 2012, PLAINTIFFS contacted EXTREME executive Kelsey Dewald, and asked her to produce, for their inspection, any documents reflecting agreements and income generated by EXTREME for any of the exploitations EXTREME had negotiated for PLAINTIFFS' music with third party customers. PLAINTIFFS obviously wanted to discover what income EXTREME was getting for the exploitation of PLAINTIFFS' music pursuant to the terms of the 2011 Composer Agreement. In response, EXTREME refused to produce documents involving the exploitation of PLAINTIFFS' music and specifically, Ms. Dewald responded to PLAINTIFFS' request by stating, "unfortunately, the actual invoice/agreements are between Extreme-Sony and the client which makes it privileged information." This statement was knowingly false and made for the purpose of preventing PLAINTIFFS from discovering the fact that their music was being exploited in a manner that only benefitted Defendants EXTREME and in a manner that was completely contrary to the terms of the 2011 Composer Agreement.

124. EXTREME have and continue to fraudulently exploit PLAINTIFFS' music in a manner completely abhorrent and inconsistent with the terms of the 2011 Composer Agreement including its financial compensation model. Contrary to their representations and duties as described above and provided by the 2011 Composer Agreement, EXTREME have given away

PLAINTIFFS' music for free, without requiring a licensing fee or reporting to BMI which would trigger a royalty payment.   EXTREME have exploited the PLAINTIFFS music solely to benefit themselves and it has resulted in a complete devaluation of PLAINTIFFS' music, preventing PLAINTIFFS from generating new business, new customer relations, and new contracts regarding the use of their music because EXTREME have provided the customer market with a source that provides PLAINTIFFS' music for free or at a very low rate.   This devaluation of PLAINTIFFS' property has caused PLAINTIFFS substantial losses in profits and income as a result of the fraudulent conduct of the EXTREME that is completely contrary to the representations made to PLAINTIFFS and the terms of the 2011 Composer Agreement.   EXTREME's acts and omissions as alleged hereinabove have significantly devalued PLAINTIFFS' music on a global basis, which continues to this day to cause substantial harm and financial detriment to PLAINTIFFS, who had worked extremely hard in developing a brand and unique production sound that made their music unique and very marketable.   Instead, Defendants EXTREME have used the music in a "bargain basement" style that has caused substantial harm to PLAINTIFFS.

125.   One of the ways in which the EXTREME are exploiting PLAINTIFFS' music in a manner that causes a devaluation of the music is pursuant to a model that provides PLAINTIFFS' music to third party networks, ad agencies, and other customers in exchange for a blanket access or consulting fee that allows the customer to use as much of and whatever music they need without having to pay specific licensing fees or report uses to performing rights organizations thereby resulting in a loss of royalties to the writers of the song.   The access or consulting fees go directly to Defendants EXTREME and not one cent is given to the PLAINTIFFS for these exploitations. This method of exploitation is not only contrary to the terms of the 2011 Composer Agreement

but it is contrary to the specific representations made by DEFENDANTS to the PLAINTIFFS as alleged herein above.   In addition, this model or method of exploitation by the Defendants EXTREME is done in a manner that makes it virtually impossible for the PLAINTIFFS to detect and discover the full nature and extent of the exploitations by the DEFENDANTS or the income being earned by the DEFENDANTS as a result of this method of exploitation.

126.    In addition, based on information and belief, EXTREME use the PLAINTIFFS' music as bait to lure in licensees to use its services.   That is, they offer PLAINTIFFS' music for free and then gain additional economic benefit in subsequent or additional deals which only benefit EXTREME.   This method of fraudulent exploitation, which is ongoing, has and continues to create profit streams for the Defendants EXTREME only.   By way of example, PLAINTIFFS did the music for the *Amazing Spiderman* trailer. They were approached about doing the music for the trailer for *Amazing Spiderman 2*.   Defendants EXTREME proceeded to offer PLAINTIFFS' music for free and then went on to secure the score for a business partner of Defendants EXTREME who had not been involved in the first movie.   PLAINTIFFS received no royalty payment and no licensing fee for this transaction.   A second example is in regard to a Range Rover commercial.   Defendants EXTREME offered PLAINTIFFS music for free to the subject advertising agency who then went on to pay Defendant EXTREME for music (not from the PLAINTIFFS) for the next two Range Rover commercials.   PLAINTIFFS received no royalty payment and no licensing fee for this transaction.   When PLAINTIFFS inquired with Defendants EXTREMES' CEO, Russell Emmanuel, about whether this type of exploitation was occurring, he lied to them by stating "it was not."   This statement was knowingly false and made for the purpose of misleading the PLAINTIFFS.

127.   In addition, in yet another end run around having to pay PLAINTIFFS for the exploitation of PLAINTIFFS' works, Defendants EXTREME engaged in additional subterfuge in that they began re-naming PLAINTIFFS' music so as to prevent tracing the use of the works thereby preventing the PLAINTIFFS from claiming their writer's share and/or licensing revenue that was owed.   By way of example, pursuant to the terms of the 2011 Composer Agreement, PLAINTIFFS' delivered a song entitled "The Monsters are Due on Maple Street."   On February 27, 2012, Defendants EXTREME registered the song "Monsters on Maple."   On September 18 2012, Defendants EXTREME re-registered the song as "AETN Monsters on Maple."   This was not the only time.   Defendants EXTREME registered a work entitled "What Happens on Tour" on January 28, 2015.   This was not a title chosen by the PLAINTIFFS and Defendants EXTREME provided PLAINTIFFS with information about how to identify the work.   On information and belief, Defendants EXTREME are purposefully mislabeling PLAINTIFFS' work such as to prevent PLAINTIFFS from tracking the usage of their works and to prevent PLAINTIFFS from collecting their writer's share and licensing revenues.   This was purposeful on the part of Defendants EXTREME such as to maximize their own profits and save their clients' money as they would not have to pay PLAINTIFFS' any license or royalty or writer's share.

128.   PLAINTIFFS reasonably relied on the various statements made by Defendants MTVN, EXTREME, and HYPE, and each of them, as set forth throughout this Complaint, and relied on the statements and conduct of Defendants MTVN, EXTREME, and HYPE, all to the PLAINTIFFS' significant detriment and damage.

53

129.   In addition, Defendants MTVN, EXTREME, and HYPE'S conduct as described herein amounts to such gross, wanton, dishonest, and malicious wrongdoing as to warrant an award of punitive damages in an amount to be proven at trial.

130.   PLAINTIFFS allege that the DEFENDANTS were entrusted with the copyright ownership of PLAINTIFFS' musical compositions only if DEFENDANTS complied with the terms of the 2011 Composer Agreement and that DEFENDANTS induced PLAINTIFFS into the agreement under the auspices that they would comply with its terms, such that the copyrights would then be transferred.   Since PLAINTIFFS allege that this has not occurred, DEFENDANTS are mere bailees entrusted with the care and custody the copyrights in and to of PLAINTIFFS' musical compositions.   PLAINTIFFS allege that the DEFENDANTS fraudulently misappropriated PLAINTIFFS' music with no intent to comply with the terms of the 2011 Composer Agreement and used PLAINTIFFS' music for DEFENDANTS' own benefit and in total disregard of PLAINTIFFS' ownership rights.

### FIFTH CLAIM
### RESCISSION
### (Against all DEFENDANTS)

131.   PLAINTIFFS refer to and incorporate Paragraphs 1 through 130 as though fully set forth herein.

132.   As alleged hereinabove, PLAINTIFFS and Defendant NEW CREATIVE entered into the 2011 Composer Agreement.

133.   On information and belief, Defendant NEW CREATIVE assigned its rights to PLAINTIFFS' music to EXTREME, MTVN, and/or HYPE.

134.   PLAINTIFFS were fraudulently induced to enter the 2011 Composer Agreement based on false representations by DEFENDANTS from January 2011 through March 2011 that the agreement would represent a "partnership" between PLAINTIFFS and DEFENDANTS and that PLAINTIFFS would be fairly compensated for their work, would receive a 50/50 share of all license fees and gross receipts, and would receive their writer's share of royalties.

135.   It is abundantly clear, as alleged throughout this Complaint, that DEFENDANTS never intended to comply with the terms of the 2011 Composer Agreement and have materially, willfully and maliciously breached their obligations under the agreement and owed to PLAINTIFFS.

136.   It is also abundantly clear that the breaches of the 2011 Composer Agreement by these DEFENDANTS were substantial and fundamental such as to defeat the object of the parties in making the contracts.

137.   DEFENDANTS have failed to act in good faith toward the PLAINTIFFS in regard to the respective contracts.

138.   DEFENDANTS by their actions and inactions, materially, willfully, substantially and fundamentally breached the 2011 Composer Agreement.

139.   By reason of the foregoing, PLAINTIFFS are entitled to rescission of the 2011 Composer Agreement in its entirety.   Any and all ownership and rights in and to PLAINTIFFS' musical composition conveyed pursuant to the terms of the 2011 Composer Agreement should be returned to PLAINTIFFS.

140.    In addition, notice is hereby given that pending a legal determination of the issues set forth herein, the PLAINTIFFS hereby terminate the 2011 Composer Agreement pursuant to Paragraph 3.1.

141.    PLAINTIFFS request that the Court enter judgment rescinding the 2011 Composer Agreement.

<div align="center">

**SIXTH CLAIM**
**ACCOUNTING**
**(Against all DEFENDANTS)**

</div>

142.    PLAINTIFFS incorporate Paragraphs 1 through 141 as though fully set forth herein.

143.    DEFENDANTS have a duty to fully and accurately account to the PLAINTIFFS for all of the profits derived as a result of the use and exploitation of PLAINTIFFS' music.

144.    Pursuant to the 2011 Composer Agreement, DEFENDANTS are obligated to provide complete, accurate and timely reports, accountings and payments to PLAINTIFFS consistent with the terms and conditions of the 2011 Composer Agreement and in a manner that would accurately and fully account to PLAINTIFFS for all gross receipts generated from the exploitation of PLAINTIFFS' musical compositions pursuant to the terms of the 2011 Composer Agreement.

145.    As alleged hereinabove, PLAINTIFFS are informed and believe and based thereon allege that DEFENDANTS have derived and received significant income, profit and other benefits from the exploitation of PLAINTIFFS' musical compositions which have not been disclosed or accounted for by Defendants NEW CREATIVE and EXTREME.

<div align="center">

56

</div>

146.    The express terms of the 2011 Composer Agreement require that DEFENDANTS render semi-annual statements to PLAINTIFFS accurately reflecting the amount of all gross receipts derived from the exploitation of PLAINTIFFS' musical compositions, and to remit to PLAINTIFFS their proper share of such revenues.

147.    Plaintiffs allege that a balance is due and owing to them that is instead being retained by DEFENDANTS.   DEFENDANTS are in charge of, and have control over, all information necessary to determine PLAINTIFFS' proper share of revenue from the exploitation of PLAINTIFFS' musical compositions.   PLAINTIFFS do not have access to this information and the amount owed by DEFENDANTS to PLAINTIFFS cannot be reasonably ascertained without a full and complete accounting of DEFENDANTS' relevant books a records.   As a result, the full amount due and owing to PLAINTIFFS by DEFENDANTS remains unknown.   Due to PLAINTIFFS' exclusion from exercising any control or management over the distribution, licensing and/or other exploitation of PLAINTIFFS' musical compositions by DEFENDANTS, and the collection, reporting and accounting of revenues generated from that world-wide exploitation, and the complex nature of the accounts of the world-wide exploitation of PLAINTIFFS' musical compositions by DEFENDANTS, it is impractical to ascertain a fixed sum that is currently owed by DEFENDANTS to PLAINTIFFS of the amounts claimed hereinabove. Accordingly, the full and precise amount owed and due to PLAINTIFFS from DEFENDANTS can only be determined pursuant to a full and accurate accounting of all world-wide gross proceeds generated from the licensing and/or other exploitation of PLAINTIFFS' musical compositions.

148.    PLAINTIFFS are entitled to a full and complete accounting of the use of and profits generated from the exploitation of PLAINTIFFS' work.

57

## PRAYER

**WHEREFORE**, PLAINTIFFS demand judgment as follows:

1.      Compensatory damages;

2.      Rescission of any and all Contracts between PLAINTIFFS and DEFENDANTS;

3.      General Damages;

4.      Punitive Damages;

5.      Accounting of Profits;

6.      Disgorgement of Profits;

7.      Costs incurred;

8.      Pre and post judgment interest;

9.      Such other and further relief as this Court deems just and proper.

Dated:   March 28, 2017              Respectfully submitted,

                                     */s/ Michael G. Marderosian*
                                     _____
                                     Michael G. Marderosian (*Pro Hac Vice*)
                                     Heather S. Cohen (*Pro Hac Vice*)
                                     MARDEROSIAN & COHEN,
                                     A PROFESSIONAL CORPORATION
                                     1260 Fulton Mall
                                     Fresno, CA 93721
                                     Telephone:   (559) 441-7991
                                     Facsimile:   (559) 441-8170
                                     Email:   mick@mcc-legal.com
                                     Email:   heather@mcc-legal.com

Brian G. Wolf (*Pro Hac Vice*)
Andrew B. Brettler *(S.D.N.Y. Bar No. AB2662)*
LAVELY & SINGER PROFESSIONAL CORPORATION
2049 Century Park East, Suite 2400
Los Angeles, CA 90067-2906
Telephone:   (310) 556-3501
Facsimile:   (310) 556-3615
Email:   bwolf@lavelysinger.com
Email:   abrettler@lavelysinger.com

*Counsel for Plaintiffs*

# EXHIBIT 1

# BLANKET COMPOSER AGREEMENT (DIRECT)

By and between New Remote Productions Inc. ("Company"), 1515 Broadway, New York, NY 10036,
and Twelvesixty, LLC ("Lender") for the services of Aron Marderosian, individually, ("AMardo") and Robert Marderosian, individually, ("RMardo") together professionally known as "Heavy Young Heathens" (AMardo and RMardo are collectively referred to herein as "Composer") P.O. Box 4430, Malibu, CA 90264 [this "Agreement"].

Dated: As of May 19, 2010

1. **ADDRESS AND PAYMENT INFORMATION:**

   Checks payable to:         Twelvesixty, LLC
   Payment address:           P.O. Box 4430
                              Malibu, CA 90264
   Telephone:                 310-924-4402
   Agent and Telephone:       N/A
   Social Security #:         Tin# ▮▮▮▮▮▮▮▮

2. **PROJECT:** As described in any "Deal Term Sheet" (as defined below) signed by both parties (the "Project").

3. **SERVICES:**
   Lender agrees to provide the services of Composer to Company and/or its designee(s) as a composer and audio producer in connection with each Project in connection with which Company engages Composer's services. Lender shall have Composer's services to be rendered according to the specific deal terms set forth on the approved "Deal Term Sheet" (an example of which is attached hereto as Exhibit "A") relating to each Project in connection with which Lender and Composer are engaged by Company. Composer's services in connection with each Project shall include, without limitation, (a) writing, composing, arranging, orchestrating, conducting and delivering to Company suitable original musical material, whether consisting of lyrics and/or sound effects ("Compositions") and performing, recording, producing, mixing, dubbing and delivering to Company suitable original audio recordings of the Compositions (the "Masters"); (b) any and all services customarily provided by first class audio producers and composers; and (c) any and all other services Company requests in connection with the Project. Company shall be under no obligation to use the results and proceeds of Composer hereunder. Company may employ or engage other persons as composers, lyricists, arrangers, orchestrators, copyist, adapters or conductors in connection with the Project and such other persons may, at Company's direction, modify, edit, adapt, re-record or make any other changes to the Compositions as requested by Company. All services provided hereunder shall be pursuant to the direction and control of Company and are subject to Company's approval at its sole discretion.

4. **TERM:**
   This Agreement shall be in force from the date hereof until the termination of this Agreement either party hereto, which termination shall be effective upon delivery of written notice to the other party; provided that if Lender is providing Composer to render on, or provide materials

EXHIBIT 1.1

for, any Project at the time of such termination, the provisions of this Agreement shall apply to Composer's services and Lender's and Composer's obligations with respect to such Project, and, if requested by Company, Lender and Composer shall be required to complete all services and obligations related thereto (the "Term"). Company shall have the right to terminate this Agreement at any time, with or without cause, subject to Company's obligation to pay Lender any accrued but unpaid compensation for services already actually completed by Composer

5.  **DELIVERY:**

Services hereunder shall not be deemed completed until delivery to Company of: (a) Compositions and Masters which are technically, commercially and creatively acceptable to Company in its sole discretion, according to the delivery schedule set forth in the applicable Deal Terms Sheet; (b) all original manuscripts, all lyric and lead sheets, conductor's score, instrumental and vocal parts and other music of every kind prepared in connection with the Masters and Compositions (whether or not, in Lender and/or Composer's possession, or under Lender's and/or Composer's direct control); (c) the Masters, in accordance with the specifications set forth in Exhibit "B"; and (d) a completed Exhibit "C". Lender will also provide Composer to perform all services required by Company in connection with the preparation of the cue sheets (which services shall include, without limitation, entering cue sheet information directly into Company's proprietary online cue sheet system). Lender and Composer agree that delivery of the Masters in accordance with the timeline set forth by Company is of the essence of this Agreement. Lender shall have Composer promptly make all changes requested by Company.

6.  **COMPENSATION/PAYMENT SCHEDULE:**

(a)      Provided that Company has received a copy of this Agreement signed by Lender and Composer, Lender and Composer have complied with all applicable requirements, including, but not limited to, signing and delivering to Company any and all required tax and immigration forms (as applicable) and neither Lender nor Composer are in breach or default of this Agreement, Lender shall receive a one-time all-inclusive payment in the amount set forth in the applicable Deal Term Sheet in full consideration of the services performed, materials furnished and rights acknowledged or granted under this Agreement, including without limitation, all Recording Costs (as defined in Section 6(c) below), subject to Lender's and Composer's full performance of the terms of this Agreement. Unless specified otherwise in any applicable Deal Term Sheet, Lender's compensation shall be payable 50% upon complete execution of this Agreement and 50% following Lender's and Composer's completion and Company's acceptance of all services and materials required hereunder, including, without limitation, Lender's completion and delivery to Company of Exhibit "C". Lender's compensation is subject to all withholdings and deductions that employers are required to make by law. Company is not obligated to pay Lender until Lender has furnished to Company all documents required by the Immigration Reform and Control Act of 1986. Lender and Composer shall comply with all eligibility verifications required by law.

(b)      Lender and Composer hereby jointly and severally acknowledge and agree that Lender shall not be entitled to any other compensation whatsoever in connection with Lender and Composer's services hereunder and/or the exploitation of the Compositions and the Masters, including, without limitation, any songwriter royalties, mechanical royalties, phonorecord royalties, synchronization fees, master use license fees or print royalties. Lender and Composer hereby jointly and severally acknowledge that this agreement constitutes a full

435675

EXHIBIT 1.2

buy-out of any and all rights to such compensation. Notwithstanding the foregoing, Lender may receive and retain Lender's respective portion of the so-called writer's share of public performance income which may be payable directly from a performing rights society such as ASCAP, BMI and SESAC and Company will retain one hundred percent (100%) of the so-called publisher's share of public performance income and one hundred percent (100%) of all other publishing income. Lender confirms that Composer is a member of BMI. It is acknowledged and agreed that payment of the writer's share of performance income provided herein shall cover the entire Compositions, including, without limitation, words, music and arrangement. If Composer co-writes a Composition, either from inception or subsequently (e.g., an additional composer and/or lyricist is hired to compose additional music for the Composition and/or rewrite all or part of the lyrics at a later date), Lender's share of the performance royalties shall be reduced proportionately in accordance with Composer's contribution to the work as agreed among Lender and Composer and the co-writer(s), but in the absence of such agreement, or if the Compositions are subsequently altered or modified, the assessment of such reduction shall be made solely by Company. Lender and Composer hereby jointly and severally acknowledge that Company is acquiring hereunder, at no additional cost to Company, a U.S. theatrical performance "buy-out" with respect to the theatrical performance in the United States of the Compositions. If requested by Company, Lender shall obtain from and deliver to Company an appropriate release, at no cost to Company, consenting to the theatrical performance in the United States of the Compositions. Notwithstanding anything to the contrary, however, where it is, or may from time to time be, unlawful for the performing rights society, or any of its affiliated bodies, to collect performance fees, or where the society, or any of its affiliated bodies, does not, from time to time, for any reason whatsoever, actually maintain a regular system of collecting performance fees, Company may authorize the performance of the Compositions in and as a part of the Project, other productions, television programs and/or motion pictures in which they are included and the advertising, promotion and publicity thereof, or otherwise, without payments of any performance fees whatsoever to Lender, the society, or to anyone else.

(c)     Lender shall be solely responsible for the payment of all costs whatsoever ("Recording Costs") incurred in the recording (including re-recording required for creative reasons by Company until final delivery and acceptance of the Masters) and delivery of the Masters (dub ready), including, without limitation, the costs of all studios, tape, instrument rentals, engineers, musicians and all other parties rendering services in connection with the musical material, cartage and related expenses, travel, accommodations and per diem. Notwithstanding the foregoing, Company shall reimburse Lender and/or Composer for any direct, out-of-pocket, business expenses specifically approved in advance by Company in writing. Such reimbursement shall be made to Lender by Company following Company's receipt and acceptance of Lender's and/or Composer's completed travel and expense form (T&E) or petty cash form (as applicable) accompanied by the original receipts. If Company requires Composer to travel in connection with the Project, Company shall furnish Composer with Company's standard travel accommodations as determined in Company's sole discretion (which may include one (1) round-trip, coach-class airline ticket, standard hotel accommodations of Company's choosing, ground transportation determined in Company's sole discretion and Company's standard daily per diem rate).

(d)     Lender and Composer hereby jointly and severally acknowledge that Company makes no warranty, representation or covenant that the Compositions will generate public performance income or any particular amount thereof. Nothing herein shall be construed as

435675

EXHIBIT 1.3

vesting in Lender and/or Composer any right, title or interest whatsoever in the Compositions, the Masters and/or the Project or in anything related thereto, or in any profits, proceeds or receipts thereof, or any lien or charge thereon. So far as Lender and Composer are concerned, Company and its licensees and assigns shall have full and exclusive control of the distribution and other exploitation of the Compositions, the Masters and/or the Project, all without any obligation to consult with or obtain Lender and/or Composer's approval. Nothing shall obligate Company to exploit the Compositions, the Masters and/or the Project.

7. **EXCLUSIVITY:**
Unless specified otherwise in the applicable Deal Term Sheet, Lender's and Composer's services shall be exclusive to Company.

8. **RIGHTS:**
(a)      All services rendered by Composer pursuant to this Agreement and the results and proceeds thereof, including, without limitation, all literary, dramatic, factual, artistic, photographic, visual, sculptural, musical and/or other material of whatever kind or nature created, written, contributed or suggested by Composer hereunder, as well as all inventions, processes and improvements, and all versions and revisions thereof, and all notes, ideas, "gags," suggestions, plots, characters, logos, titles, themes, songs, products and/or stories, whether or not reduced to writing or other tangible media, heretofore or hereafter created, written, contributed, developed, invented or suggested by Composer, including, without limitation, the Compositions and Masters, and whether or not actually used by Company in or in connection with the Project (all such material, services, and the results and proceeds thereof are referred to collectively as the "Material"), have been and/or will be solely created by Composer as a "work made for hire" specially ordered or commissioned by Company for use as part of an audio/visual work within the meaning of the U.S. Copyright Law, with Company being deemed the sole author, and, at all stages of completion, the sole and exclusive owner of the Material, and of all rights of every kind or nature, whether now known or hereafter devised (including, but not limited to, all copyrights, trademarks, patents and all extensions and renewals of same) in and to the Material in perpetuity throughout the universe and in all languages, with the right to use, exploit and advertise the Material and the Project, in any form, manner and/or medium, whether now known or hereafter devised, without any further obligation whatsoever to Lender and/or Composer or any person or entity claiming through or on behalf of Lender and/or Composer.

(b)      If, under any applicable law, the fact that the Material is a "work made for hire" is not effective to place authorship and ownership of the Material and the Project and all rights therein in Company, or if it is determined that the Material or any part thereof does not constitute a "work made for hire" for Company within the meaning of the copyright laws of the United States, then to the fullest extent allowable and for the full term of protection otherwise accorded to Lender and Composer under such applicable law, Lender and Composer hereby assign to Company irrevocably, exclusively, perpetually and throughout the universe all rights of every kind in and to the Material and any and all of Lender's and/or Composer's right, title and interest in the Project and any other works now or hereafter created containing any of the Material. Without in any way limiting the generality of the foregoing, Company shall have the right to make all known or hereafter existing uses of the Material in perpetuity throughout the universe, whether in and/or in connection with the Project or any other productions, television programs and/or motion pictures or otherwise, in all media and all forms and all formats,

435675

EXHIBIT 1.4

including, without limitation, videocassette, videodisc, sound recording, publishing, music publishing, merchandising, character, sequel, remake, theme park, legitimate stage, electronic, interactive, digital, computer-assisted media and other new technologies, whether now known or hereafter devised, including, but not limited to, laser disc, cartridge, CD-ROM and other similar or dissimilar disc systems, interactive television/cable, all means of video and/or audio streaming, still or download, whether delivered to portable devices, personal computers, set top boxes, televisions or other forms of hardware via broadcast, syndication, basic cable, pay television, pay-over-the-air, closed circuit, hotel/motel, TVRO, SMATV, MDS, MMDS, DBS, video-on-demand, pay-per-view, datacasting, Internet protocol, wireless protocol, terrestrial radio, satellite radio, and any other devices and/or methods of delivery, in any and all media now existing or hereafter devised, and all allied, ancillary and subsidiary rights in and to each of the foregoing, and the right to make all changes in the Material as Company deems necessary or desirable, including, but not limited to, the right to revise, change, modify, translate, reformat, reprocess, dramatize, fictionalize, add material to and/or remove material from the Material as Company shall, in its sole discretion, deem appropriate.

(c)     Without in any way limiting the generality of the foregoing, Company and Lender and Composer are aware and jointly and severally hereby acknowledge that new rights of and to the Material may come into being and/or be recognized in the future, under law and/or in equity (collectively the "New Exploitation Rights"), and Lender and Composer intend and do hereby assign, grant and convey to Company, any and all such New Exploitation Rights in and to such results and proceeds.   Company and Lender and Composer also are aware and do hereby jointly and severally acknowledge that new (and/or changed) technology, uses, media, formats, modes of transmission, and methods of distribution, dissemination, exhibition or performance (collectively the "New Exploitation Methods") are being and inevitably will continue to be developed in the future, which would offer new opportunities for exploiting the Material.  Lender and Composer intend and do hereby assign, grant and convey to Company any and all rights to such New Exploitation Methods with respect to such results and proceeds.

(d)     Lender shall not have Composer utilize any material as the basis of the Masters or Compositions (including samples) or any arrangements hereunder which are believed to be in the public domain without first notifying Company of the identity of such material so that Company may verify the public domain status thereof, and that Lender shall not have Composer use any material whatsoever nor composed entirely by him, such as "samples" (whether or not in the public domain) without first obtaining Company's prior written consent in each instance.

(e)     Lender and Composer hereby jointly and severally irrevocably waive the benefits of any provision of law known as "droit moral," "moral rights," or any similar rights or principals of law in any country of the world which Lender and/or Composer may now or later have in the Material and/or Project, and Lender and Composer hereby jointly and severally agree not to institute or permit any action or lawsuit on the grounds that the Project, Material, or any other work based upon the Material constitutes an infringement of Lender's and/or Composer's droit moral or is in any way a defamation or mutilation of the Material or any part thereof, or contains unauthorized variations, alterations, modifications, changes, or translations of the Material. Lender and Composer expressly acknowledge that many parties will contribute to the Project and other works that may or will embody all or part of the Material. Accordingly, if under any applicable law the above waiver or assignment by Lender and Composer of "droit moral" or "moral rights" is not effective, then Lender and Composer hereby jointly and severally agree to

433675

EXHIBIT 1.5

exercise such rights in a manner which recognizes the contribution of, and will not have a material adverse effect upon, such other parties.

(f)     Lender, on Lender's own behalf, on Composer's behalf and on behalf of Lender's and/or Composer's heirs, executors, administrators and assigns, hereby assigns to Company in perpetuity all rental and lending rights under national laws (whether implemented pursuant to the EC Rental and Lending Rights Directive or otherwise) to which Lender and/or Composer may now be or hereafter become entitled with respect to the Project and/or any other works based upon the Material and/or any derivative works derived therefrom.

(g)     Lender and Composer hereby jointly and severally irrevocably waive the benefits of any provision of law known as "droit moral," "moral rights," or any similar rights or principals of law in any country or the world which Lender and/or Composer may now or later have in the Material and/or Project, and Lender and Composer hereby jointly and severally agree not to institute or permit any action or lawsuit on the grounds that the Project, Material, or any other work based upon the Material constitutes an infringement of Lender's and/or Composer's droit moral or is in any way a defamation or mutilation of the Material or any part thereof, or contains unauthorized variations, alterations, modifications, changes, or translations of the Material. Lender and Composer expressly acknowledge that many parties will contribute to the Project and other works that may or will embody all or part of the Material. Accordingly, if under any applicable law the above waiver or assignment by Lender and/or Composer of "droit moral" or "moral rights" is not effective, then Lender and Composer hereby jointly and severally agree to exercise such rights in a manner which recognizes the contribution of, and will not have a material adverse effect upon, such other parties. Without limiting the generality of the foregoing, Lender and Composer hereby jointly and severally irrevocably waive and unconditionally waive any right or entitlement Lender and/or Composer may have pursuant to Sections 77-85 inclusive] of Chapter IV of the Copyright Designs and Patents Act 1988, or any statutory modifications or enactments thereof or the laws of any other jurisdictions. With respect to any of the Material, if and to the extent copyright registration therefor in any country/territory is required to be acquired in Lender's and/or Composer's name, Company shall have the full right, power and authority to apply for such copyright registration(s) in Lender's and/or Composer's name, whereupon Lender and Composer shall promptly assign/transfer such copyright registration(s) to Company. Similarly, if any copyrights in and to any of the Material in any country/territory are required to be renewed and/or extended in the name of Lender and/or Composer, then Lender shall take all measures necessary to renew/extend the copyrights involved and promptly thereafter shall assign such copyrights (and all rights thereunder and otherwise) to Company for such renewal/extended term(s), without Company's having to pay any additional consideration therefor. Lender, on Lender's own behalf, on Composer's behalf and on behalf of Lender's and/or Composer's successors-in-interest, heirs, executors, administrators and assigns, hereby assigns to Company in perpetuity all of Lender's economic rights in the Material, in the Project and any derivative works based on such Material and/or the Project which are, at any time, granted by domestic, foreign, or multi-national legislation, including, but not limited to all rental and lending rights under legislation or directives (whether implemented pursuant to the EC Rental and Lending Rights Directive or otherwise) to which Lender and/or Composer may now be or hereafter become entitled with respect to the Material and/or Project and/or any other works based upon the Material and/or any derivative works derived therefrom, including, but not limited to any blank audio/visual tape levy, rental, lending, public performance rights, so-called "performer's property rights" and/or rights in respect of

435675

EXHIBIT 1.6

satellite and cable retransmission broadcasts in EC member states or otherwise. Lender and Composer agree on Lender's and Composer's behalf and on behalf of Lender's and/or Composer's successors-in-interest, heirs, executors, administrators and assigns, not to institute, support, maintain or authorize directly or indirectly any litigation or proceedings instituted or maintained on the ground that Company's (or its designee's) exercise of the rights granted Company in the Project in any way constitutes an infringement or violation of any such rental or lending rights as aforesaid. Company and Lender and Composer hereby jointly and severally acknowledge and agree that the following sums are in consideration of, and constitute equitable remuneration for, the rental and lending rights provided for in this paragraph: an agreed allocation to the rental and lending rights of 3.8% of the compensation payable by Company to Lender for Composer's services in connection with the Project. If under the applicable law of any territory or jurisdiction, any additional or different form of compensation is required to satisfy the requirement of equitable remuneration, then it is agreed that the grant to Company of the rental right shall nevertheless be fully effective, and Company shall pay Lender such compensation or, if necessary, the parties shall in good faith negotiate the amount and nature thereof in accordance with applicable law.

(h)     Company shall have the right, but not the obligation, to use Lender's and/or Composer's name, voice, likeness, and biography in connection with the Compositions, the Masters and/or the Project and any uses thereof, in all media now known or hereafter devised in perpetuity throughout the universe, including, without limitation, for the purpose of advertising and promoting the Project, the distributors of the Project and the programming services of MTV Networks.

## 9.  NON-UNION PRODUCTION:

Lender and Composer acknowledge that Company is not a party to any collective bargaining agreements that might be applicable to the type of services provided hereunder, and Lender and Composer understand that neither this Agreement nor Lender's nor Composer's services hereunder shall be subject to any collective bargaining agreements, including, without limitation the American Federation of Musicians ("AFM").

## 10.  RE-RECORDING RESTRICTION:

Effective as of the date of this agreement, and unless Company otherwise consents in writing, Lender shall not have Composer record, re-record, produce, arrange, or perform (as conductor or otherwise) for anyone other than for Company, any of the Compositions at any time. The foregoing shall be applicable whether or not any record company becomes entitled to issue a recording of all of such musical material, or any part thereof, by reason of the so-called "compulsory license" provisions of any applicable copyright law.

## 11.  SUSPENSION/TERMINATION:

If any event of disability, default or force majeure occurs at any time during the Term, then notwithstanding anything to the contrary contained in this Agreement, Company shall have the right to suspend the Term. No compensation shall accrue or be payable to Lender under this Agreement during any such period of suspension. Company's payment of compensation to Lender during any period of suspension shall not be deemed a waiver by Company of any of its rights under this Agreement, and Company may apply such payment(s) against any compensation accruing or coming due to Lender pursuant to this Agreement. Any suspension under this Agreement shall continue until Company's notice to Lender and/or Composer ending

435675

EXHIBIT 1.7

the suspension or until the cause of such suspension shall have ceased to exist, whichever first occurs, and, with respect to a suspension for disability or default, until Lender and Composer shall have reported to Company ready, willing and able to perform all of Lender's and Composer's obligations hereunder.  Notwithstanding the foregoing, any period of suspension may, at Company's election, be extended to include such period of time as may be required by Company to make preparation for the utilization or resumption of Lender's and Composer's services.  Lender shall have Composer resume rendering services upon such date following the lifting of any suspension as Company may designate.  If the period of any suspension under this Agreement shall include a starting date previously designated by Company, then Company may, at Company's election, cancel and/or postpone such starting date.  During any period of suspension neither Lender nor Composer shall render services for any other person or on Lender's and/or Composer's behalf.  If Lender and/or Composer is in default under this Agreement, then in addition to all other rights Company may have at law, in equity or otherwise, Company shall have the right at Company's election to terminate this Agreement during the continuance of such default (whether or not Company has first suspended Lender and/or Composer), but only after providing Lender and/or Composer two (2) business days to cure such default (if, but only if, in Company's good faith judgment, said default is curable).  In the event of Lender and/or Composer's disability, Company shall have the right, at Company's election, to terminate this Agreement at any time after the continuance of such disability for three (3) consecutive business days or for an aggregate of five (5) business days during any production period, or immediately in the event of death.  In the event that any period of force majeure continues for more than two (2) weeks, Company shall have the right, at Company's election, to terminate this Agreement.  In the event of any termination of this Agreement, Company shall be relieved of any and all further obligations to Lender under this Agreement, except that termination for any reason other than for default by Lender and/or Composer shall not relieve Company of its obligation to pay all accrued compensation with respect to periods for which Lender had Composer complete all services prior to such termination.  Company's rights under this Agreement (including, without limitation, its termination and suspension rights) are in addition to any other rights or remedies available to Company, whether at law, in equity or otherwise.

## 12  WARRANTIES AND REPRESENTATIONS/INDEMNITY:

(a)  Lender and Composer hereby jointly and severally represent and warrant that (i) Lender and Composer have the right to execute this document and neither Lender nor Composer have entered into and will not enter into any commitment or agreement that will or might in any way conflict with Lender's and Composer's obligations under this Agreement; (ii) the Material shall be wholly original with Composer and shall not be copied in whole or in part from or be based upon or be adapted from any other work and Lender and Composer have the full right and authority to grant the rights in the Material granted to Company hereunder; (iii) neither Lender nor Composer have signed, agreed to sign, nor will neither Lender nor Composer sign during the Term hereof, an exclusive recording agreement and/or songwriter/publishing agreement or any other agreement that may affect Company's rights hereunder; (iv) Composer shall not collaborate with any third-party lyricists and/or composers, or with any recording artists/musicians under exclusive contract to any recording company, and shall not make use of any musical compositions not written/composed specifically and originally for the Project, without Company's prior written consent; (v) neither the Material nor Company's use of the Material will infringe or violate any rights of any person or entity, and Company shall not be required to pay or incur any sums to any person or entity as a result of

EXHIBIT 1.8

Company's ownership, acquisition, use, or exploitation of the Material, except as herein provided; (vi) the Material is not and shall not be based in whole or in part on the life of any real person, except as approved in advance in writing by Company in each instance; (vii) the Materials shall be suitable for their intended purpose; (viii) the Material does not and shall not violate the right of privacy or publicity of, or constitute a libel or slander against, or otherwise violate any other rights (including, without limitation, copyrights) of any kind or nature whatsoever of, any person or entity; (ix) the Material is not and shall not be the subject of any litigation or of any claim that might give rise to litigation (x) neither Lender nor Composer is subject to and will not collaborate with any third parties who are subject to any collective bargaining agreements (including, without limitation, AFM) that would affect the rights in the Material granted to Company hereunder; and (xi) Lender has paid all Recording Costs.

(b)      Lender and Composer jointly and severally shall indemnify and hold harmless Company, its shareholders, officers, directors, employees, agents, and any person(s) or entity(ies), in whole or in part, owning, financing, producing, distributing and/or otherwise exploiting the Material and/or the Project, as well as any and all licensees, successors, assigns and principals of each of the foregoing, and each of them, from and against any and all liabilities, claims, costs, damages or expenses (including, but not limited to, attorneys' and accountants' fees and costs, whether or not in connection with litigation) (collectively, "Damages") arising out of, resulting from, based upon or incurred because of or in connection with (i) a breach or claim which, if true, would constitute a breach, of any of Lender's and/or Composer's representations, warranties or obligations contained in this Agreement, (ii) the malfeasance and/or negligence and/or other tortious acts or omissions committed by Lender and/or Composer and/or any agent, employee, guest or invitee of Lender and/or Composer, and/or (iii) any acts by Lender and/or Composer outside of the scope of Lender's and Composer's services hereunder or contrary to Company's instructions in connection with the occurrence giving rise to such Damages. Company may compromise or settle any such claims or legal actions made by a third party upon such terms as Company may determine.

## 13. NOTICES:

All notices and other communications between the parties hereto shall be in writing and shall be deemed received when delivered in person or by facsimile or telegram or three (3) days after deposited in the mail, postage prepaid, certified or registered mail addressed to the other party at the addresses set forth on page 1 hereof, or at such other address as such party may supply by written notice, provided, however, that a notice for change of address shall not be deemed effective until received.

## 14. MISCELLANEOUS:

(a)      Lender and Composer are aware that federal law prohibits "payola" and "plugola," and Lender and Composer acknowledge that it is unlawful to accept anything of value (except the compensation payable hereunder) for promoting any product, service or company, or arranging for any person or product to appear on the air. Lender and Composer hereby jointly and severally covenant that Composer shall not violate any such law.

(b)      Neither Lender nor Composer nor any of Lender's and/or Composer's agents or representatives shall, without Company's prior written approval in each instance, reveal the terms of this Agreement or issue or authorize the publication or dissemination of any

435675

EXHIBIT 1.9

information, news stories or publicity relating to Composer's services hereunder or to Company, the Project, the Material, MTV, MTV2, MTV Films, MTV Networks, Viacom International, any MTVN programming service, any distributor of the Project or any person associated with any of the foregoing, or any other of their policies and practices or any confidential or proprietary information that Company provides or to which Composer gains access in connection with the Project or Composer's services hereunder or otherwise; provided, however, that Composer may reveal the terms of this Agreement to Composer's personal representatives for legitimate business purposes only.

(c)     Lender shall not have Composer, at any time, use any of Company's or MTV Networks' names, logos, tradenames or trademarks (including, but not limited to, MTV) or those of any of Company's or MTV Networks' related companies, in any fashion, including, but not limited to, in connection with any kind of advertising, promotion, publicity, merchandise, tie-in, product or service.

(d)     The sole remedy of Lender in the event of any breach by Company hereunder or in connection with this Agreement or the Project shall be an action at law against Company to recover monetary damages actually suffered, if any (but in no event any consequential, special or punitive damages). Neither Lender nor Composer shall have any right to enjoin or seek to enjoin the exhibition or other exploitation of the Compositions, the Masters or the Project (or any portion thereof) or other exploitation or any other production or work based thereon or upon the Material (including, without limitation, any other production which incorporates the Compositions and/or Masters), or any element of thereof, or any advertising, promotion or publicity thereof, or to terminate or rescind any rights granted to Company hereunder or by this Agreement, or to obtain any other form of equitable or injunctive relief, any right to which Lender and Composer hereby waive. At all times, Company shall have all rights and remedies which it has at law or in equity pursuant hereto or otherwise, all of which rights and remedies shall be construed as cumulative.

(e)     Company may freely assign or license this Agreement, and all of the rights granted by Lender and Composer hereunder, to any other person or entity without restriction. Neither Lender nor Composer may assign this Agreement, and any attempt to do so shall be void ab initio.

(f)     This Agreement, Exhibit A, Exhibit B, Exhibit C and the applicable Deal Term Sheet in connection with each Project constitute the entire agreement between Company and Lender and Composer concerning the subject matter hereof, and cannot be modified except in writing by Lender and Composer and an authorized officer of Company. No officer, employee or representative of Company has made any representation or promise in connection with this Agreement which is not contained herein. If this Agreement has been revised during the course of negotiation, such revisions and prior drafts incorporating such revisions or original language may not be used, and shall not be admissible, as evidence for any purpose in any litigation that may arise between the parties. This Agreement shall be deemed to have been drafted by all the parties hereto, as all parties were assisted by their representative in reviewing and agreeing thereto, and no ambiguity shall be resolved against any party because of its participation in the drafting of this Agreement.

435675

EXHIBIT 1.10

(g)     This Agreement shall be governed and construed in accordance with the laws of the state of New York applicable to contracts entered into and fully to be performed therein and the parties consent and agree to the exclusive jurisdiction and venue of the state and federal courts having jurisdiction over New York county, New York.

(h)     All representations, warranties, obligations, grants and indemnities of Composer pursuant to this Agreement are undertaken jointly and severally by each party comprising Composer and shall apply to each of them individually as well as to any combination of such parties. When sums accrue and become payable to Composer hereunder, such sums shall be attributed fifty percent (50%) to AMardo and fifty percent (50%) to RMardo. If Company has the right to suspend and/or terminate the services of either party comprising Composer hereunder, then, at Company's election, Company may suspend and/or terminate this Agreement as to both individuals comprising Composer or only one such person rendering services, in which event the remaining Composer shall continue to render services pursuant to this Agreement. Payment for the services of such remaining Composer shall be one-half (½) of the then unpaid compensation set forth in this Agreement.

Accepted and Agreed to:

TWELVESIXTY, LLC

NEW REMOTE PRODUCTIONS INC.

By:

Its:

I ACKNOWLEDGE THAT I HAVE READ THIS AGREEMENT AND AGREE TO BE BOUND BY ITS TERMS AS IF I HAD ENTERED INTO IT DIRECTLY WITH COMPANY, AND I ACKNOWLEDGE THAT WITHOUT THIS ACKNOWLEDGEMENT, COMPANY WOULD NOT BE WILLING TO ENTER INTO THIS AGREEMENT WITH LENDER:

ARON MARDER
Social Security #:

ROBERT MARDER
Social Security #:

435675

EXHIBIT 1.11

8.   COMPANY CONTACT: Ernesto Elias  Ernesto.Elias@mfvmtx.com

ACCEPTED AND AGREED:                          NEW REMOTE PRODUCTIONS INC
TWELVESIXTY, LLC

By: _____                   By: _____
An Authorized Signatory                        An Authorized Signatory

Its,_____

I have read the above agreement and agree to its terms:

Signature of Composer Above
_____
Print Composer's Name: _____
Composer's SS#: ███████████████

Signature of Composer Above
_____
Print Composer's Name: _____
Composer's SS#: ███████████████

435675

EXHIBIT 1.12

## Exhibit "A"

### DEAL TERM SHEET

### COMPOSER SERVICES

By and between New Remote Productions Inc. ("Company"), 1515 Broadway, New York, NY 10036, and Twelvesixty, LLC, ("Lender") for the services of Aron Marderosian, individually, ("AMardo") and Robert Marderosian, individually, ("RMardo") together professionally known as "Heavy Young Heathers" (AMardo and RMardo are collectively referred to herein as "Composer"). Company and Lender and Composer hereby agree to the terms set forth below with respect to the Project described below and agree that the terms of the Blanket Composer Agreement dated as of May 19th, 2010 signed by Lender and AMardo and RMardo with Company shall be incorporated herein by reference

1.   CONTRACTING PARTY NAME: Twelvesixty, LLC for the services of Aron Marderosian and Robert Marderosian together professionally known as "Heavy Young Heathers."

2.   PROJECT NAME/DESCRIPTION: "SYNK" Music Library ("Project")

3.   SERVICES TO BE PROVIDED: Compose, record, and submit music for the MTV music library as directed by Company.

4.   MATERIALS TO BE DELIVERED:
   (a) Number of Compositions: 50
   (b) Number of Masters: 50
   (c) Timing/Duration of each track - All tracks between 1:30 and 3:30 in length
   (d) Genre: Any
   (e) Tempo: Any
   (f) BPM/cadence / other creative info/lyrics included, if applicable
   (g) All tracks will be delivered with stems and sings

5.   MATERIALS DELIVERY SCHEDULE: All Materials for the Project shall be due not less than 3 months from the date of this agreement hereof

6.   COMPENSATION AND CASH FLOW SCHEDULE: $10,000 flat fee ("Fee") which shall be payable to Lender as follows: fifty percent (50%) shall be payable upon execution of this agreement; and the remaining fifty percent (50%) shall be payable upon Project completion and delivery of all final Materials for the Project as determined by Company. For the avoidance of doubt and for the sake of clarity, Fee shall not be paid to Lender until Composer delivers and Company accepts a completed Exhibit "C" as determined by Company

7.   DATE SERVICES TO COMMENCE: May 19, 2010

Services will be provided until all services requested by Company on the Project have been fully completed to Company's satisfaction with no guarantee of any minimum term of employment

435675

EXHIBIT 1.13

## Exhibit "B"

## Technical Delivery Specifications

- All Tracks to be between 2.30-3.30 in length unless otherwise agreed

- Format: 48k 24bit

- Mix splits/stems to accommodate requests for 5.1 or alternate mixes

- Pro-tools / Logic or relevant files and sessions inc audio tracks where possible

- If there is a vocal supply full, voice only and instrumental mixes

- All lyrics with translations if appropriate.

- Composer credits together with performance society membership association and membership numbers

- Composer full names and addresses and contact numbers

- For multiple composers provide share splits (Also included in Exhibit "A")

- Materials are to be delivered to:

  Ernesto Elias
  Music Coordinator
  ph: 310-752-8103
  email: Ernesto.Elias@mtvnmix.com
  MTV Networks
  2700 Colorado Avenue
  Santa Monica, CA 90404

-----End of Exhibit B-----

435675

EXHIBIT 1.14

## Exhibit "C"

| | Title | Composer | Performing Rights Organization | Percent Ownership | ISRC |
|---|---|---|---|---|---|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | | | | | |
| 11. | | | | | |
| 12. | | | | | |
| 13. | | | | | |
| 14. | | | | | |
| 15. | | | | | |
| 16. | | | | | |
| 17. | | | | | |
| 18. | | | | | |
| 19. | | | | | |
| 20. | | | | | |
| 21. | | | | | |
| 22. | | | | | |
| 23. | | | | | |
| 24. | | | | | |
| 25. | | | | | |
| 26. | | | | | |
| 27. | | | | | |
| 28. | | | | | |
| 29. | | | | | |
| 30. | | | | | |
| 31. | | | | | |
| 32. | | | | | |
| 33. | | | | | |
| 34. | | | | | |
| 35. | | | | | |
| 36. | | | | | |
| 37. | | | | | |
| 38. | | | | | |
| 39. | | | | | |
| 40. | | | | | |
| 41. | | | | | |
| 42. | | | | | |
| 43. | | | | | |
| 44. | | | | | |
| 45. | | | | | |
| 46. | | | | | |
| 47. | | | | | |
| 48. | | | | | |
| 49. | | | | | |
| 50. | | | | | |

-----End of Exhibit C-----

435675

EXHIBIT 1.15

# EXHIBIT 2

(http://www.viacom.com/pages/default.aspx)

# NEWS

## MTV and Sony ATV's Extreme Music to Launch Hype Production Music

### Category:

MTV News (/category/press-release-category/%5Bcatpath-raw%5D-8), Music (/category/press-release-category/%5Bcatpath-raw%5D-26), Partnership (/category/press-release-category/%5Bcatpath-raw%5D-36)

Tuesday, March 1, 2011 8:08 am EST

### Dateline:

LOS ANGELES

**"Day to day we search out the best emerging artists and songs to help tell a story and we are thrilled to be deepening those relationships. In partnership with Extreme, we are able to work hand-in-hand with artists from the start to create and distribute amazing original music."**

**MTV,** a division of Viacom Inc. (NYSE: VIA and VIA.B), and **EXTREMEMUSIC,** the production music arm of Sony/ATV, today announced the launch of **HYPE PRODUCTION MUSIC:** a newly created, first-of-its-kind hybrid music production and licensing partnership fueled by the very best new and emerging independent talent.

Hype Production Music will empower MTV and Extreme to contract directly with unsigned artists and creatively help them produce new music with vocals that will enjoy first look consideration for key placements across MTV Networks' programming and feed music supervisors' appetites throughout the industry for blog-breaking freshmen bands.

Hype artists will benefit from their songs' inclusion in the Hype Music Library that will be licensed through Extreme's global client base of professional users with the copyright diligence of a major label, but the credibility of an indie. In addition, MTV will serve as music distributor for all contracted songs, delivering music to the artist's fans through multiple digital music services. All revenues from licensing and digital distribution of songs included in the Hype Music Library will be split with 50 percent going to the artist.

"MTV has always been in the business of championing artists on the cusp. With the launch of 'HYPE', MTV has a platform to bring those artists to the forefront within our programming and beyond," said **Joe Cuello SVP, Creative Music Integration for MTV.**"Day to day we search out the best emerging artists and songs to help tell a story and we are thrilled to be deepening those relationships. In partnership with Extreme, we are able to work hand-in-hand with artists from the start to create and distribute amazing original music."

"It's no secret that the music industry is gasping for air and struggling for ways to break new artists," said **Russell Emanuel CEO, Extreme Music.** "HYPE's hybrid model as an artist-friendly incubator leveraging its ability to license tracks directly in high profile shows will dramatically boost an act's profile. This is a new breed, second to none career jump-starting opportunity. It's production music on steroids!"

The initial HYPE offerings are slated for release early in 2011 and include:**Daniel Chavez Wright (3D Friends), George Byrne, Locksley, Ginger Sling, The Midi Mafia, New Cassettes, Desoto Jones, Theft, National Skyline, Atlantic Line, Hell & Lula, Marc Robillard, The Diamond Light, The New FOs, Lego Johnson, Atlantic Connection and Heavy Young Heathens.**

For more information about Extreme Music, please visit www.extrememusic.com (http://cts.businesswire.com/ct/CT?id=smartlink&url=http%3A%2F%2Fwww.extrememusic.com%2F&esheet=50941189&newsitemid=20140911006274&lan=en-US&anchor=www.extrememusic.com&index=1&md5=c95307c2adb1b5b3b4b53b541cce1148).

### About MTV:

MTV is the world's premier youth entertainment brand. With a global reach of more than a half-billion households, MTV is the cultural home of the millennial generation, music fans and artists, and a pioneer in creating innovative programming for young people. MTV reflects and creates pop culture with its Emmy®, Grammy® and Peabody® award-winning content built around compelling storytelling, music discovery and activism across TV, online and mobile. MTV's sibling networks MTV2 and mtvU each deliver unparalleled customized content for young males, music fans and college students, and its online hub MTV.com is the leading destination for music, news and pop culture. MTV is part of MTV Networks, a unit of Viacom (NYSE: VIA, VIA.B), one of the world's leading creators of programming and content across all media platforms. For more information, go to www.mtvpress.com (http://cts.businesswire.com/ct/CT?id=smartlink&url=http%3A%2F%2Fwww.mtvpress.com%2F&esheet=50941189&newsitemid=20140911006274&lan=en-US&anchor=www.mtvpress.com&index=2&md5=2b25fc165b09640e0d7e3dd305f73031).

### About Extreme Music:

World-renowned as the "Bad Boys of the Industry" Extreme, the Production Music Library arm of Sony/ATV Music Publishing, have made it their duty to change the face of library music. Since exploding onto the scene in 1997 these production music zeitgeists have consistently delivered an industry-quaking catalogue that leaves their competition sleeping with the lights on and establishes them as the undisputed

EXHIBIT 2.1

masters in their field. Their unrivalled roster famously boasts names such as Snoop Dogg, Rodney Jerkins, Robbie Nevil, Junkie XL, Paul Oakenfold, Mark Mothersbaugh and Vince Clarke to name a few.

## SEARCH NEWS

SUBSCRIBE TO VIACOM NEWS (http://ir.viacom.com/alerts.cfm?)

## HOW TO FIND US

(mailto:corpcomm@viacom.com)  Email Corporate Relations (mailto:corpcomm@viacom.com)

(https://www.facebook.com/Viacom/)  Visit our Facebook (https://www.facebook.com/Viacom/)

(https://twitter.com/Viacom/)  Follow @viacom (https://twitter.com/Viacom/)

## PRESS SITES

Click here (/press-sites) for press information for Viacom's brands.

## VIACOM ON TWITTER

EXHIBIT 2.2

# EXHIBIT 3

New Creative Mix Inc.
1515 Broadway
New York, NY 10036

March 7, 2011

Twelvesixty, LLC
P.O. Box 4420
Malibu, CA 90264
Attn: Robert Marderosian

Re: "Twelvesixty, LLC f/s/o Aron Marderosian and Robert Marderosian together p/k/a
"Heavy Young Heathens" Composer Agreement/Amendment # 1"

Dear Robert:

Reference is made to the agreement dated as of May 19, 2010 between New Remote Productions Inc.
("Company") on the one hand, and Twelvesixty, LLC ("Lender") for the services of Aron
Marderosian, individually, ("AMardo") and Robert Marderosian, individually, ("RMardo") together
the artists professionally known as "Heavy Young Heathens" (AMardo and RMardo are collectively
referred to herein as "Composer"), on the other hand, with respect to the composer services of
Composer ("Existing Agreement"). The Existing Agreement together with this amendment dated as
of March 7, 2011 ("Amendment # 1") shall jointly be referred to as the "Agreement." Capitalized
terms used herein without definition shall have the respective definition(s) ascribed thereto in the
Existing Agreement.

Company and Composer hereby agree to modify the Existing Agreement as follows:

1.      This shall confirm that effective as of the date hereof, Company hereby transfers and
assigns to New Creative Mix Inc. and New Creative Mix Inc. hereby accepts the transfer and
assignment of, all of Company's right, title, interest and obligations in and to the Existing Agreement.

2.      Lender and Composer agree to execute Company's "Hype Music Library" master
composer agreement (the "Hype Master Agreement"), attached hereto as Exhibit "A", in connection
with the Compositions, Masters and/or any and all additional Materials delivered by Composer to
Company under the Existing Agreement as directed by Company. In the event of any conflicts
between the Existing Agreement and the Hype Master Agreement the terms of the Hype Master
Agreement shall prevail, however, at all other times the terms and conditions of the Existing
Agreement shall remain in full force and effect.

Except as otherwise expressly indicated above, all terms and conditions of the Agreement remain in
full force and effect. Please sign below to indicate agreement with, and acceptance of, the terms of
this Amendment #1. The parties may execute this Amendment #1 by signatures obtained through
facsimile and/or e-mail PDF and signatures may be relied upon by the other party as valid as if they
were signed in the presence of the other party. This Amendment #1 shall constitute a full and binding
amendment between the parties.

[Signature page to follow]

3086675

EXHIBIT 3.1

ACCEPTED AND AGREED:

TWELVESIXTY, LLC

By: _____ Henry Young Mattews
              (Title)

Date: 3/24/11

NEW CREATIVE MIX INC.

By: _____ Svp M&&c
              (Title)

Date: _____

806675

EXHIBIT 3.2

## EXHIBIT "A"
## HYPE MASTER AGREEMENT

Dated                    March 7, 2011

NEW CREATIVE MIX INC.

[♦]

_____

BLANKET COMPOSER
AGREEMENT

_____

5060679

EXHIBIT 3.3

## Contents

| Clause | Page |
|---|---|
| 1 | Definitions ...........................................................................................................1 |
| 2 | Rights ...............................................................................................................3 |
| 3 | Warranties and Representations ..........................................................................5 |
| 4 | Compensation ....................................................................................................6 |
| 5 | Accounting .........................................................................................................7 |
| 6 | Legal Advice .......................................................................................................9 |
| 7 | Miscellaneous ....................................................................................................9 |
| | Schedule A.........................................................................................................11 |

EXHIBIT 3.4

This Agreement is made on ................................................. March 7, 2011 (Effective Date)

**Between**

(1)  New Creative Mix Inc., whose principal place of business is at 1515 Broadway, New York, New York 10036 (**Company**); and

(2)  Twelvesixty, LLC ("**Lender**") for the services of Aron Marderosian, individually, ("AMardo") and Robert Marderosian, individually, ("RMardo") together the artists professionally known as "Heavy Young Heathens" ("**Composer**"), on the other hand

**Whereas**

(A)  Company owns, operates and manages programming services and produces original programming for exhibition on such services and licenses Works (as defined in paragraph 2.1 below) for use by third parties.

(B)  The Composer is a composer, arranger, performer and producer of the Works (as defined in Clause 2.1 below).

**It is agreed**

1    Definitions

1.1  Composition(s) shall have the meaning set forth in Clause 2.1

1.2  Blanket Licences means all so-called "blanket licences" issued by or on behalf of Extreme to third parties entitling them to access and use a library of production/library music composed by various composers, where such composers include the Composer;

1.3  Extreme means The Extreme Music Library Limited whose principal place of business is at 30 Golden Square, London W1 9LD;

1.4  Gross Receipts means all monies (exclusive of value added tax) that are actually received by Extreme or Company, or credited to Extreme or Company against a prior advance, and that:

(a)  represent the Relevant Share of Hype Music Blanket Licensing Income; or

(b)  are, to the extent that such monies do not represent the Relevant Share of Hype Music Blanket Licensing Income, directly and identifiably attributable to the exploitation of the HM Works,

it being acknowledged, without prejudice to the generality of the foregoing and without limitation, that Gross Receipts shall exclude: (A) any sub-publisher fees and commissions charged by affiliated or third-party sub-publishers; (B) any costs and expenses incurred by Company or Extreme in the exercise of the rights granted herein; (C) any foreign withholding taxes (where applicable) and (D) the so-called "writer's share" and

508522

EXHIBIT 3.5

"publisher's share" of public performance royalties (if any) as set forth in Clause 7.4
below;

1.5     **Hype Music Library** means the premium production music library currently named the
"Hype Music Library", which library may be accessed by third party licensees in return for
a license fee;

1.6     **Hype Music Blanket Licensed Compositions** means in respect of any Blanket
Licences, the Hype Music Library compositions made available to third party licensees
under such Blanket Licences;

1.7     **Hype Music Blanket Licensing Income** means Hype Music Library income from
Blanket Licences;

1.8     **Masters** shall have the meaning set forth in Clause 2.1.

1.9     **MTVN** means MTV Networks, a division of Viacom International Inc., whose principal
place of business is at 1515 Broadway, New York, New York 10036;

1.10    **Recording Costs** means all costs incurred in connection with the recording (including re-
recording required by Company for creative or other reasons until final delivery to and
acceptance by Company of the Works) and delivery of the Works (dub ready), including,
without limitation, the costs of all studios, tape, instrument rentals, engineers, musicians
and all other parties rendering services in connection with the musical material, cartage
and related expenses, travel, accommodations and per diems; and

1.11    **Relevant Share** means, in respect of Hype Music Blanket Licensing Income, the share of
Hype Music Blanket Licensing Income apportioned in respect of the Composer's
compositions on the basis specified in Clause 7.3 below.

1.12    **Works** shall have the meaning set forth in Clause 2.1.

## 2       Services

2.1     Lender shall cause Composer to render services for Company as a composer and audio
producer.   These services shall include, without limitation, (a) writing, composing,
arranging, orchestrating, conducting and delivering to Company suitable original musical
material, whether consisting of lyrics and/or sound effects (**Compositions**) and
performing, recording, producing, mixing, dubbing and delivering to Producer suitable
original audio recordings of the Compositions (the **Masters** and together with the
Compositions, the **Works**), (b) any and all services customarily provided by first class
audio producers and composers; and (c) any and all other services Company requests.
Company may employ or engage other persons or entities as composers, lyricists,
arrangers, orchestrators, copyists, adapters or conductors and such other persons may, at
Company's direction, modify, edit, adapt, re-record or make any other changes to the Works
as requested by Company.   All services provided hereunder shall be pursuant to the
direction and control of Company and are subject to Company's approval in its sole
discretion.   For the avoidance of doubt, Company shall have the right to assign any or all

506675

EXHIBIT 3.6

of Lender's and/or Composer's services and/or the results and proceeds thereof pursuant to Clause 8.2 below. Notwithstanding anything to the contrary contained in this Agreement, Company shall be under no obligation to use the results and proceeds of Composer hereunder.

2.2 A list of Works is set forth in the Short Form License Agreement attached hereto as Schedule A and incorporated herein by this reference. Any works set forth in a Short Form License Agreement to this Agreement signed by Company and the Lender and the Composer following the date of this Agreement shall be deemed to be Works hereunder.

2.3 In respect of each Work, the terms of this Agreement shall apply from the date upon which the parties sign the Short Form License Agreement in which such Work is listed.

2.4 Lender shall cause Composer to deliver the Works in compliance with the Technical Delivery Specifications set forth on Exhibit "A". In addition, Lender shall cause Composer to provide Company with a completed Exhibit "B".

## 3    Term/Exclusivity

3.1 The term of this Agreement shall commence upon the Effective Date set forth above and continue until the termination of this Agreement by either party hereto, which termination shall be effective upon delivery of written notice to the other party; provided that if Composer is rendering on, or providing materials for Company with respect to any Works at the time of such termination, the provisions of this Agreement shall apply to Composer's services and obligations with respect to such Works, and, if requested by Company, Lender shall be required to cause Composer to complete all services and obligations related thereto (the "Term"). Company shall have the right to terminate this Agreement at any time, with or without cause, subject to Company's obligation to pay Lender any accrued but unpaid compensation for services already actually completed by Composer.

3.2 For a period of two (2) years commencing upon the Effective Date, Lender shall provide Composer to render services exclusively to Company with respect to composing and/or recording production/library music library. Notwithstanding the foregoing, Composer shall not be precluded from entering into direct deals with third party television production companies to compose and/or record original music solely for use by such third party television production companies.

## 4    Rights

4.1 The Services rendered by Composer pursuant to this Agreement and the results and proceeds thereof, including, without limitation, the Works, and whether or not actually used by Company (all such material, services, and the results and proceeds thereof are referred to collectively as the Material), have been and/or will be solely created by Composer as a "work made for hire" specially ordered or commissioned by Company for use as part of an audio/visual work within the meaning of the U.S. Copyright Law, with Company being deemed the sole author, and, at all stages of completion, the sole and exclusive owner of the Material, and of all rights of every kind or nature, whether now

509675

EXHIBIT 3.7

known or hereafter devised (including, without limitation, all copyrights, trademarks, patents and all extensions and renewals of same) in and to the Material in perpetuity throughout the universe.   To the extent not deemed works "made-for-hire," then immediately upon creation but no later than Composer's completion of services in connection with the Material, Artist will be deemed to have automatically and irrevocably assigned solely and exclusively to Company, and Company will own, in perpetuity and throughout the universe, all right, title and interest of every kind and nature in all media, whether now known or hereafter recognized, in all languages, in all versions (including without limitation digitized versions), in and to the Material.   In connection with Company's exploitation of the rights granted to Company herein, Company shall have the right, subject only to Clause 7.2 below, to collect any and all income arising throughout the world in respect of exploitation of the Material.

4.2     Without in any way limiting the generality of the foregoing, Company shall have the right to make all known or hereafter existing uses of the Material in perpetuity throughout the universe, including without limitation as Production/Library Music in productions, television programs and/or motion pictures or otherwise, in all media and all forms and all formats, including, without limitation, videocassette, videodisc, sound recording, publishing, music publishing, merchandising, character, sequel, remake, theme park, legitimate stage, electronic, interactive, digital, computer-assisted media and other new technologies, whether now known or hereafter devised, including, but not limited to, laser disc, cartridge, CD-ROM and other similar or dissimilar disc systems, interactive television/cable, all means of video and/or audio streaming, still or download, whether delivered to portable devices, personal computers, set top boxes, televisions or other forms of hardware via broadcast, syndication, basic cable, pay television, pay-over-the-air, closed circuit, hotel/motel, TVRO, SMATV, MDS, MMDS, DBS, video-on-demand, pay-per-view, datacasting, internet protocol, wireless protocol, terrestrial radio, satellite radio, and any other devices and/or methods of delivery, in any and all media now existing or hereafter devised, and all allied, ancillary and subsidiary rights in and to each of the foregoing, and the right to make all changes in the Material as Company deems necessary or desirable, including, but not limited to, the right to revise, change, modify, translate, reformat, reprocess, dramatize, fictionalize, add material to and/or remove material from the Material as Company shall, in its sole discretion, deem appropriate.

4.3     Composer shall not (i) utilize any material as the basis of the Works (including samples) or any arrangements hereunder which are believed to be in the public domain without first notifying Company of the identity of such material so that Company may verify the public domain status thereof; or (ii) use any material whatsoever not composed entirely by Composer, such as samples (whether or not in the public domain) without first obtaining Company's prior written consent in each instance.

4.4     The Lender and Composer jointly and severally hereby absolutely, irrevocably and unconditionally waives all so-called "droit moral", "moral rights" or similar rights or principals of law in any country of the world which Lender and Composer may now or later have in the Material and Lender and Composer agree not to institute or permit any action or lawsuit on the grounds that the Material or any other work based upon the Material constitutes an infringement of Lender's and/or Composer's droit moral or is in

506675

EXHIBIT 3.8

any way a defamation or mutilation of the Material or any part thereof, or contains unauthorized variations, alterations, modifications, changes, or translations of the Material. Lender and Composer expressly acknowledge that other works may or will embody all or part of the Material. Accordingly, if under any applicable law the above waiver or assignment by Lender and Composer of "droit moral" or "moral rights" is not effective, then Lender and Composer agree to exercise such rights in a manner which recognizes the contribution of, and will not have a material adverse effect upon, such other parties.

4.5    The Lender and Composer hereby grant to Company the right in connection with the exploitation of the Works to exploit and permit and permit third parties to exploit Composer's name, professional name, and any likeness, photograph, signature and biographical material. The Lender shall cause Composer to supply, upon Company's request, suitable materials for publicity, advertising, trade and promotional purposes inclusive of all rights in the same.

4.6    The Lender shall cause Composer to at the reasonable request and expense of Company do all further acts, deeds and things and execute all such further documents, deeds and instruments from time to time as necessary to vest in Company the rights granted under this Agreement and, subject to the other terms of this Agreement, for the protection and enforcement of the same.

4.7    The Lender shall cause Composer to deliver to Company as soon as reasonably practicable following signature of this Agreement the Works in such format as Company shall reasonably direct.

4.8    Company shall register in its name the Works with all appropriate mechanical and performing rights collecting societies who are responsible for the collection and distribution of royalties relating to exploitation of mechanical and performing rights.

4.9    Effective as of the date of this Agreement, and unless Company otherwise consents in writing, Composer shall not record, re-record, produce, arrange, or perform (as conductor or otherwise) for anyone other than for Company, any of the Compositions at any time. The foregoing shall be applicable regardless of the so-called "compulsory license" provisions of any applicable copyright law.

4.10   Lender and Composer acknowledge that Company is not a party to any collective bargaining agreements that might be applicable to the type of services provided hereunder, and Lender and Composer understand and agree that neither this Agreement nor Composer's services hereunder shall be subject to any collective bargaining agreements, including, without limitation the American Federation of Musicians ("AFM") or the American Federation of Television and Radio Artists ("AFTRA").

## 5    Hype Music Option

5.1    Company shall have the exclusive, irrevocable option ("Hype Music Option") exercisable without notice, at any time, to exploit any or all of the Works as part of the Hype Music Library (each such Work, an "HM Work") and in connection therewith, shall have the right

506675

EXHIBIT 3.9

to transfer all rights and obligations hereunder with respect to each HM Work to the owners of the Hype Music Library (currently MTVN and Extreme) or their designees ("HM Transferees").

## 6    Warranties and Representations

6.1    The Lender and Composer jointly and severally hereby warrant and represent that:

(a)    The Lender and Composer have full right and power to enter into this Agreement and to grant, transfer and assign the rights granted to Company under this Agreement and neither Lender nor Composer have entered into and will not enter into any commitment or agreement that will or might in any way conflict with Lender's and Composer's obligations under this Agreement;

(b)    The Composer is the sole author and producer of the Works and is the sole owner of the entire right, title, and interest in and to the Works including, without limitation, copyright, performers' property rights, rights of action and all other rights of whatsoever nature as may exist in any part of the world in and to the Works;

(c)    Neither the Lender nor the Composer have previously assigned, transferred, charged, mortgaged, licensed or otherwise granted to a third party any right, title or interest in or to the Works;

(d)    Neither Lender nor Composer has signed , agreed to sign, nor will neither Lender nor Composer sign during the Term hereof, an exclusive recording agreement and/or songwriter/publishing agreement or any other agreement that may affect Company's rights hereunder;

(e)    Composer shall not collaborate with any third-party lyricists and/or composers and/or recording artists/musicians under exclusive contracts with third parties, and shall not make use of any musical compositions not written or composed specifically and originally in connection with this Agreement, without Company's prior written consent;

(f)    The Material is wholly original to the Composer and does not contain anything that infringes the rights of any third party;

(g)    The Works contain nothing that is obscene, blasphemous or libellous;

(h)    The Works contain no uncleared samples or interpolations;

(i)    The Lender has caused Composer to obtain to the full extent permitted by law from any performer whose performance is embodied in the Works an irrevocable assignment of any and all right, title or interest in and to the Works (including, without limitation, performers' property rights), a grant of all relevant consents and an irrevocable waiver of all so-called "moral rights" or similar rights;

506675

EXHIBIT 3.10

(j)     No consents are required from, and no payments are required to, any third party in connection with the rights granted and assigned under this Agreement; and

(k)     Lender has paid all Recording Costs.

6.2    The Lender and Composer shall indemnify Company and keep Company, its parent, subsidiary and affiliated entities, and the shareholders, officers, directors, employees and agents of each of the foregoing, and any person(s) or entity(ies), in whole or in part, owning, financing, distributing and/or otherwise exploiting the Material fully indemnified on demand from and against all losses and all actions, claims, proceedings, costs and damages (including any damages or compensation paid by Company on legal advice to compromise or settle any claim) and all legal costs or other expenses arising out of any breach of any of the warranties and representations contained in this Agreement or out of any claim by a third party based on any facts which if substantiated would constitute such a breach. The Lender and Composer hereby authorise Company or any HM Transferees (without prior notice) to apply any sums due to the Lender and Composer under this Agreement or otherwise towards satisfaction of the Lender's and Composer's liability under this indemnity.

## 7     Compensation

7.1    Provided that Company has received a copy of this Agreement signed by Lender and Composer, Lender and Composer have complied with all applicable requirements, including, but not limited to, signing and delivering to Company any and all required tax and immigration forms (as applicable) and neither Lender nor Composer are in breach or default of this Agreement, Lender shall receive a one-time all-inclusive payment in the amount set forth on the applicable Short Form License Agreement in full consideration of the services performed, materials furnished and rights acknowledged or granted under this Agreement, including without limitation, all Recording Costs (as defined in Clause 1.5 above), subject to Lender's and Composer's full performance of the terms of this Agreement. Unless stated otherwise in the applicable Short Form License Agreement, the foregoing compensation shall be payable 50% upon complete execution of this Agreement and 50% following Lender's and Composer's completion of all services and materials required hereunder. Composer's compensation is subject to all withholdings and deductions that employers are required to make by law. Lender and Composer shall comply with all eligibility verifications required by law.

7.2    Notwithstanding anything to the contrary contained herein, in the event Company exercises the Hype Music Option, and provided Composer has complied with all applicable requirements and is not in breach or default of this Agreement, and solely for the period during which the HM Works are exploited as part of the Hype Music Library, Company or the HM Transferees shall pay or cause to be paid to the Composer in respect of all exploitation of the HM Works, a royalty equal to 50% of the Gross Receipts, except that neither Company nor the HM Transferees shall have any obligation to pay a royalty on the reasonable reproduction, distribution, performance, communication to the public and other exploitation of the HM Works in any form or in any medium (including, without limitation, by the distribution of printed editions, compact discs, tapes or digital

506675

EXHIBIT 3.11

files or by the making available of the HM Works on websites) for the purposes of promoting the HM Works and/or the Hype Music Library. For the avoidance of doubt, Gross Receipts shall include revenue from the sale of permanent digital downloads of the Masters.

7.3     In the event Company exercises the Hype Music Option, Company agrees that it shall procure that the HM Transferees shall apportion Hype Music Blanket Licensing Income as between Hype Music Blanket Licensed Compositions on a fair, reasonable and practicable basis, such basis to be determined in Company and the HM Transferees' sole discretion. Without prejudice to the generality of the foregoing, Company and the HM Transferees reserve the right to apportion Hype Music Blanket Licensing Income:

    (a)     on any actual usage basis determined by Company or the HM Transferees; or

    (b)     on any projected usage basis determined by Company or the HM Transferees; or

    (c)     on a basis which is a composite of the methods described above.

7.4     Lender and Composer acknowledge and agree that, except as otherwise specified in this Clause 7, neither Lender nor Composer shall be entitled to any other compensation whatsoever in connection with Composer's services hereunder and/or the exploitation of the Material, including, without limitation, any songwriter royalties, mechanical royalties, phonorecord royalties, synchronization fees, master use license fees, print royalties or any other revenue opportunities, including, without limitation, exploitation of the Works as part or production music libraries (other than the Hype Music Library). Lender and Composer acknowledge that this agreement constitutes a full buy-out of any and all rights to the Works. Notwithstanding the foregoing, Lender and Composer and Company hereby acknowledge and agree that Composer may receive and retain Composer's respective portion of the so-called "writer's share" of public performance income which may be payable directly from a performing rights society such as ASCAP, BMI and SESAC, and Company will retain one hundred percent (100%) of the so-called "publisher's share" of public performance income and one hundred percent (100%) of all other publishing income. If Composer co-writes a Composition, either from inception or subsequently (e.g., an additional composer and/or lyricist is hired to compose additional music for the Composition and/or rewrite all or part of the lyrics at a later date or an additional writer is otherwise granted or receives a writer's credit on the Composition concerned) then Lender and Composer acknowledge and agree that Composer's share of the performance royalties shall be reduced proportionately in accordance with Composer's contribution to the work as agreed among Composer and the co-writer(s), but in the absence of such agreement, or if the Compositions are subsequently altered or modified, the assessment of such reduction shall be made solely by Company. Lender and Composer hereby acknowledge that Company is acquiring hereunder, at no additional cost to Company, a U.S. theatrical performance "buy-out" with respect to the theatrical performance in the United States of the Compositions that are subject to this Agreement. If requested by Company, Lender shall cause Composer to obtain from and deliver to Company an appropriate release, at no cost to Company, consenting to the theatrical performance in the United States of the Compositions. Notwithstanding

506675

EXHIBIT 3.12

anything to the contrary, however, where it is, or may from time to time be, unlawful for the performing rights society, or any of its affiliated bodies, to collect performance fees, or where the society, or any of its affiliated bodies, does not, from time to time, for any reason whatsoever, actually maintain a regular system of collecting performance fees, Company may authorize the performance of the Compositions in and as a part of productions, television programs and/or motion pictures in which they are included and the advertising, promotion and publicity thereof, or otherwise, without payments of any performance fees whatsoever to Lender, Composer, the society, or to anyone else.

7.5     If more than one person is named in this Agreement as the Composer, Company shall allocate and pay the flat fee set forth in Clause 7.1 and royalties set forth in Clause 7.2 (if any) to each such named person in equal proportions unless otherwise directed in writing signed by all of such named persons.

7.6     Company shall pay VAT on all payments due to the Lender under this Agreement upon receipt of a proper VAT invoice.

## 8     Royalty Payments and Accountings

8.1     Company shall send (or procure that the HM Transferees shall send) statements to Lender on or before the date ninety (90) days after the end of each of Company's then-current semiannual accounting periods (currently ending on June 30 and December 31), together with payment of Composer's share of Gross Receipts, if any, earned by Composer hereunder during the semiannual period for which the statement is rendered (based on monies received during the accounting period for which the statement is rendered), less all charges against Composer's share of Gross Receipts under this Agreement which are paid or incurred prior to the end of the applicable accounting period (unless paid or incurred later than the end of that accounting period at Lender's request or for reasons within Lender's control). No payments shall be made where the total sum due is under £100, and such amounts shall be carried forward to the next following accounting statement.

8.2     Lender and Composer shall be deemed to have consented to all accountings rendered or required to be rendered by Company hereunder and each accounting shall be conclusive, final and binding, shall constitute an account stated, and shall not be subject to any objection for any reason whatsoever, unless Lender provides written notice to Company stating the specific basis for that objection within two (2) years after the date rendered. Neither Lender nor Composer may maintain any action, suit or proceeding of any nature against Company (or individually against either MTVN or Extreme) in respect of any accounting rendered or required to be rendered by Company hereunder (or in respect of the accounting period to which it relates or was to relate) unless Lender commences that action, suit or proceeding in a court of competent jurisdiction within two (2) years after the date rendered. If Lender shall commence an action, suit or proceeding against Company (or individually against either MTVN or Extreme) concerning royalty accountings rendered or required to be rendered by Company hereunder, the scope of that action, suit or proceeding shall be limited to a determination of the amount of Composer's share of Gross Receipts, if any, payable for the accounting periods in

506675

EXHIBIT 3.13

question, and Lender's and Composer's sole remedy shall be the recovery thereof. For purposes of this clause 8.2 and 8.3 below, each accounting required to be rendered hereunder shall be deemed to have been rendered as and when required unless Lender provides written notice to Company to the contrary not later than sixty (60) days after the date that accounting was required to have been rendered hereunder.

8.3    Company shall maintain books and records concerning the licensing of Individual Works and the corresponding third party income generated hereunder. Except as otherwise permitted by applicable law, Lender shall have the right to designate an independent and certified public accountant on Lender's and Composer's behalf, at Lender's own expense, to examine those books and records solely for the purpose of verifying the accuracy of accounting statements rendered by Company hereunder, only during Company's normal business hours and only upon reasonable written notice. Neither Lender nor Composer shall have the right, however, to engage a particular accountant (or Lender's own firm) to conduct an examination of our books and records on Lender's and Composer's behalf if that accountant (or his or her firm) is then-currently engaged in an examination or audit of Company's books and records (or in the resolution of any outstanding claims derived therefrom) on behalf of a third person. Company's books and records relating to a particular accounting statement may be examined only within two (2) years after the date rendered. Company shall have no obligation to permit neither Lender nor Composer to examine Company's books and/or records relating to any particular statement more than once. Prior to rendering a report to Lender with respect to the examination of Company's books and records as aforesaid, the accountant engaged by Composer shall first review his or her tentative written findings with a designated representative of Company's finance department in order to remedy any factual errors and clarify any issues that may have resulted from misunderstanding. Lender and Composer hereby acknowledge that Company's books and records contain confidential trade information. Neither Lender nor Composer nor Lender's accountant or other representatives shall communicate at any time to any other party (other than to Lender's attorney) or use on behalf of any other party any information obtained as a result of any examination of Company's books and records. Further, prior to the commencement of any examination of Company's books and records in accordance with the provisions of this Clause, Lender shall cause the accountant engaged by Lender to sign a letter in a form approved by Company which acknowledges his or her agreement (and the agreement of his or her firm) to be bound by the foregoing. The rights hereinabove granted to Lender and Composer shall constitute Lender's and Composer's sole and exclusive rights to examine Company's books and records. Notwithstanding the third sentence of this Clause 8.3, if Company notifies Lender that the representative designated by Lender to conduct an examination of Company's books and records under this Clause 8.3, is engaged in an examination on behalf of another party ("Other Examination"), Lender may nevertheless have Lender's examination conducted by Lender's designee, and the running of time within which such examination may be made shall be suspended until Lender's designee has completed the Other Examination, subject to the following conditions:

(a)    Lender shall notify Company of Lender's election to that effect within fifteen (15) days after the date of Company's said notice to Lender;

EXHIBIT 3.14

(b)   Lender's designee shall proceed in a reasonably continuous and expeditious manner to complete the Other Examination and render the final report thereon to the client and Company; and

(c)   Lender's examination, shall not be commenced by Lenders designee before the delivery to Company of the final report on the Other Examination, shall be commenced within thirty (30) days thereafter, and shall be conducted in a reasonably continuous and expeditious manner.

(The preceding provisions set forth in the last sentence of this Clause 8.3 and sections (a), (b) and (c) of this Clause 8.3 shall not apply if Company elects to waive the provisions of the third sentence of Clause 8.3 which require that Lender's representative shall not be engaged in any Other Examination.)

8.4   Company shall have the right to deduct from any monies payable hereunder any amounts which are required to be deducted from those monies under any statute, regulation, treaty or other law, or under any union or guild agreement, and Lender shall cause Composer to promptly execute and deliver to Company any documents required in connection therewith. If Company fails for any reason to make any required deduction, then, without limiting any of Company's other rights or remedies, Lender shall pay Company, upon demand, the amount of those monies which were paid to Lender but which were required to have been deducted, or, at Company's election, Company may deduct that amount from any monies payable hereunder and, at Company's election, under any other agreement between Lender and Composer and Company or Company's affiliates.

9     Legal Advice

THE LENDER AND COMPOSER ACKNOWLEDGE AND CONFIRM THAT THE LENDER AND COMPOSER HAVE BEEN ADVISED BY COMPANY PRIOR TO SIGNATURE OF THIS AGREEMENT TO RETAIN INDEPENDENT COUNSEL, SELECTED BY LENDER AND COMPOSER, TO REPRESENT THE LENDER AND COMPOSER IN CONNECTION WITH THE LENDER'S AND THE COMPOSER'S EXECUTION OF THIS AGREEMENT, AND THE LENDER AND COMPOSER WARRANT THAT THE LENDER AND COMPOSER HAVE TAKEN SUCH LEGAL ADVICE.

10    Miscellaneous

10.1  In performing its obligations under this Agreement, each of the parties hereto shall be deemed an independent contractor, and nothing in this Agreement shall in any way constitute either party, or any of such party's officer or directors, an agent or employee of the other party and this Agreement shall not be deemed to constitute a partnership, joint venture or contract of employment between the parties.

10.2  Company may freely assign or license this Agreement, and any or all of the rights granted by Lender and Composer to Company hereunder, to any other person or entity

5j0675

EXHIBIT 3.15

without restriction. Neither Lender nor Composer may assign this Agreement, and any attempt to do so shall be void ab initio.

10.3 This Agreement contains the entire understanding between the parties and supersedes all prior understandings of the parties hereto relating to the subject matter herein and/or the right for the Composer to receive royalties of any kind from Company. This Agreement cannot be changed or terminated orally.

10.4 No waiver by either of the parties hereto of any failure by the other party to keep or perform any covenant or condition of this Agreement shall be deemed a waiver of any preceding or succeeding breach by such party. Except as expressly provided to the contrary: (a) the remedies provided herein of each party hereto shall be deemed cumulative; (b) the exercise of one shall not preclude the exercise of any other; and (c) each party hereto is entitled to any rights and remedies which may be available to it at law or in equity.

10.5 The rights and remedies contained in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

10.6 If more than one person is named in this Agreement as the Composer, then, unless expressly provided otherwise, all warranties, representations, undertakings, covenants, agreements and obligations given, made or entered into in this Agreement by the Composer are made, given or entered into jointly and severally by each such named person. Company may take action against any one or more of such named persons and/or may release or compromise in whole or in part the liability of, or grant any time or other indulgence to, any one or more of such named persons under this Agreement without affecting the liability of the other(s).

10.7 No provision of this Agreement is enforceable by any person who is not a party to this Agreement.

10.8 All disputes arising under this Agreement shall be governed by the laws of the State of New York; and each of the parties submits to the exclusive jurisdiction of the federal and state courts of the State of New York.

*[Signature page to follow]*

Signed by the parties or their duly authorized representatives on the date of this Agreement.

| | |
|---|---|
| Signed by<br>duly authorized for and on behalf of<br>**New Creative Mix Inc.** | )<br>)<br>) |
| Signed by<br>**Twelvesixty, LLC** | )<br>) |

I ACKNOWLEDGE THAT I HAVE READ THIS AGREEMENT AND AGREE TO BE BOUND BY ITS TERMS AS IF I HAD ENTERED INTO IT DIRECTLY WITH COMPANY, AND I ACKNOWLEDGE THAT WITHOUT THIS ACKNOWLEDGEMENT, COMPANY WOULD NOT BE WILLING TO ENTER INTO THIS AGREEMENT WITH LENDER.

**Robert Marderosian**
Social Security #:

**Aron Marderosian**
Social Security #:

EXHIBIT 3.17

## Schedule A
## SHORT FORM LICENSE AGREEMENT

### COMPOSER SERVICES

By and between New Creative Mix Inc. ("Company"), 1515 Broadway, New York, NY 10036, and Twelvesixty, LLC ("Lender") for the services of Aron Marderosian, individually, ("AMarde") and Robert Marderosian, individually, ("RMarde") together the artists professionally known as "Heavy Young Heathens". Company and Composer hereby agree to the terms set forth below with respect to the Project described below and agree that the terms of the Blanket Composer Agreement dated as of March 7, 2011 signed by Composer with Company shall be incorporated herein by reference:

1.   CONTRACTING PARTY NAME: Twelvesixty, LLC

2    PROJECT NAME-DESCRIPTION: "Hype Music Library."

3.   SERVICES TO BE PROVIDED: Composition of original Works.

4.   MATERIALS TO BE DELIVERED:
        (a) Number of Works: Twenty (20) vocal Works, Fifteen (15) instrumental Works
        (b) Timing/Duration of each Work. Approximately 2:30-3:30 in length each
        (c) Genre: Misc
        (d) Tempo: Misc
        (e) BPM/cadence/ other creative info: All Works to be delivered with stems and stings, lyrics, if applicable.

5    MATERIALS DELIVERY SCHEDULE: All Works to be delivered within three (3) months of the Effective Date.

6    BUDGET AND CASH FLOW SCHEDULE:  Lender shall receive a flat fee of Twenty Thousand Dollars ($20,000) which shall be payable to Lender fifty percent (50%) upon commencement and the final fifty percent (50%) payment upon Company's acceptance of a completed Exhibit "B."

7.   DATE SERVICES TO COMMENCE: Upon the Effective Date.
Services will be provided until all services requested by Company on the Project have been fully completed to Company's satisfaction with no guarantee of any minimum term of employment.

8    COMPANY CONTACT: Ernesto Elias

*[Signature page to follow]*

906675

EXHIBIT 3.18

Signed by the parties or their duly authorized representatives on .................................
2011.

| | |
|---|---|
| Signed by<br>duly authorized for and on behalf of<br>**New Creative Mix Inc.** | ) <br> ) <br> ) |
| Signed by<br>**Twelvesixty, LLC** | ) <br> ) |

I have read the above agreement and agree to its terms.

Signature of Composer Above

Print Composer's Name: _____ KENNY Messersmith

Composer's SS#: _____

Signature of Composer Above

Print Composer's Name: _____ Gary DiBenedetto

Composer's SS#: _____

———End of Schedule A———

506675

EXHIBIT 3.19

## Exhibit "A"

## Technical Delivery Specifications

* All Tracks to be between 2.30-3.30 in length unless otherwise agreed

* Format: 48k 24bit

* Mix splits/stems to accommodate requests for 5.1 or alternate mixes

* Pro-tools / Logic or relevant files and sessions inc audio tracks where possible

* If there is a vocal supply full, voice only and instrumental mixes

* All lyrics with translations if appropriate.

* Composer credits together with performance society membership association and membership numbers

* Composer full names and addresses and contact numbers

* For multiple composers provide share splits (Also included in Exhibit "A")

* Materials are to be delivered to:

    Ernesto Elias
    Music Coordinator
    ph. 310-752-8403
    email: Ernesto.Elias@mtvnmix.com
    MTV Networks
    2600 Colorado Avenue
    Santa Monica, CA 90404

——End of Exhibit A——

EXHIBIT 3.20

Exhibit "B"

| | Title | Composer | Performing Rights Organization | Percent Ownership | ISRC |
|---|---|---|---|---|---|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | | | | | |
| 11. | | | | | |
| 12. | | | | | |
| 13. | | | | | |
| 14. | | | | | |
| 15. | | | | | |
| 16. | | | | | |
| 17. | | | | | |
| 18. | | | | | |
| 19. | | | | | |
| 20. | | | | | |
| 21. | | | | | |
| 22 | | | | | |
| 23. | | | | | |
| 24 | | | | | |
| 25 | | | | | |
| 26 | | | | | |
| 27. | | | | | |
| 28. | | | | | |
| 29. | | | | | |
| 30. | | | | | |
| 31. | | | | | |
| 32 | | | | | |
| 33 | | | | | |
| 34. | | | | | |
| 35. | | | | | |
| 36. | | | | | |
| 37. | | | | | |
| 38 | | | | | |
| 39 | | | | | |
| 40. | | | | | |
| 41 | | | | | |
| 42. | | | | | |
| 43. | | | | | |
| 44. | | | | | |
| 45. | | | | | |
| 46. | | | | | |
| 47 | | | | | |
| 48 | | | | | |
| 49. | | | | | |
| 50. | | | | | |

------End of Exhibit B------

506675

EXHIBIT 3.21