# Bagley Declaration
# Exhibit B

# Exhibit B(1)

Page 1

```
 1

 2              UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF NEW YORK
 3    --------------------------------x
      TWELVE SIXTY LLC, ARON
 4    MARDEROSIAN and ROBERT
      MARDEROSIAN,
 5
                        Plaintiffs,
 6
              -against-
 7
                                Civil Action No.:
 8                              1:17-CV-01479-PAC
 9
      EXTREME MUSIC LIBRARY LIMITED,
10    a division of Sony/ATV Music
      Publishing; EXTREME MUSIC
11    LIMITED; VIACOM INTERNATIONAL
      INC., NEW CREATIVE MIX INC.,
12    HYPE PRODUCTION MUSIC,
13                    Defendants.
14    --------------------------------x
15                  November 1, 2018
16                  1:00 p.m.
17
18         Deposition of ROBERT H. KOHN, taken by
19    Defendants, pursuant to Notice, held at the law
20    offices of Pryor Cashman, LLP, 7 Times Square, New
21    York, New York, before Judith Castore, a Certified
22    Livenote Reporter and Notary Public of the State of
23    New York.
24
25
```

Page 2

1
2         A P P E A R A N C E S
3  ON BEHALF OF PLAINTIFFS
        MARDEROSIAN & COHEN, PC
4        1260 Fulton Street
        Fresno, California 93721
5        559-441-7991
        BY:  MICK MARDEROSIAN, ESQ.
6           mick@mcc-legal.com
           HEATHER COHEN, ESQ.
7
8  ON BEHALF OF DEFENDANTS - Extreme Music Library
   Limited, Extreme Music Limited
9        PRYOR CASHMAN, LLP
        7 Times Square
10       New York, New York 10036
        212-421-4100
11       BY:  DONALD S. ZAKARIN, ESQ.
           dzakarin@pryorcashman.com
12          ROSS M. BAGLEY, ESQ.
           rbagley@pryorcashman.com
13          YEVGENIA S. KLEINER, ESQ.
           ykleiner@pryorcashman.com
14
15  ON BEHALF OF DEFENDANTS - Viacom International,
   Inc., New Creative Mix, Inc. and Hype
16  Production Music
        LOEB & LOEB
17       345 Park Avenue
        New York, New York 10154
18       212-407-4000
        BY:  WOOK J. HWANG, ESQ.
19          whwang@loeb.com
           ERIN SMITH DENNIS, ESQ.
20          edennis@loeb.com
21
22  ALSO PRESENT:
23       DAVID J. PRZYGODA, ESQ., Litigation
        Counsel, Sony Corporation of America
24
25

Page 3

1
2       IT IS HEREBY STIPULATED AND AGREED, by and
3  among counsel for the respective parties hereto,
4  that the filing, sealing and certification of the
5  within deposition shall be and the same are hereby
6  waived.
7       IT IS FURTHER STIPULATED AND AGREED that all
8  objections, except to the form of the question,
9  shall be reserved to the time of trial;
10      IT IS FURTHER STIPULATED AND AGREED that the
11  within deposition may be signed before any Notary
12  Public with the same force and effect as if signed
13  and sworn to before the court.
14          * * * *
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            KOHN
2  R-O-B-E-R-T  H.  K-O-H-N,
3       Having been duly sworn by a Notary Public
4  within and for the State of New York, stated an
5  address as 140 East 28th Street, Apartment 5-G, New
6  York, New York 10016, was examined and testified as
7  follows:
8  EXAMINATION BY MR. ZAKARIN:
9    Q   Good afternoon, Mr. Kohn.
10   A   Good afternoon.
11   Q   You've stated your name for
12  the record, so we'll dispense with
13  that.
14       Please give me your
15  educational background.
16   A   I have a law degree from
17  Loyola Law School.
18       COURT REPORTER:  I'm sorry.
19  If you could just keep your voice
20  up.  Law degree from?
21   A   Excuse me.
22   Q   Loyola Law School --
23   A   Loyola Law School in Los
24  Angeles.  I got a JD degree that I got
25  in 1981.  If you want prior to that, I

Page 5

1            KOHN
2  was at Cal State Northridge.  I
3  graduated with a business degree.  I
4  majored in finance, minored in
5  economics.
6       After law school, I took some
7  professional courses on the
8  entertainment business at USC here and
9  there.  I have a LLM at Columbia Law
10  School, which I got in 2016.  That
11  was -- I graduated with a Kent
12  Scholar -- James Kent Scholar.
13   Q   In what area?
14   A   Nothing practical.
15  Jurisprudence, biblical jurisprudence,
16  philosophy of law, free speech,
17  theories of property.
18   Q   So just a general LLM?
19   A   Very general.
20   Q   Okay.
21   A   Yeah.
22   Q   Give me your employment
23  history, please.
24   A   Sure.
25   Q   After you graduated law

2 (Pages 2 - 5)

KOHN

1
2 you were retained as an expert for
3 purposes of testimony?
4    A   No.
5    Q   So you were retained --
6    A   I was an expert from day one.
7    Q   Okay.
8        Because I wanted to
9 differentiate if they're
10 differentiating in terms of your fees.
11    A   No.
12    Q   So can you tell me how much
13 you have charged thus far to the
14 plaintiffs for your services?
15    A   Well, I charge at 650 an
16 hour; and I have bills that I think
17 exceeded 100 hours.  I believe it's
18 105, 110.  I don't remember.
19    Q   Through what period of time?
20    A   Starting -- the date of the
21 retainer agreement was February 1st.  I
22 think that was about when it started.
23    Q   Okay.  So --
24    A   From this year.
25    Q   Since February 1st you have

KOHN

1
2 devoted something slightly north of 100
3 hours to your work on this case?
4    A   Yes.
5    Q   Okay.  That's including
6 attending depositions and whatever
7 else?
8    A   Yes.
9    Q   Okay.
10        In connection with the
11 preparation of your report, did you
12 communicate at all verbally or in
13 writing with any production music
14 library companies?
15    A   No.
16    Q   Have you communicated at all
17 verbally or in writing with any
18 executives of any production music
19 library companies?
20    A   No.
21    Q   Have you communicated at all
22 verbally or in writing with any music
23 publishing companies?  And when I say
24 music publishing companies, I'm
25 referring to popular music publishing

KOHN

1
2 companies, whether it's Warner Chapel,
3 Sony ATV, ABMG.
4    A   Not in --
5    Q   Just to distinguish them from
6 a production music library.
7    A   If you're asking in
8 connection with this case?
9    Q   In connection with this case.
10    A   No.
11    Q   And I'm actually asking in
12 connection with the generation of your
13 report.
14    A   No.
15    Q   Have you ever been employed
16 by a production music library company?
17    A   I wouldn't call it employed.
18 My uncle ran one of the largest
19 production music libraries in the world
20 of its time, which was Southern Music
21 Library which was owned by Peer Music.
22        COURT REPORTER:  I'm sorry?
23        Owned by?
24    A   Peer Music, P-e-e-r.  Peer
25 Music.

KOHN

1
2    Q   Did you work for him?
3    A   Well, I provided him with
4 advice.  I never charged him.
5    Q   When did you provide him with
6 advice?
7    A   This would have been back in
8 the 1980s.
9    Q   Do you remember the subject
10 matter in which you provided him
11 advice?
12    A   Yeah.  My best memory is that
13 he invited me to his office, and
14 because it was during the time in which
15 I was writing the first edition of Kohn
16 on Music Licensing.  I think it was the
17 1980s.  It could have been the early
18 '90s, but I'm pretty sure it was before
19 the first edition.  As a matter of fact
20 I do -- it had to have been in the
21 '80s.  I was living in Los Angeles.  So
22 probably prior to '87.
23        I had visited his office,
24 which was a little one-man office in
25 Taluka Lake, California, which is near

Page 22

KOHN

2 Burbank, I think.  And I spent all
3 morning with him.  He took phone calls.
4 He was talking to people giving
5 licenses.  I recall actually something
6 pretty funny, at least he thought it
7 was funny to me because he had got a
8 call from -- that day from a company
9 that wanted to use a needle drop in
10 a --
11       COURT REPORTER:  I'm sorry,
12    sir.  Can you just look this way?
13    A   A needle drop -- yeah.  A
14 needle drop in a porno film and they
15 came up with a song called Big Hammer.
16 And he thought that was funny.  And he
17 takes the -- he had record albums at
18 the time and then he would take a DAT
19 tape, D-A-T, digital audiotape and do
20 recordings.  Stick it in an envelope
21 and put a contract with it or license
22 with it and send it off to the guy who
23 took the phone call.
24       And what I -- what I did for
25 him because I looked at the license

Page 23

KOHN

2 that he did, and by that time I had
3 been out of Rudin's office and I had
4 some experience in synchronization
5 licenses and such, and I was kind of
6 surprised how simple that form was.
7 And it could be better.  And I could
8 make it better.  And I actually put
9 together a synchronization license for
10 him, which he thought was too long, and
11 I got it down to one page and gave that
12 to him and he went ahead and started
13 using that.  And, you know, I'd always
14 see him at family events and things
15 like that.
16       And over the years we talked
17 about what he was doing, et cetera, and
18 he was using my license for quite a
19 while.  So I had that.  It was a
20 one-man shop at that time, but he
21 certainly had a lot of experience in
22 dealing with a major production music
23 library.  And I got a sort of -- got an
24 idea of what that was through that
25 experience.

Page 24

KOHN

2    Q   Okay.
3       So you were not employed by
4 Music Production -- a production music
5 library company but you did this little
6 consulting project on a sync license,
7 as it were, for your uncle back in the
8 '80s?
9    A   Well, I would say, yeah.  I
10 mean, whatever questions he had for me
11 and other things that I might have over
12 the years that I don't really remember
13 frankly.
14    Q   Have you ever engaged in
15 licensing on behalf of a production
16 music library company?
17    A   Not of a production music --
18 you said engaged in licensing?
19    Q   Yeah.
20    A   Actually issuing a license?
21 No.
22    Q   Have you ever been in
23 engaged --
24    A   Not for a production music
25 library.

Page 25

KOHN

2    Q   Have you ever been involved
3 in licensing on behalf of a
4 broadcaster?
5       MR. MARDEROSIAN:  Object to
6    the term "involved."
7       Vague, ambiguous.
8    A   I have never -- I don't
9 recall ever working for a broadcaster
10 in getting synchronization licenses.  I
11 did on behalf of a production
12 company -- while at Rudin's office we
13 represented Warner Brother's Pictures.
14 We represented 20th Century Fox.  We
15 represented Irving Azoff, Front Line
16 Management.  We represented Scotti
17 Brothers.
18       There was a period of time at
19 Warners Brothers Music when we were
20 redoing -- this was probably 1982, '83
21 or so -- redoing all of Warner Brothers
22 Music's synchronization licenses.  It
23 was a project that I was heavily
24 involved with.  I spent most of my time
25 on it for several weeks.  It was a time

7 (Pages 22 - 25)

KOHN

1
2 picture, I was directly involved with
3 the amount of money that was involved,
4 you know, in that.  It was a -- you
5 come to a point where some fee is
6 established and everyone answers for --
7 no, most favored nations.  So it
8 becomes easy at a point.
9        There's only so many of these
10 things you have to do in order to
11 become knowledgeable on how these
12 things are done.  I don't need to do
13 10,000 synchronization licenses in
14 order to learn how these things are
15 negotiated.
16    Q   Have you ever worked for a
17 PRO in dealing with cue sheets and
18 broadcasters?
19    A   I never worked for a PRO, no.
20    Q   Now in your report you state
21 that acquiring a work on a
22 work-for-hire basis does not mean that
23 there are no other obligations owed to
24 the writer.
25        Now, you know that a work for

KOHN

1
2 hire makes the publisher of the work
3 not only the copyright owner but also
4 the author; isn't that correct?
5        MR. MARDEROSIAN:  I'm just
6    going to object.
7        It calls for a legal opinion
8    and conclusion.
9        It's vague and overbroad.
10    Q   You can answer the question.
11    A   When a record company
12 acquires a master from a recording
13 artist, it's under a work for hire
14 agreement.  So -- but under that
15 agreement there are royalty obligations
16 back to the recording artist.  Just
17 because they have a work for hire and
18 they're the author or considered the
19 author of the work, that is the record
20 company, doesn't mean they have no
21 financial obligation whatsoever to the
22 person they're contracting with.
23    Q   Those royalty obligations are
24 specified in the contract, correct?
25        MR. MARDEROSIAN:  I'm going

KOHN

1
2    to object.
3        It calls for a legal opinion
4    and conclusion.
5    Q   You can answer the question.
6    A   There are royalty obligations
7 that are specified in the contract, and
8 there are implied obligations that are
9 a part of every contract.
10    Q   We'll get to the implied
11 obligations in due course.  Right now
12 the question that I asked you was:  On
13 a work for hire, the copyright owner is
14 the acquirer of the rights and that
15 acquirer is also under the law of the
16 author; isn't that correct?
17        MR. MARDEROSIAN:  I'm going
18    to object.
19        Calls for -- excuse me, Bob.
20    You need to protect the record.
21        I'm going to object as
22    calling for a legal opinion and
23    conclusion, and it is an
24    incomplete hypothetical.
25    Therefore, it's vague and

KOHN

1
2    overbroad.
3    A   Please read the question
4    back.
5    Q   I can say -- I'll say it
6 again, and the objection will be deemed
7 to this so we don't have to waste time.
8        The acquirer of a work for
9 hire under the Copyright Act is not
10 merely the owner of the copyright but
11 it is also deemed the author of the
12 work; isn't that correct?
13    A   That's a different question
14 but I believe the answer to it is yes.
15    Q   Okay.
16        And absent an agreement to
17 the contrary the author of the work
18 would be entitled to the author share
19 of income; isn't that correct?
20        MR. MARDEROSIAN:  I'm just
21    going to object.
22        It calls for a legal opinion
23    and conclusion.  And it is an
24    incomplete hypothetical.
25

9 (Pages 30 - 33)

KOHN

2  said, virtually give away the
3  intellectual property in exchange for a
4  small upfront fee and potential
5  lucrative writer's share of public
6  performance royalties.
7      The month before this
8  agreement was signed they got $10,000
9  from the same company that they signed
10 this agreement with for a sync license
11 for just -- they kept the intellectual
12 property.  So they went from $10,000 on
13 a non-work for hire license down to
14 $200 for a work for hire.  So that's
15 where the word "small" comes from.
16     Q   I wasn't asking you about the
17 word "small."
18     A   Well, I wanted to clarify my
19 answer.  You asked me -- you read the
20 whole thing to me.
21     Q   You have to wait -- when I'm
22 talking, you wait.  When you're
23 talking, I'll wait.  It will be much
24 better that way.  Okay?
25     A   Are you finished?

KOHN

2      Q   No, because now I'm going to
3  ask you the question --
4      A   Good.
5      Q   -- that you didn't answer.
6          You said that we were
7  provided all of these licenses.  And
8  I'm asking you what licenses do you of
9  your own knowledge know we were
10 provided of the brothers?
11     A   There's a set of licenses,
12 about 15 licenses or -- 15 to 20
13 licenses that I've seen in which the
14 brothers have licensed to third parties
15 of their own music that's not -- songs
16 and recordings that are not included in
17 either of the contracts in this case,
18 in which they licensed over the period
19 of time from 2010 until about 2017.
20     Q   Are those licenses identified
21 in the works that you reviewed, the
22 materials you reviewed?
23     MR. MARDEROSIAN:  He's been
24     provided with all of the materials
25     that were produced.  I think

KOHN

2      that's what the reports indicate.
3      Q   That wasn't my question.  I
4  asked a different question.
5          I said --
6      A   Yes.
7      Q   -- are those licenses
8  listed --
9      A   Yeah.
10     Q   -- in the material --
11     A   They don't have to be
12 listed --
13     COURT REPORTER:  I'm sorry,
14     sir.  I just need a full question.
15     A   They don't have to be listed.
16 I talked about Aron and Robert
17 regularly command $60,000 for film
18 trailers --
19     COURT REPORTER:  Sir.
20     MR. MARDEROSIAN:  Slow down.
21     Slow down, please.
22     A   Aron and Robert regularly
23 command $60,000 for film trailers that
24 use works they own and control.
25     Q   I understand --

KOHN

2      A   Where do you think I got that
3  information?
4      Q   I'm asking you a different
5  question.
6      A   Well, it's in my report.
7      Q   So you were provided with
8  licenses.  That's where you get the
9  information from; is that right?
10     A   Yes.
11     Q   Okay.
12         You also said that we were
13 provided those licenses.  And I'm
14 asking you how do you know that?
15     A   I just made an assumption on
16 that.
17     Q   So it was an assumption that
18 you made while you were sitting here?
19     A   Yes.
20     Q   You don't know that as a
21 fact?
22     A   I don't get involved with
23 communications between the plaintiff's
24 attorneys and you.
25         So I have no personal

15 (Pages 54 - 57)

KOHN

1
2 knowledge of what they sent you and
3 what you sent them.
4     Q   I understand.  All I'm trying
5 to do is get a clear record as to when
6 you know something and when you are
7 assuming something.
8     A   Well, it's fair enough.
9     Q   Because there's a difference.
10    A   It's fair enough.
11    Q   That's all.
12        How many production music
13 library work for hire contracts have
14 you studied in your career?  I know
15 these -- these two we know you have.
16 But beyond those?
17    A   I don't remember.
18    Q   More than 100?  More than a
19 1,000?
20    A   I didn't do a lot of
21 dealing --
22    Q   More than two?
23    A   It might have been more than
24 two; but it's probably less than 1,000.
25 I mean, it's less than 100.

KOHN

1
2     Q   Less than ten?
3     A   I haven't done a lot of
4 production music library work directly.
5 I've never worked for a production
6 music library.
7     Q   I understand.
8     A   But I've seen production
9 music library licenses over time in
10 connection with studying and getting
11 information from either my father or
12 for other people in the industry or
13 from sitting on panels with people like
14 Mr. Massarsky, who's sitting here at
15 the table.  I might have been on a
16 panel with him at one point or another
17 where you pick up what the customs and
18 practices are in the music industry.
19    Q   So you glean that from your
20 discussions with people like Massarsky
21 or --
22    A   Or from looking directly at
23 the contracts.
24    Q   The production music library
25 contracts --

KOHN

1
2     A   Production music library
3 contracts, yes --
4         COURT REPORTER:  Sir.  I'm
5 sorry.  Wait.  I just need a full
6 question.
7         MR. ZAKARIN:  You're right.
8 We'll try to slow it down.
9     Q   The production music library
10 contract?
11        MR. MARDEROSIAN:  Excuse me.
12 It really -- this needs to slow
13 down.
14        In all due respect to you,
15 Don, you need to slow it down with
16 the questions.  And, Bob, in
17 responding to the questions, we
18 need a moment, take a breath so
19 that we don't wear the court
20 reporter out so we can get through
21 the deposition today.
22        Okay.  And I am as guilty as
23 anyone in what advice I just gave
24 the both of you.  So let's get
25 that skunk out on the table right

KOHN

1
2 now.
3         But I'm just trying to help
4 the process so that Mr. Zakarin,
5 on behalf of his clients, can get
6 your opinions and question the
7 opinions that you set forth in
8 your report.
9         THE WITNESS:  Thanks, Mick.
10        MR. MARDEROSIAN:  All right.
11    Q   Okay.
12        Where were we?  Did we have
13 an answer?  Let's try to get back to
14 where we were.  Give me a second.
15        Now, you gleaned this -- the
16 knowledge of the custom and practice
17 from being on panels with people like
18 Massarsky and from the production music
19 library contracts, the work for hire
20 contracts you've looked at?
21    A   And discussions that I've had
22 with my Uncle Roy and the advice that I
23 might have given him over a period of
24 years, that he might have asked me
25 questions that I have given him.  He

16 (Pages 58 - 61)

KOHN

1
2 was the closest person in my life whose
3 full-time business for 40 years was
4 running a production music library.  He
5 was my uncle, and I would see him
6 very -- almost every weekend, you know,
7 in California.
8     Q   Is he still alive?
9     A   No.  He passed away last
10 year -- or two years ago.
11     Q   I'm sorry.
12     A   He was 91, lived a good life.
13     Q   But as you testified already,
14 in connection with your forming of your
15 report, you did not consult with, talk
16 to any production music libraries or
17 executives at those companies?
18     A   No.
19     Q   Okay.
20         Now, you've talked about
21 having looked at some, I think, 15
22 licenses, I think you said, of the --
23 of the plaintiff's work -- of their
24 self-published works, I guess it is; is
25 that right?

KOHN

1
2     A   Yes.
3     Q   Have you examined any of
4 their other production music library
5 agreements other than the two in this
6 case?
7     A   I don't know whether they
8 have other production music library
9 contracts.
10     Q   You're not aware of that?
11     A   No.
12     Q   Okay.
13     A   One way or the other, I don't
14 know whether they have or have not.  I
15 certainly haven't looked at that.
16     Q   You haven't looked at them?
17     A   No.
18     Q   If they exist?
19     A   Well, if they exist, I
20 haven't looked at them.
21     Q   Okay.  Fair enough.
22         Now, in your report what we
23 just looked at is what they were -- an
24 important consideration was the
25 potential lucrative writer share of

KOHN

1
2 public performance income; is that
3 right?
4     A   Yes.
5     Q   And that would be hopefully
6 generated by successful placements of
7 their works?
8     A   Yes.
9     Q   Placements with whom?
10     A   Placements with anyone
11 producing audiovisual works that are
12 likely to be broadcast by organizations
13 that are licensed by one of the
14 productions -- one of the PROs or
15 particularly in this case BMI.
16     Q   Well, in this case we're
17 dealing with the 2010 agreement.  Why
18 don't we just put that out there now
19 just so we have it.  Okay?  We're not
20 going to directly refer to it right
21 this minute, but you might as well mark
22 it as K Exhibit 2 or K2.
23         (Blanket Composer Agreement
24         (Direct) dated as of May 19, 2010,
25         was marked K Exhibit 2, for

KOHN

1
2     identification, as of this date.)
3     Q   You can just put that next to
4 it.  I'm not going to be questioning
5 you about it.
6     A   Okay.
7     Q   But I'll ask you one
8 question.  Can you identify that as the
9 2010 agreement that you reviewed?
10     A   Yes.
11         MR. MARDEROSIAN:  Don, is
12     this the one that's not
13     Bates-stamped?  Is this the one
14     that you folks produced pursuant
15     to Judge Crotty's order or is this
16     one that's been produced in
17     discovery or, excuse me, or is
18     this the one that the plaintiff's
19     produced.
20         MR. BAGLEY:  I believe that
21     this is the copy that you sent to
22     the court after he asked for a
23     more legible copy of the
24     agreements.
25         MR. MARDEROSIAN:  Yes.

17 (Pages 62 - 65)

KOHN

1
2 not sure there's room.  So let's just
3 mark this --
4       MR. MARDEROSIAN:  And that's
5 demeaning.  You need to stop that.
6       MR. ZAKARIN:  Stop what?
7       MR. MARDEROSIAN:  Do you have
8 a hearing problem as well?
9       MR. ZAKARIN:  I don't hear
10 you anymore.
11       MR. MARDEROSIAN:  You need to
12 stop trying to demean witnesses
13 and people.
14       MR. ZAKARIN:  I don't hear
15 you anymore.
16       MR. MARDEROSIAN:  Don't do
17 that --
18       MR. ZAKARIN:  Let's mark
19 this Exhibit 3 --
20       MR. MARDEROSIAN:  -- or we're
21 going to leave.  I'm going to
22 leave.
23       MR. ZAKARIN:  Go.  You can
24 leave.
25       MR. MARDEROSIAN:  Yeah, I'm

KOHN

1
2 going to leave with the witness.
3       MR. MARDEROSIAN:  That's up to
4 him.  Let's mark this Exhibit 3,
5 K3.
6       MR. MARDEROSIAN:  Let's take
7 a break.  We're going to take a
8 break.
9       (Whereupon, a brief recess
10 was taken.)
11       (March 7, 2011 Agreement, was
12 marked K Exhibit 3, for
13 identification, as of this date.)
14    Q   I'll ask you first, can you
15 identify K3 as the 2011 agreement that
16 you reviewed?
17    A   Yes.
18    Q   And I've asked you to turn to
19 Paragraph 4.8.
20    A   Yes.
21    Q   And you have that in front of
22 you?
23    A   Yes, I do.
24    Q   Okay.  And that's the
25 paragraph that required New Creative

KOHN

1
2 Mix Viacom to register the works with
3 societies, correct?
4    A   Yes.
5    Q   And turn to your report, if
6 you would.  We're also still on Page 8.
7 Not a major point, but it's the third
8 bullet point from the bottom.
9       MR. MARDEROSIAN:  Page 8?
10       MR. ZAKARIN:  On Page 8.
11    A   On page 8 of my report?
12    Q   Yes.  Third bullet point from
13 the bottom.
14       Do you see it?
15    A   Yes.
16    Q   And you say -- you have in
17 italics that the registration is
18 required to be, in italics, on a timely
19 basis.
20       Do you see that?
21    A   Yes.
22    Q   That language, you would
23 agree, is not specifically in the
24 contract?
25    A   I would say that it is

KOHN

1
2 specifically in the contract because if
3 it's not done in a timely basis the
4 performance royalties are not going to
5 get paid from the performance rights
6 societies, according to the performance
7 rights societies, particularly ASCAP
8 but BMI too.
9    Q   Is it your understanding that
10 performance royalties are based upon
11 the filing of a works registration?
12    A   It could be a works
13 registration or a cue sheet
14 registration.
15    Q   Do you know -- if no cue
16 sheets are filed but a works
17 registration is filed, would
18 performance royalties be paid?
19       MR. MARDEROSIAN:  Objection.
20       Vague and overbroad.
21       Incomplete hypothetical.
22    Q   You can answer.
23    A   According to the societies,
24 it's likely that they're not going to
25 be paid if there's no cue sheet

Page 150

KOHN

1             KOHN
2  registrations on file.
3         There's one thing I want to
4  talk about in terms of --
5      Q   Mr. Kohn, if you would, I
6  don't want to interrupt you but --
7      A   Go ahead.
8      Q   -- the way this goes is Qs
9  and As.  And it -- it doesn't go very
10  well otherwise --
11     A   Right.
12     Q   -- and I want -- I don't want
13  you to stay here until 2:00, 3:00 in
14  the morning or whatever we have to go
15  to.  I'd rather try to get my questions
16  out, try to get your answers in so that
17  we can finish.  That's my goal.
18        MR. MARDEROSIAN:  This may
19     just -- this may just be a further
20     part of the answer he was giving.
21     I don't know.  Nobody asked, and
22     you interrupted him.
23     A   Well, I wanted to clarify
24  another answer that in connection with
25  now thinking about this I was looking

Page 151

1             KOHN
2  for the equivalent paragraph concerning
3  registration in the 2010 agreement.
4      Q   Yes.
5      A   And that refreshed my
6  recollection that there is a provision
7  in the 2010 agreement --
8      Q   Can you tell me what it is?
9      A   Yeah.  In the delivery
10  provision on -- there's no page numbers
11  here.  But --
12     Q   Is there a paragraph
13  reference?
14     A   Paragraph 5.
15     Q   Okay.
16     A   Where it talks about how the
17  Aron -- Aron and Rob's company were to
18  enter -- provide services of entering
19  cue sheet information directly into
20  company's proprietary --
21        COURT REPORTER:  I'm sorry?
22     Entering cue sheet information?
23     A   -- entering cue sheet
24  information directly into company's
25  proprietary online cue sheet system.

Page 152

KOHN

1             KOHN
2         And there were two
3  depositions that I recall reading in
4  which the Viacom representatives, I
5  believe, admitted -- I'm not sure who
6  it is.  Is it -- now I'm thinking about
7  it, Ernesto and Quello, where they
8  told -- or they admitted to telling the
9  boys or suggested that -- to the boys
10  that the -- there is no online system
11  for the boys to enter into cue sheet
12  information.  So don't worry.  We'll
13  take care of it.
14        And obviously the 2011
15  agreement, I guess, memorializes what
16  the understanding was in the 2010
17  agreement with respect to the -- the
18  company's obligation under a specific
19  expressed obligation under 4.8 to
20  register the work.
21        COURT REPORTER:  I'm sorry?
22     4.8?
23     A   4.8.
24     Q   Let me see if I understand
25  what you just said.

Page 153

1             KOHN
2      A   Yeah.
3      Q   That -- you're pointing me to
4  Paragraph 5 where the Marderosians, the
5  plaintiffs, were required to enter
6  information for the preparation of cue
7  sheets; is that correct?
8      A   Into --
9         MR. MARDEROSIAN:  Objection.
10     Misstatement of the testimony.
11     A   They would provide services
12  required in connection with the
13  preparation of cue sheets.  It doesn't
14  talk about filing them.
15     Q   I understand that that part
16  of it.
17     A   But in connection with the
18  preparation of them.  Okay?  And then
19  it says which who include entering the
20  information directly into their
21  proprietary online cue sheet system,
22  which I understand from the testimony,
23  never existed.
24     Q   You understand from whose
25  testimony?

39 (Pages 150 - 153)

Page 154

KOHN

2    A   I'm trying to think back to
3  the names.  I think it's Quello and
4  Ernesto -- no, Jose -- I'm thinking of
5  something else.  Cuervo.
6        Okay.  It's just a vague
7  recollection that I have.
8    Q   You have a vague recollection
9  that there's deposition testimony to
10  the effect that there was no such
11  online system, so that it got dealt
12  with in the 2011 agreement through the
13  specific registration requirement?
14    A   Yes.
15    Q   If I understand the thrust of
16  what you're saying then, and please
17  correct me if I'm wrong, it's that, in
18  fact, there was no specific
19  registration provision in the 2010
20  agreement, there was this cue sheet
21  preparation provision --
22    A   Right.
23    Q   -- and then it got corrected
24  or addressed in the 2011 agreement in
25  Paragraph 4.8 that we just read?

Page 155

KOHN

2    A   Right.
3    Q   Thank you.
4        I just wanted to understand
5  what you were saying.
6        MR. MARDEROSIAN:  I think the
7    witnesses he was referring to is
8    Jose Quello, Q-U-E-L-L-O, and
9    Ernesto Elias.
10        MR. ZAKARIN:  I can't swear
11    you, but it doesn't matter.  It
12    either was testified to, or it
13    wasn't.  We know who they are.
14    It's the Viacom witnesses.
15    A   Thank you.
16    Q   Again in Exhibit 3, if you
17  would, and other than whether there is
18  an implied obligation or not, can you
19  tell me any provision in the 2011
20  contract which required Viacom to check
21  any cue sheets that were filed with
22  BMI?
23        MR. MARDEROSIAN:  I'm just
24    going to object.  Calls for a
25    legal opinion and conclusion.

Page 156

KOHN

2        It is an incomplete
3    hypothetical.  It's vague and
4    overbroad.
5    Q   You can answer the question.
6    A   I disagree with the expert
7  reports provided by the defendant in
8  the case who the experts in which -- in
9  which the experts took the position
10  that there's no custom and practice in
11  the music publishing or music
12  production library business of not
13  correcting cue sheets.
14        I do believe that there is a
15  custom and practice of correcting cue
16  sheets, especially when the cue sheet
17  missed information, missed corrections
18  and manipulated incorrectly through
19  metadata, however we want to discuss
20  that in terms of before, was caused by
21  the music publisher.  So I -- if there
22  is -- if the composer's name is wrong,
23  there's a likelihood that the money is
24  going to not be paid or be misdirected
25  to someone other than the songwriter.

Page 157

KOHN

2        And it's as between the
3  songwriter and the publisher.  It is
4  not the songwriter's responsibility to
5  do it.  It's the -- to administer these
6  properly, the cue sheets, but it's the
7  music publisher's responsibility.  So
8  if a major source of the income of the
9  songwriter under the bargain that has
10  been entered into under both the 2010
11  agreement and the 2011 agreement is for
12  them to get their performance royalties
13  from BMI, those cue sheets have to be
14  entered correctly and they have to have
15  their composer's name on it, not
16  something like Mix Tape or something
17  else.
18        So it is the responsibility
19  of the publisher to perform those
20  administrative duties so that the
21  songwriter gets the benefit of the
22  bargain.
23    Q   We're going to deal with the
24  custom and practice pretty much right
25  now that you just said exists.  But

KOHN

1
2 that wasn't my question.
3       My question was simply, other
4 than there, you know, being some
5 implied obligation or you say there's
6 custom and practice, is there any
7 provision in the agreement that
8 requires Viacom to check the cue sheets
9 for accuracy?  That's my question.
10      MR. MARDEROSIAN:  I'm going
11   to object.  It's been asked and
12   answered.
13      It calls for a legal opinion
14   and conclusion.
15      The document speaks for
16   itself, and it is an incomplete
17   hypothetical and inconsistent with
18   the facts of this case.
19   Q   You can now answer the
20 question.
21   A   Okay.  I am satisfied with my
22 previous answer, and the document
23 speaks for itself.
24   Q   Well, I'm not satisfied; but
25 you're satisfied.  So I will move on.

KOHN

1
2       Now, Mr. Kohn, in defining
3 custom and practice in an industry, I
4 want to understand how you define
5 custom and practice.  Does it mean that
6 a custom and practice is something that
7 some company in the industry does
8 sometimes, or is it something that all
9 companies in the industry invariably do
10 as a matter of consistent practice?
11      MR. MARDEROSIAN:  Object to
12   the question as it's vague and
13   overbroad.
14      It's an incomplete
15   hypothetical, and it calls for a
16   legal conclusion.
17      MR. ZAKARIN:  Let me do it
18   differently.
19   Q   Tell me what your definition
20 is of custom and practice.
21      MR. MARDEROSIAN:  In what
22   regard to what topic?
23      I object.  It's vague.
24   Q   You can answer the question.
25   A   Well, custom and practice in

KOHN

1
2 any industry --
3   Q   Yeah.
4   A   -- is what is typically done
5 in connection with performing one's
6 obligations under contracts or
7 performing one's obligations to
8 maximize the revenues or minimize the
9 costs for the business in question.
10   Q   So custom and practice is
11 something that in an industry is
12 typically done by most companies in an
13 industry; is that right?
14      MR. MARDEROSIAN:  I'm just
15   going to object.  It misstates the
16   testimony.  It's vague and
17   ambiguous.
18   Q   You can answer.
19   A   I would say that custom and
20 practice is performed by companies in
21 the industry who conform to their
22 obligations to fulfill the terms of the
23 contract, the bargains they've made and
24 their implied obligations of good faith
25 and fair dealing with those they

KOHN

1
2 contract with.
3   Q   So isn't that a circular
4 definition, which is, custom and
5 practice is only that which the
6 companies do who are properly doing
7 something as opposed to everybody else?
8      MR. MARDEROSIAN:  I'm going
9   to object to the question.
10   Q   Isn't that a circular
11 definition?
12      MR. MARDEROSIAN:  The
13   question is argumentative.  It's
14   vague and overbroad.
15   A   It's not a circular
16 definition.  It's a definition to a
17 term which you've even tried to
18 characterize in such abstract means.  I
19 think the discussion is better had in
20 determining whether some particular
21 activity is a custom and practice in
22 the industry or not.
23   Q   So you've given me your
24 definition.  Your definition is that
25 it's a -- custom and practice is

41 (Pages 158 - 161)

KOHN

1
2 now told us.  So we can move on.
3        MR. MARDEROSIAN:  Just for
4    the record, I'm going to --
5    A   And --
6        MR. MARDEROSIAN:  -- excuse
7    me -- I'm going to object.  That
8    was a misstate of what he said.
9    And it's vague and ambiguous.
10   A   Typically done --
11       MR. ZAKARIN:  Okay.  The
12   record will reflect it.
13   A   You didn't finish what I had
14   said.  But it's typically done in
15   compliance -- I might have said
16   earlier, in conformance, but I may have
17   misspoke -- but in compliance with
18   obligations that you have both express
19   obligations and implied obligations
20   with respect to those people that you
21   are contractually dealing with in the
22   industry.  Or to perform your duties
23   correctly for the sake of the company
24   that you're working for or for those
25   whom you're working for, such as

KOHN

1
2 shareholders or employees or
3 songwriters and other third parties you
4 may be contracting with.
5    Q   On Page 10 -- turn to Page 10
6 of your report if you would.  I'm going
7 to read you a couple of things that you
8 said on the same topic.
9        Top of the page you say, it
10 has long been the responsibility of the
11 songwriter's music publisher to monitor
12 the cue sheets, submit it to the DROs
13 and with the advent of cable television
14 and the platform it has provided to
15 independent television producers, the
16 responsibility for reviewing cue sheets
17 for accuracy has now become a routine
18 part of a music publisher's basic
19 responsibilities.
20       You then go on and say in the
21 next bullet point, as between the music
22 publisher, the PRO and the songwriter,
23 the publisher bears responsibility for
24 making sure the cue sheets are filed
25 with the proper PRO and are accurate.

KOHN

1
2        And then you say going down,
3 the last bullet point, it is the custom
4 and practice of music publishers to
5 review cue sheets for accuracy and
6 correct any mistakes.  This is true of
7 even publishers who consider themselves
8 to be music production libraries.
9        Those are your statements in
10 your report.  And when you refer to
11 custom and practice there, is that the
12 custom and practice as you've just
13 previously defined it?
14   A   I don't understand the
15 question.  Say that again.
16   Q   You've said -- you used the
17 term "custom and practice."  Is that --
18 is your use of the term "custom and
19 practice" there consistent with the
20 definition that you gave me just a few
21 minutes ago, or is it anything
22 different?
23   A   I think it is.  I think it
24 is.
25   Q   It is consistent?

KOHN

1
2    A   It would -- it sounds
3 consistent.
4    Q   Now, what I want to
5 understand is the factual basis for
6 your statement.  Let's -- these are a
7 couple of statements.  Let's deal with
8 the last one.
9        It is the custom and practice
10 of music publishers to review cue
11 sheets for accuracy and correct any
12 mistakes.  This is true of even
13 publishers who consider themselves to
14 be production music libraries.
15       What's the factual basis for
16 your statement of that being the custom
17 and practice?
18   A   The -- in terms of production
19 music libraries, I actually didn't
20 mention earlier that I meant to do, but
21 I -- I first learned the word -- what
22 the word "cue sheet" was when sitting
23 with my uncle who actually had a stack
24 of them and he explained to me what
25 they were.  And he was -- he was

Page 174

KOHN

1           KOHN
2  reviewing them.
3           I don't have any specific
4  recollection of what they -- where they
5  were from and where they got them.  It
6  was actually paper that he got.  It
7  would have -- back in the '80s.  Then
8  maybe ASCAP would have sent it to him.
9  But if he didn't make sure that the cue
10 sheets were filed properly with ASCAP,
11 he wouldn't have gotten the performance
12 money on the back end, which is what he
13 was explaining to me.  Because he
14 talked -- he told me what a needle drop
15 was.  That he might charge $200 for a
16 needle drop.  And I go that doesn't
17 sound like a lot of money.  How do you
18 make money on this?  And he says I get
19 it all in the back end.  And that
20 morning he had a stack of cue sheets,
21 whatever.  And I didn't quite fully
22 understand it at the time.  Maybe over
23 the years I got a better understanding
24 of that.
25     Q   Who else --

Page 175

1           KOHN
2      A   Now --
3      Q   I'm sorry.  I didn't want to
4  interrupt you.
5      A   Just so it is on the -- as I
6  mentioned in the third bullet on the
7  this page, according to BMI without cue
8  sheets, it would be nearly impossible
9  for such composers and publishers to be
10 compensated for their work.  The ASCAP
11 website says the same thing and
12 actually uses the term "production
13 music libraries" in the sentence.
14     COURT REPORTER:  Uses the
15     term?
16     A   Production music libraries in
17 the sentence.
18     Q   Okay.
19     A   So the ASCAP website says it.
20 The BMI website says it.  Your client,
21 the CEO of Extreme in his deposition
22 said that's not something we do, they
23 do that over at Sony ATV.
24     Q   Huh-uh.
25     A   Yes, he did.

Page 176

1           KOHN
2      Q   That's not what he said.
3      A   Yes, he did.
4      Q   Okay.
5      A   He said -- that's the job of
6  --
7      Q   Whatever it says, it says.
8      A   That's the job -- that's the
9  job of commercial publishers.  The CEO
10 of Extreme said it himself.  So one of
11 the basis of my customs and practices
12 is your own CEO saying in his
13 deposition that Sony ATV does it.
14          Dan Pounder in his
15 declaration said that we don't have the
16 resources to do it like Sony ATV does.
17 I read that.  Okay?
18          So why don't you ask your own
19 client why they don't follow the
20 customs and practices of the industry
21 that their own parent company follows
22 as well.  They say -- they chose not to
23 do it because they say they don't have
24 the resources.  If they --
25     Q   I'm sorry.  I didn't want to

Page 177

1           KOHN
2  interrupt you.
3      A   So the basis -- I've been to
4  panels.  I have discussed this with
5  people in the industry over the past 35
6  years since writing the book about how
7  to make sure -- the whole book is Kohn
8  on Music Licensing, there's a theme in
9  the book is that you shouldn't be --
10 that you should be willing to license
11 your music out there so that you get
12 the back end public performance
13 royalties.  Everyone knows.  It's plain
14 as sight.  It's on the ABMI and ASCAP
15 websites.  You can't be a production
16 music library or a music publisher and
17 miss it, that if you don't have cue
18 sheets on file, you're not going to be
19 getting the largest piece of the income
20 that music publishers make.
21          So for your client to say
22 bizarrely to me, bizarrely to the
23 court, bizarrely to the songwriters
24 that they represent that they don't
25 have any responsibility, and for you to

45 (Pages 174 - 177)

Page 178

KOHN

1            KOHN
2  bring in expert witnesses who dare --
3  the head of APM, okay, filed an expert
4  report in this case.  He's a production
5  music library, and he denies any
6  responsibility.
7         Of course he's going to come
8  in -- you brought in an expert who's
9  the CEO of a production music library
10 to tell you what -- the practices in
11 the industry.  Of course he's going to
12 say that we don't do it.  That's not
13 the practice, because he doesn't want
14 to do the work.
15        You have -- you have
16 yesterday, the expert witness that you
17 brought in yesterday that I sat in on
18 and, that's Mr. Katz.  He was on the
19 board of APM.  He also acquired a
20 production music library called First
21 Com.  And he sat there brazenly telling
22 Mr. Mardosian's [sic] --
23    Q   Marderosian.
24    A   -- Marderosian's client that
25 they have no responsibility either to

Page 179

1            KOHN
2  do it.  He's saying it's custom --
3  there's no custom and practice in the
4  industry.
5         If you read books like Todd
6  Brabec, who you called a putz the other
7  week at a deposition, which was
8  appalling and it was insulting to me
9  and the people that I know in the music
10 industry --
11    Q   Uh-huh.
12    A   -- in his book he says that
13 it's customs and practice in the music
14 industry.  You don't have to be around
15 much to understand that it is custom
16 and practice for production music
17 libraries and music publishers as their
18 basic responsibility to make sure the
19 biggest source of income gets paid to
20 the songwriters.
21    Q   Okay.  Are you done?
22        MR. MARDEROSIAN:  Well,
23    that's argumentative.
24        MR. ZAKARIN:  I just wanted
25    to know because I don't want to

Page 180

1            KOHN
2     interrupt the witness.
3     A   I am done.
4     Q   Oh, okay.  Well, now we'll go
5  back.
6         So in addition to your uncle
7  who you sat with about 30 years ago and
8  he had a stack of cue sheets on his
9  desk, what other production music
10 libraries have you either talked to or
11 found out as a matter of custom and
12 practice reviewed cue sheets, any
13 others?
14    A   I don't remember any others.
15 I met Adam --
16    Q   Thank you.  That's enough.
17    A   I --
18        MR. MARDEROSIAN:  Wait.  What
19    do you mean that's enough?
20        MR. ZAKARIN:  No, no, that's
21    enough.
22        He's answered it.  He's
23    answered the question.
24        MR. MARDEROSIAN:  No, he
25    hasn't.

Page 181

1            KOHN
2     A   No, I didn't say I didn't
3  talk to production music libraries.  I
4  met Adam Taylor a number of years ago.
5  I don't -- I talked about his
6  production music library.  I don't
7  remember having discussed with him, but
8  I might have discussed with him what he
9  does and how he does it.  There are
10 lots of people -- how do you think I
11 wrote Kohn on Music Licensing?
12 Virtually every word in that book,
13 other than the forms, without having
14 discussed with everybody in the music
15 industry that I was in touch with
16 whether it was my uncle, my father,
17 Barry Massarsky sitting at the end of
18 the table, other people that I learned
19 from, what custom and practice in the
20 music industry are?  How could I have
21 possibly have described terms of art?
22    Q   Damned if I know.
23    A   How can I sit here and give
24 you answers to your questions on issues
25 like Sound Exchange and other things if

46 (Pages 178 - 181)

Page 182

KOHN

1 I didn't talk to a lot of people in the
2 music industry to know what a custom
3 and practice in the music industry is
4 or it isn't?
5        How does a federal judge in
6 Los Angeles in federal court accept my
7 testimony as customs and practice in
8 the music industry as to the
9 interpretation of the ASCAP contract
10 with respect to performances in venues
11 across the country?
12    Q   Are you done?  I don't want
13 to interrupt you.
14    A   That's not the -- I was
15 obviously done.
16    Q   I can't tell.
17        Now, so we've established
18 that you didn't talk to any production
19 music companies or find out what they
20 do --
21    A   That's not true.
22    Q   -- but you talked --
23        COURT REPORTER:  I'm sorry.
24    You didn't talk -- I'm sorry.

Page 183

KOHN

1        Talk to any --
2    Q   Music production library
3 companies --
4        COURT REPORTER:  Music
5    production library companies.
6    Q   -- to find out what they do
7 as a matter of custom and practice?
8    A   I -- that's not the
9 testimony.
10    Q   Besides your uncle?
11    A   That's not my testimony.
12 That's not my testimony.
13    Q   It's what --
14    A   No, it's not my testimony.
15        I have talked to production
16 music libraries, people who work for --
17    Q   Who?
18    A   I even met -- I can't tell
19 you the names of the companies.  I
20 can't tell you the names of the
21 companies.  I can't tell you the
22 individuals involved in those
23 companies.  I told you I met with Adam
24 Taylor.  That's one name that came up

Page 184

KOHN

1 that I remember specifically.
2        How would I be able to write
3 about these things in the book without
4 having talked to people about what they
5 do for a living?  And that's what I
6 did --
7    Q   Do you write --
8    A   -- for over 35 years.
9    Q   -- do you write in the book
10 about the custom and practice of music
11 production library companies receiving
12 and reviewing cue sheets?
13    A   No, I do not specifically --
14    Q   Okay.
15    A   -- cover in the book cue
16 sheets.  I can't cover every single
17 custom and practice in the music
18 industry.  Now I will.  And in the next
19 version of the book, which will be
20 coming out next year, is going to be
21 talking about this.  And I'm going to
22 use this as an example of how
23 songwriters can be mistreated by their
24 publishers, and particularly production

Page 185

KOHN

1 music libraries not just for not
2 reviewing cue sheets but for the
3 shenanigans that have been going on in
4 this -- this case with your CEO.
5    Q   I look forward to it.  And
6 look forward to reading it.  I may even
7 buy it.
8        Now --
9    A   I would hope you --
10    Q   -- did you contact --
11    A   -- copyright.
12    Q   -- any music publishers to
13 find out about whether they engage in
14 this custom and practice of receiving
15 and reviewing cue sheets?  Any music
16 publishers, not production music
17 libraries, but music publishers?  Have
18 you gone --
19    A   I haven't --
20        COURT REPORTER:  I need a
21    full question, please.  If you
22    wait until he finishes --
23    Q   Have you contacted -- right.
24 Have you contacted any of them to find

47 (Pages 182 - 185)

KOHN

1
2 out?
3    A   Since I was engaged in this
4 case, no.
5    Q   Did you do a survey of any
6 production music libraries or music
7 publishers?
8    A   Since I've been engaged in
9 this case, no.
10    Q   Did you do a survey before
11 you were engaged in this case?
12    A   It depends on what you mean
13 by "survey."  If it means that --
14    Q   A survey to find --
15    A   If it means that --
16    Q   Let me finish.
17       You're asking me.  So I'm
18 going to tell you.
19    A   Go ahead.
20    Q   A survey to determine whether
21 it's a custom and practice of music
22 publishers to receive and review and
23 correct cue sheets.
24    A   You didn't define survey.
25 Try again.

KOHN

1
2    Q   Do you want to know what a
3 survey is?
4    A   Yes.
5       MR. MARDEROSIAN:  Okay.
6    We're getting conversational
7    again.
8       MR. ZAKARIN:  No, no.
9       MR. MARDEROSIAN:  Maybe we
10    need -- maybe we need another
11    break.
12       MR. ZAKARIN:  No.  No break.
13    A   We don't need a break.
14       MR. MARDEROSIAN:  Hold on
15    everybody.  Let's go back to
16    questions and answers.
17       MR. ZAKARIN:  I want to know
18    what the witness means by survey.
19    That's all.
20       MR. MARDEROSIAN:  So, Don, he
21    told you about what he went
22    through in writing his book and
23    the people that he talked to.
24       MR. ZAKARIN:  I heard him.
25       MR. MARDEROSIAN:  Now, you

KOHN

1
2    used the word "survey."  He's
3    asking you to define what you mean
4    by survey so he can answer your
5    question.
6    Q   Yeah.  Did you -- did you
7 submit questionnaires to music
8 publishers -- you didn't talk to
9 them -- but did you submit
10 questionnaires or some sort of document
11 to music publishers or production music
12 libraries to find out if they engaged
13 in this custom and practice of
14 reviewing --
15    A   I --
16    Q   -- receiving, reviewing and
17 correcting cue sheets?
18    A   I submitted questionnaires,
19 no more than the expert witnesses that
20 you have put forth have submitted
21 questionnaires to provide answers to
22 their questions.
23    Q   So the answer is no?
24    A   That's right.
25    Q   Okay.  That's all we need to

KOHN

1
2 know.
3       Now, on Page 8 -- we're going
4 back for a second.  You talk about the
5 50 percent of gross receipts, correct?
6    A   I'm sorry?  Where do I talk
7 about it?
8    Q   Page 8, you talk about, in
9 the second bullet point.  It's the
10 50 percent of gross receipts.  I'm just
11 trying to orient you.  The obligation
12 to pay 50 percent of gross receipts.
13    A   Correct.  Based on Page 8.
14    Q   Page 8, the second bullet.
15 I'm just trying to --
16    A   Got it.
17    Q   -- work with -- you know, I'm
18 just trying to orient the witness.
19 Okay.
20       Now, under Exhibit 3, K3, the
21 payment of gross receipts is not
22 unlimited.  There are conditions,
23 aren't there?
24       MR. MARDEROSIAN:  Objection.
25    Calls for a legal opinion and

Page 190

KOHN

1
2   conclusion.
3       Incomplete hypothetical.
4   Let's refer to the document
5   itself.
6   Q   Let's do that.  Let's go to
7   Paragraph 1.4 of the 2011 contract,
8   which is Exhibit K3.
9       MR. MARDEROSIAN:  Did you say
10  7.4, Don?
11      MR. ZAKARIN:  I said 1.4 I'm
12  pretty sure.
13  Q   Do you have it in front of
14  you?
15  A   Yes.
16  Q   And there are two categories
17  of gross receipts really.  One comes
18  from blanket licenses; and one is,
19  we'll call them, from needle drops,
20  right?
21  A   I would say blanket licenses
22  and discrete licenses.
23  Q   Okay.
24      Discreet license is your
25  terminology for a needle drop?

Page 191

KOHN

1
2   A   No.  Discrete license would
3   be not a blanket license.
4   Q   Okay.  Either way.
5       Now, there are conditions in
6   any event to what is gross receipts, is
7   there not?
8   A   Let's read it and see what it
9   says.
10      MR. MARDEROSIAN:  Objection.
11  Q   Okay.  Let's read it.
12      MR. MARDEROSIAN:  Calls for a
13  legal opinion and conclusion.
14  Q   Gross receipts mean --
15      MR. MARDEROSIAN:  Don, let me
16  state the objection.  Calls for
17  legal opinion and conclusion.
18      Argumentative.
19  Q   Gross receipts means all
20  monies exclusive of value added tax.
21  So we already have one exception,
22  right, exclusive of value added tax?
23  Do you disagree?
24  A   It's a definition.  I'm not
25  going to characterize something as a

Page 192

KOHN

1
2   condition or whatever.  It's a
3   definition.
4   Q   Exclusion.  Okay.
5       That are actually received by
6   Extreme or company or credited to
7   Extreme or company against a prior
8   advance.
9       So it's all monies that are
10  actually received, correct?
11      MR. MARDEROSIAN:  I'm going
12  to object.
13      It calls for a legal opinion
14  and conclusion.
15  A   Well, it's actually received
16  or credited to.
17  Q   Right.  Credited against an
18  advance, correct?
19      MR. MARDEROSIAN:  I'm going
20  to object.
21      It calls for a legal opinion
22  and conclusion.
23  A   Well, it says what it says.
24  Q   Where there's an advance you
25  get -- you may get a credit against

Page 193

KOHN

1
2   that advance and that reduces the level
3   of advance; am I right?
4       MR. MARDEROSIAN:  I'm going
5   to object.
6       It calls for a legal opinion
7   and conclusion.
8   Q   You can answer.
9   A   Yes.
10  Q   Okay.
11      And other than an advance,
12  it's monies that are actually received,
13  correct?
14      MR. MARDEROSIAN:  I'm going
15  to object.
16      It calls for a legal opinion
17  and conclusion.
18  A   That's what it says.
19  Q   And then it goes through that
20  represent the relevant share of Hype
21  Music blanket licensing income, which
22  is -- you agree that's a defined term
23  in the agreement?
24      MR. MARDEROSIAN:  I'm going
25  to object.

49 (Pages 190 - 193)

KOHN
2   A   Yes.
3   Q   And the phrase without
4 prejudice to the generality of the
5 foregoing, which is -- it doesn't -- it
6 means it's without detraction from the
7 foregoing provisions; is that right?
8   A   Well, it's --
9   Q   I mean, it's  not in
10 derogation of those -- the obligations
11 on gross receipts, but these are
12 certain deductions, so they're not
13 restrictions?
14       MR. MARDEROSIAN:  I'm just
15   going to object.
16       It calls for a legal opinion
17   and conclusion.
18   Q   Okay.
19       If you have a view.
20   A   I don't have a view.
21   Q   Okay.
22   A   It says without prejudice to
23 the generality of the foregoing.
24   Q   Do you have any understanding
25 of what that meant?

KOHN
2       MR. MARDEROSIAN:  Objection.
3   Calls for a legal opinion and
4   conclusion.
5       MR. ZAKARIN:  I just want to
6   get an understanding of the
7   witness' view.
8   A   It seems to be just
9 clarifying what gross receipts include
10 and what they don't include.
11   Q   Now, have you read Robert's
12 deposition, Robert Marderosian that is?
13   A   I would have read it, yes.
14   Q   Do you recall that he
15 testified that if Extreme did not get
16 paid, it had no obligation to pay the
17 plaintiffs any money?
18   A   If Extreme did not --
19       MR. MARDEROSIAN:  I'm going
20   to object --
21   Q   If Extreme did not actually
22 receive monies from licenses, it had no
23 obligation to pay the plaintiffs?
24       MR. MARDEROSIAN:  For the
25   record I'm going to object.  That

KOHN
2   mischaracterizes the testimony.
3   A   Yeah.  I -- I don't remember
4 it, but I can't comment on something I
5 don't remember.
6   Q   Okay.  If you don't remember
7 it, then it is what it is.
8       Now, you mentioned something
9 in your book before about licensing,
10 you know, and I want to try and pull
11 it.
12       I want to mark as Exhibit 4 a
13 section of your -- or a page from your
14 book, which I think is consistent with
15 what you just said.
16       MR. MARDEROSIAN:  Objection.
17       Argumentative.
18       MR. ZAKARIN:  Okay.
19       It's Exhibit K4.
20       THE WITNESS:  What am I
21 looking at?
22       COURT REPORTER:  One second.
23       MR. ZAKARIN:  Nothing yet.
24       THE WITNESS:  Oh.
25       (Excerpt from the book

KOHN
2   entitled, Kohn On Music Licensing,
3   was marked K Exhibit 4, for
4   identification, as of this date.)
5   Q   General advice to music
6 copyright owner.  That's in your book.
7       Did you write that or your
8 father?
9   A   I wrote it.
10   Q   Okay.
11   A   But it was based on his
12 philosophy.
13   Q   Okay.
14       This is an admonishment to
15 copyright owners that you have in your
16 book, right?  And I think it's sort of
17 what you said before which is --
18   A   That's advice.
19   Q   -- do not let your perception
20 of the value of the copyright go to
21 your head.  Remember that no matter how
22 small the license fee you receive, in
23 the long run you will tend to make up
24 more than the difference from
25 maintaining a continuing active

51 (Pages 198 - 201)

Page 202

KOHN

1          KOHN
2 relationship between the song and the
3 listening public.
4      A   Where are you reading from so
5 I can --
6      Q   Top paragraph.  You see --
7      A   Oh, before exploring?
8      Q   After exploring.
9          Do you see do not get mired
10 in the details for example --
11      A   Okay.  Now I do.
12      Q   -- then do not let your
13 perception.
14          These are your words, aren't
15 they?
16      A   Well, it says do not
17 get mired on the details for example.
18      Q   Yeah.
19      A   Right?  Okay.
20      Q   That says don't let the
21 negotiation of legal boilerplate
22 obscure your vision.
23      A   Right.
24      Q   And then you say, don't
25 let -- this is -- you're saying this to

Page 203

1          KOHN
2 the copyright owners who are
3 exploiting, right?  Don't let your
4 perception of the value of the
5 copyright go to your head.  Remember
6 that no matter how small the license
7 fee you receive, in the long run you
8 will tend to make up more than the
9 difference for maintaining a continuing
10 active relationship between the song
11 and the listening public.  Don't let
12 fear and uncertainty rule the day.
13 Recognize that life is decision-making
14 and don't be afraid to make a decision.
15 A good rule to follow is when in doubt,
16 license.  Music copyright owner's
17 primary interest should always be to
18 encourage as much activity in the song
19 as possible.
20          I think that was sort of what
21 you were expressing before, am I right?
22          MR. MARDEROSIAN:  I'm going
23      to object.
24          That's argumentative.
25          Mischaracterizes the previous

Page 204

1          KOHN
2      testimony.
3      A   What was I expressing before?
4      Q   About the licensing, that you
5 want to encourage activity in the song.
6 But regardless --
7      A   Well --
8      Q   -- you wrote those words,
9 didn't you?
10      A   I think what --
11          MR. MARDEROSIAN:  Hold on.
12 I'm just going to object.
13          MR. ZAKARIN:  Go ahead.
14          MR. MARDEROSIAN:  The
15 question is vague and confusing --
16          MR. ZAKARIN:  I'll withdraw
17      the question.
18          MR. MARDEROSIAN:  Thank you.
19          MR. ZAKARIN:  And I'll ask a
20      new one.
21          MR. MARDEROSIAN:  Okay.
22      Q   You wrote those words in the
23 book, didn't you?
24      A   Yes.
25      Q   And you believe that, don't

Page 205

1          KOHN
2 you?
3      A   I agree with my father's
4 general philosophy, yes.
5      Q   Well, that's your father's
6 philosophy; and wrote it --
7      A   Yes.
8      Q   -- you said.
9      A   Yes.
10      Q   And if you didn't believe it,
11 you wouldn't write it, would you?
12      A   No.
13      Q   Okay.  So that is your view?
14      A   Well, you said something
15 earlier.  I mean, this has got to be
16 read in the context of the reason why
17 you -- maybe I could be more clear
18 here.  But when you're licensing, you
19 are sync licensing.  And the reason why
20 you're going to make more money in the
21 long run is you're going to get money
22 in the back end.  I think that's what
23 you're referring to a moment ago about
24 what I said earlier.  That you license,
25 you get the sync licenses out and you

52 (Pages 202 - 205)

KOHN

2       Do you recall that statement?
3     A   Yes.
4     Q   Okay.
5     A   I said a year and a month.  I
6  think I corrected myself.
7     Q   Something -- that's why I
8  wasn't specific and said a year or a
9  year and a half, something like that.
10  If it's a year and a month, it is what
11  it is.
12        Have you identified any
13  performance income that the plaintiff
14  should have received that they didn't
15  receive as a result of that year and
16  one month non-registration of a works
17  registration?
18        MR. MARDEROSIAN:  I'm going
19     to object that it's vague and
20     overbroad and an incomplete
21     hypothetical.
22     Q   You can answer the question.
23     A   I haven't been asked to opine
24  on that.
25     Q   Okay.

KOHN

2       So that's not part of your
3  brief; is that right?
4     A   It wasn't in my report, and I
5  wasn't asked to have an opinion on it.
6     Q   Okay.  Turn to Page 9, if you
7  would.
8        There are some statements
9  that I want deal with, and one of them
10  starts on the first full bullet point
11  in the page.  It says complicating the
12  delay in registration.  The accurate
13  tracking of performance and the
14  collection and distribution of Aron and
15  Robert's writer share of performance
16  royalties was the utter confusion that
17  resulted from the changing of many of
18  the song titles originally chosen by
19  Aron and Robert.  Many of these changes
20  were apparently -- many of these
21  changes were made apparently by
22  Extreme's CEO and the changes caused
23  duplicate titles in Extreme's catalogs,
24  including duplicates that caused
25  confusion with songs previously

KOHN

2  registered in the name of Extreme's
3  CEO.  Extreme's CEO also registered
4  songs under his names that duplicated
5  titles of songs previously registered
6  by Aron and Rob.
7        That's the statement that you
8  have on Page 9, correct?
9     A   That is a summary of another
10  portion of my expert report.
11     Q   But I read it accurately,
12  correct?
13     A   I believe you have.  And if
14  it's been transcribed accurately, we
15  have that now.
16     Q   Okay.
17        Can you tell me what you mean
18  by the utter confusion?  What was the
19  utter confusion you are referring to?
20     A   I'm turning to the part of
21  the report --
22     Q   Sure.
23     A   -- that that summarizes.
24     Q   Sure.
25        This is the utter confusion

KOHN

2  from the changing of titles.  That's
3  what I want to see.
4     A   On Page 37 of my report I
5  mention that Mr. Elias of Viacom told
6  Aron and Rob, I think it was in an
7  e-mail, that Extreme would
8  cross-reference all of Aron and Rob's
9  song titles with existing tracks in the
10  Extreme library to make sure there were
11  no duplicates.
12     Q   Does that reflect any
13  confusion?
14     A   I'm trying to answer your
15  question.  I'm not finished.
16     Q   Okay.
17     A   Okay.
18        The next paragraph shows, and
19  also my recollection from the Extreme
20  CEO's deposition where he admitted to
21  changing titles of the songs.  All
22  right?  The next paragraph here says,
23  one of the most popular songs among
24  those delivered by Aron and Robert.
25        Now, as you know, documents

54 (Pages 210 - 213)

Page 242

KOHN

1            KOHN
2 deposition as marketing.
3        I look at a guy who's filing
4 under various names and I see 13,000
5 songs under his name.  So he -- as he
6 explained in his deposition, well,
7 10,000 of those were under, I think it
8 was Bruce Fingers or something like
9 that, that gets funneled off to a
10 company that he's the CEO of, which I
11 think is a Sony ATV company.  Right?
12        And I look at that and I go
13 well something seems to be wrong here.
14 All right?  Using alias names to funnel
15 off to another company.  Now, my
16 understanding is from his deposition,
17 which I'm not going to dispute because
18 he says what he says, that that money
19 is being paid to other songwriters.
20 Fine.  That leaves 4,000 songs under
21 his name at ASCAP.  I don't know how
22 many songs are filed under his name at
23 PRS because I don't have any access to
24 the PRS repertoire database.  So I
25 haven't had a chance to look at that.

Page 243

1            KOHN
2        So I see 4,000 songs.  I go
3 to the Extreme website and I pull out
4 about 3,500 songs and I've eliminated
5 duplicates of all -- using the aliases
6 that I knew of, not the aliases I
7 didn't know of, of 20 -- it was about
8 2500 to 3,000 songs, which I don't
9 know, I haven't been able to dig into
10 the detail here.  I need to ask for
11 discovery on this, which I think has
12 not been produced.
13        But there are 24,000 --
14 you're shaking your heads.
15    Q   I'm am.  But I'm allowed.
16    A   Fine.
17        There are 24,000 songs among
18 the catalog that's been allocated.  If
19 3,000 songs are the CEO's songs, and if
20 you are using a non-usage based way of
21 allocating to the songwriters, if
22 you're using based upon the number of
23 songs, then you're taking a song like
24 Mulholland Drive and Figueroa Street
25 and these other songs, and I'm only

Page 244

1            KOHN
2 going to get one out of 24,000 of the
3 income coming in from these blanket
4 licenses.
5        You could have 3,000 of Russ
6 Emanuel songs that have never been
7 sync'd during the period of time of the
8 blanket license that gets a piece of
9 the action, the same piece of the
10 action that songs that were used and
11 sync'd during the period.  I have seen
12 your experts incredibly try to explain
13 to this court -- I just got a
14 dizziness. Excuse me. It's from my ear
15 problem.
16        Okay.  Hold on.  Sorry.
17        MR. BAGLEY:  Do you want to
18 take a short break?
19        THE WITNESS:  I might because
20 if i -- I might faint.
21        MR. MARDEROSIAN:  Why don't
22 we do that?
23        THE WITNESS:  No, no.  Wait,
24 I think I just recovered.
25        The room spins a little bit,

Page 245

1            KOHN
2 you know, when I am doing this.
3        Okay.  Let me -- let me
4 finish.  Okay.
5    A   All right.
6        So your experts get up there
7 and say I said that everything's on
8 actual usage basis and that's the way
9 its got to be.  Well, that's a strawman
10 that they created to defend the
11 practice which only has occurred in the
12 instance of Extreme, as far as I know.
13 And maybe one other, and that is you
14 had -- yesterday Mr. Katz said that he
15 acquired a company called First Com
16 that apparently also allocated its
17 songs, a production music library based
18 upon the number of songs in the
19 catalog.
20        What Dan Pounder admitted
21 to -- Dan Pounder admitted to that he
22 knows songs are going to get paid that
23 never were used in a sync license or
24 performed at all.  You have experts,
25 maybe one sitting in this room, that

Page 246

KOHN

1
2  suggests that people are paying for an
3  access license.  Well, show me where in
4  the copyright law you have an exclusive
5  right of access.  What a blanket
6  license is --
7       COURT REPORTER:  I'm sorry?
8    Copyright law where you?
9    A   An exclusive right of access.
10  You have an exclusive right to
11  reproduce the work in copies or phono
12  records.  But you have an exclusive
13  right to prepare derivative works.  You
14  have an exclusive right of
15  distribution, exclusive right of public
16  performance, et cetera, et cetera.
17       You don't have an exclusive
18  right of access.  What you are doing
19  with a blanket license, you are
20  providing your customer with the
21  ability to reduce transaction costs by
22  saying you can choose anything among
23  these to use in your works.  Okay?
24       You can choose any of these
25  works to sync.  The license is for the

Page 247

KOHN

1
2  sync -- the license is for the fixing.
3  The license is for the reproduction.
4  And the license could be for the public
5  performance as well, whether it's BMI
6  or whether it's on a direct license.
7       So if you take the -- if you
8  take what I just said and you have
9  someone with several thousand songs in
10  a catalog, and that's not been -- you
11  know, I don't know how many songs he
12  has in the catalog.  He's getting --
13  people are getting paid for not being
14  sync'd.  And you have experts coming in
15  here saying that's a standard practice
16  in the industry.  They know that's not
17  true.  They know that's not true.  Adam
18  Taylor in his report doesn't do it that
19  way.  APM does it based upon usage.  He
20  says so in his report.  He gets usage
21  reports from his licensees.  It's
22  not -- I never said it has to be actual
23  usage.  Actual usage might be data
24  reports or performances coming in.
25  Okay?  Follow what I'm saying?

Page 248

KOHN

1
2    Q   Every bit of it.
3    A   Good.
4    Q   Are you done?
5    A   No, I'm not done.
6    Q   Oh, good.  Keep going.
7    A   So I look at this, and I see
8  this.  And you've brought in people who
9  are from the production music library
10  businesslike; like Mr. Katz and Adam
11  Taylor who are basically circling the
12  wagon saying that this is something
13  that's proper and standard -- oh, sure,
14  it's standard of practice to do that,
15  but they don't even do it themselves.
16  Adam Taylor wouldn't possibly do it
17  himself.  Why would he -- how could he
18  pay the song writers to do that?
19       Now, next stage.  Next stage.
20  The joint venture agreement between
21  Viacom and Extreme -- it's getting late
22  in the day -- the joint venture
23  agreement specifically says -- I have
24  this in my report.  And can you sit
25  there and smile all you want because I

Page 249

KOHN

1
2  know --
3    Q   I am smiling.
4    A   Yeah, you are smiling.
5    Q   I am.  I know.
6    A   You'll be really happy to see
7  what's going to happen.  Right?
8    Q   I'm enjoying this.
9    A   Okay.  Terrific, you know.
10       So the joint venture
11  agreement between Viacom and Extreme
12  has a provision in it that says advise
13  that Extreme will make sure that Viacom
14  gets paid -- its the public performance
15  royalties directly from performance
16  rights societies, BMI.
17       The reason why they did that
18  is because Viacom is not in the same
19  position as an APM.  Right?  You said
20  it yourself, and I quoted you in my
21  expert report.  You said that the --
22  Viacom is acting both -- and I'm not
23  trying to be contentious here.  I'm
24  just trying to get everyone -- I'd like
25  to be helpful to the court so they can

63 (Pages 246 - 249)

Page 250

KOHN

1   understand what's going on here.
2
3        But Viacom entered into this
4   agreement because when you are a
5   broadcaster and when you are a
6   publisher, you have a conflict of
7   interest.  The broadcaster's -- part of
8   his business is to minimize the music
9   costs that are coming in that -- you
10  know, and that's why they even set up
11  New Remote, MTV to do that.  Music
12  publisher is to maximize the income
13  coming in for him and as well as any
14  songwriters who might deserve a share
15  of that.  That is the conflict.
16       So Viacom could not, for
17  example, enter -- after entering into
18  the 2010 agreement issue a license to
19  itself to, let's say, do a direct
20  performance license because that would
21  of -- it doesn't say that they can't.
22  Mr. Zakarin, over here, keeps on saying
23  where does it say in this agreement you
24  can't do it.  And I keep on saying it's
25  an implied obligation of good faith and

Page 251

KOHN

1   fair dealing.
2
3        There's no way in hell that
4   Viacom could have issued to itself a
5   free performance license, a direct
6   performance license to eliminate its
7   obligations to the boys.  You know
8   that.  Okay.  So when it entered into
9   the agreement with Extreme, it had to
10  recognize its special position as both
11  the publisher and a broadcaster.  APM
12  is not in that position.  It's owned by
13  Sony ATV and so is First Com and so is
14  the other production music library that
15  they have.  That's a different
16  position.
17       You wanted to make sure that
18  your interest was aligned.  And I'm
19  pointing to you because you represent
20  Viacom.  You wanted to make your
21  interest aligned with the songwriters
22  to keep you out of trouble of doing the
23  wrong thing, especially when you're
24  dealing with a third party.  So the
25  reason why that joint venture agreement

Page 252

KOHN

1   says to Extreme, you will make sure
2   that you will file work registrations
3   and cue sheeting, and whatever it says
4   in that paragraph that I have in my
5   report, so that we get our income paid
6   directly from the performance right's
7   society.  The next paragraph says all
8   other income that needs to be paid to
9   us and to composers, you guys
10  administer.  They separated out
11  performance licensing from the rest of
12  us.  That protected Viacom from any
13  accusation from songwriters that they
14  were not, you know, trying to screw
15  them out of their public performance
16  royalties because that's all they were
17  going to get out of the 2010 agreement.
18       MR. HWANG:  Apparently it
19       wasn't enough protection.
20       A   Apparently it wasn't enough
21  protection because Extreme immediately
22  gave direct public performance licenses
23  to ABC, Disney, NBC, CBS, Fox, Turner
24  Broadcasting, five or six, seven

Page 253

KOHN

1   other -- you know, I have -- we have
2   all the direct performance licenses,
3   you know, that was produced here.
4
5        They went ahead and did all
6   of that.  Okay.  So now the money is
7   not going through BMI anymore, to the
8   songwriters or to Viacom.  The money
9   for performances presumably it could
10  only be through -- back through
11  Extreme.  Now remember, Extreme decided
12  not to do this on the basis of usage,
13  which is what you know BMI would.
14  That's why Viacom said I want BMI doing
15  it, and not you doing it.  That's why I
16  say, look, you should be sitting on our
17  side of the table here.
18       So it's not a question.  So
19  the -- now -- so the money is
20  throwing -- will be flowing through.
21  What does Viacom do with a direct
22  public performance license?  It goes to
23  BMI to get its cost reduced.  It
24  gets -- it goes to BMI to say we should
25  pay you less -- less annual public

64 (Pages 250 - 253)

Page 274

KOHN

1    the way I read it.
2    Q   Okay.
4    A   But, you know, it may have
5    been ambiguous.  There was a reason why
6    I used word the apparently.
7    Q   I just want to make sure what
8    we're saying here.  So if you were
9    using the term apparently, you're not
10   100 sure, as you sit here now, what
11   Russel Emanuel said.  But your source
12   of whether Russel Emanuel changed
13   titles is from his deposition; is that
14   correct?
15   A   Yes.
16   Q   Okay.
17   A   I think -- unless there was
18   something else that I received that I
19   read and gave me that impression in my
20   mind, but sitting here today that's the
21   only thing I can recollect.
22   Q   Can you identify specific
23   instances where the changed titles
24   created confusion with songs previously
25   registered in the name of Mr. Emanuel

Page 275

KOHN

1    or under one of his known pseudonyms?
3    MR. MARDEROSIAN:  I'm just
4        going to object.
5        The question is vague,
6        ambiguous, and overbroad.
7        Incomplete hypothetical.
8    Q   Do you understand the
9    question?
10   A   Well, to the extent I do, I
11   think I discussed several examples,
12   which I thought I had listed on Pages
13   36 through --
14   Q   Thirty-six, I don't see
15   anything.
16   A   Thirty-six though, I guess,
17   40.
18   Q   I'm looking at that.  Okay.
19       You're not suggesting that
20   Mulholland Drive, which I think you
21   identified as a confusion issue, is
22   Russel Emanuel song?
23   A   No.  What I -- what I
24   suggest -- no.
25       Yeah, so this is the general

Page 276

KOHN

1    pages here.  So the Mulholland Drive
2    one was an instance in which, as I
3    mentioned earlier, where Aron and Rob
4    were told that Extreme would be --
5    might be changing titles to make sure
6    there were any duplicates that they
7    weren't being -- there would not be any
8    duplicates with respect to any other
9    songs in their catalog.  And that
10   didn't occur here.  And that did
11   apparently cause confusion because
12   money that should have gone to Rob and
13   Aron went to Thomas Bergersen and
14   Nicholas Phoenix.  If there's a
15   situation where confusion may have
16   cussed a mispayment, that's certainly
17   one.  I don't --
18   Q   I don't disagree.  But I'm
19   looking --
20   A   Okay.
21       So let's go through these so
22   I can be complete.
23   Q   On Page 40 -- I haven't seen
24   anything on Pages 37, 38, 39.  But now

Page 277

KOHN

1    you have Extreme change on Page 40, you
2    refer to By the Boot Straps in the
3    middle paragraph.  Okay.
4    A   But on page --
5    Q   Bruce Fingers.
6    A   Hold on a second.
7    Q   Okay.  This is where you're
8    showing various aliases or pseudonyms,
9    starting on Page 40.
10   A   Okay.
11       So on Page 39 --
12   Q   Okay.
13   A   -- middle paragraph, you
14   know, the first paragraph is where I
15   point out I've seen cue sheets
16   generated by Viacom which says Mix Tape
17   as the composer name.
18   Q   How many --
19   A   The second --
20   Q   I'm sorry.
21       How many cue sheets have you
22   seen that say Mix Tape?
23   A   A handful.
24   Q   More than one?

70 (Pages 274 - 277)

Page 278

KOHN

1
2    A   Yeah.  Yeah.  There was like
3  about five of them or six of them
4  mentioned yesterday.
5    Q   I don't think they're all Mix
6  Tape, but it is whatever it is.  The
7  record will reflect whatever it is.
8    A   I thought I saw it but --
9    Q   There's certainly at least
10  one that was Mix Tape.
11    A   Okay.
12       I think there's five or six,
13  but anyway.
14    Q   Out of how may -- by the way,
15  out of how many, do you know?
16    A   I don't know.
17    Q   A thousand?
18    A   I don't know.
19    Q   How many cue sheets did you
20  look at?
21    A   Oh, there were a lot.  But I
22  flipped through them and -- on my
23  computer.
24    Q   I'm not suggesting that you
25  studied them.

Page 279

KOHN

1
2    A   I don't know.
3    Q   Do you have an estimate
4  whether a 1,000 or 2,000 cue sheets?
5    A   No, I don't.
6    Q   You don't know?
7    A   No.
8    Q   There are a lot?
9    A   Yeah.  You bet there are.
10    Q   And so we're now talking
11  about five or six cue sheets out of
12  however many you looked at?
13    A   Regarding the most popular
14  song these two guys wrote for your
15  client --
16    Q   Albeit --
17    A   -- where money was actually
18  received by somebody else rather than
19  the client.
20    Q   Performance income.
21    A   Okay.
22    Q   We've gone through that
23  particular one.
24    A   Okay.  Fine.
25    Q   I'm just trying to find

Page 280

KOHN

1
2  out --
3    A   So the next thing I want to
4  point out here.  So I have in the
5  middle of 39.
6    Q   Yes.
7    A   Extreme COO Dan Pounder
8  dismisses this as a one-off mistake.
9    Q   This is referring to the
10  Mulholland Drive issue.
11    A   Yes.
12    Q   I don't think it's the Mix
13  Tape.
14    A   Okay.  Fair enough.
15    Q   It's he Mulholland Drive
16  issue.
17       COURT REPORTER:  Okay.
18  Gentlemen, you're talking over
19  each other.
20       MR. MARDEROSIAN:  This record
21  is going to miserable.  I mean --
22    A   I'm reading.  Okay.  A single
23  misattribution.  This is in -- I cited
24  the page.  But he is contradicted by
25  the testimony of his own -- of his CEO

Page 281

KOHN

1
2  who testified with respect to the
3  company's retitling practices.  So the
4  CEO, Russel Emanuel himself, says that
5  retitling practices, it's changed over
6  the years.  It used to be practice that
7  it didn't matter at all.  More
8  recently, and we're talking about
9  probably 2018, Dan Pounder and his
10  department have kind of tightened up
11  that process because we were made aware
12  of some title changes going into
13  suspense.
14    Q   It doesn't say changes.  Some
15  tiles going into suspense.
16    A   Oh.  Some titles -- thank
17  you.  Some titles going into suspense.
18  I'm losing my voice today.  The society
19  started -- maybe it was too long of a
20  speech.  I don't know really.  Okay.
21  The societies -- that's just humor.
22  Okay.  Thank you for laughing on the
23  other side.
24       The society started to put --
25  I can't -- this is what he says.  I'm

Page 282

KOHN

2 going to read that line. Because we
3 were made aware of some titles going
4 into suspense, dash, the societies
5 started to put, dash, I can't remember
6 the term he uses, dash, anyway they put
7 the titles on hold until they can
8 format any dispute. I would say that's
9 the only -- that's only in the past
10 couple of years until we had -- until
11 then we had multiple works with the
12 same titles.
13        I point that out because
14 apparently this showed to me that they
15 knew they had a title problem, and it
16 was causing problems. Money was not
17 being spent. It wasn't being done
18 correctly. Money was being put in
19 suspense and not being distributed
20 correctly as a result of a policy that
21 went on from 2010, at least as early as
22 that, until 2018. That shows me that
23 there is a problem. That shows me that
24 if nothing else they didn't do their
25 job, and that means a breach of

Page 283

KOHN

2 contract. But that's a legal
3 conclusion that I shouldn't be making.
4        I know. Let's go on.
5    Q   My question --
6    A   I'm getting there.
7    Q   So -- all right.
8    A   -- I'm just trying to get
9 help you get there sooner so we can
10 work through the deposition.
11        Okay. In fact, so Mr. Elias,
12 as I said earlier, of Viacom, after he
13 had suggested to the plaintiffs that
14 their titles would be -- might be
15 changed so that they wouldn't be the
16 same as other titles, here I say the
17 exact opposite seem to be -- the exact
18 opposite was happening.
19    Q   Do you remember what my
20 question was because it may help?
21    A   Yeah. Okay.
22        So, for example, a song
23 written by Aron and Robert delivered to
24 Viacom, which Extreme published, was
25 entitled ML Lettie. I considered this

Page 284

KOHN

2 to be -- very likely to be a unique
3 title. Nevertheless, someone at
4 Extreme, and I said perhaps Russel
5 Emanuel --
6    Q   Speculating?
7    A   I was speculating. From his
8 own words, who admittedly personally
9 changing song titles, and my
10 recollection is is that he was talking
11 about these boys titles. Changed the
12 title to By the Boot Straps. There
13 happens to be a song registered at
14 ASCAP called By the Boot Straps.
15        COURT REPORTER: Sir, I know
16    you're reading; but I need you to
17    slow down.
18    A   There happens to be a song
19 registered at ASCAP called By the Boot
20 Straps, published by a PRS music
21 publisher called Directors Cuts
22 Production Music Limited, I don't know
23 who owns that, which according to
24 ASCAP's publically available records is
25 either owned by or administered by

Page 285

KOHN

2 Extreme. The song was cowritten by
3 Mr. Bruce Fingers, which is an alias
4 that he uses to funnel money -- the
5 songwriter's money to a corporation
6 called Fingers -- I forgot what it is.
7    Q   Bleeding Fingers.
8    A   Bleeding Fingers.
9    Q   Let me try and help you to
10 cut through this.
11    A   Go ahead. Thank you.
12    Q   You've identified here on
13 Page 40 one song which apparently is,
14 you know, changed to a title that
15 corresponds to a title of Russel,
16 Emanuel under one of his pseudonyms,
17 correct?
18    A   Um-hum.
19    Q   Have you identified any
20 income that was diverted to Russel
21 Emanuel as a result of that title?
22    A   I wasn't asked to go into
23 that.
24    Q   So you don't know? You don't
25 know, correct?

72 (Pages 282 - 285)

Page 286

KOHN

1
2    A   I wasn't asked to opine on
3  that if I have facts.
4    Q   So you don't know?  That's
5  all I'm saying?
6        MR. MARDEROSIAN:  I don't
7    think you produced income records
8    reflecting Mr. Emanuel's
9    royalties, Don.
10   Q   Have you seen cue sheets or
11 anything else, any other evidence that
12 shows that income was diverted to --
13 from the plaintiffs to Russel Emanuel
14 on that song?
15       MR. MARDEROSIAN:  I'm just
16   going to object.
17       The question is vague and
18   overbroad and an incomplete
19   hypothetical.
20   A   I think if you would get in
21 touch with ASCAP, I think it would
22 be -- Bruce Fingers would be Russ
23 Emanuel's Social Security number.  So I
24 don't know how that money eventually
25 goes there.  I don't have --

Page 287

KOHN

1
2    Q   But that wasn't my question.
3  My question was just -- I'm not
4  disputing whether or not that is Russel
5  Emanuel or whether he gets paid for his
6  version of the song.
7        My question was:  Do you know
8  whether any of the plaintiffs' money
9  was diverted to Russel Emanuel on that
10 song?  It's a sole question --
11       MR. MARDEROSIAN:  Just going
12   to object.
13   Q   -- by virtue of the change in
14 title?
15       MR. MARDEROSIAN:  It's vague
16   and overbroad and an incomplete
17   hypothetical.
18   Q   Yes or no?
19   A   I have to give it some
20 thought in the context of what I was
21 discussing earlier.
22   Q   I can wait.
23   A   It may take more thought than
24 that.
25   Q   Well, if you don't know, you

Page 288

KOHN

1
2  could say I don't know, but if you --
3    A   Would you repeat the question
4  again so I can --
5    Q   Would you read it back,
6  please.
7    A   It's getting very late in the
8  day for me and I'm beginning to --
9        MR. MARDEROSIAN:  The
10   objection stands.
11       (Whereupon, the record was
12     read.)
13   A   It did get diverted to --
14   A   We've dealt with Mulholland
15 Drive.  I'm asking about this song.
16   A   Okay.  Okay.
17       Oh, I'm not thinking
18 altogether right right now.
19       No.
20   Q   Okay.
21       There is then -- I'm trying
22 to see if there was any other songs
23 that you do -- that you mention.  If
24 you turn to Page 42, I think there's
25 another one.

Page 289

KOHN

1
2    A   Right.
3    Q   I've gone through this.
4        Page 42 you refer to Uphill
5  Battling in the second paragraph.
6    A   Right.
7    Q   Do you see that?
8    A   The boys had entitled a song
9  called The Silence.
10   Q   And now it's Uphill Battle.
11   A   The song was changed to
12 Uphill Battle.  There's a song
13 registered at ASCAP called Uphill
14 Battles.  The song published by
15 Directors Cuts.  And it was cowritten
16 by Bruce Fingers, which one of
17 Emanuel's alias.
18   Q   The question is the same.
19   A   The question is the same.  Do
20 I know --
21   Q   Yes.
22   A   -- whether this
23 specifically --
24   Q   There was any money diverted
25 for that change in title?

73 (Pages 286 - 289)

Page 290

KOHN

1
2    A   No.
3        MR. MARDEROSIAN:  Diverted in
4    the Russel Emanuel's pocket?
5        MR. ZAKARIN:  Yes.  Either
6    Russel Emanuel or to that song,
7    whether it went into Russel
8    Emanuel's pocket or somebody else.
9        MR. MARDEROSIAN:  Well, Aron
10   and Robert didn't get paid.
11       MR. ZAKARIN:  No, we haven't
12   established that.  We've just
13   talking about titles here.
14       And I'm asking whether that
15   change in title resulted in --
16   that you know of in any diversion
17   of income to the Russel Emanuel
18   version.  That's all.
19       MR. MARDEROSIAN:  For the
20   record -- hold on.
21       I object.  It's vague.  It's
22   an incomplete hypothetical.
23   Q   You can answer the question.
24   A   So I'm focusing on the word
25   result.  Did it result from, because I

Page 291

KOHN

1
2    don't want that to be construed --
3    Q   Did it happen?  Do you have
4    any knowledge that it happened?
5    A   I don't want that to be
6    construed that I -- because I do think
7    because of the way, as I described
8    earlier, this has been set up to
9    allocate synchronization income and
10   direct public performance licenses
11   through Extreme, and money is being
12   allocated on the basis of the number of
13   songs as opposed to usage, money would
14   be funneling -- be funneled to the
15   Extreme's CEO.
16       But you're asking me a
17   different question.
18   Q   But I'll make that easier for
19   you.
20   A   No, but -- no, no, no.  Let
21   me just -- so you're asking me a
22   different question, which is does the
23   change in title -- do I have any
24   information that the change in title
25   here resulted --

Page 292

KOHN

1
2    Q   Yes.
3    A   -- in money going from the
4    guys to this.  No.
5        My point here was to show
6    that titles were changed --
7    Q   I know.
8    A   -- in a very suspicious way.
9    But, you know, I don't have any.
10   Q   If I asked you about the next
11   couple of songs, which is Big Guns --
12   A   Guns.  Glock Sucker.
13   Q   Glock Sucker.
14       Is your answer the same that
15   it would -- you have no evidence that
16   money was diverted as a result of these
17   title changes?
18       MR. MARDEROSIAN:  I'm just
19   going to object.
20       It calls for a legal opinion
21   and conclusion.
22       MR. ZAKARIN:  It's factual.
23       MR. MARDEROSIAN:  It's vague
24   and is an incomplete hypothetical.
25   Q   You can answer the question.

Page 293

KOHN

1
2    A   Yeah, I don't have any
3    personal knowledge of any of that.
4    Q   Okay.  Okay.  And by the way,
5    I will say I'm not including in that so
6    we're clear.  So your caveat before is
7    clear, the -- your methodology of
8    allocation that you think is proper and
9    how that may or may have not affected
10   on blanket licenses, I'm not dealing
11   with that.
12   A   I appreciate you saying that
13   because I was -- earlier I was --
14   Q   You've made your point.
15   A   I wanted to make sure I
16   wasn't confusing the two things.
17   Q   No.  You've made your point.
18   And we can disagree, but that's your
19   point.
20       I think from what you've said
21   before, and I want to make sure that
22   this is correct, and it may not be part
23   of your opinion.  You haven't
24   identified any money that was paid to
25   Russel Emanuel that should have been

74 (Pages 290 - 293)

KOHN

1
2 paid to the plaintiffs putting to the
3 side your allocation theory; is that
4 correct?
5        MR. MARDEROSIAN:  I'm just
6    going to object.
7        That's vague and an
8    incomplete hypothetical.
9    A   I think that if I did a
10 further review of the tremendous amount
11 of information that I've been provided
12 with that I might have the evidence and
13 I might have seen the evidence, but
14 you're trying to sort of say other than
15 that.  I won't -- I won't agree to
16 that.
17        You follow me?
18    Q   You won't agree to that
19 because you can't speak to the
20 evidence --
21    A   Because there's so much
22 evidence --
23        COURT REPORTER:  I --
24    Q   You're right.  I'm sorry.
25 That was his fault though.

KOHN

1
2    A   There's so much evidence.  I
3 just don't want to be misrepresented or
4 kind of what I say be misconstrued.
5 Okay?
6    Q   Am I correct --
7    A   Because I very well may have,
8 at this point in time I'm not thinking
9 clearly, but I may well have other
10 evidence that I've seen that I have not
11 brought to light.  But I appreciate
12 what you're trying to do.  You're
13 trying to say other than what I said
14 earlier.  All right?
15        But when you say that I also
16 put a caveat on what I said earlier as
17 being something that I would want to
18 supplement with everything that I have
19 looked at and everything that I've said
20 before.  It's a -- it's a rhetorical
21 trick that I don't want to get caught
22 up in.
23        You follow me?
24    Q   I'm -- let's -- do you want
25 to --

KOHN

1
2        MR. ZAKARIN:  I have a
3 concern right now.  My concern is
4 the witness has said a couple of
5 times that he's not thinking
6 clearly.  And I understand.  And
7 you have vertigo.  I have a
8 concern about -- because I've got
9 a lot more to do and I don't want
10 to have a statement or a concern
11 that the witness's testimony is
12 the product of impairment, lack of
13 physical, you know, fortitude,
14 being unwell.  I'm very concerned
15 about it.
16        MR. MARDEROSIAN:  Here's the
17 only alternative to that.  He's
18 going to have to come out to Los
19 Angeles if that's the case and
20 we'll add another day out in Los
21 Angeles if that's the case.
22        MR. ZAKARIN:  I don't know
23 what else to do here because I've
24 got hours.
25        MR. MARDEROSIAN:  I

KOHN

1
2 understand.  And you don't want
3 the record to be jeopardized or
4 have me claim that something that
5 he said wasn't valid because he
6 wasn't feeling well.  I have been
7 there and I understand that.
8        I do want to say this, too,
9 Don.  When you use terms like
10 evidence, that's calling for a
11 legal opinion and conclusion
12 because there could be direct and
13 circumstantial evidence.  And we
14 know that circumstantial evidence
15 has the same effect as direct
16 evidence.  So asking an expert
17 who's not a legal expert in this
18 case if there's evidence is kind
19 of a waste of time.  And I know
20 that you know that.
21        So that -- those types of
22 questions are eating our time up,
23 as well.  Let me -- let me do
24 this.  Let me take a quick break
25 and talk to him and if he's not

KOHN

1
2       MR. MARDEROSIAN:  I have to
3    make objections if the questions
4    aren't proper questions.
5    Q   On Page 9, in the middle of
6 the page, it says, music publishers
7 where they can have influence over the
8 titles of songs will customarily
9 attempt to avoid duplicate titles to
10 avoid the obvious problem of
11 misdirected or suspended public
12 performance revenues.
13       Do you see that statement?
14    A   You said page 9.
15    Q   Page 9 of your report?
16    A   Music publishers where they
17 can have influence?
18    Q   Yes, that statement.  Do you
19 see that?
20    A   I'm reading it again.  Yes.
21    Q   Is it your testimony that
22 this is another custom and practice in
23 the industry?
24    A   I am aware over many yours
25 that one of the problems that the

KOHN

1
2 industry faces in allocating income,
3 particularly blanket income, was the
4 problem of duplicate titles.  And there
5 have been lots of ways that performance
6 societies and others have tried to deal
7 with that problem.  So I'm aware that
8 it's a problem and that -- I'm aware
9 that there are publishers who try to
10 avoid duplicate titles where they can.
11 It's not always up to them.
12       So I would say that it's a
13 custom and practice in the industry to
14 avoid duplicates where practical.
15 Sometimes it's the songwriter.  He's
16 going to do what he wants to do.  There
17 are publishers who have always insisted
18 that the first three words of the song
19 is going to be the title.  There was
20 this guy Jerome, I don't know, Robbins
21 of Robbin's Music.  So each publisher
22 has its own, sometimes, quirkiness.  As
23 metadata improves over time, that may
24 not be a problem anymore.
25    Q   You're aware that titles are

KOHN

1
2 not copyrightable?
3    A   It doesn't mean they're that
4 not protectable.  There is the Thomson
5 versus Walt Disney case in California
6 where unfair competition or palming
7 off -- the Lovebug case in which a
8 California court held that under unfair
9 competition law or palming off the
10 titles could be protectable as in the
11 form of a trademark under unfair
12 competition but not copyrightable.
13    Q   Yes, I know that.
14       Have you either spoken with
15 or surveyed any music publishers that
16 told you that they will customarily
17 change titles to avoid duplicates?
18    A   I think -- I don't know
19 whether it was music publishers that I
20 learned the problem from or people in
21 the -- PROs.  But in discussions that
22 I've had over 35 years, I've come to be
23 aware that duplicate titles have been a
24 problem and it would be good if we
25 could try to avoid them where possible.

KOHN

1
2    Q   You're aware that the PROs
3 have thousands of songs that have the
4 same title?
5    A   Yes.
6    Q   Did you ask any of the PROs
7 whether those thousands of common
8 titles present an obvious problem for
9 them in allocating income?
10    A   I have -- since the beginning
11 of this case, no.
12    Q   Did you ask them before the
13 beginning of this case?
14    A   I might have been on panels
15 that might have talked -- that's
16 probably -- may have been where I have
17 heard that it is a common problem or it
18 was a common problem 20 years ago
19 before the automation of cue sheets
20 through RapidCue and other kinds of
21 systems.  Things change over time.
22       MR. MARDEROSIAN:  Don, you
23    are aware your own expert, Adam
24    Taylor, says his company does not
25    change titles, right?  Was that

79 (Pages 310 - 313)

KOHN

2 included in your question of
3 evidence?
4        MR. ZAKARIN:  I'm fully aware
5 of it.  Adam Taylor, they don't
6 change duplicators either.
7        MR. MARDEROSIAN:  Yeah, they
8 don't change titles.
9        MR. ZAKARIN:  They don't
10 change duplicates.
11        MR. MARDEROSIAN:  I think the
12 specific phrase in his report is
13 his company does not change
14 titles.
15        MR. ZAKARIN:  Yes.
16        MR. MARDEROSIAN:  At all.
17        MR. ZAKARIN:  And it's
18 explained.
19        MR. MARDEROSIAN:  I just want
20 to make sure that that was
21 included.
22        MR. ZAKARIN:  It's explained
23 why.
24   A   I read Adam's report, and I
25 remember him saying that.

KOHN

2   Q   I'm well aware of Adam's
3 report as well.
4        And you're also aware that
5 publishers like Warner Chappell, BMI,
6 UMPG, Sony ATV, just by way of example,
7 have multiple songs in their catalogs
8 with the same titles?
9        MR. MARDEROSIAN:  Objection.
10 Vague.  Overbroad.
11        Incomplete hypothetical.
12        Assumes facts not in
13 evidence.
14   A   I trust that they do since
15 there are so many duplicate titles at
16 the PROs that they could be from the
17 same music publishing company.
18   Q   And you read Adam Taylor's
19 report.  You said that?
20   A   Yes.
21   Q   So by way of example I think
22 Adam Taylor's report reflects that APM
23 has four titles of Mulholland Drive,
24 separate songs in its own catalog.
25        Do you recall that?

KOHN

2   A   I don't remember that
3 specifically, but...
4   Q   Now if duplicate titles is,
5 as you say in your opinion, an obvious
6 problem, do you have any understanding
7 as to why BMI or ASCAP or the major
8 publishers have not done something to
9 eliminate this problem over the past 75
10 years?
11   A   I would -- I would say that
12 they're not necessarily in the position
13 to eliminate it.  They're not in
14 control of who registers what titles or
15 not.  And they are finding other ways
16 to deal with the problem.
17   Q   To be clear it's not your
18 testimony, is it, that having
19 identically titled songs automatically
20 creates confusion and results in a loss
21 of performance income?
22   A   Not automatically.
23   Q   It can happen?
24   A   Yes.
25   Q   But it's not something that

KOHN

2 is caused automatically by duplicate
3 titles?
4   A   Well, it could be caused --
5 well, it could be caused automatically
6 by a specific duplicate title but not
7 in general.
8   Q   Have you had any
9 communication with any PRO regarding
10 the error rates on cue sheets that they
11 receive from either producers of
12 programming or broadcasters?
13   A   No.
14   Q   Do you have any knowledge on
15 your own as to what the error rate is
16 for ASCAP or BMI on the cue sheets they
17 get?
18   A   No.
19   Q   You understand, don't you,
20 that cue sheets are created one way or
21 another by music supervisors or other
22 people at either broadcasters or
23 programs?
24        MR. MARDEROSIAN:  I'm going
25 to object.  Excuse me.  I'm going

Page 318

KOHN

1
2    to object.
3       That assumes facts not in
4    evidence.  Vague and overbroad.
5    Incomplete hypothetical.
6       As to what is meant by
7    prepared, it's vague.
8    Q    You can answer.
9    A    My understanding is that
10   they're largely generated by
11   broadcasters and producers based on
12   information that they have sometimes
13   from the publishers themselves.
14   Q    And you acknowledge, don't
15   you, that there is the possibility of
16   human error in the creation of cue
17   sheets?
18      MR. MARDEROSIAN:  I'm just
19   going to object.
20      It's argumentative.  It's
21   vague.  And overbroad.
22   Q    You can answer.
23   A    Yes, but I would think with
24   increasing automation the human error
25   might be less than it was in the past.

Page 319

KOHN

1
2    Q    Well, the automation still
3    requires information being inputted,
4    doesn't it?
5       MR. MARDEROSIAN:  I'm just
6    going to object.
7       This is vague and overbroad.
8    Incomplete hypothetical.  Calls
9    for speculation.
10   Q    You can answer.
11   A    But information could be
12   automatically generated from somebody's
13   metadata.  So if the publisher provides
14   metadata, it's the old expression
15   garbage in garbage out.  So you can
16   have an automated system that's
17   reproducing an error made by someone
18   that may not be an error, that may be
19   an intentional act.
20   Q    Do you know how each
21   broadcaster that has a license with
22   either BMI or ASCAP goes about filling
23   out and filing cue sheets, the process?
24   A    I know -- I know of the
25   system called RapidCue which is

Page 320

KOHN

1
2    something that -- I've never used it.
3    I've never input into RapidCue.  But I
4    understand it get automatically
5    generated to ASCAP and BMI and
6    presumably the other performance rights
7    societies.  I'm not sure.
8    Q    Do you know how information
9    is input into RapidCue by the
10   broadcaster or the programmer?
11   A    I just said I don't.
12   Q    Okay.
13   A    Yeah.
14   Q    Are you aware that the PROs
15   have large bodies of employees who
16   actually receive and review cue sheets?
17      MR. MARDEROSIAN:  I'll just
18   object.
19      It assumes facts not in
20   evidence.  Vague and overbroad.
21   Calls for speculation.
22   A    Receive is one word and
23   review is another.  That's a compound
24   question.
25      I certainly would be aware

Page 321

KOHN

1
2    that they have people and staffs who
3    receive them.  I'm not -- personal
4    knowledge of how they may review them
5    or not review them.
6    Q    So you have no knowledge one
7    way or the another whether the PROs
8    review the cue sheets that they get and
9    if there's erroneous information or
10   incomplete information, how they deal
11   with it?
12   A    I have no personal knowledge
13   of how cue sheets are received other
14   than electronically, you know, and
15   reviewed and handled by PROs.  I have
16   not worked in the PRO.  I don't know.
17   Q    So that's not part of your
18   knowledge as to how the PROs function?
19   A    Well, generally it's part of
20   my knowledge of how they function.  I
21   know they receive cue sheets from
22   RapidCue.  I don't think that's
23   generally known by a lot of people.
24   Q    They also receive cue sheets
25   that are paper cue sheets or Excel

81 (Pages 318 - 321)

KOHN

1
2 spreadsheets from broadcasters and
3 program suppliers, don't they?
4     A   Yes.
5     Q   And indeed you've looked at a
6 lot of the cue sheets that they
7 received?
8     A   That's correct.
9     Q   By the way, I may have asked
10 this and I apologize, did you look at
11 all of the cue sheets that were -- that
12 BMI produced?
13     A   No.
14     Q   You only looked at some?
15     A   Some.
16     Q   Did you have access to all of
17 them?
18     A   I think they were all sent to
19 me, yes.
20     Q   Did anybody -- strike that.
21 I won't do it.
22         Have you ever suggested to a
23 music publisher that they perhaps
24 consider changing titles to avoid
25 duplicates?

KOHN

1
2     A   Well, I had a discussion with
3 my father about it with respect to the
4 story I told you earlier about Robbins
5 Music in the early days consisting --
6 like a song like I'm In the Mood For
7 Love, the first three words of the song
8 is I'm In the Mood for Love, and
9 Robins -- the head of Robins Music
10 could care less what the songwriter
11 thought.  That's what the title was
12 going to be, the first three words of
13 it.
14         So we talked about that.  And
15 we did talk about the notion -- I
16 remember having this conversation with
17 my father about duplicate titles and
18 how is that all dealt with.  Because
19 I've seen duplicate titles before.  And
20 he was a music publisher at the time.
21 So I have to answer yes, but I do not
22 recall any specific other instances
23 where I might have had specific
24 discussions with anybody.  I just knew
25 generally that people considered it in

KOHN

1
2 the music industry over time a problem.
3     Q   Do you have any understanding
4 of any -- strike that.
5         Do you have any understanding
6 that BMI, ASCAP or SESAC cannot
7 properly allocate performance income
8 among identically titled songs?
9     A   Say that again please.
10     Q   Sure.
11         Do you have any understanding
12 or any knowledge that the PROs cannot
13 properly allocate performance income
14 among identically titled songs?
15         MR. MARDEROSIAN:  I'm going
16 to object.  That assumes facts not
17 in evidence.
18         Vague and overbroad.
19         Incomplete hypothetical.
20     A   My general understanding is
21 that they will go by the entire set of
22 metadata, such as the songwriter names
23 and will be able to distinguish between
24 songs that have duplicate titles by
25 other fields in the metadata such as

KOHN

1
2 the composer's names and the
3 publisher's name, et cetera.
4         I want to supplement a prior
5 answer before I forget.  And that is
6 you've been asking me questions about
7 whether monies could be diverted to the
8 wrong songwriter or diverted to the
9 wrong publisher as a result of
10 duplicate titles.  But the other side
11 of the --
12     Q   That wasn't quite my
13 question, but it's okay.
14     A   Okay.
15     Q   My question was more
16 specific.
17     A   Okay.
18         MR. MARDEROSIAN:  Go ahead.
19     Q   You can go ahead.
20     A   Right.
21         There's also another aspect
22 here is that if someone is calling up
23 and they know a song that they've heard
24 and they somehow learned the title of
25 the work, let's says it's Uphill

82 (Pages 322 - 325)

Page 334

KOHN

1    KOHN
2    that you -- you stepped over the
3    line when you produced something
4    like that, but you did.
5         MR. ZAKARIN:  You have no
6    comprehension of what you're
7    talking about.
8         MR. MARDEROSIAN:  I have
9    plenty of comprehension.
10        MR. ZAKARIN:  I agree.  You
11   do.
12        MR. MARDEROSIAN:  And it's
13   going to be used to defeat your
14   motion.  Really?  I mean, think
15   about it, Don.
16        MR. ZAKARIN:  There's no
17   graveyard near here, Mick, so you
18   don't have to whistle.
19        MR. MARDEROSIAN:  Just stop
20   arguing with the witness.  Stop
21   trying to elicit legal opinions
22   and conclusions so we can get
23   through this.
24        MR. ZAKARIN:  You can stop it
25   at any point and show it to the

Page 335

KOHN

1    KOHN
2    judge if you think that I'm asking
3    improper questions.
4         Let's go back to my question.
5    Please read it back because it
6    was -- it followed his answer and
7    I want my question.
8         (Whereupon, the record was
9    read.)
10   Q    Do you have knowledge of the
11   facts or evidence that anybody called
12   Upstream and asked for one of Aron and
13   Robert's songs and were instead
14   misdirected to somebody else's song.
15   That was the question.  You identified
16   that as a possibility.
17        So my question is, do you
18   know if that ever happened?
19        MR. MARDEROSIAN:  Objection.
20   Calls for a legal opinion and
21   conclusion.
22        Incomplete hypothetical.
23   A    You asked me if I had any
24   evidence, and the evidence is that we
25   know that Russ Emanuel has admitted to

Page 336

KOHN

1    KOHN
2    changing song titles.  I think he led
3    me to believe that it looked like he
4    was changing Rob and Aron's song
5    titles.  What other song titles could
6    he have been discussing during his
7    deposition other than Aron and Rob's
8    songs.
9         So you have him changing song
10   titles.  He was asked why do you do
11   that?  He says he did it for marketing
12   reasons, which is inconsistent with the
13   answer that Dan Pounder had given,
14   which is inconsistent with what Rob and
15   Aron were told by Viacom's employee
16   or -- who said specifically in an
17   e-mail that the titles would be changed
18   for the purpose of avoiding duplicates.
19   And just the opposite had happened.
20   And it looks like the CEO was doing it.
21        And what I'm suggesting is
22   that there's plenty of circumstantial
23   evidence in the record that shows that
24   it was being done for the purpose of
25   diverting revenues to the song tiles

Page 337

KOHN

1    KOHN
2    that were registered by the CEO under
3    his own name.
4    Q    Now, let's deal with my
5    question.
6    A    That is the answer to your
7    question.  That is evidence.
8         MR. MARDEROSIAN:  Hold on.
9    We're arguing again.
10        Please, question and answer.
11   No argument in between.
12   Q    I asked you a very specific
13   question:  Do you know of anybody that
14   called Extreme and asked for Rob and
15   Aron's title and were instead
16   misdirected to a different title?
17   A    Of course not.
18   Q    Thank you.
19   A    And nor do I know of
20   anyone -- whether someone at Extreme
21   had any outbound phone calls selling
22   them on songs that should have been Rob
23   and Aron's song when people were
24   looking for a song.
25   Q    You have no knowledge of

85 (Pages 334 - 337)

Page 338

KOHN

1
2 either one?
3     A   I don't have any personal
4 knowledge of phone calls.
5     Q   Okay.
6        That's all we needed.
7     A   Well, I think we have all we
8 need here.
9        (Whereupon, a brief recess
10 was taken.)
11    Q   Let's mark as Exhibit K5 --
12       MR. MARDEROSIAN:  Anyone
13 would know that an audio is
14 completely useless.
15       MR. BAGLEY:  Don't tell me
16 what anyone would know, Mick.
17       MR. MARDEROSIAN:  I'm sorry.
18 But, I mean, you -- you say those
19 things like you're trying to argue
20 the case, and I just have to
21 respond how ridiculous it is --
22 how ridiculous it is.
23       MR. BAGLEY:  Argue the case?
24       MR. ZAKARIN:  Stop it.  Both
25 of you because we want to get this

Page 339

KOHN

1
2 deposition done.
3        If you want to do this, I'm
4 telling you that we will go
5 straight into Massarsky's
6 deposition tomorrow at 9:00.
7        This is going to be K5.
8        (Document entitled, Turner -
9 BMI Music Performance License
10 Agreement, was marked K Exhibit 5,
11 for identification, as of this
12 date.)
13    Q   Mr. Kohn, you attended
14 Allison Smith's deposition, right?
15    A   Yes.
16    Q   And you remember, these are
17 exhibits for her deposition 12 through
18 15.  And these are contracts between
19 BMI and various broadcasters.
20       Do you recall that?
21    A   Yes.
22       MR. MARDEROSIAN:  This is K
23 what, Don?
24       MR. ZAKARIN:  K5.
25       MR. MARDEROSIAN:  Thank you.

Page 340

KOHN

1
2     Q   Have you read any of these
3 license agreements between BMI and the
4 broadcasters?
5     A   Yes, I did.  Except where
6 there was a redaction, I didn't.
7     Q   Well, you read it; but you
8 didn't see what was there?
9     A   Right.
10    Q   Before this case, had you
11 ever seen any licenses between a
12 broadcaster and a PRO?
13    A   I might have one in my book
14 or several in my book.  Yes.  The
15 answer is yes.
16    Q   These are blanket licenses,
17 these licenses?
18    A   Yes.
19    Q   You're familiar with PRO
20 blanket licenses?
21    A   Yes.
22    Q   And you're familiar with the
23 fact that they're based upon a
24 percentage of the broadcaster's
25 revenue?

Page 341

KOHN

1
2     A   Yes.
3     Q   And you're also familiar --
4 turn to Page 14, the first one.  We'll
5 just deal with the first one, which is
6 Turner.
7        This is one of the exhibits.
8 It identifies the information to be
9 contained in a cue sheet in paragraph,
10 I think, 6A, doesn't it?
11    A   Yes.
12    Q   And the information is not
13 nearly this long title.  It's a number
14 of other items, correct?
15    A   Yes.
16    Q   It includes, by way of
17 example, writer, composer, publisher,
18 nature and type of use, manner of
19 performance, duration of performance
20 and the relevant PRO, correct?
21    A   Yes.
22    Q   So that's a number of items.
23       And it's correct, isn't it,
24 that the publisher doesn't supply all
25 of that quote/unquote metadata, does

86 (Pages 338 - 341)

Page 342

KOHN

1          KOHN
2 it?
3    A   Correct.
4    Q   By way of example the
5 publisher doesn't provide the nature
6 and type of use, does it?
7    A   Well, that might be in the
8 sync license, right?  I'm not sure
9 whether the sync license would end up
10 in metadata, no.
11   Q   Doesn't include the manner of
12 performance, doesn't come from the
13 publisher?
14   A   Well, it certainly wouldn't
15 include -- it wouldn't include the
16 episode name for example, right?
17        MR. MARDEROSIAN:  Don't guess
18    or speculate.
19   Q   Doesn't include the duration
20 of performance either, does it?  These
21 are all broadcaster pieces of
22 information.
23   A   Right.  Exactly.
24   Q   So cue sheets are not merely
25 the publisher-supplied metadata,

Page 343

1          KOHN
2 there's other pieces of information
3 that the PRO requires that could come
4 only from the program supplier or the
5 broadcaster, correct?
6    A   Correct.
7        MR. MARDEROSIAN:  I'm going
8    to object.  It calls for
9    speculation.
10       Vague and overbroad.
11       Incomplete hypothetical.
12   Q   And you recall from
13 Ms. Smith's deposition, don't you, that
14 she says this is the type of
15 information that BMI requires from all
16 of its licensees in order to allocate
17 performance income?
18       MR. MARDEROSIAN:  I'm just
19    going to object.
20   Q   Do you recall that?
21       MR. MARDEROSIAN:  Outside the
22    scope of the opinion.
23       Vague and ambiguous.  Calls
24    for speculation.
25   A   I don't recall everything she

Page 344

1          KOHN
2 said in her deposition.  If it's there,
3 it's there.
4    Q   Page 9 also you have a
5 statement as follows -- it's the third
6 from the bullet point, I think:  The
7 evidence suggests -- the evidence
8 suggests that the information provided
9 by the Extreme defendants to
10 broadcasters and program producers was
11 not accurate as many cue sheets reflect
12 inaccurate information.
13       Do you see that?
14   A   Yes.
15   Q   And when you're talking about
16 many cue sheets, I think -- can you
17 tell me if you've identified more than
18 five or six that have inaccurate
19 information?
20   A   I saw a number of them.
21   Q   Is the number between one and
22 ten that had inaccurate information?
23   A   That may be where I stopped,
24 yeah.
25   Q   And that's out of the -- how

Page 345

1          KOHN
2 many do you think you looked at?  I
3 know that there's probably 1,000 or
4 more.
5       How many -- do you think you
6 looked at 100, 200?  Do you know?
7    A   No, that much.  Maybe 20 or
8 so.  I looked at the ones that were --
9 had mistakes in it.  And then I found
10 others that I couldn't really tell.
11   Q   How would you --
12   A   Well, the things that said
13 Mix Tape on it as the composer name.
14   Q   But in looking at the cue
15 sheets, how would you know before
16 you -- how would you know there were
17 mistakes on cue sheets unless somebody
18 told you to look at particular cue
19 sheets if you're just going into the
20 body of cue sheets?
21   A   They might have.
22   Q   They might have told you?
23   A   Yeah.
24   Q   So the mistaken or the
25 incorrect cue sheets may have been

87 (Pages 342 - 345)

Page 346

KOHN

1                    KOHN
2  preselected for you to look at?
3      A   Some of them.  Some of them
4  were pointed out to me.
5      Q   Okay.  And you didn't
6  undertake to try to assess, you know,
7  whether there was a large or small
8  number relative to the total number of
9  cue sheets?
10     A   No, I wasn't asked to do
11 that.
12     Q   Okay.
13        In your report -- well, you
14 say here there were many cue sheets
15 reflecting inaccurate information and
16 you've testified now as to the range of
17 numbers that you saw, I think in your
18 report you actually only identify one
19 cue sheet that was inaccurate because
20 it didn't identify the plaintiffs as
21 authors; is that right?
22     A   Yeah, I identified one.  That
23 was probably the most glaring one that
24 I --
25     Q   Page 47 of your report, I

Page 347

1                    KOHN
2  think, is where you identify this.
3      A   Yeah.
4      Q   This is --
5      A   Wait a minute.  On 47?
6      Q   I think it's on 47.
7      A   I thought I had a picture of
8  it.
9      Q   I think you're talking
10 about -- well, you may have a picture
11 of it.
12     A   I thought I did.
13     Q   But No Turning Back by AMC
14 regarding Better Call Sol.
15     A   Right.
16     Q   Okay.
17     A   Right.
18     Q   I think that was -- that was
19 the one -- it's actually -- and can you
20 carry on, I think -- you the -- on Page
21 50, I think.  No, you don't.  It's
22 50 -- maybe it's 53 -- 54 is where you
23 have it.
24     A   Right.
25     Q   Okay.  Fifty-four is your

Page 348

1                    KOHN
2  screenshot, correct?
3      A   Yes.
4      Q   Okay.  But it starts on
5  Page 47 is where you're talking about
6  this?
7      A   Right.
8      Q   Now, that is the one cue
9  sheet that you do identify as having
10 inaccurate information in your report,
11 correct?  Because I looked at it.  I
12 don't know if there's any others you
13 identify.
14     A   And I think I made a
15 statement in here --
16     Q   You did.
17     A   -- where I kind of -- I said
18 limitations of space in this report
19 prevents an accounting of the full
20 picture of inaccurate cue sheets
21 submitted by Viacom and others that
22 went unchecked by Extreme.  Let one
23 example referenced below suffice at
24 this time.
25        So I basically stopped after

Page 349

1                    KOHN
2  I saw a number of these and just
3  focused on this one and decided to use
4  this screenshot.
5      Q   And so you identified one and
6  you said that there are -- the
7  limitations of space prevented you from
8  identifying others, correct?
9      A   It didn't prevent me from
10 identifying others.  It prevented me of
11 making this a 400-page report rather
12 than a 90-page report or whatever it
13 is.  It was getting to -- at some point
14 I had to stop.
15     Q   Did anybody tell you that
16 your report had to be limited in terms
17 of pages?
18     A   No.
19     Q   Okay.
20        And do you think that
21 identifying the other five or six or
22 seven cue sheets would have expanded
23 your report to 400 pages?
24     A   Well, maybe I was
25 exaggerating a little bit.

88 (Pages 346 - 349)

Page 350

1          KOHN
2    Q   You know, it's a little
3  hyperbole.
4    A   I -- you know, I had to lot
5  do in this report.  There was a lot
6  to -- there was a lot to parse out and
7  think through and understand.  And you
8  can't do everything to 100 percent
9  degree.  You know, you try to do the
10 best you can.
11   Q   And, again, I think that
12 you've testified to this, you don't
13 have any -- you haven't done a
14 percentage, you know, sort of
15 inaccuracy rate?
16      MR. MARDEROSIAN:  Hold on.
17      You've asked and answered
18 that.
19   Q   Okay.
20   A   You have asked and answered
21 that.
22   Q   I haven't answered it, but I
23 certainly asked it.
24   A   Sorry.
25   Q   Okay.

Page 351

1          KOHN
2      You also say in your second
3  basis for your -- I think it's on
4  Page 9 again.  Okay?  Maybe not.  Let
5  me look.  It's on 47, I think, where
6  you talk about the -- yeah, it's on 47
7  where we talk about Better Call Sol,
8  that particular statement.
9      Do you recall that?
10   A   Yeah.
11   Q   Okay.
12      What you say is, and through
13 a comparison of the amount of TuneSat
14 detections when compared to the small
15 number of cue sheets on file with BMI.
16      Do you see that?
17   A   Yes.
18   Q   Okay.
19      On number one you didn't
20 count the cue sheets, correct?
21   A   I didn't count them, but my
22 understanding is there was a couple
23 thousand or something -- or something
24 like that.
25   Q   I think that's probably

Page 352

1          KOHN
2  right.
3    A   But I also went on TuneSat
4  and I took a look at the catalog of
5  these recordings that Rob and Aron did.
6  And the detections on the TuneSat.  It
7  was in the tens of thousands.  So that
8  was the basis of my statement.
9    Q   Is it your understanding that
10 every time a program or promo is
11 broadcast, even if it's broadcast
12 dozens or hundreds of times, that a
13 separate cue sheet is filed for each
14 and every single broadcast?
15   A   Not broadcast but every
16 single sync should have one.
17   Q   So you understand, don't you,
18 that it's only the initial broadcast,
19 the synchronization license broadcast
20 that would have a cue sheet?
21   A   You're confusing a broadcast
22 with a fixation.  That is, when you
23 synchronization something, that's the
24 license for the synchronization is to
25 fix the work and that's the

Page 353

1          KOHN
2  synchronization license that you're
3  giving.
4    Q   And the initial broadcast of
5  it is one broadcast -- you don't get a
6  new sync for every broadcast, do you?
7    A   No, but you get -- the sync
8  license is for the reproduction that's
9  being made.
10   Q   Correct.
11   A   All right.
12      And the broadcast is the
13 public performance.  Don't get the two
14 confused.
15   Q   I don't think I do, and I'll
16 try to be clear.
17      The cue sheet is only issued
18 for the initial broadcast; isn't that
19 right?
20   A   It's the -- the cue sheet --
21 oh, the cue sheet --
22   Q   Is only issued for the
23 initial broadcast of the
24 synchronization license work?
25   A   Well, the cue sheet is

89 (Pages 350 - 353)

Page 366

KOHN

1 KOHN
2 first got involved in the case I took a
3 look at the TuneSat data and came up
4 with about 16,000 unique syncs or
5 unique programs that contained those
6 musical works that are part of the --
7 Q Original broadcasts, you're
8 saying?
9 A You know, I don't like
10 original broadcasts.  But you could say
11 unique programs that contain the
12 musical work that were broadcast,
13 right, once.  And not including all the
14 other broadcasts of the same programs.
15 I came up with about 16,000.
16 Q Now as I recall the --
17 MR. MARDEROSIAN:  You were
18 done?
19 THE WITNESS:  Yes.
20 Q As I recall Aron and Robert
21 said there were about 30,000 to 33,000
22 total detections; is that right?
23 A That sounds about right.
24 Q So -- and of that it's your
25 testimony that about half of them were

Page 367

1 KOHN
2 just unique original broadcast?
3 A I told you I did a rough
4 pivot table which took the data and did
5 a rough on that.  There is another way
6 that I didn't do where you can strip
7 out on how it goes on multiple
8 networks.  Okay?  Because as you
9 mentioned earlier, you can have a
10 particular program on the TuneSat that
11 happened to be broadcast on Turner in
12 the United States and then broadcasted
13 on some German station some time later.
14 I didn't go to the length of
15 stripping out the multiple networks
16 that it could be.  But when I looked at
17 the data, 67 percent were the United
18 States.  A program that was on MTV was
19 likely to be on MTV.  So if I came up
20 with 16,000, I'm looking at maybe
21 there's 15,000 that I could strip -- if
22 I had to strip out some duplicates on
23 alternative networks around the world.
24 So it was a -- it was a quick
25 look at it to give me an idea of how

Page 368

1 KOHN
2 many unique syncs that it was.
3 Q So back of the envelope?
4 A Back of the envelope would be
5 a good way to put it.
6 Q Now, did you listen to any of
7 the audio clips?
8 A Yes, I did.
9 Q And were you able to make an
10 assessment of how many of the
11 detections you identified were promos
12 as compared to in-program uses or
13 didn't you do that?
14 A I did.  Well, I didn't -- I
15 would have had to have listened to
16 16,000 individual, which I didn't do
17 because I wasn't asked to do that.  And
18 it would have taken my time and it
19 wouldn't have been worth the effort.
20 But I saw there was a good mix.  There
21 was certain in-program uses of music
22 and there were promos being
23 advertisements for it.  They were a
24 good mix of it.  I don't think I -- I
25 might have looked at a the Land Rover

Page 369

1 KOHN
2 commercial and the Starbucks commercial
3 in there.  I might have found it.  I
4 might have listened to it, but I don't
5 remember.
6 But I poked around it to see
7 what was there but I did not do what
8 you had asked me.  And I did not do a
9 calculations as to how much were this
10 kind and how much were that kind.
11 Q Turn to Exhibit B of your
12 report, if you would.
13 (Whereupon, a brief recess
14 was taken.)
15 Q Okay.
16 I think when we broke, I had
17 asked you to look at your Exhibit B --
18 A Yes.
19 Q -- to your report.  Do you
20 recall?  Pull it out.
21 A Okay.  Exhibit B.
22 Q And you say these are unique
23 TuneSat detections?
24 A That's what the title of it
25 is.

93 (Pages 366 - 369)

KOHN

2    Q    Are they unique?
3    A    Yes.  That's my understanding
4  of what they are.  I didn't produce
5  these.
6    Q    You didn't --
7    A    No.
8    Q    -- create this document?
9    A    No.
10   Q    So somebody else created it,
11 and told you what it was?
12   A    Well, I was given it by
13 attorneys; and I understand that Karen
14 Rodriguez had prepared it.
15   Q    Okay.
16        And the total number of
17 detections when you add them up are
18 about 21, nearly 22,000, correct?
19 You've got 6,848 and 15,093.
20   A    Fifteen plus six, yeah, about
21 22,000, something like that.
22   Q    I said about 22,000 or close
23 to 22,000.
24        And you multiplied $200
25 against every one of these detections?

1              KOHN
2    A    Yeah.
3    Q    But you don't know if these
4  are unique detections, correct?
5    A    Well, it says unique
6  detections.  And I understood them to
7  be unique detections.  I had previously
8  given a back of the envelope done in my
9  own way, way back in February when I
10 started working on the case and using
11 data that went all the way back to 2013
12 or something like that.  And -- like I
13 said.  So when I saw these numbers I
14 said it's in the realm of -- again, I
15 did back of the envelope and I just
16 took these as what it was.
17   Q    And now they've gone up by
18 some nearly 7,000 from your number?
19   A    Apparently.
20   Q    And you don't know whether
21 they are or not unique detections?
22   A    I'm not the one who generated
23 this.  So I don't know whether they're
24 unique in the way that you and I have
25 been talking about my understanding of

1              KOHN
2  what unique is.
3    Q    Do you know how many of these
4  detections -- I assume you're going to
5  know the answer -- are Viacom
6  detections, detections of broadcasts on
7  Viacom networks?
8    A    I could do that.
9    Q    You could pull it out from
10 the list?
11   A    Right.  Like MTV Classic is
12 MTV2.  MTV -- we can probably pull out
13 and add the numbers up.
14   Q    So we can add up what the
15 total number of MTV detections are?
16        MR. MARDEROSIAN:  Well, he
17   said he did not prepare this.
18        MR. ZAKARIN:  I understand.
19        MR. MARDEROSIAN:  And I think
20   that's a question for Karen
21   Rodriguez.
22        MR. ZAKARIN:  Well, the
23   problem is it's attached to his
24   report.
25        MR. MARDEROSIAN:  I think

1              KOHN
2  just to be fair about it, I think
3  he relied on it on a specific
4  narrow topic in his report, Don.
5  And that was the extent of his use
6  of this document.
7        But you can ask whatever you
8  want, but I think these are
9  questions for Karen Rodriguez.
10       MR. ZAKARIN:  Unusually, you
11 know, I ask witnesses about their
12 reports and other witnesses about
13 their reports.  And if he relied
14 upon somebody else to do something
15 and he's basically just, in
16 effect, saying what somebody has
17 told him, I'm entitled to know
18 that.  That's all.
19       MR. MARDEROSIAN:  I get that,
20 absolutely.  But the operative
21 phrase is do something and I'm
22 saying you should ask him what it
23 is that he used it for.
24       MR. ZAKARIN:  I know what he
25 used it for.  It's in his report.

Page 374

KOHN

1
2      Anyway, let's continue on.
3      Q   In terms of -- so we could
4  figure out which are Viacom channels
5  and therefore which are Viacom
6  detections, correct?
7      A   Yes, if we knew what Viacom's
8  channels are.
9      Q   For which you applied $200
10  for each and every one of the
11  detections, correct?
12      A   Well, are you just saying the
13  same thing for each -- yeah, I used the
14  total numbers here and multiplied it by
15  $200.
16      Q   And in terms of these
17  detections, do you know how many are
18  not works that were delivered to Viacom
19  Extreme but are owned by others
20  including the plaintiffs?
21      MR. MARDEROSIAN:  Objection.
22  Vague.
23      Q   You know that the plaintiffs
24  self-published works, right?
25      A   Yes.

Page 375

KOHN

1
2      Q   Do you know how many of these
3  detections are of the plaintiffs'
4  self-published works?
5      A   I think -- I didn't generate
6  this.  So I don't have the underlying
7  data that was used to generate this.  I
8  wouldn't be able to answer any of those
9  questions.
10      Q   You with agree with me though
11  that there's no reason to charge or
12  make a claim against Extreme or Viacom
13  for $200 per each of the plaintiffs'
14  own works?
15      A   No.
16      Q   Okay.
17      A   Absolutely not.
18      Q   So if the plaintiffs'
19  self-published works or works published
20  by third parties are among these
21  detections --
22      A   Right.
23      Q   -- they have --
24      MR. MARDEROSIAN:  Hold on.
25      Let him finish the question

Page 376

KOHN

1
2  because I want to object to it
3  before you agree to it.
4      Q   -- they have to get backed
5  out?
6      MR. MARDEROSIAN:  I'm going
7  to object.
8      It's an incomplete
9  hypothetical, and it doesn't
10  include the fact that there's
11  evidence that Extreme is taking
12  Aron and Robert's own publishing
13  for Lonely Orchard and Brothers
14  Heathen.
15      Q   You can answer my question as
16  opposed to the rhetoric there.
17      A   My understanding is that
18  these were unique detections of
19  music -- musical work, sound recordings
20  that were created by Aron and Rob and
21  delivered under the contract.
22      Q   But in fact you don't know
23  whether these were, in fact, delivered
24  or are self-published?
25      MR. MARDEROSIAN:  I'm just

Page 377

KOHN

1
2  going to object.
3      It's an incomplete
4  hypothetical and vague.
5      Q   You can answer.
6      MR. MARDEROSIAN:  And doesn't
7  include the issue over whether or
8  not Extreme is taking the
9  plaintiffs' published --
10  self-published songs.
11      A   And I don't know whether this
12  is an underrepresentation and doesn't
13  include all of their songs that were
14  delivered and used.
15      Q   So you don't know very much
16  at all about this document?
17      A   That's right.
18      Q   Essentially, what you did is
19  you took the number of detections
20  without knowing what they are and
21  multiplied each one by 200?
22      A   And that wasn't the essential
23  part of my report.  The essential part
24  of my report was coming up with the
25  $200 figure.  If this wasn't included,

95 (Pages 374 - 377)

KOHN

2 it wouldn't have mattered because
3 whichever the true number is would be
4 multiplied by $200.  If it was --
5 instead of 21,000, if it was 16,000, if
6 it was 30,000, whatever that number is.
7 And I'm sure enough good minds can get
8 together and figure out using the
9 TuneSat data what the proper number is.
10    Q   We'll come to the 200 in due
11 course.
12       In any event, if I understand
13 you correctly you -- it's your view
14 that the 200 is the right number for --
15 for these -- for all of those
16 detections, that's your opinion?
17       MR. MARDEROSIAN:  Right
18 number for what?
19    Q   The right number for the sync
20 fee for each of these 200 detections
21 that you have opined?
22    A   My report says what it says
23 about the $200 number.  We can turn to
24 it.  I don't want to say anything
25 that's inconsistent and be --

KOHN

2    Q   Well, let's look at Page 86
3 which is where I think come up with
4 this.
5    A   Thank you.  Thank you.
6    Q   Okay.
7    A   That's helpful.
8    Q   I think this is where you
9 explain how you came up with your $200.
10    A   I'm there.
11    Q   Okay.
12       And if I -- I want to
13 characterize this correctly, what you
14 did was you looked at the license of
15 their works to CBS for a promo use for
16 $120, correct?
17    A   Yes.
18    Q   And you compared that to an
19 in-program license use of one of their
20 own works, meaning Rob and Aron, for
21 $300.  And you then -- and you
22 reference to up to 20,000 for works
23 they own control.  You mentioned that.
24 And then you conclude, I think you just
25 say I therefore applied the sum of 200

KOHN

2 to each of these.  So your view is, at
3 the very least, for the CBS promo use
4 200 would be the right number?
5    A   200 would be the right number
6 to use across the board for the
7 detections -- unique detections that
8 were discovered during the period from
9 mid-2014 to the present.
10    Q   But one of those is you look
11 at CBS promo use and you figure they
12 charge 120.  I think 200 is the right
13 one?
14    A   Well, there might have been
15 an in-program use -- well, I call it an
16 in-program use -- that might have been
17 worth $20,000 or worth more.  But I
18 picked 200 as an overall way of just
19 going across the board to simplify it.
20    Q   Could you look at Exhibit A
21 of your report for a second.  And we'll
22 come back to that.
23    A   Yes.
24    Q   Exhibit A, this you have done
25 all by yourself?

KOHN

2    A   No.
3    Q   Who helped with you with this
4 one?
5    A   I had asked Rob and Aron to
6 come up with what they think are
7 reasonable fees based upon their works.
8 I asked them to send me license
9 agreements that they had for their own.
10 And I took their numbers and validated
11 them.  I didn't think -- I didn't
12 disagree with any of them.
13    Q   Did you examine the terms of
14 those license agreements?
15    A   Yes.
16    Q   You don't know whether those
17 license agreements were provided to the
18 defendants, do you?
19    A   No.
20    Q   I was curious about a couple
21 of things.
22       MR. MARDEROSIAN:  Do you know
23 if the defendants even asked for
24 those?
25       THE WITNESS:  I don't know.

96 (Pages 378 - 381)

Page 382

KOHN

1
2    Q   I was curious about
3 something.
4    A   Go ahead.
5    Q   In the middle of the page you
6 have CBS on-air promos fourth quarter
7 2016, CBS marketing third quarter 2016
8 promos.
9        Do you see that?
10   A   No, I don't.
11   Q   It's down about one-third of
12 the way down.
13   A   What's the first word?  CBS?
14   Q   CBS.
15   A   On-air promos.
16   Q   Yes.  And there are promos --
17 there's two entries for promos.
18       Do you see that?
19   A   CBS on-air promos, fourth
20 quarter 2016.
21   Q   Two in a row.
22   A   And this is CBS marketing?
23   Q   CBS marketing third quarter
24 2016 promos.
25   A   Yes, I see them now.

Page 383

KOHN

1
2    Q   They're both the 120?
3    A   Right.
4    Q   As you -- as in your --
5 Page 86 of your report, correct?
6    A   Correct.
7    Q   But here instead of $200 you
8 apply $10,000 for each of them as the
9 proper fee, right?  That's what you
10 think is the fair fee there?
11       MR. MARDEROSIAN:  No, you're
12   misreading this.
13       MR. ZAKARIN:  No, actually
14   I'm reading it accurately.
15       MR. MARDEROSIAN:  No, no.  I
16   think you're misreading it but you
17   can treat it anyway that you want.
18   Q   You total -- if you total up
19 the second column, it comes out
20 $1,975,000, right?  Mr. Kohn?
21   A   When I looked at -- okay,
22 yeah, the total says $1,975,000.
23   Q   And in calculating your
24 damage claim, you take 50 percent of
25 that number, don't you?

Page 384

KOHN

1
2        MR. MARDEROSIAN:  Incorrect.
3   This is for direct needle drop
4   licenses here.
5        MR. ZAKARIN:  I know what it
6   is.
7        MR. MARDEROSIAN:  It's not
8   for the figure that he applies to
9   the blanket --
10       COURT REPORTER:  Excuse me.
11       THE WITNESS:  Sorry.  My
12   fault.
13       MR. ZAKARIN:  You're not
14   testifying.  So please answer my
15   question.
16       MR. MARDEROSIAN:  Well, then
17   let me just object that you're
18   mischaracterizing the evidence.
19   A   Yeah.  When I applied the
20 $200 figure I was taking into
21 consideration that there's all sorts of
22 things and under 21,000 different uses.
23       It would have been
24 impractical for me to go through every
25 single one and do an evaluation as to

Page 385

KOHN

1
2 whether it was a commercial or a
3 foreground vocal use versus a source
4 use like coming out of a radio in a car
5 or that kind of a thing.  And also here
6 I looked at -- when I saw it says
7 promos, I may have taken a look at that
8 and said maybe that was multiple
9 different promos.  I might have done
10 that and not taken it as a single
11 promo.  But they're apples and oranges,
12 is what I'm saying.  These were, for
13 the most part, discrete licenses that
14 were issued by Extreme as opposed to
15 the --
16   Q   Page 86 aren't you referring
17 to a discreet license?
18   A   That's right.  These are
19 discreet licenses.
20   Q   Okay.
21       And you've applied $200
22 rather than 120.  And now here you're
23 applying $10,000 rather than 200; isn't
24 that correct?
25       MR. MARDEROSIAN:  No, it's

97 (Pages 382 - 385)

KOHN

1 not.
2    MR. ZAKARIN: You're not
3 testifying, Mick.
4    MR. MARDEROSIAN: You're
5 mischaracterizing the evidence and
6 the document.
7    Q   Here it's $10,000 that you
8 think is the right amount or at least
9 Rob and Aaron figure was the right
10 amount and in Exhibit A it's $200?
11    A   There's a huge difference
12 between CBS and some cable channel --
13 Yes channels or some whatever. This is
14 CBS. It's a network.
15    Q   Take a look on Exhibit B, if
16 you will. Okay. Exhibit B again.
17 Unique TuneSat detections. Okay.
18    Do you see CBS is listed
19 right there?
20    A   Okay.
21    But so is --
22    Q   So now you've -- so CBS is
23 real different. You're including it.
24    A   But so is something called

KOHN

1 GAC, which I've never even heard of.
2 What about the Oxygen channel -- the
3 Ovation channel I've never heard of.
4 The Hub I've never heard of. Something
5 called Showtime East, 1,674. This --
6 when I have to apply -- I'm not going
7 to go through every single one of
8 those. So I gave 200 to CBS, but I
9 gave 200 to something called TLC.
10    Q   And you have no idea what
11 they do. You don't even know some of
12 those broadcasters, right?
13    A   I don't -- I -- that's the
14 point.
15    Q   Okay.
16    A   You know.
17    Q   So you just arbitrarily
18 picked the $200?
19    A   I didn't arbitrarily pick it.
20 I picked it -- if you're going to
21 take -- try to come up with a
22 reasonable amount that wasn't 120, that
23 wasn't 300, and I thought 200.
24 Basically if you look in my book, it

KOHN

1 talks about needle drops. And
2 basically that's about the -- that's
3 about the price that you would get,
4 $200.
5    Q   Okay.
6    And so here for the CBS
7 promos the appropriate price is not
8 $200 but it's $10,000 for each promo,
9 right? That's your -- that's what
10 you've done here?
11    A   No, but you're taking apples
12 and oranges.
13    Q   Okay.
14    That's -- your testimony is
15 whatever your testimony is there.
16    A   Okay. That's my testimony.
17    Q   Okay.
18    A   I mean, you're trying to
19 suggest that these are the same thing.
20 When I take $200 and do it as an
21 average some of them are CBS, which is
22 a huge network, and some of them are
23 networks you've never heard of. NY9 I
24 never heard of. Maybe nobody watched

KOHN

1 the NY9 and got $200 for the promo for
2 it.
3    Q   Is the $10,000 that you put
4 in there, is that also in your Exhibit
5 B? Is it the same use as Exhibit B?
6    A   I don't know.
7    Q   So you could have a
8 duplication there?
9    A   I might have a duplication.
10    Q   You don't know that?
11    A   Neither do you. I don't know
12 whether I do.
13    Q   Not my burden.
14    Did you -- by the way on your
15 Exhibit B, did you back out what was
16 actually paid on any of those licenses?
17    A   I was not asked to do that.
18    Q   Okay.
19    So you were just asked to
20 come up with a gross number and put
21 that forward as the damage claim?
22    A   I was asked to come up with
23 the $200 amount. All right. I was
24 given the unique numbers. I did the

KOHN

1    multiplication.  It was towards the end
2    of this.  I didn't have the information
3    to back it out.  And I wasn't provided
4    to -- but it.  But it could be backed
5    out by somebody else.
6       Q   Lots of things could be done,
7    but it wasn't done.  So this is put
8    forth -- you're aware that you've put
9    this forth as a damage claim, $200
10   times 20 -- almost 22,000 detections?
11      A   Well, I also said to you that
12   I'm not the one who came up with the
13   22,000 detections.  All right?
14      Q   Is it your testimony?
15      A   Somebody -- you know,
16   somebody else came up with that number
17   and I came up with the $200.  I made a
18   multiplication of the two numbers.  One
19   number I came up with.  Another number
20   somebody else came up with, and that's
21   what I put in here.
22      Q   At the bottom of -- here,
23   based on my calculations, Page 86, Aron
24   and Rob share of these broadcast

KOHN

1    licensing fees for the 15,093 unique
2    audiovisual works, it's really almost
3    22,000 --
4       A   Yeah.
5       Q   -- in which their music was
6    suffixed for the period spanning
7    July 1, 2014 to August 1, 2018 is
8    $2,194,100.
9          That put forth as a damage
10   claim.  Are you aware of that?
11      A   I'm not familiar with the
12   term damage claim as litigators use it.
13   So I --
14      Q   Are you aware that that is
15   part of the plaintiffs' claim that they
16   have supposedly been deprived of that
17   money?
18      A   Yes.
19      Q   Okay.
20         And you don't know whether
21   what they were actually paid is or is
22   not backed out of that number?
23      MR. MARDEROSIAN:  It calls
24      for speculation.  This is not his

KOHN

1    role.
2       A   Yeah.  I --
3       Q   It's in his report.
4       A   I wasn't asked to back it
5    out.
6       MR. MARDEROSIAN:  Your
7       question on this topic is not in
8       his report.
9          You're mischaracterizing the
10      evidence.
11      MR. ZAKARIN:  Well, we'll
12      see.
13      Q   And you don't know whether
14   that 2,194,000 duplicates your other
15   number in Exhibit A in any respect, do
16   you?
17      MR. MARDEROSIAN:
18      Mischaracterizes the evidence.
19         Vague.  Incomplete
20      hypothetical.
21      A   So if we backed out -- how
22   many uniques are on Exhibit A?  Can we
23   count them?  Two, four, six, ten, maybe
24   30.

KOHN

1       Q   I'm more interested in your
2    number.
3       A   Let me ask you this:  There
4    are 30 of them there, right?
5       Q   Yes.
6       A   Okay.
7          Let's subtract 30 from
8    21,000.
9       Q   Let's subtract 1,975,000 from
10   it.
11      A   No, because these are
12   completely different.  This is a Land
13   Rover commercial for example.
14      Q   Which is also time barred.
15   You're aware of that, aren't you?
16      MR. MARDEROSIAN:  No, it's
17      not time barred because there's an
18      e-mail from your client after
19      July 1, 2014, offering to pay them
20      the money.  It's still a claim
21      that's on the table.  I'm sorry.
22      By the admission of your own
23      client.
24      MR. ZAKARIN:  The claim is

KOHN
1
2  gone, long gone.
3      MR. MARDEROSIAN:  Don't try
4  to instruct the client as to what
5  the damage claim is because this
6  is not his realm, and it's
7  contrary to the evidence.  Okay?
8      MR. ZAKARIN:  No, it's not
9  contrary to the evidence.
10      MR. MARDEROSIAN:  Yes, it is.
11      MR. ZAKARIN:  It's in his
12  report.
13      MR. MARDEROSIAN:  Whatever,
14  Don.  It's argumentative.
15      MR. ZAKARIN:  It's in his
16  report.
17      MR. MARDEROSIAN:  What's in
18  his report?
19      MR. ZAKARIN:  The damage
20  claim.
21   Q   Let's continue, Mr. Kohn.
22      So you've got here -- you've
23  taken from Aron and Robert their
24  proposed numbers and you've included
25  that here and you totaled them up,

KOHN
1
2  right?
3   A   Yes.
4   Q   Okay.  I just wanted to know
5  where it came from.
6      We'll come back to this a
7  little bit later.  Page 11 and onto
8  Page 12 of your report.  Now we get to
9  your allocation theories.
10      You say towards the bottom,
11  the next to last bullet point on Page
12  11, when licenses are granted on a
13  blanket basis Aron and Robert are
14  entitled to a pro rata share, their
15  relevant share based upon the usage of
16  their songs and recordings, not based
17  upon the number of songs they delivered
18  in relation to the total number of
19  songs in the catalogs licensed.
20      So let's parse that a little
21  bit and go through it.  You propose
22  that there should be a usage based
23  allocation model, correct?
24   A   Repeat the question.
25   Q   You propose that with respect

KOHN
1
2  to blanket licenses or fees from
3  blanket licenses, that it should be
4  allocated on a usage basis not across
5  the libraries licensed?
6   A   I said that it was the custom
7  and practice to take blanket -- fees
8  that were generated on a blanket basis
9  and allocate them based upon usage, not
10  based upon the number of songs.
11   Q   Well, actually the next
12  statement tells us what you say, which
13  is -- give me a second.
14      It says the determination --
15   A   Would you please tell us the
16  page --
17   Q   Page 11.  The determination
18  of the relevant share based on the
19  number of songs rather than the usage
20  of the songs is inconsistent with both
21  the terms of the 2011 composer
22  agreement and customs and practices in
23  the industry.
24      What I want to try to do
25  first is deal with -- because you just

KOHN
1
2  said it's inconsistent with customs and
3  practices, correct?
4   A   Yes.
5   Q   Okay.
6   A   Not just that but --
7   Q   You've said the contract and
8  customs and practices.
9   A   Right.
10   Q   Let's deal with customs and
11  practices first.
12      In terms of the customs and
13  practices of production music libraries
14  in determining how they allocate
15  blanket licenses, did you contact any
16  production music libraries to find out
17  how they did it?
18   A   Excuse me.  I was distracted.
19   Q   I'm sorry.
20      MR. ZAKARIN:  Why don't we
21  reread the question, please.
22      (Whereupon, the record was
23  read.)
24   A   Not since I was engaged in
25  this case.

100 (Pages 394 - 397)

Page 398

KOHN

1
2    Q   Did you do it before?
3    A   I learned it through 35 years
4 of discussing it with people, at least
5 the past ten years of discussing it
6 with people in the industry.
7    Q   Who did you discuss it with
8 over the last ten years, can you
9 identify anybody?
10   A   No, I can't -- no, I can't
11 identify any specific person.
12   Q   And since you were retained,
13 you didn't talk to anybody?
14   A   Well, I'm trying to think --
15 no, since I've been retained, I didn't
16 need to.
17   Q   And you can't identify any of
18 these people in the production music
19 library --
20   A   Well --
21   Q   Let me finish.  It will be
22 clear if I finish.
23   A   You started a question before
24 I finished the last answer.  But answer
25 your -- ask your question.

Page 399

KOHN

1
2    Q   You can't identify anybody
3 that you've spoken with since you were
4 retained to discuss that issue.  And
5 I'm asking you, you can't identify any
6 of the people that you spoke with who
7 were in the production music library
8 business in the ten years prior to your
9 retention; is that right?
10   A   Look, where did I say in
11 these two sentences -- where are the
12 words production music library here?
13 That the first thing we have to do is
14 going from top down not from bottom up.
15   Q   You're talking about customs
16 and practice in the industry, right?
17   A   Yes.
18   Q   What industry are you talking
19 about?
20   A   The entire industry.  The
21 entire record industry.  Let's go back
22 to what I --
23   Q   We're not in the record
24 industry.
25   A   This is just a summary.  This

Page 400

KOHN

1
2 is just a summary.  Let's go back to
3 the section of my report where I
4 discuss this.  You will have to help me
5 here.
6       MR. MARDEROSIAN:  Take your
7    time.
8    A   Okay.  I think it's Page 71.
9 Okay?
10   Q   Yes.
11   A   All right.
12       So you're going to ask me a
13 series of questions about who talked I
14 to and since I didn't talk to -- I
15 can't remember who I talked to, it's
16 not fair to me at all.
17       So it really is on Page 76.
18   Q   Okay.
19   A   Where I give a number of
20 examples.  I start with, I believe --
21 and after I discuss the PROs usage if
22 ASCAP or BMI allocated --
23   Q   Where on 76 is this?
24   A   I think I'm going back to 74.
25   Q   Okay.  Now we're on 74.

Page 401

KOHN

1
2    A   I'm sorry.  I may have
3 misspoke.
4    Q   PRO is like ASCAP and BMI?
5    A   PRO is like ASCAP and BMI.
6 What I'm --
7    Q   I see it.
8    A   -- I'm saying here is it
9 would be unfair and unreasonable for
10 ASCAP or BMI to distribute income based
11 upon the number of songs and their
12 respective repertoire because a vast
13 number of songs in the catalog, which
14 may never be performed, would receive
15 the same share of income as frequently
16 performed songs.
17   Q   Now, we're not talking --
18   A   No, no.
19   Q   You're still talking.  Go
20 ahead.
21   A   I'm still talking.
22   Q   Please, go ahead.
23   A   I'm still talking.  Because
24 we're talking -- because as I said
25 customs and practices in the music

101 (Pages 398 - 401)

KOHN

1
2 industry and that applies across the
3 board.
4     Q    The music industry?
5     A    Yeah.  And it includes -- the
6 music industry includes the record
7 companies, PROs, music publishing
8 companies and music production
9 libraries or production music
10 libraries.
11     Q    We're talking about sync
12 licenses now, aren't we, blanket sync
13 licenses?
14     A    No, we're looking at -- we're
15 looking at blanket revenue.
16     Q    No.
17     A    Yes, we are.  Oh, yes, we
18 are.
19     Q    Yes, we are?
20     A    Yes, we are.  We're looking
21 at blanket -- a blanket license is a
22 form of license where you -- one of
23 your experts would like to use the word
24 access.  So you have -- we're going to
25 reduce your transaction costs, you

KOHN

1
2 that have been performed a lot or
3 sync'd a lot or used a lot get the same
4 amount of money as songs who don't get
5 used at all.  That is unfair and
6 unreasonable.  It may be practical
7 because it makes your job easier, but
8 it's unfair and it's unreasonable.
9 That's the music industry.  Everyone
10 does that.  And if you don't do it --
11 if you don't do it, you're being unfair
12 and you're being unreasonable.
13     Q    So -- oh, you're still
14 talking?
15     A    Yeah.
16         So I have those examples in
17 this report on 76.  I say it's a common
18 practice for record companies to
19 allocate blanket income on the basis of
20 the most practical means available.
21 For example, sometimes a record label
22 must pay royalties on what is called
23 breakage income.  That is, they might
24 have received an advance from an
25 organization that does streaming from,

KOHN

1
2 know, read US versus ASCAP and BMI.
3 You know a 1979 Supreme Court case, the
4 reason why they don't violate the
5 antitrust laws, music publishing
6 companies, is because they're reducing
7 the transaction cost of their
8 customers.  That's what a blanket does.
9 A -- it's something that's issued in a
10 blanket form that you can go ahead and
11 use what's here.  All right?  And
12 whenever money is brought in on a
13 blanket basis whether it's from a PRO
14 issuing for performance licenses,
15 whether it's a blanket for
16 synchronization licenses, whether it's
17 from a record company who's got
18 breakage, whether it's from black box
19 money that's overseas from music
20 publishing companies, you always
21 allocate it to the best of your ability
22 on a fair and reasonable basis which is
23 always based upon usage.
24         If you don't base it upon
25 usage you're going to have some songs

KOHN

1
2 let's say, ten years ago, a company --
3 Cue Tracks, it's a company that paid
4 millions of dollars to the record
5 companies, and they may have gone out
6 of business before they even went
7 online.  All right?  So now a record
8 company is at advance of let's say 10
9 or $20 million, and how do they
10 distribute that money to the artist?
11 They have no reports whatsoever.  What
12 they do is they look at other streaming
13 companies, look at the reports that
14 they do have, do an extrapolation and
15 allocate the money based upon usage.
16 They do not allocate the money counting
17 the number of recordings that they have
18 in their catalog and giving everyone
19 the same amount.  Okay?
20         So that's the record
21 industry.  And I say here -- and you
22 were asking who did I talk to.  Well,
23 in that particular instance when I was
24 in my company at Royalty Share I sat in
25 policy discussions at Sony Music, which

KOHN

1
2 is a sister company to Sony ATV, and
3 that's how they do it.  The Sony
4 corporation does it that way.  That's
5 the way it's supposed to be done.
6        Now, black box monies is
7 monies overseas that music publishers
8 receive that do not come accompanied by
9 usage reports because it's money that
10 was unallocated to anyone specifically.
11 The music publisher gets it and an
12 honest music publisher will distribute
13 that monies -- its portions to the
14 other publishers, sub-publisher,
15 original publishers or others,
16 copublishers and to songwriters on a
17 fair and reasonable basis.  And that's
18 going to be based upon some projected
19 usage or if they have the report it
20 will be actual usage.  And that's the
21 way it's done.
22        Nobody that I've ever heard
23 of, except in the past day I heard of
24 First Com, your last -- Mr. Katz said
25 that he acquired a company when he was

KOHN

1
2 at Zamba that did it that way.  I was
3 surprised to hear that.  A small
4 production music library did it that
5 way.
6        And then you have your own
7 witness, Adam Taylor, he runs a
8 production music library; and he does
9 it the right way.  He basis it on
10 usage -- usage reports.  Now, all of
11 your experts went to great lengths to
12 say that I said in my report that it
13 has to be done on actual usage.  I
14 suspect that that someone may have put
15 in their heads that I said actual
16 usage.  But I didn't say that it had to
17 be done in actual usage, BMI and ASCAP
18 don't do it on actual usage all the
19 time.  They do get numbers based upon
20 electronic usage reports that reflect
21 accurate usage pretty well.
22        But when your experts set up
23 strawman that says that nobody can do
24 it in actual usage, that's simply not
25 what I said in my report.  It's a

KOHN

1
2 strawman.  I said it's based upon
3 usage.  Adam Taylor agrees it's based
4 upon usage.  I think anyone who would
5 do it on the basis of the number of
6 songs -- if ASCAP did it they'd be out
7 of business the next day.  If record
8 companies did it, they'd be sued by
9 their recording artists.  And if a
10 production music company did it to
11 their songwriters, they would be sued
12 by their -- sued by their songwriters.
13 And that's what this case is about.
14    Q   Okay.  Let me know when
15 you're done.
16    A   I'm done.
17    Q   Okay.
18        You talked about custom and
19 practice, but the custom and practice
20 now you're talking about is the music
21 industry generally and not related to
22 sync licensing by production music
23 libraries; is that right?
24        MR. MARDEROSIAN:  I'm going
25    to object.

KOHN

1
2        Mischaracterizes the
3    testimony.  Argumentative.
4    A   I am using it as sync
5 licenses for a production music
6 library.  I mentioned Adam Taylor
7 two -- how many times did I mention him
8 in the past ten minutes?  He runs a
9 production music library, has admitted
10 that his blanket sync licenses, when he
11 gets the income -- when he gets his
12 income he also gets usage reports to
13 find out what songs have been sync'd.
14 And he uses some message -- some
15 methodology based upon his usage.  He
16 wasn't specific in his report, but I
17 was very happy to hear that he's doing
18 it in some.  I don't know for sure.  I
19 haven't seen his calculations, but if
20 it's based upon usage, it's likely to
21 be more fair and more reasonable than
22 basing it upon the number of songs in
23 the catalog, which virtually nobody
24 does except your client.
25    Q   You said virtually nobody

KOHN

1
2 does.  What -- who have you talked to?
3    A   I don't have to talk to
4 everybody in the industry.
5    Q   You don't have to talk to
6 anybody it appears.
7    A   I --
8        MR. MARDEROSIAN:  Folks,
9    you're arguing with each other.
10    Q   You haven't identified a
11 single --
12        COURT REPORTER:  Excuse me.
13    A   I have -- I don't have to --
14    Q   You haven't identified a
15 single production music library that
16 you've contacted, spoke to, or found
17 out how they do it; is that right?
18    A   I sat in a deposition -- I'm
19 sorry -- in a deposition yesterday.  If
20 you don't remember, you can get the
21 transcript and read it.  Right?
22    Q   I remember it well.
23    A   His report says usage.  He
24 was asked specifically whether he
25 thought that was fair.  Now, this is a

KOHN

1
2 guy who sat on the board of APM, the
3 production music library that your
4 other expert is the CEO of.
5    Q   Um-hum.
6    A   He circled the wagon saying
7 of course it's okay to do this because
8 I had a company like that myself that
9 that did it.
10    Q   You didn't answer my
11 question.
12    A   I did answer your question.
13 I just told you -- I just told you a
14 production music library out of the
15 voice of your own experts, two of them,
16 okay, are saying that they -- that's
17 the way they do it.
18    Q   I just want to make sure.  So
19 your testimony about custom and
20 practice is now based upon what Paul
21 Katz testified to yesterday and what
22 Adam Taylor has in his report; is that
23 it?
24    A   That's not what I'm
25 testifying.  It's not what I said.

KOHN

1
2    Q   I don't know what you're
3 saying.
4        MR. MARDEROSIAN:  Hold on.
5    Stop.
6        He's answered the question.
7 You're now arguing with him.  Stop
8 arguing with him, Don.
9        Let's go to the next topic.
10 You've got his testimony on the
11 subject.
12        MR. ZAKARIN:  He hasn't
13 identified a single production
14 music --
15        MR. MARDEROSIAN:  Incorrect.
16    You haven't listened to what
17 he said.
18        MR. ZAKARIN:  I was --
19        MR. MARDEROSIAN:  You -- save
20 it for trial, Don.
21        MR. ZAKARIN:  No.
22        MR. MARDEROSIAN:  Save it for
23 trial and let's see --
24        MR. ZAKARIN:  That's not how
25 it goes.

KOHN

1
2        MR. MARDEROSIAN:  -- if the
3 jury accepts your argument on
4 this.
5        MR. ZAKARIN:  That's not how
6 it goes, Mick.  My questions get
7 answered, or else I don't leave
8 them.
9        MR. MARDEROSIAN:  His
10 question -- he did answer your
11 question, you're now just arguing
12 it.
13    A   You just don't like the
14 answer to the question.
15    Q   Well, you -- if you gave an
16 answer, I might like it.
17    I asked you --
18        COURT REPORTER:  Excuse me.
19 Gentlemen, please.
20        MR. MARDEROSIAN:  Hold on,
21 Don.  Give her -- give her a
22 moment.
23        COURT REPORTER:  I just need
24 you to speak one at a time,
25 please.

KOHN

2    MR. ZAKARIN:  We'll try.
3    Q   You've talked about custom
4 and practice and my question was very
5 simple.  What production music
6 libraries have you ascertained allocate
7 blanket license income on any kind of a
8 usage basis?  We know APM does it on a
9 reported usage basis.  What else?  What
10 other production music library
11 allocates it, however they allocate it?
12 Do you have any information?  Any
13 information?
14    A   I suspect that every other
15 one does it except your client today
16 and maybe First Com if it still exists.
17    Q   I didn't ask what you
18 suspect.  I asked what you know, facts.
19    A   I know the customs and
20 practices of the music industry.  I
21 can't tell you over 20 years of being
22 in the industry and discussing with
23 people who know what they're -- I may
24 have discussed it with Adam Taylor, who
25 knows, because we did discuss his

KOHN

2 business when I met with him five, six
3 years ago, whenever it was.  But I
4 learned this over a period of time.
5 And it is not fair -- my opinion is
6 that it's not fair or reasonable to
7 base it upon the number of songs.
8 Nobody apparently but your client does
9 it.  You have not and your experts have
10 not pointed to anyone who does it that
11 way.
12    Q   You're the one who's talking
13 about custom and practice.
14    A   Yes.
15    Q   I'm not.  So I want to know
16 what the custom and practice is of
17 production music libraries allocating
18 it.  You have a statement --
19    A   Production.
20    Q   -- the basis for the
21 statement -- you've talked about the
22 ASCAP and BMI.  You've talked about
23 record companies.  You've talked about
24 black box.
25    MR. MARDEROSIAN:  He's talked

KOHN

2 about your own experts, Don.
3    Q   What you haven't talked
4 about -- we have Adam Taylor who says
5 that they do it on a -- on a reported
6 usage basis and that's fine.  And Adam
7 Taylor says what he says.  And it's in
8 his report.
9    I'm asking you what
10 production music libraries do you
11 know -- do you know how other
12 production music libraries allocate
13 blanket license income?
14    A   Yes, they all do it.
15    Q   Who?
16    A   They all do it except
17 Extreme.  APM is one example of it.
18 And over the years --
19    Q   Give me another examples.
20    A   Over the years -- I can't
21 imagine -- my opinion is it's not fair
22 or reasonable.
23    Q   I didn't ask that.  You can
24 have that opinion.
25    MR. MARDEROSIAN:  He told you

KOHN

2 Sony Music, Don.  You're leaving
3 that out.
4    MR. ZAKARIN:  Sony Music is
5 not a production music library.
6    MR. MARDEROSIAN:  He told you
7 how they handle the publishing in
8 regard to those uses.
9    MR. ZAKARIN:  Black Box.  I
10 understand black box.  That's not
11 the question.
12    A   Yes.  The music industry
13 allocates money that's presented on a
14 blanket basis whether it's the leftover
15 advance, whether it's black box money,
16 whether it's income.  There's no one
17 who's going to -- there's no one except
18 maybe one of your witnesses yesterday
19 who suggested that that might even be
20 close to being fair.  It's not.
21    I don't have to talk to every
22 production music library in the world.
23    Q   Do you have to talk to any?
24    A   I don't even know all of the
25 ones that do it on a blanket basis,

Page 418

KOHN

1
2  okay.  Has your expert witnesses
3  reported back as to who other -- anyone
4  other than First Com that does it?  You
5  have three -- you have an expert
6  witness who is the CEO of one of the
7  largest production music libraries in
8  the world.
9      Q    Yes.
10     A    Your client is the CEO of a
11 production music library, one of the
12 largest in the world.
13     Q    Yes.
14     A    Have either of them suggested
15 that anyone other than Extreme does it
16 this way?  What do they say?
17     Q    Are you aware of how many
18 production music library --
19     A    I didn't see that.
20     Q    Are you aware of how many
21 production music libraries there are in
22 the United States?
23     A    How many?  The number?
24     Q    Yeah.
25     A    No.  It must be a large

Page 419

KOHN

1
2  number.
3      Q    And with the exception of
4  Adam Taylor's testimony in his report
5  about on a reported usage basis, do you
6  know how any of them -- any of these
7  many numbered production music
8  libraries allocate blanket license
9  income?  Do you know how any of them do
10 it?
11     A    Yes, they do it on a usage
12 basis.
13     Q    And what's the basis for your
14 statement that they do it on a usage
15 bassi?
16     A    Because everybody does it
17 that way in the business except your
18 client.
19     Q    So this is just a conclusion.
20 It's not based upon your knowledge of
21 any facts, right?
22         MR. MARDEROSIAN:  You're
23     arguing with him.  You're arguing
24     with him.  He's answered your
25     question.

Page 420

KOHN

1
2      Q    Have you done a survey of any
3  production --
4      A    Yeah, I did a survey.
5      Q    Of the production music
6  library?
7         COURT REPORTER:  Excuse me.
8     Gentlemen, please.
9         MR. MARDEROSIAN:  You're just
10     arguing.
11        MR. ZAKARIN:  I just want to
12     know the source.
13     A    I haven't been -- I haven't
14 been asked to do a survey and nor have
15 any of your experts come forth with
16 anybody else.
17     Q    So you haven't done a
18 survey --
19     A    Nor has your client.
20        COURT REPORTER:  Excuse me.
21     I'm going to need to take a break.
22        MR. ZAKARIN:  I know.  I'm
23     sorry.  I'm asking questions, and
24     he's actually answering on top of
25     my questions.

Page 421

KOHN

1
2      Q    You haven't done a survey,
3  right?  I'm not saying you were asked
4  to --
5      A    I have not done a
6  questionnaires kind of survey.
7      Q    And you haven't done a census
8  or questioned any executives of any
9  production music library about how do
10 they allocate their blanket license
11 income; is that right?  Yes or no?
12     A    In the -- since the start of
13 this case, no, for sure.
14     Q    And you didn't ask them
15 before the start of this case, did you?
16     A    I might have.
17     Q    But you don't recall whether
18 you did?
19     A    I don't recall.
20     Q    Okay.
21     A    How did I come to this
22 knowledge?  I can't remember who I
23 may -- might have talked to in the
24 1990s in researching the book.
25     Q    I understand.

106 (Pages 418 - 421)

Page 422

KOHN

1
2      But it's your opinion,
3  nonetheless, that it's custom and
4  practice to allocate it.  So it's now
5  not on an actual usage basis.  It's on
6  some usage basis?
7      A  You used the word actual
8  usage, I didn't.  I used the word
9  usage.  And you keep doing that.  Your
10 experts keep doing that.
11     It was a strawman.  It was
12 ridiculous for them to go on pages
13 after pages and say that nobody does it
14 on actual usage when they know that
15 everybody does it on usage.  And that
16 was ridiculous.  They look like fools.
17     Q  Well, that's your opinion
18 which is another good opinion.
19     So it's a usage basis now.
20 It's not actual -- it's some sort of
21 usage basis.  That's your testimony?
22     A  That's correct.
23     Q  Okay.
24     A  Some usage basis or projected
25 usage basis.  And those are the words

Page 423

KOHN

1
2  that were used in the contract.  I
3  assume that's what you're moving to
4  next.
5      Q  Yes.  Yes, we are.
6  Excellent.
7      Let's pull out Exhibit 3, I
8  think it is.  I think it's
9  Paragraph 7.3.
10     A  It is.
11     Q  Now, what it says, I think --
12 let's see if I can recall your quote
13 from the contract.  Top of Page 12,
14 your quote from the contract says the
15 2011 composer agreement states that the
16 determination or apportion of the
17 relevant share is to be made on a fair,
18 reasonable and practical basis, right?
19     A  Right.
20     Q  And actually that's not the
21 complete quote, is it?
22     A  This is a summary of the
23 quote.
24     Q  The real quote says --
25     A  The only part I quoted was on

Page 424

KOHN

1
2  a fair, reasonable, practical basis.
3      Q  I know that.  And then it
4  says there after that, what basis to be
5  determined in company and the HM
6  transferee's sole discretion, right?
7      A  Yes.
8      Q  You understand what sole
9  discretion means?
10     MR. MARDEROSIAN:  Objection.
11     Vague.
12     A  I understand what the word
13 fair and reasonable and practical basis
14 means.  I know that when a contract,
15 whether it has sole discretion or not,
16 it is going to be subject to an implied
17 obligation of good faith and fair
18 dealing.
19     Sole discretion doesn't mean
20 they can ignore what's in that
21 paragraph.  They wouldn't have been
22 able to -- why didn't they just simply
23 say they can agree to apportion the
24 licensing income on their sole
25 discretion, period?  They didn't do

Page 425

KOHN

1
2  that.
3      Q  I agree.
4      A  Right?  They led the person
5  who was reading this contract, the
6  person who didn't draft the contract,
7  two young songwriters signed a contract
8  because they're reading words like
9  fair, reasonable and practical.  Anyone
10 would read it that way.  And then it
11 says without prejudice to the
12 generality of the foregoing company and
13 HM transferees reserves the right to
14 apportion the licensing income, the
15 blanket licensing income on the ways
16 that are standard with the customs and
17 practices of the music industry.
18 Any -- on any actual usage basis
19 determined by company.  On any
20 projected usage basis determined by
21 company or on a basis which is a
22 composite of the methods described
23 above.  It doesn't have a D that says
24 or none of the above.  All right?
25     Q  Reserves the right --

107 (Pages 422 - 425)

Page 426

KOHN

1
2    A   Anyone reading this paragraph
3  is going to not be able -- not use the
4  word sole discretion to wipe out
5  everything else that's in it.  You know
6  that very well.  If you are on my side
7  of the table, you would be agreeing
8  with me a thousand percent.
9    Q   Don't be so sure.
10   A   Yes, you would.
11   Q   Sole discretion is to make
12 the determination that is fair,
13 reasonable, and practical.  I agree
14 with that.
15       MR. MARDEROSIAN:  I'm going
16     to object that it's calling for a
17     legal opinion and conclusion.
18   A   So you're saying that -- if
19 that was a question, that the word sole
20 discretion cannot be read in the
21 context -- it can only be read in the
22 context of fair, reasonable and
23 practical.  But it can't be read in the
24 context --
25       COURT REPORTER:  Sir, I'm

Page 427

KOHN

1
2    really going to ask you to slow
3    down. It's getting late.  The
4    context of fair and reasonable and
5    practical.
6    A   That you're suggesting that
7  sole discretion is going to -- I forgot
8  our train of thought -- given the court
9  reporter had trouble saying what I
10 said, I lost my train of thought.
11   Q   All I'm saying is that the
12 general proposition is they're entitled
13 to allocate blanket license income in a
14 fair, reasonable, practical method the
15 basis of which they could determine in
16 their sole discretion.  And they
17 reserve the right without prejudice to
18 that sole discretion to do so in a
19 fair, reasonable and practical basis.
20 They reserve the right to do it in
21 these other methods.
22       MR. MARDEROSIAN:  I'm going
23     to object.
24       The question is calling for a
25     legal opinion and conclusion.  And

Page 428

KOHN

1
2    is vague and ambiguous and an
3    incomplete hypothetical.
4        And it's been asked and
5    already answered.
6    A   If -- then why -- if they
7  were going to allocate it on the basis
8  of the number of songs, why didn't it
9  say without prejudice of the generality
10 of the foregoing company reserves the
11 right to apportion it based upon the
12 number of songs?  Because if somebody
13 read that in the contract, they'd say
14 I'm not signing this contract.  There's
15 no way I'm going to have them increase
16 the size of the catalog and reduce the
17 amount of money I'm getting for my
18 songs regardless of how popular they
19 are.
20       They were already told by
21 that point that they were producing for
22 them some of the best songs they've
23 got, some of the ones that -- that's
24 why they signed them up to this
25 contract to begin with.

Page 429

KOHN

1
2        No, I would not -- it is not
3  my opinion to interpret this contract
4  as basically making the words after
5  without prejudice to the generality of
6  foregoing, make the words -- all those
7  words completely meaningless.  They
8  have all the meaning in the world
9  because they're perfectly consistent
10 with music industry, custom and
11 practice.
12   Q   So it's your view that these
13 A, B, and C are requirements as opposed
14 to simply reserving the right to use
15 those methods?
16       MR. MARDEROSIAN:  I'm going
17     to object. It's calling for a
18     legal opinion and conclusion.
19       It's vague and ambiguous.
20     Incomplete hypothetical.
21   A   They provide as Justice
22 Cardozo said, and I forgot his words,
23 the -- he doesn't use the word context,
24 but fair, reasonable and practical,
25 okay, are focused or modified or are

108 (Pages 426 - 429)

Page 430

KOHN

1
2 given meaning by A, B, and C.  It
3 doesn't say it has to be an actual
4 usage, and I've never said it had to
5 be.  I mean actual usage in the way
6 your experts said it had to be perfect,
7 it would have to be based upon, you
8 know, electronic evidence recorded in
9 realtime, whatever actual is in their
10 minds.  But it does say projected usage
11 and it does say a composite of the two.
12 That is what gives meaning to fair,
13 reasonable and practical.
14       Sole discretion means it's
15 going to be within the realm of fair,
16 reasonable and practical on a usage
17 basis.  Look, if you don't have the
18 reports just like, I assume Adam Taylor
19 does if a report goes missing, they're
20 going to base -- I've seen -- I don't
21 know where I've seen it.  I've seen
22 production music library contracts, and
23 I'm going to have to go through my file
24 to find it because it would be in
25 storage, I have seen production music

Page 431

KOHN

1
2 library contracts that have blanket
3 synchronization licenses in it and it
4 says exactly the detail of what
5 projected usage is.  That if we don't
6 have an actual report we can use what's
7 otherwise available to approximate what
8 the usage would have been.  And that's
9 the sole discretion that they have to
10 do.
11       You follow me?
12    Q   I understand what you're
13 saying.
14    A   That's what it is.
15    Q   Okay.
16       That's your view.
17    A   Right.  Right.
18    Q   And you've now parsed the
19 agreement the way you read the
20 agreement, correct?
21       MR. MARDEROSIAN:  Well, it's
22    argumentative and it's calling for
23    a legal opinion and conclusion.
24       He's answered the question
25    and given you his opinion.

Page 432

KOHN

1
2    Q   Let's turn back -- let's deal
3 with the blanket licensing allocations.
4       You agree with me when a
5 blanket license is issued, a blanket
6 sync license is issued, the licensor
7 doesn't know what works in its library
8 will be used; is that right?
9       MR. MARDEROSIAN:  I'm going
10    to object.
11       That's an incomplete
12    hypothetical.
13    Q   You can answer the question.
14       MR. MARDEROSIAN:  And it's
15    vague and ambiguous.
16       And it doesn't apply to the
17    facts of this case.
18    Q   You can answer the question.
19    A   Even though a blanket sync
20 license may use that title on the top
21 of a document to describe what's
22 basically in it, what's happening is a
23 series of sync licenses, okay, are
24 being issued on a blanket -- on a -- a
25 catalog is being offered in which

Page 433

KOHN

1
2 someone can choose which songs in which
3 to sync into audio visual works and
4 that is what is being licensed.
5    Q   Any or all --
6    A   Any -- well --
7       MR. MARDEROSIAN:  Excuse me.
8    We're stopping.  You're
9    interrupting him again, Don.
10       MR. ZAKARIN:  I apologize.
11       MR. MARDEROSIAN:  We can't do
12    that.
13    Q   I apologize if I was
14 interrupting.
15    A   And I apologize for all the
16 times I interrupted you.
17       MR. MARDEROSIAN:  Let's take
18    a breath here.
19       THE WITNESS:  Okay.
20    Q   Go ahead.
21    A   Could you state the question
22 again?  Well, now I've lost my train of
23 thought.
24    Q   I'll help you.
25       What I said was on the

David Feldman Worldwide
A Veritext Company
800-642-1099                                      www.veritext.com

KOHN

1
2 BMI and ASCAP to make it a more rapid
3 process, I suppose.
4    Q   Do you have any familiarity
5 with the finances of production music
6 libraries?
7       MR. MARDEROSIAN:  Objection.
8          Vague.  Overbroad.
9    Q   You can answer the question.
10    A   No, I don't have any -- other
11 than the testimony that I've been able
12 to provide and the expertise that I
13 have about customs and practices.  No,
14 I don't have -- when you say finances
15 I'm thinking of balance sheet income
16 statement --
17    Q   Yeah.
18    A   -- cash flow, things like
19 that.
20    Q   Yes.
21    A   No.
22    Q   We're talking the same
23 language.
24    A   Right.  No.  Nor have I been
25 asked to opine on any of that.

KOHN

1
2    Q   I understand.
3       Do you have any understanding
4 how much a usage apportionment approach
5 might cost a production music library
6 to implement?
7    A   Depends upon the
8 circumstances.  Apparently APM uses
9 usage reports; and they seem to find it
10 not burdensome, otherwise why would
11 they do that.
12    Q   You're aware --
13    A   Well, they would do it for
14 obligations for -- contractual
15 obligations perhaps.
16    Q   You're aware from having read
17 Adam Taylor's report that his view of
18 the reported usage method is that a lot
19 of people whose works are used actually
20 don't get paid?
21    A   I don't recall reading that
22 in the report.
23    Q   Well, on the reported usage
24 basis -- do you understand what APM's
25 reported usage basis is?

KOHN

1
2    A   He wasn't terribly specific,
3 no.
4    Q   Okay.  You understand, don't
5 you, that if usage is not reported to
6 them, then they don't pay anybody
7 who's -- for which they don't get
8 reports?
9    A   Well, maybe they'll get sued
10 too.  Because most production music
11 libraries, my understanding of the
12 customs and practices in the business
13 and from agreements that I've seen in
14 the past is that when you don't get a
15 usage report you do allocate the money
16 on some projected basis based upon the
17 usage reports that you do get.
18    Q   When you say from your
19 understanding, you're talking -- we've
20 already covered that.  So I'll skip
21 that.  We covered that pretty well.
22    A   Thank you.
23       (Whereupon, a brief recess
24    was taken.)
25    Q   On Page 14 of your report,

KOHN

1
2 I'll ask you to turn there, you say
3 Viacom Extreme's issuance of direct
4 reproduction of public performance
5 licenses to Viacom for just one dollar
6 was a violation of the composer -- Aron
7 and Robert's composer agreements.  And
8 on Page 83 of your report you address
9 that again.  On Page 83 you say, and
10 there's even a caption on it, Viacom
11 Extreme's secret issuance of direct
12 reproduction and public performance
13 licenses to Viacom for just one dollar
14 was a violation of Aron and Robert's
15 composer agreements.
16       Then you say that it appears
17 that Viacom Extreme joint venture
18 actually granted back to Viacom not
19 only a blanket reproduction license but
20 a blanket direct public performance
21 license to all of Viacom's broadcasters
22 and producers.  And then it continues
23 on and names a number of them.
24       And on Page 84 you say
25 that -- you say it again, thus it

114 (Pages 450 - 453)

Page 466

KOHN

1
2    A   Well, these are unique -- no,
3  no, no.  When I did -- no, no, no.
4  When I did the looking at TuneSat I
5  eliminated -- I filtered out everything
6  that was not a Bayhem song.  There were
7  only Bayhem songs in my 16,000.
8    Q   I understand.
9    A   And presumably on the 23 --
10  21,000.
11    Q   There was only Bayhem songs
12  in yours?
13    A   Only Bayhem songs.  Yeah, I
14  filtered everything else out.  I
15  didn't -- I -- of course I did.  Why
16  would I include Lonely Orchard stuff
17  with stuff that's only involved in this
18  case?
19    Q   Well, apparently, Karen
20  Rodriguez didn't filter it out.
21    A   Well --
22        MR. MARDEROSIAN:  Hold on.
23  Hold on.
24    A   -- you'll have to -- you ask
25  her.

Page 467

KOHN

1
2        MR. MARDEROSIAN:  That's
3  argumentative.  Assumes facts not
4  in evidence and mischaracterizes
5  the evidence.
6        MR. ZAKARIN:  Except that
7  it's true.
8    A   You'll have to --
9        MR. MARDEROSIAN:  It's not
10  true.
11    A   Well, the number is either
12  going to be 16,000 or it's going to be
13  21,000 or something in between.  You
14  know, there's a correct number.
15    Q   How many of them -- of those
16  16,000 are Viacom, if you know?
17    A   I didn't do that filter.
18    Q   Because we didn't add up --
19  and this came from Karen Rodriguez
20  anyway, right?
21    A   Yes.
22    Q   So we'll skip that.
23        You're aware of the BMI --
24  excuse me, ASCAP consent decrees,
25  aren't you?

Page 468

KOHN

1
2    A   Generally.  I haven't read
3  them in years.
4    Q   Sadly, I have much more
5  familiarity I think.
6        But you're aware generally
7  that they preclude publishers and
8  writers from granting ASCAP and BMI
9  exclusive public performance rights,
10  aren't you?
11    A   So what?
12    Q   So what?  I didn't ask you so
13  what.  I asked you whether you're aware
14  of that?
15    A   They -- it doesn't preclude
16  the music publishers from granting it.
17    Q   It actually requires that
18  music publishers can't grant exclusive
19  rights to ASCAP and BMI.  They have to
20  be --
21    A   That's right.  That's right.
22  They have to reserve the right.  It's a
23  non-exclusive basis so they have to
24  reserve the right to issue direct
25  blanket performance licenses.  I saw

Page 469

KOHN

1
2  that in Barry's report.
3    Q   You knew it beforehand,
4  didn't you?
5    A   Yes.
6    Q   And broadcasters are also
7  fully aware of it, aren't they?
8    A   Yes.
9    Q   And you're aware, aren't you,
10  that broadcasters -- a number of
11  broadcasters will demand direct
12  performance licenses?
13    A   Yes, they will.
14    Q   Okay.
15    A   When they can get it.
16    Q   You can say no, but you can
17  also lose the license if you say no;
18  isn't that right?
19    A   That's correct.
20    Q   Okay.
21    A   Sometimes they need to have
22  the music they need to have and --
23    Q   Well, need to have the music
24  they need to have is more frequent with
25  popular music library -- popular music

118 (Pages 466 - 469)

Page 470

KOHN

1
2 publishers rather than production music
3 libraries, wouldn't you agree?
4     A   I wouldn't necessarily put it
5 that way.  But I think the way you've
6 put it is that production music
7 libraries have been more amenable to
8 granting direct public performance
9 licenses than commercial -- what your
10 client called -- other kinds of music
11 publishers, traditional music
12 publishers.
13     Q   Traditional music publishers
14 have evergreens and must-haves as
15 opposed to more generic music?
16     A   Right.  Because -- because
17 production music libraries have this --
18 it's not because the music is any
19 worse.
20     Q   No, nobody is saying quality.
21     A   But they also have the
22 ability to grant the sound recording at
23 the same time, and that gives them
24 their special advantage.
25     Q   But they typically don't have

Page 471

KOHN

1
2 must-have works or evergreen works.
3 They have genres that are used by
4 broadcasters.
5     A   Sure.
6     Q   And popular music is  just --
7 costs much more and you have much more,
8 if you excuse, me F-U power when you
9 have popular music?
10     A   Sure.
11     Q   I didn't think that it was
12 controversial.
13     A   I don't think so either.  But
14 you can't -- you can't jump to the
15 conclusion just because the consent
16 decrees say that publishers can issue
17 direct licenses, that a publisher will
18 issue a direct license and then not
19 allocate the money coming back
20 properly.
21     Q   But I'm not dealing with
22 allocation.  I'm only dealing with,
23 right now --
24     A   But the way, one of your
25 experts had used -- I think two of your

Page 472

KOHN

1
2 experts had quoted a consent decree in
3 connection with their argue.  That it
4 was okay not to use a usage basis in
5 their allocation.  Yes, they did.  And
6 I thought that was -- that was
7 incorrect.
8     Q   I don't think that they say
9 that, but they say what they say.  So
10 we don't have to debate it between you
11 and I.  I think the simple point that
12 we're just trying to make is that the
13 consent decrees make it impossible for
14 ASCAP and BMI at least to have
15 exclusive licensing rights and
16 performance rights.  They can't have it
17 exclusively.
18     A   Yes.
19     Q   And broadcasters know that
20 and --
21     A   We've already been through
22 this, right?
23     Q   So we agree.
24         It's not your contention, is
25 it, I just want to make sure, that if a

Page 473

KOHN

1
2 broadcaster, CNN, I think there are a
3 couple of others, came to Extreme and
4 said we want to license, we want a
5 direct performance license.  It's not
6 your contention that Extreme should
7 have rejected that and potentially lost
8 the license, is it?
9         MR. MARDEROSIAN:  Objection.
10         Incomplete hypothetical.
11         Calls for speculation.
12     Q   Let me rephrase it.  Let me
13 rephrase it.
14     A   Okay.
15     Q   It's not your contention, is
16 it, that if a broadcaster, whether it
17 was CNN or another broadcaster said
18 we're willing to enter into a blanket
19 license with you but only if you grant
20 us also a direct performance right,
21 that Extreme should have simply said
22 no, we won't do it?
23     A   If Extreme is not prepared to
24 do the work necessary to comply with
25 its contracts with songwriters to

KOHN

1
2    hypothetical and vague.
3       A   I'm not going to get -- so,
4    you know, you'll take my answer and
5    take it out of context.  Because we
6    just had a colloquy here among several
7    things.
8          So to state the complete
9    hypothetical, and that is, a
10   broadcaster goes to a copyright owner
11   and wants to have a sync license
12   coupled with a direct public
13   performance license for a particular
14   song and recording with that song,
15   right?
16      Q   Comes to the production music
17   library, yes.
18      A   Right.  And let's say there's
19   one or two songwriters who on the back
20   end will be allocated their, let's say
21   it's 50 percent of the license fee.
22      Q   Um-hum.
23      A   I don't see any issue on the
24   allocation side.  We know what the
25   usage is.  It's going to be -- the

KOHN

1
2    contract is going to say you're allowed
3    to use it in one episode or ten
4    episodes, or you can use it in as many
5    episodes as you want during the year,
6    you could do whatever basis it is.
7       Q   It's not a blanket.  It's not
8    a blanket.
9       A   Right.  It's a discreet
10   license.
11      Q   I agree.
12      A   Of course they have -- the
13   copyright owner has the right to do
14   that.
15      Q   Okay.  I just wanted to make
16   sure.
17          Turn again, if you would --
18   first of all, turn to Page 14 of your
19   opinion again, if you would.
20          This is the second to last
21   bullet point on 14.  We're referring
22   really to your Exhibit A again, okay?
23   And it says with respect to a fair and
24   reasonable market value for the body of
25   the sync licenses as negotiated by

KOHN

1
2    Viacom Extreme with third party
3    licensees for the use of Aron and
4    Robert's music in commercial
5    advertising, it's my opinion that Aron
6    and Robert are entitled to the total
7    sum of 987,500 which represents their
8    50 percent share of the market value of
9    the licenses.  Right?
10      A   I'm looking at page --
11   remember, whatever these bullets did, I
12   did what I could at the very end to
13   summarize this so that the reader could
14   see.
15      Q   I know.
16      A   So they're kind of like
17   headlines and things.  So Page 85 is
18   where I talk about that.
19      Q   Yes.
20      A   So why don't we just go
21   there?
22      Q   Well -- okay.  85, here you
23   say it's for TV commercials and other
24   promotional uses.  That's what you say
25   in the middle of the page?

KOHN

1
2       A   Right.
3       Q   The bullet point only talks
4    about commercial advertising?
5       A   Well, that's what I said.  It
6    was meant to be a summary.  It may not
7    be a accurate summary.  It was done at
8    the very last minute to try to
9    facilitate people understanding where
10   the document's going.  It was a long
11   document and I figured I'd try to do
12   the best I can to give you a guideline.
13   Even quoting it like it's the gospel
14   and, as you just found out, it's not
15   the gospel.  The gospel is in the body
16   of the agreement, I mean the body of
17   the report.
18      Q   I view the entire report as
19   the body of the report, but that's
20   helpful.
21          So you're agreeing then that
22   it's not merely on Exhibit A commercial
23   licenses.  There's promos, there's
24   trailers?
25      A   Various things.

KOHN

1
2    Q   There's a number of things.
3  And I think you've already testified
4  that essentially the values were
5  provided to you by Aron and Robert and
6  you assessed them?
7    A   Correct.  The copyright owner
8  or any property owners are aloud to
9  make their own assessment as to the
10 value of their own property.
11   Q   Right.  Subject to the
12 contract, but --
13   A   Right.
14   Q   Let's talk about this for a
15 little bit.
16       They provided you with some
17 licenses that they had entered into,
18 correct?
19   A   Yes.
20   Q   Did they provide you any of
21 their gratis licenses to look at?
22   A   No.
23   Q   So they selected the licenses
24 that they wanted to show you?
25       MR. MARDEROSIAN:  Only if you

KOHN

1
2  know that that's the case.
3    A   I don't -- yeah, that's true.
4  All I know is I got a set of licenses
5  that were like, I don't know whether it
6  was 10 or 15 are 20.  Something like
7  that.
8    Q   They provided you with 10 or
9  15 licenses.
10   A   That's true.
11   Q   Do you know how many licenses
12 of their works they've entered into?
13   A   No.
14   Q   And do you know the range of
15 values of the licenses for their works
16 they've entered into?
17   A   Not entirely.
18   Q   Okay.  And have you seen
19 their answers to interrogatories where
20 they identify all of the licenses --
21 not they'll produce them, but they
22 identify the license amounts --
23   A   Yes.
24   Q   -- and include about
25 15 percent of them being gratis?

KOHN

1
2    A   I do remember that.
3    Q   Okay.
4        So other than looking at
5  these 10 or 15 licenses, did you do any
6  other kind of a survey in order to come
7  up with the values that you thought
8  were fair and reasonable?
9    A   I have done surveys.  Not
10 written surveys, but surveys over the
11 past 20 years which I've kept up to
12 date in terms of what are reasonable
13 license fees for the use of music in
14 commercials and theatricals and
15 television programming.  I summarize
16 that or I try to keep it up to date in
17 the 26 chapter of Kohn Music Licensing.
18       And so -- yeah, so I didn't
19 do anything beyond all the accumulated
20 knowledge that I've had over the years
21 in talking to people and talking to as
22 a -- I feel like in a way I'm like a
23 reporter talking to various people in
24 the industry.  I might know more than
25 any individual at any particular music

KOHN

1
2  publishing company because they only
3  know what they do.  They tell me,
4  and then I verify it with somebody
5  else.  And somebody will say, that's
6  sounds too high to me or sounds too
7  low.  They would have antitrust
8  problems in talking to each other about
9  what they charge for license fees, but
10 they have no problem talking to me.
11   Q   You've done your -- you've
12 done a lot of work in terms of your
13 book.  Did you do a study of the
14 license fees being paid for production
15 music outside of looking at the 10 to
16 15 licenses given to you by Aron and
17 Robert?
18   A   Yeah.  There's a -- well,
19 when you say study, I would say that my
20 Chapter 26 does talk about licenses for
21 production music libraries -- licenses
22 of music from production music
23 libraries.  I don't recall actually the
24 depth to which I was doing that
25 because, remember, production music

Page 486

KOHN

1 libraries license both the sound
2 recording and the musical work.  And
3 they're providing some real value there
4 in reducing the transaction cost of the
5 licensees.  So it's a level of
6 refinement that I might consider
7 putting in the next edition of my book.
8    Q    Did you go to and examine the
9 backup for your book in assessing the
10 reasonableness of these values given to
11 you by Aron and Robert?
12    A    I don't have any backup in
13 any written form for any of the license
14 fees that I have in my book.
15    Q    Did you -- given that, did
16 you consult with any source to try to
17 determine the reasonableness of the
18 fees that they propose to you, you
19 know, in assessing?  Did you do any
20 source at all?
21    A    I wouldn't have to do that
22 because whatever sources I had over the
23 past ten years or so to update the
24 figures that I had in my book were my

Page 487

KOHN

1 sources for determining these license
2 fees.
3    Q    And did you compare what you
4 have in your book for production music
5 license fees ranges to the numbers that
6 Rob and Aron gave you?  Did you consult
7 your book at all in doing it?
8    A    I did consult my book, but I
9 also took a look at my license fees
10 that are in my book for production
11 music.  And I took a look at the
12 license fees that they were issuing for
13 production music.  Or I would say if
14 you want to call it production music,
15 that's what they do in Lonely Orchard
16 Music Publishing.  They're producing
17 production music with their sound
18 recordings.  And I found -- they gave
19 me a license that said they got $75,000
20 sync fee for one.  They got a 50,000
21 sync fee for another one.  They got
22 20,000 -- 10,000, I think, was the
23 lowest which is the one they -- they
24 got from -- in 2010.

Page 488

KOHN

1    I actually sorted them by
2 dates.  I went from 2010 to 2017 to
3 make sure that I'm kind of matching
4 their growth and their popularity of
5 their songs.  I actually listened to
6 the songs to make sure that what I was
7 hearing from Mulholland Drive, which I
8 was able to do by going to the Extreme
9 website and just click on it and use my
10 TuneSat account or access.  And
11 listened to the songs to say, okay,
12 what was in Lonely Orchard sounds
13 production values that are just as
14 good, equivalent to the ones that they
15 have given on a work-for-hire basis to
16 Viacom.
17    So I felt that they were
18 comparable and they -- I'm watching
19 them get 60,000, 55,000 option 85,000,
20 you know, 30,000, 40,000.  I see all of
21 that.
22    Q    But you didn't see any of the
23 gratis licenses?
24    A    I didn't see any of the

Page 489

KOHN

1 gratis licenses.
2    Q    You didn't see any of the
3 lower value licenses.  They selected
4 what they wanted you to see?
5    MR. MARDEROSIAN:  Well, no,
6 you're arguing with him.
7    And you asked that question
8 before, Don; and he's already told
9 you he doesn't know if that's the
10 case.
11    You've had your opportunity
12 to depose Aron and Robert, and
13 you'll hear them again at trial
14 explain all of this.
15    So I'm going to object.  It's
16 argumentative and you're just
17 asking this witness to speculate.
18    A    There are a variety of
19 reasons why a gratis license might be
20 given.  I felt I was getting a good
21 overview.  It covered the entire
22 time frame.  It covered things that
23 were very similar to the licenses that
24 were listed in the exhibits in my

123 (Pages 486 - 489)

KOHN

1          KOHN
2 report.  And what the fees that we came
3 up with was reasonable -- were
4 reasonable.
5     Q   By the way under the
6 agreement, the 2011 agreement, is there
7 any provision that gives Robert and
8 Aron the right to second guess the
9 license fees that Extreme was able to
10 obtain?
11        MR. MARDEROSIAN:  I'm just
12    going to object.  It calls for a
13    legal opinion and conclusion.
14        It's called good faith and
15    fair dealing as we all know which
16    is a legal opinion and conclusion.
17        MR. ZAKARIN:  Could you swear
18    in Mr. Marderosian?  He wants to
19    testify.
20        MR. MARDEROSIAN:  You're
21    asking for a legal opinion, Don.
22        MR. ZAKARIN:  No, I asked him
23    whether there's a provision in the
24    agreement that gives him the right
25    to second guess.

1          KOHN
2        That wasn't a legal opinion.
3        MR. MARDEROSIAN:  You both
4    scraped at the agreement and
5    there's an implied covenant of
6    good faith and --
7        MR. ZAKARIN:  You're
8    testifying again, Mr. Marderosian.
9        MR. MARDEROSIAN:  Well,
10    you're asking me --
11    A   No, he's just repeating what
12 I said earlier.
13    Q   I understand.
14        I asked you whether there was
15 a provision, not whether there's an
16 implied covenant.
17    A   I would consider an implied
18 covenant a provision of the agreement.
19 I would consider -- I would consider
20 given other things that I found in the
21 evidence as to how these two
22 songwriters were treated by their music
23 publishing company.  And I went through
24 a long list of things that I felt were
25 breaches of contract -- and that is a

1          KOHN
2 legal conclusion and I apologize for
3 that but that's a summary -- where I
4 felt this -- I see a $14,000 license
5 fee for the use of music in Land Rover.
6 I see small license fees, Starbucks.
7 They were way, way under.
8    Q   Way, way under what?
9    A   Way, way under what I thought
10 was going to be -- based upon what they
11 were getting for their quality of
12 music.  You can't just say this is
13 just -- oh, just a piece of production
14 music.  Just some genre thing.  These
15 were some of the best songs that you
16 guys had.
17    Q   You listened to the entire
18 library?  Did you listen to Hans Zimmer
19 stuff?
20    A   No, I wasn't giving it a
21 qualitative judgment.  I did a
22 quantitative judgment based upon
23 reports that you provided during this
24 litigation.
25    Q   Two libraries, not all the

1          KOHN
2 libraries.
3    A   They're the two libraries
4 that one says Mix Tape and one says
5 Hype and they seems to be the two --
6 where are the rest?  Show us the rest,
7 and we'll see.
8        (Excerpt from the book
9    entitled, Kohn On Music Licensing,
10    was marked K Exhibit 6, for
11    identification, as of this date.)
12    Q   I don't have to.
13        I'm going to give you what
14 we'll mark as Exhibit 6, another page
15 from your book and your father's book.
16        And this relates to value.
17 I'm going to read under quantitative
18 factors effecting value.
19        Do you see that?
20    A   Yes.
21    Q   And it says, about halfway
22 in, a music publisher with thousands of
23 songs in its catalog and with years of
24 experience in licensing music is likely
25 to have access to much of the

124 (Pages 490 - 493)

KOHN

2    MR. ZAKARIN: That's the
3  answer.
4    COURT REPORTER: Oh.
5    MR. ZAKARIN: I don't have an
6  answer.
7    Q   They could have been paid
8  nothing.
9    MR. MARDEROSIAN: And then he
10  disagreed with you. He said it
11  could be higher.
12    MR. ZAKARIN: You can't
13  testify.
14    MR. MARDEROSIAN: I'm not
15  testifying. It's just elementary
16  and juvenile this type of
17  examination.
18    MR. ZAKARIN: Thank you.
19    A   They would not have granted a
20  license for nothing. They would not
21  have granted a license for 4,000, they
22  would probably have granted it in the
23  hundreds of thousands.
24    Q   Hundreds of thousands?
25    A   Yes.

KOHN

2    Q   So your -- it's your
3  testimony that if they had asked for
4  hundreds of thousands, they would have
5  gotten it and that's what your
6  testimony is?
7    A   That's what -- you know, I
8  think on that one I have $200,000 for
9  Starbucks, right?
10    Q   Yeah. You think that's what
11  they would have gotten?
12    A   I think that that is well
13  within reason for that song.
14    Q   And that's based upon your
15  examining 10 to 15 licenses?
16    A   No, it's based upon -- yeah,
17  the licenses as well as what I know
18  commercial advertisements get from
19  companies the size of Starbucks.
20    Q   Okay.
21    A   That license was granted
22  only -- if you look at the date, it
23  says 2/16/2017, that's about a -- only
24  about a year before this litigation
25  began. All right?

KOHN

2    Q   And your point is?
3    A   And you already -- well, you
4  already know it's one of your top
5  songs. And Starbucks comes along; and
6  you grant it for $4,000.
7    Q   And half of the license fee
8  at least goes to Extreme, right, which
9  it shares with Viacom?
10    A   Yeah. Yes.
11    Q   And is it your view that
12  Extreme wants to make as little money
13  as it can?
14    A   I am not saying that they --
15  what their goal should be. I'm saying
16  given everything that's occurred in
17  this, I am suspect about the license
18  fees that were gained by -- garnered by
19  Extreme for Rob and Aron's music.
20    Q   But you've never licensed
21  production music on your own? You've
22  never negotiated or issued --
23    A   I've negotiated sync
24  licenses.
25    Q   -- for a production music

KOHN

2  library?
3    A   What does it -- you know,
4  I've negotiated sync licenses for
5  theatricals on both sides. I've
6  advised music publishing companies who
7  were -- I -- people -- I write what I
8  learn in my book and hundreds of others
9  use my license fees for negotiating
10  those synchronization licenses.
11    I would venture to say that a
12  large portion of the music publishing
13  industry uses my Chapter 26 as a
14  guideline.
15    Q   You would venture to guess
16  that?
17    A   I'd venture to guess that
18  many people -- I change it to I -- even
19  the word venture is not even a good
20  word.
21    I would suggest that many
22  people in the music publishing industry
23  look to my book as for guidance as to
24  what to charge for their music for the
25  use in theatrical motion pictures,

127 (Pages 502 - 505)

KOHN

2  A   Yes.
3  Q   And you remember --
4  A   I don't remember the
5 specifics of her testimony.  But I
6 remember the -- seeing the report as an
7 exhibit and it being discussed.
8  Q   And you remember, as well,
9 that, you know, cue sheet for cues
10 works registrations are not even
11 necessary?
12  A   That I'm aware of, yes.
13  Q   Because cue sheet
14 registrations are actually sufficient,
15 and that's what will drive payments?
16  A   I think that's correct for
17 BMI.  I'm not sure about ASCAP.
18  Q   Well, we're talking about
19 BMI.  We'll limit it to BMI.
20     Turn to Page 38 of your
21 report, please.
22  A   39?
23  Q   Thirty-eight, the last
24 paragraph says, and you're talking
25 about Mulholland Drive with respect to

KOHN

2 the Land Rover commercial is what
3 you're talking about.  That's the
4 context.
5     Do you see it?
6  A   The bottom of Page 38?
7  Q   Yes.
8  A   It appears from the evidence?
9  Q   Looking at -- take a look at
10 the two paragraphs above which are
11 dealing with the Land Rover commercial
12 and Mulholland Drive.
13  A   On Mulholland Drive.  Hold
14 on.  Let me look at this.  Go ahead.
15 Okay.
16  Q   The last paragraph, it says
17 it appears from the evidence, however,
18 that the problem stems from the
19 metadata; i.e., the identifying
20 information including title, composers,
21 publishers and associated work IDs and
22 related identifying information), close
23 paren, that Extreme provided to its
24 licensees in connection with Aron and
25 Robert's Mulholland Drive song which

KOHN

2 listed Bergeson, B-E-R-G-E-S-O-N, and
3 Phoenix's names as the composers
4 instead of Aron and Roberts.  Do you
5 see that?
6  A   Yes.
7  Q   Have you seen any documents
8 that reflect that Extreme provided
9 erroneous metadata to anybody in
10 that -- in connection with this use?
11  A   If the Bergeson's and
12 Phoenix's names were listed as
13 composers, it's going to be as a result
14 of metadata being supplied that caused
15 that result.
16  Q   Did you read Dan Pounder's
17 reply declaration?  Is that one of the
18 documents you read on the motion to
19 dismiss?
20  A   Yes.  Yes, I did.
21  Q   Did you look at the exhibits
22 to his declaration?
23  A   I'm sure I did at the time.
24  Q   Did you notice the
25 spreadsheet that was provided to manage

KOHN

2 ad music which listed the metadata for
3 the Land Rover commercial?
4  A   What was the date of the
5 metadata?
6  Q   The date of the metadata --
7  A   What was the date of the
8 metadata you're talking about?
9  Q   That was sent to manage ad
10 music?
11     MR. MARDEROSIAN:  Can you
12 produce the metadata?
13     MR. ZAKARIN:  It's attached
14 to the --
15     MR. MARDEROSIAN:  The
16 metadata isn't.
17     MR. ZAKARIN:  Yes, it is.
18     MR. MARDEROSIAN:  No, it's
19 not.
20     MR. ZAKARIN:  Yes, it is.
21 There's a spreadsheet.
22     COURT REPORTER:  Gentlemen,
23 wait.
24     MR. ZAKARIN:  You're
25 ridiculous.

130 (Pages 514 - 517)

Page 538

KOHN

1
2 the songs between November 2010 and
3 November 2011 --
4     A   There were --
5     Q   -- for which the plaintiffs
6 were not paid performance incomes?  Are
7 you aware as you sit here now?
8     A   I'm aware that they started
9 using it well before registrations were
10 filed.
11     Q   Before works registrations?
12     A   I have not been asked to
13 research or opine on what effect that
14 might have had on their royalty income.
15     Q   Okay.
16         And you have no opinion as to
17 whether it had any effect on their
18 royalty income; is that right?
19     A   Well, I do know that if work
20 registrations weren't filed and the cue
21 sheets were inaccurate, they wouldn't
22 have gotten paid.
23     Q   And if works --
24     A   And we found lots of cue
25 sheets that were inaccurate.  Not to

Page 539

KOHN

1
2 say that I know of every single cue
3 sheet during that period of time.  I
4 don't know.  But there's circumstantial
5 evidence that they probably lost income
6 as a result of the poor administration
7 by Extreme, breach of contract.
8     Q   And if -- and if works
9 registrations were filed and cue sheets
10 were filed with inaccurate information
11 they also wouldn't get paid, right?
12         MR. MARDEROSIAN:  Object to
13     incomplete hypothetical.
14         Assumes facts not in
15     evidence.
16     A   Possibly.
17     Q   You're aware that Aron and
18 Robert were represented by counsel in
19 connection with the 2010 contract,
20 aren't you?
21     A   I'm not aware of that.
22     Q   You didn't read Robert's
23 deposition?
24     A   I read it, but I don't
25 remember it.

Page 540

KOHN

1
2     Q   And you're aware that they
3 were represented by counsel, as well,
4 in connection with the 2011 contract?
5     A   I don't remember that.
6     Q   I think there's just one more
7 topic that I want to cover.  Turn to
8 Page 62 of your report.  And it's under
9 Category F.
10         Do you see that?  Where
11 you're describing what the defendants'
12 contentions supposedly are.  Do you see
13 that?  And Number 2 says, the
14 defendants contend that under the 2011
15 composer agreement Aron and Robert are
16 only entitled to 50 percent of gross
17 receipts generated by the four songs,
18 paren, of the 124 songs delivered that
19 Viacom Extreme placed into the
20 production music library called the
21 Hype music library.
22         Do you see that?
23     A   Yes. I see that.
24     Q   And you say this again I
25 think on Page 67, something to the

Page 541

KOHN

1
2 effect where you say Extreme's COO Dan
3 Pounder contends that the only songs
4 which will generate income to which
5 Aron and Robert will be entitled to a
6 50 percent share is when their songs
7 are placed in the production music
8 catalog entitled Hype Music Library,
9 that if their songs are placed in a
10 catalog entitled Mixed Tape Music
11 Library, they will not earn a
12 percentage of gross receipts.
13         Do you see that?
14     A   Yes.
15     Q   Is it your recollection,
16 Mr. Kohn, that Mr. Pounder said that
17 the only songs on which Extreme was
18 paying sync licensing income was the
19 four songs in the Hype music library?
20         MR. MARDEROSIAN:  I'm going
21     to object.  It's vague.
22     Mischaracterizes the testimony.
23     Q   Is that your testimony?
24     A   He was clear about saying
25 that he only had -- that Extreme only

136 (Pages 538 - 541)

Page 554

KOHN

1          KOHN
2 in September and October working on
3 this engagement?
4     A   I haven't even looked --
5 counted yet.  I haven't put together a
6 bill for it.
7     Q   You can't give me an estimate
8 right now?
9     A   No, I really can't.
10     Q   Are all your opinions that
11 you intend to testify to at the trial
12 of this action or in summary judgment
13 identified in this report?
14        MR. MARDEROSIAN:  Object.
15     It's vague and overbroad.
16     A   Well, at the end, say at
17 trial I reserve the right to use all
18 materials considered in preparing this
19 report including without limitation
20 materials set forth in foregoing
21 sections.  I understand that additional
22 depositions of experts and other
23 witnesses may be conducted in this
24 matter.  I plan on reviewing their
25 deposition transcripts when they become

Page 555

1          KOHN
2 available and reserve the right to
3 supplement or amend this report after
4 such review.  Finally, I reserve the
5 right to supplement or modify this
6 report and the opinions expressed based
7 upon additional facts --
8        COURT REPORTER:  Sir, please.
9        MR. MARDEROSIAN:  You just
10     have to really make an effort
11     to --
12     A   Finally, I reserve the right
13 to supplement or modify this report and
14 the opinions expressed based upon
15 additional facts, documents or other
16 materials that may be brought to my
17 attention.
18     Q   So is the answer no?  The
19 answer is no, that all -- the opinions
20 that you intend to testify to at
21 summary judgment or trial are not all
22 contained within this report?
23     A   The report contains opinions
24 that I've come up to up until the time
25 I issued the report.  I might have

Page 556

1          KOHN
2 further opinions based upon additional
3 information, additional reports that I
4 would supplement the report with.
5     Q   Have you come across any such
6 additional information?
7     A   Lots of additional
8 information.
9     Q   Other than the depositions
10 and reports of defendants' experts,
11 what other information have you come
12 across, just describe generally?
13     A   Exhibits to those reports.
14 Whatever other physical materials that
15 might have been given to me since I
16 wrote my report.
17     Q   Other materials given to you
18 by whom?
19     A   That might have been given to
20 me by somebody.
21     Q   Well, did anybody give you
22 any other materials?
23     A   I don't remember.  I mean,
24 I'm just being -- I'm trying to be
25 general because I might have received

Page 557

1          KOHN
2 something during an attachment to
3 something that I -- I'm just trying to
4 be all inclusive.  I mean, I don't have
5 anything --
6     Q   Let me make this easy for
7 you.  Did Mr. Marderosian or Ms. Cohen,
8 did plaintiffs' counsel give you any
9 additional materials following the
10 service of this report?
11     A   No.
12     Q   Did --
13     A   Not that I recall.
14     Q   Did plaintiffs give you any
15 additional material that you intend to
16 reply upon directly, other than this
17 one identified in this report?
18     A   I don't think so, no.  No.
19     Q   Other than what's identified
20 in this report?
21     A   No.  No.
22     Q   So as far as documents
23 provided to you by plaintiffs or
24 plaintiffs' law firm, there are no
25 additional materials on which you

140 (Pages 554 - 557)

Page 558

KOHN
1
2 intend to base your opinions other than
3 what's identified in this report; is
4 that accurate?
5    A    And additional documents that
6 might be attached to the expert witness
7 reports, their deposition testimony
8 that I heard, documents that I might
9 have seen in the process of their
10 taking of depositions.  And then the
11 transcripts that may come in and
12 documents attached to those transcripts
13 that I might not have seen during their
14 deposition because I hadn't looked at
15 them directly.
16    Q    Okay.
17       There's nothing else?
18   A   There's nothing else.
19       MR. MARDEROSIAN:  He received
20    all discovery documents and then
21    your expert reports.
22       MR. HWANG:  Understood.
23    A    And that occurred after my
24 report, the expert reports.
25    Q    Okay.

Page 559

KOHN
1
2       Switching gears.  You
3 understand -- let me just preface this,
4 I'm going to -- tread over some ground
5 that we've already covered today.  I'm
6 going to try to be as non-duplicative
7 as possible.
8    A    Thank you.
9    Q    But some of this will sound
10 familiar.
11       So switching gears, you
12 understand that Viacom is an owner of
13 the songs that are at issued in this
14 case?
15       MR. MARDEROSIAN:  Objection.
16    Vague.  Calls for a legal
17    opinion and conclusion.
18    A   Viacom meaning, I guess, New
19 Creative Mix.  Aren't they co-owned?
20    Q    Let me withdraw the question.
21 Let me just clarify the question.
22       When I refer to Viacom, I'm
23 referring to Viacom International, Inc.
24 If I'm referring to New Creative, I'll
25 call them New Creative.  If I refer --

Page 560

KOHN
1
2 I'll refer to them collectively as the
3 Viacom defendants.
4    A    Okay.
5    Q    But when I say Viacom, I mean
6 Viacom International, Inc.  Okay?  Is
7 that clear?
8    A    So when you say Viacom, you
9 mean Viacom International, Inc.?
10    Q    Correct.
11    A    And when you say Viacom
12 defendants you mean anyone or all or
13 some?
14    Q    Both Viacom International,
15 Inc., and New Creative Mix, Inc.
16    A    Okay.  And not MTV Networks
17 or any other subsidiaries.
18    Q    Well, I'll disclose to you
19 that MTV Networks is a division of
20 Viacom International, Inc.  It's not a
21 subsidiary.
22    A   It's a division but not a
23 subsidiary.  It's not a separate
24 corporation?
25    Q    Correct.

Page 561

KOHN
1
2       So when I say Viacom, I'm
3 referring to Viacom International,
4 Inc., which includes MTV.
5    A   Okay.
6       I'm little confused about
7 some of this, but I think we're on the
8 same page in terms of Viacom.  We'll
9 try to be careful about -- and you'll
10 correct me if I use the word -- wrong
11 Viacom in my answer.
12    Q    I don't think I'll know, but
13 let's just set the ground rules now so
14 we're both clear.  When I refer to
15 Viacom, I'm referring to Viacom
16 International, Inc.  Does that make
17 sense?
18    A   Yes.
19    Q    Is it your understanding that
20 Viacom is an owner of the songs at
21 issue in this case?
22       MR. MARDEROSIAN:  Objection.
23       Calls for a legal opinion and
24    conclusion.
25    A   I don't think they own the

141 (Pages 558 - 561)

Page 618

KOHN

1
2  are governed by the terms of the 2011
3  composer agreement.  That's your
4  understanding?
5      A   Yes.
6          MR. MARDEROSIAN:  Calls for a
7      legal opinion and conclusion.
8      Q   Just let me finish my
9  question before you answer, for her
10  sake.
11     A   Yeah, I wasn't sure.  I
12  thought you were.
13         I'm sorry.
14     Q   Is there any other source of
15  rights the Marderosians or any of the
16  plaintiffs have to the songs at issue
17  in this action?
18         MR. MARDEROSIAN:  Vague.
19     Calls for a legal opinion.
20     A   When I said they have
21  contractual rights, I included in
22  expressed rights or implied rights
23  under those contracts.
24     Q   By implied rights, you're
25  referring to the implied covenant and

Page 619

KOHN

1
2  good faith and fair dealing?
3      A   Among others, to the extent
4  there are others.
5      Q   What others?
6      A   I don't know.
7      Q   So the only one you're aware
8  of as far as implied rights go are --
9  is the implied covenant and good faith
10  and fair dealing, right?
11         MR. MARDEROSIAN:  Calls for a
12     legal opinion.
13     A   Yeah, I'd like to do some --
14  I would want to do some legal research
15  before answering that definitively as a
16  legal conclusion, but that's the only
17  one I can think of today.
18     Q   That's the only implied right
19  referenced in your expert report,
20  right?
21     A   Yes.
22         MR. MARDEROSIAN:  Calls for a
23     legal opinion.
24     A   Yes, that's the only one
25  that's referenced in my --

Page 620

KOHN

1
2      Q   One more time.  Let's not
3  speak over each other.  It's making it
4  tough on her.
5      A   You did finish it.
6      Q   You're always one word too
7  early.  So just give it a pause, let me
8  finish the question.
9      A   But he had objected to it
10  already.
11     ^discussion off the record
12     Q   So let's turn to K3, which is
13  the 2011 composer agreement.
14     A   I have it in my hand.
15     Q   Where in this agreement does
16  it say that Viacom is obligated to pay
17  a license fee for the use of the songs
18  at issue in this action?
19         MR. MARDEROSIAN:  Calls for a
20     legal opinion.
21     A   I would take Section 1.4, the
22  gross receipts definition combined with
23  Section 7, compensation, which to
24  summarize requires that the 1260 and
25  the Marderosians are entitled to

Page 621

KOHN

1
2  50 percent of gross receipts derived
3  from the exploitation of the songs that
4  they delivered under this agreement.
5      Q   Anything else?
6      A   There is an implied
7  obligation of good faith that New
8  Creative, which owned the copyrights,
9  and whoever else derived rights from
10  them, if they were transferred to
11  somebody else, to charge arm's length
12  license fees to those affiliated
13  entities that it might have a
14  relationship with.  That would cause a
15  conflict of interest and to otherwise
16  charge arm's length license fees would
17  be, and this is a legal conclusion, be
18  in violation of the implied covenant of
19  good faith, which is the affiliated
20  company problem that I talked about
21  earlier that I talked about in my
22  report and that I talked about in my
23  book as early as 1992, the first
24  edition of Kohn on Music Licensing.
25     Q   The first edition, was that

156 (Pages 618 - 621)

KOHN

1
2 written by your father?
3   A   No, that was written by me.
4       MR. MARDEROSIAN:  Come on.
5   He's told you that.
6       Why are you being personal
7   like that?
8       MR. HWANG:  I honestly didn't
9   know.  I thought he took over a
10  subsequent edition.
11  A   I wrote the book over ten
12 years.  There is -- just to clarify, my
13 father did write a little short history
14 of Warner Brother's Music or Warner
15 Chappell Music, which I did include in
16 the book.  I added it, but it's about a
17 page or two long.  And every other word
18 in the book I wrote either through my
19 own knowledge and research or through
20 asking my father principle policies and
21 licensing philosophies that he
22 developed over his many years as a
23 music publisher.
24  Q   I thought he had written a
25 book, no?

KOHN

1
2   A   No.  He's written some songs.
3 He was an arranger.  He never wrote a
4 book.
5   Q   Your father never wrote a
6 book about licensing, music licensing?
7   A   No.
8   Q   Okay.
9       The affiliated company
10 problem you referred to, how does that
11 manifest itself within the context of
12 this case as far as Viacom is
13 concerned, to the best of your
14 understanding?
15  A   Okay.
16      So the plaintiffs signed an
17 agreement with New Creative Mix, Inc.,
18 which I understand is either a
19 subsidiary or -- I don't know what you
20 call it, owned by either MTV Networks
21 or the entity that's now called MTV
22 Networks.  They changed the name.
23  Q   New Creative Mix, just to
24 speed this up, is owned by Viacom
25 International, Inc.?

KOHN

1
2   A   Directly.
3   Q   MTV is, again, a division of
4 Viacom International, Inc.
5   A   Okay.  Okay.
6       So New Creative Mix is -- it
7 says incorporated.  So I assume it's a
8 corporation, right?
9   Q   It's a subsidiary, correct.
10  A   Okay.
11      So it's a corporation that is
12 wholly owned by Viacom International,
13 Inc.?
14  Q   Could I just -- I don't want
15 to interrupt you, but I really just
16 want to speed this up.
17      Who are the affiliated
18 companies within Viacom?
19  A   Well, I wanted to answer your
20 question because New Creative, Inc., is
21 the company that these guys did the
22 deal with.  If they did a -- so if they
23 did a deal with Warner Brothers -- if
24 they did a deal with Universal Music,
25 and Universal Music has a -- is owned

KOHN

1
2 by the same company that owns Universal
3 Pictures, it doesn't mean that
4 Universal Music, because it owns Works
5 For Hire works that it can license
6 their works to Universal Pictures for
7 free.
8       And so what I'm trying to do
9 by analogy is New Creative Mix cannot
10 license any of the Viacom affiliated
11 entities; that is, their parent, their
12 subsidiaries, their sister companies,
13 meaning other companies who are owned
14 by Viacom, Inc., the parent of Viacom
15 Inc.  They're all affiliated companies.
16 They all have a direct financial
17 relationship.
18      So it will be a conflict of
19 interest for New Creative Mix to grant
20 to any of those affiliated companies a
21 license that's not an arm's length
22 transaction to the best of it's ability
23 in good faith and nor could they
24 transfer their rights to anyone who
25 would do the same thing.  Because their

157 (Pages 622 - 625)

KOHN

2 13, correct?
3    A   I'll accept your
4 representation that it does.
5    Q   Okay.
6        So, in fact, your statement
7 that Viacom has not produced a
8 commensurate number of cue sheets for
9 the episodes aired with respect to
10 Jersey Shore, that's a false statement,
11 right?
12    A   I didn't find these when I
13 was flipping through and looking for
14 that in the BMI statements that I have.
15 I don't have paper copies, they're all
16 PDFs.  So I didn't see them.
17    Q   But it's an incorrect
18 statement, correct?
19        MR. MARDEROSIAN:  I am just
20    going to object that it assumes
21    facts not in evidence that these
22    cue sheets were submitted to BMI.
23    A   Well, again, I -- they appear
24 to be cue sheets for those episodes.
25 The only one I looked at in detail was

KOHN

2 the first one.
3    Q   Okay.
4    A   And there was a song that's
5 in there, you know, that is the Rob and
6 Aron song -- an Aron and Rob song back
7 there and The Young Heathens.  It's
8 there.  I missed it.
9        MR. HWANG:  Mark this as
10    Exhibit 10.
11        (Printout from IMDB.com of
12    all 20 episodes from the two
13    seasons of the show Ain't That
14    America, was marked K Exhibit 10,
15    for identification, as of this
16    date.)
17        (Cue sheets corresponding to
18    K Exhibit 10, was marked K Exhibit
19    11, for identification, as of this
20    date.)
21        MR. HWANG:  Exhibits K10 and
22    K11.
23    Q   Mr. Kohn, the reporter has
24 handed you two separate exhibits,
25 Exhibits 10 and 11.

KOHN

2        Exhibit 10 is a printout from
3 IMDB.com of all 20 episodes from the
4 two seasons of the show Ain't That
5 America.  And there are eight episodes
6 in Season 1 and there are 12 episodes
7 in Season 2.  Eleven is the 20 cue
8 sheets corresponding to each of those
9 episodes.
10        And you can take a look
11 through and confirm that for me.
12    A   I accept your representation
13 that these are what you just described.
14    Q   Okay.
15    A   Without going through every
16 one of them.
17    Q   So your statement that Viacom
18 has not produced a commensurate number
19 of cue sheets for the episodes aired
20 with respect to the show Ain't That
21 America is also incorrect, right?
22    A   Apparently these are two
23 examples.  I was given two examples and
24 apparently -- if your representation is
25 correct that these represent every

KOHN

2 single episode then that would be an
3 incorrect statement.
4    Q   Okay.
5        Who gave these facts to you?
6    A   I asked for two examples of
7 missing cue sheets that would be
8 familiar to people who are -- you know,
9 there's a lot of songs -- a lot of TV
10 shows you can pick.  I'm familiar with
11 Jersey Shore.  I'm familiar with Ain't
12 That America.  I recognize those.  And
13 they said these are two and they
14 suggested that those are the two
15 examples where cue sheets were missing.
16    Q   They being -- they being the
17 plaintiffs?
18    A   Well, Mick, yes.
19    Q   And these are the only two
20 examples within this category under
21 Subsection B of Viacom's purported
22 failure to submit cue sheets to BMI,
23 correct?
24    A   I'm sorry, the only what?
25    Q   The two examples that you

176 (Pages 698 - 701)

Page 702

KOHN

1
2 identity of instances where Viacom
3 failed to submit a sufficient number of
4 cue sheets to BMI or Jersey Shore and
5 Ain't That America, right, in your
6 entire report?
7     A   I think those are the two
8 examples that I provided and they may
9 be the only ones; but, yes.
10    Q   And they're both incorrect,
11 right?
12    A   Looks like it.
13    Q   Do you know if the
14 Marderosians received their writer
15 share of public performance royalties
16 with respect to each of the 15 episodes
17 of Jersey Shore identified in your
18 Footnote 13?
19    A   Well, I have all of the
20 statements and if I went back and
21 looked I would be able to tell you.
22    Q   Did you look?
23    A   I was focused more on the
24 detections on TuneSat, so I don't
25 remember looking at the BMI statements.

Page 703

KOHN

1
2 Or did I?  I don't remember right now.
3 I think I focused on the TuneSat
4 detections, that there were lots --
5 they were missing cue sheets and there
6 were lots of performances.  But I may
7 have missed going to the BMI statements
8 to check.  They're very detailed and,
9 as you know, looking for these are like
10 a needle in a haystack.  With
11 everything else that I was doing I
12 wasn't going to go into that level of
13 detail on this.
14    Q   So you didn't look at the BMI
15 statements to confirm that -- whether
16 or not --
17    A   No.
18    Q   Hold on.
19        Whether or not the
20 Marderosians received the writer share
21 of public performance royalties with
22 respect to each of the 15 episodes
23 identified for Jersey Shore in your
24 Footnote 13, correct?
25    A   Yes.  I don't remember doing

Page 704

KOHN

1
2 that.
3     Q   With respect to Ain't That
4 America, is it the same, you didn't go
5 through the BMI statements for Robert
6 and Aron Marderosian to confirm whether
7 or not they received any public
8 performance income with respect to the
9 20 episodes of that show?
10    A   I didn't because I was
11 operating under the assumption.  I
12 didn't see the cue sheets.  I saw the
13 detections.  I didn't go look at BMI
14 and I should have.
15    Q   And if, in fact, the
16 Marderosians received their writer
17 share of public performance royalties
18 with respect to each of these 20
19 episodes of Ain't That America and the
20 15 episodes you identified for Jersey
21 Shore, that would necessarily mean that
22 Viacom had submitted cue sheets for
23 each of those episodes to BMI, right?
24    A   If, in fact, they got
25 performance royalties in their

Page 705

KOHN

1
2 statements on these shows -- I don't
3 know whether they have or not because I
4 haven't looked at the statements.  They
5 might not have.  I don't really know.
6        You represent to me that
7 you've looked at the statements and you
8 found monies paid to them for --
9 throughout this entire period.
10    Q   I haven't represented that to
11 you, no.
12        MR. MARDEROSIAN:  He said --
13    I don't remember him saying that.
14    A   I'm asking him if he has,
15 so -- but I haven't seen it, so I can't
16 tell you that they have been paid
17 because I don't remember looking at the
18 BMI statements for that purpose.  I
19 looked at them for other purposes but I
20 don't recall doing that.
21        I kind of may have jumped to
22 the conclusion that since I couldn't
23 find what you just showed me out of
24 thousands of BMI statements that were
25 clogging up my hard disk, that there

177 (Pages 702 - 705)

1            KOHN
2 upon who's manipulating the data and
3 for what purpose.
4    Q   Let me ask you this question:
5 Viewed in isolation, would these four
6 cue sheets to you be an indication of
7 bad faith on the part of Viacom in its
8 submission of cue sheets to BMI?
9        MR. MARDEROSIAN:  That's the
10    same question.  Asked and
11    answered.
12        I'm going to object.  It
13    calls for a legal opinion and
14    conclusion.
15    A   I've answered that question.
16    Q   No, you answered a very
17 different question that you asked
18 yourself.
19        I'm asking you this narrow
20 question.  Viewed in isolation, would
21 the submission of these four cue
22 sheets, out of the hundreds that Viacom
23 submitted to BMI, be an indicator to
24 you in your expert opinion of Viacom's
25 bad faith in its submission of cue

1            KOHN
2 sheets to BMI?
3        MR. MARDEROSIAN:  Object.
4    It calls for a legal opinion
5    and conclusion.
6    A   Again, if you wanted to set
7 up a hypothetical where a composer's
8 name is incorrect on a cue sheet out of
9 thousands of cue sheets, and that's the
10 only thing -- let's say it's Warner
11 Brothers Pictures, out of thousands of
12 cue sheets they submitted to BMI -- or
13 Warners Brother's Television, out of
14 thousands of cue sheets they submitted
15 to BMI and they had one error that they
16 forgot to put a composer's name in or
17 they either themselves had changed the
18 name of the composer to something like
19 Mix Tape or used somebody else's
20 metadata, in total isolation, in that
21 hypothetical, you could say it sounded
22 like something that would not
23 necessarily bring about a accusation of
24 bad faith.
25    Q   Okay.

1            KOHN
2    A   That's a hypothetical that
3 you can ask.  I'm not going to be
4 taking -- using Viacom -- using what
5 you were trying to do in the context of
6 everything else that's going on here.
7    Q   I'm going to ask you -- I'm
8 going to ask you one more time.  Okay?
9        These four cue sheets viewed
10 in isolation out of the hundreds of cue
11 sheets that Viacom submitted to BMI
12 listing one or more of the songs at
13 issue in this case, would you take
14 that -- do you take that as an
15 indicator of Viacom's bad faith in its
16 cue sheet submission practices?
17        MR. MARDEROSIAN:  I'm going
18    to object.  It calls for a legal
19    opinion and conclusion.
20    Q   This is the last time I'm
21 going to ask this question and if you
22 refuse to answer it will be noted.
23    A   I've already answered the
24 question.
25    Q   No, you gave me a totally

1            KOHN
2 different hypothetical.
3        MR. MARDEROSIAN:  I'd like to
4    finish my objection.
5    Q   Are you refusing to answer my
6 question?
7    A   That was -- that was the
8 second or third time I answered your
9 question.
10        MR. MARDEROSIAN:  I'd like to
11    finish my objection.
12        It's an incomplete
13    hypothetical.  And it's been asked
14    and answered and it's getting to
15    the point where it's harassment.
16    Q   Are you refusing to answer my
17 question?
18    A   I already answered your
19 question.
20    Q   So the answer is yes,
21 you're --
22    A   You don't like the answer
23 that's the only thing here.
24    Q   So the answer is yes, you're
25 refusing to answer my question?

188 (Pages 746 - 749)

Page 750

1
2     A   I answered your question.
3     Q   Okay.
4         (Time noted: 1:47 a.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 752

1
2             C E R T I F I C A T I O N
3
     STATE OF NEW YORK  )
4                       ) ss.:
     COUNTY OF NEW YORK )
5
6         I, JUDITH CASTORE, Shorthand Reporter
7     and Notary Public within and for the State
8     of New York, do hereby certify:
9         That ROBERT H. KOHN, the witness
10    whose deposition is hereinbefore set
11    forth, was duly sworn by me and that this
12    transcript of such examination is a true
13    record of the testimony given by such
14    witness.
15        I further certify that I am not
16    related to any of the parties to this
17    action by blood or marriage and that I am
18    in no way interested in the outcome of
19    this matter.
20        IN WITNESS WHEREOF, I have hereunto
21    set my hand this 8th day of November,
22    2018.
23                    _Judith Castore_
24            JUDITH CASTORE
25

Page 751

1
2     STATE OF _____ )
3                        ) :ss
4     COUNTY OF _____ )
5
6
7         I, ROBERT H. KOHN, the witness
8     herein, having read the foregoing
9     testimony of the pages of this deposition,
10    do hereby certify it to be a true and
11    correct transcript, subject to the
12    corrections, if any, shown on the attached
13    page.
14
15        _____
16            ROBERT H. KOHN
17
18
19
20    Sworn and subscribed to before me,
21    this _____ day of _____, 2018.
22
23    _____
24        Notary Public
25

Page 753

1
2                 I N D E X
3     WITNESS                    PAGE
4     ROBERT H. KOHN
5       Examination by:
6       MR. ZAKARIN              4
        MR. HWANG                547
7
8             E X H I B I T S
9
10    K                         PAGE
11    Exhibit 1  Expert Report of Bob Kohn, August   15
               17, 2018
12    Exhibit 2  Blanket Composer Agreement      65
               (Direct) dated as of May 19, 2010
13    Exhibit 3  March 7, 2011 Agreement          147
      Exhibit 4  Excerpt from the book entitled,   201
14        Kohn On Music Licensing
      Exhibit 5  Document entitled, Turner - BMI   339
15        Music Performance License
          Agreement
16    Exhibit 6  Excerpt from the book entitled,   493
          Kohn On Music Licensing
17    Exhibit 7  Excerpts from the book entitled,  613
          Kohn On Music Licensing
18    Exhibit 8  Form 8.2, Multi-Purpose Work For  631
          Hire Agreement
19    Exhibit 9  Multi-page document containing    695
          cue sheets
20    Exhibit 10 Printout from IMDB.com of all 20   699
          episodes from the two seasons of
21        the show Ain't That America
      Exhibit 11 Cue sheets corresponding to K     699
22        Exhibit 10
      Exhibit 12 Document, Bates-stamped           730
23        VIACOM_0000568 through 667
24
25

189 (Pages 750 - 753)

Page 754

```
1        INSTRUCTIONS TO WITNESS
2
3     Please read your deposition over carefully
4  and make any necessary corrections. You should state
5  the reason in the appropriate space on the errata
6  sheet for any corrections that are made.
7     After doing so, please sign the errata sheet
8  and date it.
9     You are signing same subject to the changes
10  you have noted on the errata sheet, which will be
11  attached to your deposition.
12     It is imperative that you return the original
13  errata sheet to the deposing attorney within thirty
14  (30) days of receipt of the deposition transcript by
15  you. If you fail to do so, the deposition transcript
16  may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25
```

Page 755

```
1          E R R A T A
2
3
4
5     I wish to make the following changes,
6  for the following reasons:
7
8  PAGE LINE
9  ___ ___ CHANGE:_____
10  REASON:_____
11  ___ ___ CHANGE:_____
12  REASON:_____
13  ___ ___ CHANGE:_____
14  REASON:_____
15  ___ ___ CHANGE: _____
16  REASON:_____
17  ___ ___ CHANGE: _____
18  REASON:_____
19
20  _____  _____
21       ROBERT H. KOHN        DATE
22  SUBSCRIBED AND SWORN TO BEFORE
23  ME THIS ___DAY OF_____, 201 .
24
25  _____   _____
     NOTARY PUBLIC      COMMISSION EXPIRES
```

David Feldman Worldwide
A Veritext Company

800-642-1099                                    www.veritext.com

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# Exhibit B(2)

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------X
 4   TWELVE SIXTY LLC, ARON MARDEROSIAN,
     and ROBERT MARDEROSIAN,
 5
             Plaintiffs,
 6
             vs.           Civil Action No.
 7                         1:17-CV-01479-PAC
 8   EXTREME MUSIC LIBRARY LIMITED, a
     division of Sony/ATV Music Publishing;
 9   EXTREME MUSIC LIMITED; VIACOM
     INTERNATIONAL INC., NEW CREATIVE
10   MIX INC., HYPE PRODUCTION MUSIC,
11         Defendants.
12   ------------------------------------X
13
14
15              VOLUME II
16        CONTINUED DEPOSITION OF
17          ROBERT H. KOHN
18          New York, New York
19        Friday, November 2, 2018
20
21
22
23
24   Reported by:
     JOAN WARNOCK
25   JOB NO. J3015335A
```

Page 2

```
 1
 2
 3           November 2, 2018
 4           9:10 a.m.
 5
 6      VOLUME II - Continued deposition of
 7   ROBERT H. KOHN, held at the offices of
 8   Pryor Cashman LLP, 7 Times Square,
 9   New York, New York, pursuant to Notice,
10   before Joan Warnock, a Notary Public of
11   the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S:
 3
 4      MARDEROSIAN & COHEN,
 5      A Professional Corporation
 6      Attorneys for Plaintiffs
 7          1260 Fulton Street
 8          Fresno, California  93721
 9      BY:  MICHAEL G. MARDEROSIAN, ESQ.
10           HEATHER S. COHEN, ESQ.
11
12      PRYOR CASHMAN LLP
13      Attorneys for Defendants Extreme Music
14      Library Limited and Extreme Music Limited
15          7 Times Square
16          New York, New York  10036
17      BY:  DONALD S. ZAKARIN, ESQ.
18           ROSS M. BAGLEY, ESQ.
19           YEVGENIA S. KLEINER, ESQ.
20
21
22
23
24
25
```

Page 4

```
 1
 2   A P P E A R A N C E S:  (Cont'd.)
 3
 4      LOEB & LOEB LLP
 5      Attorneys for Defendants Viacom
 6      International Inc., New Creative
 7      Mix Inc., and Hype Production Music
 8          345 Park Avenue
 9          New York, New York  10154
10      BY:  WOOK J. HWANG, ESQ.
11           ERIN SMITH DENNIS, ESQ.
12
13
14   ALSO PRESENT:
15      DAVID J. PRZYGODA, SONY CORPORATION OF
16   AMERICA
17      BARRY MASSARSKY
18
19
20
21
22
23
24
25
```


ESQUIRE
DEPOSITION SOLUTIONS

Page 5

```
1                R. Kohn
2    R O B E R T  H.  K O H N, called as a
3      witness, having been duly sworn by
4      a Notary Public, was examined and
5      testified further as follows:
6          COURT REPORTER:  Please state your
7      name for the record.
8          THE WITNESS:  Robert H. Kohn.
9    EXAMINATION (Cont'd.)
10   BY MR. HWANG:
11       Q.   Good morning, Mr. Kohn.
12       A.   Good morning.
13       Q.   You recall the instructions from
14   yesterday?
15       A.   The instructions?
16       Q.   Yes.  The instructions, namely,
17   that we shouldn't speak over each other?
18       A.   Oh, the admonitions.
19       Q.   Right.
20       A.   Yes.
21       Q.   Let's try not to do that for the
22   sake of the reporter.  So, Mr. Kohn,
23   throughout your report you raised several
24   instances in which -- several bases for
25   contending that the Marderosians may not have
```

Page 6

```
1                R. Kohn
2    received their full entitlement to public
3    performance royalties.  Is that an accurate
4    characterization?
5        A.   May not have received their --
6    okay.  Yes.
7        Q.   From BMI; right?
8        A.   Yeah.  Well, may not have received
9    their public performance royalties.
10       Q.   There's no obligation from Viacom,
11   New Creative, or Extreme to pay the public
12   performance royalties; right?
13           MR. MARDEROSIAN:  Objection.  Calls
14       for a legal conclusion.
15       A.   Well, to the extent they issued
16   direct performance licenses, they need to do
17   that.
18       Q.   As a share of the gross receipts,
19   as that term is defined --
20       A.   As gross receipts, right.
21       Q.   As that term is defined in the 2011
22   --
23       A.   Yes.
24       Q.   -- Composer Agreement?
25       A.   Yes.
```

Page 7

```
1                R. Kohn
2        Q.   So other than in the case of direct
3    public performance licenses, there's no
4    obligation from Viacom, New Creative, or
5    Extreme to pay any public performance
6    royalties to the Marderosians; correct?
7            MR. MARDEROSIAN:  Objection.  Calls
8        for a legal conclusion.
9        A.   They have an obligation to pay BMI.
10   BMI pays the Marderosians.
11       Q.   Okay.  And that payment to BMI from
12   Viacom would be in the form of a blanket
13   license fee?
14       A.   Yes.
15       Q.   Pursuant to the separate agreement
16   between BMI and Viacom --
17       A.   That's correct.
18       Q.   -- correct?
19           MR. MARDEROSIAN:  Objection.  Calls
20       for a legal opinion.
21       Q.   Have you undertaken any analysis to
22   determine how much the Marderosians were
23   purportedly underpaid in the writer's share
24   of public performance income?
25       A.   No.  I was not asked to opine on
```

Page 8

```
1                R. Kohn
2    that.
3        Q.   So you don't actually know if they
4    were underpaid?
5        A.   There's enough evidence that I've
6    seen in this case that suggest they were
7    underpaid.
8        Q.   But you don't know how much?
9        A.   I don't know how much.
10       Q.   And you're not opining on how much?
11       A.   No.  That's correct.  I mean yes, I
12   am not opining on how much.
13       Q.   If the Marderosians weren't paid
14   public performance income for a particular
15   use, does that necessarily mean that a cue
16   sheet wasn't submitted to BMI?
17           MR. MARDEROSIAN:  Objection.
18       Incomplete hypothetical.
19       A.   I agree with that.  I agree that
20   it's an incomplete hypothetical.  Does it
21   necessarily mean?
22       Q.   Someone's going to have to explain
23   to me what that is at some point.  But go
24   ahead.
25       A.   There was a song -- well, you'll
```



1          R. Kohn
2   royalties can be traced back to the failure
3   to timely register work with BMI?
4          MR. MARDEROSIAN:  Wook, I think he
5   answered the question.
6          MR. HWANG:  Objection noted.
7          A.   What I could say is that I might
8   have seen it in the course of the past eight
9   months of working on this case.  Sitting here
10  right now, I would need something to refresh
11  my recollection if I knew it at some point,
12  but right now I can't point to you a missing
13  payment in a BMI statement, all right, that
14  could be traced to a specific eleven-month
15  delay in registrations when those works were
16  being broadcast.
17         Q.   Okay.
18         A.   I mean it's -- go ahead.  Go ahead.
19         Q.   Direct your attention to --
20         A.   I would have --
21         Q.    -- page 45 of your report.
22         MR. MARDEROSIAN:  Was there
23  something else you wanted to add?
24         THE WITNESS:  Yeah.
25         A.   I'm trying to think about -- you

1          R. Kohn
2   asked me could that be done.  It could be
3   done, but you would have to go back and get
4   the TuneSat data from 2010 to 2011 or the
5   TuneSat data on all of these broadcasts,
6   right, all these public performances during
7   the time frame that the registrations were
8   delayed in order to perform that.  Now,
9   Extreme has the data.  I mean in
10  Mr. Massarsky's report there's a chart that
11  shows that giving us data, a summary chart
12  going back two years.  But according to Dan
13  Pounder's deposition, he says that they've
14  been using TuneSat dating back to 2008.  So
15  Extreme has all of the broadcast data
16  necessary in order for me to answer your
17  question, but that hasn't been produced in
18  this litigation.  And I do believe it's been
19  asked.  Don just said it's not true.
20         THE WITNESS:  But what is not true?
21         Q.   Okay.  Let's --
22         MR. MARDEROSIAN:  Don't worry.
23  He's shaking his head.  He's just trying
24  to intimidate you.  Don't worry about
25  it.

1          R. Kohn
2          MR. ZAKARIN:  Actually, I'm not
3   trying to intimidate --
4          MR. MARDEROSIAN:  Well, your facial
5   reaction is a manifestation --
6          A.   I do know that Dan Pounder said in
7   his deposition, and this is true, that they
8   started using TuneSat in 2008.  They weren't
9   using it for the purposes of usage, which
10  they could have.  They were using it for
11  other purposes.  So Extreme is sitting with
12  the data today that would help me make the
13  determination as to whether there were
14  detections on TuneSat that were a direct
15  result of the late registration.
16         Q.   Okay.
17         A.   And I have not done it because I
18  don't -- I wasn't asked to do it, and we
19  haven't been given the data necessary to do
20  it, because we don't have the data.  We only
21  have data going back to 2013.
22         Q.   Okay.  Let me direct your attention
23  to page 45 of your report.  Are you there?
24         A.   45.  Yes, I'm here.
25         Q.   There's a paragraph that reads,

1          R. Kohn
2   "The retitling mess compounded the
3   registration problems," dot dot dot, "and
4   ultimately Aron and Robert's writer share of
5   public performance royalties."  Do you see
6   that?
7          A.   Well, read the dot, dot, dot.  So
8   it says from the beginning of the sentence,
9   "The retitling mess compounded the
10  registration problems, including the
11  inexcusable delay in registrations, and may
12  have affected the accuracy of cue sheets and
13  ultimately Aron and Robert's writer's share
14  of public performance royalties discussed
15  below."  Go ahead.
16         Q.   Okay.  I'm glad you read that,
17  because I read a sentence fragment.  So if I
18  can just focus on the retitling mess that you
19  you're referring to here.
20         A.   Yes.
21         Q.   In sum and substance, you're saying
22  the retitling mess may have affected
23  adversely Aron and Robert's receipt of the
24  writer's share of public performance income?
25         A.   Right.



Page 41

R. Kohn

1
2       Q.   So when you say may, you don't
3   actually know if it did; right?
4       A.   Well, the evidence shows --
5           MR. MARDEROSIAN:  Again, it's
6   calling for speculation again.  Same
7   reasons as before.
8           MR. HWANG:  The reason I'm calling
9       for speculation is because he's
10      speculating in his report.
11          MR. MARDEROSIAN:  No.  Not true.
12      Q.   Go ahead.
13          MR. MARDEROSIAN:  It's because the
14  data's available but you haven't
15  produced it to show that these
16  nonpayments are due to Russell's
17  retitling of the songs.
18      Q.   When you say the retitling --
19          MR. MARDEROSIAN:  But I don't think
20  I have to prove that for breach of
21  contract in any event.  I just have to
22  show other issues.
23          MR. HWANG:  We know you think you
24  have no burden of proof in this case.
25          MR. MARDEROSIAN:  No.  I didn't say

Page 42

R. Kohn

1
2   that.  You're misquoting me.
3       Q.   The retitling mess may have
4   adversely affected Aron and Robert's receipt
5   of the writer's share of public performance
6   royalties.  That's what this says,
7   effectively; right?
8       A.   Yes, that's what it -- it says what
9   it says.
10      Q.   Are you aware of a single instance
11  in which the quote, unquote, retitling mess
12  can be traced as the cause of Aron and
13  Robert's non-receipt of any public
14  performance royalties?
15          MR. MARDEROSIAN:  I'm going to
16      object.  It calls for speculation.
17      Incomplete hypothetical.
18      A.   In my opinion, the failure to
19  retitle Mulholland Drive, which was a
20  duplicate of another song in the Extreme
21  catalog, could ultimately have resulted in
22  people requesting Mulholland Drive for
23  synchronization and using the Phoenix
24  Bergerson, I don't know how to spell
25  Bergerson, version instead of Rob and Aron's

Page 43

R. Kohn

1
2   version and could have resulted in the
3   original payment of the Land Rover royalties
4   to Phoenix and Bergerson, which were the
5   result of, I believe, their being misnamed in
6   cue sheets that caused the misdirection of
7   those performance royalties.
8       Q.   Okay.  Other than the Land Rover
9   example, is there any other example that you
10  can identify?
11          MR. MARDEROSIAN:  Objection.  Calls
12      for speculation.
13      A.   I might have seen others, but
14  nothing comes to mind right now.
15      Q.   They're not identified in your
16  report either, right, other than the Land
17  Rover example?
18      A.   My report speaks for itself.  I
19  don't want to start reading it.
20      Q.   But sitting here today, you can't
21  identify any others?
22      A.   Sitting here right now, that's the
23  one that comes to mind.
24      Q.   That's the only one that comes to
25  mind; right?

Page 44

R. Kohn

1
2           MR. MARDEROSIAN:  Object.  It calls
3       for speculation.  Incomplete
4       hypothetical.
5       Q.   Please speculate as to what comes
6   to mind.
7           MR. MARDEROSIAN:  Sorry?
8       Q.   I said please speculate as to what
9   comes to your mind.
10          MR. MARDEROSIAN:  He's not going to
11      speculate.
12      A.   I'm not going to speculate.
13      Q.   That was a rhetorical question.
14  I'm not asking you to speculate.  I'm asking
15  you what's in your head right now.
16      A.   What's in my head right -- you've
17  asked --
18          MR. MARDEROSIAN:  Hold on.  The
19      question is vague, overbroad.  You're
20      asking him to speculate.  It's an
21      incomplete hypothetical.
22      Q.   That's the only example, the Land
23  Rover example is the only example that comes
24  to mind sitting here today as to an instance
25  in which you believe the quote, unquote,



R. Kohn

1  retitling mess can be traced as the cause of
2  any non-receipt of public performance
3  royalties to Aron and Robert; correct?
4      MR. MARDEROSIAN:  I'm going to
5  object.
6      Q.  Correct?
7      MR. MARDEROSIAN:  I'm going to
8  object.  You're asking him to speculate.
9      It's an incomplete hypothetical.  You
10      want him to identify a specific
11      nonpayment due to a retitling issue.
12      And that's asking him to speculate.  And
13      it's an incomplete hypothetical.
14      A.   That comes to mind as we discussed
15  it yesterday, and it's very foremost in my
16  mind, and that's the one that's in my mind
17  right now.  I can't think of any others right
18  now.
19      Q.  Okay.  That's good enough.  Let's
20  move on to the direct public performance
21  licenses.
22      A.  Okay.
23      Q.  For the sake of speeding this up --
24  well, you know what, I don't want to do that.

R. Kohn

1      MR. MARDEROSIAN:  Well, it's 9:54.
2  How much more time do you estimate here?
3      MR. HWANG:  Let's go off the
4  record.
5      (Discussion off the record.)
6      Q.  So, Mr. Kohn, when a licensee has a
7  direct public performance license, that
8  obviates the need to submit cue sheets to
9  BMI.  Is that an accurate statement?
10      A.  It should.  Well, let me rephrase
11  that.  I think the answer is no, because, let
12  me explain why, when you have a program,
13  let's say it has, and I'm creating a
14  hypothetical, that's got ten musical works in
15  it.  Only one of the songs might be subject
16  to a direct performance license.  So a cue
17  sheet would probably be generated for the
18  purposes of that program to include not only
19  the nine songs that are in the program that
20  are not subject to a direct performance
21  license, but would also include a song that
22  is subject to a direct performance license.
23  I don't think the systems are -- well,
24  whatever.  So I think a cue sheet would be

R. Kohn

1  generated, would probably be generated for a
2  song that was subject to a direct performance
3  license.
4      Q.  Okay.  In which case there's no
5  harm to a composer; right?  They would still
6  receive the writer's share of the public
7  performance royalties with respect to the
8  song as to which a direct public performance
9  license had been granted under your
10  hypothetical; correct?
11      A.  I'm not certain about that.  That
12  depends upon BMI's systems in this case or
13  ASCAP's systems in terms of whether it knows
14  that a song was subject to a direct
15  performance license or not.
16      Q.  Okay.  Let me make this clear.  A
17  direct public performance license means with
18  respect to any particular song, that it
19  doesn't have to be reported on a cue sheet to
20  BMI.  Is that your understanding?
21      MR. MARDEROSIAN:  I'm going to
22  object.  It's vague.  It's an incomplete
23  hypothetical.
24      A.  I don't know what BMI and ASCAP's

R. Kohn

1  policies are with respect to that, because
2  their contracts say that you must -- it
3  doesn't say in here -- well, I'd have to read
4  this entire contract again, but I --
5      Q.  Mr. Kohn, you're aware of the
6  consent decree; right?  You talked about that
7  yesterday?
8      A.  Oh, but that's completely -- yeah.
9  So you want to go back to music publishers
10  and music --
11      Q.  No, no, I don't want to go back.  I
12  want to --
13      A.  Okay, then don't.
14      Q.  -- streamline this.
15      A.  It's totally irrelevant to what I'm
16  saying.
17      Q.  You're opining on the negative
18  adverse effect of a purported direct public
19  performance license that you think has been
20  granted to Viacom.  Is that an accurate
21  statement as to the contents of your report?
22      A.  The contents of my report, Viacom
23  was -- had received clearly a direct blanket
24  synchronization license to everything covered



1           R. Kohn
2      Q.   Teenage Vamps.
3      A.   Not on Teenage Vamps, but on
4   Mulholland Drive --
5      Q.   That's the only question.  Did I
6   ask you about Mulholland Drive?
7      A.   I saw 60 pages of Mulholland Drive
8   promotional announcements that Bayham was
9   paid on, and they were not paid.  And when I
10  see 60 pages where Bayham is paid and are
11  clearly identified and associated with the
12  plaintiffs and not in the BMI statements, the
13  only thing I can imagine is that there are
14  other composers who were paid on those works.
15  That's what I was focused on.  Teenage Vamps
16  was just a matter of the fact that you
17  provided a report that didn't include it.
18     Q.   Is it possible you have a limited
19  imagination?
20     A.   I think that's an insulting
21  question.
22     Q.   I'll withdraw the question.  You
23  just said the only thing that you can imagine
24  is that there was some, you know, some change
25  in the data or it was misdirected; is that

1           R. Kohn
2   right?
3      A.   It's a figure of speech.  I said
4   earlier --
5      Q.   Oh.  It's a figure of speech when
6   you say it's the only thing you can imagine.
7   Let me just try it.  Other --
8           MR. MARDEROSIAN:  You're getting
9      argumentative, Don.  Argumentative.
10     Q.   Are there other possibilities that
11  you could imagine, Mr. Kohn?
12          MR. MARDEROSIAN:  He's not going to
13     speculate.  He's not going to speculate.
14          MR. ZAKARIN:  That's all he's done
15     today.
16          MR. MARDEROSIAN:  Incorrect.
17     That's an argumentative and insulting
18     statement.  And I object to that.
19          MR. ZAKARIN:  It's an accurate
20     statement.
21     A.   I would like to see, given what --
22          MR. MARDEROSIAN:  It's based on the
23     evidence that you've produced in the
24     case.
25          MR. ZAKARIN:  I understand.  I've

1           R. Kohn
2      asked him a question.
3      A.   Based on everything I've seen in
4   this case, I have asked for and I have not
5   seen the royalty statements that Russell
6   Emanuel and under all of his aliases have
7   received through ASCAP, PRS so I can make an
8   absolute determination which composers
9   received those royalties.  And if you would
10  show us those and be transparent about it,
11  and perhaps Sony ATV might be very interested
12  in knowing whether that's the case, because
13  if it turns out to be the case, we all have
14  problems.
15     Q.   Okay.  Now that you just finished
16  that long statement, the question was not
17  what you didn't see, what you didn't get to
18  see, whether you were entitled to see it.  My
19  question was much simpler.
20     A.   I answered your question.
21     Q.   Then what was the speech for?
22     A.   That was my answer.
23     Q.   I don't think I asked anything
24  relating to that.
25          MR. ZAKARIN:  I have no further

1           R. Kohn
2   questions.
3           MR. MARDEROSIAN:  Thank you, Don.
4      Are we done?
5           MR. HWANG:  Close it out.
6           MR. MARDEROSIAN:  Same stipulation
7      as we reached with the other experts
8      where I get the original, notify you of
9      any changes.  We good with that?
10          MR. ZAKARIN:  Yes.
11          (Time noted:  11:00 a.m.)
12
13
14
15  _____
16         ROBERT H. KOHN
17
18  Subscribed and sworn to before me
19  this ___ day of _____, 2018.
20
21  _____
22
23
24
25



Page 117

```
1
2              C E R T I F I C A T E
3    STATE OF NEW YORK        )
4                           : ss.
5    COUNTY OF WESTCHESTER    )
6
7          I, JOAN WARNOCK, a Notary Public
8    within and for the State of New York, do
9    hereby certify:
10         That ROBERT H. KOHN, the witness
11   whose deposition is hereinbefore set
12   forth, was duly sworn by me and that
13   such deposition is a true record of the
14   testimony given by the witness.
15         I further certify that I am not
16   related to any of the parties to this
17   action by blood or marriage, and that I
18   am in no way interested in the outcome
19   of this matter.
20         IN WITNESS WHEREOF, I have hereunto
21   set my hand this 8th day of November,
22   2018.
23
24   _____
25                 JOAN WARNOCK
```

Page 118

```
1    ----------------- I N D E X ----------------
2
3    WITNESS          EXAMINATION BY      PAGE
4    R. Kohn          Mr. Hwang             5
5                     Mr. Marderosian      78
6                     Mr. Hwang            96
7                     Mr. Zakarin         106
8
9    ----------- INFORMATION REQUESTS -----------
10   DIRECTIONS:
11   RULINGS:
12   TO BE FURNISHED:
13   REQUESTS:
14   MOTIONS:
15
16   ------------------ EXHIBITS ----------------
17   DEFENDANTS'                    FOR ID.
18     EXHIBIT K-13              64
19     Expert Report of Roger Miller
20     EXHIBIT K-14               73
21     First Amended Complaint for Damages
22     and Demand for Jury Trial
23     EXHIBIT K-15               79
24     Document Bates stamped Extreme
25     0006585, Exhibit 7 to Mr. Katz's
```

Page 119

```
1
2    Deposition
3    EXHIBIT K-16                        80
4    Subextract taken from extract
5    produced by Extreme, Exhibit 8 to
6    Katz Deposition
7    EXHIBIT K-17                        87
8    Spread sheet produced by Extreme
9    setting forth performance value of
10   Aron and Robert's songs compared to
11   other songs
12   EXHIBIT K-18                        92
13   Six-page document beginning with
14   Bates stamp Extreme 0083277,
15   Excerpts of Semiannual Statements
16
17
18
19
20
21
22
23
24
25
```

Page 120

```
1              DEPOSITION ERRATA SHEET
2
3    Our Assignment No.: J3015335A
4    Case Caption:  Twelve Sixty LLC vs. Extreme
5    Music Library Limited
6
7       DECLARATION UNDER PENALTY OF PERJURY
8
9          I declare under penalty of perjury
10   that I have read the entire transcript of my
11   Deposition taken in the captioned matter or
12   the same has been read to me, and the same is
13   true and accurate, save and except for
14   changes and/or corrections, if any, as
15   indicated by me on the DEPOSITION ERRATA
16   SHEET hereof, with the understanding that I
17   offer these changes as if still under oath.
18   _____
19                  Robert H. Kohn
20   Subscribed and sworn to on the ____ day of
21   _____, 20 ____ before me.
22   _____
23   Notary Public,
24   in and for the State of
25   _____.
```



Page 121

```
1           DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25            Robert H. Kohn
```

Page 122

```
1           DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25            Robert H. Kohn
```

