# Zakarin Declaration
# Exhibit 1

# Robert Kohn Deposition Volume 1

Page 1

1

2                UNITED STATES DISTRICT COURT

            FOR THE SOUTHERN DISTRICT OF NEW YORK

3    -------------------------------x

     TWELVE SIXTY LLC, ARON

4    MARDEROSIAN and ROBERT

     MARDEROSIAN,

5

                        Plaintiffs,

6

              -against-

7

                                 Civil Action No.:

8                                1:17-CV-01479-PAC

9

     EXTREME MUSIC LIBRARY LIMITED,

10   a division of Sony/ATV Music

     Publishing; EXTREME MUSIC

11   LIMITED; VIACOM INTERNATIONAL

     INC., NEW CREATIVE MIX INC.,

12   HYPE PRODUCTION MUSIC,

13                   Defendants.

14   -------------------------------x

15                   November 1, 2018

16                   1:00 p.m.

17

18        Deposition of ROBERT H. KOHN, taken by

19   Defendants, pursuant to Notice, held at the law

20   offices of Pryor Cashman, LLP, 7 Times Square, New

21   York, New York, before Judith Castore, a Certified

22   Livenote Reporter and Notary Public of the State of

23   New York.

24

25

Page 2

```
1
2        A P P E A R A N C E S
3   ON BEHALF OF PLAINTIFFS
         MARDEROSIAN & COHEN, PC
4        1260 Fulton Street
         Fresno, California 93721
5        559-441-7991
         BY:  MICK MARDEROSIAN, ESQ.
6            mick@mcc-legal.com
             HEATHER COHEN, ESQ.
7
8   ON BEHALF OF DEFENDANTS - Extreme Music Library
    Limited, Extreme Music Limited
9        PRYOR CASHMAN, LLP
         7 Times Square
10       New York, New York 10036
         212-421-4100
11       BY:  DONALD S. ZAKARIN, ESQ.
             dzakarin@pryorcashman.com
12           ROSS M. BAGLEY, ESQ.
             rbagley@pryorcashman.com
13           YEVGENIA S. KLEINER, ESQ.
             ykleiner@pryorcashman.com
14
15  ON BEHALF OF DEFENDANTS - Viacom International,
    Inc., New Creative Mix, Inc. and Hype
16  Production Music
         LOEB & LOEB
17       345 Park Avenue
         New York, New York 10154
18       212-407-4000
         BY:  WOOK J. HWANG, ESQ.
19           whwang@loeb.com
             ERIN SMITH DENNIS, ESQ.
20           edennis@loeb.com
21
22  ALSO PRESENT:
23       DAVID J. PRZYGODA, ESQ., Litigation
         Counsel, Sony Corporation of America
24
25
```

Page 3

```
1
2        IT IS HEREBY STIPULATED AND AGREED, by and
3   among counsel for the respective parties hereto,
4   that the filing, sealing and certification of the
5   within deposition shall be and the same are hereby
6   waived.
7        IT IS FURTHER STIPULATED AND AGREED that all
8   objections, except to the form of the question,
9   shall be reserved to the time of trial;
10       IT IS FURTHER STIPULATED AND AGREED that the
11  within deposition may be signed before any Notary
12  Public with the same force and effect as if signed
13  and sworn to before the court.
14            * * * *
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              KOHN
2   R-O-B-E-R-T  H.  K-O-H-N,
3        Having been duly sworn by a Notary Public
4   within and for the State of New York, stated an
5   address as 140 East 28th Street, Apartment 5-G, New
6   York, New York 10016, was examined and testified as
7   follows:
8   EXAMINATION BY MR. ZAKARIN:
9    Q   Good afternoon, Mr. Kohn.
10   A   Good afternoon.
11   Q   You've stated your name for
12  the record, so we'll dispense with
13  that.
14       Please give me your
15  educational background.
16   A   I have a law degree from
17  Loyola Law School.
18       COURT REPORTER:  I'm sorry.
19  If you could just keep your voice
20  up.  Law degree from?
21   A   Excuse me.
22   Q   Loyola Law School --
23   A   Loyola Law School in Los
24  Angeles.  I got a JD degree that I got
25  in 1981.  If you want prior to that, I
```

Page 5

```
1              KOHN
2   was at Cal State Northridge.  I
3   graduated with a business degree.  I
4   majored in finance, minored in
5   economics.
6        After law school, I took some
7   professional courses on the
8   entertainment business at USC here and
9   there.  I have a LLM at Columbia Law
10  School, which I got in 2016.  That
11  was -- I graduated with a Kent
12  Scholar -- James Kent Scholar.
13   Q   In what area?
14   A   Nothing practical.
15  Jurisprudence, biblical jurisprudence,
16  philosophy of law, free speech,
17  theories of property.
18   Q   So just a general LLM?
19   A   Very general.
20   Q   Okay.
21   A   Yeah.
22   Q   Give me your employment
23  history, please.
24   A   Sure.
25   Q   After you graduated law
```

2 (Pages 2 - 5)

KOHN

1
2  you were retained as an expert for
3  purposes of testimony?
4      A   No.
5      Q   So you were retained --
6      A   I was an expert from day one.
7      Q   Okay.
8          Because I wanted to
9  differentiate if they're
10 differentiating in terms of your fees.
11     A   No.
12     Q   So can you tell me how much
13 you have charged thus far to the
14 plaintiffs for your services?
15     A   Well, I charge at 650 an
16 hour; and I have bills that I think
17 exceeded 100 hours.  I believe it's
18 105, 110.  I don't remember.
19     Q   Through what period of time?
20     A   Starting -- the date of the
21 retainer agreement was February 1st.  I
22 think that was about when it started.
23     Q   Okay.  So --
24     A   From this year.
25     Q   Since February 1st you have

KOHN

1
2  devoted something slightly north of 100
3  hours to your work on this case?
4      A   Yes.
5      Q   Okay.  That's including
6  attending depositions and whatever
7  else?
8      A   Yes.
9      Q   Okay.
10         In connection with the
11 preparation of your report, did you
12 communicate at all verbally or in
13 writing with any production music
14 library companies?
15     A   No.
16     Q   Have you communicated at all
17 verbally or in writing with any
18 executives of any production music
19 library companies?
20     A   No.
21     Q   Have you communicated at all
22 verbally or in writing with any music
23 publishing companies?  And when I say
24 music publishing companies, I'm
25 referring to popular music publishing

KOHN

1
2  companies, whether it's Warner Chapel,
3  Sony ATV, ABMG.
4      A   Not in --
5      Q   Just to distinguish them from
6  a production music library.
7      A   If you're asking in
8  connection with this case?
9      Q   In connection with this case.
10     A   No.
11     Q   And I'm actually asking in
12 connection with the generation of your
13 report.
14     A   No.
15     Q   Have you ever been employed
16 by a production music library company?
17     A   I wouldn't call it employed.
18 My uncle ran one of the largest
19 production music libraries in the world
20 of its time, which was Southern Music
21 Library which was owned by Peer Music.
22         COURT REPORTER:  I'm sorry?
23         Owned by?
24     A   Peer Music, P-e-e-r.  Peer
25 Music.

KOHN

1
2      Q   Did you work for him?
3      A   Well, I provided him with
4  advice.  I never charged him.
5      Q   When did you provide him with
6  advice?
7      A   This would have been back in
8  the 1980s.
9      Q   Do you remember the subject
10 matter in which you provided him
11 advice?
12     A   Yeah.  My best memory is that
13 he invited me to his office, and
14 because it was during the time in which
15 I was writing the first edition of Kohn
16 on Music Licensing.  I think it was the
17 1980s.  It could have been the early
18 '90s, but I'm pretty sure it was before
19 the first edition.  As a matter of fact
20 I do -- it had to have been in the
21 '80s.  I was living in Los Angeles.  So
22 probably prior to '87.
23         I had visited his office,
24 which was a little one-man office in
25 Taluka Lake, California, which is near

Page 22

KOHN

1
2  Burbank, I think.  And I spent all
3  morning with him.  He took phone calls.
4  He was talking to people giving
5  licenses.  I recall actually something
6  pretty funny, at least he thought it
7  was funny to me because he had got a
8  call from -- that day from a company
9  that wanted to use a needle drop in
10  a --
11        COURT REPORTER:  I'm sorry,
12    sir.  Can you just look this way?
13    A   A needle drop -- yeah.  A
14  needle drop in a porno film and they
15  came up with a song called Big Hammer.
16  And he thought that was funny.  And he
17  takes the -- he had record albums at
18  the time and then he would take a DAT
19  tape, D-A-T, digital audiotape and do
20  recordings.  Stick it in an envelope
21  and put a contract with it or license
22  with it and send it off to the guy who
23  took the phone call.
24        And what I -- what I did for
25  him because I looked at the license

Page 23

KOHN

1
2  that he did, and by that time I had
3  been out of Rudin's office and I had
4  some experience in synchronization
5  licenses and such, and I was kind of
6  surprised how simple that form was.
7  And it could be better.  And I could
8  make it better.  And I actually put
9  together a synchronization license for
10  him, which he thought was too long, and
11  I got it down to one page and gave that
12  to him and he went ahead and started
13  using that.  And, you know, I'd always
14  see him at family events and things
15  like that.
16        And over the years we talked
17  about what he was doing, et cetera, and
18  he was using my license for quite a
19  while.  So I had that.  It was a
20  one-man shop at that time, but he
21  certainly had a lot of experience in
22  dealing with a major production music
23  library.  And I got a sort of -- got an
24  idea of what that was through that
25  experience.

Page 24

KOHN

1
2    Q   Okay.
3        So you were not employed by
4  Music Production -- a production music
5  library company but you did this little
6  consulting project on a sync license,
7  as it were, for your uncle back in the
8  '80s?
9    A   Well, I would say, yeah.  I
10  mean, whatever questions he had for me
11  and other things that I might have over
12  the years that I don't really remember
13  frankly.
14    Q   Have you ever engaged in
15  licensing on behalf of a production
16  music library company?
17    A   Not of a production music --
18  you said engaged in licensing?
19    Q   Yeah.
20    A   Actually issuing a license?
21  No.
22    Q   Have you ever been in
23  engaged --
24    A   Not for a production music
25  library.

Page 25

KOHN

1
2    Q   Have you ever been involved
3  in licensing on behalf of a
4  broadcaster?
5        MR. MARDEROSIAN:  Object to
6    the term "involved."
7        Vague, ambiguous.
8    A   I have never -- I don't
9  recall ever working for a broadcaster
10  in getting synchronization licenses.  I
11  did on behalf of a production
12  company -- while at Rudin's office we
13  represented Warner Brother's Pictures.
14  We represented 20th Century Fox.  We
15  represented Irving Azoff, Front Line
16  Management.  We represented Scotti
17  Brothers.
18        There was a period of time at
19  Warners Brothers Music when we were
20  redoing -- this was probably 1982, '83
21  or so -- redoing all of Warner Brothers
22  Music's synchronization licenses.  It
23  was a project that I was heavily
24  involved with.  I spent most of my time
25  on it for several weeks.  It was a time

7 (Pages 22 - 25)

Page 30

KOHN

1
2 picture, I was directly involved with
3 the amount of money that was involved,
4 you know, in that.  It was a -- you
5 come to a point where some fee is
6 established and everyone answers for --
7 no, most favored nations.  So it
8 becomes easy at a point.
9        There's only so many of these
10 things you have to do in order to
11 become knowledgeable on how these
12 things are done.  I don't need to do
13 10,000 synchronization licenses in
14 order to learn how these things are
15 negotiated.
16    Q    Have you ever worked for a
17 PRO in dealing with cue sheets and
18 broadcasters?
19    A    I never worked for a PRO, no.
20    Q    Now in your report you state
21 that acquiring a work on a
22 work-for-hire basis does not mean that
23 there are no other obligations owed to
24 the writer.
25        Now, you know that a work for

Page 31

KOHN

1
2 hire makes the publisher of the work
3 not only the copyright owner but also
4 the author; isn't that correct?
5        MR. MARDEROSIAN:  I'm just
6     going to object.
7        It calls for a legal opinion
8     and conclusion.
9        It's vague and overbroad.
10    Q    You can answer the question.
11    A    When a record company
12 acquires a master from a recording
13 artist, it's under a work for hire
14 agreement.  So -- but under that
15 agreement there are royalty obligations
16 back to the recording artist.  Just
17 because they have a work for hire and
18 they're the author or considered the
19 author of the work, that is the record
20 company, doesn't mean they have no
21 financial obligation whatsoever to the
22 person they're contracting with.
23    Q    Those royalty obligations are
24 specified in the contract, correct?
25        MR. MARDEROSIAN:  I'm going

Page 32

KOHN

1
2 to object.
3        It calls for a legal opinion
4     and conclusion.
5    Q    You can answer the question.
6    A    There are royalty obligations
7 that are specified in the contract, and
8 there are implied obligations that are
9 a part of every contract.
10    Q    We'll get to the implied
11 obligations in due course.  Right now
12 the question that I asked you was:  On
13 a work for hire, the copyright owner is
14 the acquirer of the rights and that
15 acquirer is also under the law of the
16 author; isn't that correct?
17        MR. MARDEROSIAN:  I'm going
18 to object.
19        Calls for -- excuse me, Bob.
20     You need to protect the record.
21        I'm going to object as
22     calling for a legal opinion and
23     conclusion, and it is an
24     incomplete hypothetical.
25     Therefore, it's vague and

Page 33

KOHN

1
2 overbroad.
3    A    Please read the question
4 back.
5    Q    I can say -- I'll say it
6 again, and the objection will be deemed
7 to this so we don't have to waste time.
8        The acquirer of a work for
9 hire under the Copyright Act is not
10 merely the owner of the copyright but
11 it is also deemed the author of the
12 work; isn't that correct?
13    A    That's a different question
14 but I believe the answer to it is yes.
15    Q    Okay.
16        And absent an agreement to
17 the contrary the author of the work
18 would be entitled to the author share
19 of income; isn't that correct?
20        MR. MARDEROSIAN:  I'm just
21     going to object.
22        It calls for a legal opinion
23     and conclusion.  And it is an
24     incomplete hypothetical.
25

9 (Pages 30 - 33)

KOHN

1
2   said, virtually give away the
3   intellectual property in exchange for a
4   small upfront fee and potential
5   lucrative writer's share of public
6   performance royalties.
7       The month before this
8   agreement was signed they got $10,000
9   from the same company that they signed
10  this agreement with for a sync license
11  for just -- they kept the intellectual
12  property.  So they went from $10,000 on
13  a non-work for hire license down to
14  $200 for a work for hire.  So that's
15  where the word "small" comes from.
16      Q   I wasn't asking you about the
17  word "small."
18      A   Well, I wanted to clarify my
19  answer.  You asked me -- you read the
20  whole thing to me.
21      Q   You have to wait -- when I'm
22  talking, you wait.  When you're
23  talking, I'll wait.  It will be much
24  better that way.  Okay?
25      A   Are you finished?

KOHN

1
2       Q   No, because now I'm going to
3   ask you the question --
4       A   Good.
5       Q   -- that you didn't answer.
6           You said that we were
7   provided all of these licenses.  And
8   I'm asking you what licenses do you of
9   your own knowledge know we were
10  provided of the brothers?
11      A   There's a set of licenses,
12  about 15 licenses or -- 15 to 20
13  licenses that I've seen in which the
14  brothers have licensed to third parties
15  of their own music that's not -- songs
16  and recordings that are not included in
17  either of the contracts in this case,
18  in which they licensed over the period
19  of time from 2010 until about 2017.
20      Q   Are those licenses identified
21  in the works that you reviewed, the
22  materials you reviewed?
23          MR. MARDEROSIAN:  He's been
24      provided with all of the materials
25      that were produced.  I think

KOHN

1
2       that's what the reports indicate.
3       Q   That wasn't my question.  I
4   asked a different question.
5           I said --
6       A   Yes.
7       Q   -- are those licenses
8   listed --
9       A   Yeah.
10      Q   -- in the material --
11      A   They don't have to be
12  listed --
13          COURT REPORTER:  I'm sorry,
14      sir.  I just need a full question.
15      A   They don't have to be listed.
16  I talked about Aron and Robert
17  regularly command $60,000 for film
18  trailers --
19          COURT REPORTER:  Sir.
20          MR. MARDEROSIAN:  Slow down.
21      Slow down, please.
22      A   Aron and Robert regularly
23  command $60,000 for film trailers that
24  use works they own and control.
25      Q   I understand --

KOHN

1
2       A   Where do you think I got that
3   information?
4       Q   I'm asking you a different
5   question.
6       A   Well, it's in my report.
7       Q   So you were provided with
8   licenses.  That's where you get the
9   information from; is that right?
10      A   Yes.
11      Q   Okay.
12          You also said that we were
13  provided those licenses.  And I'm
14  asking you how do you know that?
15      A   I just made an assumption on
16  that.
17      Q   So it was an assumption that
18  you made while you were sitting here?
19      A   Yes.
20      Q   You don't know that as a
21  fact?
22      A   I don't get involved with
23  communications between the plaintiff's
24  attorneys and you.
25          So I have no personal

Page 58

KOHN

1
2 knowledge of what they sent you and
3 what you sent them.
4     Q   I understand.  All I'm trying
5 to do is get a clear record as to when
6 you know something and when you are
7 assuming something.
8     A   Well, it's fair enough.
9     Q   Because there's a difference.
10     A   It's fair enough.
11     Q   That's all.
12         How many production music
13 library work for hire contracts have
14 you studied in your career?  I know
15 these -- these two we know you have.
16 But beyond those?
17     A   I don't remember.
18     Q   More than 100?  More than a
19 1,000?
20     A   I didn't do a lot of
21 dealing --
22     Q   More than two?
23     A   It might have been more than
24 two; but it's probably less than 1,000.
25 I mean, it's less than 100.

Page 59

KOHN

1
2     Q   Less than ten?
3     A   I haven't done a lot of
4 production music library work directly.
5 I've never worked for a production
6 music library.
7     Q   I understand.
8     A   But I've seen production
9 music library licenses over time in
10 connection with studying and getting
11 information from either my father or
12 for other people in the industry or
13 from sitting on panels with people like
14 Mr. Massarsky, who's sitting here at
15 the table.  I might have been on a
16 panel with him at one point or another
17 where you pick up what the customs and
18 practices are in the music industry.
19     Q   So you glean that from your
20 discussions with people like Massarsky
21 or --
22     A   Or from looking directly at
23 the contracts.
24     Q   The production music library
25 contracts --

Page 60

KOHN

1
2     A   Production music library
3 contracts, yes --
4         COURT REPORTER:  Sir.  I'm
5 sorry.  Wait.  I just need a full
6 question.
7         MR. ZAKARIN:  You're right.
8 We'll try to slow it down.
9     Q   The production music library
10 contract?
11         MR. MARDEROSIAN:  Excuse me.
12 It really -- this needs to slow
13 down.
14         In all due respect to you,
15 Don, you need to slow it down with
16 the questions.  And, Bob, in
17 responding to the questions, we
18 need a moment, take a breath so
19 that we don't wear the court
20 reporter out so we can get through
21 the deposition today.
22         Okay.  And I am as guilty as
23 anyone in what advice I just gave
24 the both of you.  So let's get
25 that skunk out on the table right

Page 61

KOHN

1
2 now.
3         But I'm just trying to help
4 the process so that Mr. Zakarin,
5 on behalf of his clients, can get
6 your opinions and question the
7 opinions that you set forth in
8 your report.
9         THE WITNESS:  Thanks, Mick.
10         MR. MARDEROSIAN:  All right.
11     Q   Okay.
12         Where were we?  Did we have
13 an answer?  Let's try to get back to
14 where we were.  Give me a second.
15         Now, you gleaned this -- the
16 knowledge of the custom and practice
17 from being on panels with people like
18 Massarsky and from the production music
19 library contracts, the work for hire
20 contracts you've looked at?
21     A   And discussions that I've had
22 with my Uncle Roy and the advice that I
23 might have given him over a period of
24 years, that he might have asked me
25 questions that I have given him.  He

16 (Pages 58 - 61)

Page 62

KOHN

1
2  was the closest person in my life whose
3  full-time business for 40 years was
4  running a production music library.  He
5  was my uncle, and I would see him
6  very -- almost every weekend, you know,
7  in California.
8      Q   Is he still alive?
9      A   No.  He passed away last
10  year -- or two years ago.
11      Q   I'm sorry.
12      A   He was 91, lived a good life.
13      Q   But as you testified already,
14  in connection with your forming of your
15  report, you did not consult with, talk
16  to any production music libraries or
17  executives at those companies?
18      A   No.
19      Q   Okay.
20          Now, you've talked about
21  having looked at some, I think, 15
22  licenses, I think you said, of the --
23  of the plaintiff's work -- of their
24  self-published works, I guess it is; is
25  that right?

Page 63

KOHN

1
2      A   Yes.
3      Q   Have you examined any of
4  their other production music library
5  agreements other than the two in this
6  case?
7      A   I don't know whether they
8  have other production music library
9  contracts.
10      Q   You're not aware of that?
11      A   No.
12      Q   Okay.
13      A   One way or the other, I don't
14  know whether they have or have not.  I
15  certainly haven't looked at that.
16      Q   You haven't looked at them?
17      A   No.
18      Q   If they exist?
19      A   Well, if they exist, I
20  haven't looked at them.
21      Q   Okay.  Fair enough.
22          Now, in your report what we
23  just looked at is what they were -- an
24  important consideration was the
25  potential lucrative writer share of

Page 64

KOHN

1
2  public performance income; is that
3  right?
4      A   Yes.
5      Q   And that would be hopefully
6  generated by successful placements of
7  their works?
8      A   Yes.
9      Q   Placements with whom?
10      A   Placements with anyone
11  producing audiovisual works that are
12  likely to be broadcast by organizations
13  that are licensed by one of the
14  productions -- one of the PROs or
15  particularly in this case BMI.
16      Q   Well, in this case we're
17  dealing with the 2010 agreement.  Why
18  don't we just put that out there now
19  just so we have it.  Okay?  We're not
20  going to directly refer to it right
21  this minute, but you might as well mark
22  it as K Exhibit 2 or K2.
23          (Blanket Composer Agreement
24      (Direct) dated as of May 19, 2010,
25      was marked K Exhibit 2, for

Page 65

KOHN

1
2      identification, as of this date.)
3      Q   You can just put that next to
4  it.  I'm not going to be questioning
5  you about it.
6      A   Okay.
7      Q   But I'll ask you one
8  question.  Can you identify that as the
9  2010 agreement that you reviewed?
10      A   Yes.
11          MR. MARDEROSIAN:  Don, is
12      this the one that's not
13      Bates-stamped?  Is this the one
14      that you folks produced pursuant
15      to Judge Crotty's order or is this
16      one that's been produced in
17      discovery or, excuse me, or is
18      this the one that the plaintiff's
19      produced.
20          MR. BAGLEY:  I believe that
21      this is the copy that you sent to
22      the court after he asked for a
23      more legible copy of the
24      agreements.
25          MR. MARDEROSIAN:  Yes.

17 (Pages 62 - 65)

KOHN

1
2 performance income of sound recordings.
3 There's a performer share.
4    A   Well, a performer share.
5       Okay.  I misspoke.  Correct.
6 Performer share.
7    Q   I just want to make sure that
8 we're not confusing the record.
9       MR. MARDEROSIAN:  Well, then
10   ask questions as opposed to making
11   statements --
12      THE WITNESS:  So that.
13      MR. MARDEROSIAN:  Excuse
14   me -- to the witness.  This is
15   supposed to be question --
16      MR. ZAKARIN:  The witness --
17      MR. MARDEROSIAN:  Hold on.
18      MR. ZAKARIN:  -- accidentally
19   misspoke.
20      MR. MARDEROSIAN:  It's
21   supposed to be a question and
22   answer process.  I know that you
23   believe in what you're stating,
24   but that's not the point for this
25   process.  It's question and

KOHN

1
2   answer.
3       If he's wrong, point that out
4   at a later time before the court
5   or at the time of trial.
6       MR. ZAKARIN:  I think I
7   helped your witness to correct a
8   misstatement that was inadvertent.
9       THE WITNESS:  It was
10   inadvertent.  It wasn't advertent.
11   It was a performers.
12      The performer doesn't
13 register the fact that they -- if they
14 don't put their name on Sound Exchange
15 and attach themselves to some metadata
16 of some kind.  They're not going to get
17 paid at all.
18      Now, when you say they
19 registered at Sound Exchange, that
20 could mean a lot of things and I -- and
21 we have to look at the facts.  And I
22 certainly have no personal knowledge of
23 what they did or didn't do with respect
24 to Sound Exchange in those recordings.
25   Q   Okay.

KOHN

1
2       In terms of the 2010
3 agreement, Exhibit K2, can you identify
4 any provision in it that obligated
5 Viacom as a music publisher, meaning
6 New Remote Productions, to file cue
7 sheets with BMI?
8       MR. MARDEROSIAN:  I'm just
9   going to object.  It calls for a
10   legal opinion and conclusion.
11   A   I'm going to take a minute to
12 look through this.
13   Q   Please do.
14   A   Because there's a difference
15 between this agreement and the other
16 agreement as to what they said.
17   Q   Please do.
18   A   I think I can treat this the
19 way I said it before, in that whether
20 there's something specific in here or
21 not, what music publishers do is in
22 administering the rights acquired from
23 songwriters, whether it's on a work for
24 hire basis or a copyright assignment
25 basis or an administration basis where

KOHN

1
2 they have an administration agreement,
3 their responsibility is going to be to
4 do those things necessary for the song
5 writer to receive the benefit of the
6 bargain they made in signing the
7 contract.
8       So the answer is, yes, they
9 have an obligation to review cue sheets
10 with respect -- if the cue sheets have
11 mistakes in them, they're not going to
12 get paid.  BMI says that.  The other
13 thing is if the mistakes were caused by
14 the administrator as it was in this
15 case by apparently providing very bad
16 metadata where I've seen cue sheets
17 that have the word Mix Tape as the name
18 of the composer, and that wasn't just
19 one that I had in my report.
20      Mr. Marderosian yesterday
21 pointed out to one of your expert
22 witnesses who had never even seen those
23 before.  He seemed -- his face looked
24 shocked when he saw the word "Mix
25 Tape," which is the name of a library

26 (Pages 98 - 101)

KOHN
1
2 that your client runs as the name of
3 the composer.  Now, how did that
4 happen, I say rhetorically.
5        So that -- when they cause
6 mistakes like that, they have every
7 obligation to fix the mistake.  Rob and
8 Aron didn't make those mistakes.
9    Q   Tell me something.  You just
10 said that our client provided very bad
11 metadata.
12        Have you seen the metadata?
13        Have you seen the metadata?
14        MR. MARDEROSIAN:  Object.
15 It's vague and overbroad.
16        What metadata are you
17 referring to?
18        MR. ZAKARIN:  He's just --
19        THE WITNESS:  I don't need
20 the see metadata.
21        MR. MARDEROSIAN:  Hold on.
22 Excuse me.
23        We made a request for
24 production of the hard drives, and
25 you said that they don't exist any

KOHN
1
2 longer.
3        So are you now changing that?
4        MR. ZAKARIN:  Yeah.  The
5 witness has --
6        MR. MARDEROSIAN:  Do they
7 exist or not?
8        MR. ZAKARIN:  The witness has
9 made a statement, and I've asked
10 him the appropriate question.
11    Q   Have you seen the metadata
12 that you said was bad?
13        MR. MARDEROSIAN:
14 Mr. Zakarin, I asked for the
15 metadata.  I wanted to see the
16 metadata that Dan White and Russel
17 Emanuel were sending with the
18 audio tracks.  And I have been
19 repeatedly told through the
20 discovery of this case it no
21 longer exists.
22        Are you now changing -- does
23 it exist or not?
24        MR. BAGLEY:  Where was that
25 discovery request?

KOHN
1
2        MR. ZAKARIN:  You are --
3 wait.  Shh.  Shh.  That's right.
4        MR. MARDEROSIAN:  In the
5 depositions.
6        MR. ZAKARIN:  There is no
7 such --
8        MR. MARDEROSIAN:  In the
9 depositions.
10        MR. ZAKARIN:  I don't care.
11 It doesn't matter.  That has
12 nothing to do with my question.
13        You're vamping now, Mick, and
14 it's not very effective.
15        MR. MARDEROSIAN:  I'm not
16 vamping at all.
17        MR. ZAKARIN:  You are.
18 There's a question on the record.
19 You answer it.
20    Q   Have you seen any of the
21 metadata that you have now stated was
22 bad?
23    A   The word "Mix Tape" is part
24 of the metadata.  So the answer is yes.
25    Q   You don't know it is, do you?

KOHN
1
2    A   Yes, I do.  How else would
3 that --
4        MR. MARDEROSIAN:  Hold on.
5        You're arguing now.
6        Let's take a break.  We're
7 taking a break.
8        You need to control yourself
9 and stop arguing with the witness.
10        MR. ZAKARIN:  I'm fine.
11        MR. MARDEROSIAN:  Let's take
12 a break.
13        MR. ZAKARIN:  I'm fine.
14        MR. MARDEROSIAN:  You're
15 arguing with the witness.
16        MR. ZAKARIN:  You can take a
17 break, but I am fine.
18        MR. MARDEROSIAN:  We're going
19 to take a break because you're --
20 you need to calm down.
21        (Whereupon, a brief recess
22 was taken.)
23    Q   It's a simple question.
24        MR. ZAKARIN:  This is working
25 now?

27 (Pages 102 - 105)

Page 106

KOHN

1
2      COURT REPORTER:  It should
3   be, yes.
4      MR. ZAKARIN:  Okay.
5      MR. MARDEROSIAN:  When you
6   say "simple question," we really
7   don't need remarks like that on
8   the record, Don.  That's
9   argumentative.
10      MR. ZAKARIN:  Thank you,
11   Mick.
12   Q   Mr. Kohn, you haven't seen
13   any of the metadata; isn't that
14   correct?
15   A   What I testified to earlier
16   is that when I saw the word "Mix Tape"
17   as the name of a composer that I was
18   looking at the metadata.
19   Q   You haven't seen any of the
20   metadata that was provided by Extreme
21   to any broadcaster, have you?
22      MR. MARDEROSIAN:  I'm going
23   to object.  It's vague and
24   overbroad.
25      Are you talking about the

Page 107

KOHN

1
2   hard drives that Kelsey Dewald
3   testified to?  Is that what you're
4   talking about, the electronic
5   information that Extreme, even
6   your own expert said Extreme
7   provided to the broadcasters?  Is
8   that what you're asking him, the
9   actual hard drives?  Because they
10   haven't been produced in this
11   case.
12      MR. ZAKARIN:  I understand.
13   Q   You can answer the question.
14      Have you seen any of the
15   metadata that was supplied by Extreme
16   either through hard drives or on its
17   website to any broadcaster?
18      MR. MARDEROSIAN:  I'm still
19   going to object as vague.
20      MR. ZAKARIN:  You can answer.
21      MR. MARDEROSIAN:  And
22   compound.
23   A   I'm thinking now back to a
24   woman named Kelsey.
25   Q   Who's that?

Page 108

KOHN

1
2   A   Kelsey -- there was a
3   deposition by a Kelsey.  I can't
4   remember if that's her first name or
5   last name, where she was talking about
6   the responsibility when the metadata
7   management was in the UK by Extreme.
8   Q   Now --
9   A   And that was changing all the
10   time.  So I think about that, and I
11   wonder what you mean by which metadata.
12      There's lots of metadata that
13   could be used to produce and to give
14   information to broadcasters.  When I
15   see a cue sheet, usually it is
16   comprised of entries that are taken
17   from metadata.  So to answer your
18   question when I'm looking at the cue
19   sheet and I see errors that seem to me
20   were either the result of manipulated
21   metadata intentionally or someone
22   intentionally eliminating the
23   composer's name, I don't know what to
24   make of it.
25      So have I seen hard drives of

Page 109

KOHN

1
2   anything?  No.  Hard drives were not
3   given to me.  Generally when you get
4   metadata, it can be in the form of a
5   electronic spreadsheet file.  I've had
6   a lot of spreadsheets sent to me in the
7   course of my report that I've taken a
8   look at.  I'm not sure which one might
9   have been the metadata that you're
10   talking about.
11   Q   So you don't know if you've
12   seen any metadata; is that right?
13      MR. MARDEROSIAN:  Objection.
14      That's misstating the
15   testimony, the answer just given.
16      It's argumentative as well.
17   Q   You can answer.
18   A   I've already answered that
19   question.
20   Q   No.  You can answer the
21   question now.
22   A   I've already --
23   Q   You don't get to decide.
24   A   I've already answered it.
25   Q   So you're refusing to answer

28 (Pages 106 - 109)

KOHN

1
2 the question?
3    A   No, I already answered the
4 question.
5    Q   Well, I asked you a different
6 question.  If you don't want to answer
7 it, just say so.
8       MR. MARDEROSIAN:  Mr. Zakarin
9    ,you're arguing with the witness.
10    He told you that he answered the
11    question.  If you disagree, you
12    must take it up with the court.
13       MR. ZAKARIN:  I will.
14    Q   Now Mr. Kohn, have you gone
15 onto the website of Extreme and
16 examined any of the metadata?
17    A   Yes.  Well, I've gone onto
18 the website of Extreme; and I've done a
19 number of searches.  And if you've seen
20 ISRC codes -- I'm sorry --
21       COURT REPORTER:  I'm sorry?
22    ISRC codes?
23    A   ISW -- ISWC codes, perhaps
24 ISRC codes.  So if -- that is typically
25 part of metadata.  So that if you're

KOHN

1
2 asking whether I've seen metadata on
3 the website, the answer is yes.
4    Q   Okay.  Have you seen any
5 metadata on the website with respect to
6 the Marderosians' works that improperly
7 identifies the composers, the title of
8 the work, the publisher or the PRO?
9       MR. MARDEROSIAN:  I'm just
10    going to object as vague and
11    overbroad.
12    A   I think it's also too narrow
13 because I don't know what ISRC code and
14 what ISWC code I was seeing -- looking
15 at.  But in Dan Pounder's deposition --
16 I'm sorry -- in Dan Pounder's
17 declaration that was attached to a
18 motion to dismiss or objection to a
19 motion to dismiss, I'm not sure which
20 it was, I guess it was the motion to
21 dismiss, he talks about that there was
22 flaws in the metadata.  He doesn't
23 explain what caused the flaws in the
24 metadata.  That was changing over a
25 period of time, according to this woman

KOHN

1
2 Kelsey.  But that had to be fixed.  I
3 don't know what --
4    Q   But --
5    A   I don't know -- I started
6 working on this case last February.
7 And I don't know when that declaration
8 was filed.  I don't know when the
9 metadata was fixed.  So it was -- so I
10 don't --
11    Q   Go ahead.
12    A   You know, I'm trying to get
13 back to your question and I'm kind of
14 looping back and finding nothing.  So
15 go ahead.
16    Q   So it's your recollection, as
17 long as you brought it up, that
18 Mr. Pounder said that the metadata or
19 the -- or something was wrong with the
20 IWC code?
21       MR. MARDEROSIAN:  Objection.
22    A   That's my recollection.
23    Q   As opposed to him saying that
24 the outward facing website did not have
25 the accurate information but that the

KOHN

1
2 inside website had the information.
3       You don't recall what he
4 said?
5       MR. MARDEROSIAN:  I'm going
6    to object.  It's vague.
7    Q   Is it --
8       MR. MARDEROSIAN:  Vague and
9    overbroad.
10       MR. ZAKARIN:  I'll withdraw
11    the question.
12    Q   Is it your -- do you recall
13 what it was that he actually said in
14 his reply affidavit?
15    A   I'm telling you now that I,
16 and I think I said it earlier, I
17 vaguely recollect him saying something
18 about flawed metadata in his
19 declaration.  I don't remember
20 precisely what he said in his
21 declaration.
22    Q   Okay.
23       In terms of the, you know,
24 cue sheets that you've seen that have
25 some erroneous information, have you

KOHN
1
2  compared any of those cue sheets to
3  other cue sheets for the same songs
4  that have correct information?
5       MR. MARDEROSIAN:  Just going
6   to object that the question as
7   phrased is vague and ambiguous.
8       What body of cue sheets are
9   you referring to, Don?
10      MR. ZAKARIN:  The ones that
11  the witness talked about having
12  improper information such as Mix
13  Tape on it.  That's what he's just
14  testified to.  That's what the
15  question is directed to, Mick.
16      MR. MARDEROSIAN:  Just so
17  we're clear, and I apologize, but
18  there are BMI produced cue sheets
19  in this case.  There are ASCAP
20  produced cue sheets in this case.
21  There are Viacom produced cue
22  sheets in this case.  So there are
23  various sources of cue sheets.
24      Which ones are you referring
25  to that -- in your question?

KOHN
1
2       MR. ZAKARIN:  I'm referring
3   to the ones that the witness is
4   talking about.  That's what I am
5   referring to.  I couldn't care
6   less who produced the cue sheets.
7   I'm talking about the ones that
8   he's testified had erroneous
9   information and from which he has
10  drawn the conclusion that the
11  metadata was flawed.
12      That's what I am asking him
13  about.
14      MR. MARDEROSIAN:  What's the
15  question?  Has he seen --
16      MR. ZAKARIN:  If you would
17  listen --
18      MR. MARDEROSIAN:  -- flawed
19  information?
20      MR. ZAKARIN:  -- if you would
21  not interrupt, you would hear the
22  question.
23      MR. MARDEROSIAN:  Well, it's
24  not about interrupting.  It's
25  about understanding the question.

KOHN
1
2       Do you understand the
3   question?
4       THE WITNESS:  No, I don't.
5    Q   Okay.  You're not supposed to
6   if your counsel professes not to.  So
7   that was very good.
8       Let me try and do this again.
9       MR. MARDEROSIAN:  That's not
10  necessary, Don, but anyways.
11      MR. ZAKARIN:  I found it
12  necessary.
13      MR. MARDEROSIAN:  Remember
14  control.
15      MR. ZAKARIN:  I am.
16      MR. MARDEROSIAN:  We
17  agreed -- both you and I agreed to
18  control.
19      MR. ZAKARIN:  I'm exercising
20  great control, Mick.  In fact,
21  extraordinary control.
22   Q   My question is --
23      MR. MARDEROSIAN:  Mine comes
24  more naturally.
25   Q   -- with respect to the

KOHN
1
2   erroneous cue sheets that you
3   reference -- you recall referencing
4   some erroneous cue sheets?
5       MR. MARDEROSIAN:  He didn't
6   say some.  You're arguing again.
7       MR. ZAKARIN:  One.  You want
8   to make --
9       MR. MARDEROSIAN:  Don't argue
10  the case.  Just ask the question.
11   Q   You have seen more than one
12  erroneous cue sheet?
13   A   You mean cue sheets that
14  contained --
15   Q   Mistaken information or
16  incomplete information, one or the
17  other.
18   A   Or manipulated information.
19   Q   You -- we'll talk about
20  whether it's manipulated.  You're
21  drawing a conclusion on manipulated,
22  aren't you?
23   A   You're drawing a conclusion
24  on mistaken.
25   Q   When I say that that they

30 (Pages 114 - 117)

KOHN

1
2 didn't have corrected --
3    A   I don't know whether --
4    Q   -- they didn't have correct
5 information.  I'm not making a value
6 judgment as to intent, manipulation,
7 how it got there.  I'm simply dealing
8 with a cue sheet that did not have
9 either complete or accurate
10 information.
11    A   The word mistake will connote
12 innocence.  And I don't see, given the
13 cue sheets that I've looked at, the
14 ones that had incorrect -- I mean
15 literally way off the charts incorrect
16 information would seem to me coming
17 from metadata that one of the
18 depositions say was manipulated in the
19 UK by somebody.
20       I have seen a number of cue
21 sheets.  I've seen lots of things
22 produced to me.  I've looked at cue
23 sheets, a whole slew of them, perused
24 them.  And all I could say is I pointed
25 out the ones that, as I did in my

KOHN

1
2 report, and Mick's produced to your
3 expert witnesses yesterday a number of
4 them that say the composer's name is
5 Mix Tape, which is the name of the
6 library.
7    Q   Okay.
8       Now, do you know how Mix Tape
9 got listed there?  Do you know?
10    MR. MARDEROSIAN:  Objection.
11       Vague and overbroad.
12    A   I have no personal
13 knowledge --
14    Q   Okay.  Did you --
15    A   -- of how the word --
16    Q   Go ahead, please.
17    A   -- Mix Tape is there.  I
18 have my suspicions, but I have no
19 personal knowledge of how it got there.
20    Q   So you didn't go to --
21    MR. MARDEROSIAN:  Are you
22       done with your answer?
23    A   Yes, I am.
24    Q   You didn't go to the
25 broadcaster and ask, did you?  Yes or

KOHN

1
2 no?
3    A   I didn't go to the
4 broadcaster -- which broadcaster?
5    Q   The broadcaster that had the
6 mistaken or the incorrect information
7 on the cue sheet?
8    A   Well, I don't know whether it
9 was the broadcaster who produced the
10 cue sheet or whether it was the
11 producer who produced the cue sheet.
12       Are you assuming --
13    Q   Did you go to the producer?
14    MR. MARDEROSIAN:  Hold on.
15       Go ahead.
16    Q   Did you go to the producer?
17    A   I didn't go to -- I didn't go
18 to anyone on the outside to ask them
19 who produced.
20    Q   Okay.  Did you go to Extreme
21 and ask them?
22    MR. MARDEROSIAN:  Wait a
23       second.  Hold on, please.
24       Okay.  I object to the
25       question.

KOHN

1
2       You mean, did he go to your
3 client and have a discussion with
4 your client?
5    MR. ZAKARIN:  Yeah, did he
6 inquire of anybody?
7    A   I looked at the evidence that
8 was presented to me.  And there is
9 clear evidence from someone who works
10 for Viacom that the metadata was
11 changed and manipulated in the UK.  All
12 right?  And it seems to me that the
13 misinformation that you're saying is in
14 these cue sheets or however you want
15 to -- incorrectly putting a name of
16 your client's library as the composer
17 name, gets there through information
18 provided to the broadcaster or the
19 producer.  That's generally how it gets
20 there.
21       I can't imagine how a
22 broadcaster or producer would confuse a
23 composer's name with the name of a
24 library or the word Mix Tape.
25    Q   So --

31 (Pages 118 - 121)

Page 122

KOHN

1
2    A    But, no, I haven't had any --
3  make any phone calls to your client.
4    Q    But you've concluded that the
5  person filling out the cue sheet could
6  not have possibly made an honest
7  mistake; is that your testimony?
8        MR. MARDEROSIAN:  Hold on.
9        I'm going to object to the
10  question.
11        This is calling for
12  speculation.  It's argumentative.
13  It's vague and overbroad.
14        MR. ZAKARIN:  Everything the
15  witness has testified to in the
16  last 20 minutes has been rank
17  speculation.  Why should we stop
18  now?
19        MR. MARDEROSIAN:  Incorrect.
20        Don, stop arguing the case.
21  Kelsey Dewald testified that from
22  Santa Monica Russel Emanuel and
23  Dan Knight continually changed the
24  metadata that went to the
25  broadcasters.

Page 123

KOHN

1
2        MR. ZAKARIN:  There's no such
3  testimony.
4        MR. MARDEROSIAN:  Hold on.
5  You know --
6        MR. ZAKARIN:  There's no such
7  testimony.
8        MR. MARDEROSIAN:  You opened
9  the door --
10        MR. ZAKARIN:  There's no such
11  testimony.
12        MR. MARDEROSIAN:  You want me
13  to read it into the record?
14        MR. ZAKARIN:  Yes.
15        MR. MARDEROSIAN:  Because if
16  you're telling your client --
17        MR. ZAKARIN:  Yes.  Read it
18  into the record.
19        MR. MARDEROSIAN:  Let me get
20  it.  I can absolutely --
21        MR. ZAKARIN:  On the next
22  break, you sit here and read it
23  into the record.
24        MR. MARDEROSIAN:  I will
25  absolutely read Kelsey Dewald's

Page 124

KOHN

1
2  testimony into the record.
3        MR. ZAKARIN:  I want you to
4  do it.
5        MR. MARDEROSIAN:  And I'll do
6  it tomorrow with your expert to
7  see if he's --
8        MR. ZAKARIN:  Please --
9        MR. MARDEROSIAN:  -- familiar
10  with it.
11        MR. ZAKARIN:  -- please do
12  it.
13        MR. MARDEROSIAN:  Because the
14  evidence, even your own experts
15  use --
16        MR. ZAKARIN:  Please do it.
17        MR. MARDEROSIAN:  Let me
18  finish.
19        Even Mr. Katz agreed Extreme
20  controlled all of the metadata
21  that went to --
22        MR. ZAKARIN:  No dispute.
23        MR. MARDEROSIAN:  -- the
24  broadcasters.  That in and of
25  itself is a breach of contract

Page 125

KOHN

1
2  because you're controlling the
3  payment pathway that leads to
4  payment to a composer.  You're
5  controlling the metadata.  And
6  guess what, the results are on all
7  the cue sheets, what cue sheets
8  were filed.  Not even talking
9  about all the cue sheets that your
10  own extract admits were not filed
11  that your client got paid for that
12  my client did not.
13        MR. ZAKARIN:  You haven't
14  proved a thing you keep saying the
15  same thing.
16        MR. MARDEROSIAN:  You
17  produced the documents.
18        MR. ZAKARIN:  You're right.
19  Go through it.  You haven't asked
20  a question about it.
21        MR. MARDEROSIAN:  When you
22  argue that this is speculation, I
23  must respond this way because you
24  seem -- you have a habit of
25  ignoring the adverse evidence in

32 (Pages 122 - 125)

KOHN

1
2    the case.  And that's okay, Don.
3    I'm okay with that because I don't
4    really care.  But don't do it on
5    the record and argue with the
6    expert witness that he's
7    speculating.
8         Kelsey Dewald testified out
9    of Santa Monica the metadata was
10   changed all the time.  You know
11   what it was changed?  Because he's
12   manipulating the composer names to
13   use the composer catalogs that he
14   controls.
15        MR. ZAKARIN:  Mick, you make
16   stuff up on the record and you
17   think that that's --
18        MR. MARDEROSIAN:  I'm not
19   making it up.
20        MR. ZAKARIN:  Don't talk when
21   I'm talking.  I listened to you
22   patiently again.  It's very
23   difficult, but I did listen to you
24   patiently.  Now, you also have to
25   listen to me.  I'll be very brief.

KOHN

1
2         You constantly rhetorically
3    in lieu of evidence make stuff up.
4    And you splay it all across the
5    record.  And it's not evidence.
6    It's not anything but something
7    that you find comforting.
8         MR. MARDEROSIAN:  Here's your
9    extract --
10        MR. ZAKARIN:  I know all
11   about it.
12        MR. MARDEROSIAN:  -- money's
13   flowing through ASCAP.
14        MR. ZAKARIN:  You don't know
15   what it is.
16        MR. MARDEROSIAN:  You
17   produced it yourself.
18        MR. ZAKARIN:  You have you
19   no --
20        MR. MARDEROSIAN:  You've
21   admitted to that money flows
22   through ASCAP.
23        MR. ZAKARIN:  You have no --
24        MR. MARDEROSIAN:  Why is
25   that, Don?

KOHN

1
2         MR. ZAKARIN:  You have no
3    clue what that is and neither do
4    your clients --
5         MR. MARDEROSIAN:  Here's the
6    semiannual reports.  The money's
7    going through ASCAP.  You're
8    reporting to Viacom that the money
9    is flowing through ASCAP, Don.
10        MR. ZAKARIN:  You have no --
11        MR. MARDEROSIAN:  I'm sorry,
12   Don.  But the evidence -- the
13   evidence is over.  It's over.
14        MR. ZAKARIN:  So is this case
15   shortly.
16        MR. MARDEROSIAN:  And you're
17   going to see more during the
18   summary judgment as well.  More --
19   when I make the summary judgment.
20        MR. ZAKARIN:  Please do,
21   Mick.
22        MR. MARDEROSIAN:  I'm going
23   to do that.
24        MR. ZAKARIN:  You think
25   you're threatening me?

KOHN

1
2         MR. MARDEROSIAN:  I'm not
3    threatening you.  You have
4    threatened me with the summary
5    judgment for months.
6         But, Don, guess what, I --
7    this evidence in this case is
8    overwhelming.  And when I get that
9    decision on the summary judgment,
10   it's going to be in the media.
11   I'm going to tell you right now
12   because this is nothing short of
13   theft.  This is illegal activity.
14        MR. ZAKARIN:  The only thing
15   illegal is --
16        MR. MARDEROSIAN:  And it's
17   not going to end.  I'm going to
18   tell you it's not going to end.
19        MR. ZAKARIN:  The only
20   thing --
21        MR. MARDEROSIAN:  There are
22   people lining up.  I'll tell you
23   that right now.
24        MR. HWANG:  I'm going to
25   state something for the record.

Page 130

KOHN

1
2    I'm going to go as long as I need
3    to with Mr. Kohn.
4        MR. MARDEROSIAN:  Do whatever
5    you need to do.
6        MR. HWANG:  However late into
7    the night --
8        MR. MARDEROSIAN:  You
9    don't --
10       MR. HWANG:  -- into tomorrow.
11       COURT REPORTER:  Wait.  One
12   at a time.
13       MR. MARDEROSIAN:  Your
14   threats count nothing to me, Wook.
15   You complain about being a lawyer
16   all the time.  I could care
17   less --
18       MR. ZAKARIN:  Please.
19       MR. MARDEROSIAN:  -- how long
20   we have to stay here.
21       MR. ZAKARIN:  Okay.  Mick,
22   you're wasting my time.  You're
23   wasting everybody's time.
24       MR. MARDEROSIAN:  Ask a
25   question then.

Page 131

KOHN

1
2        MR. ZAKARIN:  You wouldn't
3    know how to ask a question if your
4    life depended on it.
5        MR. MARDEROSIAN:  Don, you
6    opened the door by arguing with
7    the witness that it's speculation.
8    If you don't do that, you won't
9    have to encounter any of this.
10       Act appropriately as a
11   experienced lawyer in asking
12   questions and eliciting answers
13   based on this expert's opinion,
14   just like I did yesterday.
15       MR. ZAKARIN:  You did what?
16       MR. MARDEROSIAN:  Just like I
17   did yesterday.
18       MR. ZAKARIN:  What is --
19       MR. MARDEROSIAN:  In spite of
20   all of your interference, I got
21   all I needed to get out of your
22   own experts because you didn't
23   prepare them correctly.
24       MR. ZAKARIN:  I feel like
25   I've walked into a Mr. Mick's

Page 132

KOHN

1
2    Picklet moment.
3        MS. COHEN:  Don't do that,
4    Wook.  Don't do that.
5        MR. HWANG:  I'm going to make
6    a statement for the record
7    whenever Mr. Marderosian breathes
8    and I can make a statement without
9    interruption.
10       Is that okay?
11       MR. ZAKARIN:  Don't ask --
12       MR. MARDEROSIAN:  Is what
13   okay?
14       MR. HWANG:  Can I make a
15   statement without interruption
16   right now?
17       MR. MARDEROSIAN:  You don't
18   have to ask for my permission
19   about anything.  You're a lawyer
20   that complains about work.  I have
21   no respect for that.  Zero.
22       MR. HWANG:  Can I make a
23   statement now?
24       I'm going to go as long as I
25   need to with Mr. Kohn into the

Page 133

KOHN

1
2    evening, into tomorrow.
3        So to the extent that
4    precludes any testimony you need
5    to take from Mr. --
6        MR. MARDEROSIAN:  You're not
7    going into tomorrow.
8        MR. HWANG:  Absolutely --
9        MR. MARDEROSIAN:  That's not
10   what the --
11       MR. HWANG:  -- I'm going into
12   tomorrow.
13       MR. MARDEROSIAN:  No, you're
14   not.
15       MR. HWANG:  Absolutely.  I'm
16   going to get --
17       MR. MARDEROSIAN:  You get --
18       COURT REPORTER:  Gentlemen,
19   one at a time, please.
20       MR. MARDEROSIAN:  It's going
21   to be until we're done.
22       MR. HWANG:  I'm going as long
23   as I need to with Mr. Kohn.
24       MR. MARDEROSIAN:  Yeah.
25       MR. ZAKARIN:  You don't even

34 (Pages 130 - 133)

KOHN

2   A   I'm trying to think back to
3   the names.  I think it's Quello and
4   Ernesto -- no, Jose -- I'm thinking of
5   something else.  Cuervo.
6        Okay.  It's just a vague
7   recollection that I have.
8     Q   You have a vague recollection
9   that there's deposition testimony to
10  the effect that there was no such
11  online system, so that it got dealt
12  with in the 2011 agreement through the
13  specific registration requirement?
14    A   Yes.
15    Q   If I understand the thrust of
16  what you're saying then, and please
17  correct me if I'm wrong, it's that, in
18  fact, there was no specific
19  registration provision in the 2010
20  agreement, there was this cue sheet
21  preparation provision --
22    A   Right.
23    Q   -- and then it got corrected
24  or addressed in the 2011 agreement in
25  Paragraph 4.8 that we just read?

KOHN

2   A   Right.
3   Q   Thank you.
4        I just wanted to understand
5   what you were saying.
6        MR. MARDEROSIAN:  I think the
7     witnesses he was referring to is
8     Jose Quello, Q-U-E-L-L-O, and
9     Ernesto Elias.
10        MR. ZAKARIN:  I can't swear
11    you, but it doesn't matter.  It
12    either was testified to, or it
13    wasn't.  We know who they are.
14    It's the Viacom witnesses.
15    A   Thank you.
16    Q   Again in Exhibit 3, if you
17  would, and other than whether there is
18  an implied obligation or not, can you
19  tell me any provision in the 2011
20  contract which required Viacom to check
21  any cue sheets that were filed with
22  BMI?
23        MR. MARDEROSIAN:  I'm just
24    going to object.  Calls for a
25    legal opinion and conclusion.

KOHN

2        It is an incomplete
3     hypothetical.  It's vague and
4     overbroad.
5     Q   You can answer the question.
6     A   I disagree with the expert
7   reports provided by the defendant in
8   the case who the experts in which -- in
9   which the experts took the position
10  that there's no custom and practice in
11  the music publishing or music
12  production library business of not
13  correcting cue sheets.
14        I do believe that there is a
15  custom and practice of correcting cue
16  sheets, especially when the cue sheet
17  missed information, missed corrections
18  and manipulated incorrectly through
19  metadata, however we want to discuss
20  that in terms of before, was caused by
21  the music publisher.  So I -- if there
22  is -- if the composer's name is wrong,
23  there's a likelihood that the money is
24  going to not be paid or be misdirected
25  to someone other than the songwriter.

KOHN

2        And it's as between the
3   songwriter and the publisher.  It is
4   not the songwriter's responsibility to
5   do it.  It's the -- to administer these
6   properly, the cue sheets, but it's the
7   music publisher's responsibility.  So
8   if a major source of the income of the
9   songwriter under the bargain that has
10  been entered into under both the 2010
11  agreement and the 2011 agreement is for
12  them to get their performance royalties
13  from BMI, those cue sheets have to be
14  entered correctly and they have to have
15  their composer's name on it, not
16  something like Mix Tape or something
17  else.
18        So it is the responsibility
19  of the publisher to perform those
20  administrative duties so that the
21  songwriter gets the benefit of the
22  bargain.
23    Q   We're going to deal with the
24  custom and practice pretty much right
25  now that you just said exists.  But

Page 158

KOHN

1
2 that wasn't my question.
3        My question was simply, other
4 than there, you know, being some
5 implied obligation or you say there's
6 custom and practice, is there any
7 provision in the agreement that
8 requires Viacom to check the cue sheets
9 for accuracy?  That's my question.
10       MR. MARDEROSIAN:  I'm going
11   to object.  It's been asked and
12   answered.
13       It calls for a legal opinion
14   and conclusion.
15       The document speaks for
16   itself, and it is an incomplete
17   hypothetical and inconsistent with
18   the facts of this case.
19   Q   You can now answer the
20 question.
21   A   Okay.  I am satisfied with my
22 previous answer, and the document
23 speaks for itself.
24   Q   Well, I'm not satisfied; but
25 you're satisfied.  So I will move on.

Page 159

KOHN

1
2      Now, Mr. Kohn, in defining
3 custom and practice in an industry, I
4 want to understand how you define
5 custom and practice.  Does it mean that
6 a custom and practice is something that
7 some company in the industry does
8 sometimes, or is it something that all
9 companies in the industry invariably do
10 as a matter of consistent practice?
11       MR. MARDEROSIAN:  Object to
12   the question as it's vague and
13   overbroad.
14       It's an incomplete
15   hypothetical, and it calls for a
16   legal conclusion.
17       MR. ZAKARIN:  Let me do it
18   differently.
19   Q   Tell me what your definition
20 is of custom and practice.
21       MR. MARDEROSIAN:  In what
22   regard to what topic?
23       I object.  It's vague.
24   Q   You can answer the question.
25   A   Well, custom and practice in

Page 160

KOHN

1
2 any industry --
3   Q   Yeah.
4   A   -- is what is typically done
5 in connection with performing one's
6 obligations under contracts or
7 performing one's obligations to
8 maximize the revenues or minimize the
9 costs for the business in question.
10   Q   So custom and practice is
11 something that in an industry is
12 typically done by most companies in an
13 industry; is that right?
14       MR. MARDEROSIAN:  I'm just
15   going to object.  It misstates the
16   testimony.  It's vague and
17   ambiguous.
18   Q   You can answer.
19   A   I would say that custom and
20 practice is performed by companies in
21 the industry who conform to their
22 obligations to fulfill the terms of the
23 contract, the bargains they've made and
24 their implied obligations of good faith
25 and fair dealing with those they

Page 161

KOHN

1
2 contract with.
3   Q   So isn't that a circular
4 definition, which is, custom and
5 practice is only that which the
6 companies do who are properly doing
7 something as opposed to everybody else?
8       MR. MARDEROSIAN:  I'm going
9   to object to the question.
10   Q   Isn't that a circular
11 definition?
12       MR. MARDEROSIAN:  The
13   question is argumentative.  It's
14   vague and overbroad.
15   A   It's not a circular
16 definition.  It's a definition to a
17 term which you've even tried to
18 characterize in such abstract means.  I
19 think the discussion is better had in
20 determining whether some particular
21 activity is a custom and practice in
22 the industry or not.
23   Q   So you've given me your
24 definition.  Your definition is that
25 it's a -- custom and practice is

41 (Pages 158 - 161)

Page 162

KOHN
1
2 something that's typically performed by
3 companies in the industry who conform
4 to their obligations to fulfill the
5 terms of the contract had the bargains
6 they've made in their implied
7 obligations, good faith and fair
8 dealings with those they contracted
9 were, I guess, performed; is that
10 right?
11    A   I'm not sure that's a
12 precise --
13    Q   I read --
14    A   I know what you read.
15    Q   Okay.
16    A   But what you read doesn't
17 sound like what I said.
18    Q   Well, then would you
19 please --
20    A   So it might not have been
21 transcribed properly.
22    Q   Could you please say it again
23 so we make -- so we know?
24    A   I don't want to say two
25 things different.

Page 163

KOHN
1
2    MR. MARDEROSIAN:  Let's --
3 Ross, don't do that.  Hold on.
4 Let's just wait.  There's too many
5 eye rollings and too many -- you
6 have to stop doing that.  It's not
7 professional and I'm not going to
8 sit here I'm going to tell you,
9 and experience that anymore.
10    MR. ZAKARIN:  He's not
11 rolling his eyes.
12    MR. MARDEROSIAN:  Yes, he is.
13 And Heather has seen it and others
14 have seen it, and it's being done.
15 And it's not professional.
16    Let all come to an agreement
17 not to do that, either side.
18 Either side.  Ask your
19 questions --
20    MR. ZAKARIN:  I did.
21    MR. MARDEROSIAN:  -- just get
22 the responses.
23    MR. ZAKARIN:  I did.
24    MR. MARDEROSIAN:  We don't
25 need reaction.

Page 164

KOHN
1
2    MR. ZAKARIN:  I did.
3    MR. MARDEROSIAN:  We don't
4 need reactions like that.
5    MR. ZAKARIN:  Mick, you don't
6 lecture my colleagues, please.
7    MR. MARDEROSIAN:  I'm -- I'm
8 not lecturing him as your
9 colleague.  I'm lecturing him as
10 an opponent --
11    MR. ZAKARIN:  Okay.
12    MR. MARDEROSIAN:  -- in the
13 room.
14    MR. ZAKARIN:  You can lecture
15 me.
16    MR. MARDEROSIAN:  Don, just
17 let it -- just let it go.
18 BY MR. ZAKARIN:
19    Q   Let's -- if it's improperly
20 or incorrectly transcribed in any way,
21 I want to have this clear on the
22 record.
23    MR. MARDEROSIAN:  Make fun of
24 us all you want.  There's going to
25 come --

Page 165

KOHN
1
2    MR. ZAKARIN:  Mick --
3    MR. MARDEROSIAN:  -- a day,
4 Ross, you're not going to be
5 making fun of us.  I'm going to
6 tell you right now --
7    MR. ZAKARIN:  Mick, I'm
8 trying to --
9    MR. MARDEROSIAN:  -- so just
10 stop it.
11    MR. ZAKARIN:  Mick, can I
12 please go forward with this
13 deposition?
14    MR. MARDEROSIAN:  Yes.  I --
15 I really would appreciate that.
16    MR. ZAKARIN:  I'm trying.
17 Trust me.  I am.
18    MR. MARDEROSIAN:  I know you
19 are.
20    Q   Let's go through your
21 definition of custom and practice
22 against, sir, because it's important to
23 have on the record.
24    MR. MARDEROSIAN:  Just -- I'm
25 going to object.  It's been asked

42 (Pages 162 - 165)

KOHN

1
2 now told us.  So we can move on.
3          MR. MARDEROSIAN:  Just for
4    the record, I'm going to --
5    A   And --
6          MR. MARDEROSIAN:  -- excuse
7    me -- I'm going to object.  That
8    was a misstate of what he said.
9    And it's vague and ambiguous.
10    A   Typically done --
11          MR. ZAKARIN:  Okay.  The
12    record will reflect it.
13    A   You didn't finish what I had
14    said.  But it's typically done in
15    compliance -- I might have said
16    earlier, in conformance, but I may have
17    misspoke -- but in compliance with
18    obligations that you have both express
19    obligations and implied obligations
20    with respect to those people that you
21    are contractually dealing with in the
22    industry.  Or to perform your duties
23    correctly for the sake of the company
24    that you're working for or for those
25    whom you're working for, such as

KOHN

1
2 shareholders or employees or
3 songwriters and other third parties you
4 may be contracting with.
5          Q   On Page 10 -- turn to Page 10
6 of your report if you would.  I'm going
7 to read you a couple of things that you
8 said on the same topic.
9          Top of the page you say, it
10 has long been the responsibility of the
11 songwriter's music publisher to monitor
12 the cue sheets, submit it to the DROs
13 and with the advent of cable television
14 and the platform it has provided to
15 independent television producers, the
16 responsibility for reviewing cue sheets
17 for accuracy has now become a routine
18 part of a music publisher's basic
19 responsibilities.
20          You then go on and say in the
21 next bullet point, as between the music
22 publisher, the PRO and the songwriter,
23 the publisher bears responsibility for
24 making sure the cue sheets are filed
25 with the proper PRO and are accurate.

KOHN

1
2          And then you say going down,
3 the last bullet point, it is the custom
4 and practice of music publishers to
5 review cue sheets for accuracy and
6 correct any mistakes.  This is true of
7 even publishers who consider themselves
8 to be music production libraries.
9          Those are your statements in
10 your report.  And when you refer to
11 custom and practice there, is that the
12 custom and practice as you've just
13 previously defined it?
14    A   I don't understand the
15 question.  Say that again.
16    Q   You've said -- you used the
17 term "custom and practice."  Is that --
18 is your use of the term "custom and
19 practice" there consistent with the
20 definition that you gave me just a few
21 minutes ago, or is it anything
22 different?
23    A   I think it is.  I think it
24 is.
25    Q   It is consistent?

KOHN

1
2    A   It would -- it sounds
3 consistent.
4    Q   Now, what I want to
5 understand is the factual basis for
6 your statement.  Let's -- these are a
7 couple of statements.  Let's deal with
8 the last one.
9          It is the custom and practice
10 of music publishers to review cue
11 sheets for accuracy and correct any
12 mistakes.  This is true of even
13 publishers who consider themselves to
14 be production music libraries.
15          What's the factual basis for
16 your statement of that being the custom
17 and practice?
18    A   The -- in terms of production
19 music libraries, I actually didn't
20 mention earlier that I meant to do, but
21 I -- I first learned the word -- what
22 the word "cue sheet" was when sitting
23 with my uncle who actually had a stack
24 of them and he explained to me what
25 they were.  And he was -- he was

Page 174

KOHN

1
2 reviewing them.
3        I don't have any specific
4 recollection of what they -- where they
5 were from and where they got them.  It
6 was actually paper that he got.  It
7 would have -- back in the '80s.  Then
8 maybe ASCAP would have sent it to him.
9 But if he didn't make sure that the cue
10 sheets were filed properly with ASCAP,
11 he wouldn't have gotten the performance
12 money on the back end, which is what he
13 was explaining to me.  Because he
14 talked -- he told me what a needle drop
15 was.  That he might charge $200 for a
16 needle drop.  And I go that doesn't
17 sound like a lot of money.  How do you
18 make money on this?  And he says I get
19 it all in the back end.  And that
20 morning he had a stack of cue sheets,
21 whatever.  And I didn't quite fully
22 understand it at the time.  Maybe over
23 the years I got a better understanding
24 of that.
25    Q   Who else --

Page 175

KOHN

1
2    A   Now --
3    Q   I'm sorry.  I didn't want to
4 interrupt you.
5    A   Just so it is on the -- as I
6 mentioned in the third bullet on the
7 this page, according to BMI without cue
8 sheets, it would be nearly impossible
9 for such composers and publishers to be
10 compensated for their work.  The ASCAP
11 website says the same thing and
12 actually uses the term "production
13 music libraries" in the sentence.
14    COURT REPORTER:  Uses the
15    term?
16    A   Production music libraries in
17 the sentence.
18    Q   Okay.
19    A   So the ASCAP website says it.
20 The BMI website says it.  Your client,
21 the CEO of Extreme in his deposition
22 said that's not something we do, they
23 do that over at Sony ATV.
24    Q   Huh-uh.
25    A   Yes, he did.

Page 176

KOHN

1
2    Q   That's not what he said.
3    A   Yes, he did.
4    Q   Okay.
5    A   He said -- that's the job of
6 --
7    Q   Whatever it says, it says.
8    A   That's the job -- that's the
9 job of commercial publishers.  The CEO
10 of Extreme said it himself.  So one of
11 the basis of my customs and practices
12 is your own CEO saying in his
13 deposition that Sony ATV does it.
14        Dan Pounder in his
15 declaration said that we don't have the
16 resources to do it like Sony ATV does.
17 I read that.  Okay?
18        So why don't you ask your own
19 client why they don't follow the
20 customs and practices of the industry
21 that their own parent company follows
22 as well.  They say -- they chose not to
23 do it because they say they don't have
24 the resources.  If they --
25    Q   I'm sorry.  I didn't want to

Page 177

KOHN

1
2 interrupt you.
3    A   So the basis -- I've been to
4 panels.  I have discussed this with
5 people in the industry over the past 35
6 years since writing the book about how
7 to make sure -- the whole book is Kohn
8 on Music Licensing, there's a theme in
9 the book is that you shouldn't be --
10 that you should be willing to license
11 your music out there so that you get
12 the back end public performance
13 royalties.  Everyone knows.  It's plain
14 as sight.  It's on the ABMI and ASCAP
15 websites.  You can't be a production
16 music library or a music publisher and
17 miss it, that if you don't have cue
18 sheets on file, you're not going to be
19 getting the largest piece of the income
20 that music publishers make.
21        So for your client to say
22 bizarrely to me, bizarrely to the
23 court, bizarrely to the songwriters
24 that they represent that they don't
25 have any responsibility, and for you to

45 (Pages 174 - 177)

Page 178

KOHN

1
2 bring in expert witnesses who dare --
3 the head of APM, okay, filed an expert
4 report in this case.  He's a production
5 music library, and he denies any
6 responsibility.
7       Of course he's going to come
8 in -- you brought in an expert who's
9 the CEO of a production music library
10 to tell you what -- the practices in
11 the industry.  Of course he's going to
12 say that we don't do it.  That's not
13 the practice, because he doesn't want
14 to do the work.
15       You have -- you have
16 yesterday, the expert witness that you
17 brought in yesterday that I sat in on
18 and, that's Mr. Katz.  He was on the
19 board of APM.  He also acquired a
20 production music library called First
21 Com.  And he sat there brazenly telling
22 Mr. Mardosian's [sic] --
23    Q    Marderosian.
24    A    -- Marderosian's client that
25 they have no responsibility either to

Page 179

KOHN

1
2 do it.  He's saying it's custom --
3 there's no custom and practice in the
4 industry.
5       If you read books like Todd
6 Brabec, who you called a putz the other
7 week at a deposition, which was
8 appalling and it was insulting to me
9 and the people that I know in the music
10 industry --
11    Q    Uh-huh.
12    A    -- in his book he says that
13 it's customs and practice in the music
14 industry.  You don't have to be around
15 much to understand that it is custom
16 and practice for production music
17 libraries and music publishers as their
18 basic responsibility to make sure the
19 biggest source of income gets paid to
20 the songwriters.
21    Q    Okay.  Are you done?
22       MR. MARDEROSIAN:  Well,
23    that's argumentative.
24       MR. ZAKARIN:  I just wanted
25    to know because I don't want to

Page 180

KOHN

1
2    interrupt the witness.
3    A    I am done.
4    Q    Oh, okay.  Well, now we'll go
5 back.
6       So in addition to your uncle
7 who you sat with about 30 years ago and
8 he had a stack of cue sheets on his
9 desk, what other production music
10 libraries have you either talked to or
11 found out as a matter of custom and
12 practice reviewed cue sheets, any
13 others?
14    A    I don't remember any others.
15 I met Adam --
16    Q    Thank you.  That's enough.
17    A    I --
18       MR. MARDEROSIAN:  Wait.  What
19 do you mean that's enough?
20       MR. ZAKARIN:  No, no, that's
21 enough.
22       He's answered it.  He's
23 answered the question.
24       MR. MARDEROSIAN:  No, he
25 hasn't.

Page 181

KOHN

1
2    A    No, I didn't say I didn't
3 talk to production music libraries.  I
4 met Adam Taylor a number of years ago.
5 I don't -- I talked about his
6 production music library.  I don't
7 remember having discussed with him, but
8 I might have discussed with him what he
9 does and how he does it.  There are
10 lots of people -- how do you think I
11 wrote Kohn on Music Licensing?
12 Virtually every word in that book,
13 other than the forms, without having
14 discussed with everybody in the music
15 industry that I was in touch with
16 whether it was my uncle, my father,
17 Barry Massarsky sitting at the end of
18 the table, other people that I learned
19 from, what custom and practice in the
20 music industry are?  How could I have
21 possibly have described terms of art?
22    Q    Damned if I know.
23    A    How can I sit here and give
24 you answers to your questions on issues
25 like Sound Exchange and other things if

46 (Pages 178 - 181)

Page 182

KOHN

1      KOHN
2  I didn't talk to a lot of people in the
3  music industry to know what a custom
4  and practice in the music industry is
5  or it isn't?
6          How does a federal judge in
7  Los Angeles in federal court accept my
8  testimony as customs and practice in
9  the music industry as to the
10 interpretation of the ASCAP contract
11 with respect to performances in venues
12 across the country?
13   Q   Are you done?  I don't want
14 to interrupt you.
15   A   That's not the -- I was
16 obviously done.
17   Q   I can't tell.
18      Now, so we've established
19 that you didn't talk to any production
20 music companies or find out what they
21 do --
22   A   That's not true.
23   Q   -- but you talked --
24      COURT REPORTER:  I'm sorry.
25 You didn't talk -- I'm sorry.

Page 183

1      KOHN
2      Talk to any --
3   Q   Music production library
4  companies --
5      COURT REPORTER:  Music
6      production library companies.
7   Q   -- to find out what they do
8  as a matter of custom and practice?
9   A   I -- that's not the
10 testimony.
11   Q   Besides your uncle?
12   A   That's not my testimony.
13 That's not my testimony.
14   Q   It's what --
15   A   No, it's not my testimony.
16      I have talked to production
17 music libraries, people who work for --
18   Q   Who?
19   A   I even met -- I can't tell
20 you the names of the companies.  I
21 can't tell you the names of the
22 companies.  I can't tell you the
23 individuals involved in those
24 companies.  I told you I met with Adam
25 Taylor.  That's one name that came up

Page 184

1      KOHN
2  that I remember specifically.
3          How would I be able to write
4  about these things in the book without
5  having talked to people about what they
6  do for a living?  And that's what I
7  did --
8   Q   Do you write --
9   A   -- for over 35 years.
10   Q   -- do you write in the book
11 about the custom and practice of music
12 production library companies receiving
13 and reviewing cue sheets?
14   A   No, I do not specifically --
15   Q   Okay.
16   A   -- cover in the book cue
17 sheets.  I can't cover every single
18 custom and practice in the music
19 industry.  Now I will.  And in the next
20 version of the book, which will be
21 coming out next year, is going to be
22 talking about this.  And I'm going to
23 use this as an example of how
24 songwriters can be mistreated by their
25 publishers, and particularly production

Page 185

1      KOHN
2  music libraries not just for not
3  reviewing cue sheets but for the
4  shenanigans that have been going on in
5  this -- this case with your CEO.
6   Q   I look forward to it.  And
7  look forward to reading it.  I may even
8  buy it.
9          Now --
10   A   I would hope you --
11   Q   -- did you contact --
12   A   -- copyright.
13   Q   -- any music publishers to
14 find out about whether they engage in
15 this custom and practice of receiving
16 and reviewing cue sheets?  Any music
17 publishers, not production music
18 libraries, but music publishers?  Have
19 you gone --
20   A   I haven't --
21      COURT REPORTER:  I need a
22      full question, please.  If you
23      wait until he finishes --
24   Q   Have you contacted -- right.
25 Have you contacted any of them to find

47 (Pages 182 - 185)

KOHN

1
2  out?
3      A   Since I was engaged in this
4  case, no.
5      Q   Did you do a survey of any
6  production music libraries or music
7  publishers?
8      A   Since I've been engaged in
9  this case, no.
10     Q   Did you do a survey before
11 you were engaged in this case?
12     A   It depends on what you mean
13 by "survey." If it means that --
14     Q   A survey to find --
15     A   If it means that --
16     Q   Let me finish.
17         You're asking me. So I'm
18 going to tell you.
19     A   Go ahead.
20     Q   A survey to determine whether
21 it's a custom and practice of music
22 publishers to receive and review and
23 correct cue sheets.
24     A   You didn't define survey.
25 Try again.

KOHN

1
2      Q   Do you want to know what a
3  survey is?
4      A   Yes.
5          MR. MARDEROSIAN:  Okay.
6  We're getting conversational
7  again.
8          MR. ZAKARIN:  No, no.
9          MR. MARDEROSIAN:  Maybe we
10 need -- maybe we need another
11 break.
12         MR. ZAKARIN:  No.  No break.
13     A   We don't need a break.
14         MR. MARDEROSIAN:  Hold on
15 everybody.  Let's go back to
16 questions and answers.
17         MR. ZAKARIN:  I want to know
18 what the witness means by survey.
19 That's all.
20         MR. MARDEROSIAN:  So, Don, he
21 told you about what he went
22 through in writing his book and
23 the people that he talked to.
24         MR. ZAKARIN:  I heard him.
25         MR. MARDEROSIAN:  Now, you

KOHN

1
2  used the word "survey."  He's
3  asking you to define what you mean
4  by survey so he can answer your
5  question.
6      Q   Yeah.  Did you -- did you
7  submit questionnaires to music
8  publishers -- you didn't talk to
9  them -- but did you submit
10 questionnaires or some sort of document
11 to music publishers or production music
12 libraries to find out if they engaged
13 in this custom and practice of
14 reviewing --
15     A   I --
16     Q   -- receiving, reviewing and
17 correcting cue sheets?
18     A   I submitted questionnaires,
19 no more than the expert witnesses that
20 you have put forth have submitted
21 questionnaires to provide answers to
22 their questions.
23     Q   So the answer is no?
24     A   That's right.
25     Q   Okay.  That's all we need to

KOHN

1
2  know.
3          Now, on Page 8 -- we're going
4  back for a second.  You talk about the
5  50 percent of gross receipts, correct?
6      A   I'm sorry?  Where do I talk
7  about it?
8      Q   Page 8, you talk about, in
9  the second bullet point.  It's the
10 50 percent of gross receipts.  I'm just
11 trying to orient you.  The obligation
12 to pay 50 percent of gross receipts.
13     A   Correct.  Based on Page 8.
14     Q   Page 8, the second bullet.
15 I'm just trying to --
16     A   Got it.
17     Q   -- work with -- you know, I'm
18 just trying to orient the witness.
19 Okay.
20         Now, under Exhibit 3, K3, the
21 payment of gross receipts is not
22 unlimited.  There are conditions,
23 aren't there?
24         MR. MARDEROSIAN:  Objection.
25 Calls for a legal opinion and

48 (Pages 186 - 189)

KOHN

1
2 first got involved in the case I took a
3 look at the TuneSat data and came up
4 with about 16,000 unique syncs or
5 unique programs that contained those
6 musical works that are part of the --
7    Q   Original broadcasts, you're
8 saying?
9    A   You know, I don't like
10 original broadcasts.  But you could say
11 unique programs that contain the
12 musical work that were broadcast,
13 right, once.  And not including all the
14 other broadcasts of the same programs.
15 I came up with about 16,000.
16    Q   Now as I recall the --
17       MR. MARDEROSIAN:  You were
18    done?
19       THE WITNESS:  Yes.
20    Q   As I recall Aron and Robert
21 said there were about 30,000 to 33,000
22 total detections; is that right?
23    A   That sounds about right.
24    Q   So -- and of that it's your
25 testimony that about half of them were

KOHN

1
2 just unique original broadcast?
3    A   I told you I did a rough
4 pivot table which took the data and did
5 a rough on that.  There is another way
6 that I didn't do where you can strip
7 out on how it goes on multiple
8 networks.  Okay?  Because as you
9 mentioned earlier, you can have a
10 particular program on the TuneSat that
11 happened to be broadcast on Turner in
12 the United States and then broadcasted
13 on some German station some time later.
14       I didn't go to the length of
15 stripping out the multiple networks
16 that it could be.  But when I looked at
17 the data, 67 percent were the United
18 States.  A program that was on MTV was
19 likely to be on MTV.  So if I came up
20 with 16,000, I'm looking at maybe
21 there's 15,000 that I could strip -- if
22 I had to strip out some duplicates on
23 alternative networks around the world.
24       So it was a -- it was a quick
25 look at it to give me an idea of how

KOHN

1
2 many unique syncs that it was.
3    Q   So back of the envelope?
4    A   Back of the envelope would be
5 a good way to put it.
6    Q   Now, did you listen to any of
7 the audio clips?
8    A   Yes, I did.
9    Q   And were you able to make an
10 assessment of how many of the
11 detections you identified were promos
12 as compared to in-program uses or
13 didn't you do that?
14    A   I did.  Well, I didn't -- I
15 would have had to have listened to
16 16,000 individual, which I didn't do
17 because I wasn't asked to do that.  And
18 it would have taken my time and it
19 wouldn't have been worth the effort.
20 But I saw there was a good mix.  There
21 was certain in-program uses of music
22 and there were promos being
23 advertisements for it.  They were a
24 good mix of it.  I don't think I -- I
25 might have looked at a the Land Rover

KOHN

1
2 commercial and the Starbucks commercial
3 in there.  I might have found it.  I
4 might have listened to it, but I don't
5 remember.
6       But I poked around it to see
7 what was there but I did not do what
8 you had asked me.  And I did not do a
9 calculations as to how much were this
10 kind and how much were that kind.
11    Q   Turn to Exhibit B of your
12 report, if you would.
13       (Whereupon, a brief recess
14    was taken.)
15    Q   Okay.
16       I think when we broke, I had
17 asked you to look at your Exhibit B --
18    A   Yes.
19    Q   -- to your report.  Do you
20 recall?  Pull it out.
21    A   Okay.  Exhibit B.
22    Q   And you say these are unique
23 TuneSat detections?
24    A   That's what the title of it
25 is.

Page 370

KOHN

1
2    Q   Are they unique?
3    A   Yes.  That's my understanding
4  of what they are.  I didn't produce
5  these.
6    Q   You didn't --
7    A   No.
8    Q   -- create this document?
9    A   No.
10    Q   So somebody else created it,
11  and told you what it was?
12    A   Well, I was given it by
13  attorneys; and I understand that Karen
14  Rodriguez had prepared it.
15    Q   Okay.
16        And the total number of
17  detections when you add them up are
18  about 21, nearly 22,000, correct?
19  You've got 6,848 and 15,093.
20    A   Fifteen plus six, yeah, about
21  22,000, something like that.
22    Q   I said about 22,000 or close
23  to 22,000.
24        And you multiplied $200
25  against every one of these detections?

Page 371

KOHN

1
2    A   Yeah.
3    Q   But you don't know if these
4  are unique detections, correct?
5    A   Well, it says unique
6  detections.  And I understood them to
7  be unique detections.  I had previously
8  given a back of the envelope done in my
9  own way, way back in February when I
10  started working on the case and using
11  data that went all the way back to 2013
12  or something like that.  And -- like I
13  said.  So when I saw these numbers I
14  said it's in the realm of -- again, I
15  did back of the envelope and I just
16  took these as what it was.
17    Q   But now they've gone up by
18  some nearly 7,000 from your number?
19    A   Apparently.
20    Q   And you don't know whether
21  they are or not unique detections?
22    A   I'm not the one who generated
23  this.  So I don't know whether they're
24  unique in the way that you and I have
25  been talking about my understanding of

Page 372

KOHN

1
2  what unique is.
3    Q   Do you know how many of these
4  detections -- I assume you're going to
5  know the answer -- are Viacom
6  detections, detections of broadcasts on
7  Viacom networks?
8    A   I could do that.
9    Q   You could pull it out from
10  the list?
11    A   Right.  Like MTV Classic is
12  MTV2.  MTV -- we can probably pull out
13  and add the numbers up.
14    Q   So we can add up what the
15  total number of MTV detections are?
16        MR. MARDEROSIAN:  Well, he
17    said he did not prepare this.
18        MR. ZAKARIN:  I understand.
19        MR. MARDEROSIAN:  And I think
20    that's a question for Karen
21    Rodriguez.
22        MR. ZAKARIN:  Well, the
23    problem is it's attached to his
24    report.
25        MR. MARDEROSIAN:  I think

Page 373

KOHN

1
2  just to be fair about it, I think
3  he relied on it on a specific
4  narrow topic in his report, Don.
5  And that was the extent of his use
6  of this document.
7        But you can ask whatever you
8  want, but I think these are
9  questions for Karen Rodriguez.
10        MR. ZAKARIN:  Unusually, you
11    know, I ask witnesses about their
12    reports and other witnesses about
13    their reports.  And if he relied
14    upon somebody else to do something
15    and he's basically just, in
16    effect, saying what somebody has
17    told him, I'm entitled to know
18    that.  That's all.
19        MR. MARDEROSIAN:  I get that,
20    absolutely.  But the operative
21    phrase is do something and I'm
22    saying you should ask him what it
23    is that he used it for.
24        MR. ZAKARIN:  I know what he
25    used it for.  It's in his report.

94 (Pages 370 - 373)

KOHN

1
2       Anyway, let's continue on.
3    Q   In terms of -- so we could
4 figure out which are Viacom channels
5 and therefore which are Viacom
6 detections, correct?
7    A   Yes, if we knew what Viacom's
8 channels are.
9    Q   For which you applied $200
10 for each and every one of the
11 detections, correct?
12    A   Well, are you just saying the
13 same thing for each -- yeah, I used the
14 total numbers here and multiplied it by
15 $200.
16    Q   And in terms of these
17 detections, do you know how many are
18 not works that were delivered to Viacom
19 Extreme but are owned by others
20 including the plaintiffs?
21        MR. MARDEROSIAN:  Objection.
22    Vague.
23    Q   You know that the plaintiffs
24 self-published works, right?
25    A   Yes.

KOHN

1
2    Q   Do you know how many of these
3 detections are of the plaintiffs'
4 self-published works?
5    A   I think -- I didn't generate
6 this.  So I don't have the underlying
7 data that was used to generate this.  I
8 wouldn't be able to answer any of those
9 questions.
10    Q   You with agree with me though
11 that there's no reason to charge or
12 make a claim against Extreme or Viacom
13 for $200 per each of the plaintiffs'
14 own works?
15    A   No.
16    Q   Okay.
17    A   Absolutely not.
18    Q   So if the plaintiffs'
19 self-published works or works published
20 by third parties are among these
21 detections --
22    A   Right.
23    Q   -- they have --
24        MR. MARDEROSIAN:  Hold on.
25    Let him finish the question

KOHN

1
2 because I want to object to it
3 before you agree to it.
4    Q   -- they have to get backed
5 out?
6        MR. MARDEROSIAN:  I'm going
7 to object.
8        It's an incomplete
9 hypothetical, and it doesn't
10 include the fact that there's
11 evidence that Extreme is taking
12 Aron and Robert's own publishing
13 for Lonely Orchard and Brothers
14 Heathen.
15    Q   You can answer my question as
16 opposed to the rhetoric there.
17    A   My understanding is that
18 these were unique detections of
19 music -- musical work, sound recordings
20 that were created by Aron and Rob and
21 delivered under the contract.
22    Q   But in fact you don't know
23 whether these were, in fact, delivered
24 or are self-published?
25        MR. MARDEROSIAN:  I'm just

KOHN

1
2 going to object.
3        It's an incomplete
4 hypothetical and vague.
5    Q   You can answer.
6        MR. MARDEROSIAN:  And doesn't
7 include the issue over whether or
8 not Extreme is taking the
9 plaintiffs' published --
10 self-published songs.
11    A   And I don't know whether this
12 is an underrepresentation and doesn't
13 include all of their songs that were
14 delivered and used.
15    Q   So you don't know very much
16 at all about this document?
17    A   That's right.
18    Q   Essentially, what you did is
19 you took the number of detections
20 without knowing what they are and
21 multiplied each one by 200?
22    A   And that wasn't the essential
23 part of my report.  The essential part
24 of my report was coming up with the
25 $200 figure.  If this wasn't included,

Page 378

KOHN

1
2  it wouldn't have mattered because
3  whichever the true number is would be
4  multiplied by $200.  If it was --
5  instead of 21,000, if it was 16,000, if
6  it was 30,000, whatever that number is.
7  And I'm sure enough good minds can get
8  together and figure out using the
9  TuneSat data what the proper number is.
10     Q   We'll come to the 200 in due
11  course.
12        In any event, if I understand
13  you correctly you -- it's your view
14  that the 200 is the right number for --
15  for these -- for all of those
16  detections, that's your opinion?
17        MR. MARDEROSIAN:  Right
18  number for what?
19     Q   The right number for the sync
20  fee for each of these 200 detections
21  that you have opined?
22     A   My report says what it says
23  about the $200 number.  We can turn to
24  it.  I don't want to say anything
25  that's inconsistent and be --

Page 379

KOHN

1
2     Q   Well, let's look at Page 86
3  which is where I think come up with
4  this.
5     A   Thank you.  Thank you.
6     Q   Okay.
7     A   That's helpful.
8     Q   I think this is where you
9  explain how you came up with your $200.
10     A   I'm there.
11     Q   Okay.
12        And if I -- I want to
13  characterize this correctly, what you
14  did was you looked at the license of
15  their works to CBS for a promo use for
16  $120, correct?
17     A   Yes.
18     Q   And you compared that to an
19  in-program license use of one of their
20  own works, meaning Rob and Aron, for
21  $300.  And you then -- and you
22  reference to up to 20,000 for works
23  they own control.  You mentioned that.
24  And then you conclude, I think you just
25  say I therefore applied the sum of 200

Page 380

KOHN

1
2  to each of these.  So your view is, at
3  the very least, for the CBS promo use
4  200 would be the right number?
5     A   200 would be the right number
6  to use across the board for the
7  detections -- unique detections that
8  were discovered during the period from
9  mid-2014 to the present.
10     Q   But one of those is you look
11  at CBS promo use and you figure they
12  charge 120.  I think 200 is the right
13  one?
14     A   Well, there might have been
15  an in-program use -- well, I call it an
16  in-program use -- that might have been
17  worth $20,000 or worth more.  But I
18  picked 200 as an overall way of just
19  going across the board to simplify it.
20     Q   Could you look at Exhibit A
21  of your report for a second.  And we'll
22  come back to that.
23     A   Yes.
24     Q   Exhibit A, this you have done
25  all by yourself?

Page 381

KOHN

1
2     A   No.
3     Q   Who helped with you with this
4  one?
5     A   I had asked Rob and Aron to
6  come up with what they think are
7  reasonable fees based upon their works.
8  I asked them to send me license
9  agreements that they had for their own.
10  And I took their numbers and validated
11  them.  I didn't think -- I didn't
12  disagree with any of them.
13     Q   Did you examine the terms of
14  those license agreements?
15     A   Yes.
16     Q   You don't know whether those
17  license agreements were provided to the
18  defendants, do you?
19     A   No.
20     Q   I was curious about a couple
21  of things.
22        MR. MARDEROSIAN:  Do you know
23  if the defendants even asked for
24  those?
25        THE WITNESS:  I don't know.

96 (Pages 378 - 381)

KOHN

1
2    not.
3        MR. ZAKARIN:  You're not
4    testifying, Mick.
5        MR. MARDEROSIAN:  You're
6    mischaracterizing the evidence and
7    the document.
8    Q   Here it's $10,000 that you
9  think is the right amount or at least
10 Rob and Aaron figure was the right
11 amount and in Exhibit A it's $200?
12    A   There's a huge difference
13 between CBS and some cable channel --
14 Yes channels or some whatever.  This is
15 CBS.  It's a network.
16    Q   Take a look on Exhibit B, if
17 you will.  Okay.  Exhibit B again.
18 Unique TuneSat detections.  Okay.
19        Do you see CBS is listed
20 right there?
21    A   Okay.
22        But so is --
23    Q   So now you've -- so CBS is
24 real different.  You're including it.
25    A   But so is something called

KOHN

1
2  GAC, which I've never even heard of.
3  What about the Oxygen channel -- the
4  Ovation channel I've never heard of.
5  The Hub I've never heard of.  Something
6  called Showtime East, 1,674.  This --
7  when I have to apply -- I'm not going
8  to go through every single one of
9  those.  So I gave 200 to CBS, but I
10 gave 200 to something called TLC.
11    Q   And you have no idea what
12 they do.  You don't even know some of
13 those broadcasters, right?
14    A   I don't -- I -- that's the
15 point.
16    Q   Okay.
17    A   You know.
18    Q   So you just arbitrarily
19 picked the $200?
20    A   I didn't arbitrarily pick it.
21 I picked it -- if you're going to
22 take -- try to come up with a
23 reasonable amount that wasn't 120, that
24 wasn't 300, and I thought 200.
25 Basically if you look in my book, it

KOHN

1
2  talks about needle drops.  And
3  basically that's about the -- that's
4  about the price that you would get,
5  $200.
6    Q   Okay.
7        And so here for the CBS
8  promos the appropriate price is not
9  $200 but it's $10,000 for each promo,
10 right?  That's your -- that's what
11 you've done here?
12    A   No, but you're taking apples
13 and oranges.
14    Q   Okay.
15        That's -- your testimony is
16 whatever your testimony is there.
17    A   Okay.  That's my testimony.
18    Q   Okay.
19    A   I mean, you're trying to
20 suggest that these are the same thing.
21 When I take $200 and do it as an
22 average some of them are CBS, which is
23 a huge network, and some of them are
24 networks you've never heard of.  NY9 I
25 never heard of.  Maybe nobody watched

KOHN

1
2  the NY9 and got $200 for the promo for
3  it.
4    Q   Is the $10,000 that you put
5  in there, is that also in your Exhibit
6  B?  Is it the same use as Exhibit B?
7    A   I don't know.
8    Q   So you could have a
9  duplication there?
10    A   I might have a duplication.
11    Q   You don't know that?
12    A   Neither do you.  I don't know
13 whether I do.
14    Q   Not my burden.
15        Did you -- by the way on your
16 Exhibit B, did you back out what was
17 actually paid on any of those licenses?
18    A   I was not asked to do that.
19    Q   Okay.
20        So you were just asked to
21 come up with a gross number and put
22 that forward as the damage claim?
23    A   I was asked to come up with
24 the $200 amount.  All right.  I was
25 given the unique numbers.  I did the

98 (Pages 386 - 389)

                    KOHN
1                   KOHN
2  multiplication.  It was towards the end
3  of this.  I didn't have the information
4  to back it out.  And I wasn't provided
5  to -- but it.  But it could be backed
6  out by somebody else.
7      Q   Lots of things could be done,
8  but it wasn't done.  So this is put
9  forth -- you're aware that you've put
10 this forth as a damage claim, $200
11 times 20 -- almost 22,000 detections?
12     A   Well, I also said to you that
13 I'm not the one who came up with the
14 22,000 detections.  All right?
15     Q   Is it your testimony?
16     A   Somebody -- you know,
17 somebody else came up with that number
18 and I came up with the $200.  I made a
19 multiplication of the two numbers.  One
20 number I came up with.  Another number
21 somebody else came up with, and that's
22 what I put in here.
23     Q   At the bottom of -- here,
24 based on my calculations, Page 86, Aron
25 and Rob share of these broadcast

1                   KOHN
2  licensing fees for the 15,093 unique
3  audiovisual works, it's really almost
4  22,000 --
5      A   Yeah.
6      Q   -- in which their music was
7  suffixed for the period spanning
8  July 1, 2014 to August 1, 2018 is
9  $2,194,100.
10        That's put forth as a damage
11 claim.  Are you aware of that?
12     A   I'm not familiar with the
13 term damage claim as litigators use it.
14 So I --
15     Q   Are you aware that that is
16 part of the plaintiffs' claim that they
17 have supposedly been deprived of that
18 money?
19     A   Yes.
20     Q   Okay.
21        And you don't know whether
22 what they were actually paid is or is
23 not backed out of that number?
24        MR. MARDEROSIAN:  It calls
25     for speculation.  This is not his

1                   KOHN
2      role.
3      A   Yeah.  I --
4      Q   It's in his report.
5      A   I wasn't asked to back it
6  out.
7         MR. MARDEROSIAN:  Your
8      question on this topic is not in
9      his report.
10        You're mischaracterizing the
11     evidence.
12        MR. ZAKARIN:  Well, we'll
13     see.
14     Q   And you don't know whether
15 that 2,194,000 duplicates your other
16 number in Exhibit A in any respect, do
17 you?
18        MR. MARDEROSIAN:
19     Mischaracterizes the evidence.
20        Vague.  Incomplete
21     hypothetical.
22     A   So if we backed out -- how
23 many uniques are on Exhibit A?  Can we
24 count them?  Two, four, six, ten, maybe
25 30.

1                   KOHN
2      Q   I'm more interested in your
3  number.
4      A   Let me ask you this:  There
5  are 30 of them there, right?
6      Q   Yes.
7      A   Okay.
8         Let's subtract 30 from
9  21,000.
10     Q   Let's subtract 1,975,000 from
11 it.
12     A   No, because these are
13 completely different.  This is a Land
14 Rover commercial for example.
15     Q   Which is also time barred.
16 You're aware of that, aren't you?
17        MR. MARDEROSIAN:  No, it's
18     not time barred because there's an
19     e-mail from your client after
20     July 1, 2014, offering to pay them
21     the money.  It's still a claim
22     that's on the table.  I'm sorry.
23     By the admission of your own
24     client.
25        MR. ZAKARIN:  The claim is

KOHN
1
2  gone, long gone.
3       MR. MARDEROSIAN:  Don't try
4  to instruct the client as to what
5  the damage claim is because this
6  is not his realm, and it's
7  contrary to the evidence.  Okay?
8       MR. ZAKARIN:  No, it's not
9  contrary to the evidence.
10       MR. MARDEROSIAN:  Yes, it is.
11       MR. ZAKARIN:  It's in his
12  report.
13       MR. MARDEROSIAN:  Whatever,
14  Don.  It's argumentative.
15       MR. ZAKARIN:  It's in his
16  report.
17       MR. MARDEROSIAN:  What's in
18  his report?
19       MR. ZAKARIN:  The damage
20  claim.
21   Q   Let's continue, Mr. Kohn.
22       So you've got here -- you've
23  taken from Aron and Robert their
24  proposed numbers and you've included
25  that here and you totaled them up,

KOHN
1
2  right?
3   A   Yes.
4   Q   Okay.  I just wanted to know
5  where it came from.
6       We'll come back to this a
7  little bit later.  Page 11 and onto
8  Page 12 of your report.  Now we get to
9  your allocation theories.
10       You say towards the bottom,
11  the next to last bullet point on Page
12  11, when licenses are granted on a
13  blanket basis Aron and Robert are
14  entitled to a pro rata share, their
15  relevant share based upon the usage of
16  their songs and recordings, not based
17  upon the number of songs they delivered
18  in relation to the total number of
19  songs in the catalogs licensed.
20       So let's parse that a little
21  bit and go through it.  You propose
22  that there should be a usage based
23  allocation model, correct?
24   A   Repeat the question.
25   Q   You propose that with respect

KOHN
1
2  to blanket licenses or fees from
3  blanket licenses, that it should be
4  allocated on a usage basis not across
5  the libraries licensed?
6   A   I said that it was the custom
7  and practice to take blanket -- fees
8  that were generated on a blanket basis
9  and allocate them based upon usage, not
10  based upon the number of songs.
11   Q   Well, actually the next
12  statement tells us what you say, which
13  is -- give me a second.
14       It says the determination --
15   A   Would you please tell us the
16  page --
17   Q   Page 11.  The determination
18  of the relevant share based on the
19  number of songs rather than the usage
20  of the songs is inconsistent with both
21  the terms of the 2011 composer
22  agreement and customs and practices in
23  the industry.
24       What I want to try to do
25  first is deal with -- because you just

KOHN
1
2  said it's inconsistent with customs and
3  practices, correct?
4   A   Yes.
5   Q   Okay.
6   A   Not just that but --
7   Q   You've said the contract and
8  customs and practices.
9   A   Right.
10   Q   Let's deal with customs and
11  practices first.
12       In terms of the customs and
13  practices of production music libraries
14  in determining how they allocate
15  blanket licenses, did you contact any
16  production music libraries to find out
17  how they did it?
18   A   Excuse me.  I was distracted.
19   Q   I'm sorry.
20       MR. ZAKARIN:  Why don't we
21  reread the question, please.
22       (Whereupon, the record was
23  read.)
24   A   Not since I was engaged in
25  this case.

100 (Pages 394 - 397)

KOHN

1
2   Q   Did you do it before?
3   A   I learned it through 35 years
4 of discussing it with people, at least
5 the past ten years of discussing it
6 with people in the industry.
7   Q   Who did you discuss it with
8 over the last ten years, can you
9 identify anybody?
10   A   No, I can't -- no, I can't
11 identify any specific person.
12   Q   And since you were retained,
13 you didn't talk to anybody?
14   A   Well, I'm trying to think --
15 no, since I've been retained, I didn't
16 need to.
17   Q   And you can't identify any of
18 these people in the production music
19 library --
20   A   Well --
21   Q   Let me finish.  It will be
22 clear if I finish.
23   A   You started a question before
24 I finished the last answer.  But answer
25 your -- ask your question.

KOHN

1
2   Q   You can't identify anybody
3 that you've spoken with since you were
4 retained to discuss that issue.  And
5 I'm asking you, you can't identify any
6 of the people that you spoke with who
7 were in the production music library
8 business in the ten years prior to your
9 retention; is that right?
10   A   Look, where did I say in
11 these two sentences -- where are the
12 words production music library here?
13 That the first thing we have to do is
14 going from top down not from bottom up.
15   Q   You're talking about customs
16 and practice in the industry, right?
17   A   Yes.
18   Q   What industry are you talking
19 about?
20   A   The entire industry.  The
21 entire record industry.  Let's go back
22 to what I --
23   Q   We're not in the record
24 industry.
25   A   This is just a summary.  This

KOHN

1
2 is just a summary.  Let's go back to
3 the section of my report where I
4 discuss this.  You will have to help me
5 here.
6       MR. MARDEROSIAN:  Take your
7   time.
8   A   Okay.  I think it's Page 71.
9 Okay?
10   Q   Yes.
11   A   All right.
12       So you're going to ask me a
13 series of questions about who talked I
14 to and since I didn't talk to -- I
15 can't remember who I talked to, it's
16 not fair to me at all.
17       So it really is on Page 76.
18   Q   Okay.
19   A   Where I give a number of
20 examples.  I start with, I believe --
21 and after I discuss the PROs usage if
22 ASCAP or BMI allocated --
23   Q   Where on 76 is this?
24   A   I think I'm going back to 74.
25   Q   Okay.  Now we're on 74.

KOHN

1
2   A   I'm sorry.  I may have
3 misspoke.
4   Q   PRO is like ASCAP and BMI?
5   A   PRO is like ASCAP and BMI.
6 What I'm --
7   Q   I see it.
8   A   -- I'm saying here is it
9 would be unfair and unreasonable for
10 ASCAP or BMI to distribute income based
11 upon the number of songs and their
12 respective repertoire because a vast
13 number of songs in the catalog, which
14 may never be performed, would receive
15 the same share of income as frequently
16 performed songs.
17   Q   Now, we're not talking --
18   A   No, no.
19   Q   You're still talking.  Go
20 ahead.
21   A   I'm still talking.
22   Q   Please, go ahead.
23   A   I'm still talking.  Because
24 we're talking -- because as I said
25 customs and practices in the music

101 (Pages 398 - 401)

KOHN

1
2  industry and that applies across the
3  board.
4      Q   The music industry?
5      A   Yeah.  And it includes -- the
6  music industry includes the record
7  companies, PROs, music publishing
8  companies and music production
9  libraries or production music
10  libraries.
11      Q   We're talking about sync
12  licenses now, aren't we, blanket sync
13  licenses?
14      A   No, we're looking at -- we're
15  looking at blanket revenue.
16      Q   No.
17      A   Yes, we are.  Oh, yes, we
18  are.
19      Q   Yes, we are?
20      A   Yes, we are.  We're looking
21  at blanket -- a blanket license is a
22  form of license where you -- one of
23  your experts would like to use the word
24  access.  So you have -- we're going to
25  reduce your transaction costs, you

KOHN

1
2  know, read US versus ASCAP and BMI.
3  You know a 1979 Supreme Court case, the
4  reason why they don't violate the
5  antitrust laws, music publishing
6  companies, is because they're reducing
7  the transaction cost of their
8  customers.  That's what a blanket does.
9      A -- it's something that's issued in a
10  blanket form that you can go ahead and
11  use what's here.  All right?  And
12  whenever money is brought in on a
13  blanket basis whether it's from a PRO
14  issuing for performance licenses,
15  whether it's a blanket for
16  synchronization licenses, whether it's
17  from a record company who's got
18  breakage, whether it's from black box
19  money that's overseas from music
20  publishing companies, you always
21  allocate it to the best of your ability
22  on a fair and reasonable basis which is
23  always based upon usage.
24      If you don't base it upon
25  usage you're going to have some songs

KOHN

1
2  that have been performed a lot or
3  sync'd a lot or used a lot get the same
4  amount of money as songs who don't get
5  used at all.  That is unfair and
6  unreasonable.  It may be practical
7  because it makes your job easier, but
8  it's unfair and it's unreasonable.
9  That's the music industry.  Everyone
10  does that.  And if you don't do it --
11  if you don't do it, you're being unfair
12  and you're being unreasonable.
13      Q   So -- oh, you're still
14  talking?
15      A   Yeah.
16      So I have those examples in
17  this report on 76.  I say it's a common
18  practice for record companies to
19  allocate blanket income on the basis of
20  the most practical means available.
21  For example, sometimes a record label
22  must pay royalties on what is called
23  breakage income.  That is, they might
24  have received an advance from an
25  organization that does streaming from,

KOHN

1
2  let's say, ten years ago, a company --
3  Cue Tracks, it's a company that paid
4  millions of dollars to the record
5  companies, and they may have gone out
6  of business before they even went
7  online.  All right?  So now a record
8  company is at advance of let's say 10
9  or $20 million, and how do they
10  distribute that money to the artist?
11  They have no reports whatsoever.  What
12  they do is they look at other streaming
13  companies, look at the reports that
14  they do have, do an extrapolation and
15  allocate the money based upon usage.
16  They do not allocate the money counting
17  the number of recordings that they have
18  in their catalog and giving everyone
19  the same amount.  Okay?
20      So that's the record
21  industry.  And I say here -- and you
22  were asking who did I talk to.  Well,
23  in that particular instance when I was
24  in my company at Royalty Share I sat in
25  policy discussions at Sony Music, which

102 (Pages 402 - 405)

KOHN

1
2 is a sister company to Sony ATV, and
3 that's how they do it.  The Sony
4 corporation does it that way.  That's
5 the way it's supposed to be done.
6          Now, black box monies is
7 monies overseas that music publishers
8 receive that do not come accompanied by
9 usage reports because it's money that
10 was unallocated to anyone specifically.
11 The music publisher gets it and an
12 honest music publisher will distribute
13 that monies -- its portions to the
14 other publishers, sub-publisher,
15 original publishers or others,
16 copublishers and to songwriters on a
17 fair and reasonable basis.  And that's
18 going to be based upon some projected
19 usage or if they have the report it
20 will be actual usage.  And that's the
21 way it's done.
22          Nobody that I've ever heard
23 of, except in the past day I heard of
24 First Com, your last -- Mr. Katz said
25 that he acquired a company when he was

KOHN

1
2 at Zamba that did it that way.  I was
3 surprised to hear that.  A small
4 production music library did it that
5 way.
6          And then you have your own
7 witness, Adam Taylor, he runs a
8 production music library; and he does
9 it the right way.  He basis it on
10 usage -- usage reports.  Now, all of
11 your experts went to great lengths to
12 say that I said in my report that it
13 has to be done on actual usage.  I
14 suspect that that someone may have put
15 in their heads that I said actual
16 usage.  But I didn't say that it had to
17 be done in actual usage, BMI and ASCAP
18 don't do it on actual usage all the
19 time.  They do get numbers based upon
20 electronic usage reports that reflect
21 accurate usage pretty well.
22          But when your experts set up
23 strawman that says that nobody can do
24 it in actual usage, that's simply not
25 what I said in my report.  It's a

KOHN

1
2 strawman.  I said it's based upon
3 usage.  Adam Taylor agrees it's based
4 upon usage.  I think anyone who would
5 do it on the basis of the number of
6 songs -- if ASCAP did it they'd be out
7 of business the next day.  If record
8 companies did it, they'd be sued by
9 their recording artists.  And if a
10 production music company did it to
11 their songwriters, they would be sued
12 by their -- sued by their songwriters.
13 And that's what this case is about.
14     Q    Okay.  Let me know when
15 you're done.
16     A    I'm done.
17     Q    Okay.
18          You talked about custom and
19 practice, but the custom and practice
20 now you're talking about is the music
21 industry generally and not related to
22 sync licensing by production music
23 libraries; is that right?
24          MR. MARDEROSIAN:  I'm going
25     to object.

KOHN

1
2          Mischaracterizes the
3     testimony.  Argumentative.
4     A    I am using it as sync
5 licenses for a production music
6 library.  I mentioned Adam Taylor
7 two -- how many times did I mention him
8 in the past ten minutes?  He runs a
9 production music library, has admitted
10 that his blanket sync licenses, when he
11 gets the income -- when he gets his
12 income he also gets usage reports to
13 find out what songs have been sync'd.
14 And he uses some message -- some
15 methodology based upon his usage.  He
16 wasn't specific in his report, but I
17 was very happy to hear that he's doing
18 it in some.  I don't know for sure.  I
19 haven't seen his calculations, but if
20 it's based upon usage, it's likely to
21 be more fair and more reasonable than
22 basing it upon the number of songs in
23 the catalog, which virtually nobody
24 does except your client.
25     Q    You said virtually nobody

KOHN

1
2 does.  What -- who have you talked to?
3     A   I don't have to talk to
4 everybody in the industry.
5     Q   You don't have to talk to
6 anybody it appears.
7     A   I --
8         MR. MARDEROSIAN:  Folks,
9     you're arguing with each other.
10     Q   You haven't identified a
11 single --
12         COURT REPORTER:  Excuse me.
13     A   I have -- I don't have to --
14     Q   You haven't identified a
15 single production music library that
16 you've contacted, spoke to, or found
17 out how they do it; is that right?
18     A   I sat in a deposition -- I'm
19 sorry -- in a deposition yesterday.  If
20 you don't remember, you can get the
21 transcript and read it.  Right?
22     Q   I remember it well.
23     A   His report says usage.  He
24 was asked specifically whether he
25 thought that was fair.  Now, this is a

KOHN

1
2 guy who sat on the board of APM, the
3 production music library that your
4 other expert is the CEO of.
5     Q   Um-hum.
6     A   He circled the wagon saying
7 of course it's okay to do this because
8 I had a company like that myself that
9 that did it.
10     Q   You didn't answer my
11 question.
12     A   I did answer your question.
13 I just told you -- I just told you a
14 production music library out of the
15 voice of your own experts, two of them,
16 okay, are saying that they -- that's
17 the way they do it.
18     Q   I just want to make sure.  So
19 your testimony about custom and
20 practice is now based upon what Paul
21 Katz testified to yesterday and what
22 Adam Taylor has in his report; is that
23 it?
24     A   That's not what I'm
25 testifying.  It's not what I said.

KOHN

1
2     Q   I don't know what you're
3 saying.
4         MR. MARDEROSIAN:  Hold on.
5     Stop.
6         He's answered the question.
7 You're now arguing with him.  Stop
8 arguing with him, Don.
9         Let's go to the next topic.
10 You've got his testimony on the
11 subject.
12         MR. ZAKARIN:  He hasn't
13 identified a single production
14 music --
15         MR. MARDEROSIAN:  Incorrect.
16     You haven't listened to what
17 he said.
18         MR. ZAKARIN:  I was --
19         MR. MARDEROSIAN:  You -- save
20 it for trial, Don.
21         MR. ZAKARIN:  No.
22         MR. MARDEROSIAN:  Save it for
23 trial and let's see --
24         MR. ZAKARIN:  That's not how
25 it goes.

KOHN

1
2         MR. MARDEROSIAN:  -- if the
3 jury accepts your argument on
4 this.
5         MR. ZAKARIN:  That's not how
6 it goes, Mick.  My questions get
7 answered, or else I don't leave
8 them.
9         MR. MARDEROSIAN:  His
10 question -- he did answer your
11 question, you're now just arguing
12 it.
13     A   You just don't like the
14 answer to the question.
15     Q   Well, you -- if you gave an
16 answer, I might like it.
17     I asked you --
18         COURT REPORTER:  Excuse me.
19     Gentlemen, please.
20         MR. MARDEROSIAN:  Hold on,
21 Don.  Give her -- give her a
22 moment.
23         COURT REPORTER:  I just need
24 you to speak one at a time,
25 please.

KOHN

1
2    MR. ZAKARIN:  We'll try.
3    Q   You've talked about custom
4  and practice and my question was very
5  simple.  What production music
6  libraries have you ascertained allocate
7  blanket license income on any kind of a
8  usage basis?  We know APM does it on a
9  reported usage basis.  What else?  What
10  other production music library
11  allocates it, however they allocate it?
12  Do you have any information?  Any
13  information?
14    A   I suspect that every other
15  one does it except your client today
16  and maybe First Com if it still exists.
17    Q   I didn't ask what you
18  suspect.  I asked what you know, facts.
19    A   I know the customs and
20  practices of the music industry.  I
21  can't tell you over 20 years of being
22  in the industry and discussing with
23  people who know what they're -- I may
24  have discussed it with Adam Taylor, who
25  knows, because we did discuss his

KOHN

1
2  business when I met with him five, six
3  years ago, whenever it was.  But I
4  learned this over a period of time.
5  And it is not fair -- my opinion is
6  that it's not fair or reasonable to
7  base it upon the number of songs.
8  Nobody apparently but your client does
9  it.  You have not and your experts have
10  not pointed to anyone who does it that
11  way.
12    Q   You're the one who's talking
13  about custom and practice.
14    A   Yes.
15    Q   I'm not.  So I want to know
16  what the custom and practice is of
17  production music libraries allocating
18  it.  You have a statement --
19    A   Production.
20    Q   -- the basis for the
21  statement -- you've talked about the
22  ASCAP and BMI.  You've talked about
23  record companies.  You've talked about
24  black box.
25    MR. MARDEROSIAN:  He's talked

KOHN

1
2  about your own experts, Don.
3    Q   What you haven't talked
4  about -- we have Adam Taylor who says
5  that they do it on a -- on a reported
6  usage basis and that's fine.  And Adam
7  Taylor says what he says.  And it's in
8  his report.
9    I'm asking you what
10  production music libraries do you
11  know -- do you know how other
12  production music libraries allocate
13  blanket license income?
14    A   Yes, they all do it.
15    Q   Who?
16    A   They all do it except
17  Extreme.  APM is one example of it.
18  And over the years --
19    Q   Give me another examples.
20    A   Over the years -- I can't
21  imagine -- my opinion is it's not fair
22  or reasonable.
23    Q   I didn't ask that.  You can
24  have that opinion.
25    MR. MARDEROSIAN:  He told you

KOHN

1
2  Sony Music, Don.  You're leaving
3  that out.
4    MR. ZAKARIN:  Sony Music is
5  not a production music library.
6    MR. MARDEROSIAN:  He told you
7  how they handle the publishing in
8  regard to those uses.
9    MR. ZAKARIN:  Black Box.  I
10  understand black box.  That's not
11  the question.
12    A   Yes.  The music industry
13  allocates money that's presented on a
14  blanket basis whether it's the leftover
15  advance, whether it's black box money,
16  whether it's income.  There's no one
17  who's going to -- there's no one except
18  maybe one of your witnesses yesterday
19  who suggested that that might even be
20  close to being fair.  It's not.
21    I don't have to talk to every
22  production music library in the world.
23    Q   Do you have to talk to any?
24    A   I don't even know all of the
25  ones that do it on a blanket basis,

105 (Pages 414 - 417)

Page 418

KOHN

1
2  okay.  Has your expert witnesses
3  reported back as to who other -- anyone
4  other than First Com that does it?  You
5  have three -- you have an expert
6  witness who is the CEO of one of the
7  largest production music libraries in
8  the world.
9      Q    Yes.
10     A    Your client is the CEO of a
11 production music library, one of the
12 largest in the world.
13     Q    Yes.
14     A    Have either of them suggested
15 that anyone other than Extreme does it
16 this way?  What do they say?
17     Q    Are you aware of how many
18 production music library --
19     A    I didn't see that.
20     Q    Are you aware of how many
21 production music libraries there are in
22 the United States?
23     A    How many?  The number?
24     Q    Yeah.
25     A    No.  It must be a large

Page 419

KOHN

1
2  number.
3      Q    And with the exception of
4  Adam Taylor's testimony in his report
5  about on a reported usage basis, do you
6  know how any of them -- any of these
7  many numbered production music
8  libraries allocate blanket license
9  income?  Do you know how any of them do
10 it?
11     A    Yes, they do it on a usage
12 basis.
13     Q    And what's the basis for your
14 statement that they do it on a usage
15 bassi?
16     A    Because everybody does it
17 that way in the business except your
18 client.
19     Q    So this is just a conclusion.
20 It's not based upon your knowledge of
21 any facts, right?
22         MR. MARDEROSIAN:  You're
23     arguing with him.  You're arguing
24     with him.  He's answered your
25     question.

Page 420

KOHN

1
2      Q    Have you done a survey of any
3  production --
4      A    Yeah, I did a survey.
5      Q    Of the production music
6  library?
7         COURT REPORTER:  Excuse me.
8     Gentlemen, please.
9         MR. MARDEROSIAN:  You're just
10    arguing.
11        MR. ZAKARIN:  I just want to
12    know the source.
13     A    I haven't been -- I haven't
14 been asked to do a survey and nor have
15 any of your experts come forth with
16 anybody else.
17     Q    So you haven't done a
18 survey --
19     A    Nor has your client.
20        COURT REPORTER:  Excuse me.
21    I'm going to need to take a break.
22        MR. ZAKARIN:  I know.  I'm
23    sorry.  I'm asking questions, and
24    he's actually answering on top of
25    my questions.

Page 421

KOHN

1
2      Q    You haven't done a survey,
3  right?  I'm not saying you were asked
4  to --
5      A    I have not done a
6  questionnaires kind of survey.
7      Q    And you haven't done a census
8  or questioned any executives of any
9  production music library about how do
10 they allocate their blanket license
11 income; is that right?  Yes or no?
12     A    In the -- since the start of
13 this case, no, for sure.
14     Q    And you didn't ask them
15 before the start of this case, did you?
16     A    I might have.
17     Q    But you don't recall whether
18 you did?
19     A    I don't recall.
20     Q    Okay.
21     A    How did I come to this
22 knowledge?  I can't remember who I
23 may -- might have talked to in the
24 1990s in researching the book.
25     Q    I understand.

106 (Pages 418 - 421)

Page 422

KOHN

1
2       But it's your opinion,
3  nonetheless, that it's custom and
4  practice to allocate it.  So it's now
5  not on an actual usage basis.  It's on
6  some usage basis?
7       A   You used the word actual
8  usage, I didn't.  I used the word
9  usage.  And you keep doing that.  Your
10  experts keep doing that.
11       It was a strawman.  It was
12  ridiculous for them to go on pages
13  after pages and say that nobody does it
14  on actual usage when they know that
15  everybody does it on usage.  And that
16  was ridiculous.  They look like fools.
17       Q   Well, that's your opinion
18  which is another good opinion.
19       So it's a usage basis now.
20  It's not actual -- it's some sort of
21  usage basis.  That's your testimony?
22       A   That's correct.
23       Q   Okay.
24       A   Some usage basis or projected
25  usage basis.  And those are the words

Page 423

KOHN

1
2  that were used in the contract.  I
3  assume that's what you're moving to
4  next.
5       Q   Yes.  Yes, we are.
6  Excellent.
7       Let's pull out Exhibit 3, I
8  think it is.  I think it's
9  Paragraph 7.3.
10       A   It is.
11       Q   Now, what it says, I think --
12  let's see if I can recall your quote
13  from the contract.  Top of Page 12,
14  your quote from the contract says the
15  2011 composer agreement states that the
16  determination or apportion of the
17  relevant share is to be made on a fair,
18  reasonable and practical basis, right?
19       A   Right.
20       Q   And actually that's not the
21  complete quote, is it?
22       A   This is a summary of the
23  quote.
24       Q   The real quote says --
25       A   The only part I quoted was on

Page 424

KOHN

1
2  a fair, reasonable, practical basis.
3       Q   I know that.  And then it
4  says there after that, what basis to be
5  determined in company and the HM
6  transferee's sole discretion, right?
7       A   Yes.
8       Q   You understand what sole
9  discretion means?
10       MR. MARDEROSIAN:  Objection.
11       Vague.
12       A   I understand what the word
13  fair and reasonable and practical basis
14  means.  I know that when a contract,
15  whether it has sole discretion or not,
16  it is going to be subject to an implied
17  obligation of good faith and fair
18  dealing.
19       Sole discretion doesn't mean
20  they can ignore what's in that
21  paragraph.  They wouldn't have been
22  able to -- why didn't they just simply
23  say they can agree to apportion the
24  licensing income on their sole
25  discretion, period?  They didn't do

Page 425

KOHN

1
2  that.
3       Q   I agree.
4       A   Right?  They led the person
5  who was reading this contract, the
6  person who didn't draft the contract,
7  two young songwriters signed a contract
8  because they're reading words like
9  fair, reasonable and practical.  Anyone
10  would read it that way.  And then it
11  says without prejudice to the
12  generality of the foregoing company and
13  HM transferees reserves the right to
14  apportion the licensing income, the
15  blanket licensing income on the ways
16  that are standard with the customs and
17  practices of the music industry.
18  Any -- on any actual usage basis
19  determined by company.  On any
20  projected usage basis determined by
21  company or on a basis which is a
22  composite of the methods described
23  above.  It doesn't have a D that says
24  or none of the above.  All right?
25       Q   Reserves the right --

107 (Pages 422 - 425)

KOHN

2 BMI and ASCAP to make it a more rapid
3 process, I suppose.
4     Q   Do you have any familiarity
5 with the finances of production music
6 libraries?
7         MR. MARDEROSIAN:  Objection.
8             Vague.  Overbroad.
9     Q   You can answer the question.
10    A   No, I don't have any -- other
11 than the testimony that I've been able
12 to provide and the expertise that I
13 have about customs and practices.  No,
14 I don't have -- when you say finances
15 I'm thinking of balance sheet income
16 statement --
17    Q   Yeah.
18    A   -- cash flow, things like
19 that.
20    Q   Yes.
21    A   No.
22    Q   We're talking the same
23 language.
24    A   Right.  No.  Nor have I been
25 asked to opine on any of that.

KOHN

2     Q   I understand.
3         Do you have any understanding
4 how much a usage apportionment approach
5 might cost a production music library
6 to implement?
7     A   Depends upon the
8 circumstances.  Apparently APM uses
9 usage reports; and they seem to find it
10 not burdensome, otherwise why would
11 they do that.
12    Q   You're aware --
13    A   Well, they would do it for
14 obligations for -- contractual
15 obligations perhaps.
16    Q   You're aware from having read
17 Adam Taylor's report that his view of
18 the reported usage method is that a lot
19 of people whose works are used actually
20 don't get paid?
21    A   I don't recall reading that
22 in the report.
23    Q   Well, on the reported usage
24 basis -- do you understand what APM's
25 reported usage basis is?

KOHN

2     A   He wasn't terribly specific,
3 no.
4     Q   Okay.  You understand, don't
5 you, that if usage is not reported to
6 them, then they don't pay anybody
7 who's -- for which they don't get
8 reports?
9     A   Well, maybe they'll get sued
10 too.  Because most production music
11 libraries, my understanding of the
12 customs and practices in the business
13 and from agreements that I've seen in
14 the past is that when you don't get a
15 usage report you do allocate the money
16 on some projected basis based upon the
17 usage reports that you do get.
18    Q   When you say from your
19 understanding, you're talking -- we've
20 already covered that.  So I'll skip
21 that.  We covered that pretty well.
22    A   Thank you.
23        (Whereupon, a brief recess
24    was taken.)
25    Q   On Page 14 of your report,

KOHN

2 I'll ask you to turn there, you say
3 Viacom Extreme's issuance of direct
4 reproduction of public performance
5 licenses to Viacom for just one dollar
6 was a violation of the composer -- Aron
7 and Robert's composer agreements.  And
8 on Page 83 of your report you address
9 that again.  On Page 83 you say, and
10 there's even a caption on it, Viacom
11 Extreme's secret issuance of direct
12 reproduction and public performance
13 licenses to Viacom for just one dollar
14 was a violation of Aron and Robert's
15 composer agreements.
16        Then you say that it appears
17 that Viacom Extreme joint venture
18 actually granted back to Viacom not
19 only a blanket reproduction license but
20 a blanket direct public performance
21 license to all of Viacom's broadcasters
22 and producers.  And then it continues
23 on and names a number of them.
24        And on Page 84 you say
25 that -- you say it again, thus it

114 (Pages 450 - 453)

KOHN

1
2    Q    There's a number of things.
3 And I think you've already testified
4 that essentially the values were
5 provided to you by Aron and Robert and
6 you assessed them?
7    A    Correct.  The copyright owner
8 or any property owners are aloud to
9 make their own assessment as to the
10 value of their own property.
11    Q    Right.  Subject to the
12 contract, but --
13    A    Right.
14    Q    Let's talk about this for a
15 little bit.
16        They provided you with some
17 licenses that they had entered into,
18 correct?
19    A    Yes.
20    Q    Did they provide you any of
21 their gratis licenses to look at?
22    A    No.
23    Q    So they selected the licenses
24 that they wanted to show you?
25        MR. MARDEROSIAN:  Only if you

KOHN

1
2    know that that's the case.
3    A    I don't -- yeah, that's true.
4 All I know is I got a set of licenses
5 that were like, I don't know whether it
6 was 10 or 15 are 20.  Something like
7 that.
8    Q    They provided you with 10 or
9 15 licenses.
10    A    That's true.
11    Q    Do you know how many licenses
12 of their works they've entered into?
13    A    No.
14    Q    And do you know the range of
15 values of the licenses for their works
16 they've entered into?
17    A    Not entirely.
18    Q    Okay.  And have you seen
19 their answers to interrogatories where
20 they identify all of the licenses --
21 not they'll produce them, but they
22 identify the license amounts --
23    A    Yes.
24    Q    -- and include about
25 15 percent of them being gratis?

KOHN

1
2    A    I do remember that.
3    Q    Okay.
4        So other than looking at
5 these 10 or 15 licenses, did you do any
6 other kind of a survey in order to come
7 up with the values that you thought
8 were fair and reasonable?
9    A    I have done surveys.  Not
10 written surveys, but surveys over the
11 past 20 years which I've kept up to
12 date in terms of what are reasonable
13 license fees for the use of music in
14 commercials and theatricals and
15 television programming.  I summarize
16 that or I try to keep it up to date in
17 the 26 chapter of Kohn Music Licensing.
18        And so -- yeah, so I didn't
19 do anything beyond all the accumulated
20 knowledge that I've had over the years
21 in talking to people and talking to as
22 a -- I feel like in a way I'm like a
23 reporter talking to various people in
24 the industry.  I might know more than
25 any individual at any particular music

KOHN

1
2    publishing company because they only
3 know what they do.  They tell me,
4 and then I verify it with somebody
5 else.  And somebody will say, that's
6 sounds too high to me or sounds too
7 low.  They would have antitrust
8 problems in talking to each other about
9 what they charge for license fees, but
10 they have no problem talking to me.
11    Q    You've done your -- you've
12 done a lot of work in terms of your
13 book.  Did you do a study of the
14 license fees being paid for production
15 music outside of looking at the 10 to
16 15 licenses given to you by Aron and
17 Robert?
18    A    Yeah.  There's a -- well,
19 when you say study, I would say that my
20 Chapter 26 does talk about licenses for
21 production music libraries -- licenses
22 of music from production music
23 libraries.  I don't recall actually the
24 depth to which I was doing that
25 because, remember, production music

Page 486

KOHN

1
2 libraries license both the sound
3 recording and the musical work.  And
4 they're providing some real value there
5 in reducing the transaction cost of the
6 licensees.  So it's a level of
7 refinement that I might consider
8 putting in the next edition of my book.
9    Q   Did you go to and examine the
10 backup for your book in assessing the
11 reasonableness of these values given to
12 you by Aron and Robert?
13    A   I don't have any backup in
14 any written form for any of the license
15 fees that I have in my book.
16    Q   Did you -- given that, did
17 you consult with any source to try to
18 determine the reasonableness of the
19 fees that they propose to you, you
20 know, in assessing?  Did you do any
21 source at all?
22    A   I wouldn't have to do that
23 because whatever sources I had over the
24 past ten years or so to update the
25 figures that I had in my book were my

Page 487

KOHN

1
2 sources for determining these license
3 fees.
4    Q   And did you compare what you
5 have in your book for production music
6 license fees ranges to the numbers that
7 Rob and Aron gave you?  Did you consult
8 your book at all in doing it?
9    A   I did consult my book, but I
10 also took a look at my license fees
11 that are in my book for production
12 music.  And I took a look at the
13 license fees that they were issuing for
14 production music.  Or I would say if
15 you want to call it production music,
16 that's what they do in Lonely Orchard
17 Music Publishing.  They're producing
18 production music with their sound
19 recordings.  And I found -- they gave
20 me a license that said they got $75,000
21 sync fee for one.  They got a 50,000
22 sync fee for another one.  They got
23 20,000 -- 10,000, I think, was the
24 lowest which is the one they -- they
25 got from -- in 2010.

Page 488

KOHN

1
2       I actually sorted them by
3 dates.  I went from 2010 to 2017 to
4 make sure that I'm kind of matching
5 their growth and their popularity of
6 their songs.  I actually listened to
7 the songs to make sure that what I was
8 hearing from Mulholland Drive, which I
9 was able to do by going to the Extreme
10 website and just click on it and use my
11 TuneSat account or access.  And
12 listened to the songs to say, okay,
13 what was in Lonely Orchard sounds
14 production values that are just as
15 good, equivalent to the ones that they
16 have given on a work-for-hire basis to
17 Viacom.
18       So I felt that they were
19 comparable and they -- I'm watching
20 them get 60,000, 55,000 option 85,000,
21 you know, 30,000, 40,000.  I see all of
22 that.
23    Q   But you didn't see any of the
24 gratis licenses?
25    A   I didn't see any of the

Page 489

KOHN

1
2 gratis licenses.
3    Q   You didn't see any of the
4 lower value licenses.  They selected
5 what they wanted you to see?
6       MR. MARDEROSIAN:  Well, no,
7    you're arguing with him.
8       And you asked that question
9    before, Don; and he's already told
10    you he doesn't know if that's the
11    case.
12       You've had your opportunity
13    to depose Aron and Robert, and
14    you'll hear them again at trial
15    explain all of this.
16       So I'm going to object.  It's
17    argumentative and you're just
18    asking this witness to speculate.
19    A   There are a variety of
20 reasons why a gratis license might be
21 given.  I felt I was getting a good
22 overview.  It covered the entire
23 time frame.  It covered things that
24 were very similar to the licenses that
25 were listed in the exhibits in my

123 (Pages 486 - 489)

Page 490

KOHN

1
2 report. And what the fees that we came
3 up with was reasonable -- were
4 reasonable.
5    Q   By the way under the
6 agreement, the 2011 agreement, is there
7 any provision that gives Robert and
8 Aron the right to second guess the
9 license fees that Extreme was able to
10 obtain?
11       MR. MARDEROSIAN: I'm just
12    going to object. It calls for a
13    legal opinion and conclusion.
14       It's called good faith and
15    fair dealing as we all know which
16    is a legal opinion and conclusion.
17       MR. ZAKARIN: Could you swear
18    in Mr. Marderosian? He wants to
19    testify.
20       MR. MARDEROSIAN: You're
21    asking for a legal opinion, Don.
22       MR. ZAKARIN: No, I asked him
23    whether there's a provision in the
24    agreement that gives him the right
25    to second guess.

Page 491

KOHN

1
2    That wasn't a legal opinion.
3       MR. MARDEROSIAN: You both
4    scraped at the agreement and
5    there's an implied covenant of
6    good faith and --
7       MR. ZAKARIN: You're
8    testifying again, Mr. Marderosian.
9       MR. MARDEROSIAN: Well,
10    you're asking me --
11    A   No, he's just repeating what
12 I said earlier.
13    Q   I understand.
14       I asked you whether there was
15 a provision, not whether there's an
16 implied covenant.
17    A   I would consider an implied
18 covenant a provision of the agreement.
19 I would consider -- I would consider
20 given other things that I found in the
21 evidence as to how these two
22 songwriters were treated by their music
23 publishing company. And I went through
24 a long list of things that I felt were
25 breaches of contract -- and that is a

Page 492

KOHN

1
2 legal conclusion and I apologize for
3 that but that's a summary -- where I
4 felt this -- I see a $14,000 license
5 fee for the use of music in Land Rover.
6 I see small license fees, Starbucks.
7 They were way, way under.
8    Q   Way, way under what?
9    A   Way, way under what I thought
10 was going to be -- based upon what they
11 were getting for their quality of
12 music. You can't just say this is
13 just -- oh, just a piece of production
14 music. Just some genre thing. These
15 were some of the best songs that you
16 guys had.
17    Q   You listened to the entire
18 library? Did you listen to Hans Zimmer
19 stuff?
20    A   No, I wasn't giving it a
21 qualitative judgment. I did a
22 quantitative judgment based upon
23 reports that you provided during this
24 litigation.
25    Q   Two libraries, not all the

Page 493

KOHN

1
2 libraries.
3    A   They're the two libraries
4 that one says Mix Tape and one says
5 Hype and they seems to be the two --
6 where are the rest? Show us the rest,
7 and we'll see.
8       (Excerpt from the book
9       entitled, Kohn On Music Licensing,
10       was marked K Exhibit 6, for
11       identification, as of this date.)
12    Q   I don't have to.
13       I'm going to give you what
14 we'll mark as Exhibit 6, another page
15 from your book and your father's book.
16       And this relates to value.
17 I'm going to read under quantitative
18 factors effecting value.
19       Do you see that?
20    A   Yes.
21    Q   And it says, about halfway
22 in, a music publisher with thousands of
23 songs in its catalog and with years of
24 experience in licensing music is likely
25 to have access to much of the

124 (Pages 490 - 493)

Page 750

```
1
2      A    I answered your question.
3      Q    Okay.
4           (Time noted: 1:47 a.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 752

```
1
2              C E R T I F I C A T I O N
3
    STATE OF NEW YORK  )
4                      ) ss.:
    COUNTY OF NEW YORK )
5
6         I, JUDITH CASTORE, Shorthand Reporter
7    and Notary Public within and for the State
8    of New York, do hereby certify:
9         That ROBERT H. KOHN, the witness
10   whose deposition is hereinbefore set
11   forth, was duly sworn by me and that this
12   transcript of such examination is a true
13   record of the testimony given by such
14   witness.
15        I further certify that I am not
16   related to any of the parties to this
17   action by blood or marriage and that I am
18   in no way interested in the outcome of
19   this matter.
20        IN WITNESS WHEREOF, I have hereunto
21   set my hand this 8th day of November,
22   2018.
23
                      Judith Castore
24                _____
                     JUDITH CASTORE
25
```

Page 751

```
1
2    STATE OF _____ )
3                      ) :ss
4    COUNTY OF _____ )
5
6
7         I, ROBERT H. KOHN, the witness
8    herein, having read the foregoing
9    testimony of the pages of this deposition,
10   do hereby certify it to be a true and
11   correct transcript, subject to the
12   corrections, if any, shown on the attached
13   page.
14
15        _____
16            ROBERT H. KOHN
17
18
19
20   Sworn and subscribed to before me,
21   this _____ day of _____, 2018.
22
23   _____
24        Notary Public
25
```

Page 753

```
1
2              I N D E X
3    WITNESS                    PAGE
4    ROBERT H. KOHN
5      Examination by:
6        MR. ZAKARIN              4
         MR. HWANG              547
7
8            E X H I B I T S
9
10   K                         PAGE
11   Exhibit 1  Expert Report of Bob Kohn, August   15
                17, 2018
12   Exhibit 2  Blanket Composer Agreement          65
                (Direct) dated as of May 19, 2010
13   Exhibit 3  March 7, 2011 Agreement            147
     Exhibit 4  Excerpt from the book entitled,    201
14          Kohn On Music Licensing
     Exhibit 5  Document entitled, Turner - BMI    339
15          Music Performance License
            Agreement
16   Exhibit 6  Excerpt from the book entitled,    493
            Kohn On Music Licensing
17   Exhibit 7  Excerpts from the book entitled,   613
            Kohn On Music Licensing
18   Exhibit 8  Form 8.2, Multi-Purpose Work For   631
            Hire Agreement
19   Exhibit 9  Multi-page document containing     695
            cue sheets
20   Exhibit 10 Printout from IMDB.com of all 20   699
            episodes from the two seasons of
21          the show Ain't That America
     Exhibit 11 Cue sheets corresponding to K      699
22          Exhibit 10
     Exhibit 12 Document, Bates-stamped            730
23          VIACOM_0000568 through 667
24
25
```

189 (Pages 750 - 753)

Page 754

```
1        INSTRUCTIONS TO WITNESS
2
3     Please read your deposition over carefully
4  and make any necessary corrections. You should state
5  the reason in the appropriate space on the errata
6  sheet for any corrections that are made.
7     After doing so, please sign the errata sheet
8  and date it.
9     You are signing same subject to the changes
10  you have noted on the errata sheet, which will be
11  attached to your deposition.
12     It is imperative that you return the original
13  errata sheet to the deposing attorney within thirty
14  (30) days of receipt of the deposition transcript by
15  you. If you fail to do so, the deposition transcript
16  may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25
```

Page 755

```
1            E R R A T A
2
3
4
5     I wish to make the following changes,
6  for the following reasons:
7
8  PAGE LINE
9  ___ ___ CHANGE:_____
10  REASON:_____
11  ___ ___ CHANGE:_____
12  REASON:_____
13  ___ ___ CHANGE:_____
14  REASON:_____
15  ___ ___ CHANGE:_____
16  REASON:_____
17  ___ ___ CHANGE:_____
18  REASON:_____
19
20  _____  _____
         ROBERT H. KOHN          DATE
21
22  SUBSCRIBED AND SWORN TO BEFORE
23  ME THIS ___DAY OF_____, 201 .
24
    _____  _____
25  NOTARY PUBLIC     COMMISSION EXPIRES
```

190 (Pages 754 - 755)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# Robert Kohn Deposition Volume 2

**Page 1**

```
 1
 2   UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------X
 4   TWELVE SIXTY LLC, ARON MARDEROSIAN,
     and ROBERT MARDEROSIAN,
 5
              Plaintiffs,
 6
          vs.              Civil Action No.
 7                         1:17-CV-01479-PAC
 8   EXTREME MUSIC LIBRARY LIMITED, a
     division of Sony/ATV Music Publishing;
 9   EXTREME MUSIC LIMITED; VIACOM
     INTERNATIONAL INC., NEW CREATIVE
10   MIX INC., HYPE PRODUCTION MUSIC,
11              Defendants.
12   ------------------------------------X
13
14
15              VOLUME II
16         CONTINUED DEPOSITION OF
17            ROBERT H. KOHN
18           New York, New York
19         Friday, November 2, 2018
20
21
22
23
24   Reported by:
     JOAN WARNOCK
25   JOB NO. J3015335A
```

**Page 2**

```
 1
 2
 3            November 2, 2018
 4            9:10 a.m.
 5
 6      VOLUME II - Continued deposition of
 7   ROBERT H. KOHN, held at the offices of
 8   Pryor Cashman LLP, 7 Times Square,
 9   New York, New York, pursuant to Notice,
10   before Joan Warnock, a Notary Public of
11   the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2   A P P E A R A N C E S:
 3
 4      MARDEROSIAN & COHEN,
 5      A Professional Corporation
 6      Attorneys for Plaintiffs
 7         1260 Fulton Street
 8         Fresno, California  93721
 9      BY:   MICHAEL G. MARDEROSIAN, ESQ.
10            HEATHER S. COHEN, ESQ.
11
12      PRYOR CASHMAN LLP
13      Attorneys for Defendants Extreme Music
14      Library Limited and Extreme Music Limited
15         7 Times Square
16         New York, New York  10036
17      BY:  DONALD S. ZAKARIN, ESQ.
18           ROSS M. BAGLEY, ESQ.
19           YEVGENIA S. KLEINER, ESQ.
20
21
22
23
24
25
```

**Page 4**

```
 1
 2   A P P E A R A N C E S:  (Cont'd.)
 3
 4      LOEB & LOEB LLP
 5      Attorneys for Defendants Viacom
 6      International Inc., New Creative
 7      Mix Inc., and Hype Production Music
 8         345 Park Avenue
 9         New York, New York  10154
10      BY:  WOOK J. HWANG, ESQ.
11           ERIN SMITH DENNIS, ESQ.
12
13
14   ALSO PRESENT:
15      DAVID J. PRZYGODA, SONY CORPORATION OF
16   AMERICA
17      BARRY MASSARSKY
18
19
20
21
22
23
24
25
```



ESQUIRE
DEPOSITION SOLUTIONS

Page 5

1           R. Kohn
2   R O B E R T   H.   K O H N, called as a
3     witness, having been duly sworn by
4     a Notary Public, was examined and
5     testified further as follows:
6         COURT REPORTER:  Please state your
7     name for the record.
8         THE WITNESS:  Robert H. Kohn.
9   EXAMINATION (Cont'd.)
10  BY MR. HWANG:
11      Q.   Good morning, Mr. Kohn.
12      A.   Good morning.
13      Q.   You recall the instructions from
14  yesterday?
15      A.   The instructions?
16      Q.   Yes.  The instructions, namely,
17  that we shouldn't speak over each other?
18      A.   Oh, the admonitions.
19      Q.   Right.
20      A.   Yes.
21      Q.   Let's try not to do that for the
22  sake of the reporter.  So, Mr. Kohn,
23  throughout your report you raised several
24  instances in which -- several bases for
25  contending that the Marderosians may not have

Page 6

1           R. Kohn
2   received their full entitlement to public
3   performance royalties.  Is that an accurate
4   characterization?
5       A.   May not have received their --
6   okay.  Yes.
7       Q.   From BMI; right?
8       A.   Yeah.  Well, may not have received
9   their public performance royalties.
10      Q.   There's no obligation from Viacom,
11  New Creative, or Extreme to pay the public
12  performance royalties; right?
13          MR. MARDEROSIAN:  Objection.  Calls
14      for a legal conclusion.
15      A.   Well, to the extent they issued
16  direct performance licenses, they need to do
17  that.
18      Q.   As a share of the gross receipts,
19  as that term is defined --
20      A.   As gross receipts, right.
21      Q.   As that term is defined in the 2011
22  --
23      A.   Yes.
24      Q.   -- Composer Agreement?
25      A.   Yes.

Page 7

1           R. Kohn
2       Q.   So other than in the case of direct
3   public performance licenses, there's no
4   obligation from Viacom, New Creative, or
5   Extreme to pay any public performance
6   royalties to the Marderosians; correct?
7           MR. MARDEROSIAN:  Objection.  Calls
8       for a legal conclusion.
9       A.   They have an obligation to pay BMI.
10  BMI pays the Marderosians.
11      Q.   Okay.  And that payment to BMI from
12  Viacom would be in the form of a blanket
13  license fee?
14      A.   Yes.
15      Q.   Pursuant to the separate agreement
16  between BMI and Viacom --
17      A.   That's correct.
18      Q.   -- correct?
19          MR. MARDEROSIAN:  Objection.  Calls
20      for a legal opinion.
21      Q.   Have you undertaken any analysis to
22  determine how much the Marderosians were
23  purportedly underpaid in the writer's share
24  of public performance income?
25      A.   No.  I was not asked to opine on

Page 8

1           R. Kohn
2   that.
3       Q.   So you don't actually know if they
4   were underpaid?
5       A.   There's enough evidence that I've
6   seen in this case that suggest they were
7   underpaid.
8       Q.   But you don't know how much?
9       A.   I don't know how much.
10      Q.   And you're not opining on how much?
11      A.   No.  That's correct.  I mean yes, I
12  am not opining on how much.
13      Q.   If the Marderosians weren't paid
14  public performance income for a particular
15  use, does that necessarily mean that a cue
16  sheet wasn't submitted to BMI?
17          MR. MARDEROSIAN:  Objection.
18      Incomplete hypothetical.
19      A.   I agree with that.  I agree that
20  it's an incomplete hypothetical.  Does it
21  necessarily mean?
22      Q.   Someone's going to have to explain
23  to me what that is at some point.  But go
24  ahead.
25      A.   There was a song -- well, you'll



Page 49

R. Kohn

1
2  in the exhibit to the co-publishing
3  agreement, joint venture agreement.
4      Q.   Is it direct --
5      A.   And then --
6      Q.   Wait a second.  Let me --
7      A.   Let me answer your question.
8      Q.   Wait a second.
9      A.   No, no, no, no.  I get to answer
10  the question first.  I get to answer the
11  question.
12      Q.   Go ahead.
13      A.   On the direct performance side, I
14  extrapolated that that license would include
15  a direct performance license from the
16  statements that were made and the evidence
17  that I saw here in Dan Pounder's declaration
18  and some of the other declarations or
19  depositions or whatever that -- and the
20  statements that are even made in this
21  litigation that Viacom, because it's a work
22  for hire, has no obligation to pay for the
23  use of any -- no obligation to pay monies
24  that would generate gross receipts, that
25  50 percent of which the plaintiffs would be

Page 50

R. Kohn

1
2  entitled to.  So the statement that you're
3  making that Viacom doesn't owe any money,
4  doesn't owe anything that would generate
5  gross receipts under the 2011 agreement,
6  suggests to me that you think you have a
7  direct performance license.
8      Q.   Let me turn your attention to
9  Page 84 of the report.  Page 84 of the
10  report.
11      A.   Go ahead.
12      Q.   You state that Viacom received,
13  quote, a direct public performance license
14  for that music in circumvention of BMI's
15  collection and distribution of writer's share
16  performance fees to Aron and Robert's music,
17  a clear violation of the benefit of their
18  bargain with Viacom.  Do you see that?
19      A.   That was my conclusion.  That is my
20  opinion based upon what I said earlier just a
21  few moments ago, and that is reflected in
22  this report.
23      Q.   How did Viacom circumvent BMI's
24  collection and distribution of writer's share
25  performance fees to Robert and Aron?

Page 51

R. Kohn

1
2      A.   By basically granting itself a
3  direct public performance license.
4      Q.   And thereby not feeling obligated
5  or not submitting cue sheets to BMI?
6      A.   It doesn't matter.  We don't even
7  have to get to cue sheets.  If Viacom thinks
8  it's granted itself a direct public
9  performance license, then it has no
10  obligation to BMI to submit cue sheets on any
11  of that.
12      Q.   And yesterday we established that
13  you can't identify a single example in which
14  Viacom didn't submit a cue sheet for a
15  program that aired on a Viacom network;
16  correct?
17          MR. MARDEROSIAN:  I'm going to
18      object.  It calls for speculation and
19      incomplete hypothetical.
20      A.   As I just said, Viacom has an
21  obligation to submit cue sheets to BMI for
22  programs.  We just read it in the contract.
23  We just read it, right, in the A&E contract.
24  We haven't seen the Viacom agreement with
25  BMI.  We can read it in that to actually see

Page 52

R. Kohn

1
2  what the obligation that Viacom had.  But as
3  a practical matter, I haven't seen any of
4  these -- just because it's in a cue sheet
5  doesn't mean you didn't have a direct
6  performance license, because as a practical
7  matter, you generate a cue sheet of all of
8  the musical works that are in an episode in a
9  program, as I explained.
10      Q.   So if a cue sheet is submitted, and
11  there's a direct public performance license,
12  and BMI royalties are paid out to the
13  writers, what is the harm in having a direct
14  public performance license, if any?
15      A.   Well, think of all the -- well,
16  there are lots of -- direct public
17  performance licenses were not only issued to
18  Viacom.  They were issued to all of the major
19  networks.
20      Q.   Let's stick to Viacom.
21      A.   No.
22      Q.   Because that's what I'm asking you
23  about.
24      A.   No.  No.  You asked me a broader
25  question.



1          R. Kohn
2     Q.   No, that's not what I asked you.  I
3   referred you to 84 of your report in which
4   you say Viacom improperly received a direct
5   public performance license, quote, in
6   circumvention of BMI's collection and
7   distribution of writer's share performance
8   fees to Aron and Robert's music.  Do you see
9   that?
10        MR. MARDEROSIAN:  Mr. Hwang, you're
11     arguing with the witness.
12        MR. HWANG:  I'm trying to speed
13     this up for your sake.
14        MR. MARDEROSIAN:  Well, I
15     appreciate it, but you have to ask
16     better questions so that we can move
17     this along.  He's trying to answer your
18     questions.
19     A.   It could explain -- just because
20   BMI received a cue sheet with information on
21   it regarding one of the plaintiff's songs
22   doesn't mean they actually paid the public
23   performance royalty.  If they have
24   information from some source, whether it's
25   Extreme or Viacom, right, that there was a

1          R. Kohn
2   direct public performance license, BMI would
3   not pay.  And that might explain why they're
4   not getting paid from BMI what they think
5   they should be paid.
6     Q.   Are you aware of any such instance
7   in which this purported direct public
8   performance license to Viacom resulted in a
9   nonpayment of the writer's share of public
10   performance fees to Aron and Robert?
11        MR. MARDEROSIAN:  Calls for
12     speculation.  Incomplete hypothetical.
13     A.   I go back to the extract that you
14   provided to us.  What explains the fact that
15   there was Bayham receiving all of this and
16   the writers not receiving it.
17     Q.   Okay.  Other than that, is there
18   any other instance in which you're aware that
19   the purported direct public performance
20   license to Viacom result in a nonpayment of
21   public performance fees to Aron and Robert?
22     A.   When you --
23        MR. MARDEROSIAN:  Objection.  Calls
24     for speculation.  Incomplete
25     hypothetical.

1          R. Kohn
2     Q.   I'm just asking you to identify a
3   single instance, if you can.
4     A.   It was a breach of contract to give
5   yourself a direct public performance license,
6   which is what you've been saying during this
7   litigation.
8     Q.   Thank you, Judge Kohn.
9     A.   That you have --
10     Q.   Thank you, Judge Kohn.
11     A.   I'm not --
12     Q.   I'm asking you a factual question.
13   Are you aware of a single instance in which
14   this purported direct public performance
15   license to Viacom resulted in a nonpayment of
16   public performance royalties to Aron and
17   Robert?
18        MR. MARDEROSIAN:  Objection.  It
19     calls for speculation.  Incomplete
20     hypothetical.
21     A.   How can I trace something that's
22   not in a BMI statement, okay.  It won't be in
23   a -- nonpayment means not in BMI's statement.
24   How can I look at a BMI statement to the
25   plaintiffs and determine how a payment wasn't

1          R. Kohn
2   made?  What I need to do is go back and look
3   at the TuneSat data which will show me all of
4   the broadcasts for public performances of all
5   those audiovisual works.  That would allow me
6   to do that.  That was denied to me, okay, so
7   I could not do that.
8     Q.   So you're not aware sitting here
9   today of any such instance?
10        MR. MARDEROSIAN:  Same objection.
11     It calls for speculation.  Incomplete
12     hypothetical.
13     A.   How am I going to be aware of an
14   instance of something that I don't have the
15   information to even determine?  I can't match
16   a nonpayment to something that I don't have
17   the information on.
18     Q.   So you're not aware of any such
19   instance?
20     A.   The only way I would be aware of it
21   is to be aware of the actual performances.
22   You're asking me to have watched television
23   full-time all of Viacom networks since 2010.
24   That would be the only way to do it, for me
25   to let you know of a particular instance



Page 57

R. Kohn

1        R. Kohn
2  without having the TuneSat data.
3      Q.   So you're not aware of a single
4  instance sitting here today?
5      A.   That's correct.  But I suggest that
6  Extreme is aware of it because it has the
7  data.
8      Q.   And you speculated that Viacom or
9  Extreme may have told BMI that Viacom has a
10  direct public performance license and
11  therefore BMI doesn't need to pay the
12  writer's share of public performance
13  royalties?
14      A.   That's not my testimony.  I did not
15  say that.
16      Q.   You said that might have happened,
17  right, in that case that BMI wouldn't pay the
18  writer's share.  Wasn't that your testimony?
19      A.   I didn't speculate on anything.  I
20  said that if BMI had received information
21  that it could put into its systems, I mean
22  this is what I would say now, with respect to
23  a particular set of programs and a particular
24  set of musical works, or I should say a
25  network that produces programs under their

Page 58

R. Kohn

1        R. Kohn
2  agreement, then they wouldn't pay.
3      Q.   Are you aware of any such
4  communications?
5      A.   No.
6      Q.   Okay.  If --
7      A.   Let me just take that back.  I
8  remember seeing in the file several letters
9  that Extreme -- I believe that Extreme wrote
10  to a performance rights society, it might
11  have been BMI, I'm just doing this from
12  memory, that let BMI know that certain
13  catalogs of their works were subject to a
14  direct performance license.  I don't know if
15  it was the Viacom network.  But I did see
16  that in the file.
17      Q.   Other than that, you're not aware
18  of any such communications?
19      A.   Well, there might have been others
20  that I haven't seen.
21      Q.   So you're not aware of any such
22  communications?
23      A.   I'm not aware.  I'm not aware of --
24  none of those potential communications have
25  been brought to my attention.

Page 59

R. Kohn

1        R. Kohn
2      Q.   Okay.  If Viacom had a direct
3  public performance license, they also
4  wouldn't have received the publisher's share
5  of public performance royalties for uses of
6  the songs at issue on Viacom programming;
7  isn't that right?
8      A.   BMI would have received the
9  publisher's share?
10      Q.   If Viacom had a direct public
11  performance license --
12      A.   Oh.  Okay.  Viacom.
13      Q.   Viacom also wouldn't have received
14  any publisher's share of performance income
15  for programming on its network?
16      A.   That's correct.
17      Q.   Are you aware of any instance in
18  which Viacom didn't receive the publisher's
19  share of public performance income as a
20  result of this purported direct public
21  performance license that it received from
22  Extreme?
23      A.   I have not been provided with any
24  information as to what Viacom -- well, except
25  for the extract, I'm not sure whether that

Page 60

R. Kohn

1        R. Kohn
2  was Viacom or not now, what's in there.  I
3  have not received -- other than the extract
4  that I have seen, no, I have not seen that.
5      Q.   The fundamental predicate to what I
6  just asked you is that Viacom as a
7  copublisher is entitled to receive
8  publisher's share of public performance
9  income from BMI; correct?
10      A.   Yes.
11      Q.   Including --
12          MR. MARDEROSIAN:  Well, actually,
13  in reality, the evidence --
14          MR. HWANG:  Just stop.
15          MR. MARDEROSIAN:  -- in the case is
16  that --
17          MR. HWANG:  Just stop testifying.
18          MR. MARDEROSIAN:  -- Extreme pays
19  Viacom.  BMI does not pay Viacom.  So
20  your question is not consistent with the
21  evidence.  It misstates the evidence.
22  It's an incomplete hypothetical.  It
23  comes from Extreme.  They administer,
24  they collect everything.  Your own
25  30(b)(6) witness Anita Chinkes said



Page 109

1           R. Kohn
2       Q.   Weren't you concerned, then, if
3   it's not in the extracts, that maybe somehow
4   meta data was bad and the Marderosians were
5   not being paid on that song?
6           MR. MARDEROSIAN:  Objection.
7       Incomplete hypothetical.
8       Q.   You can answer.
9           MR. MARDEROSIAN:  Calls for
10      speculation.
11      A.   I was concerned when I didn't see
12   it in the extracts because I understand that
13   was supposed to cover all the songs.
14      Q.   But when you went back --
15      A.   But, but I didn't go back in every
16   occasion to look at whether something
17   appeared on a BMI.  If I did that throughout
18   the three months of my preparing the expert
19   report, I would never have gotten it done.
20      Q.   And you saw on the other document,
21   which I think it was Katz 6, that we
22   produced, that Extreme produced that it
23   reflected on Teenage Vamps that there was a
24   substantial amount of performance income that
25   Extreme received for Teenage Vamps; right?

Page 110

1           R. Kohn
2   Isn't that what your testimony was a few
3   minutes ago?
4       A.   There was -- on that list there was
5   -- it was very substantial.  I don't know
6   whether it was performance, but I -- was it
7   performance or sync?
8       Q.   I think you testified it was
9   performance.
10      A.   I said 34,000.
11      Q.   Okay.  So that was reported and
12   identified in a document produced by Extreme
13   in this case; correct?
14      A.   Right.  But the point --
15      Q.   No, no.  I didn't ask you anything.
16   All you need to say is "right," because that
17   was the question asked.  We'll get out of
18   here faster, or you will, not us, if you
19   answer my questions, not ones I didn't ask.
20   Okay?
21      A.   What's your question?
22      Q.   Good.  If you pay attention, we'll
23   go through it.
24      A.   I've been paying attention very
25   carefully.

Page 111

1           R. Kohn
2       Q.   The question was --
3       A.   And lots of questions are not
4   properly phrased, so I have to --
5       Q.   I know I'm not up to your
6   standards, but I'll try.  So here we go.
7           You didn't look to see, having
8   looked at the extract that you saw, there was
9   Teenage Vamps was not listed, having looked
10   at Exhibit 6, you saw that money was paid to
11   Extreme on Teenage Vamps, you didn't look at
12   the BMI statements to see were the
13   Marderosians paid on Teenage Vamps; is that
14   right?
15          MR. MARDEROSIAN:  Meaning did he do
16      a comparison to see if the performance
17      royalties supposedly reported by Extreme
18      matched the performance royalties of
19      Aron and Robert's BMI statements for the
20      exploitation of Teenage Vamps?  Is that
21      the question?
22          MR. ZAKARIN:  Read back my
23      question, not Mr. Marderosian's speech.
24          MR. MARDEROSIAN:  No.  Mine is the
25      more accurate question.

Page 112

1           R. Kohn
2           MR. ZAKARIN:  Well, you can ask
3       your questions.  This is my turn to ask
4       mine.
5           (Record read.)
6       Q.   Simple question.
7           MR. MARDEROSIAN:  Mr. Zakarin, can
8       you identify the amount of money you're
9       talking about that the Marderosians were
10      paid for Teenage Vamps?
11      Q.   You can answer my question.
12      A.   I was focused on what was not being
13   paid on, not what was.  If I had to look and
14   compare on everything that they were paid on,
15   I'd never get the thing done.
16      Q.   So you don't know one way or the
17   other whether they were paid on Teenage Vamps
18   by BMI; is that right?
19      A.   I have no recollection in my mind
20   about that.
21      Q.   And you have no idea, then, whether
22   they were underpaid, overpaid, or paid on a
23   comparable basis to what was received by
24   Extreme; is that correct?
25      A.   Not on Teen -- not on --



Page 113

R. Kohn

2   Q.   Teenage Vamps.
3   A.   Not on Teenage Vamps, but on
4  Mulholland Drive --
5   Q.   That's the only question.  Did I
6  ask you about Mulholland Drive?
7   A.   I saw 60 pages of Mulholland Drive
8  promotional announcements that Bayham was
9  paid on, and they were not paid.  And when I
10  see 60 pages where Bayham is paid and are
11  clearly identified and associated with the
12  plaintiffs and not in the BMI statements, the
13  only thing I can imagine is that there are
14  other composers who were paid on those works.
15  That's what I was focused on.  Teenage Vamps
16  was just a matter of the fact that you
17  provided a report that didn't include it.
18   Q.   Is it possible you have a limited
19  imagination?
20   A.   I think that's an insulting
21  question.
22   Q.   I'll withdraw the question.  You
23  just said the only thing that you can imagine
24  is that there was some, you know, some change
25  in the data or it was misdirected; is that

Page 114

R. Kohn

2  right?
3   A.   It's a figure of speech.  I said
4  earlier --
5   Q.   Oh.  It's a figure of speech when
6  you say it's the only thing you can imagine.
7  Let me just try it.  Other --
8   MR. MARDEROSIAN:  You're getting
9  argumentative, Don.  Argumentative.
10   Q.   Are there other possibilities that
11  you could imagine, Mr. Kohn?
12   MR. MARDEROSIAN:  He's not going to
13  speculate.  He's not going to speculate.
14   MR. ZAKARIN:  That's all he's done
15  today.
16   MR. MARDEROSIAN:  Incorrect.
17  That's an argumentative and insulting
18  statement.  And I object to that.
19   MR. ZAKARIN:  It's an accurate
20  statement.
21   A.   I would like to see, given what --
22   MR. MARDEROSIAN:  It's based on the
23  evidence that you've produced in the
24  case.
25   MR. ZAKARIN:  I understand.  I've

Page 115

R. Kohn

2  asked him a question.
3   A.   Based on everything I've seen in
4  this case, I have asked for and I have not
5  seen the royalty statements that Russell
6  Emanuel and under all of his aliases have
7  received through ASCAP, PRS so I can make an
8  absolute determination which composers
9  received those royalties.  And if you would
10  show us those and be transparent about it,
11  and perhaps Sony ATV might be very interested
12  in knowing whether that's the case, because
13  if it turns out to be the case, we all have
14  problems.
15   Q.   Okay.  Now that you just finished
16  that long statement, the question was not
17  what you didn't see, what you didn't get to
18  see, whether you were entitled to see it.  My
19  question was much simpler.
20   A.   I answered your question.
21   Q.   Then what was the speech for?
22   A.   That was my answer.
23   Q.   I don't think I asked anything
24  relating to that.
25   MR. ZAKARIN:  I have no further

Page 116

R. Kohn

2  questions.
3   MR. MARDEROSIAN:  Thank you, Don.
4  Are we done?
5   MR. HWANG:  Close it out.
6   MR. MARDEROSIAN:  Same stipulation
7  as we reached with the other experts
8  where I get the original, notify you of
9  any changes.  We good with that?
10   MR. ZAKARIN:  Yes.
11   (Time noted:  11:00 a.m.)
12
13
14
15   _____
16   ROBERT H. KOHN
17
18  Subscribed and sworn to before me
19  this ___ day of _____, 2018.
20
21  _____
22
23
24
25



Page 117

```
1
2              C E R T I F I C A T E
3   STATE OF NEW YORK         )
4                     : ss.
5   COUNTY OF WESTCHESTER     )
6
7          I, JOAN WARNOCK, a Notary Public
8    within and for the State of New York, do
9    hereby certify:
10         That ROBERT H. KOHN, the witness
11   whose deposition is hereinbefore set
12   forth, was duly sworn by me and that
13   such deposition is a true record of the
14   testimony given by the witness.
15         I further certify that I am not
16   related to any of the parties to this
17   action by blood or marriage, and that I
18   am in no way interested in the outcome
19   of this matter.
20         IN WITNESS WHEREOF, I have hereunto
21   set my hand this 8th day of November,
22   2018.
23
24   _____
25              JOAN WARNOCK
```

Page 119

```
1
2   Deposition
3   EXHIBIT K-16                            80
4   Subextract taken from extract
5   produced by Extreme, Exhibit 8 to
6   Katz Deposition
7   EXHIBIT K-17                            87
8   Spread sheet produced by Extreme
9   setting forth performance value of
10   Aron and Robert's songs compared to
11   other songs
12  EXHIBIT K-18                            92
13  Six-page document beginning with
14  Bates stamp Extreme 0083277,
15  Excerpts of Semiannual Statements
16
17
18
19
20
21
22
23
24
25
```

Page 118

```
1
2   ----------------- I N D E X ----------------
3   WITNESS          EXAMINATION BY        PAGE
4   R. Kohn          Mr. Hwang               5
5                    Mr. Marderosian        78
6                    Mr. Hwang              96
7                    Mr. Zakarin           106
8
9   ----------- INFORMATION REQUESTS -----------
10  DIRECTIONS:
11  RULINGS:
12  TO BE FURNISHED:
13  REQUESTS:
14  MOTIONS:
15
16  ------------------ EXHIBITS ----------------
17  DEFENDANTS'                    FOR ID.
18   EXHIBIT K-13                    64
19   Expert Report of Roger Miller
20   EXHIBIT K-14                    73
21   First Amended Complaint for Damages
22   and Demand for Jury Trial
23   EXHIBIT K-15                    79
24   Document Bates stamped Extreme
25   0006585, Exhibit 7 to Mr. Katz's
```

Page 120

```
1           DEPOSITION ERRATA SHEET
2
3   Our Assignment No.: J3015335A
4   Case Caption: Twelve Sixty LLC vs. Extreme
5   Music Library Limited
6
7       DECLARATION UNDER PENALTY OF PERJURY
8
9          I declare under penalty of perjury
10  that I have read the entire transcript of my
11  Deposition taken in the captioned matter or
12  the same has been read to me, and the same is
13  true and accurate, save and except for
14  changes and/or corrections, if any, as
15  indicated by me on the DEPOSITION ERRATA
16  SHEET hereof, with the understanding that I
17  offer these changes as if still under oath.
18  _____
19              Robert H. Kohn
20  Subscribed and sworn to on the ____ day of
21  _____, 20 ____ before me.
22  _____
23  Notary Public,
24  in and for the State of
25  _____.
```



Page 121

```
 1        DEPOSITION ERRATA SHEET
 2    Page No.____Line No.____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No.____Line No.____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No.____Line No.____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No.____Line No.____Change to:_____
12    _____
13    Reason for change:_____
14    Page No.____Line No.____Change to:_____
15    _____
16    Reason for change:_____
17    Page No.____Line No.____Change to:_____
18    _____
19    Reason for change:_____
20    Page No.____Line No.____Change to:_____
21    _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
25              Robert H. Kohn
```

Page 122

```
 1        DEPOSITION ERRATA SHEET
 2    Page No.____Line No.____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No.____Line No.____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No.____Line No.____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No.____Line No.____Change to:_____
12    _____
13    Reason for change:_____
14    Page No.____Line No.____Change to:_____
15    _____
16    Reason for change:_____
17    Page No.____Line No.____Change to:_____
18    _____
19    Reason for change:_____
20    Page No.____Line No.____Change to:_____
21    _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
25              Robert H. Kohn
```



ESQUIRE
DEPOSITION SOLUTIONS