# Pounder Declaration

## <u>Redacted to Preserve Confidentiality</u>
(Un-Redacted Version Filed Under Seal)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| TWELVE SIXTY LLC, ARON MARDEROSIAN, and ROBERT MARDEROSIAN, <br><br> Plaintiffs, <br><br> -against- <br><br> EXTREME MUSIC LIBRARY LIMITED, a division of Sony/ATV Music Publishing; EXTREME MUSIC LIMITED; VIACOM INTERNATIONAL, INC.; NEW CREATIVE MIX INC.; HYPE PRODUCTION MUSIC, <br><br> Defendants. | Civil Case No. 1:17-cv-01479-PAC <br> ECF Case <br><br> *District Judge:  Hon. Paul A. Crotty* <br> *Magistrate:  Hon. Gabriel W. Gorenstein* <br><br> **DECLARATION OF DAN POUNDER IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT OF THE EXTREME MUSIC LIBRARY LIMITED AND EXTREME MUSIC LIMITED** |

I, DAN POUNDER, declare as follows:

1.      I am the Executive Vice President of Defendants, The Extreme Music Library Limited and Extreme Music Limited (hereinafter sometimes collectively referred to as "Extreme"), the second-most senior officer, based in London.  The administrative management of Extreme's catalogues of musical compositions, including its copyright, finance and royalty administration departments, are under my direct supervision in London.  I have been the primary liaison with Extreme's counsel in this case.

2.      I am fully familiar with the facts and documents that I will refer to herein.  The primary purpose of this declaration is to address the few specific instances of alleged non-payment of royalties identified by the Plaintiffs during the course of expert depositions in this case – which involve a few hundred dollars at most.  I am doing so because I expect that Plaintiffs will try to avoid summary judgment by arguing that these few instances create disputed issues of material fact.

3.      In fact, even if every one of the "issues" raised by Plaintiffs at the expert depositions reflected an alleged underpayment to Plaintiffs (whether by Plaintiffs' performing rights organization, Broadcast Music, Inc., "BMI," or by defendants in this case), the total amount of the alleged underpayment would not come close to satisfying the jurisdictional minimum that I understand is required for filing a case in this Court.  And as I will show below, in virtually every specific instance identified by Plaintiffs, there has actually been no underpayment of royalties.

4.      In order to frame the issues in this case, it is important to explain how the production music library business works.  Production music libraries are essentially music publishers of generic music (as opposed to popular music).  Production music is used primarily in television programs as background or incidental music or sometimes themes.  It is an extremely competitive business with one library's works being largely substitutional for those of any other library, making the licensing values obtainable substantially lower than those available to the publishers of popular music.  In fact, the lower cost for production music is a significant part of their attraction to broadcasters and program producers.

5.      The synchronization licenses issued by Extreme fall into two basic categories: needle-drop licenses (which are licenses of individual works for a specified license fee) and blanket licenses, which are licenses of the entirety of Extreme's library of works.[1]   While with needle-drop licenses, the licensee (the program producer or broadcaster) has already determined which work it wants to synchronize with its program(s), with blanket licenses the licensee has generally not made a determination of which work or works it wants to use.  The blanket license affords the licensee the right

---

[1] A synchronization license is a one-time license for a one-time fee that authorizes a licensee to fix a musical work (composition and recording) in timed relationship with a visual image.  The licensee can broadcast the program in which the musical work is performed as many times as it wants without paying any further synchronization fee (but the broadcaster will have to pay the Performing Rights Organizations ("PROs") performance royalties for the broadcasts in accordance with the terms of the broadcaster's licenses from the PROs).  In turn, the PROs will pay the writers and publishers in accordance with the PRO's own payment policies.

to choose over the course of the license period (which can be as long as a year or more) which works it wants to use.  And, the blanket licensee has the unlimited right to use as many works as it wants in as many programs, promos or productions that it broadcasts.[2]

6.      In addition to the license fees it receives from program producers and broadcasters for synchronization licenses, Extreme also receives what is known as the publisher share of public performance income.  Broadcasters (and sometimes program producers) enter into licenses with the PROs, usually on a blanket basis, which require them to report their usage of works on their programs (through what are known as "cue sheets").[3]  The PROs use the cue sheets to allocate, according to their own formulas, the performance license fees paid by the broadcasters (or program producers) to the publishers and writers of the works that have been used.  This is done worldwide on a country by country basis by PROs that exist in virtually every country of the world.

7.      Because Extreme's libraries contain in excess of 25,000 works, between the hundreds or even thousands of licenses it issues each year and the PRO royalty reports it receives from dozens of

---

[2] "Promos" are promotional announcements which are typically broadcast interstitially (between programs) and which promote the network or some other program broadcast on that or some other network. ████████ ████████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████  In addition, as Ms. Smith testified and as BMI's publicly available Royalty Policy Manual states, BMI was not allocating any performance income for promos on cable prior to around 2013 and even now, BMI only allocates performance income where it receives sufficient information from broadcasters for promo uses of music.  That is BMI's policy and it affects publishers and writers equally.  Ms. Smith's deposition testimony and BMI's Royalty Policy Manual are specifically referenced and attached to the accompanying Zakarin declaration.

[3] I will address this cue sheet process, which has been materially misrepresented by Plaintiffs, in more detail below.  However, as an overview, cue sheets contain the following information: title of work, writer, publisher, PRO affiliation, program, nature of use (*i.e.*, background vocal or instrumental or theme) and duration of use (which information has been called "metadata").  Because programs often contain a great deal of music, cue sheets will generally list such information for many works and will be sent to every PRO (because the listed works are likely to have been composed by affiliates or members of different PROs).  The cue sheet is only submitted once for a program.  It is not resubmitted when the program is rebroadcast because the information for the program is already in the database of the PROs from the initial cue sheet and they monitor rebroadcasts by other means (BMI, I believe, uses a service known as Gracenote).

PROs around the world (BMI and the American Society of Composers, Authors and Publishers ("ASCAP") render domestic royalty reports and payments four times a year and ASCAP renders an additional four international reports and payments a year), Extreme receives millions of lines of data reflecting the uses of its works and royalty payments every year.  And this volume of data is dwarfed by the information received by the PROs, which have millions of songs in their repertoires and receive reports from tens of thousands of sources.

8.      While royalty accounting has become a heavily computerized process, it is still very much a human process as well and humans make mistakes.  The cue sheet process, for instance, involves music supervisors filling out (both manually and by accessing metadata provided by the music publisher or by the PROs) the cue sheets with the required information.  In that process, titles can be garbled or mistaken.  Writers and publishers can be misattributed or misidentified. Works that were used in a program can be omitted (or mistakenly credited).  These are not purposeful errors, but they occur.  To my knowledge, as described in the Saltzman declaration, the PROs, which employ a great many people, do their best to monitor and review the information they receive to try to make sure the information they receive from broadcasters is correct.  But it remains imperfect.

9.      While there is and always will be some inevitable errors, the PROs also encourage writers and publishers to let them know if they have identified any uses of their songs for which they have not received payment. The Plaintiffs have produced correspondence with BMI showing that they have, at least in some instances, directly addressed some of their "issues" with BMI.

10.      Critically, however, both the number of PRO errors and their dollar value (in this case) are incredibly minimal.  As I have said, this declaration will focus on the few errors that Plaintiffs have identified.  It does not address the thousands (or tens of thousands) of uses of their

works for which Plaintiffs have been properly accounted to and paid.  And as such, the few "errors" that Plaintiffs have identified (most of which do not even entail any loss of income by them) do not reflect, as Plaintiffs have argued, the tip of the iceberg.  Instead, they are the whole ice-cube.

11.    I think it important to note that this is actually the first opportunity Extreme has had to address and refute the "errors" because Plaintiffs first identified these "errors" after the close of fact discovery and during the expert depositions.  For example, as detailed in the accompanying Zakarin declaration, while Extreme produced the "extracts" of the PRO royalty reports on April 9, 2018, Plaintiffs never asked a single question about them or even mentioned them until after Defendants served their expert reports on October 15, 2018.   In fact, the extracts were so unimportant to Plaintiffs' claims – at least until after Defendants' expert reports identified the material flaws in the damage theories advanced by Plaintiffs' "experts" – that Plaintiffs' counsel first inquired about them in an email on October 18, 2018, three days after our expert reports were served (and more than six months after these extracts were produced).

12.    Moreover, underscoring how unimportant these extracts were until after we provided our expert reports, Plaintiffs did not even know when the extracts had been produced or what their bates numbers were until we told them in response to their inquiry.[4]  Plaintiffs then placed what appeared to be huge importance on these extracts in the expert depositions – not because they reflected any loss of performance income by Plaintiffs; not because they had anything to do with how Plaintiffs even computed their supposed lost writer performance income claim (as reflected in Ms. Rodriguez's report) but because, for reasons I will explain below, the extracts were both incomplete and had input errors made by people working under my supervision.

---

[4] As explained in Mr. Zakarin's declaration, the extracts took on importance only after the Massarsky Report demonstrated that the Karen Rodriguez Report, on which Plaintiffs based their lost writer performance income claim, was founded entirely on a massive (and I believe purposeful) misrepresentation of the Tunesat detection data (inflating the Tunesat detection time by a multiple of some 33 times).

13.     The "errors" that Plaintiffs focus upon fall into the following categories:

(i)  Errors that Extreme made in its document production (namely the extracts) that do not entail any loss of income by Plaintiffs;

(ii) The isolated and miniscule number of cue sheet errors made by broadcasters (not by Extreme);

(iii) The economically insignificant minimal number of payment errors made by the PROs (again, not by Extreme);

(iv) Plaintiffs' misunderstanding of BMI's method for allocating performance income where it has incomplete information which resulted in payments to Plaintiffs for songs they did not compose or publish (which obviously did not reflect any loss by Plaintiffs);

(v) The economically insignificant and minimal number of payment errors made by Extreme in paying Viacom its co-publisher share of income from the co-published works (again, having nothing to do with any loss suffered by Plaintiffs); and,

(vi)  Certain "errors" Plaintiffs complained of which were caused by them.

I will address all of these "errors" below.

## A.     EXTREME DOCUMENT PRODUCTION ERRORS

14.     Plaintiffs had demanded that Extreme produce all of its PRO royalty statements going back to 2010.  Extreme explained that the PROs do not separate out Plaintiffs' works in their reports but report on all of some 25,000 works in Extreme's libraries.  Accordingly, Extreme offered to produce extracts from its PRO reports that would relate solely to Plaintiffs' works and this Court approved of that approach at a hearing on April 13, 2018.  Unfortunately, as I will explain below, we made several errors in extracting the information from Extreme's PRO

statements – errors that were never identified to us until they were raised by Plaintiffs' counsel after the close of fact discovery and during expert depositions.  We have since provided Plaintiffs with corrected extracts.

### 1.   Songs Omitted In the BMI Extract

15.     As I indicated above, PROs enter into blanket licenses with broadcasters and program producers and collect license fees for public performances of compositions from broadcasters and production companies.  They then allocate the performance income among the works performed (each PRO has its own formulas).  Four times a year, the PROs render royalty statements and distribute payments, separately, to composers and publishers.

16.     Publishers and writers have their own direct contractual relationships with the PROs.  The publisher affiliation for a given song is dictated by the writer affiliation.  Where, as in this case, the writers have an affiliation agreement with BMI, the publisher (Extreme) will administer their works using a BMI affiliated entity.  Extreme's entity for collecting publisher share income for songs composed by writers affiliated with BMI is Bayham Music Library ("Bayham") and Extreme's entity for collecting publisher share income for songs composed by writer members of ASCAP is Extreme Production Music USA ("Extreme USA").  In essence, the way the PROs operate, a writer will receive 50% of the performance income allocated to their works by the PRO and the publisher will receive the other 50%.  These payments are known respectively as the "writer share" and the "publisher share" of performance income.  The payments are made directly by the PRO.  The publisher has nothing to do with the writer's performance income and the writer has nothing to do with the publisher's performance income.  As I said, each has their own direct contract with the PRO.

17.     I have come to learn that the extract we made from our BMI statements (the "BMI Extract") contained errors which were not identified to Extreme until late October of 2018.  Indeed, as Mr. Zakarin's declaration shows, Plaintiffs' counsel first inquired about the existence of the extract on October 18, 2018, three days after Plaintiffs received the reports of Extreme's expert witnesses, Adam Taylor, Paul Katz and Barry Massarsky.

18.     As discussed in the Zakarin declaration, on November 1, 2018, during the deposition of Bob Kohn, one of Plaintiffs' experts, Plaintiffs' counsel identified a song, *Teenage Vamps*, **a song on which Plaintiffs had been paid writer performance income,** but which was not identified on our BMI Extract.  In other words, this was not a matter of Plaintiffs not being paid but a matter of the extract not being complete.

19.     In addition, Plaintiffs' counsel marked a PDF of the songs that were on the BMI Extract as Exhibit 9 to the deposition of Extreme's expert witness Paul Katz, attached hereto as **Exhibit A**, to reflect that not every song Plaintiffs had been paid on was included in the BMI Extract.  Following the pages showing which songs were on the BMI Extract, Katz Exhibit 9 reflects BMI's list of the songs by the Plaintiffs for which BMI issues performance licenses to broadcasters and program producers.

20.     Again, this was not a matter of Plaintiffs not having been paid writer share performance income, because they identified songs on which they were paid but which were not reported on the extract we produced on April 9, 2018.  Our BMI Extract was simply – and unintentionally – incomplete (as I will explain below, it was also over-inclusive, in that it included information about works not written by Plaintiffs).

21.     It is my responsibility for the extract being incomplete.  When I was advised of the problem, I undertook to investigate why the BMI Extract we produced did not reflect all of the

songs published by Extreme on which Plaintiffs were paid by BMI.  The explanation derives in part from how Extreme exploits the works in its libraries.

22.     Extreme licenses music and recordings (tracks) in its libraries to third party broadcasters and program producers in exchange for synchronization license fees.  Extreme's libraries are divided into labels and tracks that are placed on albums (recordings) to be exploited and marketed to prospective licensees.  In the main, Extreme licenses these albums and tracks on a blanket license basis to third party broadcasters and program producer licensees covering all of the albums in all of the libraries.

23.     Plaintiffs delivered some 113 songs and tracks pursuant to their 2010 contract with New Remote Productions (the "2010 Agreement") and 2011 contract with New Creative Mix Inc., (the "2011 Agreement") both affiliated with Viacom International Inc. (collectively "Viacom"), which Viacom then delivered to Extreme to license to third parties.[5]  Of the 113 songs and tracks, four of them were placed on an album that Extreme released under its "Hype" music label and licensed to third parties and 54 were placed on albums that Extreme released under its "Mixtape" music label and licensed to third parties.  The remaining works and tracks have not thus far been placed on albums or licensed to third parties.[6]

24.     Although 55 songs and tracks were not placed on albums or licensed to third parties by Extreme, they have been used in Viacom programming and, as reflected by the fact that Plaintiffs have been paid writer share performance income by BMI for Viacom's use of these

---

[5] Plaintiffs also signed off on several agreements pursuant to which they delivered additional works that were subject to the terms of the 2011 Agreement (which superseded the 2010 Agreement in any event). For instance, a number of works were delivered for use in the Viacom program "*Punk'd*."  Some of those works were placed on albums and marketed to third parties.  Plaintiffs have testified to varying numbers of works delivered but to the best of my knowledge, Extreme received some 113 songs.

[6] Both the 2011 Agreement and the 2010 Agreement, which are work for hire agreements, specifically provide that Viacom (and hence Extreme) has no obligation to exploit any or all of the works.

works in its programs, Extreme has also been paid the publisher share of performance income for Viacom's use of these songs.

25.     However, our initial BMI Extract included only the 58 songs that Extreme included on albums and licensed to third parties but failed to include the performance income we received on the songs that were exploited only by Viacom.  I have discovered two reasons for why we failed to include the songs exploited only by Viacom on the original BMI Extract.  First, the BMI statements sent to Bayham reflect income for performance of a given work during a given period by a line of data that includes the title of the song and a unique BMI "Work Number," but does not include the name of the composer for the work.  Thus, when we prepared the initial BMI Extract, we could not do so by reference to Plaintiffs as writers.  Instead, we used the Work Numbers from our database.  But the problem I have found is that our database of Work Numbers only included the titles that are featured on our website (the titles we released on albums for license by third parties) and therefore, the database we used to match the Work Numbers was incomplete (as it did not include the works exploited only by Viacom).

26.     But this methodology created a second problem.  When we extracted the information from the BMI statements using the Work Numbers, we did so using only the Work Numbers linked to the songs that Extreme had released on Hype or Mixtape albums and failed to include the BMI performance income we received for Viacom's use of the 55 tracks that Extreme had not released on any album.  In addition, the BMI Extract only included Work Numbers for works that Extreme had registered with BMI and did not include income for works that had been separately registered by cue sheet registrations.[7]

---

[7] This is an important point which goes to another of Plaintiffs' claims.  Plaintiffs complain that Extreme breached the 2010 Agreement and 2011 Agreement by supposedly not registering their songs with BMI. In fact, it is indisputable that we did register their works.  Inconsistently, they also claim Extreme registered their songs late.  In fact, it is indisputable that we did not register their songs late (and Plaintiffs have not

27.     After Plaintiffs first raised this "incomplete extract" issue during expert depositions, we created a corrected BMI Extract using Work Numbers for the songs we did not license to third parties (the "Corrected BMI Extract"), and, where the BMI statement did not reflect a Work Number for a song usage (either foreign society income or proxy distributions/black box), we worked to match payments by title.[8]   The Corrected BMI Extract was produced to Plaintiffs on November 6, 2018.

28.     I want to be clear, we tried to completely capture all of the publisher share of performance income Extreme has received for Plaintiffs' songs.   But it is possible that even the Corrected BMI extract may not correlate, penny for penny, what Extreme has been paid by BMI for Plaintiffs' songs with what Plaintiffs have been paid by BMI.   In part, this is because the BMI statements we receive do not identify the composers for each song title on which we are paid and payments for songs registered by cue sheet do not always identify titles (they often will refer instead to the program title in which the songs or "cues" appear).    In addition, some of the songs may be registered only to Viacom's BMI affiliate (Music By Video) such that Extreme may not have been paid at all (although Plaintiffs will have been paid as writers).   And finally, BMI, like all PROs, simply makes mistakes from time to time.

---

identified a penny of writer performance income they have lost as a result of any late registration).   But the main point, as testified to by Alison Smith of BMI (attached to the Zakarin declaration), is that works registrations (registration by a publisher or writer) are essentially irrelevant.   BMI does not pay based on a works registration.   It only pays based on cue sheets.   And BMI registers works based on cue sheets.   So while a publisher (or writer) can file works registrations (and Extreme did so for Plaintiffs' songs), it has nothing to do with whether or not Plaintiffs get paid writer performance income.   That is dependent solely on cue sheets being filed.

[8] More specifically, Extreme searched BMI's repertory for all works associated with the Plaintiffs as composers and matched the Work Numbers for those works to Plaintiffs' songs in Extreme's library. Extreme then cross checked these titles to the songs identified in Exhibit C of the report of Plaintiffs' expert, Karen Rodriguez, to determine if there were alternate titles for songs in Extreme's library that had been registered by BMI following submission of a cue sheet to include income Extreme received on those songs.

29.     The overriding point, however, is that the supposed issue Plaintiffs presented by pointing to discrepancies between the original "extract" we produced and their royalty statements from BMI does not reflect any non-payment of performance income to Plaintiffs by BMI.  On the contrary, Plaintiffs were paid by BMI for many more works and uses than were reflected on our original extract because our original method of preparing the extract was imperfect.

### 2. Inclusion of Payments For *Mulholland Drive* Composed By Bergersen/Phoenix In The BMI Extract

30.     As I mentioned above, one reason our original BMI Extract was inaccurate (in part, incomplete) was due to the fact that our BMI reports do not identify the songs by composer names. This resulted in another "error" which Plaintiffs have assumed reflects the non-payment of performance income to them by BMI but in fact reflects the original extract being over-inclusive, as it included income for songs not written by Plaintiffs but which share titles.

31.     One of Extreme's expert witnesses, Paul Katz, was deposed on October 31, 2018. During this deposition, Plaintiffs' counsel introduced an Exhibit (marked as Katz 8 and attached hereto as **Exhibit B**), constituting rows from the original BMI Extract (as it turns out, our having labeled it a BMI Extract was incorrect because the extract mistakenly included United States performance income from both BMI and ASCAP sources of income).  Exhibit B included publisher share performance income received by Extreme for performances of the song *Mulholland Drive* for which Plaintiffs claimed they did not receive corresponding writer share income from BMI.  There are approximately 950 separate rows in Exhibit B and the income in each row ranges from 2 cents to $6.57.

32.     After investigating these entries, it became clear that our original extract included performance income from both BMI and ASCAP sources and I realized that we had inadvertently included income on a different song in the Extreme library also titled *Mulholland Drive,* composed

by Nick Phoenix and Thomas Bergersen, who are ASCAP members.[9]  *Mulholland Drive* is a common title (as Adam Taylor points out in his report and declaration, APM, the production music library of which he is President, has four songs with the title *Mulholland Drive* and one can go on both the BMI and ASCAP public websites, do a title search and the search will turn up some 60 songs titled *Mulholland Drive* in the BMI and ASCAP repertories).

33.    When Extreme extracted the payment information from its electronic records of PRO income by title (as I have explained, the PRO statements do not include composer names), the people doing the work mistakenly included income on works that have the same titles as Plaintiffs' songs but were written by different composers.

34.    Thus, while Plaintiffs assumed that the approximately 950 rows of *Mulholland Drive* payments reflected on the original BMI Extract were for their song (which I accept was reasonable because the extract was supposed to reflect our BMI income for their songs), our BMI Extract was mistaken.  BMI did not fail to pay Plaintiffs writer performance income on their *Mulholland Drive*.

35.    On the contrary, with the single exception of the 2011 Land Rover commercial, which I addressed on Extreme's motion to dismiss (and as to which use Plaintiffs have now been paid by BMI), Plaintiffs have not identified a single broadcast use of *Mulholland Drive* on which they should have been paid writer performance income but were not paid based on any mistake or "breach of contract" by Extreme.  Rather, Plaintiffs have simply identified an "extract" error (meaning we mistakenly produced information on the extract reflecting our receipt of publisher

---

[9] It is worth mentioning that, while Plaintiffs have complained about the fact that Extreme retitled some of their songs (and they were fully involved in the process and approved of the titles), Extreme did not retitle Plaintiffs' song *Mulholland Drive*.  Plaintiffs delivered the song and track with that title in 2011 which happened to duplicate the title of a song written by Phoenix and Bergersen which has been in Extreme's library since 2008.

performance income from ASCAP for the Phoenix and Bergersen song, *Mulholland Drive,* that Plaintiffs did not write).

## B.   CUE SHEET ERRORS BY BROADCASTERS

36.   The next category of "errors" Plaintiffs have focused on involve an extremely limited number of cue sheets.  Of some 17,000 cue sheets produced by BMI in discovery, Plaintiffs have identified between 5 and 10 cue sheets that have errors on them.

37.   As I testified at my deposition, music publishers, whether they are publishers of popular music or production music libraries, do not supervise the PROs or exercise "quality control" over the cue sheet process.  This is confirmed in the accompanying declarations of Adam Taylor, the CEO of APM, the largest production music library in the United States, Paul Katz, who has over 30 years' experience in operating production music libraries (and in providing consulting services for film and television licensees) and music economist Barry Massarsky.  It is also confirmed in the declaration of Seth Saltzman of ASCAP.  Further, music publishers do not guarantee payment of writer performance income by PROs.  Writers have their own direct contracts with PROs and their right to payment is solely from the PROs.

38.   So the Plaintiffs' claim for alleged underpaid writer performance income is not based on any contractual right.  Rather, it is based on the thesis propounded by Plaintiffs' "expert," Bob Kohn, that Extreme failed to comply with a supposed custom and practice among production music libraries of receiving, reviewing and correcting cue sheets (and thereby breached the covenant of good faith and fair dealing by failing to detect the supposed underpayment of writer performance income).[10]  However, Mr. Kohn admitted he actually has no basis for his opinion

---

[10] As conclusively demonstrated in the accompanying declarations of Donald Zakarin, Barry Massarsky and Chris Woods (the COO of Tunesat), Plaintiffs' "expert," Karen Rodriguez, fabricated a lost writer performance income damage computation based on the complete misrepresentation of Tunesat data. Based on her own damage construct, as corrected to remove her massive inflation of the total duration of Tunesat

about the supposed customs and practices of production music libraries.  He conducted no survey or even any inquiry into the customs and practices of production music libraries.  Rather, as noted in the Zakarin declaration, Mr. Kohn admitted that his "opinion" is based on a single observation he made over 30 years ago watching his uncle looking at cue sheets.  (*See* **Exhibit C** attached hereto (B. Kohn, Volume I Tr.) at 19:9-24:25; 61:12-62:18; 173:9-189:1.)

39.     As I said above, humans are involved in the cue sheet process.  And humans make mistakes.  To place the cue sheet percentage error in context, out of some 17,000 cue sheets produced by BMI in this case (thousands of which I understand include Plaintiffs' songs), Plaintiffs have identified a handful of cue sheets with mistakes (between 5 and 10 they have so far identified).  Beyond the fact that Extreme does not create or submit cue sheets to the PROs, it is worth noting that the error factor that Plaintiffs have identified is perhaps a tenth or hundredth of one percent.

40.     Extreme has nothing to do with any cue sheet mistakes (although Plaintiffs would hold Extreme accountable for these small errors through Mr. Kohn's invention of a non-existent custom and practice).  Nevertheless, I have examined the cue sheet errors Plaintiffs have identified and address them below.

    1.     ***Inbetweeners* and *Mulholland Drive***

41.     During the deposition of Extreme's expert Paul Katz, Plaintiffs' counsel introduced an Exhibit 13, attached hereto as **Exhibit D**.  Exhibit D begins with a page of a royalty statement from The Performing Rights Society ("PRS") which is the PRO in the United Kingdom, similar to BMI or ASCAP in the United States, reflecting payments to Extreme for broadcasts of *Mulholland Drive* by Thomas Bergersen and Nicholas Phoenix on a program titled *Inbetweeners*.

---

detected performances of Plaintiffs' works, Plaintiffs have no underpayment claim for writer performance income.

42.     The next page of Exhibit D, is the cue sheet submitted to BMI (the same cue sheet would have been provided to ASCAP, as cue sheets are submitted to all PROs, not just one of them) for an episode of the program *The Inbetweeners* titled *Class Clown*.  The cue sheet reflects a usage of *Mulholland Drive* by Bergersen and Phoenix, however Plaintiffs' counsel represented that the episode actually includes the *Mulholland Drive* written by the Plaintiffs.  I do not know whether Plaintiffs' counsel is right but for purposes of this motion, I will assume that the representation of Plaintiffs' counsel is correct.

43.     A search of ASCAP's cue sheet database reflects usage of Bergersen and Phoenix's *Mulholland Drive* in the *Class Clown* episode of *Inbetweeners*:



44.     Assuming that Plaintiffs' counsel's representation is correct, this cue sheet was in error in identifying the Phoenix/Bergersen version of *Mulholland Drive* (*see* **Exhibit E** attached hereto (*Mulholland Drive* Source Statement from ASCAP) at page 5).[11]

---

[11] I also understand that when ASCAP reported income from this usage of *Mulholland Drive*, Extreme attributed the income from *Mulholland Drive* on *Class Clown* to the Plaintiffs, and therefore made a payment to Viacom of half of that performance income as a co-publisher of that song.

45.     Thus, if Plaintiffs' counsel is correct, the music supervisor for the program made a mistake, identifying the wrong version of *Mulholland Drive* in the cue sheet submitted to the PROs.

46.     Without the slightest evidence, Plaintiffs have accused Extreme of altering "metadata" so that Plaintiffs' songs would be attributed to other writers (and use this cue sheet error as an example).   As Mr. Zakarin's declaration shows, there is neither evidence nor logic supporting this accusation.   Plaintiff Robert Marderosian admitted at his deposition that it was simply a conclusion he drew, but he had no evidence to support it.   (**Exhibit  F** (R. Marderosian Tr.) at 269:20-272:21.)   Mr. Kohn said he "can't imagine" any other explanation (other than altered metadata) but he offered no evidence to support his imagination.   (Exhibit C  (B. Kohn, Volume I Tr.) at 121:21-24.)

47.     Plaintiffs' altered metadata speculation is demonstrably absurd.   Plaintiffs' BMI statements report the payment of performance income for tens of thousands of performances of their songs on hundreds of episodes of programs broadcast on dozens of broadcast channels.   The payments on the BMI statements are derived from cue sheets BMI receives from broadcasters and program producers.   Out of thousands of cue sheets on which their songs are properly identified, Plaintiffs have identified a handful of cue sheets with mistakes.

48.     I want to be clear about what this means: for BMI to have reported and paid Plaintiffs performance income for tens of thousands of performances of their songs on hundreds of episodes of programs on dozens of channels over the course of some eight years pursuant to the submission to BMI of thousands of cue sheets, the metadata on which those cue sheets were based

had to be correct.  That Plaintiffs have managed to identify only a handful of cue sheets with any errors on them refutes their "altered metadata" theory.[12]

49.     In any event, based on my inquiries, it appears that BMI, as part of its own quality control, identified the cue sheet error.  While the cue sheet for *Class Clown* incorrectly identified Bergersen and Phoenix as the composers of *Mulholland Drive*, it appears BMI's records correctly attribute the song to Plaintiffs as Plaintiffs' BMI statements reflect that they were paid performance income on usage of *Mulholland Drive* in the *Class Clown* episode.  *See* excerpted pages of Plaintiffs' BMI statements reflecting payments for *Mulholland Drive* on broadcasts of the *Class Clown* episode of *The Inbetweeners* attached hereto as **Exhibit G**.

50.     In other words, having pointed to this single cue sheet error out of some 17,000 cue sheets produced (an error not made by Extreme), it turns out that it was an "error" that BMI partially caught and corrected.  Extreme has received a total of $35 of publisher share of performance income on this use that was incorrectly attributed to the wrong *Mulholland Drive*. That means that, assuming BMI did not catch all of the performances that were incorrectly attributed to the wrong *Mulholland Drive,* at most, Plaintiffs were underpaid a total of $35 in writer performance income between 2013 to 2016.[13]

**2.**     ***Mixtape***

51.     Another one of the isolated cue sheet "errors" identified by Plaintiffs' counsel at expert depositions was Exhibit 12 to the deposition of Viacom's expert witness Roger Miller,

---

[12] Despite the undisputed fact that Plaintiffs have thus far identified a cue sheet "error" rate of a tiny fraction of one percent and despite the fact that 99.99% or more of the cue sheets could not be correct if Extreme were altering the metadata, Plaintiffs refuse to accept that their altered metadata thesis is completely nonsensical.
[13] The total of $35 was the product of a number of individual payments none of which rose to the $25 threshold BMI requires before it will make an adjustment.  *See* https://www.bmi.com/creators/royalty/miscellaneous_royalty_rules.

attached hereto as **Exhibit H**. This cue sheet for an MTV promotional spot identified the composer for the Plaintiffs' song *No Turning Back* as "Mixtape," which is the library in which Extreme placed *No Turning Back*. The cue sheet does not identify any percentage of writer or publisher share interest and therefore, assuming that this program was actually broadcast, it is unclear whether BMI distributed any performance income to anyone.

52.     That the error was plainly some inadvertent music supervisor mistake is evidenced by the fact that the cue sheet lists Plaintiffs (Heavy Young Heathens) as performers. I am surprised that BMI did not catch this mistake (in fact, I do not know that it did not catch the mistake) but it happens. Again, if this was an error, it was not made by Extreme.

### 3.     *Knife Fight: Smith v Sappington*

53.     The next cue sheet "error" Plaintiffs have identified reflects another instance in which their version of *Mulholland Drive* was inadvertently attributed to the composers Nick Phoenix and Thomas Bergersen for the episode *Smith v Sappington* of the program *Knife Fight*, which Plaintiffs' counsel introduced as Exhibit 15 to the deposition of Extreme's expert witness Paul Katz and which is attached hereto as **Exhibit I**.[14]

54.     This appears to be another isolated instance of a cue sheet error made by a music supervisor working for a broadcaster or program producer having nothing to do with Defendants. I have calculated that Plaintiffs were underpaid $30 total over several periods for this cue sheet

---

[14] As pointed out in Mr. Katz's declaration, Mr. Katz's report was submitted in response to the reports of Mr. Kohn and Mr. Brabec. Neither Mr. Kohn nor Mr. Brabec addressed any of these supposed cue sheet errors (Mr. Kohn identified a single cue sheet error in his report). Plaintiffs' counsel nonetheless elected to question Mr. Katz (and Mr. Miller and Mr. Taylor) about documents that had nothing to do with the reports to which they were responding and which they therefore did not review or address in their own reports. Again, I reiterate, this is actually the first time that we have had the chance to address Plaintiffs' belated focus on the miniscule number of "errors" Plaintiffs have managed to find.

error based on income received by Extreme for the usages.[15]   Added to the possible $35 underpayment on the *Class Clown* episode, it makes for a total of some $65 in underpayments attributable to cue sheet errors identified by the Plaintiffs.

      **4.**    ***Knife Fight: Cardoons***

55.    Another instance where Plaintiffs' counsel has identified an apparent cue sheet error made by a third party was presented in the deposition of Extreme's expert Paul Katz as Exhibit 14, attached as **Exhibit J** hereto.

56.    Exhibit J is a 2014 cue sheet for an episode of the program *Knife Fight* titled *Teich v. Zone "Cardoons"* produced by G4 Media Productions, LLC.  The cue sheet identifies the song *Mulholland Drive* on entry #25 as *ESQ_HYP025_01_1_Mulholland_Drive* but incorrectly identifies the composer as Blues Saraceno.

57.    A review of the ASCAP cue sheet database shows that despite this incorrect cue sheet produced in discovery by BMI, ASCAP (which would have received the same cue sheet as BMI) has the correct composer information for the usage of *Mulholland Drive* on the *Cardoons* episode of *Knife Fight*:

---

[15] Each of these payment failures was also under the $25 threshold BMI requires before it will make an adjustment.  *See* https://www.bmi.com/creators/royalty/miscellaneous_royalty_rules.

58.     I followed up with ASCAP to determine why Plaintiffs were identified as composers for *Mulholland Drive* on the *Cardoons* episode in ASCAP's database despite the erroneous cue sheet identifying Blues Saraceno and was advised that the correction was made by an ASCAP internal analyst.  ASCAP further advised that while the Plaintiffs' *Mulholland Drive* was attributed to the *Cardoons* episode on the same date that the other songs on the cue sheet were processed by ASCAP, ASCAP could not ascertain at this point whether a claim or letter of direction prompted the correction or if it was made for some other reason.

59.     Just as ASCAP's records reflect that it caught the cue sheet error and corrected it, it appears that PRS too caught it and corrected it: Plaintiffs' BMI statements, excerpted and attached hereto as **Exhibit K**, reflect they were paid for public performances of *Mulholland Drive* on the *Cardoons* episode of *Knife Fight* in the United Kingdom.

60.     In other words, while there appears to have been a cue sheet error in this instance, it also appears that ASCAP and PRS both caught and corrected the error and Plaintiffs were paid for at least the foreign public performances of their song through BMI.  Extreme was not paid by

BMI for any United States performances of this song in this program and I therefore assume that Plaintiffs too were not paid.

61.     Since ASCAP corrected the cue sheet error and did not pay any writer or publisher performance income on this use (as it was a use of a song not controlled by ASCAP), contrary to Plaintiffs' unsupported accusations, there was no "diversion" of any income by Extreme, which was not paid publisher performance income for United States performances for this use.  Again, not only are these isolated cue sheet errors that were made by music supervisors, in this instance, they also appear to have been partially corrected by the PROs.

### a.     Russell Emanuel Pseudonyms

62.     Before I turn to the next category of "errors" identified by the Plaintiffs, I want to briefly address the Plaintiffs' tactic of demonizing Russell Emanuel, the CEO of Extreme and very successful and prolific songwriter in his own right.

63.     Perhaps because their claims lack any evidentiary basis, Plaintiffs have engaged in an *ad hominem* attack on Mr. Emanuel, illogically accusing him of masterminding a scheme to deprive them of the riches they fantasize their production music songs should have earned but for Mr. Emanuel retitling their songs (ignoring that they were fully involved in the retitling process and approved all of the titles selected) and supposedly altering metadata to attribute their songs to him or others (a nonsensical claim I have already addressed above).

64.     For example, Plaintiffs' counsel has asserted that Mr. Saraceno (the composer addressed with respect to the cue sheet issue in item 4 above) is not a real person but an "alias" of Russell Emanuel.  (*See* **Exhibit L** (P. Katz Tr.) at 192:7-25.)  In fact, Mr. Saraceno is both a live person and successful composer.  *See* https://en.wikipedia.org/wiki/Blues_Saraceno.

65.     Plaintiffs also complain about the supposed disproportionate amount of synchronization income supposedly paid to Mr. Emanuel, claiming that Extreme's method of allocating synchronization blanket license income unfairly benefits Mr. Emanuel because he supposedly has a disproportionate number of songs in the Extreme libraries.  As shown in the Massarsky report, Plaintiffs offer nothing to support the contention and it is false.

66.     In fact, the Tunesat detections (on which Plaintiffs have largely, but erroneously, based their case) refute their assertions: songs written by Mr. Emanuel (under his own name and all pseudonyms on which he receives any share of synchronization income) constitute about 4% of the overall detections of songs in Extreme's library.   Under Extreme's access model of allocating synchronization blanket license income, Mr. Emanuel receives about the same 4%.  I have attached a chart I prepared reflecting this analysis as **Exhibit M**.   In other words, if Tunesat detections are viewed as proxy for the use of songs in Extreme's libraries, Mr. Emanuel's share of synchronization blanket income is not disproportionate.

67.     In this regard, as documented in Mr. Massarsky's declaration, Plaintiffs have been allocated substantially more under Extreme's access model of allocating synchronization blanket license income than the TuneSat detections of their songs would have dictated.  Simply put, far from being penalized by the method of allocating synchronization blanket license income chosen by Extreme, Plaintiffs have instead received a disproportionately larger share of the blanket license income.

68.     Plaintiffs also complain about the supposed high payment of performance income to Mr. Emanuel for promotional uses of his songs (although I have no idea why the amount that the PROs paid to any writer for promotional uses of their songs has anything to do with Plaintiffs' claims in this case).   During the deposition of Roger Miller, Plaintiffs' counsel introduced as

Exhibit 6 an exhibit attached hereto as **Exhibit N** which he claimed shows inordinately high payments of performance income to Extreme for promo usages of songs supposedly attributed to Mr. Emanuel.  Specifically, he stated that the songs he was identifying on the exhibit were "registered in the name of Russell Emanuel or some of his aliases" and that "this next to last page shows the value of what Russell Emanuel and others at Extreme supposedly on catalogs that he owns or controls are receiving."  (**Exhibit O** (R. Miller Tr. at 185:9-189:5).)

69.     With respect to the two examples Plaintiffs' counsel identified, one, *Dancing With Shadows*, was co-written by Mr. Emanuel and is credited with his own name alongside co-composer Jacob Shea, and the other, *Peak and Destroy*, was written by separate composers as reflected by the screen shots below from the Extreme and BMI websites.  Mr. Emanuel does collect writer share royalties for songs he co-composed, in this instance *Dancing With Shadows*. [16]

---

[16] In response to Plaintiffs' inquiry concerning *Teen Wolf, Battlefield* discussed later in this declaration, Extreme's counsel produced excel spreadsheets of Extreme's income from BMI for all works for the first quarter of 2013 and the second quarter of 2014 to assist Plaintiffs' counsel in identifying a small underpayment resulting from a cue sheet error.  Plaintiffs' counsel used the second quarter 2014 spreadsheet to identify the income for *Dancing with Shadows* and *Peak and Destroy* which he mistakenly alleged reflected very large promotional use payments.  He is wrong and I will explain why below.



## DANCING WITH SHADOWS

**BMI Work #** 16545488

**Total Controlled by BMI:** 75%

| SONGWRITER/COMPOSER | CURRENT AFFILIATION | CAE/IPI # |
|---|---|---|
| EMANUEL RUSSELL JASON | ASCAP | 121536802 |
| SHEA JACOB | BMI | 491986989 |
| **PUBLISHERS** | **CURRENT AFFILIATION** | **CAE/IPI #** |
| BAYHAM MUSIC LIBRARY | BMI | 358038941 |

*Additional Non-BMI Publishers*





70.    All that Exhibit N shows is that composers can receive $1,000 or more for a promo

use on a cable channel if the promo is broadcast over and over again (as Alison Smith testified,

BMI's statements do not report either the duration or the number of broadcasts of promos on cable). As set forth in the Massarsky Report (and admitted by Karen Rodriguez), the majority of the performances of Plaintiffs' works were promotional uses. It is undisputed that, while Plaintiffs only received a few hundred dollars a year in writer performance income prior to entering into the 2010 Agreement with Viacom, Plaintiffs have been paid hundreds of thousands of dollars in performance income since then, a significant portion of which is thus derived from promo broadcasts. Given how much performance income Plaintiffs have been paid by BMI for the promotional uses of their own songs, it is difficult to understand why the amount of performance income any other writer received from the PROs for promotional uses of their songs has any bearing on any claim asserted by Plaintiffs.

71.    I want to also address the *ad hominem* attack on Russell Emanuel for his use of what Plaintiffs have labeled "aliases" supposedly to divert income from them.[17]

72.    Like many other writers (some of whom are mentioned below), Mr. Emanuel has used various pseudonyms as a composer. While this has nothing whatsoever to do with any claim in this case and there is no evidence that even remotely suggests any improper action on the part of Extreme or Mr. Emanuel, I am going to list his name and every one of his pseudonyms for songs controlled by Extreme: (a) Russell Jason Emanuel, (b) Massive Rusty, (c) Mad Dog Sly, (d) Captain Black, (e) Harry Boat, (f) Boom Boom Room (GB1), (g) The Firm, (h) Benga Boys, (i) Killa Sharkx, (j) Spandex Ballet, (k) Top Dogz, (l) Lap Catz (GB 2), (m) ACIDICA, (n) Blank Generation (GB2), (o) Omega Men, (p) Spinstones 1, (q) Dirty Dick, (r) Dropstarz1 (s) Kapital Gain 1, (t) Billy Joe Grace, (u) Nineoneone, and (v) Matt Black.

---

[17] The term used in the music business (and in literature as well) for writers who write under different names – which is quite common by the way – is "pseudonym." Paul McCartney has written under pseudonyms as has Prince, Taylor Swift and Elton John (in fact, Elton John is itself a pseudonym). I assume that Plaintiffs' counsel uses the word "alias" because it has a negative connotation.

73.     The fact that Mr. Emanuel has used pseudonyms as a composer is not unusual.  Mr. Emanuel has testified that he uses pseudonyms for promotional and marketing reasons, and many composers use pseudonyms for such purposes.

74.     Finally, as I explained in my declaration submitted in reply on Extreme's motion to dismiss certain claims in Plaintiffs' complaint, the names Billie Ray Fingers and Bruce Fingers are composer pseudonyms for Mr. Emanuel and Steve Kofsky.  Under these pseudonyms, Mssrs. Emanuel and Kofsky are associated with Bleeding Fingers Custom Music Shop, which is a joint venture between the renowned film composer Hans Zimmer and Sony/ATV Music Publishing (which owns Extreme).  As Mr. Emanuel explained in his deposition, on songs where he is identified as Billie Ray Fingers, he does not receive any income.  Instead, by agreement with ASCAP, he is identified as a composer on those songs to enable Bleeding Fingers Custom Music Shop, which caused these songs to be created, to collect the composer share of performance income from ASCAP on works published by Bleeding Fingers Custom Music Shop and distribute it to Mr. Zimmer and Sony/ATV Music Publishing.  Mr. Emanuel does not receive any of the writer performance income on these works.  (**Exhibit P** (R. Emanuel Tr.) at 8:21-11:25.)

## C.     PRO PAYMENT ERRORS AND PAYMENT ALLOCATIONS

75.     In addition to the mistakes in the original extracts produced by Extreme – which, as I explained above, involved not a penny of lost writer performance income suffered by Plaintiffs – and the handful of cue sheet "errors" made by third parties (many of which the PROs caught and corrected, which do not involve Extreme in any event and which seem to have a total value less than $100), Plaintiffs also presented a few documents during expert depositions which appear to reflect minor errors by the PROs in their administration of performance rights (and the payment of performance income).

76.     Again, these issues first surfaced after Defendants provided their expert reports on October 15, 2018, which debunked the Plaintiffs' "expert" reports (primarily those of Mr. Kohn and Ms. Rodriguez).  Nevertheless, I have worked to track down the source/explanation for these supposed errors, none of which had any meaningful economic impact on Plaintiffs (in fact, if one added up every one of the supposed errors identified by Plaintiffs, they would total perhaps a few hundred dollars).

77.     Based on my inquiries, these "errors" (which I will address below) are attributable to either BMI's allocation method for certain income where it does not receive complete information or rare processing mistakes made by the PROs.  They are not "errors" attributable in any way to Extreme or Viacom.  This is because, based on my inquiries: (1) no cue sheet for any of the titles produced by BMI for these songs identifies an incorrect composer and (2) these payments were made by BMI, not by Extreme.

   1.     **ASCAP Income On** *No Turning Back*

78.     While Plaintiffs are paid their writer share of performance income earned in the United Kingdom by BMI pursuant to agreements between BMI and PRS, Extreme is paid directly by PRS in the United Kingdom.[18]  Extreme's affiliate entities for collecting publisher share income from PRS are The Extreme Music Library Limited and Extreme Music Limited (collectively, "Extreme UK").

79.     On the same basis and for the same reason that the Court permitted Extreme to produce an extract of its BMI reported income with respect to Plaintiffs' works, Extreme also

---

[18] Writers are typically members of one PRO and do not register with foreign PROs (although there are rare exceptions).  Instead, the PROs around the world have correspondent agreements with each other and pay writer performance income to the domestic PRO which represents the writer.  In contrast, publishers usually have foreign subpublishers around the world which register with the local PRO and which then receive and pay over the performance income earned in the subpublished territory to the original publisher.

produced an extract of the income reported to Extreme UK by PRS for performances of Plaintiffs' works in the United Kingdom (the "PRS Extract").

80.     In the deposition of Viacom expert witness Roger Miller, Plaintiffs' counsel presented an exhibit (Miller Exhibit 3, attached hereto as **Exhibit Q**) identifying income Extreme received from ASCAP on a song titled *No Turning Back*.

81.     Specifically, there are seven instances where the PRS Extract identifies income for *No Turning Back* and the usage narrative is "USA (ASCAP) GENERAL & BROADCASTING." To place the monetary impact of this PRS information in context, the total amount of payments for these usages is $1.45.

82.     Again, when I was advised of this exhibit, I reviewed our information and determined that the broadcast was on VH-1, a Viacom channel.

83.     I then reviewed certain statements from ASCAP to Extreme USA, which reflected income for the title *No Turning Back* for the episode *Reunion Part 2* of a program titled *Love and Hip Hop* and for the episode *Reunion Part 2* of *Love and Hip Hop Hollywood*:



84.     I then reviewed the cue sheet records at ASCAP for those two episodes, which are submitted by broadcasters to the PROs to report the songs broadcast on television programs. While I found no usages of any work authored by the Plaintiffs, I did find that the track *No Turning Back* by James Latham was included in both episodes. Mr. Latham is an ASCAP member and his *No Turning Back* is published by Extreme UK, which is affiliated with PRS:



85.     PRS has confirmed to Extreme that after ASCAP sent PRS the song title, publisher information and publisher performance income for Latham's *No Turning Back* on *Love and Hip Hop* and *Love and Hip Hop Hollywood*, PRS incorrectly matched the usage to the Marderosians' *No Turning Back* and paid Extreme UK income from ASCAP, erroneously crediting the Marderosian track rather than the Latham track of the same title.

86.     In other words, this is not an issue of Plaintiffs not having been paid writer share performance income for the use of their songs.  Rather, it was simply an error by PRS that resulted in ASCAP publisher income appearing in the PRS Extract we produced in discovery that was actually earned on James Latham's *No Turning Back*, not the Plaintiffs' *No Turning Back*.  This is not one of our extract errors but a PRO error.  It is also not an underpayment or non-payment to Plaintiffs for performances of their works.  So the $1.45 is not even an amount of money that Plaintiffs should have, but did not, receive.

### 2.  *Checklist, Winning Streak* **and** *Storm Warning*

87.     At the deposition of Extreme's expert witness Paul Katz, Plaintiffs' counsel introduced as Exhibit 10, attached hereto as **Exhibit R**, a cue sheet for episode 901 of the MTV program *Punk'd* titled *Justin Bieber*.  One of the songs identified on the cue sheet is titled *Checklist*, identified as composed by Plaintiffs and published by one of their publishing companies, The Brothers Heathen Music Publishing ("Brothers Heathen").

88.     The next page in Exhibit R reflects a rolled-up[19] cue registration for *Punk D Justin Bieber* at BMI and identifies *Checklist* as one of the songs within that rolled-up cue.  The following pages reflect Plaintiff Aron Marderosian being paid $293.15 on *Punk D-Cues* for the *Justin Bieber* episode of *Punk'd* and a corresponding publisher share payment to Brothers Heathen, both for the second quarter of 2012.[20]

89.     As I mentioned above, based on the corresponding relationships between PROs, PRS will make payments to United States PROs for the writer share of performance income generated by broadcasts of a program in the United Kingdom.  Exhibit R contains a BMI statement for the first quarter of 2013 reflecting payment of PRS performance income to Plaintiff Aron Marderosian for both *Punk D Cues* and for *Checklist* on *Punk'd*.

90.     Exhibit R also includes a heavily redacted page of a BMI statement to Brothers Heathen which shows payments to that entity for the songs *Storm Warning* and *Winning Streak*

---

[19] When a producer or broadcaster uses a song, they submit cue sheets to PROs identifying the song's title and composer together with other information concerning the usage.  Where the program contains multiple songs by the same composer, BMI will sometimes register them under the title of the show.  These are commonly referred to as "rolled-up cues" and the cue sheet registrations for the songs will reflect the episode title rather than the song title.

[20] None of the BMI statements to Plaintiffs' publishing entities, whether Lonely Orchard or Brothers Heathen, were produced during discovery and have only been presented at expert depositions in highly redacted form.  Defendants do not know what has been redacted and cannot speak to the integrity of any information in the publishers' BMI reports for Plaintiffs' self-published works.

from PRS in the United Kingdom for the first quarter of 2013.  Plaintiffs are not composers of either song.  However, I have determined that BMI intentionally allocated payments to Plaintiffs for these songs which appear on other episodes of *Punk'd* due to incomplete information from PRS which I will explain below.

91.     While Plaintiffs are not complaining that they have been paid for these two works they did not write, Plaintiffs' counsel does complain that Brothers Heathen was not paid for the usage of the composition *Checklist* in *Punk'd* in the United Kingdom (I will assume this is so but, because the BMI statement to Brothers Heathen in Exhibit R is redacted, I cannot verify whether Brothers Heathen was or was not paid for *Punk D Cues* or for *Checklist* for United Kingdom broadcasts).

92.     Finally, Exhibit R shows a page from a spreadsheet produced to Plaintiffs which shows that Extreme has been paid on a composition titled *Checklist* by BMI for the *Justin Bieber* episode of *Punk'd* in the first quarter of 2013 because, as I will explain, PRS incorrectly identified Bayham as the publisher of the work.

93.     Following the introduction of this Exhibit at Mr. Katz's deposition, I reviewed the cue sheet for the *Justin Bieber* episode of *Punk'd* which was produced by BMI as an excel spreadsheet bates-numbered BMIPROD-00000290 and is attached hereto converted to PDF as **Exhibit S**.  The cue sheet correctly identifies the Plaintiffs as composers and Brothers Heathen as the publisher of *Checklist*.  Since the cue sheet was correct, the error had to have occurred at PRS.

94.     The cue sheets for other episodes of *Punk'd* produced by BMI reflect use of a song titled *Storm Warning*, composed by Klaus Bedelt and published by Extreme, on episode 801 and usage of a song titled *Winning Streak,* composed by Darren Drew and Brian Reidinger and published by Giant Client Publishing and GC Plan B Publishing LLC, on episode 902 of *Punk'd*.

A PDF conversion of the cue sheet for episode 801 of *Punk'd* is attached hereto as **Exhibit T** and a PDF conversion of the cue sheet for episode 902 of *Punk'd* is attached hereto as **Exhibit U**. Again, here too the cue sheet was correct so the error had to have occurred at PRS.

95.     I also reviewed Plaintiffs' BMI statements which reflect numerous unearned payments from PRS for United Kingdom broadcasts of *Storm Warning* and *Winning Streak* but do not identify the specific episodes of *Punk'd* in which they were performed.  I have attached excerpted pages reflecting those payments here as **Exhibit V**.   Again, Plaintiffs are not complaining about having been paid performance income on songs they did not write.

96.     It is important to stop here to again emphasize that the payments to Plaintiffs by PRS through BMI for *Storm Warning* and *Winning Streak* are not the result of cue sheet errors (and they do not reflect any loss of writer performance income by Plaintiffs but instead reflect payments for songs Plaintiffs did not write).   Similarly, the apparent non-payment for United Kingdom exploitation by PRS to BMI (and from BMI to Brothers Heathen) for *Checklist* for the *Justin Bieber* episode of *Punk'd* is also not the result of cue sheet errors.

97.     Because the payment by PRS through BMI to Extreme on *Checklist* and by PRS through BMI to Plaintiffs and Brothers Heathen on *Storm Warning* and *Winning Streak* were not the result of any cue sheet error, I approached PRS and BMI in an effort to try to understand whether a processing error was made by either PRS or BMI and, if so, how did it occur.  To be clear, processing errors do happen at the PROs because human beings make mistakes.

98.     With regard to *Checklist*, Brothers Heathen, Plaintiffs' publishing company, apparently did not register it with PRS.  As a result, because PRS had a number of Plaintiffs' works correctly associated with Extreme/Bayham as the publisher (including in episodes of *Punk'd*), it mistakenly associated Bayham as the publisher of *Checklist*.  This was a processing mistake made

by PRS. It had nothing to do with Extreme but is instead an isolated error due in part to Plaintiffs' own failure and to PRS's error in processing. Based on my inquiry, PRS mistakenly paid Extreme $283 in publishing income for *Checklist* that should have been paid to Brothers Heathen.[21]

99.     Before I move on, I want to repeat something I said earlier: because this declaration focuses exclusively on the "errors" identified by the Plaintiffs - it does not mention the tens of thousands of correctly identified uses of Plaintiffs' works around the world for which Plaintiffs have been accounted to and paid - it may appear as if there were a meaningful number of errors. In fact, the total number of identified errors is truly minimal and have only nominal value. These are the sum total of the "errors" Plaintiffs have identified after having had full discovery from Defendants and numerous non-parties and spent substantial amounts of their time apparently examining every single document produced by Extreme, Viacom and the multiple non-parties.

100.     Moreover, I have determined that the payments on *Storm Warning* and *Winning Streak* are not actually errors at all. With respect to these compositions, PRS explained that it had paid publisher income on the songs into a "BMI Share Account" at BMI for distribution to BMI affiliates. BMI in turn explained that where PRS paid performance income like this into the BMI Share Account, BMI received only the title and series/episode information, but not composer information.

101.     When BMI receives incomplete information like this, if it has the reported cue sheets, it allocates the royalties received across all the writers and publishers on the stated cue sheets for the series. Consequently, BMI used the composer and publisher information for the entire series as a surrogate to allocate payments, identified Plaintiffs as composers and Brothers

---

[21] I would note that Brothers Heathen is not a plaintiff in this case and this is not one of Plaintiffs' claims in this case. So this $283 mistakenly paid to Extreme, offset by the monies mistakenly paid to Plaintiffs on the other songs, should not be added to the $65 in potential underpayments by BMI that Plaintiffs have identified.

Heathen as publishers of numerous works on the show *Punk'd* and therefore allocated income to Plaintiffs and Brothers Heathen for *Storm Warning* and *Winning Streak*. That is all that Exhibit V shows. Thus, these are not erroneous payments but instead are payments made as a function of BMI's policies by which both Plaintiffs and Extreme/Bayham, as affiliates of BMI, are bound.

102. I have addressed this issue involving *Storm Warning* and *Winning Streak* even though it involves Plaintiffs having been paid pennies of performance income to which they were not entitled rather than being deprived of any performance income, because they have asserted that it is part of a scheme to divert money from them. In fact, the entire issue arises out of the fact that Plaintiffs have an incomplete understanding of their own BMI statements and BMI's payment policies. Instead of assuming wrongdoing, they could have (and should have) conducted the very same inquiry I conducted and they would have learned that there was nothing untoward or unusual about the payments.

### 3. *Shadowman* and *Funny Bizness*

103. At the deposition of Extreme's expert Paul Katz, Plaintiffs' counsel introduced as Exhibit 11 documents showing BMI payments to Plaintiffs and another of their publishing entities Lonely Orchard Music ("Lonely Orchard") in the fourth quarter of 2010 for performances of Plaintiffs' songs *Blistered Kiss* and *Laynes Dilemma* in an episode of the Viacom show *Made* titled *Cheerleaders*. I have attached Exhibit 11 to the Katz deposition hereto as **Exhibit W**. The excerpted statement to Lonely Orchard is heavily redacted and was not produced in discovery.

104. The second half of the exhibit shows income from PRS to BMI and then to Aron Marderosian for performance of the song *Shadowman* on an episode of *Made* titled *Cheerleaders* and payments to Lonely Orchard for performances of *Shadowman* and a song titled *Funny Bizness* both for the fourth quarter of 2012.

105.    My investigation into this apparent "error" initially showed that there were multiple episodes of the show *Made* titled *Cheerleader*.  The cue sheet for one of those episodes, number 1027, produced by BMI as BMIPROD-00000050 and at BMI505043 and attached as **Exhibit X**, reflects that episode 1027 included the song *Shadowman*, composed by Klaus Badelt and published by Extreme, as well as the song *Funny Bizness,* composed by Richard Friedman and published by Extreme as well as the song *Laynes Dilemma* composed by the Plaintiffs and published by Lonely Orchard.  The payment to Plaintiffs on songs they did not compose therefore did not appear to be the consequence of incorrect cue sheet information.

106.    I also reviewed Plaintiffs' BMI statements and determined that Plaintiffs had been paid by PRS through BMI for *Shadowman* a number of times for performances of the song on episodes of *Jersey Shore* and *Made*.  I have attached excerpted pages from their BMI statements reflecting those payments as **Exhibit Y**.

107.    With respect to *Shadowman* and *Funny Bizness*, as with *Storm Warning* and *Winning Streak* – two other songs which Plaintiffs did not write but on which Plaintiffs have been paid – PRS explained that it had paid publisher income on the song to the BMI Share Account.  As discussed above, BMI in turn explained that for these works where PRS paid performance income into the BMI Share Account, BMI received only the title and series/episode information, but not composer information.  Consequently, BMI used the series information as a surrogate to allocate payments and allocated income for *Funny Bizness* and *Shadownman* to Plaintiffs and Lonely Orchard.

108.    Thus, Exhibit R, like Exhibit W, merely shows an allocation by BMI that resulted in payments to Plaintiffs on songs they did not write because, despite the accuracy of the cue sheets, the information PRS provided to BMI, consistent with BMI's procedures, resulted in BMI

allocating payment to the Plaintiffs for songs they did not write.  Again, this is not error but instead is simply BMI procedure.

109.    Ironically, Plaintiffs are seemingly oblivious to the fact that, in identifying PRO errors, they have highlighted "errors" that have worked in their economic favor (which hardly supports their thesis of the existence of a vast conspiracy to deprive them of income they supposedly should have received from the PROs).  They also seem oblivious to the fact that the "errors" they point to underscore one of the points Extreme has made: the PROs make occasional errors and where those errors are not caught by the PROs, they generally involve tiny amounts of money (and the errors involve both puts and takes).

110.    In this instance, the "errors" are not errors at all. Rather, they are BMI policies by which we as publishers and Plaintiffs as writers are bound.  The policies are designed to allocate income that BMI receives from its licensees on a fair basis but, given the nature of BMI's business and the sheer volume of data that it receives and must process, the allocation is not done on a precise or perfectly exacting basis.  In some instances BMI's policies may result in one writer or one publisher being paid money for works they did not write or did not control and in some instances it may result in other writers and publishers not being paid for works they did write or control.  Royalty processing and payment by the PROs as well as by music publishers is not an exact science.  BMI, PRS, ASCAP and yes, even Extreme, are not perfect.  But these minimal "errors" involving minimal amounts of money, both paid and not paid, that Plaintiffs have identified are not breaches of contract, not by BMI and not by Extreme.

### 4.    *Monkeyman*

111.    Plaintiffs' counsel introduced another exhibit, Exhibit 12, at the deposition of Extreme's expert witness Paul Katz which, like the previous examples, begins with a cue sheet

identifying certain works used in an episode of *Punk'd*.  I have attached Exhibit 12 hereto as **Exhibit Z**.

112.    The third page of the cue sheet in Exhibit Z identifies a song titled *Monkeyman* as composed by the Plaintiffs and published by Lonely Orchard.   The following page of the exhibit identifies a registration for a "rolled-up" cue for *Punk D Cues – Lucy Hale* including the "background cue" *Monkeyman*.

113.    The following page is from Plaintiff Aron Marderosian's BMI statement and identifies a payment for the performance of *Punk D-Cues* for the *Lucy Hale* episode of *Punk'd* and the next page, although heavily redacted, shows payment to Lonely Orchard music for the performance of *Punk D-Cues* for the *Lucy Hale* episode of *Punk'd* both for the second quarter of 2012.

114.    The following page in Exhibit Z is a BMI statement reflecting additional income from PRS to Plaintiff Aron Marderosian on *Punk D-Cues,* although like the other income from PRS on BMI's statements, it does not identify the usages by episode making it impossible to determine whether this payment included royalties for the performance of *Monkeyman*.

115.    The following page is a BMI statement to Lonely Orchard showing income from PRS, but redacting every line of data except to show $.03 of performance income was paid to Plaintiffs for the songs *Storm Warning* and *Winning Streak* in connection with the show *Punk'd* (the episode is not identified).  Because the page is so heavily redacted and was not produced in unredacted form, I cannot determine whether Lonely Orchard was also paid for the performance of *Monkeyman* or *Punk D-Cues* on the *Lucy Hale* episode of *Punk'd*.  Accordingly, all this exhibit shows, like Exhibit R and Exhibit W, is that Lonely Orchard was paid a miniscule amount of income – all of three cents – on songs not written by the Plaintiffs and not controlled by Lonely

Orchard pursuant to the same allocation method BMI made as previously explained in paragraphs 98-100 and 101-105 above.

116.    In short, while pointing to what they apparently believe are anomalies in BMI payment reports – which are instead a reflection of BMI's payment policies by which both Plaintiffs and Extreme are bound by their separate contracts with BMI – Plaintiffs have not actually identified a penny of performance income that they, as writers, should have been, but were not, paid (instead, only showing a miniscule amount of performance income paid to them for songs they did not write).

117.    Again, Plaintiffs' identification of "errors" has simply underscored what Extreme has said throughout this wastefully expensive litigation that Plaintiffs have pursued: there are rarely, but occasionally, cue sheet mistakes made by broadcasters and rarely, but occasionally, processing mistakes made by the PROs (and there are also policy decisions made by the PROs that may affect how small amounts of monies are allocated by the PROs).

118.    I have investigated every one of the "errors" Plaintiffs identified after the close of fact discovery.  I would have done the same investigation had Plaintiffs bothered to bring these issues to my attention before they sued.  And if Plaintiffs identify any additional "errors" – and it would not surprise me if there were other instances where Plaintiffs were not paid tiny amounts of monies by BMI on songs they wrote and instances where they were paid tiny amounts of money by BMI on songs they did not write – I would investigate them as well.  But the "errors" identified by Plaintiffs are economically minute and most of them are not errors but are part of BMI's policies.

5.      **ISRC Codes For *Joey Lawrence of Arabia/No Turning Back***

119.    Plaintiffs' counsel introduced as Exhibit 16 to the deposition of Paul Katz, attached hereto as **Exhibit AA**, a series of documents that included (1) a page of the catalog of Plaintiffs' works registered at BMI identifying a song Plaintiffs titled *Joey Lawrence of Arabia* and which Defendants re-titled *No Turning Back*;[22] (2) a page from the SoundExchange[23] website identifying an International Standard Recording Code ("ISRC" is an international identifying code for sound recordings) of USYP61100138 for *Joey Lawrence of Arabia* and (3) a screen grab from Extreme's website that identifies the ISRC of GBBPP1238201 for *No Turning Back*.[24]

120.    The reason for the two ISRC codes for this song is simply that Viacom created a separate registration for *Joey Lawrence of Arabia* on April 24, 2012 with SoundExchange.

121.    Extreme had no knowledge that Viacom had assigned this ISRC to the track.  When Extreme later released the work as *No Turning Back,* as part of its processes the song was assigned another ISRC code.

122.    Thus, all Exhibit AA reflects is that there are two ISRC codes for the work.  It has nothing to do with any breach of contract claim that Plaintiffs have alleged and Plaintiffs have not shown that they have been deprived of a penny of money by virtue of there being two ISRC code numbers.

---

[22] In my Reply Declaration in support of Extreme's motion to dismiss, I expressed my belief that the retitled works had come to Extreme's Santa Monica office from Viacom with the changes in titles (based on the list of titles that were provided to us in London where the administration of the works centered).  We produced some 125,000 pages of documents in discovery subsequent to my Reply Declaration and in the course of reviewing them, I have come to understand that Kelsey Dewald of our Santa Monica office worked with the Plaintiffs and Viacom on retitling the works.

[23] SoundExchange is the sole organization designated by the U.S. Congress to collect and distribute digital performance royalties for sound recordings to record labels and to recording artists.

[24] To the best of my knowledge, tracks are generally only assigned a single ISRC number.  I assume that is why Plaintiffs have raised this issue during expert discovery.  However, what they have not done is identify any loss or problem allegedly caused by the limited existence of more than one ISRC number.

**D.    ACCOUNTING BETWEEN EXTREME AND VIACOM**

     **1.    Extreme's Statement To Viacom Identifying "ASCAP" Income**

          **a.    *Mulholland Drive***

123.    At the deposition of Viacom's expert Roger Miller, Plaintiffs' counsel introduced several pages of statements reflecting performance income that Extreme pays to Viacom pursuant to the parties' co-publishing relationship.  I have attached the exhibit (Miller 4) hereto as **Exhibit BB**.

124.    These statements identify four instances where a total of $1.76 of "USA ASCAP PERFORMANCE" income was paid on the track *AETN Mulholland Drive,* attributed to the Plaintiffs, for performances on the A&E program *Hoarders*.

125.    Upon reviewing this documents, I pulled statements from ASCAP from Extreme's files to determine why the usages were attributed to Plaintiffs, who are affiliated with BMI.

126.    Excerpts of the statements from ASCAP to Extreme, attached hereto as **Exhibit CC**, show payments for *AETN Mulholland Drive* for two episodes of *Hoarders* titled *Andrew Shania* and *Annaclaire and Vance.*  I reviewed the cue sheet submitted to ASCAP for these two episodes of *Hoarders* which reported usages of *AETN Mulholland Drive* by Bergersen and Phoenix, not the Plaintiffs:



127.    Thus, it appears that because, as I have explained, ASCAP does not identify the composers on its statement to Extreme (Exhibit E hereto), the Extreme royalty system did not automatically match the income associated with the Phoenix/Bergersen work, requiring manual matching.  The royalty staff at Extreme then mistakenly attributed this performance income to the

Plaintiffs' song, *Mulholland Drive*, and Extreme erroneously paid Viacom half of that performance income.

128.    Plaintiffs are not entitled to any income from these performances of *Mulholland Drive* by Bergersen and Phoenix, both ASCAP members, and neither was Viacom (because it is not a co-published song).   Plaintiffs lost no writer performance income; instead Extreme mistakenly paid Viacom $1.76.   So this is a tiny erroneous payment made by Extreme to Viacom and it does not reflect a penny in unpaid income owed to Plaintiffs.

### b.    *AETN Late Hour*

129.    The final page of Exhibit BB reflects that 2 cents was paid to Viacom in "USA ASCAP PERFORMANCE" income for Plaintiffs' song *AETN LATE HOUR*.

130.    I reviewed the ASCAP source statement in detail for income on *AETN LATE HOUR* and could find no payment to Extreme from ASCAP for any song with that title.   Instead, I identified a payment for 5 cents from ASCAP for a performance of the song *AETN Last Stand* on a program titled *History of The World In*.   The page of the ASCAP statement identifying this payment is attached hereto as **Exhibit DD**.

131.    I then went to ASCAP's online cue sheet database and located a record of a performance of *AETN Last Stand* on A&E's program *History of The World in Two Hours*, published by Extreme and composed by Oswin Mackintosh:



132.    It therefore appears that Extreme incorrectly manually attributed the 5 cents of performance income it received on the performance of *AETN Last Stand* on *The History of The World in Two Hours* to the Plaintiffs' song titled *AETN Late Hour*, and then inadvertently paid 2 cents (half of the 5 cents earned) to Viacom on a song that Viacom does not actually co-publish with Extreme.

133.    As with the *Mulholland Drive* example above, because Plaintiffs are not entitled to any income from these performances of *AETN Last Stand*, this error did not deprive them of a penny of performance income.  Rather, Viacom was mistakenly enriched by 2 cents.

### 2.    *Fly Curious* and *Teen Wolf: Battlefield*

134.    I understand that in October 2018, Plaintiffs' counsel raised an instance where he concluded that Viacom and Extreme had been paid $1.50 by BMI for a performance of the Plaintiffs' song *Fly Curious* on an episode of the MTV show *Teen Wolf* titled *Battlefield* where Plaintiffs were not paid as the result of a cue sheet error identified in Viacom's expert Roger

Miller's report.  *See* **Exhibit EE**, (Miller Report) at p. 18 & Fn. 10 and **Exhibit FF** (Battlefield Cue Sheet) at VIACOM_000878.

135.    Based on payments for uses of other Extreme songs on this program, I have calculated that both Plaintiffs and Extreme were underpaid $124 on domestic performances of the *Battlefield* episode of *Teen Wolf* as a result of this cue sheet error.

136.    Extreme did, however, receive income from the foreign performances of *Fly Curious* on *Battlefield*.  As identified by accountings to Viacom attached as **Exhibit GG**, Extreme accounted to Viacom for its 50% co-publishing interest in those usages for the following payments:

      a.  On September 20, 2013, Extreme received $4.36 from BMI through the Canadian PRO SOCAN for performances of *Fly Curious* in *Battlefield* as reflected by a payment on the excerpted statement to Bayham attached as **Exhibit GG(1)**.  The exchange rate from pounds to dollars for that period was 1.5934 so Extreme accounted £1.38 to Viacom which is half of the £2.75 ($4.36) it received from BMI (*see* **Exhibit GG(2)** at Viacom_0005118); and

      b.  On January 16, 2015, Extreme received $.70 from BMI through SOCAN for performances of *Fly Curious* in *Battlefield* as reflected by a payment on the excerpted statement to Bayham at Exhibit GG(1). Deducting a sub-publishing fee on this song, Extreme accounted half of the remaining £.23 (converted from $.35 at an exchange rate of 1.5236) to Viacom as reflected in the £.12 payment on **Exhibit GG(3)** at Viacom_0008616.

137.     Critically, despite Plaintiffs' counsel's assertion in an October 16, 2018 email to Defendants' counsel with regard to Exhibit GG(2) and GG(3) (showing Extreme's accounting to Viacom on these performances), that "Your client's [sic] are collecting Publishing income on our works performing on Viacom networks, and my clients are not being paid a writers share royalty reflecting the performance on our BMI writer share statements" (attached hereto as **Exhibit HH**), the Plaintiffs' BMI statements show they were in fact paid their writer's share on these same performances.

138.     Specifically, on September 20, 2013, Aron Marderosian was paid a writer share of $2.18 (half of the $4.36 that Extreme received for the publisher share) by BMI through SOCAN for performances of *Fly Curious* in *Battlefield*. *See* excerpted BMI statement of Aron Marderosian attached hereto as **Exhibit II(1)** at PLTF004738.  And, Robert Marderosian was paid a writer share of $2.19 by BMI from SOCAN for the same performance of *Fly Curious* in *Battlefield* in Canada. *See* excerpted BMI statement of Robert Marderosian attached hereto as **Exhibit II(2)** at PLTF005804.

139.     And, on January 16, 2015, Aron Marderosian was paid a writer share of $.34 (half of the $.70 that Extreme received for the publisher share) by BMI through SOCAN for performances of *Fly Curious* in *Battlefield*. *See* excerpted BMI statement of Aron Marderosian attached hereto as **Exhibit JJ(1)** at PLTF004916.  Likewise, Robert Marderosian was paid a writer share of $.34 by BMI from SOCAN for performances of *Fly Curious* in *Battlefield* in Canada. *See* excerpted BMI statement of Robert Marderosian attached hereto as **Exhibit JJ(2)** at PLTF005981.

140.     In short, while both Extreme and Plaintiffs appear to have been underpaid by about $134.00 each due to a cue sheet error (one of some 5 to 10 in total that have been identified out of some 17,000 cue sheets produced by BMI), such underpayment is not the result of any breach of

any obligation of Extreme (and it is most certainly not part of some fantastical scheme of Extreme to divert monies from Plaintiffs invented in the fervid imaginations of the Plaintiffs).

141.  As documented above, putting to the side the offsetting mistaken payments Plaintiffs have received for performances of songs they did not write, the total potential identified underpayment of Plaintiffs' writer performance income amounts to $199.00 ($35 + $30 + $134). And Extreme too suffered the same underpayment of $134.

142.  In pursuit of claims that do not exist, Plaintiffs and their experts have manufactured alleged customs and practices that do not exist. They have ignored the plain language of the 2010 Agreement and the 2011 Agreement. They have ginned up big numbers by purposefully distorting Tunesat detection data and fabricating licensing values for production music that do not exist in the real world (and which are also contrary to the plain terms of the contracts).

143.  Extreme apologizes for the length of not only this declaration but the accompanying declarations. Picking Plaintiffs' claims apart has been a laborious process, not because the claims have any merit but because the claims are all founded on purposeful misrepresentations and distortions, the refutation of which has therefore required reference to testimony and multiple documents. But the undisputed evidence establishes that Plaintiffs' claims are baseless and at this point, summary judgment dismissing the complaint is appropriate.


Pursuant to 28 U.S.C. § 1746, declares under penalty of perjury under the laws of the United States of America that the foregoing is true and correct:


Dated: March 5th, 2019

DAN POUNDER

48