# Exhibit 1
To the Zakarin Reply Declaration
in further support of
Defendants' *Daubert* motion of Bob Kohn

# Kohn Deposition Volume I

Page 1

1

2              UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF NEW YORK
3  ----------------------------------x
   TWELVE SIXTY LLC, ARON
4  MARDEROSIAN and ROBERT
   MARDEROSIAN,
5
                      Plaintiffs,
6
              -against-
7
                               Civil Action No.:
8                              1:17-CV-01479-PAC
9
   EXTREME MUSIC LIBRARY LIMITED,
10 a division of Sony/ATV Music
   Publishing; EXTREME MUSIC
11 LIMITED; VIACOM INTERNATIONAL
   INC., NEW CREATIVE MIX INC.,
12 HYPE PRODUCTION MUSIC,
13                     Defendants.
14 ----------------------------------x
15                  November 1, 2018
16                  1:00 p.m.
17
18      Deposition of ROBERT H. KOHN, taken by
19 Defendants, pursuant to Notice, held at the law
20 offices of Pryor Cashman, LLP, 7 Times Square, New
21 York, New York, before Judith Castore, a Certified
22 Livenote Reporter and Notary Public of the State of
23 New York.
24
25

```
1
2                    A P P E A R A N C E S
3          ON BEHALF OF PLAINTIFFS
                   MARDEROSIAN & COHEN, PC
4                  1260 Fulton Street
                   Fresno, California 93721
5                  559-441-7991
                   BY:   MICK MARDEROSIAN, ESQ.
6                        mick@mcc-legal.com
                         HEATHER COHEN, ESQ.
7
8          ON BEHALF OF DEFENDANTS - Extreme Music Library
           Limited, Extreme Music Limited
9                  PRYOR CASHMAN, LLP
                   7 Times Square
10         New York, New York 10036
                   212-421-4100
11                 BY:   DONALD S. ZAKARIN, ESQ.
                         dzakarin@pryorcashman.com
12                       ROSS M. BAGLEY, ESQ.
                         rbagley@pryorcashman.com
13                       YEVGENIA S. KLEINER, ESQ.
                         ykleiner@pryorcashman.com
14
15         ON BEHALF OF DEFENDANTS - Viacom International,
           Inc., New Creative Mix, Inc. and Hype
16         Production Music
                   LOEB & LOEB
17                 345 Park Avenue
                   New York, New York 10154
18                 212-407-4000
                   BY:   WOOK J. HWANG, ESQ.
19                       whwang@loeb.com
                         ERIN SMITH DENNIS, ESQ.
20                       edennis@loeb.com
21
22         ALSO PRESENT:
23                 DAVID J. PRZYGODA, ESQ., Litigation
                   Counsel, Sony Corporation of America
24
25
```

```
                                    Page 19
 1                    KOHN
 2   devoted something slightly north of 100
 3   hours to your work on this case?
 4        A    Yes.
 5        Q    Okay.  That's including
 6   attending depositions and whatever
 7   else?
 8        A    Yes.
 9        Q    Okay.
10             In connection with the
11   preparation of your report, did you
12   communicate at all verbally or in
13   writing with any production music
14   library companies?
15        A    No.
16        Q    Have you communicated at all
17   verbally or in writing with any
18   executives of any production music
19   library companies?
20        A    No.
21        Q    Have you communicated at all
22   verbally or in writing with any music
23   publishing companies?  And when I say
24   music publishing companies, I'm
25   referring to popular music publishing
```

```
 1                    KOHN
 2   companies, whether it's Warner Chapel,
 3   Sony ATV, ABMG.
 4        A    Not in --
 5        Q    Just to distinguish them from
 6   a production music library.
 7        A    If you're asking in
 8   connection with this case?
 9        Q    In connection with this case.
10        A    No.
11        Q    And I'm actually asking in
12   connection with the generation of your
13   report.
14        A    No.
15        Q    Have you ever been employed
16   by a production music library company?
17        A    I wouldn't call it employed.
18   My uncle ran one of the largest
19   production music libraries in the world
20   of its time, which was Southern Music
21   Library which was owned by Peer Music.
22             COURT REPORTER:  I'm sorry?
23        Owned by?
24        A    Peer Music, P-e-e-r.  Peer
25   Music.
```

```
                                          Page 21
 1                        KOHN
 2        Q     Did you work for him?
 3        A      Well, I provided him with
 4   advice.   I never charged him.
 5        Q      When did you provide him with
 6   advice?
 7        A      This would have been back in
 8   the 1980s.
 9        Q      Do you remember the subject
10   matter in which you provided him
11   advice?
12        A      Yeah.  My best memory is that
13   he invited me to his office, and
14   because it was during the time in which
15   I was writing the first edition of Kohn
16   on Music Licensing.  I think it was the
17   1980s.  It could have been the early
18   '90s, but I'm pretty sure it was before
19   the first edition.  As a matter of fact
20   I do -- it had to have been in the
21   '80s.  I was living in Los Angeles.  So
22   probably prior to '87.
23             I had visited his office,
24   which was a little one-man office in
25   Taluka Lake, California, which is near
```

```
 1                    KOHN
 2   Burbank, I think.  And I spent all
 3   morning with him.  He took phone calls.
 4   He was talking to people giving
 5   licenses.  I recall actually something
 6   pretty funny, at least he thought it
 7   was funny to me because he had got a
 8   call from -- that day from a company
 9   that wanted to use a needle drop in
10   a --
11             COURT REPORTER:  I'm sorry,
12        sir.  Can you just look this way?
13        A    A needle drop -- yeah.  A
14   needle drop in a porno film and they
15   came up with a song called Big Hammer.
16   And he thought that was funny.  And he
17   takes the -- he had record albums at
18   the time and then he would take a DAT
19   tape, D-A-T, digital audiotape and do
20   recordings.  Stick it in an envelope
21   and put a contract with it or license
22   with it and send it off to the guy who
23   took the phone call.
24             And what I -- what I did for
25   him because I looked at the license
```

Page 23

1                          KOHN
2     that he did, and by that time I had
3     been out of Rudin's office and I had
4     some experience in synchronization
5     licenses and such, and I was kind of
6     surprised how simple that form was.
7     And it could be better.  And I could
8     make it better.  And I actually put
9     together a synchronization license for
10    him, which he thought was too long, and
11    I got it down to one page and gave that
12    to him and he went ahead and started
13    using that.  And, you know, I'd always
14    see him at family events and things
15    like that.
16              And over the years we talked
17    about what he was doing, et cetera, and
18    he was using my license for quite a
19    while.  So I had that.  It was a
20    one-man shop at that time, but he
21    certainly had a lot of experience in
22    dealing with a major production music
23    library.  And I got a sort of -- got an
24    idea of what that was through that
25    experience.

Page 24

1               KOHN

2      Q    Okay.

3            So you were not employed by

4   Music Production -- a production music

5   library company but you did this little

6   consulting project on a sync license,

7   as it were, for your uncle back in the

8   '80s?

9      A    Well, I would say, yeah.  I

10   mean, whatever questions he had for me

11   and other things that I might have over

12   the years that I don't really remember

13   frankly.

14      Q    Have you ever engaged in

15   licensing on behalf of a production

16   music library company?

17      A    Not of a production music --

18   you said engaged in licensing?

19      Q    Yeah.

20      A    Actually issuing a license?

21   No.

22      Q    Have you ever been in

23   engaged --

24      A    Not for a production music

25   library.

```
                                              Page 30

 1                        KOHN

 2    picture, I was directly involved with

 3    the amount of money that was involved,

 4    you know, in that.  It was a -- you

 5    come to a point where some fee is

 6    established and everyone answers for --

 7    no, most favored nations.  So it

 8    becomes easy at a point.

 9              There's only so many of these

10    things you have to do in order to

11    become knowledgeable on how these

12    things are done.  I don't need to do

13    10,000 synchronization licenses in

14    order to learn how these things are

15    negotiated.

16         Q    Have you ever worked for a

17    PRO in dealing with cue sheets and

18    broadcasters?

19         A    I never worked for a PRO, no.

20         Q    Now in your report you state

21    that acquiring a work on a

22    work-for-hire basis does not mean that

23    there are no other obligations owed to

24    the writer.

25              Now, you know that a work for
```

Page 61

```
 1                    KOHN
 2      now.
 3           But I'm just trying to help
 4      the process so that Mr. Zakarin,
 5      on behalf of his clients, can get
 6      your opinions and question the
 7      opinions that you set forth in
 8      your report.
 9           THE WITNESS:  Thanks, Mick.
10           MR. MARDEROSIAN:  All right.
11      Q    Okay.
12           Where were we?  Did we have
13   an answer?  Let's try to get back to
14   where we were.  Give me a second.
15           Now, you gleaned this -- the
16   knowledge of the custom and practice
17   from being on panels with people like
18   Massarsky and from the production music
19   library contracts, the work for hire
20   contracts you've looked at?
21      A    And discussions that I've had
22   with my Uncle Roy and the advice that I
23   might have given him over a period of
24   years, that he might have asked me
25   questions that I have given him.  He
```

```
                                    Page 62

 1                    KOHN
 2   was the closest person in my life whose
 3   full-time business for 40 years was
 4   running a production music library.  He
 5   was my uncle, and I would see him
 6   very -- almost every weekend, you know,
 7   in California.
 8        Q    Is he still alive?
 9        A    No.  He passed away last
10   year -- or two years ago.
11        Q    I'm sorry.
12        A    He was 91, lived a good life.
13        Q    But as you testified already,
14   in connection with your forming of your
15   report, you did not consult with, talk
16   to any production music libraries or
17   executives at those companies?
18        A    No.
19        Q    Okay.
20             Now, you've talked about
21   having looked at some, I think, 15
22   licenses, I think you said, of the --
23   of the plaintiff's work -- of their
24   self-published works, I guess it is; is
25   that right?
```

```
 1                        KOHN
 2   that your client runs as the name of
 3   the composer.  Now, how did that
 4   happen, I say rhetorically.
 5              So that -- when they cause
 6   mistakes like that, they have every
 7   obligation to fix the mistake.  Rob and
 8   Aron didn't make those mistakes.
 9        Q    Tell me something.  You just
10   said that our client provided very bad
11   metadata.
12              Have you seen the metadata?
13              Have you seen the metadata?
14              MR. MARDEROSIAN:  Object.
15         It's vague and overbroad.
16              What metadata are you
17         referring to?
18              MR. ZAKARIN:  He's just --
19              THE WITNESS:  I don't need
20         the see metadata.
21              MR. MARDEROSIAN:  Hold on.
22         Excuse me.
23              We made a request for
24         production of the hard drives, and
25         you said that they don't exist any
```

```
 1                    KOHN
 2      longer.
 3           So are you now changing that?
 4           MR. ZAKARIN:  Yeah.  The
 5      witness has --
 6           MR. MARDEROSIAN:  Do they
 7      exist or not?
 8           MR. ZAKARIN:  The witness has
 9      made a statement, and I've asked
10      him the appropriate question.
11      Q    Have you seen the metadata
12  that you said was bad?
13           MR. MARDEROSIAN:
14      Mr. Zakarin, I asked for the
15      metadata.  I wanted to see the
16      metadata that Dan White and Russel
17      Emanuel were sending with the
18      audio tracks.  And I have been
19      repeatedly told through the
20      discovery of this case it no
21      longer exists.
22           Are you now changing -- does
23      it exist or not?
24           MR. BAGLEY:  Where was that
25      discovery request?
```

```
 1                    KOHN
 2          MR. ZAKARIN:  You are --
 3     wait.  Shh.  Shh.  That's right.
 4          MR. MARDEROSIAN:  In the
 5     depositions.
 6          MR. ZAKARIN:  There is no
 7     such --
 8          MR. MARDEROSIAN:  In the
 9     depositions.
10          MR. ZAKARIN:  I don't care.
11     It doesn't matter.  That has
12     nothing to do with my question.
13          You're vamping now, Mick, and
14     it's not very effective.
15          MR. MARDEROSIAN:  I'm not
16     vamping at all.
17          MR. ZAKARIN:  You are.
18     There's a question on the record.
19     You answer it.
20     Q    Have you seen any of the
21   metadata that you have now stated was
22   bad?
23     A    The word "Mix Tape" is part
24   of the metadata.  So the answer is yes.
25     Q    You don't know it is, do you?
```

1                    KOHN

2      A    Yes, I do.  How else would

3   that --

4           MR. MARDEROSIAN:  Hold on.

5           You're arguing now.

6           Let's take a break.  We're

7      taking a break.

8           You need to control yourself

9      and stop arguing with the witness.

10          MR. ZAKARIN:  I'm fine.

11          MR. MARDEROSIAN:  Let's take

12      a break.

13          MR. ZAKARIN:  I'm fine.

14          MR. MARDEROSIAN:  You're

15      arguing with the witness.

16          MR. ZAKARIN:  You can take a

17      break, but I am fine.

18          MR. MARDEROSIAN:  We're going

19      to take a break because you're --

20      you need to calm down.

21          (Whereupon, a brief recess

22      was taken.)

23      Q    It's a simple question.

24          MR. ZAKARIN:  This is working

25      now?

```
 1                        KOHN
 2           COURT REPORTER:  It should
 3      be, yes.
 4           MR. ZAKARIN:  Okay.
 5           MR. MARDEROSIAN:  When you
 6      say "simple question," we really
 7      don't need remarks like that on
 8      the record, Don.  That's
 9      argumentative.
10           MR. ZAKARIN:  Thank you,
11      Mick.
12      Q    Mr. Kohn, you haven't seen
13 any of the metadata; isn't that
14 correct?
15      A    What I testified to earlier
16 is that when I saw the word "Mix Tape"
17 as the name of a composer that I was
18 looking at the metadata.
19      Q    You haven't seen any of the
20 metadata that was provided by Extreme
21 to any broadcaster, have you?
22           MR. MARDEROSIAN:  I'm going
23      to object.  It's vague and
24      overbroad.
25           Are you talking about the
```

1                        KOHN

2          hard drives that Kelsey Dewald

3          testified to?  Is that what you're

4          talking about, the electronic

5          information that Extreme, even

6          your own expert said Extreme

7          provided to the broadcasters?  Is

8          that what you're asking him, the

9          actual hard drives?  Because they

10         haven't been produced in this

11         case.

12              MR. ZAKARIN:  I understand.

13         Q    You can answer the question.

14              Have you seen any of the

15    metadata that was supplied by Extreme

16    either through hard drives or on its

17    website to any broadcaster?

18              MR. MARDEROSIAN:  I'm still

19         going to object as vague.

20              MR. ZAKARIN:  You can answer.

21              MR. MARDEROSIAN:  And

22         compound.

23         A    I'm thinking now back to a

24    woman named Kelsey.

25         Q    Who's that?

1                       KOHN

2        A     Kelsey -- there was a

3    deposition by a Kelsey.  I can't

4    remember if that's her first name or

5    last name, where she was talking about

6    the responsibility when the metadata

7    management was in the UK by Extreme.

8        Q    Now --

9        A     And that was changing all the

10   time.  So I think about that, and I

11   wonder what you mean by which metadata.

12            There's lots of metadata that

13   could be used to produce and to give

14   information to broadcasters.  When I

15   see a cue sheet, usually it is

16   comprised of entries that are taken

17   from metadata.  So to answer your

18   question when I'm looking at the cue

19   sheet and I see errors that seem to me

20   were either the result of manipulated

21   metadata intentionally or someone

22   intentionally eliminating the

23   composer's name, I don't know what to

24   make of it.

25            So have I seen hard drives of

1                      KOHN

2    anything?  No.  Hard drives were not

3    given to me.  Generally when you get

4    metadata, it can be in the form of a

5    electronic spreadsheet file.  I've had

6    a lot of spreadsheets sent to me in the

7    course of my report that I've taken a

8    look at.  I'm not sure which one might

9    have been the metadata that you're

10   talking about.

11        Q    So you don't know if you've

12   seen any metadata; is that right?

13             MR. MARDEROSIAN:  Objection.

14             That's misstating the

15        testimony, the answer just given.

16             It's argumentative as well.

17        Q    You can answer.

18        A    I've already answered that

19   question.

20        Q    No.  You can answer the

21   question now.

22        A    I've already --

23        Q    You don't get to decide.

24        A    I've already answered it.

25        Q    So you're refusing to answer

                              KOHN
1

2   the question?

3        A    No, I already answered the

4   question.

5        Q    Well, I asked you a different

6   question.  If you don't want to answer

7   it, just say so.

8             MR. MARDEROSIAN:  Mr. Zakarin

9        ,you're arguing with the witness.

10       He told you that he answered the

11       question.  If you disagree, you

12       must take it up with the court.

13            MR. ZAKARIN:  I will.

14       Q    Now Mr. Kohn, have you gone

15   onto the website of Extreme and

16   examined any of the metadata?

17       A    Yes.  Well, I've gone onto

18   the website of Extreme; and I've done a

19   number of searches.  And if you've seen

20   ISRC codes --  I'm sorry --

21            COURT REPORTER:  I'm sorry?

22       ISRC codes?

23       A    ISW -- ISWC codes, perhaps

24   ISRC codes.  So if -- that is typically

25   part of metadata.  So that if you're

```
 1                    KOHN
 2  asking whether I've seen metadata on
 3  the website, the answer is yes.
 4       Q    Okay.  Have you seen any
 5  metadata on the website with respect to
 6  the Marderosians' works that improperly
 7  identifies the composers, the title of
 8  the work, the publisher or the PRO?
 9            MR. MARDEROSIAN:  I'm just
10       going to object as vague and
11       overbroad.
12       A    I think it's also too narrow
13  because I don't know what ISRC code and
14  what ISWC code I was seeing -- looking
15  at.  But in Dan Pounder's deposition --
16  I'm sorry -- in Dan Pounder's
17  declaration that was attached to a
18  motion to dismiss or objection to a
19  motion to dismiss, I'm not sure which
20  it was, I guess it was the motion to
21  dismiss, he talks about that there was
22  flaws in the metadata.  He doesn't
23  explain what caused the flaws in the
24  metadata.  That was changing over a
25  period of time, according to this woman
```

```
                                        Page 112
 1                    KOHN
 2   Kelsey.  But that had to be fixed.  I
 3   don't know what --
 4        Q    But --
 5        A    I don't know -- I started
 6   working on this case last February.
 7   And I don't know when that declaration
 8   was filed.  I don't know when the
 9   metadata was fixed.  So it was -- so I
10   don't --
11        Q    Go ahead.
12        A    You know, I'm trying to get
13   back to your question and I'm kind of
14   looping back and finding nothing.  So
15   go ahead.
16        Q    So it's your recollection, as
17   long as you brought it up, that
18   Mr. Pounder said that the metadata or
19   the -- or something was wrong with the
20   IWC code?
21             MR. MARDEROSIAN:  Objection.
22        A    That's my recollection.
23        Q    As opposed to him saying that
24   the outward facing website did not have
25   the accurate information but that the
```

Page 113

1                    KOHN

2  inside website had the information.

3          You don't recall what he

4  said?

5          MR. MARDEROSIAN:  I'm going

6      to object.  It's vague.

7      Q    Is it --

8          MR. MARDEROSIAN:  Vague and

9      overbroad.

10          MR. ZAKARIN:  I'll withdraw

11      the question.

12      Q    Is it your -- do you recall

13  what it was that he actually said in

14  his reply affidavit?

15      A    I'm telling you now that I,

16  and I think I said it earlier, I

17  vaguely recollect him saying something

18  about flawed metadata in his

19  declaration.  I don't remember

20  precisely what he said in his

21  declaration.

22      Q    Okay.

23          In terms of the, you know,

24  cue sheets that you've seen that have

25  some erroneous information, have you

```
 1                    KOHN
 2  erroneous cue sheets that you
 3  reference -- you recall referencing
 4  some erroneous cue sheets?
 5           MR. MARDEROSIAN:  He didn't
 6      say some.  You're arguing again.
 7           MR. ZAKARIN:  One.  You want
 8      to make --
 9           MR. MARDEROSIAN:  Don't argue
10      the case.  Just ask the question.
11      Q    You have seen more than one
12  erroneous cue sheet?
13      A    You mean cue sheets that
14  contained --
15      Q    Mistaken information or
16  incomplete information, one or the
17  other.
18      A    Or manipulated information.
19      Q    You -- we'll talk about
20  whether it's manipulated.  You're
21  drawing a conclusion on manipulated,
22  aren't you?
23      A    You're drawing a conclusion
24  on mistaken.
25      Q    When I say that that they
```

```
 1                    KOHN
 2   didn't have corrected --
 3        A    I don't know whether --
 4        Q    -- they didn't have correct
 5   information.  I'm not making a value
 6   judgment as to intent, manipulation,
 7   how it got there.  I'm simply dealing
 8   with a cue sheet that did not have
 9   either complete or accurate
10   information.
11        A    The word mistake will connote
12   innocence.  And I don't see, given the
13   cue sheets that I've looked at, the
14   ones that had incorrect -- I mean
15   literally way off the charts incorrect
16   information would seem to me coming
17   from metadata that one of the
18   depositions say was manipulated in the
19   UK by somebody.
20               I have seen a number of cue
21   sheets.  I've seen lots of things
22   produced to me.  I've looked at cue
23   sheets, a whole slew of them, perused
24   them.  And all I could say is I pointed
25   out the ones that, as I did in my
```

```
 1                    KOHN
 2  report, and Mick's produced to your
 3  expert witnesses yesterday a number of
 4  them that say the composer's name is
 5  Mix Tape, which is the name of the
 6  library.
 7       Q    Okay.
 8            Now, do you know how Mix Tape
 9  got listed there?  Do you know?
10            MR. MARDEROSIAN:  Objection.
11            Vague and overbroad.
12       A    I have no personal
13  knowledge --
14       Q    Okay.  Did you --
15       A    -- of how the word --
16       Q    Go ahead, please.
17       A    -- Mix Tape gets in there.  I
18  have my suspicions, but I have no
19  personal knowledge of how it got there.
20       Q    So you didn't go to --
21            MR. MARDEROSIAN:  Are you
22       done with your answer?
23       A    Yes, I am.
24       Q    You didn't go to the
25  broadcaster and ask, did you?  Yes or
```

```
 1                    KOHN
 2  no?
 3       A    I didn't go to the
 4  broadcaster -- which broadcaster?
 5       Q    The broadcaster that had the
 6  mistaken or the incorrect information
 7  on the cue sheet?
 8       A    Well, I don't know whether it
 9  was the broadcaster who produced the
10  cue sheet or whether it was the
11  producer who produced the cue sheet.
12            Are you assuming --
13       Q    Did you go to the producer?
14            MR. MARDEROSIAN:  Hold on.
15            Go ahead.
16       Q    Did you go to the producer?
17       A    I didn't go to -- I didn't go
18  to anyone on the outside to ask them
19  who produced.
20       Q    Okay.  Did you go to Extreme
21  and ask them?
22            MR. MARDEROSIAN:  Wait a
23       second.  Hold on, please.
24            Okay.  I object to the
25       question.
```

```
 1                    KOHN
 2            You mean, did he go to your
 3       client and have a discussion with
 4       your client?
 5            MR. ZAKARIN:  Yeah, did he
 6       inquire of anybody?
 7       A    I looked at the evidence that
 8  was presented to me.  And there is
 9  clear evidence from someone who works
10  for Viacom that the metadata was
11  changed and manipulated in the UK.  All
12  right?  And it seems to me that the
13  misinformation that you're saying is in
14  these cue sheets or however you want
15  to -- incorrectly putting a name of
16  your client's library as the composer
17  name, gets there through information
18  provided to the broadcaster or the
19  producer.  That's generally how it gets
20  there.
21            I can't imagine how a
22  broadcaster or producer would confuse a
23  composer's name with the name of a
24  library or the word Mix Tape.
25       Q    So --
```

```
                                    Page 122
 1                    KOHN
 2       A    But, no, I haven't had any --
 3   make any phone calls to your client.
 4       Q    But you've concluded that the
 5   person filling out the cue sheet could
 6   not have possibly made an honest
 7   mistake; is that your testimony?
 8            MR. MARDEROSIAN:  Hold on.
 9            I'm going to object to the
10       question.
11            This is calling for
12       speculation.  It's argumentative.
13       It's vague and overbroad.
14            MR. ZAKARIN:  Everything the
15       witness has testified to in the
16       last 20 minutes has been rank
17       speculation.  Why should we stop
18       now?
19            MR. MARDEROSIAN:  Incorrect.
20            Don, stop arguing the case.
21       Kelsey Dewald testified that from
22       Santa Monica Russel Emanuel and
23       Dan Knight continually changed the
24       metadata that went to the
25       broadcasters.
```

Page 173

1                         KOHN

2        A     It would -- it sounds

3    consistent.

4        Q     Now, what I want to

5    understand is the factual basis for

6    your statement.  Let's -- these are a

7    couple of statements.  Let's deal with

8    the last one.

9              It is the custom and practice

10   of music publishers to review cue

11   sheets for accuracy and correct any

12   mistakes.  This is true of even

13   publishers who consider themselves to

14   be production music libraries.

15             What's the factual basis for

16   your statement of that being the custom

17   and practice?

18       A     The -- in terms of production

19   music libraries, I actually didn't

20   mention earlier that I meant to do, but

21   I -- I first learned the word -- what

22   the word "cue sheet" was when sitting

23   with my uncle who actually had a stack

24   of them and he explained to me what

25   they were.  And he was -- he was

Page 174

1                           KOHN

2    reviewing them.

3              I don't have any specific

4    recollection of what they -- where they

5    were from and where they got them.  It

6    was actually paper that he got.  It

7    would have -- back in the '80s.  Then

8    maybe ASCAP would have sent it to him.

9    But if he didn't make sure that the cue

10   sheets were filed properly with ASCAP,

11   he wouldn't have gotten the performance

12   money on the back end, which is what he

13   was explaining to me.  Because he

14   talked -- he told me what a needle drop

15   was.  That he might charge $200 for a

16   needle drop.  And I go that doesn't

17   sound like a lot of money.  How do you

18   make money on this?  And he says I get

19   it all in the back end.  And that

20   morning he had a stack of cue sheets,

21   whatever.  And I didn't quite fully

22   understand it at the time.  Maybe over

23   the years I got a better understanding

24   of that.

25        Q    Who else --

Page 175

```
1                    KOHN
2        A    Now --
3        Q    I'm sorry.  I didn't want to
4   interrupt you.
5        A    Just so it is on the -- as I
6   mentioned in the third bullet on the
7   this page, according to BMI without cue
8   sheets, it would be nearly impossible
9   for such composers and publishers to be
10  compensated for their work.  The ASCAP
11  website says the same thing and
12  actually uses the term "production
13  music libraries" in the sentence.
14            COURT REPORTER:  Uses the
15       term?
16       A    Production music libraries in
17  the sentence.
18       Q    Okay.
19       A    So the ASCAP website says it.
20  The BMI website says it.  Your client,
21  the CEO of Extreme in his deposition
22  said that's not something we do, they
23  do that over at Sony ATV.
24       Q    Huh-uh.
25       A    Yes, he did.
```

```
 1                        KOHN
 2       Q    That's not what he said.
 3       A    Yes, he did.
 4       Q    Okay.
 5       A    He said -- that's the job of
 6  --
 7       Q    Whatever it says, it says.
 8       A    That's the job -- that's the
 9  job of commercial publishers.  The CEO
10  of Extreme said it himself.  So one of
11  the basis of my customs and practices
12  is your own CEO saying in his
13  deposition that Sony ATV does it.
14            Dan Pounder in his
15  declaration said that we don't have the
16  resources to do it like Sony ATV does.
17  I read that.  Okay?
18            So why don't you ask your own
19  client why they don't follow the
20  customs and practices of the industry
21  that their own parent company follows
22  as well.  They say -- they chose not to
23  do it because they say they don't have
24  the resources.  If they --
25       Q    I'm sorry.  I didn't want to
```

Page 177

```
 1                         KOHN
 2    interrupt you.
 3         A    So the basis -- I've been to
 4    panels.  I have discussed this with
 5    people in the industry over the past 35
 6    years since writing the book about how
 7    to make sure -- the whole book is Kohn
 8    on Music Licensing, there's a theme in
 9    the book is that you shouldn't be --
10    that you should be willing to license
11    your music out there so that you get
12    the back end public performance
13    royalties.  Everyone knows.  It's plain
14    as sight.  It's on the ABMI and ASCAP
15    websites.  You can't be a production
16    music library or a music publisher and
17    miss it, that if you don't have cue
18    sheets on file, you're not going to be
19    getting the largest piece of the income
20    that music publishers make.
21              So for your client to say
22    bizarrely to me, bizarrely to the
23    court, bizarrely to the songwriters
24    that they represent that they don't
25    have any responsibility, and for you to
```

Page 178

```
  1                        KOHN
  2    bring in expert witnesses who dare --
  3    the head of APM, okay, filed an expert
  4    report in this case.  He's a production
  5    music library, and he denies any
  6    responsibility.
  7            Of course he's going to come
  8    in -- you brought in an expert who's
  9    the CEO of a production music library
 10    to tell you what -- the practices in
 11    the industry.  Of course he's going to
 12    say that we don't do it.  That's not
 13    the practice, because he doesn't want
 14    to do the work.
 15            You have -- you have
 16    yesterday, the expert witness that you
 17    brought in yesterday that I sat in on
 18    and, that's Mr. Katz.  He was on the
 19    board of APM.  He also acquired a
 20    production music library called First
 21    Com.  And he sat there brazenly telling
 22    Mr. Mardosian's [sic] --
 23        Q    Marderosian.
 24        A    -- Marderosian's client that
 25    they have no responsibility either to
```

Page 179

KOHN

1

2   do it.  He's saying it's custom --

3   there's no custom and practice in the

4   industry.

5          If you read books like Todd

6   Brabec, who you called a putz the other

7   week at a deposition, which was

8   appalling and it was insulting to me

9   and the people that I know in the music

10  industry --

11      Q    Uh-huh.

12      A    -- in his book he says that

13  it's customs and practice in the music

14  industry.  You don't have to be around

15  much to understand that it is custom

16  and practice for production music

17  libraries and music publishers as their

18  basic responsibility to make sure the

19  biggest source of income gets paid to

20  the songwriters.

21      Q    Okay.  Are you done?

22          MR. MARDEROSIAN:  Well,

23      that's argumentative.

24          MR. ZAKARIN:  I just wanted

25      to know because I don't want to

Page 180

```
 1                    KOHN
 2      interrupt the witness.
 3      A    I am done.
 4      Q    Oh, okay.  Well, now we'll go
 5  back.
 6            So in addition to your uncle
 7  who you sat with about 30 years ago and
 8  he had a stack of cue sheets on his
 9  desk, what other production music
10  libraries have you either talked to or
11  found out as a matter of custom and
12  practice reviewed cue sheets, any
13  others?
14      A    I don't remember any others.
15  I met Adam --
16      Q    Thank you.  That's enough.
17      A    I --
18            MR. MARDEROSIAN:  Wait.  What
19      do you mean that's enough?
20            MR. ZAKARIN:  No, no, that's
21      enough.
22            He's answered it.  He's
23      answered the question.
24            MR. MARDEROSIAN:  No, he
25      hasn't.
```

Page 181

KOHN

1

2      A     No, I didn't say I didn't

3   talk to production music libraries.  I

4   met Adam Taylor a number of years ago.

5   I don't -- I talked about his

6   production music library.  I don't

7   remember having discussed with him, but

8   I might have discussed with him what he

9   does and how he does it.  There are

10   lots of people -- how do you think I

11   wrote Kohn on Music Licensing?

12   Virtually every word in that book,

13   other than the forms, without having

14   discussed with everybody in the music

15   industry that I was in touch with

16   whether it was my uncle, my father,

17   Barry Massarsky sitting at the end of

18   the table, other people that I learned

19   from, what custom and practice in the

20   music industry are?  How could I have

21   possibly have described terms of art?

22      Q     Damned if I know.

23      A     How can I sit here and give

24   you answers to your questions on issues

25   like Sound Exchange and other things if

```
                                    Page 182
 1                   KOHN
 2   I didn't talk to a lot of people in the
 3   music industry to know what a custom
 4   and practice in the music industry is
 5   or it isn't?
 6           How does a federal judge in
 7   Los Angeles in federal court accept my
 8   testimony as customs and practice in
 9   the music industry as to the
10   interpretation of the ASCAP contract
11   with respect to performances in venues
12   across the country?
13       Q    Are you done?  I don't want
14   to interrupt you.
15       A    That's not the -- I was
16   obviously done.
17       Q    I can't tell.
18           Now, so we've established
19   that you didn't talk to any production
20   music companies or find out what they
21   do --
22       A    That's not true.
23       Q    -- but you talked --
24           COURT REPORTER:  I'm sorry.
25       You didn't talk -- I'm sorry.
```

```
 1                        KOHN
 2        Talk to any --
 3        Q    Music production library
 4   companies --
 5             COURT REPORTER:  Music
 6        production library companies.
 7        Q    -- to find out what they do
 8   as a matter of custom and practice?
 9        A    I -- that's not the
10   testimony.
11        Q    Besides your uncle?
12        A    That's not my testimony.
13   That's not my testimony.
14        Q    It's what --
15        A    No, it's not my testimony.
16             I have talked to production
17   music libraries, people who work for --
18        Q    Who?
19        A    I even met -- I can't tell
20   you the names of the companies.  I
21   can't tell you the names of the
22   companies.  I can't tell you the
23   individuals involved in those
24   companies.  I told you I met with Adam
25   Taylor.  That's one name that came up
```

Page 184

```
 1                        KOHN
 2   that I remember specifically.
 3             How would I be able to write
 4   about these things in the book without
 5   having talked to people about what they
 6   do for a living?  And that's what I
 7   did --
 8        Q    Do you write --
 9        A    -- for over 35 years.
10        Q    -- do you write in the book
11   about the custom and practice of music
12   production library companies receiving
13   and reviewing cue sheets?
14        A    No, I do not specifically --
15        Q    Okay.
16        A    -- cover in the book cue
17   sheets.  I can't cover every single
18   custom and practice in the music
19   industry.  Now I will.  And in the next
20   version of the book, which will be
21   coming out next year, is going to be
22   talking about this.  And I'm going to
23   use this as an example of how
24   songwriters can be mistreated by their
25   publishers, and particularly production
```

```
 1                      KOHN
 2  music libraries not just for not
 3  reviewing cue sheets but for the
 4  shenanigans that have been going on in
 5  this -- this case with your CEO.
 6       Q    I look forward to it.  And
 7  look forward to reading it.  I may even
 8  buy it.
 9            Now --
10       A    I would hope you --
11       Q    -- did you contact --
12       A    -- copyright.
13       Q    -- any music publishers to
14  find out about whether they engage in
15  this custom and practice of receiving
16  and reviewing cue sheets?  Any music
17  publishers, not production music
18  libraries, but music publishers?  Have
19  you gone --
20       A    I haven't --
21            COURT REPORTER:  I need a
22       full question, please.  If you
23       wait until he finishes --
24       Q    Have you contacted -- right.
25  Have you contacted any of them to find
```

Page 186

KOHN

1
2  out?

3      A    Since I was engaged in this
4  case, no.

5      Q    Did you do a survey of any
6  production music libraries or music
7  publishers?

8      A    Since I've been engaged in
9  this case, no.

10     Q    Did you do a survey before
11 you were engaged in this case?

12     A    It depends on what you mean
13 by "survey."  If it means that --

14     Q    A survey to find --

15     A    If it means that --

16     Q    Let me finish.

17          You're asking me.  So I'm
18 going to tell you.

19     A    Go ahead.

20     Q    A survey to determine whether
21 it's a custom and practice of music
22 publishers to receive and review and
23 correct cue sheets.

24     A    You didn't define survey.
25 Try again.

```
                                        Page 187

 1                    KOHN
 2        Q    Do you want to know what a
 3   survey is?
 4        A    Yes.
 5             MR. MARDEROSIAN:  Okay.
 6        We're getting conversational
 7        again.
 8             MR. ZAKARIN:  No, no.
 9             MR. MARDEROSIAN:  Maybe we
10        need -- maybe we need another
11        break.
12             MR. ZAKARIN:  No.  No break.
13        A    We don't need a break.
14             MR. MARDEROSIAN:  Hold on
15        everybody.  Let's go back to
16        questions and answers.
17             MR. ZAKARIN:  I want to know
18        what the witness means by survey.
19        That's all.
20             MR. MARDEROSIAN:  So, Don, he
21        told you about what he went
22        through in writing his book and
23        the people that he talked to.
24             MR. ZAKARIN:  I heard him.
25             MR. MARDEROSIAN:  Now, you
```

```
 1                    KOHN

 2        used the word "survey."  He's

 3        asking you to define what you mean

 4        by survey so he can answer your

 5        question.

 6        Q    Yeah.  Did you -- did you

 7   submit questionnaires to music

 8   publishers -- you didn't talk to

 9   them -- but did you submit

10   questionnaires or some sort of document

11   to music publishers or production music

12   libraries to find out if they engaged

13   in this custom and practice of

14   reviewing --

15        A    I --

16        Q    -- receiving, reviewing and

17   correcting cue sheets?

18        A    I submitted questionnaires,

19   no more than the expert witnesses that

20   you have put forth have submitted

21   questionnaires to provide answers to

22   their questions.

23        Q    So the answer is no?

24        A    That's right.

25        Q    Okay.  That's all we need to
```

Page 189

```
 1                    KOHN
 2   know.
 3            Now, on Page 8 -- we're going
 4   back for a second.  You talk about the
 5   50 percent of gross receipts, correct?
 6       A    I'm sorry?  Where do I talk
 7   about it?
 8       Q    Page 8, you talk about, in
 9   the second bullet point.  It's the
10   50 percent of gross receipts.  I'm just
11   trying to orient you.  The obligation
12   to pay 50 percent of gross receipts.
13       A    Correct.  Based on Page 8.
14       Q    Page 8, the second bullet.
15   I'm just trying to --
16       A    Got it.
17       Q    -- work with -- you know, I'm
18   just trying to orient the witness.
19   Okay.
20            Now, under Exhibit 3, K3, the
21   payment of gross receipts is not
22   unlimited.  There are conditions,
23   aren't there?
24            MR. MARDEROSIAN:  Objection.
25       Calls for a legal opinion and
```

```
                                     Page 310

 1                       KOHN
 2           MR. MARDEROSIAN:  I have to
 3      make objections if the questions
 4      aren't proper questions.
 5      Q    On Page 9, in the middle of
 6  the page, it says, music publishers
 7  where they can have influence over the
 8  titles of songs will customarily
 9  attempt to avoid duplicate titles to
10  avoid the obvious problem of
11  misdirected or suspended public
12  performance revenues.
13           Do you see that statement?
14      A    You said page 9.
15      Q    Page 9 of your report?
16      A    Music publishers where they
17  can have influence?
18      Q    Yes, that statement.  Do you
19  see that?
20      A    I'm reading it again.  Yes.
21      Q    Is it your testimony that
22  this is another custom and practice in
23  the industry?
24      A    I am aware over many yours
25  that one of the problems that the
```

Page 311

1                          KOHN

2     industry faces in allocating income,

3     particularly blanket income, was the

4     problem of duplicate titles.  And there

5     have been lots of ways that performance

6     societies and others have tried to deal

7     with that problem.  So I'm aware that

8     it's a problem and that -- I'm aware

9     that there are publishers who try to

10    avoid duplicate titles where they can.

11    It's not always up to them.

12              So I would say that it's a

13    custom and practice in the industry to

14    avoid duplicates where practical.

15    Sometimes it's the songwriter.  He's

16    going to do what he wants to do.  There

17    are publishers who have always insisted

18    that the first three words of the song

19    is going to be the title.  There was

20    this guy Jerome, I don't know, Robbins

21    of Robbin's Music.  So each publisher

22    has its own, sometimes, quirkiness.  As

23    metadata improves over time, that may

24    not be a problem anymore.

25         Q    You're aware that titles are

```
                                        Page 312
 1                      KOHN
 2   not copyrightable?
 3        A    It doesn't mean they're that
 4   not protectable.  There is the Thomson
 5   versus Walt Disney case in California
 6   where unfair competition or palming
 7   off -- the Lovebug case in which a
 8   California court held that under unfair
 9   competition law or palming off the
10   titles could be protectable as in the
11   form of a trademark under unfair
12   competition but not copyrightable.
13        Q    Yes, I know that.
14             Have you either spoken with
15   or surveyed any music publishers that
16   told you that they will customarily
17   change titles to avoid duplicates?
18        A    I think -- I don't know
19   whether it was music publishers that I
20   learned the problem from or people in
21   the -- PROs.  But in discussions that
22   I've had over 35 years, I've come to be
23   aware that duplicate titles have been a
24   problem and it would be good if we
25   could try to avoid them where possible.
```

```
                                    Page 313

 1                      KOHN
 2        Q    You're aware that the PROs
 3   have thousands of songs that have the
 4   same title?
 5        A    Yes.
 6        Q    Did you ask any of the PROs
 7   whether those thousands of common
 8   titles present an obvious problem for
 9   them in allocating income?
10        A    I have -- since the beginning
11   of this case, no.
12        Q    Did you ask them before the
13   beginning of this case?
14        A    I might have been on panels
15   that might have talked -- that's
16   probably -- may have been where I have
17   heard that it is a common problem or it
18   was a common problem 20 years ago
19   before the automation of cue sheets
20   through RapidCue and other kinds of
21   systems.  Things change over time.
22             MR. MARDEROSIAN:  Don, you
23        are aware your own expert, Adam
24        Taylor, says his company does not
25        change titles, right?  Was that
```

Page 314

1                    KOHN

2      included in your question of

3      evidence?

4          MR. ZAKARIN:  I'm fully aware

5      of it.  Adam Taylor, they don't

6      change duplicators either.

7          MR. MARDEROSIAN:  Yeah, they

8      don't change titles.

9          MR. ZAKARIN:  They don't

10     change duplicates.

11         MR. MARDEROSIAN:  I think the

12     specific phrase in his report is

13     his company does not change

14     titles.

15         MR. ZAKARIN:  Yes.

16         MR. MARDEROSIAN:  At all.

17         MR. ZAKARIN:  And it's

18     explained.

19         MR. MARDEROSIAN:  I just want

20     to make sure that that was

21     included.

22         MR. ZAKARIN:  It's explained

23     why.

24     A    I read Adam's report, and I

25   remember him saying that.

Page 315

1                         KOHN

2        Q    I'm well aware of Adam's

3   report as well.

4              And you're also aware that

5   publishers like Warner Chappell, BMI,

6   UMPG, Sony ATV, just by way of example,

7   have multiple songs in their catalogs

8   with the same titles?

9              MR. MARDEROSIAN:  Objection.

10        Vague.  Overbroad.

11              Incomplete hypothetical.

12              Assumes facts not in

13        evidence.

14        A    I trust that they do since

15   there are so many duplicate titles at

16   the PROs that they could be from the

17   same music publishing company.

18        Q    And you read Adam Taylor's

19   report.  You said that?

20        A    Yes.

21        Q    So by way of example I think

22   Adam Taylor's report reflects that APM

23   has four titles of Mulholland Drive,

24   separate songs in its own catalog.

25              Do you recall that?

Page 316

1                        KOHN

2        A    I don't remember that

3    specifically, but...

4        Q    Now if duplicate titles is,

5    as you say in your opinion, an obvious

6    problem, do you have any understanding

7    as to why BMI or ASCAP or the major

8    publishers have not done something to

9    eliminate this problem over the past 75

10   years?

11       A    I would -- I would say that

12   they're not necessarily in the position

13   to eliminate it.  They're not in

14   control of who registers what titles or

15   not.  And they are finding other ways

16   to deal with the problem.

17       Q    To be clear it's not your

18   testimony, is it, that having

19   identically titled songs automatically

20   creates confusion and results in a loss

21   of performance income?

22       A    Not automatically.

23       Q    It can happen?

24       A    Yes.

25       Q    But it's not something that

```
 1                      KOHN
 2    is caused automatically by duplicate
 3    titles?
 4         A    Well, it could be caused --
 5    well, it could be caused automatically
 6    by a specific duplicate title but not
 7    in general.
 8         Q    Have you had any
 9    communication with any PRO regarding
10    the error rates on cue sheets that they
11    receive from either producers of
12    programming or broadcasters?
13         A    No.
14         Q    Do you have any knowledge on
15    your own as to what the error rate is
16    for ASCAP or BMI on the cue sheets they
17    get?
18         A    No.
19         Q    You understand, don't you,
20    that cue sheets are created one way or
21    another by music supervisors or other
22    people at either broadcasters or
23    programs?
24              MR. MARDEROSIAN:  I'm going
25         to object.  Excuse me.  I'm going
```

1                       KOHN

2    that they have people and staffs who

3    receive them.  I'm not -- personal

4    knowledge of how they may review them

5    or not review them.

6         Q    So you have no knowledge one

7    way or the another whether the PROs

8    review the cue sheets that they get and

9    if there's erroneous information or

10   incomplete information, how they deal

11   with it?

12        A    I have no personal knowledge

13   of how cue sheets are received other

14   than electronically, you know, and

15   reviewed and handled by PROs.  I have

16   not worked in the PRO.  I don't know.

17        Q    So that's not part of your

18   knowledge as to how the PROs function?

19        A    Well, generally it's part of

20   my knowledge of how they function.  I

21   know they receive cue sheets from

22   RapidCue.  I don't think that's

23   generally known by a lot of people.

24        Q    They also receive cue sheets

25   that are paper cue sheets or Excel

Page 322

```
                           KOHN
 1
 2    spreadsheets from broadcasters and
 3    program suppliers, don't they?
 4         A    Yes.
 5         Q    And indeed you've looked at a
 6    lot of the cue sheets that they
 7    received?
 8         A    That's correct.
 9         Q    By the way, I may have asked
10    this and I apologize, did you look at
11    all of the cue sheets that were -- that
12    BMI produced?
13         A    No.
14         Q    You only looked at some?
15         A    Some.
16         Q    Did you have access to all of
17    them?
18         A    I think they were all sent to
19    me, yes.
20         Q    Did anybody -- strike that.
21    I won't do it.
22              Have you ever suggested to a
23    music publisher that they perhaps
24    consider changing titles to avoid
25    duplicates?
```

Page 356

```
                              KOHN
1
2    now.  Go ahead.  I'm good.
3         Q    I just want to make sure
4    you're okay.
5         A    I'm good.
6         Q    Cue sheets are submitted with
7    respect to the first or initial
8    broadcast of a use, not for every
9    rebroadcast?
10            MR. MARDEROSIAN:  Do we know
11        that to be the case, Don?  Do we
12        know that to be absolutely the
13        case every time?
14            MR. ZAKARIN:  I'm asking the
15        witness.  I'm not asking you.
16            MR. MARDEROSIAN:  I
17        understand.  But you keep asking
18        it as if it is, and I don't know
19        if that is the case.
20            I'm just going to object that
21        the question is vague and calls
22        for speculation because we don't
23        really know what broadcasters do
24        in terms of -- from the initial
25        air to rebroadcast.
```

```
 1                    KOHN
 2          And I don't want to quarrel
 3      with you, but I don't want you to
 4      ask it as if that is the case.
 5      He's not an expert on what
 6      broadcasters do.
 7              MR. ZAKARIN:  It is the case
 8      but I think the witness knows and
 9      that's why I'm asking him.
10              MR. MARDEROSIAN:  I'm not so
11      sure that is the case.
12      Q    You can answer.
13      A    I think we're in agreement on
14   the basic principle.  I just will
15   continue to have a problem with your
16   saying that it's a -- for the first
17   broadcast not for the second broadcast
18   or the third broadcast or the fourth
19   broadcast.  The cue sheet reflects the
20   music that has been synchronized into
21   an audiovisual work.  That's it.  It
22   may never be broadcast, and someone
23   could submit the cue sheet.
24      Q    That is true.
25      A    Right?  So it has nothing to
```

Page 358

1                      KOHN
2    do with the first broadcast.
3         Q    Unlikely a cue sheet would be
4    submitted if it's not broadcasted?
5         A    That's correct.  But I'm just
6    trying to be correct in the language.
7    And I'm not going to agree to something
8    that I don't think is precise from a --
9         Q    I don't want you to agree
10   with anything unless you agree with it.
11        A    Good.
12        Q    So but you would agree with
13   me that broadcasters program suppliers
14   do not submit cue sheets each and every
15   time that the same program is
16   rebroadcasted or the same promo is
17   rebroadcasted?
18             MR. MARDEROSIAN:  I'm going
19        to object.
20             It's vague and overbroad.
21        Incomplete hypothetical.  Assumes
22        facts not in evidence.  Asking for
23        speculation.
24        Q    Now you can answer.
25             MR. MARDEROSIAN:  And outside

```
 1                    KOHN
 2      the scope of this expert's report.
 3      A    Well, yeah, it could be
 4  outside of my --
 5      Q    I don't think it is, but go
 6  ahead and answer.
 7      A    The way you put it, yes.
 8      Q    Are you aware that the PROs
 9  actually do track rebroadcasts of
10  programs through such things as
11  Gracenote or surveys?
12      A    They have a number of methods
13  that they use for tracking.  They
14  use -- some of them use TuneSat.
15      Q    I think SESAC.
16      A    SESAC does.
17      Q    But I'm not sure what they
18  use TuneSat for?
19      A    SESAC and SOCAN, I think, do.
20      Q    SOCAN is Canada.
21      A    Well, what can I tell you,
22  it's a PRO.  You said PRO.
23      Q    Now, has anybody ever told
24  you that every TuneSat detection is a
25  unique initial broadcast of a
```

```
 1                    KOHN
 2  performance, of a song?
 3            MR. MARDEROSIAN:  A unique
 4       initial broadcast.
 5            MR. ZAKARIN:  That's what I
 6       said.
 7            MR. MARDEROSIAN:  A first
 8       airing?
 9       Q    A unique initial broadcast.
10            MR. MARDEROSIAN:  I'm going
11       to object.
12            It's vague an overbroad.
13            Incomplete hypothetical.
14       A    Has anyone ever told me what?
15       Q    Have you ever been told that
16  each and every TuneSat detection is a
17  unique initial broadcast rather than
18  multiple rebroadcasts of the same
19  program or promo?
20            MR. MARDEROSIAN:  Same
21       objection.  And I'll add compound.
22       A    No one's told me that.
23       Q    Okay.
24            Your understanding is, isn't
25  it, that the TuneSat detections are --
```

Page 361

```
                           KOHN
 1
 2   include multiple rebroadcasts?
 3        A    Include multiple public
 4   performances of an audiovisual work
 5   that contains musical works.  How's
 6   that?
 7        Q    I don't think that's --
 8   that's entirely it.  It's multiple
 9   public performances.  When you say
10   multiple public performances, are you
11   referring to multiple rebroadcasts of
12   the same program?
13               MR. MARDEROSIAN:  Object.
14        It's a incomplete hypothetical.
15        It's vague and overbroad.
16        A    I'm just weary of the word
17   rebroadcast because it's an
18   audiovisual -- well, you've got
19   broadcasts.  You've got transmissions
20   for over the internet.  I don't think
21   that TuneSat --
22        Q    I'm going to give you a
23   hypothetical.  Maybe we can cut through
24   it.
25        A    It's just the word broadcast
```

Page 362

1                          KOHN
2    that's bothering me and rebroadcast
3    that's bothering me.  The copyright law
4    in the compulsory license for cable,
5    there's rebroadcast, there's -- I have
6    trouble with the word.  But it's just a
7    semantical thing.  I'm not trying to be
8    difficult.
9         Q    I'm sure you're not.  I'm
10   trying -- I'm going to try and make it
11   simple.  I'll give you a hypothetical,
12   okay?
13             A show goes into syndication.
14   A show is broadcast -- a new show, CBS,
15   Big Bang Theory, music on Big Bang
16   Theory, original broadcast on CBS goes
17   in syndication and it's rebroadcasted
18   on Turner, it's rebroadcasted on
19   Channel 9, it's rebroadcasted all the
20   ways.  So there's thousands of
21   rebroadcasts of the same original
22   initial show.  TuneSat detections will
23   pick up every one of those performances
24   of the show on -- not of the show, but
25   of the music in the show on CBS, it

```
 1                    KOHN
 2  will pick up the original one.  It will
 3  pick it up on Turner.
 4       A    Yes.
 5       Q    It will pick it up on all the
 6  syndications.
 7       A    Okay.  Yes.
 8       Q    You agree with me?
 9       A    Yes.
10       Q    So the TuneSat detections
11  don't correspond to the original
12  broadcast only.  They have all the
13  other showings of the same program?
14       A    But you can use the TuneSat
15  data to determine how many unique
16  broadcasts were of those programs.
17       Q    You can?
18       A    Yes.
19       Q    But unfiltered if you just
20  look at a shear number of TuneSat
21  detections?
22       A    Unfiltered, yes.
23       Q    But if you look at -- if you
24  have 15 or 20,000 TuneSat detections,
25  you'd have to examine it to see which
```

Page 364

                              KOHN

1     are rebroadcasts, which are the

2     original broadcasts, correct?

3         A    You want to put it that way,

4     yeah.  Which is the unique program that

5     contains the musical work, how many of

6     those versus how many times it was

7     rebroadcast or broadcast, yes.  Yes.

8         Q    And same thing for promos?

9         A    Unfiltered, yes.

10        Q    Okay.

11             I didn't it was

12    controversial.

13        A    No, it's not.

14        Q    I'm glad we got to --

15        A    I just want to make sure you

16    don't --

17        Q    I'm glad we got to an

18    agreement on terminology.

19        A    Okay.  Good.

20             MR. MARDEROSIAN:  Actually it

21        sounds like you got to an

22        agreement on the validity of

23        TuneSat data.

24             MR. ZAKARIN:  Thanks, Mick.

```
                                        Page 369
 1                    KOHN
 2   commercial and the Starbucks commercial
 3   in there.  I might have found it.  I
 4   might have listened to it, but I don't
 5   remember.
 6             But I poked around it to see
 7   what was there but I did not do what
 8   you had asked me.  And I did not do a
 9   calculations as to how much were this
10   kind and how much were that kind.
11        Q    Turn to Exhibit B of your
12   report, if you would.
13             (Whereupon, a brief recess
14        was taken.)
15        Q    Okay.
16             I think when we broke, I had
17   asked you to look at your Exhibit B --
18        A    Yes.
19        Q    -- to your report.  Do you
20   recall?  Pull it out.
21        A    Okay.  Exhibit B.
22        Q    And you say these are unique
23   TuneSat detections?
24        A    That's what the title of it
25   is.
```

1                          KOHN

2        Q     Are they unique?

3        A     Yes.   That's my understanding

4    of what they are.   I didn't produce

5    these.

6        Q     You didn't --

7        A     No.

8        Q     -- create this document?

9        A     No.

10       Q     So somebody else created it,

11   and told you what it was?

12       A     Well, I was given it by

13   attorneys; and I understand that Karen

14   Rodriguez had prepared it.

15       Q     Okay.

16             And the total number of

17   detections when you add them up are

18   about 21, nearly 22,000, correct?

19   You've got 6,848 and 15,093.

20       A     Fifteen plus six, yeah, about

21   22,000, something like that.

22       Q     I said about 22,000 or close

23   to 22,000.

24             And you multiplied $200

25   against every one of these detections?

Page 371

1                        KOHN

2        A     Yeah.

3        Q     But you don't know if these

4   are unique detections, correct?

5        A     Well, it says unique

6   detections.  And I understood them to

7   be unique detections.  I had previously

8   given a back of the envelope done in my

9   own way, way back in February when I

10  started working on the case and using

11  data that went all the way back to 2013

12  or something like that.  And -- like I

13  said.  So when I saw these numbers I

14  said it's in the realm of -- again, I

15  did back of the envelope and I just

16  took these as what it was.

17       Q     But now they've gone up by

18  some nearly 7,000 from your number?

19       A     Apparently.

20       Q     And you don't know whether

21  they are or not unique detections?

22       A     I'm not the one who generated

23  this.  So I don't know whether they're

24  unique in the way that you and I have

25  been talking about my understanding of

Page 372

```
 1                    KOHN
 2   what unique is.
 3        Q    Do you know how many of these
 4   detections -- I assume you're going to
 5   know the answer -- are Viacom
 6   detections, detections of broadcasts on
 7   Viacom networks?
 8        A    I could do that.
 9        Q    You could pull it out from
10   the list?
11        A    Right.  Like MTV Classic is
12   MTV2.  MTV -- we can probably pull out
13   and add the numbers up.
14        Q    So we can add up what the
15   total number of MTV detections are?
16             MR. MARDEROSIAN:  Well, he
17        said he did not prepare this.
18             MR. ZAKARIN:  I understand.
19             MR. MARDEROSIAN:  And I think
20        that's a question for Karen
21        Rodriguez.
22             MR. ZAKARIN:  Well, the
23        problem is it's attached to his
24        report.
25             MR. MARDEROSIAN:  I think
```

Page 373

KOHN

```
1
2       just to be fair about it, I think
3       he relied on it on a specific
4       narrow topic in his report, Don.
5       And that was the extent of his use
6       of this document.
7            But you can ask whatever you
8       want, but I think these are
9       questions for Karen Rodriguez.
10           MR. ZAKARIN:  Unusually, you
11      know, I ask witnesses about their
12      reports and other witnesses about
13      their reports.  And if he relied
14      upon somebody else to do something
15      and he's basically just, in
16      effect, saying what somebody has
17      told him, I'm entitled to know
18      that.  That's all.
19           MR. MARDEROSIAN:  I get that,
20      absolutely.  But the operative
21      phrase is do something and I'm
22      saying you should ask him what it
23      is that he used it for.
24           MR. ZAKARIN:  I know what he
25      used it for.  It's in his report.
```

Page 374

1                        KOHN

2            Anyway, let's continue on.

3        Q     In terms of -- so we could

4    figure out which are Viacom channels

5    and therefore which are Viacom

6    detections, correct?

7        A     Yes, if we knew what Viacom's

8    channels are.

9        Q     For which you applied $200

10   for each and every one of the

11   detections, correct?

12       A     Well, are you just saying the

13   same thing for each -- yeah, I used the

14   total numbers here and multiplied it by

15   $200.

16       Q     And in terms of these

17   detections, do you know how many are

18   not works that were delivered to Viacom

19   Extreme but are owned by others

20   including the plaintiffs?

21            MR. MARDEROSIAN:  Objection.

22   Vague.

23       Q     You know that the plaintiffs

24   self-published works, right?

25       A     Yes.

Page 375

1              KOHN

2       Q    Do you know how many of these

3    detections are of the plaintiffs'

4    self-published works?

5       A    I think -- I didn't generate

6    this.  So I don't have the underlying

7    data that was used to generate this.  I

8    wouldn't be able to answer any of those

9    questions.

10      Q    You with agree with me though

11   that there's no reason to charge or

12   make a claim against Extreme or Viacom

13   for $200 per each of the plaintiffs'

14   own works?

15      A    No.

16      Q    Okay.

17      A    Absolutely not.

18      Q    So if the plaintiffs'

19   self-published works or works published

20   by third parties are among these

21   detections --

22      A    Right.

23      Q    -- they have --

24           MR. MARDEROSIAN:  Hold on.

25           Let him finish the question

Page 376

```
 1                       KOHN
 2      because I want to object to it
 3      before you agree to it.
 4      Q     -- they have to get backed
 5   out?
 6              MR. MARDEROSIAN:  I'm going
 7      to object.
 8              It's an incomplete
 9      hypothetical, and it doesn't
10      include the fact that there's
11      evidence that Extreme is taking
12      Aron and Robert's own publishing
13      for Lonely Orchard and Brothers
14      Heathen.
15      Q     You can answer my question as
16   opposed to the rhetoric there.
17      A     My understanding is that
18   these were unique detections of
19   music -- musical work, sound recordings
20   that were created by Aron and Rob and
21   delivered under the contract.
22      Q     But in fact you don't know
23   whether these were, in fact, delivered
24   or are self-published?
25              MR. MARDEROSIAN:  I'm just
```

```
                                    Page 377
 1                      KOHN
 2        going to object.
 3              It's an incomplete
 4        hypothetical and vague.
 5        Q    You can answer.
 6              MR. MARDEROSIAN:  And doesn't
 7        include the issue over whether or
 8        not Extreme is taking the
 9        plaintiffs' published --
10        self-published songs.
11        A    And I don't know whether this
12   is an underrepresentation and doesn't
13   include all of their songs that were
14   delivered and used.
15        Q    So you don't know very much
16   at all about this document?
17        A    That's right.
18        Q    Essentially, what you did is
19   you took the number of detections
20   without knowing what they are and
21   multiplied each one by 200?
22        A    And that wasn't the essential
23   part of my report.  The essential part
24   of my report was coming up with the
25   $200 figure.  If this wasn't included,
```

1                       KOHN

2    it wouldn't have mattered because

3    whichever the true number is would be

4    multiplied by $200.  If it was --

5    instead of 21,000, if it was 16,000, if

6    it was 30,000, whatever that number is.

7    And I'm sure enough good minds can get

8    together and figure out using the

9    TuneSat data what the proper number is.

10        Q    We'll come to the 200 in due

11   course.

12             In any event, if I understand

13   you correctly you -- it's your view

14   that the 200 is the right number for --

15   for these -- for all of those

16   detections, that's your opinion?

17             MR. MARDEROSIAN:  Right

18        number for what?

19        Q    The right number for the sync

20   fee for each of these 200 detections

21   that you have opined?

22        A    My report says what it says

23   about the $200 number.  We can turn to

24   it.  I don't want to say anything

25   that's inconsistent and be --

```
                                   Page 389
 1                   KOHN
 2    the NY9 and got $200 for the promo for
 3    it.
 4        Q    Is the $10,000 that you put
 5    in there, is that also in your Exhibit
 6    B?  Is it the same use as Exhibit B?
 7        A    I don't know.
 8        Q    So you could have a
 9    duplication there?
10        A    I might have a duplication.
11        Q    You don't know that?
12        A    Neither do you.  I don't know
13    whether I do.
14        Q    Not my burden.
15             Did you -- by the way on your
16    Exhibit B, did you back out what was
17    actually paid on any of those licenses?
18        A    I was not asked to do that.
19        Q    Okay.
20             So you were just asked to
21    come up with a gross number and put
22    that forward as the damage claim?
23        A    I was asked to come up with
24    the $200 amount.  All right.  I was
25    given the unique numbers.  I did the
```

Page 390

```
                                              KOHN
 1
 2   multiplication.  It was towards the end
 3   of this.  I didn't have the information
 4   to back it out.  And I wasn't provided
 5   to -- but it.  But it could be backed
 6   out by somebody else.
 7        Q    Lots of things could be done,
 8   but it wasn't done.  So this is put
 9   forth -- you're aware that you've put
10   this forth as a damage claim, $200
11   times 20 -- almost 22,000 detections?
12        A    Well, I also said to you that
13   I'm not the one who came up with the
14   22,000 detections.  All right?
15        Q    Is it your testimony --
16        A    Somebody -- you know,
17   somebody else came up with that number
18   and I came up with the $200.  I made a
19   multiplication of the two numbers.  One
20   number I came up with.  Another number
21   somebody else came up with, and that's
22   what I put in here.
23        Q    At the bottom of -- here,
24   based on my calculations, Page 86, Aron
25   and Rob share of these broadcast
```

```
 1                    KOHN
 2   licensing fees for the 15,093 unique
 3   audiovisual works, it's really almost
 4   22,000 --
 5        A    Yeah.
 6        Q    -- in which their music was
 7   suffixed for the period spanning
 8   July 1, 2014 to August 1, 2018 is
 9   $2,194,100.
10             That's put forth as a damage
11   claim.  Are you aware of that?
12        A    I'm not familiar with the
13   term damage claim as litigators use it.
14   So I --
15        Q    Are you aware that that is
16   part of the plaintiffs' claim that they
17   have supposedly been deprived of that
18   money?
19        A    Yes.
20        Q    Okay.
21             And you don't know whether
22   what they were actually paid is or is
23   not backed out of that number?
24             MR. MARDEROSIAN:  It calls
25        for speculation.  This is not his
```

Page 392

```
 1                        KOHN
 2      role.
 3      A     Yeah.  I --
 4      Q     It's in his report.
 5      A     I wasn't asked to back it
 6   out.
 7            MR. MARDEROSIAN:  Your
 8      question on this topic is not in
 9      his report.
10            You're mischaracterizing the
11      evidence.
12            MR. ZAKARIN:  Well, we'll
13      see.
14      Q     And you don't know whether
15   that 2,194,000 duplicates your other
16   number in Exhibit A in any respect, do
17   you?
18            MR. MARDEROSIAN:
19      Mischaracterizes the evidence.
20            Vague.  Incomplete
21      hypothetical.
22      A     So if we backed out -- how
23   many uniques are on Exhibit A?  Can we
24   count them?  Two, four, six, ten, maybe
25   30.
```

```
                                      Page 397
 1                      KOHN
 2    said it's inconsistent with customs and
 3    practices, correct?
 4         A    Yes.
 5         Q    Okay.
 6         A    Not just that but --
 7         Q    You've said the contract and
 8    customs and practices.
 9         A    Right.
10         Q    Let's deal with customs and
11    practices first.
12              In terms of the customs and
13    practices of production music libraries
14    in determining how they allocate
15    blanket licenses, did you contact any
16    production music libraries to find out
17    how they did it?
18         A    Excuse me.  I was distracted.
19         Q    I'm sorry.
20              MR. ZAKARIN:  Why don't we
21         reread the question, please.
22              (Whereupon, the record was
23         read.)
24         A    Not since I was engaged in
25    this case.
```

Page 398

KOHN

```
 1                      KOHN
 2      Q    Did you do it before?
 3      A    I learned it through 35 years
 4   of discussing it with people, at least
 5   the past ten years of discussing it
 6   with people in the industry.
 7      Q    Who did you discuss it with
 8   over the last ten years, can you
 9   identify anybody?
10      A    No, I can't -- no, I can't
11   identify any specific person.
12      Q    And since you were retained,
13   you didn't talk to anybody?
14      A    Well, I'm trying to think --
15   no, since I've been retained, I didn't
16   need to.
17      Q    And you can't identify any of
18   these people in the production music
19   library --
20      A    Well --
21      Q    Let me finish.  It will be
22   clear if I finish.
23      A    You started a question before
24   I finished the last answer.  But answer
25   your -- ask your question.
```

```
 1                      KOHN
 2      Q    You can't identify anybody
 3  that you've spoken with since you were
 4  retained to discuss that issue.  And
 5  I'm asking you, you can't identify any
 6  of the people that you spoke with who
 7  were in the production music library
 8  business in the ten years prior to your
 9  retention; is that right?
10      A    Look, where did I say in
11  these two sentences -- where are the
12  words production music library here?
13  That the first thing we have to do is
14  going from top down not from bottom up.
15      Q    You're talking about customs
16  and practice in the industry, right?
17      A    Yes.
18      Q    What industry are you talking
19  about?
20      A    The entire industry.  The
21  entire record industry.  Let's go back
22  to what I --
23      Q    We're not in the record
24  industry.
25      A    This is just a summary.  This
```

```
1              KOHN
2   is just a summary.  Let's go back to
3   the section of my report where I
4   discuss this.  You will have to help me
5   here.
6              MR. MARDEROSIAN:  Take your
7        time.
8        A    Okay.  I think it's Page 71.
9   Okay?
10       Q    Yes.
11       A    All right.
12             So you're going to ask me a
13  series of questions about who talked I
14  to and since I didn't talk to -- I
15  can't remember who I talked to, it's
16  not fair to me at all.
17             So it really is on Page 76.
18       Q    Okay.
19       A    Where I give a number of
20  examples.  I start with, I believe --
21  and after I discuss the PROs usage if
22  ASCAP or BMI allocated --
23       Q    Where on 76 is this?
24       A    I think I'm going back to 74.
25       Q    Okay.  Now we're on 74.
```

1                    KOHN

2        A    I'm sorry.  I may have

3    misspoke.

4        Q    PRO is like ASCAP and BMI?

5        A    PRO is like ASCAP and BMI.

6    What I'm --

7        Q    I see it.

8        A    -- I'm saying here is it

9    would be unfair and unreasonable for

10   ASCAP or BMI to distribute income based

11   upon the number of songs and their

12   respective repertoire because a vast

13   number of songs in the catalog, which

14   may never be performed, would receive

15   the same share of income as frequently

16   performed songs.

17       Q    Now, we're not talking --

18       A    No, no.

19       Q    You're still talking.  Go

20   ahead.

21       A    I'm still talking.

22       Q    Please, go ahead.

23       A    I'm still talking.  Because

24   we're talking -- because as I said

25   customs and practices in the music

Page 402

                        KOHN

1
2  industry and that applies across the
3  board.
4      Q    The music industry?
5      A    Yeah.  And it includes -- the
6  music industry includes the record
7  companies, PROs, music publishing
8  companies and music production
9  libraries or production music
10 libraries.
11     Q    We're talking about sync
12 licenses now, aren't we, blanket sync
13 licenses?
14     A    No, we're looking at -- we're
15 looking at blanket revenue.
16     Q    No.
17     A    Yes, we are.  Oh, yes, we
18 are.
19     Q    Yes, we are?
20     A    Yes, we are.  We're looking
21 at blanket -- a blanket license is a
22 form of license where you -- one of
23 your experts would like to use the word
24 access.  So you have -- we're going to
25 reduce your transaction costs, you

Page 403

KOHN

1

2    know, read US versus ASCAP and BMI.

3    You know a 1979 Supreme Court case, the

4    reason why they don't violate the

5    antitrust laws, music publishing

6    companies, is because they're reducing

7    the transaction cost of their

8    customers.  That's what a blanket does.

9    A -- it's something that's issued in a

10   blanket form that you can go ahead and

11   use what's here.  All right?  And

12   whenever money is brought in on a

13   blanket basis whether it's from a PRO

14   issuing for performance licenses,

15   whether it's a blanket for

16   synchronization licenses, whether it's

17   from a record company who's got

18   breakage, whether it's from black box

19   money that's overseas from music

20   publishing companies, you always

21   allocate it to the best of your ability

22   on a fair and reasonable basis which is

23   always based upon usage.

24           If you don't base it upon

25   usage you're going to have some songs

Page 404

1          KOHN
2   that have been performed a lot or
3   sync'd a lot or used a lot get the same
4   amount of money as songs who don't get
5   used at all.  That is unfair and
6   unreasonable.  It may be practical
7   because it makes your job easier, but
8   it's unfair and it's unreasonable.
9   That's the music industry.  Everyone
10  does that.  And if you don't do it --
11  if you don't do it, you're being unfair
12  and you're being unreasonable.
13       Q    So -- oh, you're still
14  talking?
15       A    Yeah.
16            So I have those examples in
17  this report on 76.  I say it's a common
18  practice for record companies to
19  allocate blanket income on the basis of
20  the most practical means available.
21  For example, sometimes a record label
22  must pay royalties on what is called
23  breakage income.  That is, they might
24  have received an advance from an
25  organization that does streaming from,

Page 405

KOHN

1
2      let's say, ten years ago, a company --
3      Cue Tracks, it's a company that paid
4      millions of dollars to the record
5      companies, and they may have gone out
6      of business before they even went
7      online.  All right?  So now a record
8      company is at advance of let's say 10
9      or $20 million, and how do they
10     distribute that money to the artist?
11     They have no reports whatsoever.  What
12     they do is they look at other streaming
13     companies, look at the reports that
14     they do have, do an extrapolation and
15     allocate the money based upon usage.
16     They do not allocate the money counting
17     the number of recordings that they have
18     in their catalog and giving everyone
19     the same amount.  Okay?
20              So that's the record
21     industry.  And I say here -- and you
22     were asking who did I talk to.  Well,
23     in that particular instance when I was
24     in my company at Royalty Share I sat in
25     policy discussions at Sony Music, which

Page 406

```
 1                    KOHN
 2   is a sister company to Sony ATV, and
 3   that's how they do it.  The Sony
 4   corporation does it that way.  That's
 5   the way it's supposed to be done.
 6            Now, black box monies is
 7   monies overseas that music publishers
 8   receive that do not come accompanied by
 9   usage reports because it's money that
10   was unallocated to anyone specifically.
11   The music publisher gets it and an
12   honest music publisher will distribute
13   that monies -- its portions to the
14   other publishers, sub-publisher,
15   original publishers or others,
16   copublishers and to songwriters on a
17   fair and reasonable basis.  And that's
18   going to be based upon some projected
19   usage or if they have the report it
20   will be actual usage.  And that's the
21   way it's done.
22            Nobody that I've ever heard
23   of, except in the past day I heard of
24   First Com, your last -- Mr. Katz said
25   that he acquired a company when he was
```

```
 1                        KOHN
 2   at Zamba that did it that way.  I was
 3   surprised to hear that.  A small
 4   production music library did it that
 5   way.
 6            And then you have your own
 7   witness, Adam Taylor, he runs a
 8   production music library; and he does
 9   it the right way.  He basis it on
10   usage -- usage reports.  Now, all of
11   your experts went to great lengths to
12   say that I said in my report that it
13   has to be done on actual usage.  I
14   suspect that that someone may have put
15   in their heads that I said actual
16   usage.  But I didn't say that it had to
17   be done in actual usage, BMI and ASCAP
18   don't do it on actual usage all the
19   time.  They do get numbers based upon
20   electronic usage reports that reflect
21   accurate usage pretty well.
22            But when your experts set up
23   strawman that says that nobody can do
24   it in actual usage, that's simply not
25   what I said in my report.  It's a
```

```
                                    Page 408

 1                      KOHN

 2   strawman.  I said it's based upon

 3   usage.  Adam Taylor agrees it's based

 4   upon usage.  I think anyone who would

 5   do it on the basis of the number of

 6   songs -- if ASCAP did it they'd be out

 7   of business the next day.  If record

 8   companies did it, they'd be sued by

 9   their recording artists.  And if a

10   production music company did it to

11   their songwriters, they would be sued

12   by their -- sued by their songwriters.

13   And that's what this case is about.

14        Q    Okay.  Let me know when

15   you're done.

16        A    I'm done.

17        Q    Okay.

18             You talked about custom and

19   practice, but the custom and practice

20   now you're talking about is the music

21   industry generally and not related to

22   sync licensing by production music

23   libraries; is that right?

24             MR. MARDEROSIAN:  I'm going

25        to object.
```

Page 409

KOHN

Mischaracterizes the

testimony.   Argumentative.

A     I am using it as sync

licenses for a production music

library.  I mentioned Adam Taylor

two -- how many times did I mention him

in the past ten minutes?  He runs a

production music library, has admitted

that his blanket sync licenses, when he

gets the income -- when he gets his

income he also gets usage reports to

find out what songs have been sync'd.

And he uses some message -- some

methodology based upon his usage.  He

wasn't specific in his report, but I

was very happy to hear that he's doing

it in some.  I don't know for sure.  I

haven't seen his calculations, but if

it's based upon usage, it's likely to

be more fair and more reasonable than

basing it upon the number of songs in

the catalog, which virtually nobody

does except your client.

Q     You said virtually nobody

Page 410

1                          KOHN
2   does.  What -- who have you talked to?
3        A    I don't have to talk to
4   everybody in the industry.
5        Q    You don't have to talk to
6   anybody it appears.
7        A    I --
8             MR. MARDEROSIAN:  Folks,
9        you're arguing with each other.
10       Q    You haven't identified a
11  single --
12            COURT REPORTER:  Excuse me.
13       A    I have -- I don't have to --
14       Q    You haven't identified a
15  single production music library that
16  you've contacted, spoke to, or found
17  out how they do it; is that right?
18       A    I sat in a deposition -- I'm
19  sorry -- in a deposition yesterday.  If
20  you don't remember, you can get the
21  transcript and read it.  Right?
22       Q    I remember it well.
23       A    His report says usage.  He
24  was asked specifically whether he
25  thought that was fair.  Now, this is a

```
 1                       KOHN
 2   guy who sat on the board of APM, the
 3   production music library that your
 4   other expert is the CEO of.
 5        Q     Um-hum.
 6        A     He circled the wagon saying
 7   of course it's okay to do this because
 8   I had a company like that myself that
 9   that did it.
10        Q     You didn't answer my
11   question.
12        A     I did answer your question.
13   I just told you -- I just told you a
14   production music library out of the
15   voice of your own experts, two of them,
16   okay, are saying that they -- that's
17   the way they do it.
18        Q     I just want to make sure.  So
19   your testimony about custom and
20   practice is now based upon what Paul
21   Katz testified to yesterday and what
22   Adam Taylor has in his report; is that
23   it?
24        A     That's not what I'm
25   testifying.  It's not what I said.
```

```
 1                    KOHN
 2      Q    I don't know what you're
 3   saying.
 4           MR. MARDEROSIAN:  Hold on.
 5      Stop.
 6           He's answered the question.
 7      You're now arguing with him.  Stop
 8      arguing with him, Don.
 9           Let's go to the next topic.
10      You've got his testimony on the
11      subject.
12           MR. ZAKARIN:  He hasn't
13      identified a single production
14      music --
15           MR. MARDEROSIAN:  Incorrect.
16           You haven't listened to what
17      he said.
18           MR. ZAKARIN:  I was --
19           MR. MARDEROSIAN:  You -- save
20      it for trial, Don.
21           MR. ZAKARIN:  No.
22           MR. MARDEROSIAN:  Save it for
23      trial and let's see --
24           MR. ZAKARIN:  That's not how
25      it goes.
```

```
 1                    KOHN
 2         MR. MARDEROSIAN:  -- if the
 3     jury accepts your argument on
 4     this.
 5         MR. ZAKARIN:  That's not how
 6     it goes, Mick.  My questions get
 7     answered, or else I don't leave
 8     them.
 9         MR. MARDEROSIAN:  His
10     question -- he did answer your
11     question, you're now just arguing
12     it.
13     A    You just don't like the
14  answer to the question.
15     Q    Well, you -- if you gave an
16  answer, I might like it.
17         I asked you --
18         COURT REPORTER:  Excuse me.
19     Gentlemen, please.
20         MR. MARDEROSIAN:  Hold on,
21     Don.  Give her -- give her a
22     moment.
23         COURT REPORTER:  I just need
24     you to speak one at a time,
25     please.
```

1              KOHN

2         MR. ZAKARIN:  We'll try.

3      Q    You've talked about custom

4  and practice and my question was very

5  simple.  What production music

6  libraries have you ascertained allocate

7  blanket license income on any kind of a

8  usage basis?  We know APM does it on a

9  reported usage basis.  What else?  What

10  other production music library

11  allocates it, however they allocate it?

12  Do you have any information?  Any

13  information?

14      A    I suspect that every other

15  one does it except your client today

16  and maybe First Com if it still exists.

17      Q    I didn't ask what you

18  suspect.  I asked what you know, facts.

19      A    I know the customs and

20  practices of the music industry.  I

21  can't tell you over 20 years of being

22  in the industry and discussing with

23  people who know what they're -- I may

24  have discussed it with Adam Taylor, who

25  knows, because we did discuss his

Page 415

KOHN

1

2  business when I met with him five, six

3  years ago, whenever it was.  But I

4  learned this over a period of time.

5  And it is not fair -- my opinion is

6  that it's not fair or reasonable to

7  base it upon the number of songs.

8  Nobody apparently but your client does

9  it.  You have not and your experts have

10  not pointed to anyone who does it that

11  way.

12      Q    You're the one who's talking

13  about custom and practice.

14      A    Yes.

15      Q    I'm not.  So I want to know

16  what the custom and practice is of

17  production music libraries allocating

18  it.  You have a statement --

19      A    Production.

20      Q    -- the basis for the

21  statement -- you've talked about the

22  ASCAP and BMI.  You've talked about

23  record companies.  You've talked about

24  black box.

25          MR. MARDEROSIAN:  He's talked

Page 416

```
 1                    KOHN
 2       about your own experts, Don.
 3       Q    What you haven't talked
 4   about -- we have Adam Taylor who says
 5   that they do it on a -- on a reported
 6   usage basis and that's fine.  And Adam
 7   Taylor says what he says.  And it's in
 8   his report.
 9            I'm asking you what
10   production music libraries do you
11   know -- do you know how other
12   production music libraries allocate
13   blanket license income?
14       A    Yes, they all do it.
15       Q    Who?
16       A    They all do it except
17   Extreme.  APM is one example of it.
18   And over the years --
19       Q    Give me another examples.
20       A    Over the years -- I can't
21   imagine -- my opinion is it's not fair
22   or reasonable.
23       Q    I didn't ask that.  You can
24   have that opinion.
25            MR. MARDEROSIAN:  He told you
```

Page 417

```
 1                       KOHN
 2        Sony Music, Don.  You're leaving
 3        that out.
 4             MR. ZAKARIN:  Sony Music is
 5        not a production music library.
 6             MR. MARDEROSIAN:  He told you
 7        how they handle the publishing in
 8        regard to those uses.
 9             MR. ZAKARIN:  Black Box.  I
10        understand black box.  That's not
11        the question.
12        A    Yes.  The music industry
13   allocates money that's presented on a
14   blanket basis whether it's the leftover
15   advance, whether it's black box money,
16   whether it's income.  There's no one
17   who's going to -- there's no one except
18   maybe one of your witnesses yesterday
19   who suggested that that might even be
20   close to being fair.  It's not.
21             I don't have to talk to every
22   production music library in the world.
23        Q    Do you have to talk to any?
24        A    I don't even know all of the
25   ones that do it on a blanket basis,
```

Page 418

```
1                        KOHN
2    okay.  Has your expert witnesses
3    reported back as to who other -- anyone
4    other than First Com that does it?  You
5    have three -- you have an expert
6    witness who is the CEO of one of the
7    largest production music libraries in
8    the world.
9         Q    Yes.
10        A    Your client is the CEO of a
11   production music library, one of the
12   largest in the world.
13        Q    Yes.
14        A    Have either of them suggested
15   that anyone other than Extreme does it
16   this way?  What do they say?
17        Q    Are you aware of how many
18   production music library --
19        A    I didn't see that.
20        Q    Are you aware of how many
21   production music libraries there are in
22   the United States?
23        A    How many?  The number?
24        Q    Yeah.
25        A    No.  It must be a large
```

Page 419

1                     KOHN
2  number.
3       Q    And with the exception of
4  Adam Taylor's testimony in his report
5  about on a reported usage basis, do you
6  know how any of them -- any of these
7  many numbered production music
8  libraries allocate blanket license
9  income?  Do you know how any of them do
10 it?
11      A    Yes, they do it on a usage
12 basis.
13      Q    And what's the basis for your
14 statement that they do it on a usage
15 bassi?
16      A    Because everybody does it
17 that way in the business except your
18 client.
19      Q    So this is just a conclusion.
20 It's not based upon your knowledge of
21 any facts, right?
22           MR. MARDEROSIAN:  You're
23      arguing with him.  You're arguing
24      with him.  He's answered your
25      question.

Page 420

1                       KOHN
2        Q    Have you done a survey of any
3    production --
4        A    Yeah, I did a survey.
5        Q    Of the production music
6    library?
7             COURT REPORTER:  Excuse me.
8        Gentlemen, please.
9             MR. MARDEROSIAN:  You're just
10       arguing.
11            MR. ZAKARIN:  I just want to
12       know the source.
13       A    I haven't been -- I haven't
14   been asked to do a survey and nor have
15   any of your experts come forth with
16   anybody else.
17       Q    So you haven't done a
18   survey --
19       A    Nor has your client.
20            COURT REPORTER:  Excuse me.
21       I'm going to need to take a break.
22            MR. ZAKARIN:  I know.  I'm
23       sorry.  I'm asking questions, and
24       he's actually answering on top of
25       my questions.

Page 421

1                    KOHN
2        Q    You haven't done a survey,
3    right?  I'm not saying you were asked
4    to --
5        A    I have not done a
6    questionnaires kind of survey.
7        Q    And you haven't done a census
8    or questioned any executives of any
9    production music library about how do
10   they allocate their blanket license
11   income; is that right?  Yes or no?
12       A    In the -- since the start of
13   this case, no, for sure.
14       Q    And you didn't ask them
15   before the start of this case, did you?
16       A    I might have.
17       Q    But you don't recall whether
18   you did?
19       A    I don't recall.
20       Q    Okay.
21       A    How did I come to this
22   knowledge?  I can't remember who I
23   may -- might have talked to in the
24   1990s in researching the book.
25       Q    I understand.

Page 450

1              KOHN
2    BMI and ASCAP to make it a more rapid
3    process, I suppose.
4        Q    Do you have any familiarity
5    with the finances of production music
6    libraries?
7              MR. MARDEROSIAN:  Objection.
8              Vague.  Overbroad.
9        Q    You can answer the question.
10       A    No, I don't have any -- other
11   than the testimony that I've been able
12   to provide and the expertise that I
13   have about customs and practices.  No,
14   I don't have -- when you say finances
15   I'm thinking of balance sheet income
16   statement --
17       Q    Yeah.
18       A    -- cash flow, things like
19   that.
20       Q    Yes.
21       A    No.
22       Q    We're talking the same
23   language.
24       A    Right.  No.  Nor have I been
25   asked to opine on any of that.

```
 1                    KOHN
 2      Q     I understand.
 3            Do you have any understanding
 4  how much a usage apportionment approach
 5  might cost a production music library
 6  to implement?
 7      A     Depends upon the
 8  circumstances.  Apparently APM uses
 9  usage reports; and they seem to find it
10  not burdensome, otherwise why would
11  they do that.
12      Q     You're aware --
13      A     Well, they would do it for
14  obligations for -- contractural
15  obligations perhaps.
16      Q     You're aware from having read
17  Adam Taylor's report that his view of
18  the reported usage method is that a lot
19  of people whose works are used actually
20  don't get paid?
21      A     I don't recall reading that
22  in the report.
23      Q     Well, on the reported usage
24  basis -- do you understand what APM's
25  reported usage basis is?
```

Page 467

1         KOHN

2         MR. MARDEROSIAN:  That's

3    argumentative.  Assumes facts not

4    in evidence and mischaracterizes

5    the evidence.

6         MR. ZAKARIN:  Except that

7    it's true.

8    A    You'll have to --

9         MR. MARDEROSIAN:  It's not

10    true.

11    A    Well, the number is either

12 going to be 16,000 or it's going to be

13 21,000 or something in between.  You

14 know, there's a correct number.

15    Q    How many of them -- of those

16 16,000 are Viacom, if you know?

17    A    I didn't do that filter.

18    Q    Because we didn't add up --

19 and this came from Karen Rodriguez

20 anyway, right?

21    A    Yes.

22    Q    So we'll skip that.

23         You're aware of the BMI --

24 excuse me, ASCAP consent decrees,

25 aren't you?

Page 468

KOHN

1

2      A    Generally.  I haven't read

3   them in years.

4      Q    Sadly, I have much more

5   familiarity I think.

6           But you're aware generally

7   that they preclude publishers and

8   writers from granting ASCAP and BMI

9   exclusive public performance rights,

10  aren't you?

11     A    So what?

12     Q    So what?  I didn't ask you so

13  what.  I asked you whether you're aware

14  of that?

15     A    They -- it doesn't preclude

16  the music publishers from granting it.

17     Q    It actually requires that

18  music publishers can't grant exclusive

19  rights to ASCAP and BMI.  They have to

20  be --

21     A    That's right.  That's right.

22  They have to reserve the right.  It's a

23  non-exclusive basis so they have to

24  reserve the right to issue direct

25  blanket performance licenses.  I saw

Page 469

                                    KOHN

1

2    that in Barry's report.

3         Q    You knew it beforehand,

4    didn't you?

5         A    Yes.

6         Q    And broadcasters are also

7    fully aware of it, aren't they?

8         A    Yes.

9         Q    And you're aware, aren't you,

10   that broadcasters -- a number of

11   broadcasters will demand direct

12   performance licenses?

13        A    Yes, they will.

14        Q    Okay.

15        A    When they can get it.

16        Q    You can say no, but you can

17   also lose the license if you say no;

18   isn't that right?

19        A    That's correct.

20        Q    Okay.

21        A    Sometimes they need to have

22   the music they need to have and --

23        Q    Well, need to have the music

24   they need to have is more frequent with

25   popular music library -- popular music

Page 470

                    KOHN

1
2  publishers rather than production music
3  libraries, wouldn't you agree?
4       A    I wouldn't necessarily put it
5  that way.  But I think the way you've
6  put it is that production music
7  libraries have been more amenable to
8  granting direct public performance
9  licenses than commercial -- what your
10 client called -- other kinds of music
11 publishers, traditional music
12 publishers.
13      Q    Traditional music publishers
14 have evergreens and must-haves as
15 opposed to more generic music?
16      A    Right.  Because -- because
17 production music libraries have this --
18 it's not because the music is any
19 worse.
20      Q    No, nobody is saying quality.
21      A    But they also have the
22 ability to grant the sound recording at
23 the same time, and that gives them
24 their special advantage.
25      Q    But they typically don't have

```
                                      Page 471
 1                   KOHN
 2    must-have works or evergreen works.
 3    They have genres that are used by
 4    broadcasters.
 5         A     Sure.
 6         Q     And popular music is  just --
 7    costs much more and you have much more,
 8    if you excuse, me F-U power when you
 9    have popular music?
10         A     Sure.
11         Q     I didn't think that it was
12    controversial.
13         A     I don't think so either.  But
14    you can't -- you can't jump to the
15    conclusion just because the consent
16    decrees say that publishers can issue
17    direct licenses, that a publisher will
18    issue a direct license and then not
19    allocate the money coming back
20    properly.
21         Q     But I'm not dealing with
22    allocation.  I'm only dealing with,
23    right now --
24         A     But the way, one of your
25    experts had used -- I think two of your
```

```
 1                   KOHN
 2   experts had quoted a consent decree in
 3   connection with their argue.  That it
 4   was okay not to use a usage basis in
 5   their allocation.  Yes, they did.  And
 6   I thought that was -- that was
 7   incorrect.
 8        Q    I don't think that they say
 9   that, but they say what they say.  So
10   we don't have to debate it between you
11   and I.  I think the simple point that
12   we're just trying to make is that the
13   consent decrees make it impossible for
14   ASCAP and BMI at least to have
15   exclusive licensing rights and
16   performance rights.  They can't have it
17   exclusively.
18        A    Yes.
19        Q    And broadcasters know that
20   and --
21        A    We've already been through
22   this, right?
23        Q    So we agree.
24             It's not your contention, is
25   it, I just want to make sure, that if a
```

```
 1                     KOHN
 2  broadcaster, CNN, I think there are a
 3  couple of others, came to Extreme and
 4  said we want to license, we want a
 5  direct performance license.  It's not
 6  your contention that Extreme should
 7  have rejected that and potentially lost
 8  the license, is it?
 9             MR. MARDEROSIAN:  Objection.
10             Incomplete hypothetical.
11             Calls for speculation.
12        Q    Let me rephrase it.  Let me
13  rephrase it.
14        A    Okay.
15        Q    It's not your contention, is
16  it, that if a broadcaster, whether it
17  was CNN or another broadcaster said
18  we're willing to enter into a blanket
19  license with you but only if you grant
20  us also a direct performance right,
21  that Extreme should have simply said
22  no, we won't do it?
23        A    If Extreme is not prepared to
24  do the work necessary to comply with
25  its contracts with songwriters to
```

```
 1                     KOHN
 2  allocate the income on the blanket
 3  basis on a usage basis, then it should
 4  reject it.
 5       Q    Okay.  I understand your view
 6  on how a blanket should be allocated.
 7  So we may disagree, but that's your
 8  condition that they can do it but only
 9  if they allocate on a usage basis; is
10  that your position?
11       A    Yes.
12       Q    Okay.
13            And what about on a -- I call
14  it a needle drop.  You call it what, a
15  --
16       A    I think a needle --
17       Q    -- either a source or a
18  direct license?
19       A    I was saying that either
20  there's a -- yeah, there's either a
21  blanket agreement or there's discrete
22  agreements.  We'll call it --
23       Q    I think discrete and source
24  are used, but I think in the industry
25  they primarily call it a needle drop.
```

Page 475

```
 1                    KOHN
 2           Be that as it may, if a
 3    broadcaster comes, and it could be CNN,
 4    it could be Hearst, it could be
 5    anybody, and says I'll license X, Y and
 6    Z works from you but you've got to
 7    grant me the public performance grant,
 8    as well.  It's not your contention that
 9    they should have, meaning Extreme
10    should have rejected that demand?
11        A    Sorry.  You're going to have
12    to repeat the question because I didn't
13    follow it.
14        Q    I'm talking about a needle
15    drop and discreet license.
16        A    Right.
17        Q    For individual works.
18        A    Right.
19        Q    A broadcaster comes and says
20    I want to license X, Y and Z songs for
21    sync usage.
22        A    Let's say three -- you said
23    three songs.
24        Q    It could be ten songs.  It
25    doesn't matter.
```

Page 476

1                         KOHN

2        A     Okay.

3        Q     I want to license these ten

4    songs, and I want to grant the public

5    performance rights along with that

6    grant.  Okay?  It's not your

7    contention, is it, that Extreme should

8    have or was obligated to reject the

9    license request?

10       A     It has an obligation to each

11   of the songwriters, as we've discussed,

12   to allocate the income if it's done on

13   a blanket basis.

14       Q     We're not talking about a

15   blanket.  We're talking about a

16   discreet --

17       A     So let's talk about one song.

18   Don't say three songs.  Say one song.

19       Q     Well, each one gets its own

20   value in the license, in other words

21   I'll license it for 300, this one for

22   400, this one -- whatever I get.

23       A     Okay.

24             So it's basically -- it's

25   four or five discreet licenses and one

Page 477

1                          KOHN
2    agreement that covers all five sync
3    licenses?
4         Q    There are plenty of those.
5    You've seen that, haven't you?
6         A    And a public performance
7    license goes along with each of them.
8    Sure, it's done -- theatrical licenses
9    were done in precisely that way.
10        Q    But for television that's
11   what a broadcaster demands and the
12   choice is you either do it or -- a
13   broadcaster does it as well and they
14   come to you with your choices, you
15   either grant the license or test
16   whether they'll go someplace else?
17        A    Fair enough, yes.
18        Q    You're not suggesting that
19   Extreme was obligated to reject any
20   direct license demands by a
21   broadcaster?
22        A    Well, if you're going to --
23             MR. MARDEROSIAN:  I'm just
24        going to object again.
25             It's an incomplete

Page 478

```
 1                    KOHN
 2      hypothetical and vague.
 3      A    I'm not going to get -- so,
 4  you know, you'll take my answer and
 5  take it out of context.  Because we
 6  just had a colloquy here among several
 7  things.
 8           So to state the complete
 9  hypothetical, and that is, a
10  broadcaster goes to a copyright owner
11  and wants to have a sync license
12  coupled with a direct public
13  performance license for a particular
14  song and recording with that song,
15  right?
16      Q    Comes to the production music
17  library, yes.
18      A    Right.  And let's say there's
19  one or two songwriters who on the back
20  end will be allocated their, let's say
21  it's 50 percent of the license fee.
22      Q    Um-hum.
23      A    I don't see any issue on the
24  allocation side.  We know what the
25  usage is.  It's going to be -- the
```

```
                                    Page 479
 1                    KOHN
 2   contract is going to say you're allowed
 3   to use it in one episode or ten
 4   episodes, or you can use it in as many
 5   episodes as you want during the year,
 6   you could do whatever basis it is.
 7        Q    It's not a blanket.  It's not
 8   a blanket.
 9        A    Right.  It's a discreet
10   license.
11        Q    I agree.
12        A    Of course they have -- the
13   copyright owner has the right to do
14   that.
15        Q    Okay.  I just wanted to make
16   sure.
17             Turn again, if you would --
18   first of all, turn to Page 14 of your
19   opinion again, if you would.
20             This is the second to last
21   bullet point on 14.  We're referring
22   really to your Exhibit A again, okay?
23   And it says with respect to a fair and
24   reasonable market value for the body of
25   the sync licenses as negotiated by
```

```
                                    Page 522
 1                 KOHN
 2  speaking it will go slower.
 3          MR. MARDEROSIAN:  If you want
 4      to keep asking the types of
 5      questions you're asking, it's
 6      going to go real slow.
 7      Q    Okay.  That's fine.  Middle
 8  paragraph of Page 44.  As Mr. Emanuel
 9  testified, the AETN prefix was used as
10  a means to split Extreme's publisher
11  share of that income with the A&E
12  network.  This has no benefit to the
13  songwriters.  Indeed, it has the
14  potential to harm it.  The potential
15  confusion could cause performance
16  royalties to be misdirected as
17  additional registrations for the same
18  songs could spawn unanticipated errors.
19          Let's work through that
20  statement, Mr. Kohn.  You're aware,
21  aren't you, that A&E has a blanket
22  license with BMI?
23      A    Yes, we saw that earlier, I
24  think.
25      Q    When I showed you TNN but
```

```
 1                        KOHN
 2   within that Exhibit I believe is A&E as
 3   well?
 4        A     Right.
 5        Q     And that was at Allison
 6   Smith's deposition, right?
 7        A     Yes.
 8        Q     Okay.
 9              And you understand, don't
10   you, that under that blanket license
11   the licensees pays a share of its
12   revenues to the PROs regardless of how
13   much or how little it uses works?
14              MR. MARDEROSIAN:  Objection.
15              Incomplete hypothetical.
16        Vague and ambiguous.
17        Q     You could answer.
18        A     That AETN, as the licensee of
19   BMI, right -- is that what you're
20   talking about?
21        Q     It's actually A&E is the
22   licensee of BMI.
23        A     Okay.  That's right.
24        Q     Pays a blanket license fee?
25        A     Yes.
```

```
 1                    KOHN
 2       Q    And it's based on a
 3  percentage of its revenue, not based
 4  upon its usage of works?
 5       A    That's correct.
 6       Q    Now, if the licensee also
 7  receives back some performance income
 8  for the works that it uses, that
 9  reduces the effective cost of its
10  blanket license, doesn't it?
11       A    If the licensee --
12            MR. MARDEROSIAN:  I'm just
13       going to object.  It's an
14       incomplete hypothetical.  Vague
15       and overbroad.
16       A    So repeat the question.
17       Q    Sure.
18            If the licensee -- we'll deal
19  with A&E.
20       A    That's the broadcasting --
21       Q    A&E is the blanket license.
22  If it gets paid back some performance
23  income for the works that it uses,
24  because it has a share of the
25  publisher's share of performance
```

```
 1                        KOHN
 2    income, that reduces the effective cost
 3    of its blanket license, doesn't it?
 4            MR. MARDEROSIAN:  That calls
 5         for speculation and incomplete
 6         hypothetical.
 7         A    It doesn't reduce the cost of
 8    its blanket license.  It reduces the
 9    cost of its music because it's now
10    getting income.
11         Q    It's getting income that it
12    can offset against the fees that it has
13    to pay to BMI?
14            MR. MARDEROSIAN:  I'm just
15         going to object.  It calls for
16         speculation.
17         A    It can use to offset it,
18    yeah; but it doesn't reduce the cost of
19    the blanket license.
20         Q    Right.  The blanket
21    license -- if it gets -- if it gets --
22    if it pays $10 on its blanket license
23    and gets $5 back as its publisher share
24    of performance income, effectively the
25    ad cost of its blanket is $5?
```

```
 1                         KOHN
 2              MR. MARDEROSIAN:  Calls for
 3         speculation.  Incomplete
 4         hypothetical.
 5         A     It's going to find a new
 6    source of income.  And if you wish to
 7    say that it offsets, it gets a new
 8    source of income from music, then you
 9    wish to say that it offsets its cost of
10    music, sure.  It offsets its cost of
11    electricity.
12         Q     Okay.
13         A     Fine.
14         Q     And you'd agree, wouldn't
15    you, logically that A&E has an
16    incentive to use the works in its
17    programs that generate income for it?
18              MR. MARDEROSIAN:  Calls for
19         speculation.  Incomplete
20         hypothetical.
21         Q     You could answer the
22    question.
23         A     The A&E network is not in
24    business of being a music license.
25    It's not in the business of generating
```

1                          KOHN
2    money from music.  Somebody found a
3    means by which it could reduce its
4    music costs.  Right?
5         Q    Somebody found a means to --
6         A    Somebody found a means of
7    reducing its music costs by doing a
8    deal using its leverage, right?  And
9    says, okay, if you give me half of your
10   publisher's share I'll go ahead and get
11   that license and use some of your stuff
12   as opposed to -- some of your music and
13   somebody else's music.
14        Q    Correct.
15        A    That's the way to put it.
16   It's just simply a logical --
17        Q    I agree.  It has incentive
18   because it's going to make some money
19   as opposed to just spending money.
20             It's incentivized to use the
21   works on which it makes money, right?
22        A    There's --
23             MR. MARDEROSIAN:  Objection.
24             Calls for speculation.
25        Incomplete hypothetical.

1                       KOHN

2       A     If all things being equal,

3   but a lot of music use, as you know, is

4   based upon creative decisions that

5   people make.  The A&E network can try

6   to let its producers know that this

7   music will help A&E, but the producer

8   might say screw that, I'd rather use

9   somebody else's music because of

10  creative reasons.  So you -- you can't

11  just simply --

12      Q     I didn't say that it's a

13  guarantee that it will use it.  I said

14  it's incentivized to use music on which

15  it will make money, right?

16              MR. MARDEROSIAN:  Calls for

17      speculation.

18              Incomplete hypothetical.

19      A     All right.  So go ahead.

20      Q     So -- and Extreme was giving

21  up part of its publisher's share of

22  performance income in order to

23  hopefully get A&E to use those works;

24  isn't that right?

25              MR. MARDEROSIAN:  Calls for

Page 529

```
 1                    KOHN
 2      speculation.   Incomplete
 3      hypothetical.
 4            Creates a further motive.
 5      Q    There's a question
 6  outstanding.
 7            You agree with me, don't you?
 8      A    I don't disagree with you.
 9      Q    I didn't think so.
10            So, in any event, that is a
11  potential benefit to the writers, isn't
12  it, that their works get used because
13  Extreme is, in effect, subsidizing or
14  hopefully in effect sharing by sharing
15  its performance income to subsidize the
16  possible use of their works?
17            MR. MARDEROSIAN:  I'm going
18      to object.
19            It assumes a fact not in
20      evidence if they were actually
21      being paid for those uses.  And
22      secondly it's an complete
23      hypothetical.
24      A    Okay.
25            I -- but I can see that now.
```

Page 530

KOHN

1
2      I mean, what I was trying to do is
3      contrast what the CEO is saying with
4      his own COO.  Because the COO
5      originally explained that the AETN
6      reference is actually an additional
7      means of linking the songs to the
8      authors for purpose of paying public
9      performance income.
10             Now, I may have read that as
11     saying paying performance -- for public
12     performance income to the songwriters,
13     which I thought was simply nonsense.
14     And then I saw the CEO disagree with
15     that.  Because he was explaining it as
16     a means to split Extreme's publisher
17     share with somebody else and attract to
18     account -- to account and track the use
19     of it.
20        Q    But you see now what we just
21     walked through.  There is, in fact, a
22     benefit to the writers?
23        A    Yes.
24             MR. MARDEROSIAN:  Hold on,
25        please.

```
 1                      KOHN
 2   I've seen sheets -- cue sheets reflect
 3   inaccurate information.  And through a
 4   comparison -- I don't know whether I'm
 5   talking about Viacom.  I have to think
 6   about that again.  But it doesn't sound
 7   like I'm just limiting this to Viacom.
 8        Q    Let's not limit it to Viacom.
 9        A    Okay.
10        Q    So let's take a step back.
11             You compared the number of
12   TuneSat detections to the number of cue
13   sheets.  That's what is reflected here,
14   right?
15        A    Yes.  It was my understanding
16   there was a couple of thousand cue
17   sheets and there were 16,000
18   detections.  And that's the rough look
19   that I was looking at.
20        Q    Okay.
21        A    If those numbers -- they're
22   not accurate numbers because I didn't
23   count every single one.  I had a
24   better -- I had real number with
25   TuneSat and I -- I don't know where I
```

Page 652

```
 1                      KOHN
 2   it was 16,000.
 3        Q    It was based on the raw
 4   TuneSat data, yeah?
 5        A    Yes.
 6        Q    And we talked about this
 7   earlier, but it's your understanding
 8   that there's only one cue sheet for any
 9   particular audiovisual program?
10        A    Correct.
11        Q    Regardless of the number of
12   the broadcasts, right?
13        A    That's correct.
14        Q    So presumably you took the
15   TuneSat data and filtered out every
16   redundant instance of any particular
17   audiovisual program; is that right?
18             MR. MARDEROSIAN:  By
19        redundant you mean rebroadcasts?
20             MR. HWANG:  Correct.
21        A    My intention was, yes, to
22   filter out any redundant rebroadcasts.
23   The caveat that I mentioned earlier was
24   that I knew it was there, but I didn't
25   know how to filter out if a song that
```

Page 653

                    KOHN

1       appeared in a TV program that was

2       broadcast on -- let's say MTV in the

3       United States was broadcast on MTV

4       Germany.  That would have been the same

5       sync.  I did not filter out the Germany

6       thing.  I didn't know how to do that.

7           Q    Well --

8               MR. MARDEROSIAN:  There might

9           have been a German cue sheet as

10          well for that society.

11          A    Yeah, and I don't know.  I

12      don't know.

13          Q    It's my understanding that

14      your Exhibit B is from Karen Rodriguez,

15      correct?

16          A    Yes.

17          Q    And that's the number of

18      unique detections she determined exist?

19          A    Yes.  I understand it was

20      from her.

21          Q    And this is further evidence

22      of this conclusion that there weren't a

23      sufficient number of cue sheets filed

24      because the number of unique detections

```
                                        Page 699

 1                    KOHN
 2    the first one.
 3         Q    Okay.
 4         A    And there was a song that's
 5    in there, you know, that is the Rob and
 6    Aron song -- an Aron and Rob song back
 7    there and The Young Heathens.  It's
 8    there.  I missed it.
 9              MR. HWANG:  Mark this as
10         Exhibit 10.
11              (Printout from IMDB.com of
12         all 20 episodes from the two
13         seasons of the show Ain't That
14         America, was marked K Exhibit 10,
15         for identification, as of this
16         date.)
17              (Cue sheets corresponding to
18         K Exhibit 10, was marked K Exhibit
19         11, for identification, as of this
20         date.)
21              MR. HWANG:  Exhibits K10 and
22         K11.
23         Q    Mr. Kohn, the reporter has
24    handed you two separate exhibits,
25    Exhibits 10 and 11.
```

Page 700

1                          KOHN

2              Exhibit 10 is a printout from

3      IMDB.com of all 20 episodes from the

4      two seasons of the show Ain't That

5      America.  And there are eight episodes

6      in Season 1 and there are 12 episodes

7      in Season 2.  Eleven is the 20 cue

8      sheets corresponding to each of those

9      episodes.

10             And you can take a look

11     through and confirm that for me.

12        A     I accept your representation

13     that these are what you just described.

14        Q     Okay.

15        A     Without going through every

16     one of them.

17        Q     So your statement that Viacom

18     has not produced a commensurate number

19     of cue sheets for the episodes aired

20     with respect to the show Ain't That

21     America is also incorrect, right?

22        A     Apparently these are two

23     examples.  I was given two examples and

24     apparently -- if your representation is

25     correct that these represent every

```
                                    Page 701

 1                  KOHN
 2  single episode then that would be an
 3  incorrect statement.
 4      Q    Okay.
 5           Who gave these facts to you?
 6      A    I asked for two examples of
 7  missing cue sheets that would be
 8  familiar to people who are -- you know,
 9  there's a lot of songs -- a lot of TV
10  shows you can pick.  I'm familiar with
11  Jersey Shore.  I'm familiar with Ain't
12  That America.  I recognize those.  And
13  they said these are two and they
14  suggested that those are the two
15  examples where cue sheets were missing.
16      Q    They being -- they being the
17  plaintiffs?
18      A    Well, Mick, yes.
19      Q    And these are the only two
20  examples within this category under
21  Subsection B of Viacom's purported
22  failure to submit cue sheets to BMI,
23  correct?
24      A    I'm sorry, the only what?
25      Q    The two examples that you
```

Page 702

```
                           KOHN
 1
 2   identity of instances where Viacom
 3   failed to submit a sufficient number of
 4   cue sheets to BMI or Jersey Shore and
 5   Ain't That America, right, in your
 6   entire report?
 7        A    I think those are the two
 8   examples that I provided and they may
 9   be the only ones; but, yes.
10        Q    And they're both incorrect,
11   right?
12        A    Looks like it.
13        Q    Do you know if the
14   Marderosians received their writer
15   share of public performance royalties
16   with respect to each of the 15 episodes
17   of Jersey Shore identified in your
18   Footnote 13?
19        A    Well, I have all of the
20   statements and if I went back and
21   looked I would be able to tell you.
22        Q    Did you look?
23        A    I was focused more on the
24   detections on TuneSat, so I don't
25   remember looking at the BMI statements.
```

```
1                    KOHN
2  Or did I?  I don't remember right now.
3  I think I focused on the TuneSat
4  detections, that there were lots --
5  they were missing cue sheets and there
6  were lots of performances.  But I may
7  have missed going to the BMI statements
8  to check.  They're very detailed and,
9  as you know, looking for these are like
10 a needle in a haystack.  With
11 everything else that I was doing I
12 wasn't going to go into that level of
13 detail on this.
14      Q    So you didn't look at the BMI
15 statements to confirm that -- whether
16 or not --
17      A    No.
18      Q    Hold on.
19           Whether or not the
20 Marderosians received the writer share
21 of public performance royalties with
22 respect to each of the 15 episodes
23 identified for Jersey Shore in your
24 Footnote 13, correct?
25      A    Yes.  I don't remember doing
```

Page 704

1                         KOHN

2    that.

3         Q    With respect to Ain't That

4    America, is it the same, you didn't go

5    through the BMI statements for Robert

6    and Aron Marderosian to confirm whether

7    or not they received any public

8    performance income with respect to the

9    20 episodes of that show?

10        A    I didn't because I was

11   operating under the assumption.  I

12   didn't see the cue sheets.  I saw the

13   detections.  I didn't go look at BMI

14   and I should have.

15        Q    And if, in fact, the

16   Marderosians received their writer

17   share of public performance royalties

18   with respect to each of these 20

19   episodes of Ain't That America and the

20   15 episodes you identified for Jersey

21   Shore, that would necessarily mean that

22   Viacom had submitted cue sheets for

23   each of those episodes to BMI, right?

24        A    If, in fact, they got

25   performance royalties in their

Page 705

```
 1                      KOHN
 2    statements on these shows -- I don't
 3    know whether they have or not because I
 4    haven't looked at the statements.  They
 5    might not have.  I don't really know.
 6              You represent to me that
 7    you've looked at the statements and you
 8    found monies paid to them for --
 9    throughout this entire period.
10       Q    I haven't represented that to
11    you, no.
12              MR. MARDEROSIAN:  He said --
13       I don't remember him saying that.
14       A    I'm asking him if he has,
15    so -- but I haven't seen it, so I can't
16    tell you that they have been paid
17    because I don't remember looking at the
18    BMI statements for that purpose.  I
19    looked at them for other purposes but I
20    don't recall doing that.
21              I kind of may have jumped to
22    the conclusion that since I couldn't
23    find what you just showed me out of
24    thousands of BMI statements that were
25    clogging up my hard disk, that there
```

```
 1                    KOHN
 2          MR. ZAKARIN:  Exhibit 11
 3      should have been marked as Exhibit
 4      11.
 5          Well, Jersey Shore is K9.
 6          MR. HWANG:  You can stop
 7      testifying.
 8          MR. MARDEROSIAN:  Let me get
 9      the exhibit together, nine now.
10      A    It's possible that a
11  search -- I have to go look at the
12  documents to see whether I searched.  I
13  could have searched for Bayhem and it
14  didn't show up.  Maybe that's why it
15  didn't come up.
16          MR. MARDEROSIAN:  Okay.
17          This is -- this is nine here.
18      A    If I did a search for Bayhem
19  it wouldn't have come up if it only
20  says Extreme.  So maybe that's why I
21  thought they were missing.
22      Q    But regardless we've
23  established that the statements that a
24  sufficient number of cue sheets for
25  these episodes were not submitted to
```

```
 1                    KOHN
 2   BMI is incorrect, correct?
 3        A     That -- that --
 4        Q     It's incorrect, right?  That
 5   statement is incorrect?
 6              MR. MARDEROSIAN:  I'm going
 7        to object.  That's argumentative.
 8        A     Well, what I'm saying is that
 9   there are --
10              MR. MARDEROSIAN:  It lacks
11        foundation.
12        A     It appears to me that there
13   are cue sheets for those songs.
14        Q     Okay.
15        A     And what I'm saying is
16   that -- in my own defense that I
17   probably did a search on Bayhem looking
18   for Bayhem.  And the -- a lot of these
19   things -- some of them said Bayhem but
20   a lot of them said Extreme.  And I -- I
21   didn't think that the publisher on
22   these would be Extreme, I thought it
23   would be Bayhem.
24        Q     But with respect to those
25   songs you saw that --
```

1                    KOHN

2      A    You don't have to say it

3  again.

4      Q    -- that the Marderosians were

5  properly attributed as to composers,

6  right?

7      A    Yes.  Correct.

8      Q    Other than Jersey Shore and

9  Ain't That America, what examples of

10  Viacom shows are you aware of in which

11  Viacom has failed to submit the proper

12  number of cue sheets to BMI?

13      A    I can't give you specific

14  other ones that I know of.  I don't

15  remember any now.

16      Q    Okay.

17           So the answer is you're not

18  aware of any other than Jersey Shore

19  and Ain't That America?

20      A    Right now.  I don't think I

21  have any other examples.  I was looking

22  for two examples and these were the

23  only two.  I don't.

24      Q    At the time you submitted

25  this report you weren't aware of any

```
 1                        KOHN
 2   other examples other than Jersey Shore
 3   and Ain't That America in which Viacom
 4   had supposedly failed to submit a
 5   proper number of cue sheets, right?
 6        A    Right.
 7        Q    And sitting here today you
 8   are not aware of any other shows other
 9   than Jersey Shore and -- withdraw that.
10             Sitting here today you're not
11   aware of any Viacom shows in which
12   Viacom didn't submit a proper number of
13   cue sheets to BMI; is that an accurate
14   statement?
15        A    Yes.
16             MR. MARDEROSIAN:  I'm going
17        to object.  It's vague.
18        A    I can't parse it down.  No.
19   The answer is no, I am not aware of any
20   sitting here today.
21        Q    So the session starting on
22   Page 51 says, Viacom's failure to file
23   cue sheets.  It goes on for three pages
24   to Page 53.
25             You're not aware of any basis
```

Page 746

                         KOHN

1    upon who's manipulating the data and

2    for what purpose.

3         Q    Let me ask you this question:

4    Viewed in isolation, would these four

5    cue sheets to you be an indication of

6    bad faith on the part of Viacom in its

7    submission of cue sheets to BMI?

8              MR. MARDEROSIAN:  That's the

9         same question.  Asked and

10        answered.

11             I'm going to object.  It

12        calls for a legal opinion and

13        conclusion.

14        A    I've answered that question.

15        Q    No, you answered a very

16   different question that you asked

17   yourself.

18             I'm asking you this narrow

19   question.  Viewed in isolation, would

20   the submission of these four cue

21   sheets, out of the hundreds that Viacom

22   submitted to BMI, be an indicator to

23   you in your expert opinion of Viacom's

24   bad faith in its submission of cue

Page 747

1                          KOHN

2    sheets to BMI?

3              MR. MARDEROSIAN:  Object.

4              It calls for a legal opinion

5         and conclusion.

6         A    Again, if you wanted to set

7    up a hypothetical where a composer's

8    name is incorrect on a cue sheet out of

9    thousands of cue sheets, and that's the

10   only thing -- let's say it's Warner

11   Brothers Pictures, out of thousands of

12   cue sheets they submitted to BMI -- or

13   Warners Brother's Television, out of

14   thousands of cue sheets they submitted

15   to BMI and they had one error that they

16   forgot to put a composer's name in or

17   they either themselves had changed the

18   name of the composer to something like

19   Mix Tape or used somebody else's

20   metadata, in total isolation, in that

21   hypothetical, you could say it sounded

22   like something that would not

23   necessarily bring about a accusation of

24   bad faith.

25        Q    Okay.

Page 748

```
 1                    KOHN
 2      A    That's a hypothetical that
 3  you can ask.  I'm not going to be
 4  taking -- using Viacom -- using what
 5  you were trying to do in the context of
 6  everything else that's going on here.
 7      Q    I'm going to ask you -- I'm
 8  going to ask you one more time.  Okay?
 9           These four cue sheets viewed
10  in isolation out of the hundreds of cue
11  sheets that Viacom submitted to BMI
12  listing one or more of the songs at
13  issue in this case, would you take
14  that -- do you take that as an
15  indicator of Viacom's bad faith in its
16  cue sheet submission practices?
17           MR. MARDEROSIAN:  I'm going
18       to object.  It calls for a legal
19       opinion and conclusion.
20      Q    This is the last time I'm
21  going to ask this question and if you
22  refuse to answer it will be noted.
23      A    I've already answered the
24  question.
25      Q    No, you gave me a totally
```

Page 751

1

2   STATE OF _____ )

3                                     )   :ss

4   COUNTY OF _____)

5

6

7            I, ROBERT H. KOHN, the witness

8   herein, having read the foregoing

9   testimony of the pages of this deposition,

10  do hereby certify it to be a true and

11  correct transcript, subject to the

12  corrections, if any, shown on the attached

13  page.

14

15                    _____

16                         ROBERT H. KOHN

17

18

19

20  Sworn and subscribed to before me,

21  this _____ day of _____, 2018.

22

23  _____

24         Notary Public

25

Page 752

1

2              C E R T I F I C A T I O N

3

     STATE OF NEW YORK  )

4                       ) ss.:

     COUNTY OF NEW YORK )

5

6              I, JUDITH CASTORE, Shorthand Reporter

7         and Notary Public within and for the State

8         of New York, do hereby certify:

9              That ROBERT H. KOHN, the witness

10        whose deposition is hereinbefore set

11        forth, was duly sworn by me and that this

12        transcript of such examination is a true

13        record of the testimony given by such

14        witness.

15             I further certify that I am not

16        related to any of the parties to this

17        action by blood or marriage and that I am

18        in no way interested in the outcome of

19        this matter.

20             IN WITNESS WHEREOF, I have hereunto

21        set my hand this 8th day of November,

22        2018.

23                        *Judith Castore*

24                  JUDITH CASTORE

25

# Kohn Deposition Volume II

1

2    UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------------X

4    TWELVE SIXTY LLC, ARON MARDEROSIAN,
     and ROBERT MARDEROSIAN,
5
                    Plaintiffs,
6
            vs.                    Civil Action No.
7                                  1:17-CV-01479-PAC

8    EXTREME MUSIC LIBRARY LIMITED, a
     division of Sony/ATV Music Publishing;
9    EXTREME MUSIC LIMITED; VIACOM
     INTERNATIONAL INC., NEW CREATIVE
10   MIX INC., HYPE PRODUCTION MUSIC,

11                  Defendants.

12   ------------------------------------X

13

14

15                    VOLUME II

16          CONTINUED DEPOSITION OF

17                ROBERT H. KOHN

18            New York, New York

19         Friday, November 2, 2018

20

21

22

23

24   Reported by:
     JOAN WARNOCK
25   JOB NO. J3015335A



1

2

3                    November 2, 2018

4                    9:10 a.m.

5

6        VOLUME II - Continued deposition of

7   ROBERT H. KOHN, held at the offices of

8   Pryor Cashman LLP, 7 Times Square,

9   New York, New York, pursuant to Notice,

10  before Joan Warnock, a Notary Public of

11  the State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1
 2    A P P E A R A N C E S:
 3
 4         MARDEROSIAN & COHEN,
 5         A Professional Corporation
 6         Attorneys for Plaintiffs
 7              1260 Fulton Street
 8              Fresno, California  93721
 9         BY:   MICHAEL G. MARDEROSIAN, ESQ.
10               HEATHER S. COHEN, ESQ.
11
12         PRYOR CASHMAN LLP
13         Attorneys for Defendants Extreme Music
14         Library Limited and Extreme Music Limited
15              7 Times Square
16              New York, New York  10036
17         BY:   DONALD S. ZAKARIN, ESQ.
18               ROSS M. BAGLEY, ESQ.
19               YEVGENIA S. KLEINER, ESQ.
20
21
22
23
24
25
```



```
 1
 2    A P P E A R A N C E S:   (Cont'd.)
 3
 4        LOEB & LOEB LLP
 5        Attorneys for Defendants Viacom
 6        International Inc., New Creative
 7        Mix Inc., and Hype Production Music
 8             345 Park Avenue
 9             New York, New York  10154
10        BY:   WOOK J. HWANG, ESQ.
11              ERIN SMITH DENNIS, ESQ.
12
13
14    ALSO PRESENT:
15        DAVID J. PRZYGODA, SONY CORPORATION OF
16    AMERICA
17        BARRY MASSARSKY
18
19
20
21
22
23
24
25
```



1              R. Kohn

2    entitled to.  So the statement that you're

3    making that Viacom doesn't owe any money,

4    doesn't owe anything that would generate

5    gross receipts under the 2011 agreement,

6    suggests to me that you think you have a

7    direct performance license.

8        Q.    Let me turn your attention to

9    Page 84 of the report.  Page 84 of the

10   report.

11       A.    Go ahead.

12       Q.    You state that Viacom received,

13   quote, a direct public performance license

14   for that music in circumvention of BMI's

15   collection and distribution of writer's share

16   performance fees to Aron and Robert's music,

17   a clear violation of the benefit of their

18   bargain with Viacom.  Do you see that?

19       A.    That was my conclusion.  That is my

20   opinion based upon what I said earlier just a

21   few moments ago, and that is reflected in

22   this report.

23       Q.    How did Viacom circumvent BMI's

24   collection and distribution of writer's share

25   performance fees to Robert and Aron?



1                          R. Kohn

2          A.    By basically granting itself a

3    direct public performance license.

4          Q.    And thereby not feeling obligated

5    or not submitting cue sheets to BMI?

6          A.    It doesn't matter.  We don't even

7    have to get to cue sheets.  If Viacom thinks

8    it's granted itself a direct public

9    performance license, then it has no

10   obligation to BMI to submit cue sheets on any

11   of that.

12         Q.    And yesterday we established that

13   you can't identify a single example in which

14   Viacom didn't submit a cue sheet for a

15   program that aired on a Viacom network;

16   correct?

17              MR. MARDEROSIAN:  I'm going to

18         object.  It calls for speculation and

19         incomplete hypothetical.

20         A.    As I just said, Viacom has an

21   obligation to submit cue sheets to BMI for

22   programs.  We just read it in the contract.

23   We just read it, right, in the A&E contract.

24   We haven't seen the Viacom agreement with

25   BMI.  We can read it in that to actually see



```
 1                    R. Kohn
 2   what the obligation that Viacom had.  But as
 3   a practical matter, I haven't seen any of
 4   these -- just because it's in a cue sheet
 5   doesn't mean you didn't have a direct
 6   performance license, because as a practical
 7   matter, you generate a cue sheet of all of
 8   the musical works that are in an episode in a
 9   program, as I explained.
10        Q.   So if a cue sheet is submitted, and
11   there's a direct public performance license,
12   and BMI royalties are paid out to the
13   writers, what is the harm in having a direct
14   public performance license, if any?
15        A.   Well, think of all the -- well,
16   there are lots of -- direct public
17   performance licenses were not only issued to
18   Viacom.  They were issued to all of the major
19   networks.
20        Q.   Let's stick to Viacom.
21        A.   No.
22        Q.   Because that's what I'm asking you
23   about.
24        A.   No.  No.  You asked me a broader
25   question.
```



1                    R. Kohn

2        Q.   No, that's not what I asked you.   I

3    referred you to 84 of your report in which

4    you say Viacom improperly received a direct

5    public performance license, quote, in

6    circumvention of BMI's collection and

7    distribution of writer's share performance

8    fees to Aron and Robert's music.   Do you see

9    that?

10            MR. MARDEROSIAN:   Mr. Hwang, you're

11        arguing with the witness.

12            MR. HWANG:   I'm trying to speed

13        this up for your sake.

14            MR. MARDEROSIAN:   Well, I

15        appreciate it, but you have to ask

16        better questions so that we can move

17        this along.   He's trying to answer your

18        questions.

19        A.   It could explain -- just because

20    BMI received a cue sheet with information on

21    it regarding one of the plaintiff's songs

22    doesn't mean they actually paid the public

23    performance royalty.   If they have

24    information from some source, whether it's

25    Extreme or Viacom, right, that there was a



```
 1                    R. Kohn
 2    direct public performance license, BMI would
 3    not pay.  And that might explain why they're
 4    not getting paid from BMI what they think
 5    they should be paid.
 6        Q.   Are you aware of any such instance
 7    in which this purported direct public
 8    performance license to Viacom resulted in a
 9    nonpayment of the writer's share of public
10    performance fees to Aron and Robert?
11             MR. MARDEROSIAN:  Calls for
12        speculation.  Incomplete hypothetical.
13        A.   I go back to the extract that you
14    provided to us.  What explains the fact that
15    there was Bayham receiving all of this and
16    the writers not receiving it.
17        Q.   Okay.  Other than that, is there
18    any other instance in which you're aware that
19    the purported direct public performance
20    license to Viacom result in a nonpayment of
21    public performance fees to Aron and Robert?
22        A.   When you --
23             MR. MARDEROSIAN:  Objection.  Calls
24        for speculation.  Incomplete
25        hypothetical.
```



1                      R. Kohn

2        Q.    I'm just asking you to identify a

3    single instance, if you can.

4        A.    It was a breach of contract to give

5    yourself a direct public performance license,

6    which is what you've been saying during this

7    litigation.

8        Q.    Thank you, Judge Kohn.

9        A.    That you have --

10       Q.    Thank you, Judge Kohn.

11       A.    I'm not --

12       Q.    I'm asking you a factual question.

13   Are you aware of a single instance in which

14   this purported direct public performance

15   license to Viacom resulted in a nonpayment of

16   public performance royalties to Aron and

17   Robert?

18            MR. MARDEROSIAN:   Objection.   It

19        calls for speculation.   Incomplete

20        hypothetical.

21       A.    How can I trace something that's

22   not in a BMI statement, okay.   It won't be in

23   a -- nonpayment means not in BMI's statement.

24   How can I look at a BMI statement to the

25   plaintiffs and determine how a payment wasn't



```
 1                    R. Kohn
 2    made?  What I need to do is go back and look
 3    at the TuneSat data which will show me all of
 4    the broadcasts for public performances of all
 5    those audiovisual works.  That would allow me
 6    to do that.  That was denied to me, okay, so
 7    I could not do that.
 8         Q.   So you're not aware sitting here
 9    today of any such instance?
10              MR. MARDEROSIAN:  Same objection.
11         It calls for speculation.  Incomplete
12         hypothetical.
13         A.   How am I going to be aware of an
14    instance of something that I don't have the
15    information to even determine?  I can't match
16    a nonpayment to something that I don't have
17    the information on.
18         Q.   So you're not aware of any such
19    instance?
20         A.   The only way I would be aware of it
21    is to be aware of the actual performances.
22    You're asking me to have watched television
23    full-time all of Viacom networks since 2010.
24    That would be the only way to do it, for me
25    to let you know of a particular instance
```



1                    R. Kohn

2    without having the TuneSat data.

3         Q.   So you're not aware of a single

4    instance sitting here today?

5         A.   That's correct.  But I suggest that

6    Extreme is aware of it because it has the

7    data.

8         Q.   And you speculated that Viacom or

9    Extreme may have told BMI that Viacom has a

10   direct public performance license and

11   therefore BMI doesn't need to pay the

12   writer's share of public performance

13   royalties?

14        A.   That's not my testimony.  I did not

15   say that.

16        Q.   You said that might have happened,

17   right, in that case that BMI wouldn't pay the

18   writer's share.  Wasn't that your testimony?

19        A.   I didn't speculate on anything.  I

20   said that if BMI had received information

21   that it could put into its systems, I mean

22   this is what I would say now, with respect to

23   a particular set of programs and a particular

24   set of musical works, or I should say a

25   network that produces programs under their



```
 1                    R. Kohn
 2   agreement, then they wouldn't pay.
 3        Q.   Are you aware of any such
 4   communications?
 5        A.   No.
 6        Q.   Okay.  If --
 7        A.   Let me just take that back.  I
 8   remember seeing in the file several letters
 9   that Extreme -- I believe that Extreme wrote
10   to a performance rights society, it might
11   have been BMI, I'm just doing this from
12   memory, that let BMI know that certain
13   catalogs of their works were subject to a
14   direct performance license.  I don't know if
15   it was the Viacom network.  But I did see
16   that in the file.
17        Q.   Other than that, you're not aware
18   of any such communications?
19        A.   Well, there might have been others
20   that I haven't seen.
21        Q.   So you're not aware of any such
22   communications?
23        A.   I'm not aware.  I'm not aware of --
24   none of those potential communications have
25   been brought to my attention.
```



```
 1                    R. Kohn
 2        Q.    Okay.  If Viacom had a direct
 3   public performance license, they also
 4   wouldn't have received the publisher's share
 5   of public performance royalties for uses of
 6   the songs at issue on Viacom programming;
 7   isn't that right?
 8        A.    BMI would have received the
 9   publisher's share?
10        Q.    If Viacom had a direct public
11   performance license --
12        A.    Oh.  Okay.  Viacom.
13        Q.    Viacom also wouldn't have received
14   any publisher's share of performance income
15   for programming on its network?
16        A.    That's correct.
17        Q.    Are you aware of any instance in
18   which Viacom didn't receive the publisher's
19   share of public performance income as a
20   result of this purported direct public
21   performance license that it received from
22   Extreme?
23        A.    I have not been provided with any
24   information as to what Viacom -- well, except
25   for the extract, I'm not sure whether that
```



```
 1                    R. Kohn
 2    was Viacom or not now, what's in there.  I
 3    have not received -- other than the extract
 4    that I have seen, no, I have not seen that.
 5         Q.   The fundamental predicate to what I
 6    just asked you is that Viacom as a
 7    copublisher is entitled to receive
 8    publisher's share of public performance
 9    income from BMI; correct?
10         A.   Yes.
11         Q.   Including --
12              MR. MARDEROSIAN:  Well, actually,
13         in reality, the evidence --
14              MR. HWANG:  Just stop.
15              MR. MARDEROSIAN:  -- in the case is
16         that --
17              MR. HWANG:  Just stop testifying.
18              MR. MARDEROSIAN:  -- Extreme pays
19         Viacom.  BMI does not pay Viacom.  So
20         your question is not consistent with the
21         evidence.  It misstates the evidence.
22         It's an incomplete hypothetical.  It
23         comes from Extreme.  They administer,
24         they collect everything.  Your own
25         30(b)(6) witness Anita Chinkes said
```



| | |
|---|---|
| 1 | R. Kohn |
| 2 | that. |
| 3 | Q.   And that includes uses of the songs |
| 4 | at issue on Viacom programming; right?  In |
| 5 | those cases Viacom would receive publisher's |
| 6 | share -- would be entitled to receive |
| 7 | publisher's share of public performance |
| 8 | royalties from BMI; correct? |
| 9 | MR. MARDEROSIAN:  I'm going to |
| 10 | object.  That's a misstatement of the |
| 11 | evidence.  Incomplete hypothetical. |
| 12 | A.   Yes. |
| 13 | Q.   And the only way to get paid that |
| 14 | publisher's share is by filing cue sheets; |
| 15 | right? |
| 16 | A.   Yes.  Well -- yeah. |
| 17 | Q.   That's the same way that the |
| 18 | Marderosians get paid their writer's share; |
| 19 | right? |
| 20 | A.   Yes. |
| 21 | Q.   And the more uses the more |
| 22 | performance royalties the Marderosians |
| 23 | receive, and the more performance royalties |
| 24 | Viacom receives; right? |
| 25 | A.   Say that again.  I'm sorry. |



1                      R. Kohn

2          Q.    The more uses that are generated of

3     the songs at issue on Viacom programming, the

4     more performance royalties the Marderosians

5     receive, and the more performance royalties

6     Viacom receives.  Is that accurate?

7          A.    All else being equal, in other

8     words, if cue sheets were filed, if they were

9     accurate, etc., yes.

10         Q.    So their interests are aligned in

11    that regard, aren't they?

12              MR. MARDEROSIAN:  Should be.

13         A.    And only in that regard, because

14    their interests are -- remember, Viacom is

15    getting a benefit from the direct performance

16    license by paying BMI less, okay.  BMI is

17    getting paid less from Viacom by the fact

18    that -- and any network gets paid less by --

19    that's the reason why they get direct

20    performance licenses is they can lower the

21    amount that they pay as part of those

22    negotiations.  They pay BMI less money.  So

23    songwriters across the United States are

24    getting less money because you granted

25    yourself a direct performance license that



```
 1              R. Kohn
 2   Isn't that what your testimony was a few
 3   minutes ago?
 4       A.   There was -- on that list there was
 5   -- it was very substantial.  I don't know
 6   whether it was performance, but I -- was it
 7   performance or sync?
 8       Q.   I think you testified it was
 9   performance.
10       A.   I said 34,000.
11       Q.   Okay.  So that was reported and
12   identified in a document produced by Extreme
13   in this case; correct?
14       A.   Right.  But the point --
15       Q.   No, no.  I didn't ask you anything.
16   All you need to say is "right," because that
17   was the question asked.  We'll get out of
18   here faster, or you will, not us, if you
19   answer my questions, not ones I didn't ask.
20   Okay?
21       A.   What's your question?
22       Q.   Good.  If you pay attention, we'll
23   go through it.
24       A.   I've been paying attention very
25   carefully.
```



```
 1                    R. Kohn
 2        Q.    The question was --
 3        A.    And lots of questions are not
 4   properly phrased, so I have to --
 5        Q.    I know I'm not up to your
 6   standards, but I'll try.  So here we go.
 7             You didn't look to see, having
 8   looked at the extract that you saw, there was
 9   Teenage Vamps was not listed, having looked
10   at Exhibit 6, you saw that money was paid to
11   Extreme on Teenage Vamps, you didn't look at
12   the BMI statements to see were the
13   Marderosians paid on Teenage Vamps; is that
14   right?
15             MR. MARDEROSIAN:  Meaning did he do
16        a comparison to see if the performance
17        royalties supposedly reported by Extreme
18        matched the performance royalties of
19        Aron and Robert's BMI statements for the
20        exploitation of Teenage Vamps?  Is that
21        the question?
22             MR. ZAKARIN:  Read back my
23        question, not Mr. Marderosian's speech.
24             MR. MARDEROSIAN:  No.  Mine is the
25        more accurate question.
```



```
 1                   R. Kohn
 2           MR. ZAKARIN:  Well, you can ask
 3       your questions.  This is my turn to ask
 4       mine.
 5           (Record read.)
 6       Q.   Simple question.
 7           MR. MARDEROSIAN:  Mr. Zakarin, can
 8       you identify the amount of money you're
 9       talking about that the Marderosians were
10       paid for Teenage Vamps?
11       Q.   You can answer my question.
12       A.   I was focused on what was not being
13   paid on, not what was.  If I had to look and
14   compare on everything that they were paid on,
15   I'd never get the thing done.
16       Q.   So you don't know one way or the
17   other whether they were paid on Teenage Vamps
18   by BMI; is that right?
19       A.   I have no recollection in my mind
20   about that.
21       Q.   And you have no idea, then, whether
22   they were underpaid, overpaid, or paid on a
23   comparable basis to what was received by
24   Extreme; is that correct?
25       A.   Not on Teen -- not on --
```



```
 1                 R. Kohn
 2       Q.    Teenage Vamps.
 3       A.    Not on Teenage Vamps, but on
 4  Mulholland Drive --
 5       Q.    That's the only question.  Did I
 6  ask you about Mulholland Drive?
 7       A.    I saw 60 pages of Mulholland Drive
 8  promotional announcements that Bayham was
 9  paid on, and they were not paid.  And when I
10  see 60 pages where Bayham is paid and are
11  clearly identified and associated with the
12  plaintiffs and not in the BMI statements, the
13  only thing I can imagine is that there are
14  other composers who were paid on those works.
15  That's what I was focused on.  Teenage Vamps
16  was just a matter of the fact that you
17  provided a report that didn't include it.
18       Q.    Is it possible you have a limited
19  imagination?
20       A.    I think that's an insulting
21  question.
22       Q.    I'll withdraw the question.  You
23  just said the only thing that you can imagine
24  is that there was some, you know, some change
25  in the data or it was misdirected; is that
```



1              R. Kohn

2   right?

3        A.   It's a figure of speech.  I said

4   earlier --

5        Q.   Oh.  It's a figure of speech when

6   you say it's the only thing you can imagine.

7   Let me just try it.  Other --

8            MR. MARDEROSIAN:  You're getting

9        argumentative, Don.  Argumentative.

10       Q.   Are there other possibilities that

11  you could imagine, Mr. Kohn?

12           MR. MARDEROSIAN:  He's not going to

13       speculate.  He's not going to speculate.

14           MR. ZAKARIN:  That's all he's done

15       today.

16           MR. MARDEROSIAN:  Incorrect.

17       That's an argumentative and insulting

18       statement.  And I object to that.

19           MR. ZAKARIN:  It's an accurate

20       statement.

21       A.   I would like to see, given what --

22           MR. MARDEROSIAN:  It's based on the

23       evidence that you've produced in the

24       case.

25           MR. ZAKARIN:  I understand.  I've



```
 1                     R. Kohn
 2          questions.
 3               MR. MARDEROSIAN:   Thank you, Don.
 4          Are we done?
 5               MR. HWANG:  Close it out.
 6               MR. MARDEROSIAN:   Same stipulation
 7          as we reached with the other experts
 8          where I get the original, notify you of
 9          any changes.  We good with that?
10               MR. ZAKARIN:  Yes.
11               (Time noted:  11:00 a.m.)
12
13
14
15                    _____
16                    ROBERT H. KOHN
17
18     Subscribed and sworn to before me
19     this ___ day of _____, 2018.
20
21     _____
22
23
24
25
```



```
 1

 2                C E R T I F I C A T E

 3    STATE OF NEW YORK          )

 4                          : ss.

 5    COUNTY OF WESTCHESTER      )

 6

 7          I, JOAN WARNOCK, a Notary Public

 8       within and for the State of New York, do

 9       hereby certify:

10          That ROBERT H. KOHN, the witness

11       whose deposition is hereinbefore set

12       forth, was duly sworn by me and that

13       such deposition is a true record of the

14       testimony given by the witness.

15          I further certify that I am not

16       related to any of the parties to this

17       action by blood or marriage, and that I

18       am in no way interested in the outcome

19       of this matter.

20          IN WITNESS WHEREOF, I have hereunto

21       set my hand this 8th day of November,

22       2018.
```



```
23

24       _____

25       JOAN WARNOCK
```