# Exhibit 1
To the Zakarin Reply Declaration
in further support of
Extreme's motion for Summary Judgment

# Redacted
# (UnRedacted Copy is Filed Under Seal)

Page 1

1
2              UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF NEW YORK
3    ----------------------------------x
     TWELVE SIXTY LLC, ARON
4    MARDEROSIAN and ROBERT
     MARDEROSIAN,
5
                      Plaintiffs,
6
              -against-
7
                                    Civil Action No.:
8                                   1:17-CV-01479-PAC
9
     EXTREME MUSIC LIBRARY LIMITED,
10   a division of Sony/ATV Music
     Publishing; EXTREME MUSIC
11   LIMITED; VIACOM INTERNATIONAL
     INC., NEW CREATIVE MIX INC.,
12   HYPE PRODUCTION MUSIC,
13                    Defendants.
14   ----------------------------------x
15                  November 1, 2018
16                  1:00 p.m.
17
18       Deposition of ROBERT H. KOHN, taken by
19   Defendants, pursuant to Notice, held at the law
20   offices of Pryor Cashman, LLP, 7 Times Square, New
21   York, New York, before Judith Castore, a Certified
22   Livenote Reporter and Notary Public of the State of
23   New York.
24
25

Page 2

```
 1
 2                  A P P E A R A N C E S
 3       ON BEHALF OF PLAINTIFFS
                MARDEROSIAN & COHEN, PC
 4              1260 Fulton Street
                Fresno, California 93721
 5              559-441-7991
                BY:   MICK MARDEROSIAN, ESQ.
 6                    mick@mcc-legal.com
                      HEATHER COHEN, ESQ.
 7
 8       ON BEHALF OF DEFENDANTS - Extreme Music Library
         Limited, Extreme Music Limited
 9              PRYOR CASHMAN, LLP
                7 Times Square
10              New York, New York 10036
                212-421-4100
11              BY:   DONALD S. ZAKARIN, ESQ.
                      dzakarin@pryorcashman.com
12                    ROSS M. BAGLEY, ESQ.
                      rbagley@pryorcashman.com
13                    YEVGENIA S. KLEINER, ESQ.
                      ykleiner@pryorcashman.com
14
15       ON BEHALF OF DEFENDANTS - Viacom International,
         Inc., New Creative Mix, Inc. and Hype
16       Production Music
                LOEB & LOEB
17              345 Park Avenue
                New York, New York 10154
18              212-407-4000
                BY:   WOOK J. HWANG, ESQ.
19                    whwang@loeb.com
                      ERIN SMITH DENNIS, ESQ.
20                    edennis@loeb.com
21
22       ALSO PRESENT:
23              DAVID J. PRZYGODA, ESQ., Litigation
                Counsel, Sony Corporation of America
24
25
```

```
 1                      KOHN
 2   commercial and the Starbucks commercial
 3   in there.  I might have found it.  I
 4   might have listened to it, but I don't
 5   remember.
 6              But I poked around it to see
 7   what was there but I did not do what
 8   you had asked me.  And I did not do a
 9   calculations as to how much were this
10   kind and how much were that kind.
11       Q    Turn to Exhibit B of your
12   report, if you would.
13              (Whereupon, a brief recess
14       was taken.)
15       Q    Okay.
16              I think when we broke, I had
17   asked you to look at your Exhibit B --
18       A    Yes.
19       Q    -- to your report.  Do you
20   recall?  Pull it out.
21       A    Okay.  Exhibit B.
22       Q    And you say these are unique
23   TuneSat detections?
24       A    That's what the title of it
25   is.
```

                              KOHN

1         Q      Are they unique?

2         A      Yes.   That's my understanding

3    of what they are.   I didn't produce

4    these.

5         Q      You didn't --

6         A      No.

7         Q      -- create this document?

8         A      No.

9         Q      So somebody else created it,

10   and told you what it was?

11        A      Well, I was given it by

12   attorneys; and I understand that Karen

13   Rodriguez had prepared it.

14        Q      Okay.

15               And the total number of

16   detections when you add them up are

17   about 21, nearly 22,000, correct?

18   You've got 6,848 and 15,093.

19        A      Fifteen plus six, yeah, about

20   22,000, something like that.

21        Q      I said about 22,000 or close

22   to 22,000.

23               And you multiplied $200

24   against every one of these detections?

Page 371

1                        KOHN
2        A     Yeah.
3        Q     But you don't know if these
4    are unique detections, correct?
5        A     Well, it says unique
6    detections.  And I understood them to
7    be unique detections.  I had previously
8    given a back of the envelope done in my
9    own way, way back in February when I
10   started working on the case and using
11   data that went all the way back to 2013
12   or something like that.  And -- like I
13   said.  So when I saw these numbers I
14   said it's in the realm of -- again, I
15   did back of the envelope and I just
16   took these as what it was.
17       Q     But now they've gone up by
18   some nearly 7,000 from your number?
19       A     Apparently.
20       Q     And you don't know whether
21   they are or not unique detections?
22       A     I'm not the one who generated
23   this.  So I don't know whether they're
24   unique in the way that you and I have
25   been talking about my understanding of

Page 372

```
 1                        KOHN
 2    what unique is.
 3         Q    Do you know how many of these
 4    detections -- I assume you're going to
 5    know the answer -- are Viacom
 6    detections, detections of broadcasts on
 7    Viacom networks?
 8         A    I could do that.
 9         Q    You could pull it out from
10    the list?
11         A    Right.  Like MTV Classic is
12    MTV2.  MTV -- we can probably pull out
13    and add the numbers up.
14         Q    So we can add up what the
15    total number of MTV detections are?
16              MR. MARDEROSIAN:  Well, he
17         said he did not prepare this.
18              MR. ZAKARIN:  I understand.
19              MR. MARDEROSIAN:  And I think
20         that's a question for Karen
21         Rodriguez.
22              MR. ZAKARIN:  Well, the
23         problem is it's attached to his
24         report.
25              MR. MARDEROSIAN:  I think
```

Page 374

```
1                          KOHN
2              Anyway, let's continue on.
3         Q    In terms of -- so we could
4    figure out which are Viacom channels
5    and therefore which are Viacom
6    detections, correct?
7         A    Yes, if we knew what Viacom's
8    channels are.
9         Q    For which you applied $200
10   for each and every one of the
11   detections, correct?
12        A    Well, are you just saying the
13   same thing for each -- yeah, I used the
14   total numbers here and multiplied it by
15   $200.
16        Q    And in terms of these
17   detections, do you know how many are
18   not works that were delivered to Viacom
19   Extreme but are owned by others
20   including the plaintiffs?
21             MR. MARDEROSIAN:  Objection.
22        Vague.
23        Q    You know that the plaintiffs
24   self-published works, right?
25        A    Yes.
```

Page 375

1                        KOHN

2        Q    Do you know how many of these

3   detections are of the plaintiffs'

4   self-published works?

5        A    I think -- I didn't generate

6   this.  So I don't have the underlying

7   data that was used to generate this.  I

8   wouldn't be able to answer any of those

9   questions.

10       Q    You with agree with me though

11  that there's no reason to charge or

12  make a claim against Extreme or Viacom

13  for $200 per each of the plaintiffs'

14  own works?

15       A    No.

16       Q    Okay.

17       A    Absolutely not.

18       Q    So if the plaintiffs'

19  self-published works or works published

20  by third parties are among these

21  detections --

22       A    Right.

23       Q    -- they have --

24            MR. MARDEROSIAN:  Hold on.

25            Let him finish the question

Page 376

                              KOHN

1

2      because I want to object to it

3      before you agree to it.

4      Q     -- they have to get backed

5   out?

6           MR. MARDEROSIAN:  I'm going

7      to object.

8           It's an incomplete

9      hypothetical, and it doesn't

10     include the fact that there's

11     evidence that Extreme is taking

12     Aron and Robert's own publishing

13     for Lonely Orchard and Brothers

14     Heathen.

15     Q     You can answer my question as

16   opposed to the rhetoric there.

17     A     My understanding is that

18   these were unique detections of

19   music -- musical work, sound recordings

20   that were created by Aron and Rob and

21   delivered under the contract.

22     Q     But in fact you don't know

23   whether these were, in fact, delivered

24   or are self-published?

25           MR. MARDEROSIAN:  I'm just

1                    KOHN

2        going to object.

3              It's an incomplete

4        hypothetical and vague.

5        Q     You can answer.

6              MR. MARDEROSIAN:   And doesn't

7        include the issue over whether or

8        not Extreme is taking the

9        plaintiffs' published --

10       self-published songs.

11       A     And I don't know whether this

12   is an underrepresentation and doesn't

13   include all of their songs that were

14   delivered and used.

15       Q     So you don't know very much

16   at all about this document?

17       A     That's right.

18       Q     Essentially, what you did is

19   you took the number of detections

20   without knowing what they are and

21   multiplied each one by 200?

22       A     And that wasn't the essential

23   part of my report.   The essential part

24   of my report was coming up with the

25   $200 figure.   If this wasn't included,

```
 1                    KOHN
 2   it wouldn't have mattered because
 3   whichever the true number is would be
 4   multiplied by $200.  If it was --
 5   instead of 21,000, if it was 16,000, if
 6   it was 30,000, whatever that number is.
 7   And I'm sure enough good minds can get
 8   together and figure out using the
 9   TuneSat data what the proper number is.
10        Q    We'll come to the 200 in due
11   course.
12             In any event, if I understand
13   you correctly you -- it's your view
14   that the 200 is the right number for --
15   for these -- for all of those
16   detections, that's your opinion?
17             MR. MARDEROSIAN:  Right
18        number for what?
19        Q    The right number for the sync
20   fee for each of these 200 detections
21   that you have opined?
22        A    My report says what it says
23   about the $200 number.  We can turn to
24   it.  I don't want to say anything
25   that's inconsistent and be --
```

Page 379

```
 1                         KOHN
 2        Q      Well, let's look at Page 86
 3   which is where I think come up with
 4   this.
 5        A      Thank you.  Thank you.
 6        Q      Okay.
 7        A      That's helpful.
 8        Q      I think this is where you
 9   explain how you came up with your $200.
10        A      I'm there.
11        Q      Okay.
12               And if I -- I want to
13   characterize this correctly, what you
14   did was you looked at the license of
15   their works to CBS for a promo use for
16   $███, correct?
17        A      Yes.
18        Q      And you compared that to an
19   in-program license use of one of their
20   own works, meaning Rob and Aron, for
21   $300.  And you then -- and you
22   reference to up to 20,000 for works
23   they own control.  You mentioned that.
24   And then you conclude, I think you just
25   say I therefore applied the sum of 200
```

Page 380

1                         KOHN

2    to each of these.  So your view is, at

3    the very least, for the CBS promo use

4    200 would be the right number?

5         A      200 would be the right number

6    to use across the board for the

7    detections -- unique detections that

8    were discovered during the period from

9    mid-2014 to the present.

10        Q      But one of those is you look

11   at CBS promo use and you figure they

12   charge ████.  I think 200 is the right

13   one?

14        A      Well, there might have been

15   an in-program use -- well, I call it an

16   in-program use -- that might have been

17   worth $20,000 or worth more.  But I

18   picked 200 as an overall way of just

19   going across the board to simplify it.

20        Q      Could you look at Exhibit A

21   of your report for a second.  And we'll

22   come back to that.

23        A      Yes.

24        Q      Exhibit A, this you have done

25   all by yourself?

1                         KOHN

2    the NY9 and got $200 for the promo for

3    it.

4         Q    Is the $10,000 that you put

5    in there, is that also in your Exhibit

6    B?  Is it the same use as Exhibit B?

7         A    I don't know.

8         Q    So you could have a

9    duplication there?

10        A    I might have a duplication.

11        Q    You don't know that?

12        A    Neither do you.  I don't know

13   whether I do.

14        Q    Not my burden.

15             Did you -- by the way on your

16   Exhibit B, did you back out what was

17   actually paid on any of those licenses?

18        A    I was not asked to do that.

19        Q    Okay.

20             So you were just asked to

21   come up with a gross number and put

22   that forward as the damage claim?

23        A    I was asked to come up with

24   the $200 amount.  All right.  I was

25   given the unique numbers.  I did the

Page 390

                              KOHN
1
2    multiplication.   It was towards the end
3    of this.   I didn't have the information
4    to back it out.   And I wasn't provided
5    to -- but it.   But it could be backed
6    out by somebody else.
7         Q    Lots of things could be done,
8    but it wasn't done.   So this is put
9    forth -- you're aware that you've put
10   this forth as a damage claim, $200
11   times 20 -- almost 22,000 detections?
12        A    Well, I also said to you that
13   I'm not the one who came up with the
14   22,000 detections.   All right?
15        Q    Is it your testimony --
16        A    Somebody -- you know,
17   somebody else came up with that number
18   and I came up with the $200.   I made a
19   multiplication of the two numbers.   One
20   number I came up with.   Another number
21   somebody else came up with, and that's
22   what I put in here.
23        Q    At the bottom of -- here,
24   based on my calculations, Page 86, Aron
25   and Rob share of these broadcast

Page 467

1                         KOHN

2              MR. MARDEROSIAN:   That's

3        argumentative.   Assumes facts not

4        in evidence and mischaracterizes

5        the evidence.

6              MR. ZAKARIN:   Except that

7        it's true.

8        A    You'll have to --

9              MR. MARDEROSIAN:   It's not

10       true.

11       A    Well, the number is either

12  going to be 16,000 or it's going to be

13  21,000 or something in between.   You

14  know, there's a correct number.

15       Q    How many of them -- of those

16  16,000 are Viacom, if you know?

17       A    I didn't do that filter.

18       Q    Because we didn't add up --

19  and this came from Karen Rodriguez

20  anyway, right?

21       A    Yes.

22       Q    So we'll skip that.

23            You're aware of the BMI --

24  excuse me, ASCAP consent decrees,

25  aren't you?

Page 468

1                        KOHN
2        A     Generally.  I haven't read
3    them in years.
4        Q     Sadly, I have much more
5    familiarity I think.
6              But you're aware generally
7    that they preclude publishers and
8    writers from granting ASCAP and BMI
9    exclusive public performance rights,
10   aren't you?
11       A     So what?
12       Q     So what?  I didn't ask you so
13   what.  I asked you whether you're aware
14   of that?
15       A     They -- it doesn't preclude
16   the music publishers from granting it.
17       Q     It actually requires that
18   music publishers can't grant exclusive
19   rights to ASCAP and BMI.  They have to
20   be --
21       A     That's right.  That's right.
22   They have to reserve the right.  It's a
23   non-exclusive basis so they have to
24   reserve the right to issue direct
25   blanket performance licenses.  I saw

Page 469

1                          KOHN
2    that in Barry's report.
3         Q     You knew it beforehand,
4    didn't you?
5         A     Yes.
6         Q     And broadcasters are also
7    fully aware of it, aren't they?
8         A     Yes.
9         Q     And you're aware, aren't you,
10   that broadcasters -- a number of
11   broadcasters will demand direct
12   performance licenses?
13        A     Yes, they will.
14        Q     Okay.
15        A     When they can get it.
16        Q     You can say no, but you can
17   also lose the license if you say no;
18   isn't that right?
19        A     That's correct.
20        Q     Okay.
21        A     Sometimes they need to have
22   the music they need to have and --
23        Q     Well, need to have the music
24   they need to have is more frequent with
25   popular music library -- popular music

Page 470

                          KOHN
1
2    publishers rather than production music
3    libraries, wouldn't you agree?
4         A    I wouldn't necessarily put it
5    that way.  But I think the way you've
6    put it is that production music
7    libraries have been more amenable to
8    granting direct public performance
9    licenses than commercial -- what your
10   client called -- other kinds of music
11   publishers, traditional music
12   publishers.
13        Q    Traditional music publishers
14   have evergreens and must-haves as
15   opposed to more generic music?
16        A    Right.  Because -- because
17   production music libraries have this --
18   it's not because the music is any
19   worse.
20        Q    No, nobody is saying quality.
21        A    But they also have the
22   ability to grant the sound recording at
23   the same time, and that gives them
24   their special advantage.
25        Q    But they typically don't have

Page 471

1                      KOHN
2    must-have works or evergreen works.
3    They have genres that are used by
4    broadcasters.
5         A    Sure.
6         Q    And popular music is  just --
7    costs much more and you have much more,
8    if you excuse, me F-U power when you
9    have popular music?
10        A    Sure.
11        Q    I didn't think that it was
12   controversial.
13        A    I don't think so either.  But
14   you can't -- you can't jump to the
15   conclusion just because the consent
16   decrees say that publishers can issue
17   direct licenses, that a publisher will
18   issue a direct license and then not
19   allocate the money coming back
20   properly.
21        Q    But I'm not dealing with
22   allocation.  I'm only dealing with,
23   right now --
24        A    But the way, one of your
25   experts had used -- I think two of your

1                   KOHN

2    experts had quoted a consent decree in

3    connection with their argue.  That it

4    was okay not to use a usage basis in

5    their allocation.  Yes, they did.  And

6    I thought that was -- that was

7    incorrect.

8         Q    I don't think that they say

9    that, but they say what they say.  So

10   we don't have to debate it between you

11   and I.  I think the simple point that

12   we're just trying to make is that the

13   consent decrees make it impossible for

14   ASCAP and BMI at least to have

15   exclusive licensing rights and

16   performance rights.  They can't have it

17   exclusively.

18        A    Yes.

19        Q    And broadcasters know that

20   and --

21        A    We've already been through

22   this, right?

23        Q    So we agree.

24             It's not your contention, is

25   it, I just want to make sure, that if a

Page 473

```
 1                        KOHN
 2    broadcaster, CNN, I think there are a
 3    couple of others, came to Extreme and
 4    said we want to license, we want a
 5    direct performance license.  It's not
 6    your contention that Extreme should
 7    have rejected that and potentially lost
 8    the license, is it?
 9              MR. MARDEROSIAN:  Objection.
10              Incomplete hypothetical.
11              Calls for speculation.
12         Q    Let me rephrase it.  Let me
13    rephrase it.
14         A    Okay.
15         Q    It's not your contention, is
16    it, that if a broadcaster, whether it
17    was CNN or another broadcaster said
18    we're willing to enter into a blanket
19    license with you but only if you grant
20    us also a direct performance right,
21    that Extreme should have simply said
22    no, we won't do it?
23         A    If Extreme is not prepared to
24    do the work necessary to comply with
25    its contracts with songwriters to
```

```
 1                    KOHN
 2    allocate the income on the blanket
 3    basis on a usage basis, then it should
 4    reject it.
 5        Q    Okay.  I understand your view
 6    on how a blanket should be allocated.
 7    So we may disagree, but that's your
 8    condition that they can do it but only
 9    if they allocate on a usage basis; is
10    that your position?
11        A    Yes.
12        Q    Okay.
13             And what about on a -- I call
14    it a needle drop.  You call it what, a
15    --
16        A    I think a needle --
17        Q    -- either a source or a
18    direct license?
19        A    I was saying that either
20    there's a -- yeah, there's either a
21    blanket agreement or there's discrete
22    agreements.  We'll call it --
23        Q    I think discrete and source
24    are used, but I think in the industry
25    they primarily call it a needle drop.
```

Page 475

```
 1                        KOHN
 2              Be that as it may, if a
 3   broadcaster comes, and it could be CNN,
 4   it could be Hearst, it could be
 5   anybody, and says I'll license X, Y and
 6   Z works from you but you've got to
 7   grant me the public performance grant,
 8   as well.  It's not your contention that
 9   they should have, meaning Extreme
10   should have rejected that demand?
11        A    Sorry.  You're going to have
12   to repeat the question because I didn't
13   follow it.
14        Q    I'm talking about a needle
15   drop and discreet license.
16        A    Right.
17        Q    For individual works.
18        A    Right.
19        Q    A broadcaster comes and says
20   I want to license X, Y and Z songs for
21   sync usage.
22        A    Let's say three -- you said
23   three songs.
24        Q    It could be ten songs.  It
25   doesn't matter.
```

Page 476

1                              KOHN

2          A     Okay.

3          Q     I want to license these ten

4     songs, and I want to grant the public

5     performance rights along with that

6     grant.  Okay?  It's not your

7     contention, is it, that Extreme should

8     have or was obligated to reject the

9     license request?

10         A     It has an obligation to each

11    of the songwriters, as we've discussed,

12    to allocate the income if it's done on

13    a blanket basis.

14         Q     We're not talking about a

15    blanket.  We're talking about a

16    discreet --

17         A     So let's talk about one song.

18    Don't say three songs.  Say one song.

19         Q     Well, each one gets its own

20    value in the license, in other words

21    I'll license it for 300, this one for

22    400, this one -- whatever I get.

23         A     Okay.

24               So it's basically -- it's

25    four or five discreet licenses and one

Page 477

1                          KOHN
2    agreement that covers all five sync
3    licenses?
4         Q     There are plenty of those.
5    You've seen that, haven't you?
6         A     And a public performance
7    license goes along with each of them.
8    Sure, it's done -- theatrical licenses
9    were done in precisely that way.
10        Q     But for television that's
11   what a broadcaster demands and the
12   choice is you either do it or -- a
13   broadcaster does it as well and they
14   come to you with your choices, you
15   either grant the license or test
16   whether they'll go someplace else?
17        A     Fair enough, yes.
18        Q     You're not suggesting that
19   Extreme was obligated to reject any
20   direct license demands by a
21   broadcaster?
22        A     Well, if you're going to --
23              MR. MARDEROSIAN:  I'm just
24        going to object again.
25              It's an incomplete

Page 478

1                    KOHN
2        hypothetical and vague.
3        A    I'm not going to get -- so,
4    you know, you'll take my answer and
5    take it out of context.  Because we
6    just had a colloquy here among several
7    things.
8              So to state the complete
9    hypothetical, and that is, a
10   broadcaster goes to a copyright owner
11   and wants to have a sync license
12   coupled with a direct public
13   performance license for a particular
14   song and recording with that song,
15   right?
16       Q    Comes to the production music
17   library, yes.
18       A    Right.  And let's say there's
19   one or two songwriters who on the back
20   end will be allocated their, let's say
21   it's 50 percent of the license fee.
22       Q    Um-hum.
23       A    I don't see any issue on the
24   allocation side.  We know what the
25   usage is.  It's going to be -- the

Page 479

```
 1                      KOHN
 2   contract is going to say you're allowed
 3   to use it in one episode or ten
 4   episodes, or you can use it in as many
 5   episodes as you want during the year,
 6   you could do whatever basis it is.
 7        Q    It's not a blanket.  It's not
 8   a blanket.
 9        A    Right.  It's a discreet
10   license.
11        Q    I agree.
12        A    Of course they have -- the
13   copyright owner has the right to do
14   that.
15        Q    Okay.  I just wanted to make
16   sure.
17             Turn again, if you would --
18   first of all, turn to Page 14 of your
19   opinion again, if you would.
20             This is the second to last
21   bullet point on 14.  We're referring
22   really to your Exhibit A again, okay?
23   And it says with respect to a fair and
24   reasonable market value for the body of
25   the sync licenses as negotiated by
```

Page 522

```
 1                    KOHN
 2   speaking it will go slower.
 3           MR. MARDEROSIAN:  If you want
 4       to keep asking the types of
 5       questions you're asking, it's
 6       going to go real slow.
 7       Q    Okay.  That's fine.  Middle
 8   paragraph of Page 44.  As Mr. Emanuel
 9   testified, the AETN prefix was used as
10   a means to split Extreme's publisher
11   share of that income with the A&E
12   network.  This has no benefit to the
13   songwriters.  Indeed, it has the
14   potential to harm it.  The potential
15   confusion could cause performance
16   royalties to be misdirected as
17   additional registrations for the same
18   songs could spawn unanticipated errors.
19           Let's work through that
20   statement, Mr. Kohn.  You're aware,
21   aren't you, that A&E has a blanket
22   license with BMI?
23       A    Yes, we saw that earlier, I
24   think.
25       Q    When I showed you TNN but
```

Page 523

```
 1                      KOHN
 2   within that Exhibit I believe is A&E as
 3   well?
 4        A    Right.
 5        Q    And that was at Allison
 6   Smith's deposition, right?
 7        A    Yes.
 8        Q    Okay.
 9             And you understand, don't
10   you, that under that blanket license
11   the licensees pays a share of its
12   revenues to the PROs regardless of how
13   much or how little it uses works?
14             MR. MARDEROSIAN:  Objection.
15             Incomplete hypothetical.
16        Vague and ambiguous.
17        Q    You could answer.
18        A    That AETN, as the licensee of
19   BMI, right -- is that what you're
20   talking about?
21        Q    It's actually A&E is the
22   licensee of BMI.
23        A    Okay.  That's right.
24        Q    Pays a blanket license fee?
25        A    Yes.
```

Page 524

1                          KOHN
2          Q    And it's based on a
3    percentage of its revenue, not based
4    upon its usage of works?
5          A     That's correct.
6          Q     Now, if the licensee also
7    receives back some performance income
8    for the works that it uses, that
9    reduces the effective cost of its
10   blanket license, doesn't it?
11         A     If the licensee --
12              MR. MARDEROSIAN:  I'm just
13         going to object.  It's an
14         incomplete hypothetical.  Vague
15         and overbroad.
16         A     So repeat the question.
17         Q     Sure.
18              If the licensee -- we'll deal
19   with A&E.
20         A     That's the broadcasting --
21         Q     A&E is the blanket license.
22   If it gets paid back some performance
23   income for the works that it uses,
24   because it has a share of the
25   publisher's share of performance

Page 525

```
                               KOHN
 1
 2   income, that reduces the effective cost
 3   of its blanket license, doesn't it?
 4              MR. MARDEROSIAN:  That calls
 5         for speculation and incomplete
 6         hypothetical.
 7         A    It doesn't reduce the cost of
 8   its blanket license.  It reduces the
 9   cost of its music because it's now
10   getting income.
11         Q    It's getting income that it
12   can offset against the fees that it has
13   to pay to BMI?
14              MR. MARDEROSIAN:  I'm just
15         going to object.  It calls for
16         speculation.
17         A    It can use to offset it,
18   yeah; but it doesn't reduce the cost of
19   the blanket license.
20         Q    Right.  The blanket
21   license -- if it gets -- if it gets --
22   if it pays $10 on its blanket license
23   and gets $5 back as its publisher share
24   of performance income, effectively the
25   ad cost of its blanket is $5?
```

Page 526

1                        KOHN

2              MR. MARDEROSIAN:  Calls for

3         speculation.  Incomplete

4         hypothetical.

5         A    It's going to find a new

6    source of income.  And if you wish to

7    say that it offsets, it gets a new

8    source of income from music, then you

9    wish to say that it offsets its cost of

10   music, sure.  It offsets its cost of

11   electricity.

12        Q    Okay.

13        A    Fine.

14        Q    And you'd agree, wouldn't

15   you, logically that A&E has an

16   incentive to use the works in its

17   programs that generate income for it?

18             MR. MARDEROSIAN:  Calls for

19        speculation.  Incomplete

20        hypothetical.

21        Q    You could answer the

22   question.

23        A    The A&E network is not in

24   business of being a music license.

25   It's not in the business of generating

```
                                            Page 527
1                        KOHN
2    money from music.  Somebody found a
3    means by which it could reduce its
4    music costs.  Right?
5         Q    Somebody found a means to --
6         A    Somebody found a means of
7    reducing its music costs by doing a
8    deal using its leverage, right?  And
9    says, okay, if you give me half of your
10   publisher's share I'll go ahead and get
11   that license and use some of your stuff
12   as opposed to -- some of your music and
13   somebody else's music.
14        Q    Correct.
15        A    That's the way to put it.
16   It's just simply a logical --
17        Q    I agree.  It has incentive
18   because it's going to make some money
19   as opposed to just spending money.
20             It's incentivized to use the
21   works on which it makes money, right?
22        A    There's --
23             MR. MARDEROSIAN:  Objection.
24             Calls for speculation.
25        Incomplete hypothetical.
```

Page 528

1                     KOHN

2          A     If all things being equal,

3     but a lot of music use, as you know, is

4     based upon creative decisions that

5     people make.  The A&E network can try

6     to let its producers know that this

7     music will help A&E, but the producer

8     might say screw that, I'd rather use

9     somebody else's music because of

10    creative reasons.  So you -- you can't

11    just simply --

12         Q    I didn't say that it's a

13    guarantee that it will use it.  I said

14    it's incentivized to use music on which

15    it will make money, right?

16              MR. MARDEROSIAN:  Calls for

17         speculation.

18              Incomplete hypothetical.

19         A    All right.  So go ahead.

20         Q    So -- and Extreme was giving

21    up part of its publisher's share of

22    performance income in order to

23    hopefully get A&E to use those works;

24    isn't that right?

25              MR. MARDEROSIAN:  Calls for

Page 529

```
 1                        KOHN
 2        speculation.   Incomplete
 3        hypothetical.
 4                Creates a further motive.
 5        Q     There's a question
 6   outstanding.
 7                You agree with me, don't you?
 8        A     I don't disagree with you.
 9        Q     I didn't think so.
10                So, in any event, that is a
11   potential benefit to the writers, isn't
12   it, that their works get used because
13   Extreme is, in effect, subsidizing or
14   hopefully in effect sharing by sharing
15   its performance income to subsidize the
16   possible use of their works?
17                MR. MARDEROSIAN:  I'm going
18        to object.
19                It assumes a fact not in
20        evidence if they were actually
21        being paid for those uses.  And
22        secondly it's an complete
23        hypothetical.
24        A     Okay.
25                I -- but I can see that now.
```

Page 530

1                          KOHN
2       I mean, what I was trying to do is
3       contrast what the CEO is saying with
4       his own COO.  Because the COO
5       originally explained that the AETN
6       reference is actually an additional
7       means of linking the songs to the
8       authors for purpose of paying public
9       performance income.
10              Now, I may have read that as
11      saying paying performance -- for public
12      performance income to the songwriters,
13      which I thought was simply nonsense.
14      And then I saw the CEO disagree with
15      that.  Because he was explaining it as
16      a means to split Extreme's publisher
17      share with somebody else and attract to
18      account -- to account and track the use
19      of it.
20          Q    But you see now what we just
21      walked through.  There is, in fact, a
22      benefit to the writers?
23          A    Yes.
24              MR. MARDEROSIAN:  Hold on,
25          please.

Page 751

1

2  STATE OF _____ )

3                            )  :ss

4  COUNTY OF _____)

5

6

7          I, ROBERT H. KOHN, the witness

8  herein, having read the foregoing

9  testimony of the pages of this deposition,

10 do hereby certify it to be a true and

11 correct transcript, subject to the

12 corrections, if any, shown on the attached

13 page.

14

15                    _____

16                    ROBERT H. KOHN

17

18

19

20 Sworn and subscribed to before me,

21 this _____ day of _____, 2018.

22

23 _____

24        Notary Public

25

Page 752

1

2                    C E R T I F I C A T I O N

3

        STATE OF NEW YORK  )

4                          ) ss.:

        COUNTY OF NEW YORK )

5

6              I, JUDITH CASTORE, Shorthand Reporter

7         and Notary Public within and for the State

8         of New York, do hereby certify:

9              That ROBERT H. KOHN, the witness

10        whose deposition is hereinbefore set

11        forth, was duly sworn by me and that this

12        transcript of such examination is a true

13        record of the testimony given by such

14        witness.

15             I further certify that I am not

16        related to any of the parties to this

17        action by blood or marriage and that I am

18        in no way interested in the outcome of

19        this matter.

20             IN WITNESS WHEREOF, I have hereunto

21        set my hand this 8th day of November,

22        2018.

23                          *Judith Castore*

24                          JUDITH CASTORE

25