# Exhibit 2

To the Zakarin Reply Declaration
in further support of
Extreme's motion for Summary Judgment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| TWELVE SIXTY LLC, ARON MARDEROSIAN and ROBERT MARDEROSIAN, | ) ) ) |
| | ) Civil Action No. |
| Plaintiffs | ) 1-17-cv-01479 |
| | ) |
| vs. | ) |
| | ) |
| EXTREME MUSIC LIBRARY LIMITED, a division of Sony/ ATV Music Publishing; EXTREME MUSIC LIMITED; VIACOM INTERNATIONAL, INC.; NEW CREATIVE MIX INC.; HYPE PRODUCTION MUSIC, | ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

Videotaped deposition of ROBERT MARDEROSIAN

July 20, 2018

New York, New York

Reported by:

Lisa Forlano

Job no: 22271

1

2                  Videotaped deposition of ROBERT

3     MARDEROSIAN, taken by and before Lisa Forlano, CCR,

4     CRR, RMR, at Pryor Cashman LLP, 7 Times Square, 40th

5     Floor, New York, New York, on Friday, July 20, 2018,

6     commencing at 10:10 a.m.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1     A P P E A R A N C E S:

 2

 3             MARDEROSIAN & COHEN
               BY:  MICK MARDEROSIAN, ESQUIRE
 4             1260 FULTON MALL
               FRESNO, CALIFORNIA  93721
 5             (559) 441-7991
               mick@mcc-legal.com
 6             ATTORNEYS FOR PLAINTIFFS

 7

 8             PRYOR CASHMAN LLP
               BY:  DONALD S. ZAKARIN, ESQUIRE
 9                  ROSS M. BAGLEY, ESQUIRE
               7 TIMES SQUARE
10             40th FLOOR
               NEW YORK, NEW YORK 10036
11             (212) 421-4100
               dzakarin@pryorcashman.com
12             rbagley@pryorcashman.com
               ATTORNEYS FOR THE DEFENDANTS,
13             EXTREME MUSIC LIBARY

14

15             LOEB & LOEB LLP
               BY:  WOOK J. HWANG, ESQUIRE
16                  PETER POTTIER, ESQUIRE
                    ERIN SMITH DENNIS, ESQUIRE
17             345 PARK AVENUE
               NEW YORK, NEW YORK  10154
18             (212) 407-4035
               ppottier@loeb.com
19             edennis@loeb.com
               whwang@loeb.com
20             ATTORNEYS FOR THE DEFENDANTS, VIACOM
               INTERNATIONAL AND NEW CREATIVE MIX
21

22

23             ALSO PRESENT:

24             MORRIS RHODES, VIDEOGRAPHER

25
```

```
 1            question is argumentative, it's calling for a

 2            legal opinion and conclusion, and it's vague

 3            and ambiguous.

 4                 Don, we've been going an hour, can we

 5            take a break?

 6                 MR. ZAKARIN:  Sure.

 7                 MR. MARDEROSIAN:  Is that okay?

 8                 MR. ZAKARIN:  I'm fine.

 9                 MR. MARDEROSIAN:  We're here.  We have

10            all day.

11                 MR. ZAKARIN:  I understand.  I'm fine.

12            I've got plenty to do.  But we'll move along.

13                 VIDEO OPERATOR:  We are now going off

14            the record; 11:10 a.m.  This concludes tape

15            one of the deposition of Robert Marderosian.

16                 (Brief recess.)

17                 VIDEO OPERATOR:  We are now back on the

18            record at 11:25 a.m.  This begins tape 2 of

19            the deposition of Robert Marderosian.

20       BY MR. ZAKARIN:

21            Q    Mr. Marderosian, did you read the 2010

22       contract before you entered into it?

23            A    Yes.

24            Q    Did you discuss it with counsel?

25            A    Yes.
```

```
 1          Q       Who was the counsel you discussed it
 2   with?
 3          A       At the time -- I don't really remember,
 4   to be honest with you.
 5          Q       We can leave it blank.  If it occurs to
 6   you later --
 7          A       That's fine.
 8          Q       Did you understand its terms or have
 9   them explained to you by counsel?
10          A       Implicitly, yes.
11          Q       I'm not sure what you mean by
12   "implicitly."
13               MR. MARDEROSIAN:  Let me just object
14          for the record.  It's calling for a legal
15          conclusion, and it's vague and overbroad.
16   BY MR. ZAKARIN:
17          Q       I'm not asking what you and your
18   counsel discussed, I'm just asking whether you
19   understood its terms or had them explained to you by
20   your counsel?
21          A       Yes.
22               MR. MARDEROSIAN:  I'm just going to
23          object that it's vague and overbroad as to
24          whether some of the provisions are vague as
25          well.
```

```
 1    BY MR. ZAKARIN:
 2         Q      Did you ask any questions of Viacom
 3    about the contract?
 4         A      In some phone conversations, yeah.
 5         Q      Who did you have phone conversations
 6    with?
 7         A      Jose Cuello and Ernesto Elias -- Elias.
 8    I don't know how to pronounce his name.
 9         Q      Did you read the 2011 contract before
10    you signed it?
11         A      Yes, I did.
12         Q      Did you have counsel as well that you
13    worked with on the 2011 contract?
14         A      Yes, we did.
15         Q      Was it the same counsel?
16         A      I believe it was.
17         Q      We'll leave it blank for his
18    identification.
19         A      Thank you.
20         Q      Did you understand these terms or have
21    them explained to you by counsel?
22              MR. MARDEROSIAN:  I'm going to
23         objection to the form.  It calls for a legal
24         conclusion; it's vague and overbroad.
25    BY MR. ZAKARIN:
```

```
 1          Q       You can answer.
 2          A       We were told that we were receiving a
 3   writer's share and 50 percent of the gross income.
 4                   MR. ZAKARIN:  Let's mark as Exhibit
 5          2 -- let's mark as Exhibit 2 what's been
 6          previously marked 47 times in this case.  And
 7          we'll mark it again as RM-2.
 8                   (Blanket Composer Agreement (Direct)
 9          document, VIACOM_0000238 - VIACOM_0000252,
10          was marked RM-2 for identification.)
11   BY MR. ZAKARIN:
12          Q       I'm not going to question you too
13   deeply about this, but can you identify this as the
14   2010 contract?
15          A       Let me see which version this is.  This
16   is signed by Ms. Chinkes, it looks like.
17          Q       It is.
18          A       Yes, it looks like a copy of it.  The
19   schedule is blank on the back.  Yes.
20          Q       And that's your signature for
21   TwelveSixty?  Same page.
22          A       Yes, as you can see at the top.
23          Q       And it's your signature?
24          A       That is correct.
25          Q       For your own name as well?
```

1           - PLTF007982, was marked RM-4A for

2           identification.)

3                     MR. MARDEROSIAN:  This is what exhibit?

4                     THE WITNESS:  4A.

5      BY MR. ZAKARIN:

6           Q     Now we're into August of 2013 --

7           A     Yes.

8           Q     -- which is more than a year after

9      May 2012, by my count, right?

10          A     Yes, we are.

11          Q     And as of this point, you still have

12     not fully delivered all of the work, right?

13          A     No, and for the reasons I've explained

14     earlier.

15          Q     I understand.  I'm just stating.  And

16     you have back and forth with Jaron Lum quite a bit

17     in this e-mail exchange, correct?

18          A     Yes.

19          Q     Some of which, for whatever reason, I

20     can't see in this e-mail chain, these were produced

21     by you, there's hidden text.  I don't know why that

22     is.

23          A     Which page are you on?

24          Q     If you look from 7982, there's

25     e-mails --

1          A        7982.

2          Q        Bottom.  There should be a Bates stamp.

3          A        This here?

4          Q        Yeah.

5          A        That's confidential.  That was an

6     attorney that we were speaking with at the time.

7     That's why that's not in there, sir.

8          Q        Oh, see, that hasn't been identified as

9     privileged, as redacted.  Usually what you should

10    have done is redacted --

11         A        I'm working with the best I got.

12         Q        I understand.  I'm just saying, when I

13    get something like that, I don't know what it is and

14    I see that it's missing, I don't know why it's

15    missing, and if it says that it's redacted because

16    it's attorney-client privilege material, I can cope

17    with that, because that's what is supposed to be

18    done.

19         A        Ask me anything.

20         Q        I'm trying.  Jaron Lum offers up, at

21    the top, on August 12, to reduce your obligation,

22    correct?

23         A        Yes, he does.

24         Q        Okay.

25         A        As you can see, he says, Joe and I

1     discussed.  So Mr. Cuello was involved as well.

2          Q      And you accepted the reduced

3     obligation, didn't you?

4          A      We actually accepted even less reduced

5     obligation at Mr. Cuello's enhesence (sic) -- excuse

6     me -- how do you say it?

7          Q      Behest?

8          A      Behest.  Thank you very much.

9          Q      But it was still a reduced obligation,

10    and they paid you, nonetheless, in full, did they

11    not?

12         A      The contract was closed out by Mr.

13    Cuello for the delivery of 10 drone tracks, of which

14    they never identified to us what they did with them,

15    and that closed out the second, which you referred

16    to, I believe as RM-3; again, before Mr. Cuello's

17    termination.

18         Q      So you were fully paid, though,

19    regardless of the fact you didn't fully deliver all

20    of the originally contracted four works?

21              MR. MARDEROSIAN:  I'm going to object.

22         It mischaracterizes the testimony.

23    BY MR. ZAKARIN:

24         Q      Am I correct?

25         A      Incorrect, sir.  We were paid because

Page 211

1    agreement, looking at paragraph 6B.  And maybe it's

2    easier to read.

3              MR. MARDEROSIAN:  Of the 2011

4         agreement?

5              THE WITNESS:  '10, I believe he said.

6    BY MR. ZAKARIN:

7         Q    2010, it's -- you're right, it's hard

8    to read, but it's 6B.  And it's over on to page 240.

9    It's the same language I think you read before.

10   Notwithstanding, towards the end, anything to the

11   contrary where it is or may, from time to time, be

12   unlawful, et cetera.

13             You see that language?

14        A    I do see that language.

15        Q    That's also where the performing rights

16   society doesn't maintain a regular system of

17   collecting performance fees --

18        A    Yeah.

19        Q    -- no performance fees would be

20   payable?

21        A    To be clear, my brother and I are very

22   aware of those limitations that PROs do put on

23   collecting in areas where it is unattainable at

24   times.  We're aware from the start.

25        Q    Now, long before this lawsuit was

Page 212

1    filed, BMI had told you that it did not collect and

2    pay for promotional uses, at least for a period of

3    time and at least for certain networks or production

4    entities, didn't it?

5         A    No, that's incorrect.

6         Q    They never told you that?

7         A    No, they did not.

8              MR. ZAKARIN:  Let's mark as Exhibit 7,

9         I believe, an e-mail in, I think, 2015.

10   BY MR. ZAKARIN:

11        Q    This is an exchange between you and

12   Antonella, who testified yesterday.

13        A    Yes, I know it well.

14        Q    I would hope you would.  We have to

15   have the court reporter mark it first.

16        A    Sure.

17             MR. ZAKARIN:  This will be RM-7.

18             (e-mail chain was marked RM-7 for

19        identification.)

20   BY MR. ZAKARIN:

21        Q    Turn, if you would, and this chain of

22   e-mails started in November of -- maybe even

23   earlier, but I think it's November of 2015.

24        A    Yes.

25        Q    And you were asking Ms. DiSaverio,

```
1    D-i-S-A-V-E-R-I-O, you were asking her about
2    certain, as you said, promotional campaigns of your
3    works, correct?
4         A     Yes, I am.
5         Q     And that was your e-mail.  "I have a
6    couple of issues with some promo campaigns with
7    respect to your works on MTV, Viacom and the History
8    Channel," correct?
9         A     Yes.  Correct.
10        Q     Okay.  And the first one was "Like a
11   Serenade."  That's Lonely Orchard; that's a
12   self-published work?
13        A     Yes, it is.
14        Q     And then she thinks she knows the
15   second one on "Teen Mom."  That's Lonely Orchard as
16   well?
17        A     That is.
18        Q     And the third one was "Sets You Free,"
19   which was one of the works under the 2010-2011
20   agreement?
21        A     You're correct.
22        Q     Okay.  And so you asked about this.
23   And if you turn again to the next page forward.
24        A     I'm with you.
25        Q     Okay.  On November 12, which is the
```

Page 214

1    next day, Ms. DiSaverio writes to you, "We weren't

2    paying for promos on MTV back then."  And then she

3    said, "At this point we can only go back three

4    quarters from the last distribution.  Have these

5    promos aired from the third quarter 2014 through the

6    second quarter 2015?

7              So she did say to you that MTV -- that

8    BMI was not paying for promos on MTV at that time,

9    correct?

10      A      She did.  The reason why I questioned

11   her on those was because we had already been paid

12   for promos on MTV prior to when she says that they

13   started paying.  So it was in question to why we

14   hadn't received payment yet.

15      Q      She was telling you that at least while

16   you may have received some payments on promos on MTV

17   channels, she was telling you that BMI was not

18   paying, at least as a general proposition, for

19   promos on MTV at that time?

20      A      That's her statement here.

21      Q      And you understood what she was saying?

22      A      Absolutely.

23      Q      You didn't think she was lying to you,

24   did you?

25      A      I think she was mistaken, but no, I

Page 215

1    didn't think she was trying to lie to us at all.

2         Q      And you thought she was telling you

3    honestly what the state of facts was at the time?

4         A      As I stated, I found Antonella to be

5    very helpful.

6         Q      Now, turning to the second page of this

7    exhibit.  Now we're on November 19, Ms. DiSaverio

8    wrote to you because now we're dealing with the

9    promo campaign with respect to the Chrysler issue?

10        A      Correct.

11        Q      This was "Sets You Free"?

12        A      Yes, sir.

13        Q      And she said, I'm pretty sure that we

14   weren't getting promo data from the History Channel

15   back in 2012.  I'll confirm with my colleague and

16   get back to you as soon as I hear.

17               Did she get back to you?

18        A      From her colleague, yes, she does.  She

19   clarifies it here in further e-mails.

20        Q      And she told you that they were not

21   collecting for promo uses from the History Channel

22   at that time, didn't she?

23        A      Well, she gets back to me if we're

24   moving forward from the comment that you just made

25   in her e-mail here, is, she tells me that the song

1    "Sets You Free," which I'm asking about, which is

2    the duplicate title of one of Mr. Emanuel's songs,

3    is not listed for us anywhere on the cue sheets for

4    the History Channel series, The Men Who Built

5    America, which I'm asking about.

6         Q       And when she was saying it was not in

7    the cue sheets, it was not an in-program use?

8         A       She said it was neither.

9         Q       It was neither an in-program use or --

10        A       Let's go through the e-mails.  We can

11   read them through, Mr. Zakarin.  I believe I'm

12   asking her if it was a promo.  I'm pretty clear on

13   that, in which she says --

14        Q       What you said is, on November 19 is,

15   From what I understand and was told, this was an

16   in-programming use.

17        A       Yes.

18        Q       Who told you that?

19        A       Joe Cuello, on the phone, after

20   Mr. Emanuel told us that he was going to do nothing

21   to help us to receive payment for that spot.

22        Q       And did you ever confirm one way or the

23   other whether it was an in-program use as opposed to

24   a promo, or some other use?

25        A       Yes, I did.

1        Q       What did you confirm?

2        A       It's a promo use.  I found it as a

3    standalone commercial that's on YouTube.

4        Q       Okay.  And if it was a promo use, as

5    you said, Ms. --

6        A       DiSaverio.

7        Q       Yes.  Did she ever confirm to you that,

8    in fact, they were not collecting from the History

9    Channel for promo uses at that time?

10       A       At this time Antonella --

11               MR. MARDEROSIAN:  Let me just object

12           here.  Again, it's a misstatement of the

13           evidence.  I believe the evidence is dating

14           back to 2011, Don, whether or not they were

15           asking cable networks to start reporting on

16           promos as opposed to whether or not BMI was

17           paying on them.

18               MR. ZAKARIN:  I think the testimony was

19           they didn't pay or allocate if they didn't get

20           information.  But I'm trying to be simpler in

21           the questions.  I should be more precise.  And

22           you're right.  I should probably say that they

23           weren't receiving information from A & E or

24           the History Channel with respect to promo uses

25           at that time and, hence, BMI was not paying

```
 1            for such uses or allocating for promotional
 2            uses.  Correct?
 3                 THE WITNESS:  That's correct to say.
 4            And I believe they were asking because we felt
 5            it was the obligation for us to receive a
 6            payment from BMI for any use of our music.
 7       BY MR. ZAKARIN:
 8            Q     I understand.
 9            A     Yes.
10            Q     Notwithstanding the provision of the
11       agreement that we've looked at before, which is the
12       notwithstanding if BMI doesn't have a regular
13       practice of collecting for such uses --
14                 MR. MARDEROSIAN:  Again, it's a legal
15            conclusion.
16                 MR. ZAKARIN:  Okay.
17                 MR. MARDEROSIAN:  I'll object, but I'm
18            objecting just for the record.
19                 MR. ZAKARIN:  The witness has to
20            actually do more than shake his head.
21                 THE WITNESS:  No, no, I understand
22            completely what you're saying, and I agree
23            with you, although I don't find that US
24            performances of the work in any way should be
25            limited by BMI or PRO.
```

Page 220

1    in foreign market.

2         Q     I don't have it in front of me.  I

3    could bring it down later.  But you weren't at the

4    TuneSat deposition.

5         A     I was not able to make it.

6         Q     I'm not blaming you for it.  But

7    TuneSat testified that the audio clips that they

8    provide to you and the data enables you to tag the

9    type of uses that those audio clips are being put

10   to.

11        A     Yes, it does.

12        Q     Okay.  And you and your brother went

13   through those audio clips, correct?

14        A     Listened to each and everyone.

15              MR. MARDEROSIAN:  I think the question

16         is vague as to what was meant by tagging.  And

17         you might want to ask him about that.

18              MR. ZAKARIN:  I will.

19              MR. MARDEROSIAN:  Just so you know,

20         because they've worked a lot with that

21         TuneSat.

22              MR. ZAKARIN:  I have no doubt about it.

23   BY MR. ZAKARIN:

24        Q     Now, you didn't have to listen to every

25   single audio clip that TuneSat provided to you

Page 221

1    because they bunch them, didn't they?

2         A     They do.  I understand that, but we

3    chose to listen to each and every audio clip.  I

4    guess we have a lot of free time.

5         Q     I'm not going to say a word.

6               So you did listen to each and everyone

7    of them, even though they bunched them?

8         A     That's correct.

9         Q     By the way, were you able to verify

10   that their bunching of them, or bundling of them

11   into categories, was correct --

12        A     I found everything to be accurate from

13   that company.

14        Q     And we've looked at a spreadsheet that

15   TuneSat produced, which I think reflects your

16   tagging of -- which means identifying the type of

17   use.

18        A     I understand the term.

19        Q     Okay.

20              MR. MARDEROSIAN:  Just for the record,

21         again, I'm going to object that that somewhat

22         mischaracterizes what he said, what is meant

23         by tagging, to put that little mark on the cue

24         sheet.  It wasn't explained in the depo and I

25         got the point of your question, but I'm not

1                   ARON MARDEROSIAN:  How was it spelled?

2     BY MR. ZAKARIN:

3          Q      "Good Life"?

4          A      That's the first one, yes.

5          Q      That's written by Werner Kenny?

6          A      Kenny Werner, yes.

7          Q      Kenny Werner would be right.  It could

8     live a been a drone.  Also --

9          A      Published by Bayham, yes.

10         Q      Yes.  And then Kenny Werner AETN?

11         A      "The Good Life".

12         Q      Correct.

13         A      His title change is there for the AETN

14    version.

15         Q      And there's also "The Good Life" by

16    Robin Loxley and Slow Wave?

17         A      That is correct.

18         Q      Okay.

19         A      If I can make note there on the AETN --

20                ARON MARDEROSIAN:  And PRS by the way.

21                THE WITNESS:  On the AETN version of

22         "The Good Life" for Kenny Werner, his "Good

23         Life" registration at BMI, Nova is solely

24         registered to Bayham with the work number

25         ending in 6492.  That is AETN "The Good Life"

```
 1            work number ending in 6505 has now been
 2            changed to AETN "The Good Life," Kenny Werner.
 3            Now it's biographically entertaining music.  I
 4            take it that's their partnership with A & E
 5            where they profit share in the publishing of
 6            these works.
 7   BY MR. ZAKARIN:
 8        Q      They share the publisher share of
 9   public performance income, correct?
10        A      That would be a profit, yes.
11        Q      We've gone through that.
12        A      Okay.
13        Q      And then there's "Good Life" also by
14   John Fulford?
15        A      Yes.
16        Q      Which appears to be Sony ATV Harmony,
17   which is not Extreme, correct?
18        A      Is Extreme not a Sony ATV company?
19        Q      Sony and ATV are different -- Sony ATV
20   and Extreme are different companies.
21        A      Oh, okay.  It's just MTV songs on that
22   one. gotcha.
23            MR. MARDEROSIAN:  All of the
24            publication information indicates that Extreme
25            is part of Sony ATV.
```

1              MR. ZAKARIN:  Extreme is owned by Sony

2         ATV.  It's a different company.

3    BY MR. ZAKARIN:

4         Q     And then we have your "Good Life".

5    Okay?  So you're aware, aren't you, looking at

6    Exhibit 39 that there are -- again, the screen shot

7    I took, 1,013 -- just titles at BMI that are "The

8    Good Life".  Just at BMI.

9         A     I'm completely aware of that.  The

10   point being our song has turned in "It's a Good

11   Life".  Now, per Kelsey Dewald's e-mail the practice

12   is Extreme needed to change titles, I'm questioning

13   as to why they had to remove "it" and "a" and change

14   it to "The Good Life" and AETN "The Good Life"

15   knowing that all the titles you just read from this

16   document for all the writers, including Kenny Werner

17   and Robin Loxley already existed within the Extreme

18   library.  Why would they need to duplicate the title

19   for our work, sir?  I would say that is evidence

20   that could divert royalties away from us.

21        Q     I'm just looking to see if I have

22   anything else that I want to do.

23              When BMI reported to you, I think you

24   mentioned this before, it reported to you for songs

25   that you self-publish, as well as songs that were

1    published by Extreme, as well as songs that were

2    published by Songs of Puke and the Brothers Heathen

3    before you took control of the Brothers Heathen,

4    correct?

5         A    Yes.

6         Q    Did you ever compare the quantum of

7    performance income that was being reported to you by

8    way of example in programs on cue sheets where there

9    were both songs published by Extreme and songs

10   published by you within the same program?

11        A    So your question is, if I'm

12   understanding correctly, your question is whether or

13   not on the same cue sheet if an HM work and one of

14   our individually owned self-published works existed

15   on the same program, the quantification of the

16   amount paid for our work versus one the Extreme

17   works; is that correct?

18        Q    Yes, did you ever do that comparison?

19        A    I can't say I did that comparison.  My

20   comparisons were more along the lines of which works

21   were being used and which ones weren't being

22   reported.

23        Q    As you sit here now, you're not aware

24   of any disparities in how much you were paid when

25   your self-published works were in the same program

1    as works published by Extreme?

2              MR. MARDEROSIAN:  Writer's share in

3         terms of performance royalties?

4              MR. ZAKARIN:  Correct.  We're talking

5         about the BMI statements.

6              THE WITNESS:  The disparity came from

7         not so much paid, but the disparity came from

8         what's actually being reported.

9    BY MR. ZAKARIN:

10        Q     Let's just stay with the question I

11   asked because it will be simpler and we'll actually

12   get done.

13             MR. MARDEROSIAN:  Again, you're

14        arguing.

15             MR. ZAKARIN:  I'm not.

16             MR. MARDEROSIAN:  This is how he

17        chooses to respond to your question.

18             MR. ZAKARIN:  Mick, I'm entitled to get

19        a response to the question.

20   BY MR. ZAKARIN:

21        Q     It's simply, you're not aware as you

22   sit here now of any disparity between what you were

23   paid on a particular show in which your

24   self-published works were used and which -- in which

25   Extreme works were also used?

1    irrevocable right to do so and without our

2    permission.

3         Q    My question is this, in reference to

4    the section that I just read --

5         A    Yes.

6         Q    -- when you're referring to HM Work, is

7    it your understanding based on the language of this

8    provision that an HM Work is a work as to which this

9    Hype Music Option had been exercised?

10        A    As I said earlier --

11             MR. MARDEROSIAN:  Just object, calls

12        for a legal opinion.

13             THE WITNESS:  As I said earlier, I'm

14        simply referring to them as a Hype Music Work.

15   BY MR. HWANG:

16        Q    Okay.  Why are you referring to them as

17   a Hype Music Work?

18        A    If you look on the Extreme website

19   under HYPE, there's four songs listed there.  Those

20   are HYPE Works.

21        Q    Okay.  So other than those four

22   songs -- withdrawn.

23             How many songs did Plaintiffs deliver

24   pursuant to either the 2010 composer agreement or

25   the 2011 composer agreement?

1         A      Total, 124 works completed all

2    agreements, including the Short Form Amendments.

3         Q      Okay.  So other than the four works,

4    with respect to the other 120 works, are those not

5    HM Works?

6              MR. MARDEROSIAN:  I'm just going to

7         object.  It calls for a legal opinion and

8         conclusion.

9              THE WITNESS:  I don't believe they are.

10        I don't know why they're in what's called

11        Mixtape.  There's only four works in the Hype

12        Music Library.

13   BY MR. HWANG:

14        Q      Okay.

15        A      And again, the reason why I say 124 as

16   opposed to 114 is because we turned in 10 to close

17   out Agreement II per Mr. Cuello.

18        Q      We'll get into that.  So when you

19   referenced the HM Works, you're referring to the

20   four works that are classified as being part of the

21   Hype Music Library and not the other 120, correct?

22        A      As I stated earlier, Mr. Hwang, they've

23   been referred to throughout this whole litigation,

24   including in e-mails, and in these agreements as HM

25   Works.  It's a loose term.  I'm not specifying them

Page 389

1    in any category. I'm just referring to them as HM

2    Works.

3         Q     Is there any other source from which

4    you derive that term HM Works other than the

5    Section 5.1?

6         A     I've heard it thrown around in

7    conversations that I've had with Viacom employees.

8         Q     Was it your understanding that the

9    rights and obligations with respect to all 124 works

10   delivered pursuit to the 2010 Composer Agreement and

11   2011 Composer Agreement, including the Short Form

12   Agreements thereto had been assigned to MTVN and

13   Extreme?

14            MR. MARDEROSIAN:  Object, calls for a

15        legal opinion and conclusion.  The question is

16        compound.

17            THE WITNESS:  I think I made it clear

18        earlier what my statement was on the first 50

19        works when they were transferred improperly.

20   BY MR. HWANG:

21        Q     Okay.  What about with respect to the

22   other 74 works?

23        A     I believe that the four works that fell

24   under this agreement that are included on the

25   Extreme site under HYPE are the only works that

1    pertain to HYPE.  The other works I think executed

2    -- excuse me, the Hype Music Option, they optioned

3    that.  So those would probably be included in this

4    agreement as well.

5         Q     I'm sorry, I didn't understand your

6    testimony.  What other works were optioned and you

7    referenced the Hype Music Option?

8         A     You might want to fix your microphone.

9         Q     I didn't understand your testimony.

10   You referenced the Hype Music Option and you said

11   they optioned that.  Who optioned what under the

12   Hype Music Option?

13        A     All the Short Form Agreements that came

14   from your clients Viacom all optioned the Hype Music

15   Option 5.1 in the Short Form Agreement.

16        Q     Okay.  And you delivered additional

17   works other than those referenced in the Short Form

18   Agreements, didn't you?

19        A     Specify.

20        Q     Okay.  So let me break this down.  You

21   have the 50 works under the 2010 Composer Agreement

22   in one bucket?

23        A     Correct.

24        Q     You have what I believe is 60 songs

25   that were delivered pursuant to the four Short Form

Page 391

1    Agreements executed subsequent to the execution of
2    the 2011 Composer Agreement; is that right?
3         A       Uh-huh, and you're leaving out the four
4    songs, also, that were the Hype songs?
5         Q       That's the second bucket that I'm
6    referring to.
7         A       Well, you said 60 and 60 would include
8    56 Punk'd Works, plus four additional works, theme
9    song for "Lil Duval," "Ain't That America"; theme
10   song for "Buck Wild," including two additional works
11   commissioned for "Buck Wild."  That's 60.
12        Q       Right.
13        A       Plus the four works that are -- that
14   Mr. Zakarin described as Hypo 25, the Scavenger's
15   EP.
16        Q       What four songs are those?
17        A       "Mulholland Drive," "Cold Water
18   Canyon," "Figueroa Street" and "Little Girl Lost".
19   Plus the 50 upfront.
20        Q       Okay.  So you have the 50 upfront?
21        A       Uh-huh.
22        Q       You have the 60 delivered pursuant to
23   the four Short Form Agreements and then you have the
24   four HYPE music songs that were on the Scavenger's
25   EP?

1          A        Correct.

2          Q        And you testified that there were a

3     total of 120, so they were what, 124?

4          A        Plus the additional 10 songs Mr. Cuello

5     requested of us to close out the second agreement so

6     he could sign off on it.

7          Q        Okay.  So if I understand your

8     testimony as to the first 50 songs, the Hype Music

9     Option was not exercised?

10         A        Say it again.

11         Q        If I understand your testimony, the

12    Hype Music Option was not exercised as to the first

13    50 songs?

14              MR. MARDEROSIAN:  I just object.  It's

15         vague.  It calls for a legal opinion and

16         conclusion.

17              THE WITNESS:  I don't see anywhere

18         where it was in this transfer.  No composure

19         signatures.

20    BY MR. HWANG:

21         Q        Okay.  And with respect to the 60 songs

22    that were delivered pursuant to the four Short Form

23    Agreements, the Hype Music Option was or was not

24    option?

25         A        I believe the Hype Music Option was

1      exercised per those agreements.  It's clearly marked

2      in the first paragraphs of those agreements.

3            Q      Okay.  With respect to the four tracks

4      on the Scavenger's EP was the Hype Music Option

5      exercised or not?

6            A      I don't believe that Hype Music Option

7      was exercised because it falls under this agreement,

8      which is clearly labeled HYPE Master Agreement.

9      Therefore, those songs would fall under the HYPE.

10           Q      Okay.  Those were HM Works?

11           A      You could say that, yes.

12           Q      Okay.  What about with respect to the

13     last 10 songs that you delivered, was the Hype Music

14     Option exercised as to those songs?

15           A      As I indicated, Mr. Cuello did not

16     instruct us what he did with the songs, but they

17     were delivered under this agreement, the Hype Master

18     Agreement, to close it out so Mr. Cuello could sign

19     off, pay us our second half to complete the

20     agreement.

21           Q      And you were, in fact, paid the second

22     half?

23           A      Yes, we were.

24           Q      And that's the $10,000 referenced in

25     the --

Page 394

```
 1          A      This agreement was for a total of
 2     $20,000.  So it was 10,000 upfront, 10,000 on the
 3     back half of completion.
 4          Q      You were paid all $20,000, correct?
 5          A      We completed and we were paid all
 6     $20,000.
 7          Q      Are you aware that a breach of contract
 8     claim has been asserted against Extreme, the two
 9     Extreme defendants in this action?
10          A      I believe I am, yes.
11                 MR. MARDEROSIAN:  Objection, calls far
12          a legal opinion and conclusion.
13                 THE WITNESS:  Yes.
14     BY MR. HWANG:
15          Q      That's your legal conclusion -- that's
16     your legal opinion, that you are aware?
17          A      Am I lawyer?
18                 MR. MARDEROSIAN:  It's not that he's
19          aware, it's what you mean by breach of
20          contract claim.
21     BY MR. HWANG:
22          Q      So you're aware that a breach of
23     contract --
24                 MR. MARDEROSIAN:  Don't argue with the
25          witness, please.
```

1          obviously not satisfied with his responses.

2          You don't accept them and you're just

3          harassing.  It's past 8:00, I believe now.

4          So, you know, you need to get to your

5          questions and quit repeating yourself and quit

6          arguing with the witness.

7                    MR. HWANG:  I think the witness was

8          just about to answer, unless I'm wrong.

9                    THE WITNESS:  I was going to say I'm

10         not going to testify on behalf of Mr. Cuello.

11         You should have asked him that when he was

12         here.

13                   MR. MARDEROSIAN:  You represented him,

14         he's your client.  He retained you, according

15         to his testimony.

16                   MR. HWANG:  Thank you, Mick.

17    BY MR. HWANG:

18         Q     Okay.  When did you first learn that

19    the songs at issue in this case were going to be

20    placed in the Mixtapes library?

21         A     I believe Mr. Elias, if I'm not

22    mistaken, sent an e-mail that was produced that said

23    that the tracks were put in the Mixtape.  That's

24    where we first learned of it.

25         Q     And when was that?

Page 466

```
 1          A     I can't recall the date on the e-mail,
 2     sir.  I don't have it in front of me.  If you have
 3     it there, I'm happy to take a look at it.
 4          Q     We saw an e-mail earlier.  It was dated
 5     September 2, 2011 and it related to the songs for
 6     the proposed titles, "Pimps and Hose," H-O-S-E, and
 7     "Thug Paraphernalia."
 8                Do you recall that e-mail chain?
 9          A     Do you have the number there?  I can
10     pull it up.
11          Q     I have the e-mail in front of me.  I
12     don't have the exhibit number.  We can get it,
13     though.
14                MR. MARDEROSIAN:  Was it marked today?
15                MR. HWANG:  It was marked today, yes,
16          and we can see if we can find it.
17                MS. SMITH:  It's RM-14.
18                THE WITNESS:  Thank you, Erin.
19                MS. SMITH:  You're welcome.
20     BY MR. HWANG:
21          Q     Okay.  You recall Mr. Zakarin asked you
22     about the reference in Kelsey Dewald's September 2
23     e-mail --
24          A     Uh-huh.
25          Q     -- to these Mixtape additions.  Do you
```

1   see that?

2       A       Which part are you reading, Mr. Hwang?

3       Q       I'm looking at the September 2, 2011

4   e-mail from Kelsey Dewald to you, towards the bottom

5   of that first page of this exhibit.

6       A       Where she says, "I can understand the

7   concern of turning people off"?

8       Q       Correct.  That paragraph, if you look

9   on the fourth line down, there's a reference to,

10  quote, these Mix tape addition, end quote.  Do you

11  see that?

12      A       Yes.

13      Q       And she's referring by these Mix tape

14  additions to tracks you had delivered, pursuant to

15  one of the agreements at issue, correct?

16      A       Yes, that's correct.

17      Q       So is it safe to say that by this time

18  at least you were aware that at least some of the

19  songs delivered by Plaintiffs, pursuant to any of

20  the agreements at issue, would be placed in the Mix

21  tape library?

22      A       By September of 2011, yes, we were

23  being told they were being put in something called

24  Mix tape.  We weren't aware of it because we didn't

25  sign that agreement.  We signed a Hype agreement.

1        Q      Did you object to that?

2        A      I don't think I did.

3        Q      Did you feel it was a violation of the

4    obligations owed to you by any of the Defendants in

5    this action?

6               MR. MARDEROSIAN:  Objection.

7    BY MR. HWANG:

8        Q      -- for these songs to be placed in the

9    Mixtape library?

10              MR. MARDEROSIAN:  Calls for a legal

11          opinion.

12              THE WITNESS:  Mr. Hwang, if I can be

13          clear with you, I think you can see by reading

14          these e-mails I tried to make this entire

15          process with MTV pretty easy.  So I didn't

16          make many objections along the way.  I tried

17          to make it as smooth as possible.  I don't

18          know that I need to be so petty as to argue

19          about them mentioning that these Mixtape

20          additions will work amazingly in catalog.

21          Now, the catalog is very vast over at Extreme.

22          You described several volumes yourselves.

23   BY MR. HWANG:

24       Q      So you didn't raise any objections?

25       A      No, I did not, sir.  I tried to make

Page 469

1     this process smooth.

2          Q     And you say in your response to

3     Ms. Dewald, I'm reading in the middle of the second

4     paragraph, quote, Believe me when I say how grateful

5     we are to be a part of this library and the whole

6     process, end quote.

7                Was that an accurate reflection?

8          A     Yes, it was.

9          Q     And by "this library," were you

10    referring to the Mixtape library?

11         A     At this time, if that's the way

12    Ms. Dewald described it, then yes, I was.  As you

13    can see, like I said through all my e-mails, I

14    always thank people.  I'm always very appreciative

15    throughout the process.  Even when I'm asking them

16    to pay me, I say thank you.

17         Q     That's especially when you should say

18    thank you, right?

19         A     You'd be surprised.  But I'm glad you

20    brought that up.  I'd like to discuss that, if we

21    could, for a second.  You read the quote, Believe me

22    when I say how grateful we are to be a part of this

23    library and the whole process and how appreciative

24    we are of you for all your efforts and hard work on

25    our behalf.  It does not go unrecognized from this

Page 533

1          A       Not that I can recall.  I may have
2     asked questions about statements or certain works on
3     episodes, but I don't recall asking for blocks of
4     cue sheets like this.
5          Q       Okay.  Just a couple of wrapup
6     questions.  With respect to the TuneSatSat data that
7     you received from TuneSatSat, there was a
8     spreadsheet that we looked at, or an excerpt of
9     which we looked at at TuneSat's deposition.
10                 Do you recall that?
11         A       I do.
12         Q       You attended that deposition, right?
13         A       I did not.
14         Q       You're aware of the spreadsheet that
15    I'm referring to?
16         A       I am.  It's provided in the production
17    by TuneSatSat.
18         Q       Okay.  You testified, I think, earlier
19    that you and your brother had listened to each of
20    the audio files TuneSat provided?
21         A       We have.  Both on the side and for what
22    TuneSatSat provided in their production.
23         Q       Do you know how many of -- withdrawn.
24    How many detections did TuneSatSat report?
25         A       I believe in the sheet that is part of

```
1     that production, was 31,296.  That number has grown
2     since.
3          Q     Okay.  You listened to all 31,000-plus
4     of those audio files?
5          A     As Don said, a lot of them are grouped
6     together; but yes, we have.
7          Q     Okay.  And of those detections, how
8     many, if you know, were for in-program uses?
9          A     Without my notes in front of me, tough
10    to say off the top of my head.  I'd say a fair
11    amount of them.
12         Q     Do you know?  Can you give me a range?
13         A     No.  I can't give you a range.
14         Q     You haven't quantified it?
15         A     No, there's an expert that's putting
16    that together for this.
17         Q     Is that expert Bob Cohen?
18         A     That's between you and my attorney.
19    You're welcome to ask him, Mr. Hwang.  I will make
20    note, though, that the amount of usages detected in
21    these TuneSat are far less than in the cue sheets
22    that were turned in and far less than the cue sheets
23    that were turned in to Extreme.
24              MR. MARDEROSIAN:  And the answer is
25         there are auditing consultants that I have
```

Page 536

1

2                    C E R T I F I C A T I O N

3

4              I, LISA FORLANO, a Certified Realtime

5         Reporter, Certified Court Reporter and Notary

6         Public, do hereby certify that I reported the

7         deposition in the above-captioned matter, that

8         the said witness was duly sworn by me; that

9         the foregoing is a true and correct transcript

10        of the stenographic notes of testimony taken

11        by me in the above-captioned matter.

12             I further certify that I am not an

13        attorney or counsel for any of the parties,

14        not a relative or employee of any attorney or

15        counsel connected with the action, nor

16        financially interested in the action.

17

18             LISA FORLANO, CRR, CCR #XI01143

19

20   Dated:  August 2, 2018

21

22

23

24

25

Page 537

```
 1                    JURAT
 2        I, ROBERT MARDEROSIAN, the witness herein,
 3   the foregoing testimony of the pages of this
 4   deposition, do hereby certify it to be a true
 5   and correct transcript, subject to the corrections,
 6   if any, shown on the attached page.
 7
 8        _____
 9                 ROBERT MARDEROSIAN
10
11
12
13
14   Subscribed and Sworn to before me
15   this _____ day of       2018.
16   _____
17   Notary Public
18
19
20
21
22
23
24
25
```