# Exhibit 6
To the Zakarin Reply Declaration
in further support of
Extreme's motion for Summary Judgment

```
              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF NEW YORK


TWELVE SIXTY LLC,              )
ARON MARDEROSIAN, and          )
ROBERT MARDEROSIAN,            )
                               )
          Plaintiffs,          )
                               )
vs.                            )  Civil Action No.
                               )  1:17-CV-01479-PAC
EXTREME MUSIC LIBRARY          )
LIMITED, a division of         )
Sony/ATV Music Publishing;     )
EXTREME MUSIC LIMITED;         )
VIACOM INTERNATIONAL, INC.     )
NEW CREATIVE MIX, INC.,        )
HYPE PRODUCTION MUSIC,         )
                               )
          Defendants.          )
_____)




              Videotaped Deposition of:

              KELSEY DEWALD

              Taken on behalf of the Plaintiffs

              August 1, 2018




              ALPHA REPORTING CORPORATION
                  238 Adams Avenue
              Memphis, Tennessee 38103
                    800-556-8974
                 alphareporting.com

REPORTED BY:  VICKI GANNO, RPR, CCR, LCR-#198
```



```
 1              A P P E A R A N C E S

 2    For the Plaintiff:

 3         MIKE MARDEROSIAN, ESQ.
           Marderosian & Cohen
 4         1260 Fulton Mall
           Fresno, CA 93721
 5         559-441-7991
           mick@mcc-legal.com
 6

 7    For the Defendants Extreme Music Library Limited
      and Extreme Music Limited:
 8
           DONALD S. ZAKARIN, ESQ.
 9         Pryor Cashman, LLP
           7 Times Square
10         New York, NY 10036-6569
           212-421-4100
11         dzakarin@pryorcashman.com

12

13    For the Defendants Viacom Internatinal Inc., New
      Creative Mix, inc, and Hype Production Music:
14
           WOOK HWANG, ESQ.
15         Loeb & Loeb, LLP
           345 Park Avenue
16         New York, NY 10154
           212-407-4035
17         whwang@loeb.com

18

19

20

21

22    ALSO PRESENT:

23         JOHN RICHMOND, Videographer

24

25
```



```
 1   A.        I -- we had a sales staff of a few
 2   people.  I can't remember.  Maybe Leetal
 3   Nissenbaum.  I don't remember who was just their
 4   rep.
 5   Q.        I see.
 6   A.        If we -- if we even had just one rep
 7   since they were so big.
 8   Q.        Did you understand that there -- there
 9   was what is generally referred to as a blanket
10   license agreement between A&E Networks and
11   Extreme Music?
12   A.        Yes, sir.
13   Q.        And -- and so this work that you were
14   doing was -- was part of that license
15   arrangement; correct?
16   A.        What do you mean by --
17   Q.        Well, I mean, you just knew that there
18   was a contractual relationship between Extreme
19   and A&E for A&E's use of music that was
20   controlled by Extreme.
21   A.        Yes, I did.
22   Q.        In regard to the playlists, I -- I think
23   you said that -- that once a track was settled in
24   on, you would -- you would -- you would deliver
25   that track to the A&E Networks somehow; is that
```



```
 1   right?
 2   A.       Usually with a playlist because of the
 3   way the website is, they could just download it
 4   themselves.
 5   Q.       From the website?
 6   A.       From the website, from the playlist that
 7   I sent, or the majority of their editors had hard
 8   drives that had the content already on it.  So
 9   they didn't have download anything.
10   Q.       Okay.  Now let's -- let's talk about
11   that.  Would your playlists be on this hard
12   drive?
13   A.       No.  The playlist would be
14   electronically digitally.
15   Q.       Okay.  You would -- you would transfer?
16   A.       I would just send and then they
17   downloaded them.
18   Q.       And what information would go along with
19   -- with the track?
20   A.       The most tracks are -- or all tracks are
21   embedded with metadata which contained everything
22   from key words, track duration, composer
23   information, publishing information, obviously
24   track title, the catalog code.  That's all
25   embedded in the -- the metadata.
```



1  Q.      And who was responsible with the Extreme
2  organization, to your knowledge, once you and Ms.
3  Ansonga settled on the use of the particular
4  track?  Who was settled in on the embedding of
5  the metadata that would go along with the track
6  to A&E?
7  A.      It was done --
8             MR. ZAKARIN:  Objection.
9             THE WITNESS:  It was all done
10 ahead of time, so it wouldn't be a decision.
11 It's just already attached.
12 BY MR. MARDEROSIAN:
13 Q.      Now I'm assuming it was done ahead of
14 time.  Do you know who -- what department or who
15 with the Extreme organization was responsible for
16 creating that -- that metadata that went along
17 with the track that would identify composer name
18 -- hold on, Don -- composer name, publisher name,
19 some of the other criteria that you referenced
20 that you -- you understood was part of the the
21 metadata?
22            MR. ZAKARIN:  Okay.  I'm going to
23 object because I think she testified she didn't
24 send tracks.  She sent information.  The tracks
25 were either available off of their website, or



```
 1   they were already had a hard dive.
 2                 MR. MARDEROSIAN:  I'm not -- the
 3   question isn't focused --
 4                 MR. ZAKARIN:  You're suggesting
 5   that she sent tracks, and that's contrary to what
 6   she testified.
 7                 MR. MARDEROSIAN:  Well, I'm just
 8   using the word "send."  She indicated that they
 9   could download the track from the website, or you
10   indicated that -- that the music would be on a
11   hard drive; correct?
12                 MR. ZAKARIN:  Which they already
13   had.  She wasn't sending tracks.  She was sending
14   electronic information.  I just --
15                 MR. MARDEROSIAN:  Well, let's
16   clarify it.  Since you raised it, let's clarify
17   it because there seems to be some ambiguity
18   there.
19                 MR. ZAKARIN:  I didn't think so,
20   but go ahead.
21                 MR. MARDEROSIAN:  Well, there must
22   be, so we'll clarify that.
23   BY MR. MARDEROSIAN:
24   Q.       This hard drive that would contain the
25   embedded metadata; correct?
```



```
 1    A.        Uh-huh.
 2    Q.        Who -- yes?
 3    A.        Yes, sir.
 4    Q.        Okay.  Who would -- who would create
 5    that?  Let's -- let's talk again about the
 6    relationship between what you were doing on
 7    behalf of Extreme and A&E once Ms. Ansonga
 8    settled in on the particular song.  Who created
 9    this hard drive that would then be used by the
10    A&E Network programming?
11              MR. ZAKARIN:  Objection, because it
12    presumes that the hard drive followed an
13    agreement on a particular song rather preceding
14    it, which I think was what the witness testified
15    to.
16              MR. MARDEROSIAN:  Well, I'm just
17    trying find out what her testimony is, Don.
18              MR. ZAKARIN:  I understand that.
19    BY MR. MARDEROSIAN:
20    Q.        Okay.  So explain it to me.  I -- I
21    know I heard you say that they could go to the
22    website.
23    A.        Uh-huh.
24    Q.        And they -- yes?
25    A.        Yes.
```



1  Q.        And they can actually down -- download a
2  particular track from a website, and -- and then
3  interface it with a particular program or use
4  within the A&E Networks; correct?
5  A.        Yes.
6  Q.        That's one -- one way in which A&E would
7  be able to access the actual track; correct?
8  A.        Correct.
9  Q.        And the other way was what you said,
10 through a hard drive, and explain that to me as
11 to who would creates that hard drive or --
12 A.        So we had a -- I don't remember what the
13 department name was, but a hard drive staff that
14 would load these hard drives constantly.
15 Q.        Within the Extreme?
16 A.        Within the Extreme.
17 Q.        Organization.
18 A.        Organization, that they would load it
19 with the tracks, and the tracks had the metadata
20 already attached when they loaded it.
21 Q.        I see. And in regard to the -- to the
22 metadata, do you know who within the Extreme
23 organization was responsible for creating that,
24 updating it, making sure that it was correct, all
25 of that?



1   A.      I don't recall who inputs that
2   information.  What I do recall is some of it was
3   like the key words because again, that was
4   primarily my department was key wording.
5   Q.      Key words such a composer names, things
6   of that nature?
7   A.      Key words meaning descriptors that would
8   help the tracks be found quicker.  So if you need
9   a happy track, you can search happy rock, and it
10  would come up.  So I know those were done as they
11  -- as they're going into the Extreme website,
12  they would be exported ahead of time and attached
13  via metadata that way.
14  Q.      Okay.  Now the metadata that I'm most
15  interested is the metadata identifying composer
16  name, ISWC numbers --
17  A.      Correct.
18  Q.      -- I think things like that, publisher
19  name.  You indicated that that -- that was
20  embedded and placed on the hard drive from within
21  Extreme organization; correct?
22  A.      Correct.
23  Q.      And so I would like to know, if you
24  know, either what department or what individual
25  during the time that you were the catalog and



1  content executive and manager.  What was your
2  understanding as to, was there an individual or
3  individuals that would make sure that information
4  was correct, updated, things of that nature?
5           MR. ZAKARIN:  Objection on
6  "update," but you can answer.
7           THE WITNESS:  I can only recall
8  that Dan Knight being the overall VP of music
9  would at least oversee.  He was -- you know, any
10 catalog stuff would need be to overseen by him.
11 What I don't know is there was a program -- the
12 star minor, I believe was the name of the
13 program.  Star minor is what helps attach the
14 metadata; and from what I understood, it could be
15 done in one place.  And then we would get a hard
16 drive shipped to us to be like the master, so to
17 speak.  But that was updated constantly, and --
18 and we had -- you know, we were constantly
19 rotating drives out.
20 BY MR. MARDEROSIAN:
21 Q.      All right.  Now one of the things that
22 -- that you mentioned that would -- I think would
23 probably be on the metadata would be the title of
24 the song; correct?
25 A.      Correct.



1   Q.      And -- and I -- I believe that you were
2   involved somewhat in the titling process as well;
3   right?
4   A.      Of the MTV and A&E tracks.
5   Q.      Right.  And I think you worked with
6   Russell Emanuel in regard to titling as well;
7   correct?
8   A.      He would have to approve them, but I was
9   responsible again, for these specific catalogs.
10  Q.      Right.
11  A.      I would come up the list, and then he
12  would adjust if they were either duplicates, or
13  with Russell, not enough character.
14  Q.      Right.
15  A.      He liked them to have a fun, playful
16  Extreme personality to them.  But I was
17  responsible for titling, the core titling of
18  those tracks, if they needed to be titled.
19  Q.      You mentioned the word "duplicate."
20  What -- what did you mean?  How did that --
21  A.      If the track already existed in our
22  catalog.
23  Q.      In your web -- on the website, in other
24  words.
25  A.      Correct.



```
 1   Q.       So your effort was to make sure that
 2   there were not duplicate titles of a song?
 3   A.       To the best of my ability, yes.
 4   Q.       Okay.  And -- and how -- well, let me
 5   ask this.  Did you know if Dan Knight -- did he
 6   report to Russell?
 7   A.       Oh, yes.  Everybody reported to Russell.
 8   Q.       Everybody did including you?
 9   A.       Correct.
10   Q.       And so was Russell your direct
11   supervisor when you were the content manager --
12   Russell Emanuel?
13   A.       He was -- I think Dan was technically my
14   direct music manager, so to speak, but I shared a
15   wall with Russell, so...
16   Q.       You mean your office is right next door?
17   A.       Correct.
18   Q.       Okay.  And -- and what about with Mr.
19   Knight -- Dan Knight?
20   A.       I only saw him maybe once a year.
21   Q.       Okay.
22   A.       But we would talk, you know, and
23   exchange.
24   Q.       But am I correct that the song title
25   would be part of the metadata that would go with
```



1  the track?
2  A.      That's correct.
3  Q.      On the hard drive?
4  A.      Correct.
5  Q.      Okay. And -- and you -- you were
6  involved in -- in that process, the titling the
7  process, subject to Russell's approval of the
8  titles?
9  A.      Of A&E and MTV.
10 Q.      Yeah. And the purpose as you understood
11 it, at least your role, was not to select a
12 title, if you could, that duplicated an existing
13 title of a song on the Extreme website; correct?
14 A.      Correct.
15           MR. HWANG: Objection.
16 BY MR. MARDEROSIAN:
17 Q.      What were -- what were the -- what were
18 the number of tracks, if you remember, involved
19 in the entire Extreme Music website during the
20 time that you -- you were the catalog and content
21 music manager? Do you have an estimate for us --
22 your best estimate?
23 A.      The best estimate, 15 to 20,000
24 copyrights.
25 Q.      And then at some point, you -- you



1            REPORTER CERTIFICATE
2            I, VICKI S. GANNO, Registered
3    Professional Reporter, Certified Court
4    Reporter, Licensed Court Reporter, and Notary
5    Public for the State of Tennessee, hereby certify
6    that I reported the foregoing proceedings that
7    were stenographically reported by me; and that
8    the foregoing proceedings constitute a true and
9    correct transcript of said proceedings to the
10   best of my ability.
11           I further certify that I am not an
12   attorney or counsel of any of the parties, nor a
13   relative or employee of any attorney or counsel
14   connected with the action, nor financially
15   interested in events of this action.
16           Signed this 7th day of September August,
17   2017.
18
19
20   
     _____
21   VICKI S. GANNO, RPR, CCR, Notary Public
22   State of Tennessee at Large
23   My Commission expires Nov. 23, 2020.
24
25

```
Reference No.: 2365950


Case:  TWELVE SIXTY LLC vs EXTREME MUSIC LIBRARY Sony/ATV Music Publishing


       DECLARATION UNDER PENALTY OF PERJURY


       I declare under penalty of perjury that
I have read the entire transcript of my Depo-
sition taken in the captioned matter or the
same has been read to me, and the same is
true and accurate, save and except for
changes and/or corrections, if any, as indi-
cated by me on the DEPOSITION ERRATA SHEET
hereof, with the understanding that I offer
these changes as if still under oath.



       _____
       Kelsey Maureen Dewald


       NOTARIZATION OF CHANGES
            (If Required)


Subscribed and sworn to on the _____ day of

_____, 20____ before me,


(Notary Sign)_____


(Print Name)                    Notary Public,


in and for the State of _____
```

