UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
TWELVE SIXTY LLC, ARON MARDEROSIAN,  :
and ROBERT MARDEROSIAN,                        :
                                                                      :
                    *Plaintiffs*,                             :          17-cv-1479 (PAC)
                                                                      :
               - *against* -                                   :          **OPINION & ORDER**
                                                                      :
EXTREME MUSIC LIBRARY LIMITED, a          :
division of Sony/ATV Music Publishing;          :
EXTREME MUSIC LIMITED; VIACOM           :
INTERNATIONAL INC.; NEW CREATIVE MIX  :
INC.; and HYPE PRODUCTION MUSIC,           :
                                                                      :
                    *Defendants*.                           :
-------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

Before this Court are eight motions:  Defendants Extreme Music Library Limited,

Extreme Music Limited, and Viacom International Inc. ("Defendants," "Extreme," or "Viacom")

move to exclude the expert opinion and testimony of Robert Kohn ("Kohn"); to exclude the

expert testimony of Karen Rodriguez ("Rodriguez"); and make two motions for summary

judgment.  Plaintiffs Twelve Sixty, LLC, Aron Marderosian, and Robert Marderosian

("Plaintiffs") file four motions to strike inadmissible evidence submitted in conjunction either

with the motions to exclude or the motions for summary judgment.

The Plaintiffs' motion to strike evidence in support of Viacom's motion to exclude

Rodriguez's expert testimony, and the Defendants' motion to exclude Rodriguez's expert

testimony, are both DENIED.  The Plaintiffs' motion to strike evidence in support of Viacom

and Extreme's motion to exclude Kohn's expert testimony is GRANTED in part and DENIED in

part, and Plaintiffs' motions to strike evidence in support of Extreme and Viacom's motions for

summary judgment are dismissed as moot.  Viacom and Extreme's motion to exclude Kohn's

expert testimony is GRANTED.  Finally, the Defendants' motions for summary judgment are both GRANTED.

## **BACKGROUND**

### I.  **Procedural Background**

This case began three and a half years ago, on the other side of the country, when the Plaintiffs filed their Complaint in the Central District of California.  (Dkt. 1, at 1).  The Complaint listed 11 claims, including breach of contract, breach of the covenant of good faith and fair dealing, fraud, breach of fiduciary duty, and promissory estoppel.  (*Id.* at 16–21).  The district court in California *sua sponte* asked the Parties to show cause as to why they should not be bound by the contract's forum-selection clause specifying New York.  (Dkt. 21).  After hearing from the Parties, the district court enforced the forum-selection clause and transferred the case to the Southern District of New York, where it was assigned to this Court.  (Dkt. 27; Minute Entry dated Feb. 28, 2017).  The Plaintiffs filed the First Amended Complaint ("FAC"), which added the Viacom Defendants, on March 28, 2017.  (Dkt. 49).

The FAC reduced the number of claims to six, including breach of implied-in-fact contract, fraud, rescission, and accounting, all related to allegations that the Defendants had deprived the Plaintiffs of an unspecified, unknown sum due them under the 2010 or 2011 Agreements.  (FAC, Dkt. 49, at 5, 35–57).

Viacom and Extreme moved to partially dismiss the Plaintiffs' two breach of contract claims inasmuch as they sought damages beyond the 2011 Agreement; dismiss the claims for fraud, breach of implied-in-fact contract, rescission, accounting, and breach of the duty of good faith and fair dealing; strike the demands for punitive damages and disgorgement of profits; and dismiss the claims against "Hype Music Production."  (Dkt. 89, at 4).  The Court dismissed the

claims for fraud, breach of implied-in-fact contract, rescission, and accounting, and struck the demands for punitive damages and disgorgement of profits.  (Dkt. 89, at 14).  In its January 9, 2018 Order the Court found that contractual provisions in the 2011 Agreement limited the Plaintiffs to recovering damages for licensing fees accruing after July 1, 2014, and that the Plaintiffs could seek damages for alleged breaches as to public performance royalties without limitation.  (Dkt. 89, at 5, 14).  In an effort to "avoid unnecessary discovery and streamline claims," the Parties dismissed the first claim for breach of contract with prejudice in a Stipulation and Order entered December 12, 2018, leaving only the Plaintiffs' Second Claim for Breach of Contract from the FAC.  (Dkt. 140, at 2).

The following day, the Parties jointly wrote to the Court requesting an eight-week extension of the summary judgment schedule as they pursued mediation.  (Dkt. 141, at 1).  The Court granted the request.  (Dkt. 142, at 1).  Two months later, the Parties informed the Court that attempts at mediation had foundered, and a month after that the flurry of motions resolved in the present Opinion and Order ensued.  (Dkts. 143, 144–235).  The Parties submitted more than 5,100 pages of briefing, declarations, and exhibits in support of the eight motions considered here.

## II. Factual Background

The Plaintiffs in this case are Aron and Robert Marderosian, brothers and professional songwriters under the *nom de plume* "Heavy Young Heathens," who conduct their business through their limited liability company Twelve Sixty LLC, which they own and control.  (Pl.'s 56.1 Response, Dkt. 197, ¶ 1).  Viacom is a multimedia company that distributes entertainment

content over cable and satellite TV, through brands including MTV, Nickelodeon, and BET.[1] (*Id.* ¶ 2).  The Extreme Defendants are music publishers that administer production library music.  (*Id.* ¶ 3).  Finally, Broadcast Music, Inc. ("BMI") is a performing rights organization ("PRO") that issues licenses for the domestic public performance of music composed by its affiliate songwriters, including the Marderosians.  (*Id.* ¶ 4, 7).

As a PRO, BMI enters into license agreements with broadcasters, including Viacom, that allow the broadcaster to use songs in its domestic television programs in exchange for a blanket license fee that is paid to BMI.  (*Id.* ¶ 5).  When a song licensed by BMI is used in a television program or film, the licensee submits a cue sheet[2] to BMI that allows the PRO to identify the use of the song.  (*Id.* ¶¶ 10–11).  In this case, BMI then had a separate agreement with the Marderosians whereby BMI payed them the "writer's share" of public performance royalties on the licensed songs.  (*Id.* ¶ 8).  Extreme also had its own agreement with BMI such that its affiliate would collect the "publisher's share" of public performance royalties that BMI paid out. (*Id.* ¶ 9)

The Plaintiffs entered into two contracts—one in 2010 and one in 2011.  (Dkt. 227 ¶ 7). The 2010 Agreement was with New Remote.  The 2011 Agreement, which is the contract relevant to the present motions, was with NCMI.  (*Id.*).  New Remote and NCMI are both wholly-owned Viacom subsidiaries.  (*Id.*).  Viacom itself did not sign either Agreement, but the

---

[1] A number of Viacom subsidiaries are relevant to this suit:  New Remote Productions Inc. ("New Remote") and New Creative Mix, Inc. ("NCMI") are wholly-owned subsidiaries of Viacom, and MTV Networks is a division of Viacom.  (Pl.'s 56.1 Response, Dkt. 188, ¶¶ 2, 3).

[2] "Cue sheets" are submitted to PROs, including BMI, documenting the use of musical works on television programs, in ads, and in movies, and include at least information on the title, author, and publisher of the work, the name of the relevant PRO, and the nature and duration of the use. (Dkt. 188 ¶¶ 77–78).

Parties have stipulated that Viacom and Extreme assumed all rights and obligations under both Agreements.  (*Id.* ¶ 8; Stip. & Order, Dkt. 140, at 2).

Under the 2010 Agreement, the Plaintiffs agreed to deliver 50 original works to Viacom in exchange for a payment of $10,000, plus the writer's share of any public performance income that may be paid out by a PRO.  (Dkt. 148 ¶¶ 6–7;  Dkt. 188 ¶¶ 6–7).  In January 2011 Extreme and Viacom entered into a separate agreement between themselves (the "Co-Publishing Agreement") that granted Extreme 50 percent co-ownership in a specified group of Viacom-owned works, including the Plaintiffs'.  (Dkt. 148 ¶¶ 10–11;  Dkt. 188 ¶¶ 10–11).  Under the Co-Publishing Agreement, Extreme assumed exclusive responsibility for exploitation of the works by parties other than Viacom, and for administering any royalties, including those owed to Viacom, generated by the co-owned songs.  (Dkt. 148 ¶ 12;  Dkt. 188 ¶ 12).

The 2011 Agreement entered into by Viacom and the Plaintiffs includes several sections relevant on the motions for summary judgment.  Section 7.2 states that:

> Notwithstanding anything to the contrary contained herein, in the event Company exercises the Hype Music Option, and provided Composer has complied with all applicable requirements and is not in breach or default of this Agreement, and solely for the period during which the HM Works are exploited as part of the Hype Music Library, Company or the HM Transferees shall pay or cause to be paid to the Composer in respect of all exploitation of the HM Works, a royalty equal to 50% of the Gross Receipts.

(Dkt. 49, Ex. 3, § 7.2; Dkt. 227 ¶ 38).

Section 7.3 of the 2011 Agreement provides that:

> Company agrees that it shall procure that the HM Transferees shall apportion Hype Music Blanket Licensing Income as between Hype Music Blanket Licensed Compositions on a fair, reasonable and practicable basis, such basis to be determined in Company and the HM Transferees' sole discretion.  Without prejudice to the generality of the foregoing, Company and the HM Transferees reserve the right to apportion Hype Blanket Licensing income:
>
> (a) on any actual usage basis determined by Company or the HM Transferees; or

> (b) on any projected usage basis determined by Company or the HM Transferees; or
>
> (c) on a basis which is a composite of the methods described above.

(Dkt. 49, Ex. 3, § 7.3; Dkt. 227 ¶ 39).

Section 7.4 provides that:

> Lender and Composer acknowledge and agree that, except as otherwise specified in this Clause 7, neither Lender nor Composer shall be entitled to any other compensation whatsoever in connection with Composer's service hereunder and/or the exploitation of the Material, including, without limitation, any songwriter royalties, mechanical royalties, phonorecord royalties, synchronization fees, master use license fees, print royalties or any other revenue opportunities, including, without limitation, exploitation of the Works as part of production music libraries (other than the Hype Music Library).  Lender and Composer acknowledge that this agreement constitutes a full buy-out of any and all rights to the Works.  Notwithstanding the foregoing, Lender and Composer and Company hereby acknowledge and agree that Composer may receive and retain Composer's respective portion of the so-called "writer's share" of public performance income which may be payable directly from a performing rights society such as ASCAP, BMI and SESAC, and Company will retain one hundred percent (100%) of the so-called "publisher's share" of public performance income and one hundred percent (100%) of all other publishing income.

(Dkt. 49, Ex. 3, § 7.4; Dkt. 227 ¶ 40).

The Plaintiffs agreed to deliver 35 additional songs under the 2011 Agreement (the Plaintiffs contend that in fact 124 songs were delivered under the 2011 Agreement and related short-form agreements) in exchange for a $20,000 fee.  (Dkt. 49, Ex. 3, §7.1; Dkt. 148 ¶ 14;  Dkt. 188 ¶ 14).  The Plaintiffs received flat-fee payments totaling $92,000 for works delivered under the 2010, 2011, and related short-form agreements.  (Dkt. 148 ¶ 16; Dkt. 188 ¶ 16).

In late December 2015, the Plaintiffs subscribed to a service called TuneSat, which uses audio recognition technology to detect and identify the use of songs in television broadcasts in the U.S. and Europe.  (Dkt. 227 ¶¶ 55, 58).  A TuneSat subscriber supplies the service with audio files and metadata that allow the technology to generate what the Plaintiffs refer to as "audio fingerprints" that are then matched against a broadcast feed.  (Pls. 56.1 Counter., Dkt. 197 ¶¶ 56,

58; Dkt. 227 ¶¶ 56, 58). The purported detection data compiled by TuneSat is then available to the subscriber through the TuneSat website, and can be downloaded in a spreadsheet. (Pls. 56.1 Counter., Dkt. 197 ¶¶ 59–62; Dkt. 227 ¶¶ 59–62).

## **DISCUSSION**

### III.     **Motions to Strike**

Federal Rule of Civil Procedure 26(a) requires parties to provide certain information "without awaiting a discovery request," including "the name . . . of each individual likely to have discoverable information." Fed. R. Civ. P. 26(a)(1)(A)(i). Rule 26(e) provides that in all instances of disclosure made pursuant to 26(a), a party must "supplement or correct its disclosure or response" if so ordered by the court, or "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1).

Where a party fails to make the disclosures required by Rules 26(a) and (e), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Due to the harsh nature of Rule 37 sanctions, "[p]reclusion is not . . . mandatory," *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 304 (S.D.N.Y. Dec. 15, 2015), and "'[t]he party seeking Rule 37 sanctions bears the burden of showing that the opposing party failed to timely disclose information.'" *Markey v. Lapolla Indus., Inc.*, No. CV 12-4622 (JS)(AKT), 2015 WL 5027522, at *16 (E.D.N.Y. Aug. 25, 2015) (quoting *A.V.E.L.A., Inc. v. Estate of Monroe*, No. 12 Civ. 4828 (KPF) (JCF), 2014 WL 715540, at *4 (S.D.N.Y. Feb. 24, 2014)).

The specter of sanctions for failure to comply with Rule 26 is intended to "prevent the practice of 'sandbagging' an opposing party with new evidence." *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004). "Courts in this Circuit recognize that preclusion of evidence pursuant to Rule 37(c)(1) is a drastic remedy and should be exercised with discretion and caution." *Id.*

In considering whether to exercise its discretion and impose Rule 37 sanctions, the Court considers "'(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.'" *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) (quoting *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)). A showing of bad faith is not required for a court to impose Rule 37 sanctions. *Id.*

### A. Motion to Strike Inadmissible Evidence in Support of Defendants' Motion to Exclude Expert Testimony of Rodriguez

On March 11, 2019, the Viacom and Extreme Defendants moved to exclude the expert testimony of Plaintiffs' proposed expert witness Karen Rodriguez. (Dkt. 157; *see infra* Part IV.C). Defendants included a Declaration by Defendant Viacom's counsel, which had attached as Exhibit 9 a Declaration by Chris Woods, TuneSat's Chief Operating Officer, dated December 7, 2018 (the "Woods Declaration"). (Dkt. 159, Ex. 9). Plaintiffs move to strike the Woods Declaration as "highly prejudicial," arguing that, because it was obtained after discovery had been cut off and expert depositions had closed, the Plaintiffs did not have an opportunity to depose Woods regarding the Declaration. (Dkt. 180, at 1).

The Woods Declaration consists of slightly more than one page of double-spaced material, is signed under penalty of perjury, and is based on the personal knowledge and review

of relevant documents by Woods.  (Dkt. 159, Ex. 9, at 1–2).  Defendants contend in their motion

to exclude that Rodriguez incorrectly interpreted the TuneSat data, and provide the Woods

Declaration to show that "Rodriguez's fallacy has been conclusively confirmed by TuneSat

itself."  (Dkt. 158, at 9).  In the Defendants' view, Woods was properly identified in initial

disclosures, and there is no prejudice to the Plaintiffs because the Plaintiffs participated in

Woods' deposition and the Plaintiffs were aware of the purported error in Rodriguez's report,

and so the motion is without merit.  (Dkt. 220, at 2).

The Defendants' arguments are persuasive, and the Court declines to strike the Woods

Declaration.  Any prejudice to the Plaintiffs is minimal, as they were well aware of the

importance of the TuneSat data to their case.  Apart from their opportunities to depose Woods or

otherwise challenge this material, the Plaintiffs had adequate opportunity to respond to the

Woods Declaration in their own opposition to the motion to which it is attached as an exhibit.

### B.  Motion to Strike Inadmissible Evidence in Support of Defendants' Motion to Exclude Expert Testimony of Kohn

Plaintiffs move to strike particular exhibits—two consent decrees concerning ASCAP

and BMI—that were attached as Exhibit N to the Declaration of Ross Bagley ("Bagley

Declaration"), counsel for the Extreme Defendants, in support of the Defendants' motion to

preclude Kohn's expert testimony.  (Dkt. 146;  Dkt. 186, at 1).  They argue that the consent

decrees were not identified in the Defendants' Rule 26 disclosures or turned over in discovery.

(Dkt. 186, at 1).  The Plaintiffs also move to exclude a letter (the "BMI Letter") attached as

Exhibit Q to the Bagley Declaration, on the grounds that the letter's author is not a witness and

that the contents of the letter constitute hearsay.  (*Id.* at 2).  The Defendants oppose the motion.

(Dkt. 208, at 1).

### 1.  Consent Decrees

Exhibit N to the Bagley Declaration, which the Plaintiffs move to strike, consists of two consent decrees entered into with the U.S. Department of Justice.  (Dkt. 146, Ex. N).   The first was entered with the American Society of Composers, Authors and Publishers ("ASCAP") in 1941, and the second with BMI in 1966.  (*Id.*).

Plaintiffs' argument that Rule 26 imposed a duty on the Defendants to disclose the consent decrees in discovery is nonsensical.[3]  These decrees are not an "individual likely to have discoverable information," nor are they "documents, electronically stored information, and tangible things" that the Defendants had in their "possession, custody, or control."  Fed. R. Civ. P. 26(a).  Rather, these consent decrees are publicly available documents, and they have been for decades.  (Dkt. 208, at 3).  "It is well established that discovery need not be required of documents of public record which are equally accessible to all parties."  *S.E.C. v. Samuel H. Sloan & Co.*, 369 F. Supp. 994, 995 (S.D.N.Y. 1973).  Plaintiffs are right that one aim of the Federal Rules of Civil Procedure is to avert sandbagging and surprise tactics, but they cannot claim to have been blindsided by these matters of public record, especially when Plaintiffs' own proposed expert, Kohn, swore to awareness of them.  (Dkt. 208, at 3).

### 2.  BMI Letter

The BMI Letter is attached to the Bagley Declaration as Exhibit Q, is three pages long, and is dated June 1, 2018.  (Dkt. 146, Ex. Q, at 1–10).  The letter is addressed to Plaintiffs' counsel and contains BMI's attorney's response to questions regarding the PRO's cue sheet practices.  (*Id.* at 3).

---

[3] In fact, apart from a recitation of legal principles and the bare statement that "this document was never identified or disclosed," the Plaintiffs make no substantive argument as to why the decrees should be struck.  (Dkt. 186, at 2).

It is impossible to say that the BMI Letter comes as a surprise to the Plaintiffs or works any prejudice against them when the letter was written in response to inquiries from Plaintiffs' own counsel.  (Dkt. 208, at 9).  Plaintiffs admit that they received the letter and that it was at issue in BMI executive vice president Alison Smith's deposition, but argue it should still be excluded because "until the Plaintiffs received the Defendant's moving papers . . . Plaintiffs [did not] know that the Defendants intended to offer the letter as evidence in support of their motions."  (Dkt. 234, at 6; Dkt. 146, Smith Depo., Ex. I, at 166:1–175:16).  Rule 26 places certain disclosure requirements on parties, but not among them is a duty to keep one's adversary apprised of all elements of one's litigation strategy.  The BMI Letter was well known to the Plaintiffs, they had ample opportunity to familiarize themselves with it and raise it in relevant depositions, and Defendants had no special duty to give advance notice that they planned to offer it as an exhibit attached to the Bagley Declaration.

However, the Court finds the Plaintiffs' hearsay objection to the BMI Letter to be meritorious.  "Hearsay is an out-of-court statement that is offered to prove the truth of the matter asserted in the statement."  *United States v. Singh*, 726 F. App'x 845, 848 (2d Cir. 2018) (summary order); Fed. R. Evid. 801(c).  If the statement is made out of court but is "offered to prove relevant facts other than the truth of what was asserted in the statement," the statement is not hearsay.  *United States v. Johnson*, 529 F.3d 493, 500 (2d Cir. 2008).  The Plaintiffs contend the BMI Letter constitutes inadmissible hearsay.  (Dkt. 186, at 2; Dkt. 234, at 4–6).

Defendants respond that the letter is not offered as evidence of the truth of its contents, and rather "simply to illustrate the business context within which the parties and BMI acted during the time period discussed in the letter."  (Dkt. 208, at 7).  But it is difficult to see how the Defendants' context argument does not necessarily implicate content.  Further, the indicia of

"trustworthiness, materiality, probative importance, the interests of justice and notice" do not all

rise to the level required for the "residual" hearsay exception in Federal Rule of Evidence 807.

*Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991).  *See also United States v. Morgan*,

385 F.3d 196, 208 (2d Cir. 2004).  Plaintiffs' motion as to the BMI Letter is granted.

### C.  Motions to Strike Inadmissible Evidence in Support of Extreme and Viacom's Motions for Summary Judgment

Plaintiffs move to strike submissions made by Extreme in support of its summary

judgment motion.  (Dkt. 194, at 1).  Plaintiffs seek to strike virtually all of the declaration of

Donald Zakarin; to strike the declarations of Woods and Seth Saltzman in their entirety; and to

strike specified paragraphs in the declarations of Paul Katz, Barry Massarsky, Adam Taylor, and

Dan Pounder.  (*Id.*).

Plaintiffs separately move to strike submissions made by Defendant Viacom in support of

its summary judgment motion.  (Dkt. 203, at 1).  The Plaintiffs move to strike the declarations of

Woods and Seth Saltzman attached to the Declaration of Wook Hwang in support of the

Defendant's summary judgment motion.  (*Id.*).  Plaintiffs also move to strike a letter attached to

the Hwang Declaration as an exhibit.  (*Id.*).  The letter and Woods Declaration here are the same

ones on which the Court has already ruled, and those rulings apply here as well.  *See supra* Parts

III.A, III.B.2.

"An affidavit or declaration used to support or oppose a motion must be made on

personal knowledge, set out facts that would be admissible in evidence, and show that the affiant

or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

The Court may "strike portions of an affidavit that are not based upon the affiant's

personal knowledge, contain inadmissible hearsay or make generalized and conclusory

statements."  *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999), *abrogated on*

*other grounds by Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000).  Alternatively, the Court

may "simply 'decline[] to consider evidence' from the inadmissible declarations" without

granting the motion to strike.  *Seife v. F.D.A.*, 17-CV-3960, 2019 WL 1382724 (JMP), at *1

(S.D.N.Y. Mar. 27, 2019) (quoting *Fabrication Enters., Inc. v. Hygenic Corp.*, 64 F.3d 53, 59 n.5

(2d Cir. 1995)).

     "A district court deciding a summary judgment motion 'has broad discretion in choosing

whether to admit evidence.'"  *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d

244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997)).  Here, the

Court sees nothing to be gained in ruling on striking or not striking the declarations when it can

simply exercise its discretion and consider only admissible evidence when deciding the summary

judgment motions they are offered to support.[4]  *See Seife*, 2019 WL 1382724, at *2; *Martin v.

Town of Westport*, 558 F. Supp. 2d 228, 231 (D. Conn. 2008) ("[T]he court knows the difference

between admissible and non-admissible evidence.").  The Court therefore reserves its decision

regarding the admissibility of these declarations to its consideration of the summary judgment

motions.

### IV.    Motions to Exclude Experts

#### A.  Standard

     "A witness who is qualified as an expert by knowledge, skill, experience, training, or

education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific,

---

[4] There appears to be a difference in views among the district courts of this Circuit concerning whether motions to strike declarations offered in support of summary judgment motions must be decided before the summary judgment motions themselves.  *Compare Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 213 (S.D.N.Y. 2007) ("[I]t is appropriate to consider the Motion to Strike prior to the Motion for Summary Judgment.") *with Ferraresso v. Town of Granby*, 646 F. Supp. 2d 296, 301 (D. Conn. 2009) ("The Federal Rules of Civil Procedure do not explicitly allow motions to strike in the context of summary judgment.").

technical, or other specialized knowledge will help the trier of fact to understand the evidence or

to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the

testimony is the product of reliable principles and methods; and (d) the expert has reliably

applied the principles and methods to the facts of the case."  Fed. R. Evid. 702;  *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).

"An expert may base an opinion on facts or data in the case that the expert has been made

aware of or personally observed."  Fed. R. Evid. 703.  "If experts in the particular field would

reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need

not be admissible for the opinion to be admitted."  *Id.*  Judges' "gatekeeping obligation" under

*Daubert* applies to all expert testimony.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147

(1999).

The presumption under the Federal Rules of Evidence is that relevant evidence is

admissible.  Fed. R. Evid. 402.  Evidence is relevant when it "has any tendency to make a fact

more or less probable than it would be without the evidence," and pertains to a "fact . . . of

consequence in determining the action."  Fed. R. Evid. 401.  "Vigorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509

U.S. at 596.  In carrying out the "flexible inquiry" set out by *Daubert*, the "court must focus on

the principles and methodology employed by the expert, without regard to the conclusions the

expert has reached or the district court's belief as to the correctness of those conclusions."

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

### B.  Kohn's Expert Testimony

The Viacom and Extreme Defendants collectively move to exclude the opinion and testimony of Plaintiff's proposed expert witness Kohn[5] pursuant to Federal Rules of Evidence 702 and 703 and *Daubert*.  (Dkt. 144, at 1).  The Plaintiffs oppose the motion.  (Dkt. 181).

It is certainly true that "unlike an ordinary witness . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592.  This "relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline."  *Id.*

Kohn describes his task in his expert report as "supplement[ing] the record with music industry customs and practices" and "interpret[ing] the meaning of several key provisions of the contracts underlying this action and show[ing] how, in light of the existing evidence, the defendants have misinterpreted those provisions and failed to perform their contractual obligations."  (Dkt. 146, Ex. A, at 5).

The thrust of Kohn's argument, and the source of his testimonial value to the Plaintiffs, is to invite the Court to look beyond the plain terms of the 2011 Agreement on the basis that custom and practice in the music industry imposed a series of obligations on Extreme and Viacom regarding their submission of cue sheets to BMI, and that the Defendants' failure to comply with those alleged norms constitutes a breach of the contract.  (*Id.* at 10).  Primarily, he

---

[5] Kohn is an attorney licensed in California who has practiced in the music and entertainment industries for nearly four decades. (Dkt. 146, Ex. A, at 1–2).  He is the co-author with his father of *Kohn on Music Licensing*, an 1,800-page treatise that was first published in 1992 and has gone through four editions.  (*Id.* at 1–4).  Kohn holds an LL.M degree from Columbia Law School, and previously provided expert testimony in connection with cases involving the recording artists Jay-Z, Katy Perry, and Rick Ross.  (*Id.*).

opines that "[d]uring discovery, Viacom and Extreme [] disavowed their obligation to review and correct inaccurate cue sheets," and "it is the custom and practice of music publishers to review cue sheets for accuracy and correct any mistakes." (*Id.*).

All of the material Kohn says he reviewed in anticipation of his expert testimony was prepared or produced in connection with this case, *id.* at 88–92, and there is no indication of how he arrived at the conclusion that the purported customs or practices exist. The Defendants contend that he cannot provide background materials substantiating such a custom or practice because there in fact is no such custom or practice. The Defendants further assert that Kohn's sole substantive contact with the business of production music libraries was that his uncle ran one in the 1980s. (Dkt. 145, at 4–5; Dkt. 146, Kohn Depo., Ex. B, at 19:10–24:25).

It is difficult to separate outright advocacy from purported expertise in Kohn's report, especially where he makes statements such as that "the evidence is clear," or that such-and-such a proposition is "confirmed by the evidence in this case," or where he makes legal statements regarding "the essence of a contract." (Dkt. 146, Ex. A, at 46–47, 58–59). At one point, Kohn writes: "It is not for me to opine on the quality of the legal advice that Viacom and Extreme are getting . . . except to point out what the State of New York says on the subject." (*Id.* at 58–59). At other moments, his report reads even more like a brief, complete with statements of legal principles supported by citations to caselaw. (*Id.* at 59).

Kohn spends long portions of his offered report going through contract interpretation exercises that are wholly matters of law and the province of the Court, and which certainly are not "reliable expert testimony that will assist the trier of fact." *Amorgianos*, 303 F.3d at 267. None of this has any "'tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

evidence.'" *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (quoting Fed. R. Evid. 401).

Not only is this an intrusion on the work of the Court and the Parties' counsel, but the nature of Kohn's proffered testimony makes it impossible to properly apply the test laid out by the Supreme Court in *Daubert*.  Certainly, he appears qualified to practice in his chosen corner of the law.  But apart from his résumé, Kohn provides no reasoning or methodology that the Court can test for its reliability, applies no theory or technique that has been subjected to peer review, and otherwise gives the Court no way to assess the "evidentiary relevance and reliability . . . of the principles that underlie [his] proposed submission." *Daubert*, 509 U.S. at 594–95.  Kohn says his knowledge of the supposed customs and practices to which he would testify is derived from having "seen production music library licenses over time in connection with studying and getting information from my father," from perhaps "at one point or another" having sat on a panel with the defense expert, and "discussions that I've had with my Uncle Roy."  (Dkt. 146, Ex. B, at 59:8–61:25).  The entirety of the Plaintiffs' defense of Kohn's "methodology" is to reassert that his "opinions are based on his education, training, and experience as well as a thorough review of the evidence in this case."  (Dkt. 181, at 4–5).  While it is not required that an expert's opinion be based on "firsthand knowledge," here there is no reason to believe Kohn's opinion is grounded on a "reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592.  His report certainly does not display the "sufficiently rigorous analytical connection between the expert's methodology and conclusions" demanded by Rule 702; *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016).  *See also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 137 (1997); *Amorgianos*, 303 F.3d at 266 (stating that an

expert opinion may be properly excluded where it "is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached.").

For all these reasons, Kohn's expert report does not meet the baseline of admissibility set by Rule 702, 703, and *Daubert*, and the motion to preclude his expert testimony is granted.

### C. Rodriguez's Expert Testimony

The Viacom and Extreme Defendants also together move to exclude the report and testimony of the Plaintiffs' proposed expert witness Karen Rodriguez.[6]  (Dkt. 157).  The Plaintiffs oppose the motion.  (Dkt. 176).

Rodriguez drew on TuneSat data provided in a spreadsheet by the company and BMI Royalty statements provided by the Plaintiffs to come up with an estimate of the number of public performances for which she says the Plaintiffs were not paid, and the damages allegedly due.  (Dkt. 159, Ex. 1, at 3–4).

Rodriguez opines in her report that the Plaintiffs are due just under $3 million in unpaid public performance royalties.  She arrives at this number by multiplying the 142,246.40 minutes of publicly broadcasted music for which she claims the Plaintiffs were not paid by $11.99, an amount she derived from the BMI statements provided to her by the Plaintiffs, to find $1.7 million in unpaid domestic uses in broadcasts between January 1, 2013 and December 31, 2017. (*Id.* at 4–5).  She then further calculated $641,674.92 in unpaid U.S. public performance royalties

---

[6] Rodriguez has worked in the business of music publishing administration and royalties for over 26 years and has held positions in royalty analysis at the Walt Disney Company and BMI.  (Dkt. 159, Ex. 1, at 2). She has a bachelor's degree in economics and a minor in music from Indiana University and a certificate in executive management from the University of California, Los Angeles Anderson School of Management.  (*Id.*).  She has served on the board of directors for the Association of Independent Music Publishers.  (*Id.*).

between January 2010, 2010 and December 31, 2012, and an additional $645,373.21 in unpaid

foreign public performance royalties for the same period.  (*Id.* at 5).

In total, Rodriguez calculates $2,992,821.62 in unpaid public performance fees,

$3,181,600.00 in unpaid licensing fees, and $2,024,33.08 in prejudgment interest, opining that

Plaintiffs are owed $8,198,754.70 for the Defendants' misuse of their music.[7]  (*Id.*).

The Defendants attack every step in Rodriguez's analysis, but most critically, they state

that she misreads the TuneSat data underlying all of her testimony by reading the "usage

column" on the TuneSat spreadsheet as a number by which each individual row must be

multiplied, rather than as a summation of the total number of detections, each represented by a

row.  Rodriguez finds what the Defendants say is a vastly overinflated count of more than

---

[7] Extreme avers that, at most, discovery has revealed less than $1,000 in unpaid fees due the
Plaintiffs resulting from "a tiny number of human errors," and that in some instances Plaintiffs
were paid for songs they did not write.  (Dkt. 149, at 22).

600,000 individual detections[8] of the Plaintiffs' songs, as opposed to the 16,684 detections that Defendants say comes with a proper reading of the data.[9]  (Dkt. 158, at 2).

The Defendants vigorously contest the conclusions Rodriguez draws from the TuneSat data, but, unlike Kohn's proposed testimony, Rodriguez's report and testimony draw on "principles and methodology" that the Court can discern and evaluate.  *Daubert*, 509 U.S. at 595. While the data Rodriguez draws on may not say what she thinks it says, as the Defendants contend, this Court is only to consider whether her proposed testimony "rests on a reliable foundation and is relevant to the task at hand."  *Id.* at 597.  The methodology deployed here appears to be mostly grade school multiplication and addition and is within the ken of the Court.

The motion to exclude Rodriguez's expert testimony is denied.

_____

[8] Robert Marderosian states in his sworn declaration that he and his brother "over the past three years . . . have listened to each and every Tune[S]at audio detection clip of each broadcast to confirm each detection represented our music and that there [were] no 'errant' detections." (Decl. R. Marderosian, Dkt. 198 ¶ 19).  The Defendants argue that such an enterprise, based on the Plaintiffs' number of purported detections, would take approximately 100 continuous days of listening.  (Dkt. 166, at 20).

[9] Viacom submits a sworn and signed affidavit from TuneSat COO Chris Woods in support of its summary judgment motion, the aforementioned Woods Declaration, in which Woods clarifies that the Plaintiffs misinterpret the "usage count" column of the spreadsheet identifying detections of their songs. (Dkt. 167, Ex. 33, at 1–2).  The Court separately ruled on the admissibility of the Woods Declaration on the motion to strike by the Plaintiffs.  (*See supra* Part III.A).  Woods' affidavit makes clear that the Plaintiffs' method of multiplying each detection by this "usage count" leads to an erroneous and highly inflated number of purported detections.  (*Id.*).  The declaration of Extreme executive vice president Dan Pounder, submitted on the earlier motion to dismiss, that Plaintiffs cite to parry the Woods Declaration supports none of the assertions regarding "usage count" put forward by the Plaintiffs.  (Dkt. 85 ¶ 7;  Pls. 56.1 Counter., Dkt. 197 ¶ 67;  Dkt. 227 ¶ 67).

V.     **Summary Judgment Motions**

   A. **Standard**

     1. **Summary Judgment Standard**

The Court may grant summary judgment where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When, "after adequate time for discovery and upon motion . . . a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," entry of summary judgment is mandated. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "All ambiguities must be resolved in favor of the non-moving party and all permissible inferences from the factual record must be drawn in that party's favor." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

The determination of which facts are "material" is driven by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. "[I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* A fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Id.* Where "the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true," summary judgment must be granted. *Daubert*, 509 U.S. at 596.

"When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Simsbury-Avon Pres. Club v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). The non-movant then "must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor," *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467–68 (S.D.N.Y. 2011), and may not simply gesture toward "'some metaphysical doubt as to the material facts.'" *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

To survive the Defendants' summary judgment motions, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252.

### 2.   Breach of Contract Standard

#### a.   Breach of Contract

A breach of contract is made out under New York law where there is "'(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.'" *Int'l Techs. Mktg. v. Verint Sys.*, 157 F. Supp. 3d 352, 360 (S.D.N.Y. 2016) (quoting *Rexnard Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994)). "The fundamental, neutral

precept of contract interpretation is that agreements are construed in accord with the parties'

intent." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002).

"Whether or not a writing is ambiguous is a question of law to be resolved by the courts."

*W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990).  Parties may not submit

extrinsic evidence of their intent "to create an ambiguity in a written agreement which is

complete and clear and unambiguous upon its face." *Id.* at 163 (quoting *Intercontinental

Planning v. Daystrom, Inc.*, 24 N.Y.2d 372, 379 (1969)).  A contract "is unambiguous if the

language it uses has a definite and precise meaning, as to which there is no reasonable basis for a

difference of opinion." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir.

2011).

### b.  Implied Covenant of Good Faith and Fair Dealing

A covenant of good faith and fair dealing is implied in all contracts under New York law.

*Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 298–99 (S.D.N.Y. 2012).  "This covenant

embraces a pledge that 'neither party shall do anything which will have the effect of destroying

or injuring the right of the other party to receive the fruits of the contract.'" *Twelve Sixty LLC v.

Viacom Int'l Inc.*, 18 Civ. 93 (NRB), 2019 WL 1331716, at *2 (S.D.N.Y. Mar. 25, 2019)

(quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)), *aff'd*, 787 F. App'x 50, 51

(2d Cir. 2009) (summary order).  The implied covenant provides important protections and

assurances to contracting parties.  For example, "[w]here the contract contemplates the exercise

of discretion," the implied covenant "includes a promise not to act arbitrarily or irrationally in

exercising that discretion." *Dalton*, 87 N.Y.2d at 389.

But this implied covenant is not unbounded.  "No obligation can be implied . . . which

would be inconsistent with other terms of the contractual relationship." *Murphy v. Am. Home*

*Prods. Corp.*, 58 N.Y.2d 293, 304 (1983).  On a claim of breach of the implied covenant, it "is not the function of the courts to remake the contract agreed to by the parties," and the covenant only embraces "promises which a reasonable person in the position of the promisee would be justified in understanding were included."  *Rowe v. Great Atl. & Pac. Tea Co.,* 46 N.Y.2d 62, 69 (1978) (quoting 5 Williston Contracts § 1293 (rev. ed. 1937)).

## B. Application

### 1. Breach of Contract

The Plaintiffs' arguments against summary judgment are frequently disorganized, hardly stating, as concerns their breach of contract claim, which specific contractual clause or provision is alleged to have been breached.[10]  *See Gianelli v. RE/MAX of N.Y., Inc.*, 41 N.Y.S. 3d 273, 274 (N.Y. App. Div. 2016) ("A breach of contract cause of action fails as a matter of law in the absence of any showing that a specific provision of the contract was breached.").  Their Responses to the Defendants' summary judgment motions mention § 7.3 of the 2011 Agreement once, but only argue breach of that section by Extreme.  (Dkt. 187, at 9; Dkt. 196, at 9).  The Court is left to conclude, therefore, that inasmuch as the Plaintiffs may have pursued a breach of contract claim against Viacom, that claim has been abandoned.

The Plaintiffs argue that § 7.3, which specifies that blanket licensing income would be apportioned on a "fair, reasonable, and practicable basis," was breached because Extreme allegedly employed a different method of apportionment that improperly "allocate[d] blanket license revenue based on the total number of songs a composer has in a library compared with the total number of songs in the library." (Dkt. 187, at 9).  They argue that Extreme's CEO has

---

[10] The Plaintiffs start their Opposition Memorandum to Extreme's summary judgment motion with a list of eight "facts that cannot be disputed," all of which are either allegations or, where factual, are immaterial.  (Dkt. 187, at 1–2).

"thousands" of his own songs in the library, "skewing the allocation in his favor." (*Id.*).  There is

a factual dispute as to the number of songs Extreme's CEO had in the library, and the alleged

retitling of songs, and the effect this had, if any, on the apportionment of income.  (Pls. 56.1

Counter., Dkt. 197 ¶¶ 78–83; Dkt. 227 ¶¶ 78–83).

      However, even if the Extreme Defendants did choose to apportion blanket licensing

income in the manner the Plaintiffs describe, it would not constitute a breach of the 2011

Agreement.  Section 7.3's terms reserve the manner of apportionment to Extreme's "sole

discretion." (Dkt. 49, Ex. 3, at § 7.3).  There is no evidence Extreme's chosen method of

apportionment exceeded that discretion.  *See British Int'l Ins. Co. Ltd. v. Seguros La Republica,*

*S.A.*, 342 F.3d 78, 82 (2d Cir. 2003) ("A party relying on ambiguity is normally obligated to

show that a word, phrase, or provision could suggest more than one meaning.") (internal

quotation marks omitted).  The Plaintiffs also allege they are entitled to a portion of what

Viacom should have paid for its uses of the Plaintiffs' works, but the 2011 Agreement is clear

that Plaintiffs are only entitled to fees Extreme receives from "third party" licensees, and Viacom

is not a third party.  (Dkt. 49, Ex. 3, at § 1.4).

      The Plaintiffs have advanced no evidence suggesting that the language of § 7.3 has

anything other than a "definite and precise meaning" that is "unambiguous on its face," and so

the Court is not permitted to look behind the contract language and inquire as to customs and

practices in search of meaning.  *Lockheed Martin Corp.*, 639 F.3d at 69.  *See also Thompson v.*

*Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990) ("The mere assertion of an ambiguity does not suffice

to make an issue of fact.").  In the absence of ambiguity, the 2011 Agreement "must be enforced

according to the plain meaning of its terms." *Id.*  It is therefore proper to grant summary

judgment in favor of Extreme on the breach of contract claim.

2. **Breach of Implied Covenant of Good Faith and Fair Dealing**

   i. **Extreme**

The Plaintiffs argue that Extreme's discretion to apportion the blanket licensing income was exercised arbitrarily or irrationally, or that it otherwise interfered with the Plaintiffs receiving the benefit of their bargain, in violation of the implied covenant of good faith and fair dealing. (Dkt. 187, at 14). In support of this argument they point primarily to two state-law cases from California to support their contention that the Defendant's method of allocation is impermissible as a matter of law. (Dkt. 187, at 15). Neither of those cases is persuasive here, and anyway neither of them constitutes the law of the state of New York, which governs under the forum-selection clause in the 2011 Agreement. It would be inappropriate for this Court to look to California law as persuasive when applying New York law, even if it were so inclined. *See New York v. Nat'l Serv. Indus.*, 460 F.3d 201, 210–11 (2d Cir. 2006). As with their breach of contract claim, the allegedly unfair conduct the Plaintiffs point to is that the Extreme CEO had some number of his own songs in the music library.[11] (Dkt. 187, at 9).

But this alleged conduct would do nothing, even if true, to make out a claim for breach of the implied covenant of good faith and fair dealing against Extreme with regard to its blanket license allocation practices. As the Court found above, Plaintiffs have put forward no evidence suggesting § 7.3 is ambiguous, and Extreme did not act outside that section's language. Extreme had discretion to select its allocation method, and Plaintiffs do not dispute that they received the blanket license fees to which they were entitled under the scheme Extreme chose. Plaintiffs have offered no evidence showing that Extreme, in exercising the discretion afforded it by the explicit

---

[11] Plaintiffs' assertion that Extreme's CEO diverted 56 percent of blanket licensing income to himself is wholly based on the surmise of Plaintiffs' (excluded) proffered expert Kohn and is entirely without support in the factual record. (Pls. 56.1 Counter., Dkt. 197 ¶¶ 118, 120).

terms of § 7.3, "destroy[ed] or injur[ed] the right of the other party to receive the fruit of the contract." *Twelve Sixty LLC*, 2019 WL 1331716, at *2. Plaintiffs have failed to establish any genuine issue of material fact suggesting that they were deprived of any bargained-for fruit to which they had a reasonable expectation.

The Plaintiffs' argument that Extreme was underpricing the licenses runs up against the contractual and commercial reality that, if Extreme was shortchanging the Plaintiffs, it was also shortchanging itself. This is because, under the 2011 Agreement, Extreme shared in the money received when it licensed the Plaintiffs' songs. (Dkt. 49, Ex. 3, at § 7.3). Plaintiffs have offered no evidence to show that Extreme was engaged in "bad-faith targeted malevolence in the guise of business dealings" amounting to a breach of the implied covenant of good faith and fair dealing when the pricing equally affected both it and the Plaintiffs. *19 Recordings Ltd. v. Sony Music Entm't*, 165 F. Supp. 3d 156, 161 (S.D.N.Y. 2016). The Plaintiffs have not produced any evidence showing that Extreme licensed their music at below market rates, and instead they simply "presum[e]" that Extreme must have been doing so to its own benefit. (Dkt. 187, at 20). Such presumptions are not genuine issues of material fact.

There is also no genuine issue of material fact to sustain a claim for breach of the implied covenant in regard to the writer's share of public performance income under § 7.4 of the 2011 Agreement. (Dkt. 187, at 20). The Plaintiffs have not put forward any evidence establishing that Extreme's submission, correction, review, or other practices involving cue sheets in any way interfered with Plaintiffs' contractual rights, or that Extreme otherwise had an enforceable duty under the law to monitor and supervise the submission of cue sheets by broadcasters.

Lastly, the Plaintiffs in opposition to summary judgment seek to revive their dismissed fraud claims, alleging that Extreme impermissibly changed the titles of songs and altered

metadata to redirect income to itself, thereby breaching the implied covenant of good faith and fair dealing.  (Dkt. 89, at 7–10; Dkt. 187, at 21–22).  All the materials adduced to support these contentions contain merely assertions of wrongdoing, not evidence that Plaintiffs were deprived of a bargained-for benefit.  (*See* Pls. 56.1 Counter., Dkt. 188 ¶¶ 78–79; R. Marderosian Decl., Dkt. 189, ¶¶ 32–38; Kohn Decl., Dkt. 191, ¶¶ 79–113).

### ii.  Viacom

The Plaintiffs also assert a remaining claim for breach of the implied covenant of good faith and fair dealing against Viacom, which they allege was breached when Viacom failed to submit cue sheets for all its uses of the Plaintiffs' songs.  They also allege Viacom breached by failing to require, review, and correct those cue sheets, and that it improperly used the Plaintiffs' songs "for free."  (Dkt. 196, at 16–20).  The first and second bases for a breach presuppose that Viacom was a party to the Agreement—which the Parties have stipulated it was—whereas the third requires, in the Plaintiffs' words, that Viacom is "obviously a third party" that has improperly accessed the songs without payment.

Summary judgment for Viacom can readily be granted on the third basis for a breach of the implied covenant of good faith and fair dealing because, as discussed *supra* Part II, the Parties have stipulated that Viacom assumed all rights and obligations of the 2011 Agreement. No matter what the Plaintiffs' factual contentions, Viacom cannot simultaneously be a third party

to that same Agreement; the Plaintiffs acknowledge as much when they admit "the fact that the Plaintiffs' Agreement was with Viacom."[12]  (Pls. 56.1 Counter., Dkt. 197 ¶ 54; Dkt. 227 ¶ 54).

As to the first and second grounds for a breach, Plaintiffs contend that they could only get their writers' share of the public performance income as provided for in the 2011 Agreement if Viacom submitted a cue sheet to BMI accurately reporting the use of one of the Plaintiffs' songs. (Dkt. 196, at 16).  There is another factual dispute here, with the Plaintiffs contending that thousands of cue sheets went unsubmitted, while Viacom says that cue sheets were not filed for only four programs  (Dkt. 196, at 17; Dkt. 226, at 7–8).  As with Extreme's license pricing, Viacom's interests were aligned with the Plaintiffs here, because it too only received its share of the BMI royalties if the cue sheets were properly filed.  But again, whatever the number of cue sheets that were or were not submitted, the Plaintiffs have failed to point to any evidence showing that Viacom violated any legal obligation under the Agreement to police the cue sheets in the manner Plaintiffs suggest.

There is dicta in one case in this District (with the same Plaintiffs and Defendant) that suggests such a duty.  *Twelve Sixty LLC*, 2019 WL 1331716, at *2.  That case's treatment of the issue was cursory at best, was not a holding, apparently relied on a representation by Plaintiffs' counsel regarding a non-party's business practices, and cites no sources of law.  *Id.*  But absent any evidence from the Plaintiffs suggesting such a duty, and that the Defendant violated it in

---

[12] Plaintiffs regularly switch their stance on Viacom's status when it is useful to one of their claims, at another point in their Counterstatement of Additional Material Facts deciding that "Viacom was not a party to the 2011 Agreement."  (Dkt. 197 ¶ 128).  Elsewhere, they say that "there has never been a document produced which reflects" Viacom's assumption of rights and responsibilities.  (Dkt. 187, at 3; Dkt. 196, at 4).  Whatever the reason for the Plaintiffs' changing characterizations, the Parties conclusively resolved for themselves in their December 2018 Stipulation, signed by counsel for both the Plaintiffs and the Defendants, that all of the rights and obligations under the 2011 Agreement were transferred and assigned to both Viacom and Extreme.  (Dkt. 140, at 2).

contravention of Plaintiffs' reasonable expectations, the Court must enter summary judgment in favor of the Defendant.  Plaintiffs could have contracted for the protections they now seek, but did not.  *See Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455, 479 (S.D.N.Y. 2007) ("Plaintiffs here seem to be attempting to create new contractual rights that they did not previously bargain for.").  This is not a case where a duty of best efforts must be implied by the Court to prevent the contract from failing as illusory.  *See, e.g.*, *CCM Rochester, Inc. v. Federated Inv'rs, Inc.*, No. 14-CV-3600 (VEC), 2014 WL 6674480, at *6 n. 10 (S.D.N.Y. Nov. 25, 2014).  The Plaintiffs have provided no evidence of the custom and practice the existence of which they allege, and so there is no way a finder of fact could conclude that "a reasonable person in the position of the promisee would be justified in understanding" that such practices were part of the 2011 Agreement sufficient to sustain a claim under the implied covenant of good faith and fair dealing.  *Rowe*, 46 N.Y.2d at 69.

But even if this Court were to assume that there is such a duty or set of duties (which it does not), and that Plaintiffs had a reasonable expectation to a benefit of which they were deprived (which is also does not), the entirety of Plaintiffs' argument rests on a supposed discrepancy between the number of cue sheets Viacom attests to, and the number of "detections" supplied by Plaintiffs' interpretation of the TuneSat data.

This data, read in the light most favorable to the Plaintiffs, is at best "merely colorable" and is "not significantly probative" such that it could constitute "sufficient evidence" permitting a jury to return a verdict for the Plaintiffs at trial.  *Liberty Lobby*, 477 U.S. at 249–50.  Even accepting the Plaintiffs' interpretation as correct, they have not advanced admissible evidence showing that an act or omission of Viacom is responsible for the misuses they allege.  This is not an instance in which "reasonable minds could differ as to the import" of the TuneSat data put

30

forward by the Plaintiffs; rather, it is clear that no "fair-minded jury could return a verdict for the [Plaintiffs]" on the basis of the TuneSat data. *Id.* at 251–52.

## CONCLUSION

After three and a half years of litigation, attempts at mediation, and more than 5,000 pages submitted on the motions considered in this Opinion alone, the Plaintiffs have failed to raise a single genuine issue of material fact such that a reasonable factfinder could decide in their favor on their remaining breach of contract claims at trial. What remains are "'conclusory statements, conjecture, [and] speculation'" that are insufficient to defeat summary judgment. *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) (quoting *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996)).

The motion to strike evidence in support of Viacom's motion to exclude Rodriguez's expert testimony and the motion to exclude Rodriguez's expert testimony are both DENIED. The motion to strike evidence in support of the Defendants' motion to exclude Kohn's expert testimony is GRANTED in part and DENIED in part. The motions to strike evidence in support of the motions for summary judgment are dismissed as moot. The motion to exclude Kohn's expert testimony is GRANTED. The Defendants' motions for summary judgment are GRANTED.

The Clerk of Court is directed to close the motions at Dockets 144, 147, 157, 160, 161, 179, 180, 185, 186, 194, 195, 203, and 204, and to close the case.


Dated: New York, New York
     May 26, 2020

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge